## AFFIDAVIT OF NEW HAMPSHIRE STATE POLICE
## TROOPER JAMES R. NORRIS

Your affiant, being duly sworn, does depose and state the following:

## I. INTRODUCTION

A.   Your affiant, Trooper James R. Norris, has been a Trooper with the New Hampshire State Police ("NHSP") for over 10 years and a sworn law enforcement officer in the State of New Hampshire for approximately 12 years.    In May 2013, I was deputized as a Federal Task Force Officer ("TFO") by the Drug Enforcement Administration ("DEA") for the purpose of this investigation.    As a police officer in the State of New Hampshire and as a TFO, I have participated in numerous investigations involving the unlawful distribution of controlled substances and have served as the affiant in support of numerous search warrants which have resulted in the seizure of controlled substances.    I have also attended multiple specialized trainings related to narcotics trafficking and have become familiar with the methods used by individuals engaged in the distribution of controlled substances.

B.   On the basis of the following information, I believe that there is probable cause to believe that the following individuals:

(1)
KOSMAS KOUSTAS,

(2)
ALKIS NAKOS,

(3)
DEAN SIEGER,

Rutland, Massachusetts

(4)
JUAN RODRIGUEZ SANCHEZ,

(5)
CHARLES FOWLE,

(6)
FRANK FOWLE,

(7)
JEREMY BLEVENS,

(8)
CHRISTOPHER RANFOS,

(9)
KRISTOPHER VENTURINI,

(10)
WILLIAM SWANSON,

(11)
MARC GUILLEMETTE,

(12)
JOHN HORNE, JR.,

(13)
MICHAEL GRAYDON,

have engaged in violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances); 21

U.S.C. § 841(a)(1) (distribution of controlled substances and possession with intent to distribute

controlled substances); and 21 U.S.C. § 843(b)(use of a communication facility to facilitate the

distribution of controlled substances).

C.   The statements contained in this Affidavit are based on information provided by

personnel of the NHSP and other law enforcement agencies and on my experience and training as

a Trooper with the NHSP.   In addition, the information contained in this Affidavit is based on

information provided by three (3) confidential informants, CI # 2, CI # 3, and CI # 4, and a

confidential source.   The information provided by the confidential informants and the

confidential source has been found to be reliable and has been corroborated by law enforcement.

II.   **FACTS**

A.     **Background**

1.      In March 2008, members of the Oklahoma State Police stopped a Toyota Tundra, being driven by BRANDON ANDERSON and containing a New Hampshire registration, in El Reno, Oklahoma, for a motor vehicle violation.     A search of the vehicle resulted in the seizure of $2,001,550.00 in United States currency in vacuum-sealed bags which were secreted in the door panels and rear wall of the vehicle.     ANDERSON cooperated briefly with law enforcement[1] and advised that the currency represented proceeds from the distribution of controlled substances, which he had agreed to transport from New Hampshire to California.     ANDERSON also indicated that he received directions from "Buddy," subsequently identified by law enforcement as JEFFREY COLGROVE, a Canadian citizen, and "Goofy," subsequently identified by law enforcement as STEVEN SARTI, also a Canadian citizen.

2.      An investigation conducted by the Drug Enforcement Administration ("DEA") following the seizure revealed the presence of a Drug Trafficking Organization ("DTO") centered in Canada and run by COLGROVE which was responsible for the transportation of large quantities of marijuana into the United States.     The proceeds of the marijuana distribution would then be transported to Canada and California.     The currency transported to California was done in order for the DTO to obtain multi-kilogram quantities of cocaine, which would then be transported back to New Hampshire and thereafter smuggled into Canada.

3.      The investigation revealed that the marijuana supply side of the DTO was led by MIHAIL LEVENTIS, a Canadian citizen.     LEVENTIS directed individuals to transport

---

[1] Although ANDERSON provided a statement to law enforcement on March 5, 2008, he stopped cooperating with law enforcement shortly thereafter.

marijuana from within Canada to the border of the United States and Canada.   Once the marijuana arrived inside the United States, the distribution responsibilities were led by SARTI.

4.      The investigation disclosed that the DTO utilized various methods with which to deliver the marijuana into the United States, including the use of couriers who traveled by foot across the border.     The investigation also demonstrated that the DTO employed numerous individuals to deliver the marijuana and transport the proceeds of the marijuana distribution back into Canada.   If the marijuana was transported into the United States by foot, the couriers stored the marijuana at various stash houses in New Hampshire, New York, including Indian Reservations located in upstate New York, and Vermont until such time as the marijuana could be transported to its ultimate destination by use of a rented vehicle, a vehicle containing a hide, or a tractor trailer.   All marijuana destined for distribution in New Hampshire was packaged in large, black hockey bags and typically labeled "NH."

5.      In June 2009, law enforcement executed a search warrant at two stash houses, one located in Canaan, Vermont, and another located in Sutton, Vermont.   A member of the DTO was found and arrested at one of the stash houses.   Following arrest, the member of the DTO, a confidential source ("CS"), cooperated with law enforcement and identified ALKIS NAKOS as the intended recipient of all marijuana which was smuggled into the United States from Canada and labeled "NH."   The CS, who identified NAKOS from a photograph provided by law enforcement, also revealed that NAKOS was a resident of Manchester, New Hampshire, who met LEVENTIS in 2006 while the two served a term of incarceration at the New Hampshire State Prison in Concord, New Hampshire.[2]

_____

[2]Records obtained from the New Hampshire States Prison have confirmed that LEVENTIS and NAKOS were housed at the New Hampshire State Prison together from July 2005 through August 2005.   According to information provided by officials at the New Hampshire State Prison, NAKOS was sentenced to a 5-10 year term of imprisonment on January 13, 1998, for the distribution of a narcotic drug and felonious use of a firearm.   LEVENTIS was sentenced on April 13, 2004, to a 3 ½ - 20 year term of incarceration for the possession, distribution and manufacture

6.      The CS informed law enforcement that NAKOS received approximately 100 – 200 pounds of marijuana each week from the organization during the approximate period of June 2008 through June 2009.   The CS also stated that the price of the marijuana ranged from $2,300.00 - $3,700.00 in United States currency for each pound, that the DTO was responsible for the shipment of approximately 4000 - 7000 pounds of marijuana to "NH," and that approximately $3,000,000.00 - $5,000,000.00 in marijuana proceeds were obtained from "NH" during an approximate one (1) year period of time.

7.      Although numerous individuals were arrested and prosecuted for drug-related offenses in 2009 and 2010, ALKIS NAKOS, and many individuals associated with him, have not been apprehended, and it is believed that NAKOS, along with additional DTO members located in New Hampshire, Massachusetts, Vermont, New York, and Canada, continue to engage in the distribution of marijuana, a schedule I controlled substance.   It is further believed that NAKOS and KOSMAS KOUSTAS obtain marijuana for distribution from DEAN SIEGER ("SIEGER"), who distributes marijuana from a residence in the area of Worcester and Millbury, Massachusetts, and serves as a middleman or courier for the Canadian DTO.      Likewise, it is believed that KOUSTAS' connection with the DTO was initiated through ALKIS NAKOS, and that after KOUSTAS obtains marijuana from SIEGER through NAKOS, the marijuana is then distributed in New Hampshire to numerous individuals, including, but not limited to, CHARLES FOWLE, FRANK FOWLE, MARC GUILLEMETTE, JEREMY BLEVENS, CHRISTOPHER RANFOS, ROBERT VARGAS, WILLIAM SWANSON, KRISTOPHER VENTURINI, and JOHN HORNE.    It is further believed that in addition to engaging in the distribution of marijuana, KOUSTAS obtains quantities of what is believed to be MDMA, a schedule I controlled substance,

---

of marijuana.    NAKOS and LEVENTIS were housed in medium custody at the New Hampshire State Prison during the period of July 2005 through August 2005.

and then distributes the controlled substance to JEREMY BLEVENS and CHARLES FOWLE. Finally, it is believed that KOUSTAS obtained a quantity of cocaine, a schedule II controlled substance, from JUAN RODRIGUEZ SANCHEZ which he intended to distribute in the District of New Hampshire.

   B.      **The Investigation**

   1.      The DEA and NHSP focused their investigation of NAKOS and KOUSTAS in 2012.    In November and December, 2012, law enforcement obtained the assistance of a confidential informant, CI # 2.    CI # 2, who law enforcement believe is reliable and who began cooperating with the desire of obtaining leniency with respect to a possible criminal prosecution, advised law enforcement that he[3] had previously been involved with CHARLES FOWLE in the distribution of marijuana.      According to CI # 2, he and FOWLE obtained marijuana from KOUSTAS and KOUSTAS served as the "boss" who coordinated the receipt and distribution of marijuana through a Canadian source of supply.    Although CI # 2 advised law enforcement that he was no longer involved in the distribution of marijuana with FOWLE, he was aware, through conversations with FOWLE, that FOWLE continued to engage in the distribution of marijuana and maintained KOUSTAS as marijuana source of supply.    CI # 2 also informed law enforcement that he owed a large amount of currency to KOUSTAS based upon a prior marijuana-related debt.

   2.      On January 30, 2013, CI # 2 advised law enforcement that he had visited FOWLE at his (FOWLE'S) residence, 267 Waverly Street, Manchester, New Hampshire, on January 24, 2013.    During the meeting, FOWLE told CI # 2 that he (FOWLE) had returned several pounds of a marijuana shipment received from KOUSTAS because the price was too high and he could not

---

[3] Although the gender of CI # 2, CI # 3, CI # 4, and the CS will remain confidential, for ease of reading, each will be referred to herein as "he."

sell the marijuana.   FOWLE also told CI # 2 that he was scheduled to receive another shipment of marijuana from a different source of supply.   CI # 2 advised law enforcement that FOWLE contacted him on January 30, 2013, and revealed that the new marijuana shipment had arrived.

3.      Based upon the information provided by CI # 2 on January 30, 2013, law enforcement instructed CI # 2 to contact FOWLE and advise that he would travel to his (FOWLE'S) residence in order to examine the marijuana.   CI # 2, while under the direction and control of law enforcement, called  FOWLE and arranged to travel to his residence.   Following the call between CI # 2 and FOWLE, an undercover law enforcement officer transported CI # 2 to the area of 267 Waverly Street, Manchester, New Hampshire, FOWLE'S residence.    Law enforcement officers, who were conducting surveillance, observed a 2005 Mazda, registered to CHARLES FOWLE,                                            parked in the driveway. CI # 2, who was not equipped with a body-wire, remained inside the residence for approximately 11 minutes.    When CI # 2 returned to the vehicle being operated by an undercover law enforcement officer, he indicated that once inside the residence, FOWLE brought him to an upstairs bedroom and showed him a garbage bag which contained between 20 – 40 pounds of marijuana, each pound of which was contained in a heat-sealed plastic freezer bag.      FOWLE told CI # 2 that he would front a quantity of marijuana to CI # 2 and that each pound should be sold for $2,100.00 in United States currency.     CI # 2 declined FOWLE'S offer and left the residence.

4.      In February 2013, CI # 2 advised law enforcement that FOWLE told him that KOUSTAS utilized two (2) separate marijuana sources of supply.     FOWLE revealed to CI # 2 that when KOUSTAS obtained large shipments of 100 pounds or more of marijuana, he (KOUSTAS) utilized ALKIS NAKOS as his source of supply.   FOWLE also informed CI # 2 that KOUSTAS' secondary source of supply was an unknown individual from Worcester,

Massachusetts.   CI # 2 advised law enforcement that FOWLE frequently changed his cellular telephones, and that he (CI # 2) was aware of at least four (4) cellular telephones utilized by FOWLE for the purpose of engaging in the distribution of controlled substances.

5.      On March 12, 2013, CI # 2 advised law enforcement that KOUSTAS, along with an unidentified African American male, arrived at his (CI # 2's) residence on March 10, 2013, and demanded $70,000.00 in United States currency, which KOUSTAS claimed was owed by CI # 2 and FOWLE for the prior receipt of marijuana from KOUSTAS.   When CI # 2 advised KOUSTAS that the debt was not one sustained by him (CI # 2), and that he had given FOWLE $5,000.00 in United States currency, KOUSTAS informed CI # 2 that he (CI # 2) did not have to worry about the Hells Angels in New Hampshire collecting the debt, but that he (CI # 2) needed to worry about the Vancouver Hells Angels coming to collect the debt.   KOUSTAS also told CI # 2 that he could work off the debt by selling marijuana supplied to him by KOUSTAS.   CI # 2 advised KOUSTAS that his (KOUSTAS') prices were too high and that he (CI # 2) could not find purchasers who were willing to pay KOUSTAS' asking price for the marijuana.

6.      Following the meeting with KOUSTAS, CI # 2 contacted FOWLE and asked him why he had not paid KOUSTAS the $5,000.00 in United States currency.   While speaking with CI # 2, FOWLE indicated that KOUSTAS had just arrived at his (FOWLE's) residence.    Law enforcement, who had a covert video-surveillance unit secreted in the area, confirmed the information provided by CI # 2 when they observed KOUSTAS arrive at FOWLE'S residence. KOUSTAS was seen exiting the driver's side of the vehicle and meeting with FOWLE in the drive-way.   The two (KOUSTAS and FOWLE) were then observed having a heated discussion in the driveway.   After approximately 15 minutes, KOUSTAS re-entered his vehicle and departed the area.

7.      On April 28, 2013, law enforcement engaged in surveillance at Amory Street Pizza, 253 Amory Street, Manchester, New Hampshire.     Although the business entity is believed to be owned by NAKOS, the entity is registered with the State of New Hampshire as a business owned by KORNELIOS NAKOS, the father of ALKIS NAKOS.     During the period of surveillance, law enforcement observed NAKOS arrive at approximately 10:57 a.m.     Surveillance observed KOUSTAS arrive at approximately 12:21 and enter the business for approximately 15 minutes. NAKOS and KOUSTAS then left the business and met again at the business at 4:07 p.m. where they were observed engaging in a conversation for approximately 30 minutes.

8.      In September 2013, CI # 2 advised law enforcement that it (CI # 2) had recently engaged in a conversation with WILLIAM SWANSON.     According to CI # 2, SWANSON informed CI # 2 that he (SWANSON) could provide it (CI # 2) with pound quantities of marijuana for distribution.     SWANSON also told CI # 2 that each pound would cost $3,350.00 in United States currency, but that if it (CI # 2) purchased ten (10) or more pounds of marijuana, each pound would cost $3,300.00 in United States currency.     CI # 2 stated that SWANSON identified KRISTOPHER VENTURINI[4] as the source of the marijuana.

9.      On October 9, 2013, law enforcement instructed CI # 2 to contact SWANSON in order to inquire about the purchase of marijuana.     After receiving instructions from law enforcement, CI # 2, who was not monitored by law enforcement during its contact with SWANSON, advised that it (CI # 2) attempted to contact SWANSON at (603) 497-7902. Because SWANSON did not answer CI # 2's call, CI # 2 did not speak with him (SWANSON). However, CI # 2 informed law enforcement that after attempting to contact SWANSON, it (CI # 2) received an in-coming call from SWANSON, who called CI # 2 from (603) 497-7902.     During

---

[4]It is believed by law enforcement that VENTURINI may obtain quantities of marijuana from either NAKOS or KOUSTAS.

the call, according to CI # 2, SWANSON stated that KRISTOPHER VENTURINI had recently

received a shipment of marijuana and had twelve (12) pounds left for distribution. Based upon

information obtained from CI # 2, law enforcement instructed it (CI # 2) to make arrangements

with SWANSON to purchase two (2) pounds of marijuana on October 10, 2013.

10.     On October 10, 2013, law enforcement met with CI # 2 in order to arrange for the

purchase of two (2) pounds of marijuana from SWANSON.     Law enforcement, who were

monitoring the activity of CI # 2, instructed him to call SWANSON at (603) 497-7902.     During

CI # 2's conversation with SWANSON, which was monitored by law enforcement, SWANSON

indicated that the marijuana transaction would take place at 7:00 p.m. because VENTURINI was

not available until after 7:00 p.m.

11.     At 5:20 p.m., law enforcement established surveillance at 116 Dartmouth Street,

Manchester, New Hampshire, the location of SWANSON'S residence, and 374 Thornton Street,

Manchester, New Hampshire, the location of VENTURINI'S residence.     At 6:50 p.m., law

enforcement observed SWANSON, who was located in a 2006 Cadillac Escalade, New

Hampshire registration 3369340, registered to William Swanson,

                    enter the Cadillac and depart the area.     At approximately 7:00 p.m., CI # 2,

while under the direction of law enforcement, contacted SWANSON at (603) 497-7902.     During

CI # 2's conversation with SWANSON, SWANSON advised that he would meet with CI # 2 in

approximately forty (40) minutes.     At approximately 8:00 p.m., SWANSON contacted CI # 2

from (603) 497-7902 and indicated that he (SWANSON) would obtain the marijuana and transport

it to CI # 2's residence.     At 8:02 p.m., law enforcement observed that CI # 2 obtained a text

message from SWANSON, sent from (603) 497-7902, which stated, "2?," a reference to the fact

that CI # 2 intended to purchase two (2) pounds of marijuana from SWANSON.     Following

receipt of the text message, CI # 2 was provided with $6,700.00 in United States currency by law enforcement and advised to remain at its residence.

12.     Because law enforcement believed that SWANSON would travel to VENTURINI'S residence in order to obtain the marijuana for CI # 2, law enforcement followed SWANSON after he (SWANSON) confirmed that CI # 2 would purchase two (2) pounds of marijuana.     At 8:05 p.m., law enforcement followed SWANSON from his residence, 116 Dartmouth Street, Manchester, New Hampshire, directly to VENTURINI'S residence, 374 Thornton Street, Manchester, New Hampshire.   SWANSON arrived at the location at approximately 8:24 p.m.     As soon as SWANSON arrived, he entered the residence and remained inside for approximately twelve (12) minutes.     After leaving VENTURINI'S residence, SWANSON was observed by law enforcement to immediately travel to CI # 2's residence.     As soon as SWANSON arrived, CI # 2 exited its residence and entered SWANSON'S vehicle.     CI # 2 remained inside SWANSON'S vehicle for approximately six (6) minutes, during which time the vehicle was observed by law enforcement to travel a short distance from the residence and return again.     When CI # 2 exited SWANSON'S vehicle, it met with law enforcement and turned over approximately two (2) pounds of marijuana.     CI # 2, who was searched for evidence of unexplained amounts of currency and contraband with negative results, stated that when SWANSON arrived at its residence, it (CI # 2) exited the residence and entered SWANSON'S motor vehicle.     SWANSON, according to CI # 2, made a short loop around CI # 2's neighborhood and provided CI # 2 with the marijuana during the drive.     In return for the marijuana, CI # 2 provided SWANSON with $6,700.00 in United States currency.

13.     Following CI # 2's purchase of two (2) pounds of marijuana from SWANSON on October 10, 2013, law enforcement obtained toll records for SWANSON'S cellular telephone,

(603) 497-7902.    The toll records established that prior to engaging in the marijuana transaction

with CI # 2 on October 10, 2013, SWANSON was in contact with (603) 703-7704, a cellular

telephone utilized by KRISTOPHER VENTURINI.

14.    On January 6, 2014, United States District Court Judge Landya B. McCafferty

granted the United States' request for a search warrant involving the text messaging content for the

period of October 6, 2013, through October 16, 2013, involving cellular telephone (603)

497-7902, the cellular telephone utilized by SWANSON.    The search warrant was served on

Verizon Wireless on or around January 6, 2014, and the results disclosed that SWANSON utilized

the text messaging function on cellular telephone (603) 497-7902 on October 9, 2013, and October

10, 2013, in order to communicate with VENTURINI over cellular telephone (603) 703-7704 and

arrange a meeting to obtain marijuana.

15.    The records disclosed that VENTURINI utilized the text messaging function on

cellular telephone (603) 703-7704 to communicate with SWANSON on October 9, 2013, and

October 10, 2013.    For example, when CI # 2 contacted SWANSON on October 9, 2013, and

asked if he (SWANSON) could arrange to obtain two (2) pounds of marijuana from VENTURINI,

SWANSON informed CI # 2 that VENTURINI had recently received a shipment of marijuana and

had 12 pounds left for distribution.    Following CI # 2's conversation with SWANSON on

October 9, 2013, SWANSON utilized (603) 497-7902 to engage in text messaging exchanges with

VENTURINI over (603) 703-7704.    The text messaging exchanges disclosed that SWANSON

planned to meet with VENTURINI during the night of October 9, 2013, in order to talk.    The

following day, October 10, 2013, SWANSON informed CI # 2 that he (SWANSON) had arranged

to obtain two (2) pounds of marijuana from VENTURINI, and that the transaction would occur

after 7:00 p.m.    The results of SWANSON'S text messaging content established that at 8:05:33,

SWANSON utilized (603) 497-7902 to send a text message to CI # 2 which stated, "bout to head to

dude call u in a few." At 8:14:16, SWANSON utilized (603) 497-7902 to send a text message to VENTURINI at (603) 703-7704 which stated, "in route." Within approximately 10 seconds of obtaining the text message, VENTURINI sent a text message from (603) 703-7704 to SWANSON at (603) 497-7902 which stated, "k." At 8:25:31 p.m., SWANSON sent a text message from (603) 497-7902 to VENTURINI at (603) 703-7704 stating, "here."

16.     On September 24, 2013, CI # 2, who was neither monitored nor surveilled by law enforcement, contacted law enforcement and revealed that he met with FOWLE at 267 Waverly Street, Manchester, New Hampshire. According to CI # 2, while at FOWLE'S residence, he asked whether FOWLE had spoken with KOUSTAS regarding CI # 2's outstanding drug debt. When FOWLE informed CI # 2 that he had not discussed the debt with KOUSTAS, CI # 2 suggested that they (CI # 2 and FOWLE) contact KOUSTAS together. FOWLE agreed and utilized his cellular telephone number, (603) 268-1194, to call KOUSTAS at a telephone number unknown to CI # 2. When FOWLE contacted KOUSTAS, he (FOWLE) handed his cellular telephone to CI # 2 so that he (CI # 2) could speak with KOUSTAS directly. During the conversation, according to CI # 2, KOUSTAS advised CI # 2 that he (CI # 2) should make debt payments to FOWLE and that FOWLE would provide the money to KOUSTAS. KOUSTAS also advised CI # 2 that he (KOUSTAS) had plenty of "work" if he (CI # 2) was interested, which I believe was a reference to KOUSTAS' desire to provide CI # 2 with marijuana for distribution in order to reduce its debt. CI # 2 also informed law enforcement that following his conversation with KOUSTAS, he (CI # 2) remained at FOWLE'S residence for a short period of time. While there, according to CI # 2, FOWLE showed him (CI # 2) a one (1) pound sample of marijuana which he (FOWLE) stated was obtained from KOUSTAS. CI # 2 stated that FOWLE also offered to sell him (CI # 2) cocaine and 30 milligram tablets of oxycodone, a schedule II controlled substance.

17.     On September 30, 2013, law enforcement met with CI # 2, who advised that he had received recent telephone calls and text messages from FOWLE and KOUSTAS regarding the $70,000.00 debt owed by him (CI # 2) to KOUSTAS.     Although CI # 2 indicated that he did not respond to any of the telephone calls or text messages, he provided law enforcement with his telephone in order for law enforcement to observe the contacts.     Law enforcement examined CI # 2's cellular telephone and observed that on September 26, 2013, at approximately 12:00 p.m., CI # 2 received an in-coming text message from FOWLE'S cellular telephone, (603) 268-1194, which stated, "[w]heres my money player."     At approximately 3:04 p.m., CI # 2 received an in-coming text message from KOUSTAS' cellular telephone, (508) 479-6296, which stated, "[d]id u drop the paper with this kid yet."     Based upon information developed during the investigation, and based upon prior investigations and training, I believe that FOWLE'S text message to CI # 2, "[w]heres my money player," is a reference to his (FOWLE'S) conversation with CI # 2 on September 24, 2013, while at FOWLE'S residence, that KOUSTAS tasked him (FOWLE) with the receipt of currency which represented CI # 2's partial repayment of his marijuana debt to KOUSTAS.     I also believe that KOUSTAS' text message to CI # 2, "[d]id you drop the paper with this kid yet," is a reference to whether or not CI # 2 provided any currency to FOWLE for KOUSTAS.

18.     On October 3, 2013, CI # 2 advised law enforcement that he had received two telephone calls from KOUSTAS regarding CI # 2's drug debt, one on October 3, 2013, and one on October 4, 2013.     Law enforcement confirmed the information provided by CI # 2 through the utilization of the pen register for (508) 479-6296, which confirmed a call from (508) 479-6296 on October 3, 2013, at 9:57 p.m., and a call on October 4, 2013, at 7:36 p.m.     Based upon the contact, law enforcement utilized CI # 2 on October 8, 2013, in order to engage in recorded contact with KOUSTAS.     Prior to the contact, law enforcement advised CI # 2 that they would provide

him with $1,000.00 in United States currency in order to provide the currency to FOWLE or

KOUSTAS   as a partial payment of his (CI # 2's) debt to KOUSTAS.     At approximately 12:22

p.m. on October 8, 2013, CI # 2 conducted a recorded call with KOUSTAS on (508) 479-6296

involving CI # 2's payment of his debt.       Law enforcement observed CI # 2 dial the number and

confirmed placement of the call by CI # 2 through examination of the pen register data.

| | |
|---|---|
| CI#2: | Yo. |
| KOUSTAS: | What's going on? |
| CI#2: | What up man. |
| KOUSTAS: | Yo, what's up? |
| CI#2: | I don't know.   I wasn't sure if that was you or not. |
| KOUSTAS: | Huh? |
| CI#2: | I wasn't sure if that was you or not… that was trying to call me. |
| KOUSTAS: | Yeah what's going on? |
| CI#2: | I don't know, trying, trying to meet up with you actually. |
| KOUSTAS: | I'm not around right now.   Why don't you just see this kid? |
| CI#2: | What's that? |
| KOUSTAS: | Why don't you see this kid. |
| CI#2: | Who? Charlie? |
| KOUSTAS: | Um. |
| CI#2: | He got a new phone? |
| KOUSTAS: | Hm? |
| CI#2: | Did he get a new phone? |
| KOUSTAS: | Mm, I don't know isn't it the same? |
| CI#2: | No, I tried calling him (inaudible) and it doesn't even work. |
| KOUSTAS: | Yeah, let me find out.   I'll have him call you soon. |
| CI#2: | Alright. |
| KOUSTAS: | Alright. |
| CI#2: | Yep. |
| KOUSTAS: | What are you giving him? |
| CI#2: | I don't got much, like maybe like a grand. |
| KOUSTAS: | You fuckin kidding me bro. |
| CI#2: | Trying to do like a weekly payment type thing. |
| KOUSTAS: | What? |
| CI#2: | Said I'm trying to do a weekly payment. |
| KOUSTAS: | Alright.   Yeah, I'll have him call you. |
| CI#2: | Alright. |
| KOUSTAS: | Alright. |

Based upon information obtained during the investigation, and based upon prior investigations and

training, I believe that KOUSTAS' reference to CI # 2 that he (CI # 2) should "see this kid" is a

reference to CI # 2 providing currency to CHARLES FOWLE so that FOWLE could then turn the currency over to KOUSTAS.     I further believe that when CI # 2 informed KOUSTAS that he (CI # 2) planned to turn over "a grand," which is a reference to the payment of $1,000.00 in United States currency, that KOUSTAS' response, "[y]ou fuckin' kidding me bro," is his (KOUSTAS') frustration with the amount of the repayment by CI # 2, who purportedly owes KOUSTAS $70,000.00 in United States currency.

19.     Following the conversation, law enforcement utilized CI # 2 in order to meet with CHARLES FOWLE on October 9, 2013, for the purpose of providing FOWLE with a payment of $1,000.00 in United States currency toward CI # 2's debt to KOUSTAS.     Prior to CI # 2's meeting with FOWLE, law enforcement searched him for unexplained amounts of contraband and currency with negative results.     CI # 2, who was not equipped with a recording device for fear of being searched by FOWLE, was transported at approximately 1:48 p.m. by an undercover ("UC") law enforcement officer to FOWLE'S residence, 267 Waverly Street, Manchester, New Hampshire.     CI # 2, who was dropped off a short distance from 267 Waverly Street, was surveilled by law enforcement officers to 267 Waverly Street where he was observed knocking on the front door.   When no one answered the door, CI # 2 was observed walking away from the area. As soon as CI # 2 left the residence, he contacted the UC and was advised to place a call to FOWLE and return to the vehicle.     When CI # 2 arrived at the UC's vehicle, he was speaking with FOWLE on his (CI # 2's) cellular telephone, having called FOWLE at cellular telephone (603) 960-1617.     During the call, which was heard and monitored by the UC, FOWLE advised CI # 2 to travel to the Homewood Suites, 1000 Perimeter Road, Manchester, New Hampshire, in order to make the drug payment.     When CI # 2 concluded the conversation with FOWLE, he (CI # 2) advised the UC that when FOWLE received a shipment of drugs, he frequently utilized hotel rooms to distribute the substances.

20.     At approximately 2:22 p.m., the UC transported CI # 2 to the Homewood Suites. CI # 2 exited the vehicle and entered the hotel.     After approximately 40 minutes, CI # 2 was observed by law enforcement standing with FOWLE and a male, later identified by CI # 2 and law enforcement as MARC GUILLEMETTE ("GUILLEMETTE"),[5] in front of the Homewood Suites. After standing in front of the hotel for a brief period of time, CI # 2 returned to the UC's vehicle and FOWLE and GUILLEMETTE re-entered the Homewood Suites.     The UC and CI # 2 then left the area and traveled to a secure location.     Once at the secure location, CI # 2 turned over a small heat-sealed wrapper containing several marijuana buds and was searched again for evidence of unexplained amounts of contraband or currency with negative results.     CI # 2 informed law enforcement that FOWLE provided him (CI # 2) with the marijuana while he (CI # 2) was located in FOWLE'S hotel room.     According to CI # 2, FOWLE stated that KOUSTAS provided the marijuana and that he (FOWLE) could supply CI # 2 with marijuana received from KOUSTAS for $3,100.00 in United States currency for each pound.     CI # 2 also indicated that while with FOWLE, he (CI # 2) provided him (FOWLE) with $1,000.00 in United States currency for KOUSTAS.     While doing so, CI # 2 observed an open backpack on the floor of FOWLE'S hotel room which contained an unknown quantity of marijuana.

21.     After providing the currency, FOWLE advised CI # 2 that he (CI # 2) would be required to start paying $10,000.00 increments to pay off his (CI # 2's) debt to KOUSTAS. When CI # 2 told FOWLE that he (CI # 2) did not have that amount of money, FOWLE replied by stating that he (FOWLE) made KOUSTAS a lot of money.     FOWLE also informed CI # 2 that KOUSTAS was now selling MDMA (a/k/a "Molly") and that a few months earlier, he (FOWLE)

---

[5]CI # 2, who identified GUILLEMETTE from an investigative photograph, informed law enforcement that GUILLEMETTE was a neighbor of FOWLE'S and acted as a look-out for FOWLE when he (FOWLE) conducted drug transactions.     Law enforcement confirmed GUILLEMETTE'S identity and discovered, consistent with the information provided by CI # 2, that he lived at 255 Waverly Street, Manchester, New Hampshire, a short distance from FOWLE'S residence.

sold 80 pounds of "outdoor" marijuana and 50 pounds of "Jack" marijuana for KOUSTAS.    CI #

2 advised law enforcement that FOWLE revealed that on October 3, 2013, he (FOWLE) obtained

½ kilogram of cocaine for $21,000.00 in United States currency and finished distributing it on

October 8, 2013.   FOWLE told CI # 2 that he (FOWLE) could supply him (CI # 2) with a ½

kilogram quantity of cocaine for $22,000.00 in United States currency.    CI # 2, who advised law

enforcement that FOWLE utilized a Cambodian male named "Chino" as his (FOWLE'S) cocaine

source of supply, informed FOWLE that he (CI # 2) might be interested in the purchase of ounce

quantities of cocaine and confirmed that FOWLE maintained an unknown male nicknamed

"Chino" as a cocaine source of supply.

     22.    On October 23, 2013, the United States, pursuant to Title 18, United States Code,

Section 2516, filed an application with the United States District Court, District of New

Hampshire (Barbadoro, J.), for the Interception of Wire and Electronic Communications for a

thirty (30) day period involving (508) 479-6296, Target Telephone # 1, the cellular telephone

being utilized by KOUSTAS.   The Application was granted on October 23, 2013, and the United

States was authorized to intercept wire and electronic communications for the period of October

23, 2013, through November 21, 2013.

     23.    At approximately 5:12 p.m. on October 23, 2013, law enforcement intercepted a

text message to KOUSTAS at (508) 479-6296 from (508) 450-0224, a cellular telephone activated

on October 11, 2013, subscribed to by Hol Val, 30 Independence Boulevard, Warren, New Jersey,

and utilized by DEAN SIEGER.    The text message stated, "let me know when u r 20 minutes

away."   Following receipt of the text message, KOUSTAS' cellular telephone, (508) 479-6296,

received an in-coming call at 6:32 p.m. from (603) 315-9033, a cellular telephone being utilized by

JEREMY BLEVENS ("BLEVENS").     During the call, KOUSTAS and BLEVENS engaged in a

conversation involving the purchase and distribution of marijuana.

| | |
|---|---|
| BLEVENS: | I mean I, I finally got rid of the Jack.   I still have some Kush left but I have, I have everything for you….you know and I still, I still have Orange which is like a mediocre f--kin I'm still stuck with it you know what I mean.   I got this one kid that's slowly getting it off, he took Jack some of the Orange.   Next time I see him again he's gonna take the Orange and most of the Kush and then I'll see him again which will be a month from now and then he'll finish off the Kush.   I tried getting some people on the Kush but these people are f--kin wicked picky you know.   I tried but. |
| KOUSTAS: | Bro my people love, ha ha. |
| BLEVENS: | (Inaudible). |
| KOUSTAS: | I don't, I might be getting some Purple. |
| BLEVENS: | Right. |
| KOUSTAS: | So I'll let you know. |
| BLEVENS: | Just stuck on like the greenhouse and s--t. |
| KOUSTAS: | Huh? |
| BLEVENS: | There just stuck on the greenhouse and for me to give them the Kush I got to give it to em for way cheaper and then they still and they take even longer.   You know once they start serving a few people if the people don't like it then they, then they don't really want it or they'll go somewhere else.   You know what I mean, my bud buddy had some stuff just like the Kush for like 27 and I told him no cuz f--kin with all the s--t that just happened I really don't have a spot to hold s--t and take my time with it, you know I got, I need s--t that's gonna go no matter what you know. |
| KOUSTAS: | All good f--kin, um what I was gonna say. |
| BLEVENS: | I mean once, once I run through this Orange and s--t you know I'll I'll probably take some then, but I mean if you could, if we can do this chick, this kid's back on and he has a few people and you know I might, and my other buddy was telling me he wants to chill with her to, so. |
| KOUSTAS: | Ok we can do that, let me ah find out and I'll let you know. |
| BLEVENS: | I mean I'm, I'll keep. |
| KOUSTAS: | (inaudible) might make it tomorrow you know. |
| BLEVENS: | I still, I still have some of the Kush so, I'm gonna keep trying.   I haven't showed everybody you know cuz I don't always have it with me you know cuz I'm f--kin on the go now, but I'll eventually put. |
| KOUSTAS: | (inaudible). |
| BLEVENS: | I know, I know when my buddy can't, Johnny, he'll take that Kush cuz he likes it but he got, he got 5 of them, you know what I mean and he paid 3 G's and I told him I might be able to get |

him the Kush for 31 if I could get a 5 pack, you know what I
mean?

KOUSTAS:   Right.

BLEVENS:   So um, I don't know, I'm trying man, there's just not really that
much money involved, plus I got, I got my other buddy that gets
s--t from Cali and f--kin he's supposed to finally get
the ice breaker and he's got some serious numbers on some serious
s--t where I can serve the people that are serving me, you know
what I mean?

KOUSTAS:   That's cool, what's up with ah, when were me and you gonna
(inaudible) catch up?

BLEVENS:   Ahhmmm.   Today, I wanna catch up with you today.   I'm going
and get your money right now so I can see you no matter what,
you know.

Based upon information obtained during the investigation, I believe that BLEVENS' use of the

terms Jack, Orange, and Kush are references to the distribution of different strains of marijuana.

I also believe that the term "Jack" is a reference to Jack Herrer, a potent, hybrid strain of

marijuana.   Thus, I believe that when BLEVENS informed KOUSTAS that he (BLEVENS)

"finally got rid of the Jack," he (BLEVENS) was referring to his distribution of a quantity of Jack

Herrer marijuana provided by KOUSTAS.     Likewise, I believe that BLEVENS' statements to

KOUSTAS demonstrate that BLEVENS redistributes marijuana provided to him by KOUSTAS.

For example, BLEVENS' statement that "I got this kid that's slowly getting it off, he took Jack,

some of the Orange," is a reference to BLEVENS' redistribution of marijuana provided by

KOUSTAS to one of his customers.   In addition, I believe that when BLEVENS stated, "next

time I see him again, he's gonna take the Orange and most of the Kush," and "I'll see him again,

which will be in a month from now, and then he'll finish off   the Kush," it demonstrates his

(BLEVENS')   intention to continue distributing marijuana received from KOUSTAS.

24.     After KOUSTAS' conversation with BLEVENS, law enforcement intercepted a

text message sent to SIEGER at (508) 450-0224 from KOUSTAS' cellular telephone, (508)

479-6296, which stated, "ETA 6:50."    At 6:41 p.m., KOUSTAS' cellular telephone received an

in-coming text message from (508) 450-0224, which stated, "Ok c u soon."   At 6:55 p.m.,

KOUSTAS sent a text message to (508) 450-0224 stating, "Here now what place," to which a

return telephone call from (508) 450-0224 was received at 6:56 p.m.   The call between

KOUSTAS and SIEGER included SIEGER'S instructions to KOUSTAS to "ahh, follow me,

we're gonna be going for like a seven to ten minute drive."   At approximately 7:08 p.m.,

KOUSTAS' cellular telephone received another in-coming call from SIEGER.

> SIEGER:     Ah, hey when you get there, just, um, back up to the garage.
> KOUSTAS:   Ok.
> SIEGER:     Alright.    We'll be there (inaudible) in like, ah.
> KOUSTAS:   The only thing is I can't put em in the back, I gotta go in the, from
>                   the side door.
> SIEGER:     Alright, um.
> KOUSTAS:   What you want me to do.
> SIEGER:     Alright, ah, yeah, ah, alright, then it, it just doesn't matter then.
> KOUSTAS:   Huh?
> SIEGER:     It, it doesn't matter then if that's the case.
> KOUSTAS:   Alright?    Cause, ah.
> SIEGER:     Alright.
> KOUSTAS:   I don't have room in the back.
> SIEGER:     Alright.    Alright.

Based upon information obtained during the investigation, I believe that KOUSTAS was meeting

with SIEGER in order to obtain marijuana.    I further believe that SIEGER'S statement to have

KOUSTAS "back up to the garage" was a reference to an attempt to covertly transfer marijuana

in a way that would be shielded from public view.    Likewise, I believe that KOUSTAS'

response, "I can't put em in the back . . . I don't have room in the back," was a reference to the

fact that KOUSTAS did not have enough room in his trunk to store the marijuana.

     25.     At 8:11 p.m., on October 23, 2013, KOUSTAS placed an outgoing call from to

(603) 960-1617, a cellular telephone known by law enforcement to be utilized by CHARLES

FOWLE.    During the conversation, KOUSTAS and FOWLE engaged in a coded conversation

involving whether or not FOWLE could take marijuana from KOUSTAS following his

(KOUSTAS') trip to Massachusetts.

| | |
|---|---|
| KOUSTAS: | You want me to stop by or? |
| FOWLE: | Yeah, you can. |
| KOUSTAS: | Hmm. |
| FOWLE: | You can stop by if you want.   I got a buddy of mine here right now    but what time you gonna stop by? |
| KOUSTAS: | Ah, I probably got still got like half an hour. |
| FOWLE: | Alright, I can run outside anyways, or you come inside whatever. |
| . . . | |
| FOWLE: | Alright.   Well, ah, I mean, yeah it don't really matter, I guess. Today or tomorrow is cool.   I don't know what you are bringing me, but, I mean. |
| KOUSTAS: | It's what you want. |

Based upon information obtained during the investigation, I believe that KOUSTAS'

conversation with FOWLE involved KOUSTAS' plan to transport a quantity of the marijuana

obtained from SIEGER.

26.     After law enforcement intercepted the call between KOUSTAS and FOWLE,

surveillance units were sent to the area of FOWLE's residence in order to attempt to view a

meeting between KOUSTAS and FOWLE.   At 8:37 p.m., law enforcement observed a 2003

Volkswagen GTI, New Hampshire registration 2349511, registered to KOSMAS KOUSTAS,

pull into the driveway of 267 Waverly Street,

Manchester.   Within approximately four (4) minutes, law enforcement observed the

Volkswagen GTI back out of the driveway and pull away from the residence.   At approximately

9:35 p.m., KOUSTAS called FOWLE.   During the conversation, KOUSTAS and FOWLE

discussed the marijuana which KOUSTAS dropped off for FOWLE at his (FOWLE's) residence.

| | |
|---|---|
| KOUSTAS: | What's going on?   So you smoke some? |
| FOWLE: | Yeah, I'm smoking a blunt of it right now.   Trying to get the feel for it. |
| KOUSTAS: | Ah, ha . . . I think it's good.   I think the smell is not all there because of the weather will dry it up. |
| FOWLE: | Yeah. |

KOUSTAS:     If you fluff, if you fluff them up and you let the air hit it.
FOWLE:       No, those one's are, those ones are fine.    Those ones are good, I
             think.    I think it's the other ones.    The fluffier ones that may be
             aren't, aren't maybe different.    I don't know, though.
KOUSTAS:     No, I think they all the same, they all the same.    I just looked at
             them where I stopped.
FOWLE:       They're good enough, they're, they're, they're good enough, so.
KOUSTAS:     Okay.    They got good crystals and everything, so.

Based upon information obtained during the investigation, I believe that KOUSTAS'

conversation with FOWLE involved their discussion about the quality of the marijuana obtained

from SIEGER and provided to FOWLE by KOUSTAS.    I also believe that KOUSTAS'

statement to FOWLE that "they got good crystals and everything," was a reference by

KOUSTAS to the quality and potency of the marijuana.

       27.    Following the interception of the call between KOUSTAS and FOWLE, law

enforcement intercepted additional wire communications over Target Telephone # 1 during the

night of October 23, 2013, which revealed that KOUSTAS planned to meet with BLEVENS.    At

approximately 10:04 p.m., law enforcement monitored a conversation between KOUSTAS , who

called BLEVENS at (603) 315-9033, during which BLEVENS stated, "I'm just doing a few more

things to finish up and then I'll come and see you."    At 11:17 p.m., law enforcement intercepted

a call made by BLEVENS to KOUSTAS in which BLEVENS stated, "I'm here."    Law

enforcement, who were conducting surveillance at KOUSTAS' residence, 1465 Hooksett Road,

Apartment 141, Hooksett, New Hampshire, positively identified KOUSTAS as he exited the

residence after receiving the call.    KOUSTAS was also observed carrying a large plastic trash

bag, which he placed in the front passenger side of a 2008 Mitsubishi Lancer, New Hampshire

registration 249 1320, registered to Jennifer Day,[6]

---

[6]Based upon information obtained by law enforcement during the investigation, it is believed that Jennifer Day is the
girlfriend of KOUSTAS

KOUSTAS was then observed entering the driver's side of the vehicle and traveling a short distance to an area within the apartment complex.    KOUSTAS parked the vehicle next to a 2006 Toyota Camry, New Hampshire registration 2544776, registered to JEREMY BLEVENS,                                                    Although law enforcement could not positively identify BLEVENS because of their position during surveillance, they did observe a Caucasian male[7] seated in the front passenger seat of KOUSTAS' vehicle.

28.    In addition to engaging in the distribution of marijuana, I believe that the intercepted conversations between KOUSTAS and BLEVENS established that KOUSTAS may have provided BLEVENS with a quantity of what is believed to be MDMA (a/k/a "Molly") on October 24, 2013.    Prior to the conclusion of the conversation between KOUSTAS and BLEVENS at 6:32 p.m., on October 23, 2013, BLEVENS asked KOUSTAS if he (KOUSTAS) could "still get that girl," to which KOUSTAS replied, "ah, I don't know.    I can, I can make a phone call.   Why, what's up."    In response to KOUSTAS' question, BLEVENS replied that "this kid did want one up north.    He still owes me a unit but he calls me and it's, you know, he's (inaudible) one of his people f—ked him."    Based upon information obtained during the investigation, and based upon my involvement in prior investigations, I believe that BLEVENS' request for "that girl" is a coded term used to describe the controlled substance MDMA, which is colloquially referred to as "Molly," a girl's name.    Thus, I believe that during the conversation, BLEVENS asked KOUSTAS to obtain a quantity of what is believed to be MDMA so that he (BLEVENS) could then distribute it to an individual ("this kid").[8]

---

[7] JEREMY BLEVENS is a Caucasian male.
[8] KOUSTAS' ability to obtain quantities of MDMA (a/k/a "Molly") for distribution was confirmed by FOWLE'S statement to CI # 2 on October 9, 2013.    During the meeting between FOWLE and CI # 2, FOWLE advised CI # 2 that KOUSTAS was involved in the distribution of MDMA

29.     On October 24, 2013, at approximately 6:29 p.m., BLEVENS sent a text message to KOUSTAS which stated, "yo."   In response to the text message, KOUSTAS and BLEVENS engaged in a conversation in which BLEVENS asked KOUSTAS "did you grab that." KOUSTAS replied, "[he] was calling  . . . to see if [BLEVENS] wanted any," to which BLEVENS replied, "I want to do two actually because my other buddy's gonna want a halfie, but, ah, I'm gonna cover the whole thing tomorrow so that way I won't owe you nothing, f—king good, you know . . . but, ah, so what I have planned with this kid, cause he's gonna take it with him to the Phish tour on Saturday, so I'm gonna,   I'm gonna, I wanted to meet up with you, grab it tonight and I was gonna see him tomorrow at six when he's out of work."     Based upon information obtained during the investigation, I believe that BLEVENS' question to KOUSTAS regarding whether or not KOUSTAS "grab[bed] that," was a reference to BLEVENS' conversation with KOUSTAS on October 23, 2013, in which BLEVENS asked KOUSTAS to obtain "that girl," a reference to what I believe is MDMA.    I also believe that BLEVENS intended to distribute the MDMA to an individual, "that kid."   In addition, I believe that BLEVENS' statement that "I want to do two actually" was an indication that he was seeking to purchase two (2) ounces of MDMA from KOUSTAS.    BLEVENS' intention to purchase two (2) ounces was further demonstrated by his statement to KOUSTAS that his "buddy's gonna want a halfie," which I believe was a reference to the fact that BLEVENS intended to distribute ½ ounce of MDMA to "his buddy."

30.     KOUSTAS' possible distribution of what was believed to be MDMA to BLEVENS appeared to be confirmed when BLEVENS and KOUSTAS engaged in additional contact and arranged to meet.    At approximately 9:14 p.m., on October 24, 2013, BLEVENS sent KOUSTAS a text message which stated, "I'm ova at Boston Market gtng chcken."   KOUSTAS replied to BLEVENS by stating, "15 mins."   At approximately 9:39 p.m., law enforcement observed KOUSTAS, who was driving the same 2003 Volkswagen GTI, arrive at Boston Market

Restaurant, 14 March Avenue, Manchester,  New Hampshire, and park next to a 2006 Toyota

Camry, New Hampshire registration 2544776, registered to JEREMY BLEVENS,

                                                    Law enforcement also observed BLEVENS,

who was positively identified by law enforcement from an investigative photograph obtained from

the Manchester, New Hampshire, Police Department, exit the Boston Market Restaurant, walk to

KOUSTAS' vehicle, and enter the passenger side of the vehicle.   BLEVENS remained in

KOUSTAS' vehicle for approximately two (2) minutes and then exited the vehicle.   KOUSTAS

was then observed by law enforcement leaving the area.

      31.     Although KOUSTAS utilized Target Telephone # 1 extensively between October

23, 2013, and October 27, 2013, it appeared that his use diminished during the period of October

27, 2013, through October 31, 2013.    I believe that the lack of significant activity on Target

Telephone # 1 after October 27, 2013, was because KOUSTAS distributed marijuana to two (2) of

his distributors, FOWLE and BLEVENS, on October 23, 2013, and the lack of communication

over Target Telephone # 1 was attributed to KOUSTAS' intention to provide his distributors with

a period of time in which to distribute the marijuana and obtain currency from their purchasers.

This belief appeared to be confirmed by a text message, which was sent by BLEVENS to Target

Telephone # 1 on October 31, 2013, which stated, "race to gt hme reg runs out at mdngt waiting on

ths kd hf suppose to be dne tmrw so il bable to tke care of everythng hve been able to do much been

mvin."   Based upon information developed during the course of the investigation, I believe that

BLEVENS' statement that he was "waiting on ths kd," was a reference to the fact that BLEVENS

was waiting for the receipt of currency from an individual ("ths kid") based upon his (BLEVENS')

prior distribution of a controlled substance received from KOUSTAS.    I further believe that

BLEVENS' statement to KOUSTAS that he will "bable to tke care of everythng" was a reference

to the fact that BLEVENS owed KOUSTAS an amount of currency for the prior receipt of

controlled substances and that BLEVENS informed KOUSTAS that he would be able to take care

of everything, that is, provide payment to KOUSTAS.

32.     Law enforcement intercepted a conversation between KOUSTAS and FOWLE on

November 4, 2013, which appeared to confirm their belief that the lack of activity between

KOUSTAS and FOWLE was based upon FOWLE'S attempt to distribute the marijuana provided

to him (FOWLE) by KOUSTAS on October 23, 2013.     On November 4, 2013, at approximately

2:00 p.m., KOUTAS utilized Target Telephone # 1, to call FOWLE.

| | |
|---|---|
| KOUSTAS: | What is going on? Where are you at with that thing because I got to pay this dude man. |
| FOWLE: | Ah, I'm pretty much, just (voice overlaps) but I don't have any. |
| KOUSTAS: | You, you still (inaudible). |
| FOWLE: | Yeah, but I don't have any.   No,   I don't have any dough, I gave it out and just waiting, so I'm probably not ready for a few days. |
| KOUSTAS: | (inaudible). |
| FOWLE: | So ah, I don't know. |
| KOUSTAS: | Huh? |
| FOWLE: | Maybe like, I'm probably not going to be ready honestly until the weekend, till this weekend. |
| KOUSTAS: | How long? |
| FOWLE: | And then I should be done. How long has it been now? |
| KOUSTAS: | Two weeks. |
| FOWLE: | No, it's only been one week. |
| KOUSTAS: | Well, it's a week and a half, I mean tomorrow, Wednesday's, Wednesday's going to be two weeks |
| FOWLE: | So it's been what nine days? |
| KOUSTAS: | Yeah. |
| FOWLE: | I'll get you some dough together. |
| KOUSTAS: | Alright, anyways see what you can do, you know what I mean, because I. |
| FOWLE: | Yup. |

Based upon information obtained during the investigation, I believe that KOUSTAS' statement

that "where are you at with that thing" was a reference to FOWLE'S distribution of the marijuana

provided by KOUSTAS on the night of October 23, 2013.     I also believe that FOWLE'S

response that "I don't have any dough, I gave it out and [am] just waiting" was an explanation to

KOUSTAS that he (FOWLE) distributed the marijuana to his customers and was waiting for the

receipt of payment ("dough") for the marijuana.    The fact that the conversation involved

FOWLE'S receipt of marijuana from KOUSTAS on October 23, 2013, was further evidenced by

KOUSTAS' statement that "I got to pay this dude" who I believe was SIEGER.    Finally,

KOUSTAS' statement that "Wednesday" (November 6, 2013) represented two (2) weeks from

FOWLE'S receipt of the marijuana further demonstrates that the conversation involved the

receipt of marijuana on October 23, 2013, because the time frame between October 23, 2013, and

Wednesday, November 6, 2013, was exactly two (2) weeks.

    33.    In addition to engaging in a conversation about the payment of proceeds from the

prior distribution of marijuana, FOWLE advised KOUSTAS that his residence had been

burglarized and that approximately one (1) pound of marijuana was taken.

| | |
|---|---|
| FOWLE: | I'm trying to get the f—k out.   I'm packing up everything in this house. Somebody robbed the house the other night.    They really didn't get. |
| KOUSTAS: | What happened? |
| FOWLE: | This house, this house got robbed the other night, my house. |
| KOUSTAS: | Your house? |
| FOLWE: | Yup, somebody kicked the back door in. |
| KOUSTAS: | Somebody came in your house . . . |
| FOWLE: | They got one of the things, too . . . but, ah, yeah, I'll fill you in afterwards. |

Based upon information obtained during the course of the investigation, I believe that FOWLE'S

statement that "somebody robbed the house the other night . . . [and] they got one of the things"

was an indication that approximately one (1) pound of marijuana which was taken from FOWLE'S

residence.    I further believe that individuals who engage in the distribution of controlled

substances are often the victims of theft because the perpetrators know that the burglary will not be

reported to law enforcement.    Thus, I believe, consistent with the information provided by CI # 2

to law enforcement on October 9, 2013, that FOWLE utilizes his neighbor, MARC

GUILLEMETTE, as a look-out in order to ensure that controlled substances are not stolen from his

residence.

34.     GUILLEMETTE'S status as security for FOWLE was confirmed through examination of text messages sent to FOWLE on (603) 268-1725 from GUILLEMETTE. United States District Court Magistrate Judge Landya B. McCafferty authorized a search warrant on November 8, 2013, for text messaging content associated with (603) 268-1725.   On November 2, 2013, cellular telephone number (603) 703-2889, a cellular telephone subscribed to Melissa Guillemette, 255 Waverly Street, Manchester, New Hampshire, but one which is believed by law enforcement to be utilized by MARC GUILLEMETTE, sent a text message to FOWLE stating, "ur landlord's here dude.   She's in ur back yard raking . . . what if she knocks at ur back door and it opens . . . should I say something to her?"     Based upon information obtained during the investigation, I believe that the text message was sent to FOWLE by GUILLEMETTE in order to ensure that FOWLE'S landlord did not enter his (FOWLE'S) residence and discover the possible location of controlled substances.     The use of the text messaging function in order to aid FOWLE's drug-related activity was also established when another text message was sent from (603) 703-2889 to FOWLE on November 7, 2013.     The message stated, "hey call me.   Ur front windows wide open upstairs bedroom and ur ladders moved and the sheet you had hanging in ur bedroom is not up anymore.   I hope it was ur buddy that did it."     Therefore, I believe that GUILLEMETTE contacted FOWLE in order to advise him of what appeared to be an apparent change to the exterior of the residence.     I also believe that GUILLEMETTE'S message to FOWLE was a way to warn him that individuals may be inside the location, thereby attempting to ensure that the residence, a place where controlled substances may be stored, was secure.

35.     On November 5, 2013, CI # 2, at the direction of law enforcement, sent a text message to KOUSTAS at Target Telephone # 1 which stated, "can u have Charlie hit me up."

The text message was sent by CI # 2,[9] who was not present with law enforcement at the time the text message was sent, in order to arrange for the further repayment of his drug debt to KOUSTAS through FOWLE.     After receiving the text message, KOUSTAS called FOWLE and asked him to contact CI # 2.     KOUSTAS also spoke with FOWLE about the availability of marijuana obtained by KOUSTAS and KOUSTAS' obligation to pay SIEGER for the marijuana received on October 23, 2013.

| | |
|---|---|
| KK: | Hey, this dude sent me a text to tell you to call him. |
| FOWLE: | Who? |
| KK: | F—k face. |
| FOWLE: | Let me get is number.   I don't even have his number anymore. |

. . .

| | |
|---|---|
| KK: | Alright, call him up, see what he wants.   Tell him, why he skips three weeks? |
| FOWLE: | I'll see if he's got the, I'll see if he has the three piece . . . Oh yeah, you gotta be all (inaudible).   You know how hard it was to get all the rest of what I got out of him, out of him, dude, I had to like grind it out of him.    I had to like harass him every day.   I was on top of that dude every f—king day, like, due, what the f—k, you know. |
| KK: | Yeah. |
| FOWLE: | So, obviously, he must have called me for a reason, so that's good.   Maybe he'll, ah, maybe there's something I can do for him to get him to get paying again, or something, you know. |
| KK: | Mm, I don't know.   He's got money. |
| FOWLE: | That thing is going good, though, that new thing, our thing. |
| KK: | Yeah. |
| FOWLE: | Yeah, that's gonna go good. |
| KK: | I think so too. |
| FOWLE: | Real good, I like it.   I'm happy.   It was way better than I thought too |

. . .

| | |
|---|---|
| KK: | Okay. |
| FOWLE: | But, um, I'm, I'm working on it . . . should be a good weekend, I'm thinking.   I'm grinding, dude.    Grinding the gears. |
| KK: | Do what you got to do. |
| FOWLE: | I'm gonna call you before then anyways because, I'm gonna, I'll have, I'll probably have, um, I'll have something.   I'm going to need more anyways, probably, eventually before then too so by then. |

---

[9]At the time CI # 2 sent a text message to KOUSTAS at Target Telephone # 1, he was not aware of the interception of wire and electronic communications over Target Telephone # 1.

KK:        It's very limited, what is left, right now.
FOWLE:     Awesome, almost gone huh?
KK:        Yup.
FOWLE:     You want to save at least a couple of them for me?
KK:        Yeah, I'll do that, but, I, I, ah, I gotta, you know what I mean, I gotta make a payment, that's the thing, so it's like, it's like.
FOWLE:     Alright.
KK:        I will, I'll save them, you know what I mean?
FOWLE:     Yeah, I know.   I'm going to, ah, I'm trying to do a couple of other things right now and, then, as soon as I'm done doing that, which, it's a quick thing that I'm doing, so.

Based upon information obtained during the investigation, I believe that when KOUSTAS asked FOWLE to call "f—k face," he was referring to CI # 2.      KOUSTAS' reference to CI # 2's failure to make a payment in three (3) weeks, "why he skips three weeks," was consistent with the time-frame of CI # 2's payment to FOWLE for KOUSTAS, which occurred on October 9, 2013, three (3) weeks before November 5, 2013.      I also believe that FOWLE'S statement to KOUSTAS that "that thing is going good though, the new thing" was his (FOWLE'S) reference to the marijuana received from KOUSTAS on October 23, 2013.      The fact that KOUSTAS and FOWLE were discussing the prior receipt of marijuana was also supported by FOWLE'S statement to KOUSTAS that "I'm going to need more" and "save at least a couple of them for me," which I believe was FOWLE'S request to KOUSTAS to provide him (FOWLE) with an additional amount of marijuana.      Finally, I believe that the conversation involved the receipt of marijuana from SIEGER during the night of October 23, 2013, because KOUSTAS advised FOWLE again that he needed to make a payment, stating, "I gotta, you know what I mean, I gotta make a payment."

36.      On November 9, 2013, BLEVENS and KOUSTAS engaged in a conversation in which arrangements were made to meet in Manchester, New Hampshire.

BLEVENS:   Yo.
KOUSTAS:   Yo.
BLEVENS:   What up?   You in Manch?

KOUSTAS:   Yup.

BLEVENS:   I was going to go to Game Stop.  You wanna meet me at Game Stop?

KOUSTAS:   I'll go there.  I'll go there right now.

Following the conversation, KOUSTAS utilized Target Telephone # 1 in order to contact BLEVENS and indicate that he had arrived at the location.   Law enforcement, who were conducting surveillance, observed KOUSTAS, who was driving a 2003 Volkswagen GTI, New Hampshire registration 2349511, registered to KOSMAS KOUSTAS, arrive and park his vehicle in a parking lot adjacent to Game Stop, a business entity which sells video games and video gaming systems.  Within two (2) minutes of KOUSTAS' arrival, law enforcement observed BLEVENS, who was driving a 2006 Toyota Camry, New Hampshire registration 2544776, registered to JEREMY BLEVENS, arrive, park his vehicle, and enter the passenger side of KOUSTAS' vehicle.   BLEVENS remained inside KOUSTAS' vehicle for approximately two (2) minutes.   BLEVENS was then observed exiting KOUSTAS' vehicle and re-entering his vehicle, where he remained for approximately four (4) minutes.   Law enforcement observed BLEVENS exit his vehicle, walk to the passenger side of KOUSTAS' vehicle, and lean inside the window.

37.    When BLEVENS leaned inside KOUSTAS' passenger window, law enforcement observed him (BLEVENS) hand an unknown item to KOUSTAS.   BLEVENS then left KOUSTAS' vehicle and entered Game Stop.   After BLEVENS entered Game Stop, KOUSTAS left the area.   Based upon information obtained during the investigation, I believe that KOUSTAS and BLEVENS were meeting in order for BLEVENS to provide KOUSTAS with currency which represented the proceeds of the prior distribution of marijuana.   I also believe that when BLEVENS told KOUSTAS that "il cme bring u that today no matter wt," he was

attempting to meet with KOUSTAS in order to turn over currency ("that") because BLEVENS still owed KOUSTAS currency from the distribution of marijuana provided to him by KOUSTAS on October 23, 2013.

38.     Although law enforcement believe that KOUSTAS and BLEVENS met on November 9, 2013, in order for BLEVENS to make a payment to KOUSTAS for the prior receipt of marijuana, the intercepted conversations over Target Telephone # 1 also appeared to demonstrate that KOUSTAS provided BLEVENS with an additional quantity of what is believed to be MDMA on November 10, 2013.     On November 10, 2013, KOUSTAS utilized Target Telephone # 1 in order to contact BLEVENS.     During the conversation, BLEVENS stated, "this kid was asking if I could get him something today.   But he's gonna supposedly have a G for me, and I think I'll only have a G on me."     Based upon information obtained during the investigation, I believe that the conversation between KOUSTAS and BLEVENS involved BLEVENS' request to purchase what law enforcement believe was a quantity of MDMA from KOUSTAS.     I also believe that when BLEVENS stated that "this kid was asking if I could get him somex today," he was referring to the same unidentified individual ("this kid") that he (BLEVENS) identified on October 24, 2013, when he (BLEVENS) arranged to meet with KOUSTAS and obtain what was believed to be a quantity of MDMA.     Likewise, I believe that BLEVENS' comment that "this kid . . . [is] gonna have a G for me," was a reference to BLEVENS' purported receipt of $1,000.00 in United States currency (a "G") from an individual ("this kid") in order to obtain a quantity of what was believed to be MDMA from KOUSTAS. Finally, I believe that in addition to BLEVENS' receipt of $1,000.00 in United States currency from an unknown individual, he (BLEVENS) planned to purchase an additional quantity of MDMA from KOUSTAS based upon the utilization of his (BLEVENS') own currency ("I'll only have a G on me").

39.     Following the conversation between KOUSTAS and BLEVENS, law enforcement, who were conducting surveillance of KOUSTAS in the area of KOUSTAS' residence, 1465 Hooksett Road, Apartment # 141, Hooksett, New Hampshire, observed KOUSTAS, who was operating his 2003 Volkswagen GTI, pull alongside a 2001 Chevrolet van, New Hampshire registration 2765950, registered to KOSMAS KOUSTAS, which was located a short distance from KOUSTAS' residence.     KOUSTAS exited the 2003 Volkswagen GTI, opened the rear door of the 2001 Chevrolet van, retrieved a white plastic bag, and re-entered the 2003 Volkswagen GTI. After KOUSTAS re-entered the 2003 Volkswagen GTI, he (KOUSTAS) utilized Target Telephone # 1 in order to contact BLEVENS.     During the conversation, BLEVENS asked KOUSTAS "do you have, ah, one of the number things with you . . . can you bring it real quick . . . just cuz this kid came from Concord, and I don't want to go back to Manch to my boy's house?"

40.     Based upon information obtained during the investigation, I believe that BLEVENS' request for KOUSTAS to bring a "number thing" is a reference to KOUSTAS providing a scale to weigh what is believed by law enforcement to be MDMA.     I also believe that BLEVENS' statement involved his request for a scale because BLEVENS' comment that "I don't want to go back to Manch to my boy's house" reflected his intent to weigh the substance without having to transport it to another location ("to my boy's house").     Within approximately four (4) minutes of the conversation, law enforcement observed KOUSTAS and BLEVENS meet in an area located a short distance from KOUSTAS' residence.     During the meeting, BLEVENS entered the front passenger side of KOUSTAS' vehicle and remained inside for approximately two (2) minutes.     BLEVENS then exited KOUSTAS' vehicle, opened the trunk of his vehicle, and then re-entered KOUSTAS' vehicle.     After remaining inside

KOUSTAS' vehicle for approximately five (5) minutes, BLEVENS exited, re-entered his vehicle and left the area.   KOUSTAS was then observed by law enforcement leaving the area and traveling back to the location of the 2001 Chevrolet van.   Once at the van, KOUSTAS exited the 2003 Volkswagen GTI carrying a white plastic bag.   KOUSTAS opened the driver's side door of the van and reached inside the vehicle.   He then closed the door to the van, re-entered the 2003 Volkswagen GTI and left the area.   When KOUSTAS re-entered the 2003 Volkswagen GTI, he was no longer carrying the white plastic bag.

41.   KOUSTAS utilized Target Telephone # 1 in order to attempt to contact BLEVENS on November 17, 2013.   After the call was directed to an automated message, KOUSTAS then utilized Target Telephone # 1 to call FOWLE on (603) 268-1725.   During the call, KOUSTAS and FOWLE discussed FOWLE's on-going efforts to collect proceeds from the prior receipt of marijuana from KOUSTAS and KOUSTAS' distribution of what was believed to be MDMA.

| | |
|---|---|
| KOUSTAS: | Let me know when you can, we can wrap that up. |
| FOWLE: | Yeah, it's gonna (inaudible).   Whenever, pretty much.   There's only two people that owe me money, so. |
| KOUSTAS: | I need to pay these people, man.   I need to get more stuff, too. |
| FOWLE: | Yeah, I'm trying to make some money.   That way I don't have to wait for these people, you know.   That's my plan, right now.   I could probably make the money quicker than f—kin' people.   Usually that's what I do. I usually wind up making the money before people even pay me, and I usually wait forever. |
| KOUSTAS: | I don't know, have, you think we can get rid of some of that other stuff? |
| FOWLE: | Oh you still got that? |
| KOUSTAS: | (Inaudible) blow too?   Let me know, you know what I mean? because if we can get rid of that, we can get rid of blow.   You know what I mean? |
| FOWLE: | Or the um, the other thing? |
| KOUSTAS: | That chick, yeah. |
| FOWLE: | No, I still got one of them too, actually.   I got one of those kicking around. |
| KOUSTAS: | I f—king f—ked up the other night.   I moved some and I wasn't wearing gloves and I got f—ked up because of it.   That s—t is no joke. |

KOUSTAS:     I didn't even do anything.    I had it, you know my fingers were a little.
FOWLE:       Yeah.
KOUSTAS:     Chopped up, and just touching it, man.    I was like f—king biting on my
             f—king teeth all night long.    (Inaudible) all the way to the morning.    I
             was like what the f—k.

42.    Based upon information obtained during the investigation, I believe that

KOUSTAS' statement to FOWLE that "[l]et me know when you can, we can wrap that up" was

a reference to KOUSTAS' continuing efforts to obtain proceeds from FOWLE involving

KOUSTAS' distribution of marijuana to FOWLE on October 23, 2013.    I further believe that

FOWLE'S response that "[t]here's only two people that owe me money" was an indication to

KOUSTAS that FOWLE was waiting to obtain currency from two (2) individuals who obtained

quantities of the marijuana which FOWLE received from KOUSTAS.    I also believe that

when KOUSTAS advised FOWLE that he "need[ed] to pay these people," he was referring to

SIEGER.    Likewise, I believe that KOUSTAS' comment that "I need to get more stuff, too"

demonstrates his (KOUSTAS') desire to obtain a quantity of currency to pay SIEGER for

marijuana received on October 23, 2013, and thereafter obtain an additional quantity of

marijuana for re-distribution.    Finally, I believe that KOUSTAS' comment to FOWLE that

"we can get rid of some of that other stuff" was a reference to what was believed to be MDMA

because when FOWLE asked KOUSTAS what he meant ("the other thing"), KOUSTAS

responded, "that chick," which I believe represents coded terminology for MDMA (a/k/a

"Molly").    In addition, I believe that the conversation between KOUSTAS and FOWLE

involved what was believed to be MDMA because KOUSTAS informed FOWLE that "I moved

some and I wasn't wearing gloves and I got f—ked up because of it . . . I was like f—king biting

on my f—king teeth all night long."    Based upon information obtained during the course of

prior investigations, I know that MDMA can cause a psychoactive effect which results in users

grinding and clenching their teeth.   Thus, I believe that KOUSTAS was advising FOWLE that

when he was packaging what was believed to be MDMA for distribution, he (KOUSTAS)

mistakenly touched some of the substance which caused a physiological response.

43.     On November 21, 2013, members of the DEA, who were involved in an unrelated

investigation, utilized a confidential informant ("CI # 4") in order to engage in a controlled

purchase of 100 tablets of 30 milligram strength oxycodone, in exchange for $2,600.00 in United

States currency, from MICHAEL GRAYDON ("GRAYDON") in Manchester, New Hampshire.

Prior to the transaction, CI # 4 contacted GRAYDON at (603) 660-4799 in order to discuss the

purchase.     During the conversation, which occurred at approximately 5:05 p.m., GRAYDON

informed CI # 4 that he (GRAYDON) would conduct the transaction but had to contact his

source of supply in order to determine whether the oxycodone was ready for distribution.   At

approximately 5:10 p.m., GRAYDON, utilizing (603) 660-4799, called CI # 4 and advised that

he had contacted his source and that the oxycodone was available.   CI # 4, who was surveilled

by law enforcement and who was searched prior to and following the transaction with negative

results, then met with GRAYDON in Manchester, New Hampshire, and purchased 100 tablets of

oxycodone.

44.     Following the transaction, law enforcement reviewed the telephone toll records

for GRAYDON'S telephone and discovered that GRAYDON called (603) 703-2889, the cellular

telephone utilized by MARK GUILLEMETTE, on nine (9) occasions on November 21, 2013,

including contact at 5:00 p.m., 5:06 p.m., and 5:10 p.m.     The pen register data for (603)

268-1725, the telephone utilized by FOWLE, demonstrated that GUILLEMETTE, utilizing

telephone number (603) 703-2889, called FOWLE at (603) 268-1725 ten (10) times on

November 21, 2013, including contact at 12:45 p.m., 12:52 p.m., 1:03 p.m., 1:19 p.m., 1:20 p.m.,

1:21 p.m., 2:07 p.m., and 3:14 p.m.     The pen register information also established that FOWLE

contacted GUILLEMETTE on (603) 703-2889 eight (8) times on November 21, 2013, including contact at 1:20 p.m., 3:16 p.m., 4:07 p.m., 5:26 p.m., 6:50 p.m., and 7:44 p.m.

45.     Based upon information obtained during the investigation, including information provided by CI # 2 on September 24, 2013, which revealed that FOWLE was involved in the distribution of oxycodone, and information provided by CI # 2 on October 9, 2013, which revealed that GUILLEMETTE was present with FOWLE in Manchester, New Hampshire, as he (FOWLE) engaged in the distribution of controlled substances, I believe that GUILLEMETTE supplied GRAYDON with the oxycodone, which was then distributed to CI # 4.     I further believe that GUILLEMETTE obtained the oxycodone for distribution from FOWLE because the information obtained from the pen register for (603) 268-1725 established GUILLEMETTE'S contact with FOWLE prior to and following the transaction.

46.     On November 21, 2013, United States District Court, District of New Hampshire, Judge Paul J. Barbadoro issued an order authorizing the continued interception of wire communications, and the continued acquisition of information reflecting the location of cellular towers, over Target Telephone # 1 for an additional thirty (30) day period on November 21, 2013.     The Court also issued an order authorizing the interception of wire and electronic communications, and the acquisition of information reflecting the location of cellular towers, over (603) 657-5195, Target Telephone # 2, the cellular telephone utilized by BLEVENS. The continued interception of wire communications over Target Telephone # 1, and interception of wire and electronic communications over Target Telephone # 2, began on November 21, 2013.     Throughout the entire period of the wire and electronic interceptions, November 21, 2013, through December 18, 2013, law enforcement monitored communications between KOUSTAS and SIEGER, KOUSTAS and FOWLE, and KOUSTAS and BLEVENS.     During the intercepted wire and electronic communications, KOUSTAS spoke with SIEGER, FOWLE, and BLEVENS

about narcotics-related activity.    Some of the communications involved KOUSTAS' contact with SIEGER regarding the receipt of marijuana for distribution, while other communications involved KOUSTAS' contact with FOWLE and BLEVENS in order to make arrangements for them to either distribute marijuana which he (KOUSTAS) received from SIEGER or turn over proceeds from the distribution of marijuana.    All of the conversations and text messages between KOUSTAS and SIEGER, KOUSTAS and FOWLE, and KOUSTAS and BLEVENS were pertinent to the distribution of controlled substances, and law enforcement discovered that KOUSTAS continued to utilize (508) 479-6296, Target Telephone # 1, for the purpose of engaging in drug-related contact with his co-conspirators.

47.    On November 26, 2013, KOUSTAS utilized (508) 479-6296 in order to contact FOWLE.    During the conversation, KOUSTAS asked FOWLE, "you forgot me?"    In response, FOWLE advised KOUSTAS that he (FOWLE) was attempting to obtain currency and that he (FOWLE) will "definitely have more dough anyways in a couple hours."    Based upon information obtained during the investigation, I believe that KOUSTAS' statement to FOWLE, "you forgot me," was a reference to KOUSTAS' continuing effort to obtain currency from FOWLE based upon his (FOWLE'S) receipt of marijuana from KOUSTAS on October 23, 2013. I also believe that FOWLE'S response that he will "have more dough" demonstrated FOWLE'S continued understanding that he must provide KOUSTAS with the proceeds of his (FOWLE'S) prior receipt of marijuana.

48.    On December 1, 2013, KOUSTAS utilized (508) 479-6296 to contact FOWLE. During the conversation, KOUSTAS continued to inquire about FOWLE'S receipt of currency.

> KOUSTAS:    Good evening.
> FOWLE:    What's up, buddy?
> . .   .
> KOUSTAS:    I was just driving here out on, driving on Mammoth Road and I
>     figured I would give you a call and say hello.    I thought about you.

| FOWLE: | Well, um, hm, hm, what's going on, anything? |
|---|---|
| KOUSTAS: | Nothing, still waiting.    I gotta come up with some more f—king. |
| FOWLE: | Well, I've got a little bit more. |
| KOUSTAS: | Paper. |
| FOWLE: | I got a little bit more. |
| KOUSTAS: | Huh? |
| FOWLE: | I said, I got a little bit more. |
| .   .   . | |
| KOUSTAS: | Yeah, just try and see what you can do, you know what I mean? |
| FOWLE: | Yeah,. |
| KOUSTAS: | And I'll see. |
| FOWLE: | Hopefully, a little better by then.    I only got, I only got like thousand . . . ten and fifteen. |
| KOUSTAS: | So, alright, so I'll see you Tuesday.    Let's do it for Tuesday night. |

Based upon information obtained during the investigation, I believe that FOWLE failed to pay KOUSTAS for the marijuana received on October 23, 2013, and that KOUSTAS continued to contact FOWLE in an attempt to obtain proceeds from the prior distribution of marijuana.    I also believe that when KOUSTAS told FOWLE that "I gotta come up with some more f—king . . . paper," he (KOUSTAS) was referring to his intent to obtain the proceeds of his prior marijuana distribution to FOWLE.    I further believe that FOWLE'S response, "[w]ell, I've got a little more," was a reference to FOWLE'S possession of additional amounts of currency for KOUSTAS.    Such belief was confirmed by KOUSTAS' use of the word "paper," which I believe was coded terminology for United States currency.    Finally, I believe that FOWLE'S comment that he (FOWLE) "only got, I only got like thousand . . . ten and fifteen" was a reference to the amount of currency, $10,000.00 - $15,000.00, which he planned to provide KOUSTAS when they met on "Tuesday," which I believe was a reference to Tuesday, December 3, 2013.

49.    On Tuesday, December 3, 2013, the intercepted conversations over (508) 479-6296 established that KOUSTAS planned to meet with FOWLE in order to obtain proceeds from the distribution of marijuana.    At 11:01 p.m., KOUSTAS utilized (508) 479-6296 to contact FOWLE.

KOUSTAS:     Are you going to be there in a few minutes?
FOWLE:         Yup, I'm here now.
.    .    .
KOUSTAS:     I'll give you a call in a few minutes.     I'll stop by and see you.
FOWLE:         Alright.

At approximately 11:54 p.m., law enforcement, who were engaged in surveillance, observed

KOUSTAS, who was traveling in his 2003 Volkswagen GTI, arrive at and enter FOWLE'S

residence, 267 Waverly Street, Manchester, New Hampshire.     KOUSTAS remained inside the

residence for approximately twenty-two (22) minutes.     KOUSTAS was then observed by law

enforcement leaving the area at approximately 12:20 a.m., December 4, 2013.   Because it

appeared that KOUSTAS obtained a quantity of currency from FOWLE on December 3, 2013, law

enforcement believed that KOUSTAS would travel to Massachusetts at some point after

December 3, 2013, in order to obtain an additional quantity of marijuana from SIEGER.     Their

belief appeared to be confirmed based upon surveillance conducted by law enforcement and based

upon the intercepted conversations over (508) 479-6296 on December 5, 2013.

50.     On December 5, 2013, at approximately 7:17 p.m., law enforcement, who were

engaged in surveillance of KOUSTAS in the area of his workplace, Foodtech Solutions, 175

Highland Avenue, Needham, Massachusetts, observed him (KOUSTAS) approach a 2009 Honda

Accord, New Hampshire registration 3177367, registered to Andreas Koustas (who is believed to

be related to KOUSTAS),                                                                      Law

enforcement observed KOUSTAS open the trunk of the motor vehicle and remove a black gym

bag, which he (KOUSTAS) then placed in the area of the rear passenger seat.     KOUSTAS was

then observed removing a cardboard box from the trunk of the vehicle and placing it in the area of

the rear passenger seat.     After placing the black gym bag and cardboard box in the vehicle,

KOUSTAS entered the vehicle and left the area at 7:18 p.m.     Although law enforcement

attempted to follow KOUSTAS, surveillance was lost shortly after KOUSTAS left the area of

Foodtech Solutions.

      51.    At 7:53 p.m., KOUSTAS received an incoming call over (508) 479-6296 from

SIEGER, who called KOUSTAS from (508) 723-3101, a cellular telephone activated on

December 4, 2013, serviced by Verizon Wireless, and subscribed to OAS PHONEINTHEBOX,

30 Independence Boulevard, Warren, New Jersey.[10]   During the conversation, the cellular site

location data for (508) 479-6296 showed that KOUSTAS was located in the area of the

Worcester-Providence Turnpike in Millbury, Massachusetts.

> KOUSTAS:  Yo.
> SIEGER:    Hey, ah, what's going on?   Is, ah, are you over by Staples?
>              Is that you?
> KOUSTAS:  Yuh, yuh.
> SIEGER:    Alright, alright, cool.    I'll be pulling out behind you in a
>              second if you just want to follow me.
> KOUSTAS:  Yuh, alright.
> SIEGER:    We will go like five minutes down the road.
> KOUSTAS:  Alright, so, so you're coming over here in a few?
> SIEGER:    Um, no, I should be here right now.   I thought I, just, oh,
>              yea, yea, yea, yea, you just want to follow me?
> KOUSTAS:  Alright, buddy.
> SIEGER:    Alright, man.

Based upon information obtained during the investigation, I believe that SIEGER was meeting

with KOUSTAS in order to have KOUSTAS follow him (SIEGER) to an area in order to obtain

marijuana for distribution.    Such belief was based upon SIEGER'S prior meeting with

KOUSTAS on October 23, 2013, during which SIEGER similarly advised KOUSTAS to "ah,

---

[10]When KOUSTAS contacted SIEGER on October 23, 2013, he (KOUSTAS) did so by calling (508) 450-0224, a cellular telephone serviced by Verizon Wireless and subscribed to by OAS PHONEINTHE BOX, 30 Independence Boulevard, Warren, New Jersey.   However, after KOUSTAS contacted SIEGER on October 23, 2013, records obtained from Verizon Wireless demonstrated that the cellular telephone, (508) 450-0224, had no additional activity following October 23, 2013.    When KOUSTAS spoke with SIEGER at (508) 723-3101 on December 5, 2013, law enforcement discovered that the voice of SIEGER and the voice of the individual who answered cellular telephone (508) 450-0224 on October 23, 2013, were one and the same.

follow me, we're gonna be going for like a seven to ten minute drive."   Although law enforcement were unable to engage in surveillance of KOUSTAS when he met with SIEGER on December 5, 2013, it was subsequently discovered that a Staples Store was located at 70 Worcester-Providence Turnpike, Millbury, Massachusetts.   Therefore, I believe that KOUSTAS met with SIEGER on December 5, 2013, in the same area where he met with SIEGER on October 23, 2013, and obtained a quantity of marijuana for re-distribution in New Hampshire.

52.   Although KOUSTAS utilized (508) 479-6296 to speak with SIEGER, the telephone toll records for (603) 261-0853, subscribed to KOSMAS KOUSTAS,

revealed that at 9:37 p.m. on December 5, 2013, after meeting with SIEGER, KOUSTAS contacted ALKIS NAKOS at (603) 966-8239, subscribed to ALKIS NAKOS,                                                            and engaged in a brief conversation.   At approximately 9:45 p.m., law enforcement, who were positioned at 140 South Porter Street in Manchester, New Hampshire, and at KOUSTAS' residence, 1465 Hooksett Road, Hooksett, New Hampshire, observed the 2009 Honda Accord, which was being driven by KOUSTAS when he left Foodtech solutions at 7:18 p.m., arrive at 140 South Porter Street, Manchester, New Hampshire. Because of the location of the residence and the visibility at the time, law enforcement were unable to determine whether KOUSTAS carried anything into the residence.   At 10:00 p.m., law enforcement observed a 2014 Mercedes Benz, New Hampshire registration 3226292, registered to ALKIS NAKOS,                                                            arrive at 140 South Porter Street.   At 11:25 p.m., law enforcement observed the 2009 Honda Accord leave 140 South Porter Street.   The 2014 Mercedes Benz was observed by law enforcement leaving the same location 10 minutes later.   Law enforcement followed the 2009 Honda Accord and confirmed that KOUSTAS was the sole operator in the vehicle, which was surveilled to 1465 Hooksett Road,

Hooksett, New Hampshire.     The Mercedes Benz was surveilled to 366 Arah Street, Manchester,

New Hampshire, the residence of ALKIS NAKOS.

      53.     On December 6, 2013, at 4:57 p.m., KOUSTAS received an in-coming call over

(508) 479-6296 from SIEGER, who was calling from (508) 723-3101.[11]     The telephone toll

records for (603) 261-0853 demonstrated that at 10:41 a.m., prior to KOUSTAS' receipt of the call

over (508) 479-6296 from SIEGER, he received a call from NAKOS, who contacted KOUSTAS

from (603) 966-8239.   During KOUSTAS' conversation with SIEGER, he (KOUSTAS)

informed SIEGER that another marijuana transaction, which was scheduled to occur on December

6, 2013, had been canceled.

| | |
|---|---|
| KOUSTAS: | Hello. |
| SIEGER: | Hey, how's it going? |
| KOUSTAS: | What's up, buddy? |
| SIEGER: | Not much, I, I was just calling to let you know, um, I was supposed to have gotten them for you. |
| KOUSTAS: | Huh? |
| SIEGER: | But, like an hour ago.   But I haven't heard from them yet. |
| KOUSTAS: | It's gonna be no good, Roy. |
| SIEGER: | Did you hear it's not going to be good? |
| KOUSTAS: | Yeah, no go. |
| SIEGER: | No go? |
| KOUSTAS: | Yeah, maybe tomorrow or next day. |
| SIEGER: | Oh, alright. |
| KOUSTAS: | Alright? |
| SIEGER: | Alright, ah, yeah, well thank you for letting me know then. |
| KOUSTAS: | (Laughs) |
| SIEGER: | Alright (laughs). |

Based upon information obtained during the investigation, I believe that SIEGER contacted

KOUSTAS because he believed that he (SIEGER) was supposed to have obtained an additional

quantity of marijuana in order to distribute it to KOUSTAS.      In addition, although law

---

[11]Although cellular telephone (508) 723-3101 was activated on December 4, 2013, the telephone toll records
demonstrated that it stopped being utilized on December 7, 2013.

enforcement previously believed that SIEGER served as a marijuana source of supply to

KOUSTAS, it appeared, based upon the conversation, that SIEGER'S status was, instead, that of a

middleman or courier whose role was to distribute marijuana on behalf of other co-conspirators.

Such belief was based upon the fact that during the call, SIEGER informed KOUSTAS that he had

not heard from "them" yet, to which KOUSTAS replied, "yeah, no go."      Thus, based upon the

conversation, it appeared that KOUSTAS possessed superior knowledge than that held by

SIEGER involving the availability of marijuana for distribution.      Likewise, when SIEGER

asked KOUSTAS, "did you hear it's not going to be good," KOUSTAS confirmed that the

transaction would occur "maybe tomorrow or next day."   Thus, based upon the conversation, I

believe that SIEGER'S role was different than that previously believed    I also believe that

KOUSTAS possessed greater contact with co-conspirators who were involved in the distribution

of marijuana, and that NAKOS, who spoke with KOUSTAS prior to SIEGER'S call, informed

KOUSTAS that the transaction had been canceled.

    54.    On December 7, 2013, SIEGER utilized (508) 723-3101 to call KOUSTAS at (508)

479-6296.   During the conversation, KOUSTAS and SIEGER discussed KOUSTAS' travel to

Worcester, Massachusetts, in order to meet with SIEGER.

|  |  |
|---|---|
| KOUSTAS: | Yo. |
| SIEGER: | Hey, how's it going? |
| KOUSTAS: | What's up, man? |
| SIEGER: | Not much, ah, so (inaudible) saying, you, you coming down here for like 4:00 – 4:30? |
| KOUSTAS: | 4:30.   Can I do it a little later, like 6:00 – 6:30? |
| SIEGER: | Ah, yeah, I guess, ah. |
| KOUSTAS: | Or you want to do it tomorrow morning . . . . If, If I can come later on tonight, I, I can do it tonight.    If not, I can do it earlier tomorrow morning, all day tomorrow. |
| SIEGER: | Well, I just need, that if we're doing it over there, I just need it to be dark (inaudible) call me tonight when you are coming through. |

Based upon information obtained during the investigation, I believe that KOUSTAS' conversation with SIEGER on December 7, 2013, involved his (KOUSTAS') plan to travel to the area of Worcester, Massachusetts, in order to obtain an additional quantity of marijuana for distribution. I also believe that when SIEGER stated, "I just need it to be dark," he (SIEGER) was advising KOUSTAS that his (SIEGER's) transfer of the marijuana should occur at a time in which the risk of detection by law enforcement would be minimized.

55.     At 5:01 p.m. on December 7, 2013, KOUSTAS utilized (508) 479-6296 in order to contact SIEGER at (508) 723-3101.

| | |
|---|---|
| SIEGER: | Hey, how's it going? |
| KOUSTAS: | Yo, what's up, man? |
| SIEGER: | Not much. |
| KOUSTAS: | So, huh? |
| SIEGER: | Not much, so you'll be down here in like an hour? |
| KOUSTAS: | Like an hour and fifteen, hour and twenty minutes. |
| SIEGER: | Alright, cool, um, give me a call when you're like ten, fifteen away. |
| KOUSTAS: | Okay, do you mind, if you want to do it before, do you mind, like meeting me like thirty minutes closer? |
| SIEGER: | Um, I just don't know where we could be able to do it. |
| KOUSTAS: | Oh, I got a spot.     I got a good (inaudible).   It's in Needham. |
| SIEGER: | Um, I don't even know if that would work out because, ah, I'm, I'm in the middle of something right now too, and I still have to go get that for you. |
| KOUSTAS: | That's cool, that's cool.   So, I'll, I'll call you like ten minutes out, alright? |
| SIEGER: | Alright, man. |
| KOUSTAS: | Alright. |
| SIEGER: | Alright, bye. |
| KOUSTAS: | Wa, wait. |
| SIEGER: | Hey. |
| KOUSTAS: | Where, I'm going over the mall, right? |
| SIEGER: | Yea, yea, yea, same spot. |
| KOUSTAS: | Alright. |

Based upon information obtained during the investigation, I believe that KOUSTAS contacted SIEGER in order to confirm that he (KOUSTAS) would travel to Massachusetts in order to obtain

a quantity of marijuana.   The information was consistent with KOUSTAS' conversation with SIEGER on December 6, 2013, during which KOUSTAS advised SIEGER that his (KOUSTAS') scheduled trip to Worcester on December 6, 2013, was canceled and re-scheduled to occur "tomorrow or [the] next day."      I also believe that when KOUSTAS asked SIEGER if they could meet "like thirty minutes closer," and that he (KOUSTAS) had a "spot . . in Needham,"   he (KOUSTAS) was referring to his desire to engage in the transaction in or around his workplace, Foodtech Solutions, located in Needham, Massachusetts.   Finally, I believe that when KOUSTAS asked SIEGER if they would meet "by the mall," and SIEGER responded, "yea, same spot," he (SIEGER) was referring to their meeting on December 5, 2013, in the area of 70 Worcester-Providence Turnpike, Millbury, Massachusetts, which is the location of a mall and numerous commercial stores.

56.      Following KOUSTAS' conversation with SIEGER, law enforcement, who were conducting surveillance in the area of the Shoppes at Blackstone Mall, Millbury, Massachusetts, observed KOUSTAS arrive at 6:14 p.m. on December 7, 2013, in a 2009 Honda Accord, New Hampshire registration 3177367, registered to Andreas Koustas,

                        Within 10 minutes of KOUSTAS' arrival, law enforcement observed a 2005 Subaru Legacy, Massachusetts registration 29DE70, registered to DEAN SIEGER ,                                   arrive in the area.    As soon as the vehicle arrived, KOUSTAS followed it for approximately 10 minutes to 4 Coldbrook Road, Millbury, Massachusetts.      As KOUSTAS was following the 2005 Subaru Legacy, he (KOUSTAS) utilized (508) 479-6296 at 6:27 p.m. in order to attempt to contact FOWLE.      In addition, during the drive, KOUSTAS also utilized (508) 479-6296 to attempt to call BLEVENS.      However, neither FOWLE nor BLEVENS answered the call.

57.     When the vehicles, the 2009 Honda Accord and 2005 Subaru Legacy, arrived at 4 Coldbrook Road, the 2005 Subaru Legacy entered the driveway and KOUSTAS pulled the 2009 Honda Accord in the driveway behind the 2005 Subaru Legacy.     KOUSTAS remained at the residence for approximately three (3) minutes.     Because of the position of the residence, the surveillance units could not see whether KOUSTAS, or the occupant of the 2005 Subaru Legacy, entered the residence or whether KOUSTAS placed anything inside the 2009 Honda Accord. However, law enforcement engaged in active surveillance of KOUSTAS from the time he (KOUSTAS) left 4 Coldbrook Road, Millbury, Massachusetts, 6:34 p.m., until he (KOUSTAS) arrived at 140 South Porter Street, Manchester, New Hampshire, at approximately 8:30 p.m. During surveillance, law enforcement observed KOUSTAS conduct numerous counter-surveillance measures, including engaging in an erratic lane-change and cutting across the road in order to quickly take an exit.     Law enforcement also observed that KOUSTAS never exceeded the speed limit and remained in the middle lane of a three (3) lane highway during most of his (KOUSTAS') return trip to New Hampshire from Massachusetts.     While traveling back to New Hampshire, KOUSTAS utilized (508) 479-6296 at 6:58 p.m. and 8:10 p.m. in order to attempt to contact FOWLE.     However, FOWLE did not answer the telephone and KOUSTAS' call was directed to an automated message.

58.     Law enforcement observed KOUSTAS return to 140 South Porter Street, Manchester, New Hampshire, at approximately 8:30 p.m.     When KOUSTAS arrived at the location, law enforcement observed him remove items from the passenger side of the vehicle and enter the residence.     KOUSTAS remained inside the residence for approximately nine (9) minutes.     The telephone toll records for (603) 261-0853 demonstrated that at 8:41 p.m., KOUSTAS received an in-coming call over (603) 261-0853 from NAKOS, who contacted KOUSTAS from (603) 966-8239.     When KOUSTAS left the area, he (KOUSTAS) was still

traveling in the 2009 Honda Accord.     KOUSTAS was then observed arriving at 366 Arah Street,

Manchester, New Hampshire, the residence of ALKIS NAKOS.     When KOUSTAS arrived, he

exited the 2009 Honda Accord and entered a back door of the residence, where he (KOUSTAS)

remained for approximately twenty (20) minutes.     KOUSTAS departed 366 Arah Street at

approximately 10:12 p.m. and surveillance units lost contact with him (KOUSTAS).     Because

KOUSTAS entered the residence, law enforcement could not confirm whether he met with

NAKOS.

     59.     Following KOUSTAS' trip to Massachusetts in order to meet with SIEGER, law

enforcement obtained the telephone toll records for the cellular telephone, (508) 723-3101, which

SIEGER utilized to contact KOUSTAS.     The cellular telephone, (508) 723-3101, which is

subscribed to by OAS PHONEINTHEBOX, 30 Independence Boulevard, Warren, New Jersey,

was activated on December 4, 2013, and serviced by Verizon Wireless.   The telephone toll

records demonstrated that although the cellular telephone was activated on December 4, 2013, it

stopped being utilized on December 7, 2013.     During the period of December 4, 2013, through

December 7, 2013, there were three (3) telephone calls and two (2) text messages between (508)

723-3101 and (518) 569-0441, a TracFone activated on October 4, 2013, serviced by Cellco

Partnership (d/b/a Verizon Wireless), subscribed to by 1132019181.

     60.     The cellular telephone which SIEGER contacted between December 4, 2013, and

December 7, 2014, (518) 569-0441, is believed by law enforcement to be utilized by MARSHALL

LAFAVE.[12]   In addition to having contact with SIEGER, law enforcement discovered that the

number, (518) 569-0441, was in contact with (518) 478-3366, a TracFone subscribed to

---

[12]Law enforcement believe that (518) 569-0441 is utilized by LAFAVE because he is employed as a newspaper delivery man and the number, (518) 569-0441, has numerous contacts with the local newspaper, the Plattsburgh Press Republican, which employs LAFAVE.   In addition, the number, (518) 569-0441, engaged in contact with (518) 594-7112, which is the telephone number for LAFAVE'S residence, 6203 State Route 11, Ellenburgh Center, New York.

teaweed4@yahoo.com, 1 Park Way, Altona, New York.   Law enforcement discovered that the address and email account for the number, (518) 478-3366, belonged to Sara Prue, a woman who shares a child with ROBERT FILLION.     When questioned by law enforcement, Prue advised that she did not activate the telephone and believed that it was being utilized by FILLION.     Prue also advised law enforcement that FILLION was involved in transporting controlled substances from the St. Regis Mohawk Indian Reservation in New York to other locations.   In addition, Prue revealed that in or around June 2013, FILLION traveled to an area near the Akwesasne Mohawk Indian Reservation.[13]   Prue stated that FILLION then left the Indian Reservation and traveled to Burlington, Vermont, where he rented a car and drove to New York City.     FILLION remained in New York for a brief period of time and returned to his residence.   Finally, Prue stated that FILLION and LAFAVE have been seen together.

61.     Law enforcement are familiar with LAFAVE based upon a January 25, 2012, motor vehicle stop during which $32,500.00 in United States currency, located in a hermetically sealed plastic bag, was seized from his vehicle.     On January 25, 2012, law enforcement engaged in surveillance of WAYNE BUSHEY as he traveled from Plattsburgh,[14] New York, to Albany, New York.     Once in Albany, BUSHEY stopped at a gas station and met with LAFAVE, who was located in a Monte Carlo registered to TAMMY LAFAVE, the wife of LAFAVE.     After a brief meeting, LAFAVE and BUSHEY left the area in separate vehicles, maintained a separation of approximately one (1) mile, entered onto the Taconic Parkway, and traveled to Pleasant Valley, New York.     Once in Pleasant Valley, BUSHEY was observed by law enforcement to travel to a

---

[13]The St. Regis Mohawk Indian Reservation and the Akwesasne Mohawk Indian Reservation, known collectively as "Akwesasne," is a Native American reservation which straddles twelve (12) miles of the United States-Canadian Border in northern New York State.

[14]Plattsburgh, New York, is located in the northeast part of New York State and is approximately 20 miles south of the Canadian border.

residence while LAFAVE waited at a gas station a short distance away.   BUSHEY remained at the residence for approximately five (5) minutes and then left the area.

62.   Shortly after BUSHEY left, LAFAVE departed the gas station and, like BUSHEY, returned to the Taconic Parkway.   BUSHEY and LAFAVE maintained a separation of approximately one (1) mile until they reached Plattsburgh, New York, where they met at a Hannaford's Grocery Store parking lot.   Law enforcement observed BUSHEY, who was parked next to LAFAVE, obtain a blue plastic shopping bag from the trunk of his vehicle and hand it to LAFAVE.   LAFAVE, in turn, placed the shopping bag in the trunk of his vehicle.   Both vehicles then departed the area.   Surveillance was maintained on LAFAVE until he encountered a Clinton County Sheriff's Department traffic safety checkpoint in Ellenburg,[15] New York. While at the checkpoint, LAFAVE provided law enforcement with consent to search his vehicle after a K-9, who responded to the checkpoint, alerted to the undercarriage of the trunk of LAFAVE'S vehicle.   A subsequent search resulted in the seizure of a blue plastic shopping bag, which was positively identified as the shopping bag provided to LAFAVE by BUSHEY, which contained bundles of currency that had been hermetically sealed in plastic packaging and labeled "$32,500" in black marker.

63.   On November 25, 2012, WAYNE BUSHEY was inspected at the Champlain, New York, Port of Entry.   During the inspection, law enforcement discovered two (2) cellular telephones in BUSHEY'S possession.   The contact list in one of the telephones included telephone number (518) 478-3366 and a reference to "R."   Based upon information obtained by law enforcement, it is believed that "R" is a reference to ROBERT FILLION and that FILLION

---

[15]Ellenburg, New York, is approximately 27 miles from the Canadian border.

utilized (518) 478-3366 in order to engage in drug-related contact with LAFAVE at (518) 569-0441.

64.   During the period of October 20, 2013, through October 23, 2013, FILLION'S cellular telephone, (518) 478-3366, was in contact with one of DEAN SIEGER'S cellular telephones, (508) 450-0224, on eighteen (18) separate occasions.   On October 23, 2013, KOUSTAS utilized (508) 479-6296 to contact SIEGER at the same cellular telephone number, (508) 450-0224, and thereafter obtained a quantity of marijuana from him (SIEGER) on the same date, October 23, 2013, in the area of Worcester, Massachusetts, which he (KOUSTAS) then transported back to New Hampshire and redistributed to FOWLE and BLEVENS.

65.   On December 10, 2013, FOWLE contacted KOUSTAS at (508) 479-6296. During the conversation, KOUSTAS advised FOWLE that he (KOUSTAS) had been trying to contact FOWLE because he (KOUSTAS)   had "different stuff," which I believe was a reference by KOUSTAS to his (KOUSTAS') receipt of an additional quantity of marijuana.

| | |
|---|---|
| KOUSTAS: | Hello. |
| FOWLE: | Good evening. |
| KOUSTAS: | Good evening [    ].   How do you do? |
| FOWLE: | Pretty good.   What are you up to? |
| KOUSTAS: | Nothing.   Just leaving Market Basket right now.   Just getting together a couple of things. |
| FOWLE: | Yeah, what in Manchester? |
| KOUSTAS: | Huh? |
| FOWLE: | Not the one down here right, the one by your house? |
| KOUSTAS: | No, I'm right here in Manchester. |
| FOWLE: | Ah. |
| KOUSTAS: | By Elm Street. |
| FOWLE: | How's that place.   How's the Market Basket? |
| KOUSTAS: | Oh, like the hood, bro.   It is the hood here. |
| FOWLE: | I like that one.   I went in there one day, dude, it is so big.   It is almost too f—king big.   They've got so much f—king s—t in that place, huh? |
| KOUSTAS: | This is, this is the welfare place.   You find, if you, if you want to find customers, you come here (laughs). |
| FOWLE: | Ya, maybe I'll swing down there.   I could use a few. |

| KOUSTAS: | Ya, that's kind of how I am.   Just set up shot outside here in the parking lot as they go in. |
| | . . . . |
| KOUSTAS: | Well, well, where you been?   I tried calling you a bunch of times. |
| FOWLE: | Oh, I know, I've been f—king relaxing, but, ah, I'll, I'll have something for you today. |
| KOUSTAS: | Huh? |
| FOWLE: | I'll have something for you today. |
| KOUSTAS: | Ya, well that's something to do.   That'll, that's why I want to see you, maybe we can do something. |
| FOWLE: | Oh ya, people, actually people been asking me. |
| KOUSTAS: | So. |
| FOWLE: | Um, ya. |
| KOUSTAS: | I don't know. |
| FOWLE: | They've been definitely.   Well how is it? |
| KOUSTAS: | I got different stuff, different things happen. |
| FOWLE: | Oh, ya? |
| KOUSTAS: | That's why I wanted to see you, you know what I mean?   I tried calling you since Friday.   I've been trying to get a hold of you. So, I don't know.   Are you going to be at your crib? |
| FOWLE: | Oh, I'm just, I got a couple of people here in the next hour or so. So, well let me think.   I just texted the kid.   Ya, he should be here any minute.   When, when this other dude comes so, you at the Market Basket still? |
| KOUSTAS: | Give me a call later on when you finish up and stuff. |
| FOWLE: | Ya, that's what I'm gonna do.   That way I'll have something for ya. |
| KOUSTAS: | Alright. |
| FOWLE: | I'll call you in a few hours and, ah, see what's up. |

66.    Based upon information obtained during the investigation, I believe that KOUSTAS contacted FOWLE in order to inform him (FOWLE) that he (KOUSTAS) had obtained an additional amount of marijuana for distribution.   Such belief was confirmed by KOUSTAS' statement to FOWLE that "maybe we can do something," which I believe was an indication that KOUSTAS was seeking to provide FOWLE with marijuana.   In response to KOUSTAS' statement, FOWLE stated "people been asking me," and "how is it?"   KOUSTAS told FOWLE, "I got different stuff, different things happen."   Based upon information obtained during the investigation, which included KOUSTAS' travel to the area of Worcester and Millbury, Massachusetts, on December 5, 2013, and December 7, 2013, in order to meet with SIEGER, I

believe that KOUSTAS' statement to FOWLE that "I got different stuff," was a reference to the

receipt of additional quantities of marijuana from SIEGER.    Finally, I believe that when FOWLE

informed KOUSTAS that he (FOWLE) would "have something for him [KOUSTAS]," he

(FOWLE) was referring to his ability to provide KOUSTAS with additional quantities of currency

based upon the prior receipt and distribution of controlled substances received from KOUSTAS.

Thus, when FOWLE told KOUSTAS that he (FOWLE) would call after he met with "this other

dude . . .  and that way I'll have something for ya," I believe he (FOWLE) was referring to the

availability of currency for KOUSTAS after he (FOWLE) obtained currency.

     67.    On December 10, 2013, KOUSTAS received an incoming call on (508) 479-6296

from FOWLE.    During the call, FOWLE told KOUSTAS "come by, but, ah, my buddy's here,

but either way, I'll just come out or he, I'll have him go upstairs or something."    In response to

FOWLE'S statement, KOUSTAS advised, "alright, I'll be over in like, ten, fifteen minutes."

Based upon information obtained during the investigation, I believe that when FOWLE advised

KOUSTAS that he (FOWLE) would have his "buddy . . . go upstairs," he (FOWLE) was

attempting to ensure KOUSTAS that an unknown individual would not observe KOUSTAS

meeting with FOWLE.    I also believe that FOWLE made the representation to KOUSTAS

because he (FOWLE) was scheduled to obtain an additional quantity of marijuana from

KOUSTAS and he (FOWLE) would not want individuals to identify his (FOWLE'S) marijuana

source of supply.    I also believe that KOUSTAS, who supplied FOWLE with quantities of

marijuana for distribution, would not want to conduct a marijuana transaction with FOWLE while

in the presence of an unknown individual because the individual could provide incriminating

information to law enforcement based upon his observation of the transaction.    Likewise, I

believe that NAKOS, like KOUSTAS, shields himself from apprehension by law enforcement by

maintaining as much distance as possible from individual marijuana transactions.    Thus, just as

KOUSTAS intended to guarantee that FOWLE'S "buddy" would not see him when he (KOUSTAS) met with FOWLE in order to engage in the distribution of marijuana, NAKOS' actions during the investigation were carefully coordinated in order to shield himself from detection and arrest.[16]

68.     Following the call between KOUSTAS and FOWLE, law enforcement, who were conducting surveillance in the area of FOWLE'S residence, observed KOUSTAS, who was driving his 2003 Volkswagen GTI, arrive at FOWLE'S residence at approximately 10:32 p.m. However, because of the location of the surveillance, law enforcement could not determine whether KOUSTAS carried anything into the residence.    KOUSTAS remained inside FOWLE'S residence for approximately twenty-five (25) minutes.     When KOUSTAS exited, he re-entered his vehicle and left the area.

69.     After law enforcement observed KOUSTAS travel to FOWLE'S residence during the night of December 10, 2013, all calls over (508) 479-6296, Target Telephone # 1, ended. Thus, on December 18, 2013, United States District Court, District of New Hampshire, Judge Paul J. Barbadoro issued an order authorizing the interception of wire and electronic communications, and the acquisition of information reflecting the location of cellular towers, over (603) 268-1725, Target Telephone # 3, the cellular telephone being utilized by FOWLE. Interceptions began on December 19, 2013, and were scheduled to terminate on January 16, 2014.

---

[16] NAKOS' ability to maintain a significant distance from individual marijuana transactions is supported by his status within the COLGROVE DTO.   As previously detailed, the investigation disclosed that NAKOS maintained significant ties with individuals, including MIHAIL LEVENTIS, who had direct contact with COLGROVE.   Thus, because law enforcement understand that those who are involved in a leadership capacity within a DTO are generally not involved in the day-to-day operations of the business, it is not surprising that NAKOS, who law enforcement believe serves as a manager or supervisor, would not have any involvement in the actual possession and/or distribution of the marijuana, as he (NAKOS) would leave such activity to those, including KOUSTAS, who occupied an inferior position within the DTO.

70.     During the monitoring of the communications over (603) 268-1725, law

enforcement confirmed that FOWLE obtained an additional quantity of marijuana for distribution

from KOUSTAS following their December 10, 2013, conversation and meeting.     For example,

on December 19, 2013, FOWLE received an in-coming call from FRANK FOWLE ("FRANK

FOWLE"), the brother of CHARLES FOWLE.     During the conversation, FOWLE revealed that

he (FOWLE) obtained a quantity of marijuana, "but it wasn't the same as what [he] had before."

| | |
|---|---|
| FOWLE: | Yo. |
| FRANK FOWLE: | Hey. |
| FOWLE: | What? |
| FRANK FOWLE: | Remember that thing I asked you to get? |
| FOWLE: | Yeah. |
| FRANK FOWLE: | Did you get that yet? |
| FOWLE: | Yeah, but it wasn't the same as what I had before. |
| FRANK FOWLE: | Huh? |
| FOWLE: | I got one you can have, but it's not the same price.     It's still good, you know, it's better.     It's better, so that's why it costs more. |
| FRANK FOWLE: | Well, ah, I'm gonna need to check one of them out at least and if it's, if it's, if it's good, I might need two, so. |
| FOWLE: | Alright, yeah, I got, I got, I have two of them, you know, so. |
| FRANK FOWLE: | Alright, I just, it's gotta be.     I mean it's, for that number it's gotta be f—kin bomb baggy. |
| FOWLE: | No, it is.     I got some, ah, G13 Kush. |
| FRANK FOWLE: | Alright.   What's, what's your opinion.   Is it as good as the other stuff. |
| FOWLE: | Ah, what stuff? |
| FRANK FOWLE: | The purple. |
| FOWLE: | Well, I got a few different kinds.   Ah, yeah, I got some purple and I have one of, the one's that the purple ones.   Ah, it's just bud. |

71.     Based upon information obtained during the investigation, I believe that FOWLE

supplies FRANK FOWLE with quantities of marijuana for distribution.     Thus, I believe that

when FRANK FOWLE asked FOWLE if he "[got] that yet," he (FRANK FOWLE) was inquiring

about whether FOWLE obtained marijuana for him (FRANK FOWLE).     In response to FRANK

FOWLE'S question, FOWLE stated, "it wasn't the same as what I had before," which I believe

was   a reference to his (FOWLE'S) recent receipt of an additional quantity of marijuana from

KOUSTAS.   FOWLE'S statement to his brother, FRANK FOWLE, was consistent with

KOUSTAS' statement to FOWLE on December 10, 2013, that he "got different stuff, different

things happen."    The fact that FOWLE was discussing his possession of marijuana was further

established when he indicated that he had "G13 Kush" and "purple," which I believe were

references to different strains of marijuana, and "it's just bud," which I believe was a reference to

marijuana.   Accordingly, I believe that FOWLE'S conversation with FRANK FOWLE confirmed

that he (FOWLE) received an additional quantity of marijuana from KOUSTAS and that he was

attempting to distribute it.    I also believe that the conversation demonstrated that FOWLE was

engaged in the distribution of marijuana received from KOUSTAS and that FRANK FOWLE

intended to purchase a quantity of it.    Finally, I believe that FRANK FOWLE'S statement to

FOWLE that "if it's good, I might need two," was a reference to FRANK FOWLE'S intention to

purchase either one (1) or two (2) pounds of marijuana.

     72.    FRANK FOWLE'S distribution of marijuana was confirmed on December 22,

2013, during a conversation with FOWLE in which FRANK FOWLE revealed that he made

$650.00 in United States currency through the distribution of marijuana and what I believe to be a

quantity of cocaine.

| | |
|---|---|
| FRANK<br>FOWLE: | I made f—king six hundred and fifty bucks yesterday.    I went and grabbed two of those things I looked at over there and dumped those. |
| FOWLE: | (inaudible) |
| FRANK<br>FOWLE: | And, I said I went and grabbed two of those things I looked at over there and dumped those. |
| FOWLE: | Ah, you did? |
| FRANK<br>FOWLE: | Yeah, and then I went and picked up a little seven of f—king "re-re" for f—king someone else and make some off that and ended up being about six hundred and fifty bucks I made. |

Based upon information obtained during the investigation, I believe that FRANK FOWLE'S statement about "grabb[ing] two of those things" was a reference to the receipt and distribution ("I dumped those") of two (2) pounds of marijuana.   Likewise, I believe that when FRANK FOWLE indicated that he made "six hundred and fifty bucks," he was referring to proceeds obtained, in part, as a result of the distribution of marijuana.    Finally, I believe that FRANK FOWLE'S statement involving "pick[ing] up a little seven of f—king `re-re,'" involved his receipt of a quantity of cocaine (commonly distributed in seven (7) gram quantities, which is equal to approximately ½ ounce of cocaine) which he also sold and made a profit as a result of the distribution.

> 73.    FOWLE'S receipt of marijuana for distribution was further confirmed based upon a call made by FOWLE approximately 35 minutes after speaking with FRANK FOWLE.   On December 19, 2013, FOWLE utilized Target Telephone # 3 in order to contact an unknown male ("UM").   During the conversation, FOWLE advised the UM, who inquired about the purchase of what law enforcement believed to be oxycodone, that he (FOWLE) had recently purchased a quantity of marijuana.

| UM: | When do you think you'll have those? |
|---|---|
| FOWLE: | Ah, think, ah, I gotta get some money to f—king buy some.    That's the problem. |
| UM: | Yeah. |
| FOWLE: | Ah, but I should have some money soon. |
| UM: | Hm. |
| FOWLE: | Well, well. |
| UM: | What do you have now?   Do you have any? |
| FOWLE: | Ya, I got a little bit. |
| UM: | Ya. |
| FOWLE: | Gotta be able to buy at least a couple hundred at a time to get them. |
| UM: | Right. |
| FOWLE: | So, ya know. |
| UM: | But where's all your f—king ching?   Spend it, high roller? |
| FOWLE: | I already did, got some weed. |
| UM: | Oh, uh. |
| FOWLE: | Ya, spent it on the weed. |

FOWLE:      Right.   Ya, I got more too if you want more.
UM:         Ya.
FOWLE:      Ya.
UM:         Cool.   Ah, so what do you think you have of them?   How many?   Like twenty, twenty-five.
FOWLE:      Ah, Ah, I could count them right now if you want . . . Let's see what we got.   Let's see what we got in the baby socks.   Hm, looks like about twenty.
UM:         I'll take it then.
FOWLE:      Whatever works.
UM:         Alright, where are you, home?   I'll just come down and grab them right now.   Thanks.
FOWLE:      Alright.

74.    Based upon information obtained during the investigation, I believe that FOWLE'S statement that he "spent [his money] on the weed" was a reference to his (FOWLE'S) receipt purchase of a quantity of marijuana from KOUSTAS.   I also believe that the conversation between FOWLE and the UM confirmed FOWLE'S involvement in the distribution of what law enforcement believe to be oxycodone.   Thus, when FOWLE advised the UM that he needed to "be able to buy at least a couple hundred at a time," I believe that he was referring to oxycodone, which is often purchased in quantities in excess of 100 by individuals who are engaged in the distribution of significant amounts of oxycodone.   In addition, I also believe that during the conversation, FOWLE counted 20 tablets of oxycodone and agreed to distribute the tablets to the UM.

75.    The intercepted conversations over Target Telephone # 3 also established that FOWLE distributed oxycodone to WILLIAM SWANSON.   For example, on December 22, 2013, SWANSON contacted FOWLE and inquired about the availability of what law enforcement believe to be oxycodone for distribution.

SWANSON:   Okay, so there's no chance that your gonna be dry later?
FOWLE:      I don't think so because I can get them whenever I want, but I just sent, I just sent this kid to go get me some right now.
SWANSON:   Huh?

FOWLE:       I just went, I got, I got some coming here right now.
SWANSON:   You got someone coming there right now?
FOWLE:       No, I got, I got, I got a couple hundred of them, so.
SWANSON:   Alright, I was gonna say can you, can you uh?   I'm in the middle of
                Christmas shopping or whatever, so I definitely want to come by there
                before I do go home. I don't know what time it's gonna be?
FOWLE:       Yup.
SWANSON:   So I kinda wanted you to just put like, uh, twenty away.
FOWLE:       Alright, I can do that.
SWANSON:   Hold twenty for me.
FOWLE:       Yup.
SWANSON:   Alright.

76.     FOWLE'S utilization of MARC GUILLEMETTE as an oxycodone distributor

was also confirmed by the intercepted conversations over Target Telephone # 3.     Prior to

receipt of authorization to intercept communications over Target Telephone # 3, law

enforcement utilized a confidential informant (CI # 4) in November 2013 in order to engage in a

controlled purchase of 100 tablets of 30 milligram strength oxycodone, in exchange for

$2,600.00 in United States currency, from MICHAEL GRAYDON in Manchester, New

Hampshire.   Following the transaction, law enforcement reviewed the telephone toll records for

GRAYDON'S telephone, (603) 660-4799, and discovered that GRAYDON called (603)

703-2889, the cellular telephone utilized by MARC GUILLEMETTE, on nine (9) occasions on

November 21, 2013.     The pen register data for Target Telephone # 3 demonstrated that

GUILLEMETTE called FOWLE on Target Telephone # 3 ten (10) times on November 21, 2013.

Thus, law enforcement believed that GUILLEMETTE supplied GRAYDON with oxycodone for

distribution and that he (GUILLEMETTE) obtained the oxycodone from FOWLE.     Such belief

was confirmed by the intercepted conversation over Target Telephone # 3.

77.     On December 20, 2013, GUILLEMETTE contacted FOWLE and informed him

(FOWLE) that he "still got a bunch left" and that he (GUILLEMETTE) would need "another ten

piece."   Based upon information obtained during the investigation, I believe that

GUILLEMETTE'S reference to needing "another ten piece" was a reference to his desire to

obtain 10 additional tablets of oxycodone for distribution.    Two days after the conversation,

GUILLEMETTE contacted FOWLE on Target Telephone # 3 and stated, "can I, uh, grab

another, um, eleven piece off you for cash."     Like the conversation on December 20, I believe

that GUILLEMETTE'S statement to FOWLE on December 22, 2013, involved a request to

obtain a quantity of oxycodone for distribution.

       78.    On December 22, 2013, law enforcement intercepted an incoming call to FOWLE

from (508) 745-9616.    The in-coming caller was KOUSTAS.    During KOUSTAS'

conversation with FOWLE, he (KOUSTAS) inquired about the status of FOWLE'S distribution of

marijuana which law enforcement believe was provided by KOUSTAS during the night of

December 10, 2013.

| | |
|---|---|
| FOWLE: | Yo. |
| KOUSTAS: | Guten tag. |
| FOWLE: | Hi, man. |
| KOUSTAS: | What are you doing, sleeping? |
| FOWLE: | No, I was, I was just sleeping a little while ago.   I just woke up, not too long ago.   What are you doing? |
| KOUSTAS: | What's going on?   You see anybody? |
| FOWLE: | No, not yet.   Still early. |
| KOUSTAS: | Oh, ya? |
| FOWLE: | Oh, I was up early this morning.   Got up at like eight o'clock in the morning.   Pouring through that f—king. |
| KOUSTAS: | Ah, you want, you want me to give you a call later on? |
| FOWLE: | Ah, ya, Um, what was I going to say?   Yeah, I'll call you back on my other phone anyways. |

Based upon information obtained during the investigation, I believe that KOUSTAS' statement to

FOWLE that "you see anybody" was a reference to whether or not FOWLE distributed additional

quantities of marijuana received from KOUSTAS.    I further believe that FOWLE'S response,

"no, not yet, still early," was a reference to the fact that FOWLE was still attempting to distribute

marijuana obtained from KOUSTAS and that he (FOWLE) would need an additional period of

time in order to do so.    Finally, based upon information obtained during the investigation, I

believe that FOWLE'S comment to KOUSTAS that he (FOWLE) would "call [him] back on [his]

other phone," was a reference by FOWLE that he (FOWLE) may have obtained a new cellular

telephone and be in the process of dropping cellular telephone number (603) 268-1725.

79.    Following FOWLE'S conversation with KOUSTAS, law enforcement discovered

that (508) 745-9616, was activated on December 11, 2013, serviced by Verizon Wireless, and

subscribed to by Hol Val, 30 Independence Boulevard, Warren, New Jersey.    The activation

date of (508) 745-9616, December 11, 2013, was consistent with the time-frame in which

KOUSTAS stopped utilizing (508) 479-6296, December 10, 2013.    In addition, the number was

obtained through the utilization of the same subscriber information as (508) 479-6296, Hol Val, 30

Independence Boulevard, Warren, New Jersey, and the pen register data for (508) 745-9616,

showed contact with the same numbers being called by KOUSTAS through the use of (508)

479-6296.    I also believe that KOUSTAS dropped cellular telephone number (508) 479-6296

and obtained a new cellular telephone number, (508) 745-9616, in order to attempt to hide his

involvement in the distribution of controlled substances from law enforcement.    Such belief is

consistent with information obtained by law enforcement involving KOUSTAS, including his

(KOUSTAS') known utilization of numerous cellular telephone numbers, each for less than two

(2) to three (3) months, during the course of the investigation.    Likewise, because the

investigation demonstrated that KOUSTAS was cognizant of the presence of law enforcement, I

believe that his utilization of false subscriber information also demonstrated that he actively

obtained and dropped cellular telephones in order to attempt to shield his unlawful activity from

discovery.

80.    On December 30, 2013, law enforcement concluded the interception of wire and

electronic communications over FOWLE'S cellular telephone, Target Telephone # 3, (603)

268-1725, because all activity by FOWLE over the number ended on December 28, 2013.

Therefore, on January 13, 2014, United States District Court Judge Paul J. Barbadoro issued an

order authorizing the interception of wire and electronic communications, and the acquisition of

information reflecting the location of cellular towers, over (508) 745-9616, Target Telephone #

4, a cellular telephone being utilized by KOUSTAS.   Interceptions began on January 13, 2014,

and terminated on February 11, 2014.

81.   On January 16, 2014, KOUSTAS utilized Target Telephone # 4 in order to engage

in contact with FOWLE.   During the conversation, KOUSTAS   inquired about FOWLE'S

distribution of marijuana and whether he (FOWLE) had obtained any proceeds from the

distribution of it, which KOUSTAS referred to as "paper."   The conversation also confirmed

KOUSTAS' distribution of what law enforcement believe was a quantity of MDMA, a/k/a

"Molly."

| | |
|---|---|
| KOUSTAS: | Hello. |
| FOWLE: | Hello my friend. |
| . . . . | |
| KOUSTAS: | What's going on? |
| FOWLE: | Not much.   I got, ah, f—king somebody wants the other thing. |
| KOUSTAS: | The (inaudible). |
| FOWLE: | Huh?   Ya, the other thing that starts the same, the same first letter. |
| KOUSTAS: | Oh ya? |
| FOWLE: | Huh? |
| KOUSTAS: | Oh. |
| FOWLE: | So, I don't know when we're gonna do it, but I know someone that wants it, so. |
| KOUSTAS: | A lot or? |
| FOWLE: | Ya, probably.   I'm gonna try to get rid of it for ya.   It's gotta be cheap, obviously, but. |
| KOUSTAS: | Ya. |
| FOWLE: | I'm just gonna get rid of it for ay.   You know who it's probably, you could probably guess anyways who wants it.   The person, the person I was gonna try and give it to asked me for it today, so I told him, I said you're gonna be getting a lot, ha, ha, ha. |
| KOUSTAS: | Alright.   Let's rock and roll.   This weekend, this Saturday. |
| FOWLE: | Yuh, perfect.   What's today, Thursday? |
| KOUSTAS: | Thursday. |

| | |
|---|---|
| FOWLE: | Perfect.   What's up with the other thing? |
| KOUSTAS: | Huh? |
| FOWLE: | What about the other thing? |
| KOUSTAS: | I'm gonna have to take a trip.    That's what I'm saying.   Tomorrow I'm going to have to, to drive. |
| FOWLE: | Alright cool, sounds good. |
| KOUSTAS: | So, I'll plan for tomorrow, ah, ya, see what you can do to get some paper, because I'm gonna have to . . . |
| FOWLE: | Ya, I am, tomorrow hopefully is a good day.   I'm hoping so. |
| KOUSTAS: | Are you now.    I see you, ah, I might see you tomorrow night with . . |
| FOWLE: | Alright. |
| KOUSTAS: | Too, you know what I mean.    It all depends [on] the time.   I gotta make some phone calls. |
| FOWLE: | Ya, I was, there's no, there's no huge rush.    I actually want to get the other thing rolling, the normal thing.    I want to get the normal thing rolling, with that.    I know I can get it going now that I got my license back and   I'm back, I'm back going here.   Ya know? |
| KOUSTAS: | Alright. |
| FOWLE: | So, but either way, let me know. |
| KOUSTAS: | Okay. |
| FOWLE: | F—king ready.    I'm ready for action. |
| KOUSTAS: | Read, read, ready for action. |

Based upon information obtained during the investigation, I believe that KOUSTAS contacted

FOWLE in order to check on the status of FOWLE'S distribution of marijuana and the receipt of

proceeds.     During the conversation, FOWLE asked KOUSTAS if he (KOUSTAS) could obtain

"the other thing that starts the same, the same first letter."     I believe that the statement by

FOWLE consisted of a request for KOUSTAS to provide him (FOWLE) with MDMA, which is

known as "Molly," because the controlled substance starts with the same first letter, "M," as the

substance being distributed by KOUSTAS to FOWLE, "marijuana."     The fact that the

conversation included a reference to marijuana was also established when FOWLE told

KOUSTAS that he wanted to get "the other thing rolling, the normal thing.   I know I can get it

going now that I got my license back."     I believe that the comment made by FOWLE was a

reference to his ability to continue to engage in the distribution of marijuana, "the normal thing,"

because his driver's license had been reinstated.

82.     Following KOUSTAS' conversation with FOWLE on January 16, 2014, during

which KOUSTAS agreed to provide FOWLE with a quantity of what law enforcement believe was

MDMA (a/k/a "Molly"), law enforcement monitored a conversation at 1:01 p.m. on January 19,

2014, between KOUSTAS and FOWLE in which KOUSTAS advised that he (KOUSTAS) was a

short distance from FOWLE'S residence, 267 Waverly Street, Manchester, New Hampshire.

Because the conversation on January 16, 2014, between KOUSTAS and FOWLE revealed that

KOUSTAS may transport a quantity of what law enforcement believe was MDMA to FOWLE,

law enforcement established surveillance in the area of FOWLE'S residence, 267 Waverly Street,

Manchester, New Hampshire.     At approximately 1:07 p.m., law enforcement observed

KOUSTAS arrive and park at FOWLE'S residence.     Law enforcement also observed

KOUSTAS enter FOWLE'S residence, where he remained for approximately thirty (30) minutes.

At approximately 1:36 p.m., law enforcement observed KOUSTAS exit FOWLE'S residence and

leave the area.

83.     An additional conversation between KOUSTAS and FOWLE over Target

Telephone # 4 on January 19, 2014, confirmed that KOUSTAS provided a quantity of what law

enforcement believe was MDMA, a/k/a "Molly," to FOWLE.     The conversation also confirmed

that KOUSTAS and FOWLE obtained new cellular telephone numbers.

| FOWLE: | Hello. |
|---|---|
| KOUSTAS: | Hello. |
| FOWLE: | What's going on? |
| KOUSTAS: | What's going on, man? |
| FOWLE: | You know, same shit different day. |
| KOUSTAS: | Ya. |
| FOWLE: | Yup. |
| KOUSTAS: | So you changed your number? |
| FOWLE: | Ya, I got a new one. |
| KOUSTAS: | Alright, so the other one is gonna be off? |
| FOWLE: | Ya, it's gonna be off eventually.     It's still on right now, but it's gonna be off really soon. |
| KOUSTAS: | Ya, I'll go get a new one, too. |

FOWLE:      Yup, ya, it feels a lot better having a new one.

KOUSTAS:    Ya.

FOWLE:      But I still got people on that one, so this one, I don't want to blow this one up, so I gotta get another new one.

KOUSTAS:    That's good.   What's going on, anything good?

FOWLE:      Oh, ya, everthing's going good.    Um, he's still, I think that went fine, but he say, he wants to let me know, know like, I already tried when he called me in a little while, let me know how, make sure everything went fine with that, so . . . but I think it's all set.

KOUSTAS:    Oh, ya.    Ya, just got, I was f—ked up all the way until now, bro.   I'm still a little bit f—ked up.

FOWLE:      Ya, from that?

KOUSTAS:    Yup.

FOWLE:      What, just from touching it?

KOUSTAS:    Yup.

FOWLE:      Me too.

KOUSTAS:    Huh?

FOWLE:      I think I feel it too.

KOUSTAS:    Ya, well you didn't even touch it.

FOWLE:      That stuff?

KOUSTAS:    Ya.

FOWLE:      No, I touched it a little bit . . . I pulled a little piece out and ate it.

KOUSTAS:    It didn't hit me hard this time because I washed my hands right away, but I was f—ked up.    Like literally right now I'm like coming down.

FOWLE:      Mm, I, I tried a little tiny little piece of it.

KOUSTAS:    Ah, you're f—king crazy.   You're crazy, bro.

Based upon information obtained during the investigation, I believe that the conversation between KOUSTAS and FOWLE confirmed that KOUSTAS provided FOWLE with a quantity of what law enforcement believe was MDMA, a/k/a "Molly," for distribution.    During the conversation, KOUSTAS told FOWLE that he "was still coming down" after touching it.    KOUSTAS also advised FOWLE that "it didn't hit [him] hard this time because he washed [his] hands right away." The conversation between KOUSTAS and FOWLE was consistent with a prior conversation which KOUSTAS had with FOWLE over Target Telephone # 1, (508) 479-6296, on November 17, 2013.    During the November 17, 2013, conversation, KOUSTAS utilized Target Telephone # 1 in order to contact FOWLE at Target Telephone # 3, (603) 268-1725, and similarly informed FOWLE that "[he] moved some and [he] wasn't wearing gloves and [he] got f—ked up because

of it." Accordingly, I believe that the conversation between KOUSTAS and FOWLE on

January 19, 2014, confirmed that KOUSTAS remained involved in the distribution of what law

enforcement believe was MDMA, a/k/a "Molly," and that he (KOUSTAS) provided it to

FOWLE by transporting it to him (FOWLE) during the afternoon of January 19, 2014.

84.     The conversations over Target Telephone # 4 following January 19, 2014,

disclosed that although KOUSTAS provided FOWLE with what was believed to be MDMA,

FOWLE was unsuccessful in distributing a quantity of it and advised KOUSTAS that he would

have to take it back.     For example, on January 22, 2014, KOUSTAS utilized Target Telephone

# 4 to contact FOWLE.     During the conversation, FOWLE informed KOUSTAS that a

quantity of the MDMA needed to be returned because the purchaser did not want it.     Although

the conversation centered on the return of MDMA, KOUSTAS asked FOWLE about the

distribution of marijuana because he was "way open," which I believe was a reference to

KOUSTAS owing a significant amount of currency for the prior receipt of marijuana.

| | |
|---|---|
| KOUSTAS: | What's going on? |
| FOWLE: | Well, they didn't take that thing.   He gave it back, so. |
| KOUSTAS: | Huh? |
| FOWLE: | That thing, they, he gave it back to me. |
| KOUSTAS: | The whole thing? |
| FOWLE: | Yeah, expect for like four.     He took four little ones out of it, but he paid for it.     So they tried it, you know?   He said they didn't like it, so. |
| KOUSTAS: | What? |
| FOWLE: | I don't know. |
| KOUSTAS: | What the f—k, man. |
| FOWLE: | I know. |
| KOUSTAS: | Oh. |
| FOWLE: | A pain in the a--, huh? |
| KOUSTAS: | I can't, that's f—ked up.     You shouldn't have, give it back to him, man. |
| FOWLE: | Yup, I mean if he don't want it, he don't want it. You know what I mean? I don't know what to say. |
| KOUSTAS: | What, we playing f—king games, man. |
| FOWLE: | Yup. |
| KOUSTAS: | What the f—k. |
| FOWLE: | (coughing) |
| KOUSTAS: | What's going on with the other thing?     You seen the other two? |

FOWLE:      The what?
KOUSTAS:    Did you see the other guy?   Did you?
FOWLE:      What do you mean?   Did I?
KOUSTAS:    Did you put anything together?
FOWLE:      No, not yet.   I'm sure I will this, this weekend.     Not today, no.
KOUSTAS:    Oh, f—k.   I need, I need to put stuff together, man. I'm way open right
            now.
FOWLE:      You're what?
KOUSTAS:    I'm way open.     You know what I mean?   Way open.
FOWLE:      Oh, I know.   Mm, definitely working on it.
KOUSAS:     Yeah.
FOWLE:      I still got pretty much all of these, so.   I mean, I'm waiting, trying.
KOUSTAS:    Well, I guess I'll see you tonight, alright?     I'll give you a call so I can
            scoop those up.     You should have just given some left of what you have.
FOWLE:      Alright.   What is that?
KOUSTAS:    Do you still have the same thing?
FOWLE:      What?
KOUSTAS:    Or like it.    To put it back in so I can put it.
FOWLE:      Um, I don't know. I asked my buddy for it back and he, I don't know.     I
            think he said he might have, keep the rest or something, the other one that
            I had.   I don't know.
KOUSTAS:    Alright.
FOWLE:      But.
KOUSTAS:    Well, what did this guy say?   He didn't like it?   Why?
FOWLE:      I don't know.   Don't know. All I can do is try and help him, you know,
            get rid of it, but if they don't want it, they don't want it, you know?
KOUSTAS:    Yup.
FOWLE:      Nothing I can do.
KOUSTAS:    Well that's fine.   Alright.
FOWLE:      I don't know what the problem was, but it, I thought it was alright, so I
            mean, I don't know.     I guess they know.   I guess I don't know.
KOUSTAS:    Yup.

85.    Based upon information obtained during the investigation, I believe that during

the conversation, FOWLE advised KOUSTAS that the purchaser of what law enforcement

believe was MDMA returned a quantity of it.    I also believe that when KOUSTAS asked

FOWLE "what's going on with the other thing," he was inquiring about FOWLE'S distribution

of marijuana.      Such belief   was supported by KOUSTAS' statement that he was "way open

right now," which I believe was a reference to the fact that KOUSTAS owed his marijuana

source of supply proceeds from the prior receipt of marijuana.    Prior to the end of the

conversation, KOUSTAS informed FOWLE that he would meet with FOWLE in order to

retrieve the MDMA ("I'll give you a call so I can scoop those up.").

86.     Additional monitoring between KOUSTAS and FOWLE confirmed that

KOUSTAS intended to travel to FOWLE'S residence in order to obtain the unsold quantity of

MDMA.     On January 23, 2014, KOUSTAS utilized Target Telephone # 4 to contact FOWLE

at (603) 268-1329.     During the conversations, KOUSTAS informed FOWLE that "I gotta

come get that,   I'll get it tomorrow, bro."     In response to KOUSTAS' comment, FOWLE

advised that "[he had] it hidden, but that sucks that they didn't want that."     The fact that

KOUSTAS and FOWLE were engaged in a conversation involving the distribution of controlled

substances was established when KOUSTAS told FOWLE "that's why you don't give them

nothing, everything is cash, take it see you later, if you don't like it, don't buy it again."    The

conversation between KOUSTAS and FOWLE also demonstrated that the distribution of

marijuana was proceeding slowly and that FOWLE was waiting for those who purchased

marijuana to provide payment.     Thus, on January 29, 2014, when FOWLE contacted

KOUSTAS, he (FOWLE) ensured KOUSTAS that "I should be able to do this job.    If anyone

can do it.   You know and I don't really see anyone else doing it.     I think that [it is] gonna

pick up, though, it takes a little while, you know, it's gotta get out there, but that will pick up.

This is the ground work.     I've been doing ground work."     Based upon information obtained

during the investigation, I believe that the conversation, similar to other prior conversations

between KOUSTAS and FOWLE, involved FOWLE'S explanation to KOUSTAS involving the

length of time necessary to obtain proceeds from the distribution of marijuana.

87.     On January 22, 2014, law enforcement engaged in surveillance of the location

utilized by SIEGER to distribute marijuana to KOUSTAS on December 5 and 7, 2013, 4

Coldbrook Road, Millbury, Massachusetts.     During the surveillance, law enforcement observed

a 2014 Kia Sorento, registered to

arrive at the residence and pull into the garage.      Law enforcement

discovered that the vehicle was rented on January 20, 2014, at AVIS Budget Group, located at

LaGuardia Airport, New York.      Law enforcement also learned that the vehicle was rented by

ISACC OLSON,                                                        , and included an additional

licensed operation, GOLDBARG HASSAN, a female.      Law enforcement discovered that

HASSAN was the holder of a Canadian driver's license and had significant ties to both Canada

and California.      Based upon information obtained by law enforcement, it is believed that

HASSAN is employed at the Bank of Montreal in Canada.

     88.      Between January 26, 2014, and January 30, 2014, KOUSTAS continued to utilize

Target Telephone # 4 in order to engage in contact with FOWLE.      For example, on January

29, 2014, KOUSTAS utilized Target Telephone # 4 to contact FOWLE at (603) 268-1329 and

inquire about the receipt of proceeds from the distribution of marijuana.

> KOUSTAS:   When you think you gonna have something?
> FOWLE:   I mean, I got a couple right now, but I don't have many.      I'm trying to
> get more, like, something substantial.    It will probably, probably be
> Saturday, something like that, before I have a good chunk . . .
> KOUSTAS:   See if you can do something (inaudible) good, you know what I mean?
> FOWLE:   I will definitely. I am, you know, I'm on it anyways. It's not like, it's not
> like I'm not on it.   People are just f—king taking forever.   So, definitely
> on top of every person at this point.
> KOUSTAS:   Alright, just checking.

Based upon information obtained during the investigation, I believe that KOUSTAS' question to

FOWLE, "when you [    ] gonna have something," involved an inquiry into the status of

FOWLE'S receipt of proceeds based upon KOUSTAS' prior distribution of marijuana to him.

I also believe that FOWLE'S response that "it will probably be Saturday [    ] before I have a

good chunk," was a reference to FOWLE'S continuing receipt of currency ("I got a couple right

now") from the distribution of marijuana.      The conversation confirmed KOUSTAS' status as a

distributor of marijuana to FOWLE and FOWLE'S redistribution of the marijuana to numerous

individuals ("[I'm] definitely on top of every person at this point.").

89.     Following KOUSTAS' conversation with FOWLE on January 29, 2014,

KOUSTAS utilized Target Telephone # 4 on January 30, 2014, to attempt to contact BLEVENS

over Target Telephone # 2, (603) 657-5195.     Likewise, KOUSTAS utilized Target Telephone

# 4 on January 30, 2014, to attempt to contact FOWLE at (603) 268-1329.     However,

KOUSTAS' call to both BLEVENS and FOWLE went unanswered.     After KOUSTAS'

attempted contact with BLEVENS and FOWLE on January 30, 2014, all calls over Target

Telephone # 4 ended.

90.     On February 4, 2014, law enforcement engaged in a debriefing of a confidential

informant, CI # 3, regarding its knowledge of the marijuana distribution activities of KOUSTAS.

CI # 3 was known to law enforcement because an investigation identified him as an individual who

obtained quantities of marijuana from KOUSTAS and an individual who was involved in the

distribution of significant quantities of oxycodone.     At the time law enforcement approached CI

# 3, they possessed a warrant for his arrest based upon his distribution of oxycodone.     However,

because CI # 3 agreed to cooperate with law enforcement, he was not arrested and the warrant for

his arrest was dismissed without prejudice during the period of his cooperation.     CI # 3 informed

law enforcement that it met KOUSTAS, whom CI # 3 knew as "Alex," through a friend in or

around 2013.     Upon meeting KOUSTAS, it began purchasing quantities of marijuana from him

(KOUSTAS).     CI # 3 indicated that it began purchasing marijuana from KOUSTAS

approximately one (1) year earlier (2013) and would obtain 5-10 pounds quantities on a regular

basis.     CI # 3 also stated that KOUSTAS would charge it approximately $3,000.00 - $4,000.00 for

each pound of marijuana.     CI # 3 revealed that it last purchased a quantity of marijuana from

KOUSTAS in or around December 2013 and indicated that it still owed KOUSTAS approximately

$1,500.00 for the marijuana.    Finally, CI # 3 informed law enforcement that when it would

contact KOUSTAS in order to arrange for the purchase of marijuana, it (CI # 3) would do so by

calling KOUSTAS on one of his cellular telephones, identified by CI # 3 as (603) 261-0853.

91.    Based upon information obtained from CI # 3, law enforcement utilized it on

February 4, 2014, in order to engage in recorded contact with KOUSTAS.    At approximately 8:57

p.m. on February 4, 2014, CI # 3, while under the direct supervision and control of law

enforcement, called KOUSTAS at (603) 261-0853.    During the conversation, CI # 3 arranged to

meet with KOUSTAS in order to provide him (KOUSTAS) with the proceeds from CI # 3's prior

receipt of marijuana.    Following the recorded contact, law enforcement surveilled CI # 3 to a

location where it met with KOUSTAS.    During CI # 3's meeting with KOUSTAS, the two (2)

engaged in a conversation regarding the receipt and distribution of marijuana.

| | |
|---|---|
| CI # 3  : | I smoked a bunch of A-K, I'm a smoking train dog. I don't got anybody really that wants anything anymore, but one of my boys may want f--king like five or whatever.    I told him to let me know, you know what I mean.   He don't want the skunky s--t, he wants f—king, he wants something he can tag.   I don't know whatever, he'll figure it out. |
| KOUSTAS: | I'll get you some diamonds. |
| CI # 3  : | Diamonds. Ya, I mean, whatever, as long as it doesn't stink. You know, you know how my boys get down.   They, they, they want the smell or the look, you know you want that (inaudible). |
| KOUSTAS: | Bro, those Diamonds. |
| CI # 3  : | Fire? |
| KOUSTAS: | You know what I mean. They burn f--king good, they don't have the stink but they burn f--king real good, bro. |
| CI # 3  : | They look good, yeah? |
| KOUSTAS: | Oh ya, they look good too. |
| .     .     . | |
| CI # 3  : | Those last ones looked f—king good, but they didn't have the smell. |
| KOUSTAS: | Ya. |
| CI # 3  : | Whatever smells sells, ya know?   F--king (inaudible). |
| KOUSTAS: | I can get you some other Hindu s--t, Hindu Ku, Hindu Kush. |
| CI # 3  : | Expensive though, right? |

KOUSTAS:         Thirty three fifty.
CI # 3  :          Ah, I could try, but you know my boys stingy straight up.   I'm
                   f--ing stingy, too, I want to smoke it after this actually.
KOUSTAS:         I can get you the f--king Grand Daddies for thirty five. Grand
                   Daddies, that's the best f--king weed, bro, you can't get a no better
                            f--king weed.   No, I don't give a fuck who it is around here.
CI # 3  :          I know, I know.
KOUSTAS:         It's good weed, bro.
 .    .    .
KOUSTAS:         There's a lot of cheap s—t going on around.
CI # 3:           F--king dudes are pawning off f--king s—t, f--king bunk a-- like
                   indoors, you know what I mean.   Trying to f--king get crazy cash.
KOUSTAS:         You know, if you want f--king good weed, I'll get you good f--
                   king weed, bro . . . You want some Grand Daddies? I can get you
                   Grand Daddy or I can get you, ah, Master.
CI # 3:           Oh ya, ya, Master, that's that fire s—t.   I don't got dough for that
                   s--t, that s—t's expensive dog.
KOUSTAS:         No, I will give it to you for thirty five bro.
CI # 3:           I'll figure it out.
KOUSTAS:         For thirty five, Master bro?
CI # 3:           I'll puff in a little bit of it we'll see how it goes you know?
KOUSTAS:         Tell them f--king that s--t goes for four g's all day, you can make
                   f--king five bills. You tell him f--king thirty eight hundred, you'll
                   make two bills a f--king pound all day, bro, if you are listening.
CI # 3:           I'm listening, bro.

Based upon information obtained during the investigation, I believe that KOUSTAS' reference

to "diamonds," "Hindu Kush," "Grand Daddy," and "Master," involve different, potent strains of

marijuana which he (KOUSTAS) has available for distribution.        I also believe that when

KOUSTAS told CI # 3 that it could obtain "Grand Daddy" or "Master" for "thirty five" or "thirty

eight," he was referring to the purchase of a pound of a strain of marijuana for $3,500.00 or

$3,800.00 in United States currency.     Likewise, when KOUSTAS told CI # 3 that it "could

make two bills a f—king pound all day," he (KOUSTAS) was referring to the profit which CI #

3 would make after the sale of each pound of marijuana.        Finally, I believe that CI # 3's

statement to KOUSTAS that "those last ones looked f—king, good," confirmed its prior receipt of

marijuana from KOUSAS.

92.     On February 15, 2014, CI # 3, who was equipped with a body-wire and acting under the direct supervision and control of law enforcement,    met with KOUSTAS. During the meeting, like the meeting between CI # 3 and KOUSTAS on February 4, 2014, KOUSTAS informed CI # 3 that he had four (4) different strains of marijuana available for distribution, including Diamond, Kush, Grand Daddy Kush, and Master.      KOUSTAS also advised CI # 3 that he was involved in the distribution of "Molly" (MDMA) and could supply CI # 3 with the substance for distribution.      KOUSTAS also provided CI # 3 with his new cellular telephone number, (603) 361-8920, during the meeting.[17]     Following the meeting, law enforcement discovered that KOUSTAS' new cellular telephone number, (603) 361-8920, was activated on January 31, 2014, serviced by Verizon Wireless, and subscribed to Hol    Val, 30 Independence Boulevard, Warren, New Jersey.       The information involving the activation of telephone number (603) 361-8920, January 31, 2014, was consistent with the time-frame in which all calls over telephone number (508) 745-9616 ended, January 30, 2014.      Thus, I believe that KOUSTAS dropped (508) 745-9616 on January 30, 2014, and obtained (603) 361-8920 on January 31, 2014, for the purpose of engaging in contact with his coconspirators and attempting to shield his drug-related involvement from law enforcement.

93.     On February 19, 2014, law enforcement utilized CI # 3 in order to engage in a recorded conversation with KOUSTAS over (603) 361-8920.    Law enforcement, who were present with CI # 3 when it contacted KOUSTAS, instructed it (CI # 3) to contact KOUSTAS over (603) 361-8920 and observed as it dialed the number.   During the conversation, CI # 3 and

---

[17] Telephone number (603) 361-8920 was activated on January 31, 2013, was serviced by Verizon Wireless, and similar to telephone number (508) 479-6296 and telephone number (508) 745-9616, is subscribed to by Hol Val, 30 Independence Boulevard, Warren, New Jersey.

KOUSTAS discussed the distribution of a strain of marijuana identified by KOUSTAS on

February 4, 2014, and February 15, 2014, as "Diamond."

| | |
|---|---|
| CI # 3: | Hello. |
| KOUSTAS: | Hello. |
| . . . | |
| CI # 3: | Is this good?   Is this the good one or what? |
| KOUSTAS: | Yeah you can talk. |
| CI # 3: | Oh alright man, I don't want to scare you away, I don't want to get lectured, bro. |
| KOUSTAS: | I don't like talking, but you can talk go ahead. |
| CI # 3: | Ya, man just seeing what's up. |
| KOUSTAS: | Tell me a song. |
| CI # 3: | (laughing) What did you say? |
| KOUSTAS: | Go ahead tell me a song.   What you want. |
| CI # 3: | Tell you a song.   Tell you a song.   I want, I want a song about some diamonds, man, f—king.   I want to, I want to get people some diamonds (laughing.) |
| KOUSTAS: | Huh? |
| CI # 3: | I'm trying to sling some diamonds, my man, you know. |
| KOUSTAS: | Ya, huh, I got your diamonds. |

Based upon information obtained during the investigation, I believe that when CI # 3 asked

KOUSTAS if he would get some "people some diamonds," it (CI # 3) was referring to the

purchase of marijuana from KOUSTAS.     I further believe that KOUSTAS' response, "I got your

diamonds," was a reference to his ability to provide a "diamond" strain of marijuana to CI # 3.

Likewise, I believe that KOUSTAS' reference to the fact that he did not "like talking [on the

phone]," involved his attempt to shield his involvement in the distribution of marijuana from law

enforcement.

94.     On March 6, 2014, United States District Court Judge Paul J. Barbadoro

authorized the interception of wire communications over cellular telephone number (603)

261-0853, Target Telephone # 5, and (603) 361-8920, Target Telephone # 6, cellular telephones

being utilized by KOUSTAS, for a 30 day period.   KOUSTAS' continuing involvement in the

distribution of marijuana was established when he engaged in a brief conversation over (603)

261-0853 on March 6, 2014, with an individual who has been identified by law enforcement as

ROBERT VARGAS.[18]

| | |
|---|---|
| KOUSTAS: | Hello? |
| VARGAS: | What's up buddy? |
| KOUSTAS: | What's up buddy? |
| VARGAS: | What are you doing in my neck of town huh? |
| KOUSTAS: | I'm watching everything (inaudible). |
| VARGAS: | Yo, you, you didn't hear me beep the horn at you, huh, you little f—ker. . |
| KOUSTAS: | Oh, that was you over there.   I didn't hear (inaudible). |
| VARGAS: | See, I got a horn and I will beep at you. |
| KOUSTAS: | So it's passed this one (speaking to passenger in vehicle). |
| VARGAS: | Yeah, I just got out of work but I got to go up north. |
| KOUSTAS: | Oh you're going up north? |
| VARGAS: | I have to. |
| KOUSTAS: | Plattsburgh. |
| VARGAS: | Ah, yeah, they told me, they told me to go up North (inaudible). |

At the time of the conversation between KOUSTAS and VARGAS, law enforcement knew that in

October and December 2013, KOUSTAS obtained quantities of marijuana from SIEGER in

Millbury, Massachusetts, transported it to New Hampshire, and then utilized FOWLE and other

co-conspirators to distribute it.     In December 2013, law enforcement discovered that prior to and

following SIEGER'S distribution of marijuana to KOUSTAS, he (SIEGER) engaged in contact

with MARSHALL LAFAVE and ROBERT FILLION, who law enforcement have connected with

the transportation of marijuana from the Plattsburg, New York, area to numerous locations

throughout New England.     Thus, based upon the investigation, I believe that the call between

KOUSTAS and VARGAS suggests that VARGAS was traveling to Plattsburg, New York,

because he was involved with the Canadian DTO and was tasked with traveling to the area on

behalf of the DTO.     In addition, I believe that VARGAS advised KOUSTAS of his scheduled

---

[18]Law enforcement are familiar with VARGAS because he was convicted in 1986 of second degree murder and sentenced to a 27-life term of incarceration.   The facts in support of VARGAS' conviction established that VARGAS shot Herlberto Pichardo in the head during a drug transaction in which Pichardo was supplying VARGAS with a quantity of cocaine.   VARGAS was released from the term of incarceration in 2013.

trip because KOUSTAS, like VARGAS, was aware of an involved in the activities of the DTO.

95.    On March 15, 2014, KOUSTAS utilized (603) 261-0853 to contact VARGAS. During the contact, KOUSTAS advised VARGAS that he was traveling to 143 Cedar Street, Manchester, New Hampshire.    Following the conversation, law enforcement engaged in surveillance of 143 Cedar and observed KOUSTAS' vehicle, a 2001 Chevrolet C1500 van, registered to KOSMAS KOUSTAS,   in the area of 143 Cedar Street.     Law enforcement also observed a motor vehicle registered to VARGAS parked on Cedar Street.     While KOUSTAS and VARGAS were present in the area, KOUSTAS received a text message over (603) 261-0853 from CHRISTOPHER RANFOS.       Shorter after receiving the text message, KOUSTAS utilized (603) 261-0853 to contact RANFOS.   During the conversation, RANFOS advised KOUSTAS that he was would travel to the location to "check out the heat."    Based upon information obtained during the investigation, I believe that RANFOS' statement involving "check[ing] out the heat" was a reference to RANFOS' desire to purchase a quantity of marijuana.

96.    Following the conversation between KOUSTAS and RANFOS, law enforcement observed RANFOS outside of 143 Cedar Street.   Law enforcement also observed RANFOS walk to KOUSTAS' 2001 Chevrolet C1500 van, open the rear door and remove a large, dark-colored duffle bag.   RANFOS then placed the duffle bag inside his vehicle, a 2007 Chevrolet van. After placing the duffle bag inside the vehicle, RANFOS retrieved a backpack from the vehicle and entered 143 Cedar Street.   After remaining inside 143 Cedar Street for a short period of time, RANFOS left the area and traveled to his residence, located at 241 Boutwell Street, Apartment 1, Manchester, New Hampshire.    Within approximately 10 minutes of RANFOS' arrival, law enforcement observed a 2006 Mercury Mountaineer, subsequently determined to be operated by JOHN HORNE, arrive at 241 Boutwell Street and park behind RANFOS' 2007 Chevrolet van. HORNE exited his vehicle and entered RANFOS' residence.      After approximately 20 minutes,

HORNE exited the residence, traveled to the back of his vehicle, open the rear gate of his vehicle and place a backpack in the cargo area of the vehicle.    HORNE then re-entered his vehicle and left the area.   HORNE was subsequently stopped by a member of the NHSP and provided consent to search his vehicle.    Seized during the search was a backpack located in the rear cargo area which was discovered to contain approximately one-half (1/2) pound of marijuana.

97.    Although the interceptions over Target Telephone # 5 ((603) 261-0853) and Target Telephone # 6 ((603) 361-8920) demonstrated that KOUSTAS remained involved in the distribution of marijuana, the interceptions also demonstrated that he (KOUSTAS) engaged in several coded conversations with WILLIAM SWANSON involving the receipt of additional quantities of marijuana.   On March 17, 2014, KOUSTAS contacted SWANSON and engaged in a conversation about the receipt of what I believe to be a quantity of marijuana.   During the conversation, SWANSON told KOUSTAS that "you know I do the fruit thing, so I'm, ah, in the warehouse right now trying to finish putting up these orders."[19]   In response to SWANSON'S statement, KOUSTAS replied, "that's cool . . . do your thing."    Based upon information obtained during the investigation, I believe that SWANSON'S statement to KOUSTAS involved a reference to providing him (KOUSTAS) with a quantity of marijuana ("the fruit thing").

98.    On March 17, 2014, NHSP Trooper Stefan Czyzowski ("Trooper Czyzowski") was on patrol in the area of F.E. Everett Turnpike in Nashua, New Hampshire, when he observed a 2014 Mercedes E350, New Hampshire registration 3226292, registered to ALKIS NAKOS, following a vehicle at an unsafe distance. Upon stopping the vehicle, Trooper Czyzowski observed two (2) individuals inside the vehicle, the driver, identified as ALKIS NAKOS, and the passenger, identified as CHRISTOPHER RANFOS,

---

[19]Law enforcement believes that SWANSON is employed at Capital City Automotive, 88 Manchester Street, Concord, New Hampshire.    The business is co-owned by FRANK FOWLE, the brother of CHARLES FOWLE.

Both NAKOS and RANFOS

informed Trooper Czyzowski that they were traveling to Foxwoods Resorts and Casino

("Foxwoods"), Ledyard, Connecticut.    After obtaining identification information from NAKOS

and RANFOS, Trooper Czyzowski conducted a records check and discovered that a

non-extraditable warrant for the sale or delivery of marijuana existed for RANFOS in the State of

Florida.

99.    When Trooper Czyzowski returned to NAKOS' vehicle, he asked to speak with

RANFOS outside of the vehicle.    As soon as RANFOS exited the vehicle, Trooper Czyzowski

noticed that a bulge existed in RANFOS' pants pockets.    Trooper Czyzowski conducted a

pat-frisk of RANFOS and determined that his right pants pocket contained a significant quantity of

currency.    Trooper Czyzowski asked RANFOS how much currency was present in his pocket,

and RANFOS stated, "a few thousand, 2 – 3."    Trooper Czyzowski then asked RANFOS if he

could see the currency.    Although RANFOS was hesitant to do so, he briefly removed the

currency and then returned it to his pocket.    When RANFOS removed the currency, Trooper

Czyzowski observed a stack of $100.00 bills folded in half and bound with an elastic band.

Trooper Czyzowski asked RANFOS what he did for work, and RANFOS replied "HVAC, I save."

After observing the currency in RANFOS' right front pants pocket, Trooper Czyzowski conducted

a pat-frisk of RANFOS' left front pants pocket and found a similar bulge.      RANFOS would not

show Trooper Czyzowski the currency in his left pants pocket but advised that he had "a few

thousand, 2 – 3."

100.    RANFOS informed Trooper Czyzowski that he had the currency because he and

NAKOS were traveling to Foxwoods.    He also advised Trooper Czyzowski that he had a

backpack with him because he and NAKOS planned to spend the night at Foxwoods.    RANFOS

also informed Trooper Czyzowski that he knew about the Florida warrant and stated that it was for

having "1/4 pound of weed a long time ago."   RANFOS provided Trooper Czyzowski with consent to search his backpack and indicated that it was the only item belonging to him which was located inside the vehicle.

101.   After speaking with RANFOS, Trooper Czyzowski returned to NAKOS' vehicle and asked him to step outside in order to speak.   After questioning whether or not he (NAKOS) was required to exit the vehicle, NAKOS agreed to do so and traveled to the back of the vehicle. As he exited the vehicle, Trooper Czyzowski noticed that NAKOS, like RANFOS, had bulges in his pants pockets.   Upon conducting a pat-frisk, Trooper Czyzowski recognized the bulges to be significant quantities of currency.   When Trooper Czyzowski asked NAKOS how much currency he had, NAKOS replied "a few thousand."   NAKOS informed Trooper Czyzowski that he was traveling to Foxwoods and that his luggage was located inside the trunk.   Trooper Czyzowski asked NAKOS to show him the luggage, but NAKOS refused.   While speaking with Trooper Czyzowski, NAKOS indicated that he had served seven (7) years in custody for the distribution of cocaine base ("crack"), but that he did not use any controlled substances.   Trooper Czyzowski asked NAKOS for consent to search the vehicle, but NAKOS refused.

102.   A K-9 was called to the scene and was walked around the vehicle.   Upon being led around the vehicle, the K-9 had a positive alert for the presence of controlled substances. Trooper Czyzowski advised NAKOS that the vehicle would be secured while a search warrant was obtained.   In response, NAKOS was unconcerned but RANFOS was upset and argumentative. Trooper Czyzowski asked NAKOS for the keys to the vehicle, but NAKOS refused to provide them.   Prior to leaving the area, both NAKOS and RANFOS began to argue about the presence of their cellular telephones within the vehicle.   After Trooper Czyzowski informed NAKOS and RANFOS that nothing would be removed from the vehicle until the receipt of a search warrant, both NAKOS and RANFOS left the area.   Currency in the amount of $15,992.00 in United

States currency was seized by Trooper Czyzowski, consisting of $9,451.00 in United States currency from RANFOS, and $6,471.00 in United States currency from NAKOS.

103.    On March 18, 2014, KOUSTAS utilized (603) 261-0853 to attempt to contact NAKOS, but the call was not answered.    On March 18, 2014, KOUSTAS utilized (603) 261-0853 to engage in numerous text message exchanges with NAKOS.    However, because the court-ordered authorization did not include authority to monitor electronic communications (text messaging exchanges), the content of the text message exchanges between KOUSTAS and NAKOS was not obtained.    On March 18, 2014, KOUSTAS also utilized (603) 261-0853 in order to attempt to contact RANFOS.

104.    On March 19, 2014, Trooper Czyzowski appeared before Nashua, New Hampshire, District Court Judge Michael Ryan, who authorized a search of NAKOS' motor vehicle.    Items seized during the search included: (1) a Zig-Zag package (commonly used to roll marijuana in order to smoke it), which was located in a backpack in the trunk (believed to belong to NAKOS); (2) a small quantity of marijuana, which was located in the backpack; (3) $895.00 and $700.00 in United States currency, which was located in NAKOS' wallet; (4) $1,065.00 in Euros (which is equivalent to $1,480.35 in United States currency), which was located in NAKOS' wallet; (5) $20.00 in Canadian currency (which is equivalent to $17.80 in United States currency), which was located in NAKOS' wallet; (6) three (3) Apple I-Phones, including; (i)   a white I-Phone; (ii) a gray I-Phone with black shield case; and (iii) a gray I-Phone with black and white case, all of which were believed to belong to NAKOS; and (7) a Samsung Galaxy S4 mobile telephone with black case, believed to belong to RANFOS.    The total currency seized equaled $19.015.15, which consisted of $9,564.15 in United States currency belonging to NAKOS and $9451.00 in United States currency belonging to RANFOS.

105.   In addition to being involved in the distribution of marijuana, the interceptions over

(603) 261-0853 and (603) 361-8920 also demonstrated that KOUSTAS was attempting to obtain a

quantity of cocaine in order to engage in the distribution of it.     In February and March 2014,

KOUSTAS informed CI # 3 that he could supply him with quantities of cocaine for distribution.

The intercepted conversations following March 6, 2014, demonstrated KOUSTAS' efforts to

obtain cocaine for distribution.     For example, on March 6, 2014, KOUSTAS engaged in a

conversation over (603) 361-8920 with an individual identified as JUAN RODRIGUEZ

SANCHEZ about the purchase of cocaine.

| | |
|---|---|
| SANCHEZ: | How's everything? |
| KOUSTAS: | Everything's okay. |
| SANCHEZ: | Um. |
| KOUSTAS: | How you doing on your side? |
| SANCHEZ: | Alright, everything's alright. |
| KOUSTAS: | That's good. |
| SANCHEZ: | Mm, ah, that thing that we talk about, it, ah, it's, it's, it's, difficult right now.   It's high, it's high out there.   It's, ah, a lot a time you can you can find it with, ah, you, you cannot find. |
| KOUSTAS: | (inaudible) |
| SANCHEZ: | Like, ah, there, there were two days ago that it was difficult to come by, but I, I talk to, ah, I talk to, I went to New York and, ahh, talk to somebody over there, now I think, ah, we'll be able to get it. |
| KOUSTAS: | Okay |
| SANCHEZ: | Mm. |
| KOUSTAS: | So what else is going on? |
| SANCHEZ: | Huh? |
| KOUSTAS: | What else is going on, when do you want to link up, when do you want to get together for a cup of coffee? |
| SANCHEZ: | Ah, whenever you get a chance, ah, give me a call. |

Based upon information obtained during the investigation, I believe that the conversation

between KOUSTAS and SANCHEZ involved KOUSTAS' request to determine whether he

could obtain a quantity of cocaine for distribution.     I also believe that SANCHEZ' reference to

traveling to New York involved his attempt to locate a cocaine source of supply for KOUSTAS.

106.   KOUSTAS'   involvement in an attempt to receive cocaine for distribution was confirmed when he engaged in a conversation with FOWLE on March 7, 2014, over (603) 361-8920.

| | |
|---|---|
| FOWLE: | I was going to see if you ever found out about that other thing. |
| KOUSTAS: | No, because the dude went away. |
| FOWLE: | Oh. |
| KOUSTAS: | I'm waiting for him to come back.   Yeah, I spoke to him last night, so he's lining things up. |
| FOWLE: | Interesting. |
| KOUSTAS: | Interesting. |

. . . .

| | |
|---|---|
| FOWLE: | Well. |
| KOUSTAS: | Mr. connection man. |
| FOWLE: | (Laughs) |
| KOUSTAS: | You're the connection man. |
| FOWLE: | (Laughs) |

. . . .

| | |
|---|---|
| FOWLE: | I wanted to do that, I wanted to do that other thing, too bad that guy's not around. |
| KOUSTAS: | Huh? |
| FOWLE: | I said too bad that guy's not around. |
| KOUSTAS: | Yeap,   that dude was international that's why.   That guy's like, you catch him in here, you catch him over there. |
| FOWLE: | Well if he's like that, dude, he should be able to f—king, should be a good f--king number then. |
| KOUSTAS: | Yeah, but he does other things, you know what I mean, he has, he's a legit business man. |
| FOWLE: | Yup. |
| KOUSTAS: | That's why he (inaudible).   He's not the man, man, man, but he, he knows people. |
| FOWLE: | Yup. |
| KOUSTAS: | F—king, I don't know, talk to f--k face see if we can see if he can do that, that be great. |
| FOWLE: | Yeah, I will, f—king. |
| KOUSTAS: | Because then you can make some f--king dough yourself, too.   I f--king, I can help out too, you know what I mean. |
| FOWLE: | Yeah. |
| KOUSTAS: | Whatever, we can get it going. |
| FOWLE: | Yeah, if he can get the numbers we want. |

. . . .

| | |
|---|---|
| KOUSTAS: | Then we are going to be ahead of the f--king game.   Then we can f--king negotiate and do anything we like.     Then it's going to be a cake walk from that point on. |
| FOWLE: | Yup. |

KOUSTAS:    You know what I'm saying?
FOWLE:      Yup.
KOUSTAS:    Because we're gonna be able to buy right out.
FOWLE:      Yeah, money is nice.
KOUSTAS:    We'll go buy right out, who gives a f—k.   F—k them, this is it,
            boom, give me one, let me buy one and give me one too
            (laughs), you know what I'm saying?

Based upon information obtained during the investigation, I believe that KOUSTAS was advising FOWLE of his attempt to obtain a cocaine source of supply (SANCHEZ).    I also believe that KOUSTAS' reference to FOWLE that they will "buy right out, give me one, let me buy one, and give me one too," was a reference to KOUSTAS' attempt to purchase one (1) kilogram of cocaine through the utilization of    SANCHEZ and be fronted with a second kilogram of cocaine.      Finally, I believe that KOUSTAS was attempting to obtain cocaine for distribution because he may believe that cocaine distribution would result in the receipt of greater profits than those obtained through the distribution of marijuana.

107.    During the period of March 15, 2014, through March 25, 2014, the monitoring of conversations over (603) 261-0853 and (603) 361-8920 confirmed that KOUSTAS continued to attempt to obtain cocaine from SANCHEZ.    For example, on March 15, 2014, KOUSTAS utilized (603) 361-8920 to contact SANCHEZ.    During the conversation, SANCHEZ advised KOUSTAS that he had been sick and "as soon as I'm better, I'll get in touch with you so we do what we have to do."    Following the conversation, KOUSTAS utilized (603) 361-8920 on March 20, 2014, and March 22, 2014, in order to contact SANCHEZ.    During the conversations, KOUSTAS arranged to meet with SANCHEZ on March 22, 2014, in order to discuss the receipt of what law enforcement believe was a quantity of cocaine.    On March 22, 2014, law enforcement surveilled KOUSTAS as he met with SANCHEZ in the parking lot of BJ's Wholesale Club in Hooksett, New Hampshire.    Prior to the meeting, law enforcement intercepted a conversation between KOUSTAS   and NAKOS while KOUSTAS was located inside BJ's Wholesale Club.

During the conversation, NAKOS stated, "the other one, did he call," to which KOUSTAS replied, "he called me a minute ago, he is outside himself now.   I spoke to him a little ago."   Based upon information obtained during the investigation, I believe that NAKOS' comment to KOUSTAS and KOUSTAS' reply to NAKOS demonstrated NAKOS' understanding that KOUSTAS was meeting with an individual, SANCHEZ, in order to discuss the purchase of cocaine.

108.   On March 29, 2014, KOUSTAS utilized (603) 361-8920 to contact SANCHEZ at 8:10 p.m.   During the conversation, KOUSTAS asked SANCHEZ whether he "was coming through," which law enforcement believe was an inquiry by KOUSTAS regarding whether or not SANCHEZ came through with his ability to secure a quantity of cocaine.   In response to KOUSTAS' inquiry, SANCHEZ replied, "yes, yes, start heading down."   However, instead of traveling to SANCHEZ' location, KOUSTAS indicated that he would travel to meet with him (SANCHEZ) the following day, March 30, 2014.

| | |
|---|---|
| KOUSTAS: | Are you coming through or no? |
| SANCHEZ: | Ahhh, yeah, yes, yes, start heading down. |
| KOUSTAS: | Huh? |
| SANCHEZ: | Start heading down. |

.   .   .

| | |
|---|---|
| SANCHEZ: | Ahhh, can you head, can you head down tonight to pick it up? |
| KOUSTAS: | Head down there tonight? |
| SANCHEZ: | Yes. |
| KOUSTAS: | Ah. |
| SANCHEZ: | Well it's up to you either to the tonight or tomorrow. |
| KOUSTAS: | Tomorrow, we'll do it tomorrow. |
| SANCHEZ: | Okay. |

.   .   .

| | |
|---|---|
| KOUSTAS: | You want me to come down there or you gonna come up here? |
| SANCHEZ: | No come come this way I have a lot to do in the morning. |
| KOUSTAS: | So come in the morning? |
| SANCHEZ: | Ah (inaudible), yeah come down, come down in the morning, I have a lot to do in my area . . . because the guy that works with me, doesn't work tomorrow. |
| KOUSTAS: | Okay . . . Okay, I'll hit you up early. I'll get up early. |

Based upon information obtained during the investigation, I believe that the conversation between KOUSTAS and SANCHEZ involved SANCHEZ' possession of a quantity of cocaine for KOUSTAS.     I also believe that KOUSTAS agreed to travel to an area in order to meet with SANCHEZ on March 30, 2014.

109.     On March 30, 1014, at 10:25 a.m., KOUSTAS contacted SANCHEZ and stated that he was departing his residence in order to meet.     At approximately 10:33 a.m., law enforcement observed KOUSTAS exit his residence, enter his 2003 Volkswagen GTI, and head South on Interstate 93.   At approximately 11:06   a.m., law enforcement intercepted a telephone call on (603) 361-8920, between KOUSTAS and SANCHEZ in which   KOUSTAS advised that he was passing exit 48.     In response, SANCHEZ advised KOUSTAS to stop and get a coffee and he (SANCHEZ) would call him back.   At approximately 11:08 a.m., law enforcement observed KOUSTAS take exit 47 off   Interstate 93.   KOUSTAS then pulled into the Dunkin Donuts at 147 Pelham Street in Methuen, Massachusetts. At approximately 11:46 a.m., law enforcement intercepted a call over 603-361-8920 in which SANCHEZ told KOUSTAS to head to May Street and to make sure that he was not followed.

110.     At approximately 11:47 a.m., law enforcement observed KOUSTAS exit the Dunkin Donuts and travel to the area of May Court in Methuen, Massachusetts.     Within approximately 15 minutes of KOUSTAS' arrival in the area, law enforcement observed him (KOUSTAS) heading back toward Interstate 93.     Based on calls over (603) 361-8920, I believe that KOUSTAS traveled to Methuen, Massachusetts, in order to obtain a significant quantity of cocaine from SANCHEZ.     Accordingly, because it was believed that KOUSTAS possessed a significant quantity of cocaine, law enforcement decided to initiate a motor vehicle stop of his vehicle.

111.   At 12:04 p.m., a uniformed NHSP Trooper activated his emergency lights on his marked cruiser and attempted to stop KOUSTAS' vehicle.     In response, KOUSTAS pulled his vehicle over in a breakdown area on Interstate 93 North.     However, as the Trooper exited his marked cruiser, KOUSTAS pulled away and initiated a pursuit.     The pursuit was terminated by the NHSP Trooper on Interstate 93 North because KOUSTAS' operation posed an extensive safety risk to the public.   However, when it was determined that KOUSTAS took exit 4 off of Interstate 93 North, the Derry, New Hampshire, Police Department ("DPD") reinitiated the pursuit.     Like the NHSP, the DPD terminated the pursuit because of KOUSTAS'  unsafe speed.   At approximately 12:43 p.m., the DPD located KOUSTAS on foot in the area of 32 Fordway Street, Derry, New Hampshire.    KOUSTAS' vehicle was found abandoned on High Street in Derry and law enforcement believe that KOUSTAS either hid or discarded the cocaine.

112.   During the time in which KOUSTAS was engaged in a high speed chase with the NHSP, he utilized (603) 261-0853 at 12:15 p.m. in order to call an individual believed to be JAMES JOHNSON.     JOHNSON is known to law enforcement because he was convicted in United States District Court, District of New Hampshire, in 2006 for possession of a firearm by a convicted felon, for which he received a 30 month term of incarceration, followed by a 3 year period of supervised release.     JOHNSON was also convicted by the State of New Hampshire in 1999 for receiving two (2) stolen firearms and engaging in a conspiracy to distribute cocaine. During the call with the individual believed to be JOHNSON, KOSUTAS stated that he was in "a car chase" and needed a "pickup."     At 12:18 p.m., KOUSTAS contacted JOHNSON and told him to travel to his residence and remove the box on his bureau, the shoe box in the downstairs closet, the "moll," which I believe is a reference to "Molly" (MDMA) and inositol, which I know is a substance which is added to cocaine in order to increase its volume.   KOUSTAS also told

JOHNSON to have Jenny (KOUSTAS' girlfriend, Jennifer Suk Day) get the "gats," which i

believe is a reference to firearms, from the box in his drawer.[19]

113.     At approximately 2:57 p.m., KOUSTAS spoke with JOHNSON and he told

KOUSTAS that he "couldn't get there in time" because KOUSTAS' residence was surrounded by

law enforcement.    The information provided by JOHNSON was accurate, as following

KOUSTAS' high-speed chase, law enforcement traveled to KOUSTAS' residence at 1465

Hooksett Road, Apartment 141, Hooksett, New Hampshire, and secured the residence pending

receipt of a search warrant.

114.     At approximately 9:37 p.m. on March 30, 2014, while waiting for receipt of a

search warrant, law enforcement intercepted a telephone call made by KOUSTAS over (603)

261-0853 to an individual believed to be FRANK FOWLE.     During the call, which was less than

30 seconds in duration, KOUSTAS told FRANK FOWLE "let it be known I was arrest[ed]."    In

response, FOWLE stated, "you were," to which KOUSTAS stated, "bye."    Based upon the short

exchange, I believe that KOUSTAS contacted FRANK FOWLE in order to have him (FRANK

FOWLE) inform their fellow co-conspirators of his arrest.   I also believe that KOUSTAS' call to

FRANK FOWLE could have been a means by which to warn fellow co-conspirators that law

enforcement may be watching them so that they could either flee or destroy (or dispose of)

drug-related evidence.

115.     Directly after KOUSTAS' conversation with FRANK FOWLE, he made an

out-going call to an unknown individual ("UI").     During the conversation, KOUSTAS

referenced his actions and indicated that he planned to flee.     KOUSTAS also advised the UI that

---

[19]KOUSTAS has numerous prior felony convictions, including: (1) a 1996 conviction for the sale of a narcotic drug, for which he was sentenced to a 12 month deferred term of imprisonment; (2) a 2003 conviction for receiving stolen property, for which he was sentenced to a 2-4 year suspended term of incarceration; and (3) a 2003 conviction for reckless conduct, for which he was sentenced to a 1-4 year term of incarceration.

his telephone line was "not clean," which I believe is a reference to KOUSTAS' belief that law

enforcement were monitoring his conversations.

| | |
|---|---|
| KK: | Hello. |
| UI: | Hi, where are you? |
| KK: | Something very serious happened. You will not see me until next life. |
| UI: | What happened? |
| KK: | Something very serious happened.   And the line is not clean.   And I am not well.   I have to disappear.   And I want to say thank you for everything and I'm sorry that I let you down. |
| UI: | Where are you going? |
| KK: | I don't know. |
| UI: | You want to leave? |
| KK: | Yeah. |
| UI: | Are you f…kidding me? |
| KK: | No, no all right? |
| UI: | Oh, s—t. |
| KK: | It's in the news, still this is nothing, what's coming after this, f—ing, we'll talk one day we'll talk, okay? |
| UI: | It is bad stuff, ah? |
| KK: | Yes, good bye for now. |

Based upon information obtained during the investigation, I believe that KOUSTAS was

informing the UI that he was leaving that area and the UI would not see him (KOUSTAS) "until

[his] next life."   I further believe that KOUSTAS' statement that "this is nothing, what's coming

after this, f—king," was a reference by KOUSTAS that an investigation by law enforcement

would uncover more serious, significant violations, which necessitated his flight.

116.    At 10:20 p.m. on March 30, 2014, a search warrant for KOUSTAS' residence was

issued by Judge Paul S. Moore, 9th Circuit Court, Merrimack, New Hampshire.    During the

course of the search, law enforcement seized a shoebox containing approximately two (2) pounds

of MDMA, located in a first floor closet, a digital scale, located on a shelf in a bathroom on the first

floor, two (2) bottles of Inositol, located in a bag on a desk which was located near the living room,

and a Royal Sovereign money counter, located in the kitchen closet.    Also seized were two (2)

firearms:[20] (1) a Ruger P94, .40 caliber pistol, serial number 340-78726, with a .40 caliber round in the camber and a loaded magazine inserted in the magazine well, located in the master bedroom top dresser drawer; and (2) a Glock 30, .45 caliber pistol, serial number ETK617US, located in the master bedroom top dresser drawer.[21]

117.    In addition to the seizure of the controlled substance MDMA, the firearms and ammunition, law enforcement seized twelve (12) cellular telephones, including:

(1)    a white I-Phone 4 cellular telephone, Model A1349, located in the master bedroom dresser;

(2)    a white I-Phone 5 cellular telephone, IMEI 358755054042350, located in the dining room credenza;

(3)    a black I-Phone   cellular telephone, Model A1387, located on the floor in the kitchen next to the front door;

(4)    a gray Motorolla I45 cellular telephone, located on top of a kitchen cabinet;

(5)    a gray Motorolla I45 cellular telephone, located on top of a kitchen cabinet;

(6)    an LG Metro PCS 4G cellular telephone, located on top of a kitchen cabinet;

(7)    a gray and black Samsung Verizon Wireless cellular telephone, Model SCH-U365, MEID A0000039C77959, located on the floor in the kitchen next to the front door;

(8)    a black Motorolla cellular telephone, Model V860, MEID A0000015F6CDBF, located on top of the washer and dryer;

(9)    a Blackberry cellular telephone, IMEI 355570050273757, located inside a desk in the living room;

(10)   a Motorolla Verizon Google cellular telephone, Model A855, MEID HEX A0000015B6FF03, MEID DEC 268435458111992835, located inside a desk in the living room;

(11)   a sealed Verizon Wireless Samsung cellular telephone, MEID A0000045CCD94E, located inside a desk in the living room; and

(12)   a sealed Verizon Wireless Samsung cellular telephone, MEID A0000045C3EC0D, located inside a desk in the living room.[22]

---

[20] In addition to the seizure of two (2) firearms, law enforcement seized 28 rounds of .40 caliber pistol ammunition, 20 rounds of .45 caliber pistol ammunition, 20 rounds of Winchester .45 caliber ammunition, 46 rounds of Winchester .25 caliber ammunition, all of which was located in the master bedroom top dresser drawer.   Law enforcement also seized a holster for a Glock .30 caliber pistol, located inside of a desk in the living room.

[21] The Glock 30, .45 caliber pistol was reported as having been stolen in Concord, New Hampshire, on December 14, 2007.

[22] The seized cellular telephones identified it numbers (11) and twelve (12) were sealed and therefore are not believed by law enforcement to have been utilized.

In addition to the seizure of 12 cellular telephones inside the residence, law enforcement seized numerous additional electronic devices, including:

    (1)    an I-Pad, located on the living room end table;

    (2)    a Sony VIO laptop computer, Model PCG-6G4L, located in a closet off of the living room; and

    (3)    an Ienovo computer, Model B570, Serial Number WB06005949, located in a game room on the third floor.

    118.    Law enforcement also obtained a search warrant for one of KOUSTAS' vehicles, a Chevrolet C1500 van, New Hampshire registration 2765950.   Located inside the Chevrolet C1500 van was a one (1) pound vacuum-sealed package containing marijuana. Consistent with the information provided by the CS in June 2009 involving the practice of the Canadian DTO to label marijuana destined for New Hampshire with the letters "NH," the packaging contained the letters "NH" and "Grand Master" written across the top.     Also located inside the van were three (3) Blackberry cellular telephones, including:

    (1)    a Blackberry cellular telephone, IMEI 355571058586166;

    (2)    a Blackberry cellular telephone, IMEI 355571059729385; and

    (3)    a Blackberry cellular telephone, IMEI 355571058555005.

    119.    Law enforcement also obtained a search warrant for 140 Porter Street, Manchester, New Hampshire, the residence of Nicholas Koustas, the father of KOSMAS KOUSTAS.     Seized pursuant to the search was a large black empty duffle bag which was consistent with the duffle bags utilized by the Canadian DTO to transport significant quantities of marijuana.     Although no marijuana was contained inside the bag, a small, hand-written piece of paper was located in the bag.     On one side of the note was the word "Boston," and on the opposite side was the word "Diamond Kush x 50."     Based upon information obtained during the investigation, law enforcement believe that the bag was utilized to hold and transport 50 pounds of marijuana.     Law enforcement also believe that the term "Boston" was a reference by the Canadian DTO that the

marijuana was smuggled from Canada into the United States and was destined for the Boston,

Massachusetts, area.

## III.   <u>CONCLUSION</u>

Based on the foregoing, I believe that there is probable cause to believe that the following

individuals:

(1)
KOSMAS KOUSTAS,


(2)
ALKIS NAKOS,


(3)
DEAN SIEGER,


(4)
JUAN RODRIGUEZ SANCHEZ,


(5)
CHARLES FOWLE,


(6)
FRANK FOWLE,

(7)
JEREMY BLEVENS,

(8)
CHRISTOPHER RANFOS,

(9)
KRISTOPHER VENTURINI,

(10)
WILLIAM SWANSON,

(11)
MARC GUILLEMETTE,

(12)
JOHN HORNE, JR.,

(13)
MICHAEL GRAYDON,

have engaged in violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances); 21

U.S.C. § 841(a)(1) (distribution of controlled substances and possession with intent to distribute

controlled substances); and 21 U.S.C. § 843(b)(use of a communication facility to facilitate the distribution of controlled substances).   I, therefore, request that the Honorable Court issue a warrant for the arrests of the above-named individuals.

/s/ NHSP Trooper James R. Norris
NHSP Trooper James R. Norris


Sworn to and subscribed before me
this _____ day of May, 2014.

_____