UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                          \*
UNITED STATES OF AMERICA                  \*
                                          \*   14-CR-93-01-LM
            v.                            \*   August 24, 2015
                                          \*   1:20 p.m.
        ALKIS NAKOS                        \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF JURY TRIAL TESTIMONY
OF DAVID SWEENEY
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY


APPEARANCES:


For the Government:      Terry L. Ollila, AUSA
                        U.S. Attorney's Office




For the Defendant:      Robert L. Sheketoff, Esq.
                        Law Office of Robert L. Sheketoff




Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

```
                    I  N  D  E  X

WITNESS:              Direct      Cross    Redirect    Recross

DAVID SWEENEY:

By Ms. Ollila          3

By Mr. Sheketoff                   33
```

```
1                    P R O C E E D I N G S
2            THE COURT:  Government, you may call your next
3    witness.
4            MS. OLLILA:  Thank you, your Honor.  The United
5    States calls David Sweeney.
6                        DAVID SWEENEY
7            having been duly sworn, testified as follows:
8            THE CLERK:  For the record, please state your name
9    and spell your last name.
10           THE WITNESS:  David Sweeney, S-W-E-E-N-E-Y.
11                      DIRECT EXAMINATION
12   BY MS. OLLILA:
13       Q.   Good afternoon, Mr. Sweeney.
14       A.   Good afternoon.
15       Q.   You're dressed in orange, and why is that?
16       A.   Because I'm housed at Merrimack County House of
17   Corrections.
18       Q.   Is that where you are right now?
19       A.   Yes.
20       Q.   Is that where you plan to be for the immediate
21   future?
22       A.   Yeah.
23       Q.   I don't -- was that like a --
24       A.   Yes.
25       Q.   Do you have counsel who represents you, Mr.
```

1   Sweeney?

2       A.   Yes.

3       Q.   And do you see counsel in the courtroom today?

4       A.   Yes.

5       Q.   And what is his name?

6       A.   Bjorn Lange.

7       Q.   Has he represented you before, Mr. Sweeney?

8       A.   Yes.

9       Q.   Do you have a criminal record?

10      A.   Yes.

11      Q.   A really long criminal record?

12      A.   Unfortunately.

13      Q.   Have you been involved in crime most of your life,

14  Mr. Sweeney?

15      A.   Yes.

16      Q.   Is that something you're proud of?

17      A.   No.

18      Q.   How many convictions do you have?

19      A.   Three.

20      Q.   How much time have you served in custody?

21      A.   Approximately thirteen years.

22      Q.   How old are you?

23      A.   Thirty-nine.  Just turned 39.

24      Q.   So that's -- a third of your entire life has been

25  in custody; is that true?

1      A.   Yep.

2      Q.   Do you have a family, Mr. Sweeney?

3      A.   Yes.

4      Q.   Is your family supportive of you?

5      A.   Yes.

6      Q.   Do you have any brothers or sisters?

7      A.   Yeah.  I've got a half brother and a stepsister and

8  then two other half brothers.

9      Q.   Okay.  Are your parents still alive, Mr. Sweeney?

10     A.   Yes.

11     Q.   Are they supportive of you?

12     A.   Yes.

13     Q.   Are you married?

14     A.   No.

15     Q.   Do you have any children?

16     A.   One son.

17     Q.   How often do you get to see your son?

18     A.   Not often.

19     Q.   When's the last time you've seen your son?

20     A.   Eighteen months ago.

21     Q.   Do you mind if I ask how old your son is?

22     A.   Yeah, he's 14.

23     Q.   Do you want him to turn out like you, Mr. Sweeney?

24     A.   No, no.

25     Q.   What happened in your life to get you here?

1    A.    I don't know.  It started out good.

2    Q.    How so?

3    A.    Because I had a lot of money.

4    Q.    How did you have a lot of money?

5    A.    I sold narcotics.

6    Q.    When did you start selling narcotics?

7    A.    From the time I was 14 for a little while, and then

8  when I was 18 after the military.

9    Q.    Were you in the military?

10   A.    Yeah.

11   Q.    What branch of the service did you go in?

12   A.    I was in the U.S. Army.

13   Q.    For how long?

14   A.    Two years.

15   Q.    What happened?

16   A.    I was stationed at Fort Hood, Texas, and it was by

17  the Mexican border and I got involved.

18   Q.    Rather than stay in the military, you got involved

19  in dealing drugs?

20   A.    Yeah.

21   Q.    And what kind of drugs?

22   A.    Back then it was just marijuana and a little bit of

23  cocaine.

24   Q.    What's that mean, a little bit of cocaine?  Does a

25  little bit mean a lot of cocaine?

1    A.    Yeah.

2    Q.    Were you court-martialed?

3    A.    No, no.

4    Q.    So how did you get out of the service?

5    A.    I got a dirty urine and the first sergeant called

6  me in the office and he said, is the military working out for

7  you, and I said no.

8    Q.    And then what happened?

9    A.    Then he gave me a Field Grade Article 15.

10   Q.    What is that?

11   A.    Where you get -- you have to do extra duty, you get

12 deducted in pay, and then he asked me -- he said point-blank,

13 do you want to remain in the Army, and I said no.

14   Q.    So what happened?

15   A.    I got out with general under honorable conditions.

16   Q.    Honorable conditions?

17   A.    General under honorable.  It's basically saying --

18   Q.    You want out?

19   A.    Yeah.

20   Q.    You said that you tested positive.  What did you

21 test positive for?

22   A.    Marijuana.

23   Q.    What drugs have you used in your life, Mr. Sweeney?

24   A.    I've tried them all; marijuana, cocaine, Ecstasy,

25 heroin, opiates.

1      Q.    Heroin.  You're aware there's a huge heroin

2   epidemic, correct?

3      A.    Yeah.

4      Q.    Have you sold heroin?

5      A.    Yes.

6      Q.    You said you tried heroin?

7      A.    Uh-huh.

8      Q.    Were you a heroin addict?

9      A.    Yeah, I would say --

10      Q.    Is that yes?

11      A.    Yeah.

12      Q.    How did you get addicted to heroin?  Are you

13   addicted to heroin?

14      A.    Well, once an addict, always an addict, but the

15   thing is I've always been able to maintain.

16      Q.    What does that mean?

17      A.    I've been able to -- so it doesn't affect my job or

18   it doesn't affect, you know, but then again it has affected

19   my lifestyle because I sold narcotics to try to get ahead in

20   life.

21      Q.    How do you use heroin?  Is that something you snort

22   or you shoot up with a hypodermic needle?

23      A.    Well, you can snort it.  You could shoot it.  You

24   can smoke it.

25      Q.    What have you done?

1      A.    I've snorted it.  I've shot it.

2      Q.    How many times do you think you've shot heroin?

3      A.    Probably a hundred.

4      Q.    And you said Oxycodone, too.  What do you mean by

5  Oxycodone?

6      A.    They're a pain medication.  They're like a

7  Percocet.  They're an opiate.

8      Q.    Percocet is lawful if someone gets it from their

9  physician, correct?

10     A.    Right.

11     Q.    How would you get Percocet?

12     A.    Right now I would probably go see my barber in

13 Lawrence and let him know I'm looking for some Oxycodone.

14     Q.    You say your barber in Lawrence to let him know

15 you're looking for some Percocet?

16     A.    Yeah.

17     Q.    So is it fair to say that you've purchased Percocet

18 off the street before?

19     A.    Correct.

20     Q.    Let me ask you this.  Are drugs available in the

21 prison system?

22     A.    Yeah.

23     Q.    How hard would it be for you to get your hands on

24 drugs within the prison system?

25     A.    Pretty easy.

1    Q.   That's discouraging.  Have you ever used drugs in
2  the prison system?
3    A.   Yeah.  Of course.
4    Q.   When's the last time you've used drugs in the
5  prison system?
6    A.   Probably like six months ago.
7    Q.   What did you use?
8    A.   Suboxone.
9    Q.   What's Suboxone for somebody that doesn't know?
10   A.   It's like an opiate blocker.  Basically, it's to
11  get you off of opiates, but it has an effect of like doing
12  heroin.
13   Q.   All right.  So someone who is trying to detox from
14  heroin addiction is given Suboxone; is that correct?
15   A.   Correct.
16   Q.   And Suboxone is actually legal; is that correct?
17   A.   Yeah.
18   Q.   As long as you get it from your physician; is that
19  correct?
20   A.   Yeah.
21   Q.   And Suboxone is an opiate antagonist.  Do you know
22  what I mean by that?
23   A.   Yeah.
24   Q.   It goes against opiates.  So it's supposed to help
25  you detox, correct?

1      A.    Correct.

2      Q.    Why would you want that then?

3      A.    If you're off of opiates for a while and you do

4 Suboxone, it gives you a feeling like you've done heroin.

5 It's the same thing.

6      Q.    Okay.  So you're not doing it because you want to

7 stay clean off your heroin addiction.  You're doing it

8 because you want to have a heroin high?

9      A.    Correct.

10     Q.    How much does it cost to get Suboxone in the jail

11 system?

12     A.    It depends.  It depends, but a single one is like a

13 hundred bucks.

14     Q.    A hundred dollars?

15     A.    Uh-huh.

16     Q.    And you say a single one.  What do you mean by a

17 single one?

18     A.    Like a strip.

19     Q.    They come in strips, correct?

20     A.    Yeah.

21     Q.    And do you ingest them, put them in your mouth, or

22 do you put them on your body?

23     A.    No.  You can put them in your mouth, or you can add

24 water to it and sniff it.

25     Q.    What other drugs have you used while you've been in

1    the prison system?

2         A.    Marijuana and heroin.

3         Q.    Have you actually shot up heroin with a hypodermic

4    needle in the prison?

5         A.    Yeah.

6         Q.    How in the world would you get a hypodermic needle

7    in the prison system?

8         A.    Well, it's kind of gross, but these guys are

9    diabetics.  They go and they put this diabetic -- you know,

10   so it's not drawing it, but you're still using a used needle.

11        Q.    You're using a used needle?

12        A.    Yeah.  It's disgusting.

13        Q.    So you're putting in your arm what someone else had

14   already put in their arm?

15        A.    Yeah.

16        Q.    What would possess you to do that, Mr. Sweeney?

17        A.    I don't even know.  I just probably want to get

18   high.

19        Q.    You mentioned earlier that you actually had a job

20   at one point in time.  Is that true?

21        A.    Yeah, I've worked.

22        Q.    Okay.  Well, what was the job, Mr. Sweeney?

23        A.    I sell cars.

24        Q.    How long have you sold cars in your life, Mr.

25   Sweeney?

1      A.     Since I was 20.

2      Q.     Were you successful at it?

3      A.     Yeah.

4      Q.     Did you make money at it?

5      A.     Definitely.

6      Q.     What do you mean definitely?

7      A.     When I first started, I was a thirty car a month

8  guy, you know.  I was on track for a hundred thousand a year,

9  you know.

10     Q.     Making $100,000 a year?

11     A.     Yeah.

12     Q.     And then what happened?

13     A.     Oh, geez.  I met this guy in Mexico and in Texas,

14 and it kind of was hard to maintain a job and still, you

15 know, travel back and forth to Texas.  And then you've got to

16 take it and recompress it, or whatever you want to do with

17 it, you know.  There's always something to do.

18     Q.     Is it because it's easy money, Mr. Sweeney?

19     A.     I don't know.  I've thought about that, and it's a

20 good question.  Is it easy money?

21     Q.     It's not easy given where you are right now,

22 correct?

23     A.     No.  It's definitely not.  I don't know.  It's fast

24 money, you know.  But the thing is once you get it, it's so

25 hard to keep it, you know.

1     Q.   What do you mean it's so hard to keep it?  It's so

2  hard to keep what?

3     A.   The money.  Because you can only spend so much.

4  It's like having something dangled in front of your face, you

5  know, and you can make so much but you can only spend so

6  much.

7     Q.   Mr. Sweeney, most people would be so delighted to

8  make almost $100,000 a year selling cars.  Why not just do

9  that?

10     A.   Yeah.  That's a good question.

11     Q.   When is it going to stop for you, Mr. Sweeney?

12     A.   I don't know.  I would like to think that I'm done,

13  you know.

14     Q.   Why should this jury believe that, Mr. Sweeney?

15     A.   Well, I've been arrested several times -- well,

16  I've never had a co-defendant, you know, and this time there

17  was a woman I love that got arrested with me, and they put

18  her in jail.  And I told her -- I said, tell on me, you know,

19  and she said -- she was like, I'll never do that, you know.

20  She said, I'll jump on a grenade for you, and I said, you

21  know, I appreciate it, but don't, you know.

22     Q.   So you not only got arrested yourself, but you got

23  the woman you love involved with your business?

24     A.   Yeah.

25     Q.   And what was that business before you got arrested?

1          A.    Selling heroin.

2          Q.    How long were you and the woman you love selling

3    heroin?

4          A.    Ten months.

5          Q.    Where is she now?

6          A.    She's on parole in Ohio, but she did a year in

7    prison.

8          Q.    Are you still together?

9          A.    That's a toss-up, you know.  I love her.  I want to

10   be with her, but I'm going to be on federal supervised

11   release.  She's going to be on parole.  She lives in Ohio.

12         At first everything was good where her father was

13   real supportive, and then once she got out there he kind of

14   flipped the script, you know.

15         Q.    So you said that you and she were selling heroin

16   together for about ten months?

17         A.    Uh-huh.

18         Q.    How much heroin?

19         A.    Probably, I don't know, 500 grams a week, you know.

20         Q.    That's a lot of heroin.  Do you ever -- at the

21   prison do you see the news?

22         A.    Yeah.

23         Q.    Do you see that a lot of people are dying from

24   heroin overdoses these days?

25         A.    Yeah.

1      Q.    You're part of the problem, not part of the
2  solution, right, Mr. Sweeney?
3      A.    Yeah.  Definitely.
4      Q.    So, Mr. Sweeney, what are you expecting to get as a
5  result of your testimony today?
6      A.    I don't know.
7      Q.    Then why are you doing it, Mr. Sweeney?
8      A.    Obviously to get a sentence reduction, but you told
9  me that you wouldn't recommend anything so --
10      Q.    What do you mean?  What did I tell you?
11           MR. SHEKETOFF:  Well, objection.
12           THE COURT:  Approach.
13           MS. OLLILA:  I can rephrase, Judge.
14           THE COURT:  All right.  Go ahead.
15      Q.    What is your understanding -- don't say anything
16  about what I said to you.  What is your understanding as to
17  what will happen if you testify today?
18      A.    Nothing.  Basically, it's all up to the prosecutor.
19  You're not even my prosecutor.
20      Q.    Okay.  Who is your prosecutor?
21      A.    Nick Abramson.
22      Q.    Well, you do know that if you testify that
23  information will be relayed to Assistant U.S. Attorney
24  Abramson, correct?
25      A.    I'm hoping.

1       Q.    And you want something out of this, correct?

2       A.    Yeah.

3       Q.    Do you know what you're going to get out of it?

4       A.    No.  I have no idea.

5       Q.    It's going to be some sentence reduction, correct?

6       A.    Yes.

7       Q.    Has anyone thrown any numbers out at you?

8       A.    No.  I wish he would have.

9       Q.    Do you expect to get out of jail anytime soon?

10      A.    No.

11      Q.    Mr. Sweeney, do you know someone by the name of

12   Alkis Nakos?

13      A.    Yeah.

14      Q.    Do you see him in the courtroom today?

15      A.    Yep.

16      Q.    Would you please point to him and describe an

17   article of clothing that he is wearing, Mr. Sweeney.

18      A.    He looks a little different.

19      Q.    In what way, Mr. Sweeney?

20      A.    He's got a beard and hair.  He looks a lot

21   different.  You look a lot different.

22      Q.    Okay.  You're turning and you're looking over at

23   Mr. Nakos.

24            MS. OLLILA:  May the record reflect that the

25   witness has testified the defendant, Alkis Nakos?

1          THE COURT:  Yes.

2      Q.   I don't want you to have a personal conversation

3  with Mr. Nakos today.

4          How is it, Mr. Sweeney, that you met Mr. Nakos?

5      A.   I was in prison.

6      Q.   Were you in prison with Mr. Nakos?

7      A.   Yeah.

8      Q.   Were you in prison with someone by the name of

9  Nicholas Champagne?

10      A.   Yeah.

11      Q.   Okay.  I've got to ask you this question because

12  this has been the subject of some debate.  Did Nicholas

13  Champagne beat you up?

14      A.   No.

15      Q.   What happened?

16      A.   We got into an argument.  He was talking smack.

17      Q.   What does that mean, talking smack?

18      A.   Basically about my case, you know.  I was a little

19  embarrassed -- definitely, a lot embarrassed.  I felt like I

20  had something to prove.  So he said something to me, I said

21  something to him, and it happened down in the weight room.

22          The thing is in prison the weights are like a thing

23  everybody keeps away from because if there's a fight around

24  them, or somebody gets hit with something, they'll take them

25  away from us.  So everybody broke it up, you know.

1           There is some static between us, you know.  Like if

2    I saw him, you know, there would probably be problems, but I

3    try to avoid that, you know.

4           Q.   You said that you had an argument.  He didn't beat

5    you up, but you two went at it -- started to go at it.

6           A.   Yeah.

7           Q.   And you said that it occurred in the weight room,

8    but inmates don't fight in the weight room.  Why is that?

9           A.   Because if somebody gets hurt in there, they'll

10   take them away from us.

11          Q.   And is that one of the only pleasures you get --

12   other than doing drugs -- in the prison is lifting weights?

13          A.   Yeah.  That and sports.

14          Q.   Okay.  What do you have to show for yourself

15   financially today, Mr. Sweeney?

16          A.   Yeah, that's a good question, too.

17          Q.   I'm full with a lot of good questions, apparently.

18          A.   Yeah, you know, I've got a piece of real estate.

19   The mortgage and the deed is in my name.  However, I haven't

20   made a mortgage payment since 2006.  I violated parole.  My

21   partner came in and took over responsibility.  He came in and

22   he said, hey, you know, what's going on, you know, do you

23   want to lose the property, do you want me to take it over?

24   It's a house with a used car lot in Tilton off Exit 20.  I

25   have like approximately 53,000 into the property and --

1      Q.   Is it mortgaged?

2      A.   Yeah, it's mortgaged.

3      Q.   Mr. Sweeney, you indicated that you knew Alkis

4  Nakos from the prison.

5           Did you know someone by the name of Mihail

6  Leventis?

7      A.   Yeah.  I called him Mihail.

8      Q.   Mihail.  Okay.  Is that how you knew him?

9      A.   Yeah.

10     Q.   Were you friends with him?

11     A.   Not really.

12     Q.   Did you ever see who he hung out with?

13     A.   Yeah.  He hung out with a lot of dudes.  Like he

14  played poker.

15     Q.   Who did he play poker with?

16     A.   Oh, geez.  All the guys on the north unit.

17     Q.   Did he play poker with Alkis Nakos?

18     A.   I believe so.  I believe they did.

19     Q.   Okay.  Did you know anything about Mihail Leventis?

20     A.   Nothing.  Just that he could lose a lot of money.

21     Q.   You indicated that for a long time you made money

22  selling drugs and you don't have much to show for it now

23  other than a piece of property that's mortgaged; is that

24  correct?

25     A.   Yeah.

1    Q.   How much money have you made through the years
2  selling drugs?
3    A.   Made and lost?  Millions.
4    Q.   Millions of dollars.  How is that so?
5    A.   I can't seem to keep it.
6    Q.   Where does it go?
7    A.   You know, the first time I had a house and
8  commercial property, a used car lot, and my salesman was an
9  informant for the DEA.  I had, you know, motor homes, jet
10  skis, snowmobiles, four wheelers, boats.  Everything that was
11  registered to me the DEA came and they said, where's this,
12  where's this, where's this, where's that, and they took it.
13  All of it.
14    Q.   So you make a lot of money, but the government
15  comes in and takes it all away, correct?
16    A.   Yeah.
17    Q.   That's what happens when you're a drug dealer,
18  right?
19    A.   Yeah.
20    Q.   You said you have a few convictions.  Do you only
21  have convictions for drug related offenses, Mr. Sweeney?
22    A.   No.  I've got two that are embarrassing.
23    Q.   You said you have two that are embarrassing.  What
24  are those two?
25    A.   One of them is felonious sexual assault.

1        Q.    What is felonious sexual assault?

2        A.    It's if -- basically, if there's a minor involved.

3   This girl was 15 years old and I was 23 years old, and it

4   happened on my boat.

5        Q.    What happened on your boat?

6        A.    A girl came upstairs.  I was with another girl.

7   She joined in.

8        Q.    And that's against the law.

9        A.    Definitely.

10       Q.    What happened as a result?

11       A.    I got two to five years in prison.

12       Q.    And so you did prison time, correct?

13       A.    Yeah.

14       Q.    When you have sexual contact with a minor, you're

15   required to register for the rest of your life as a sex

16   offender, correct?

17       A.    Yeah.  Well, because of my age and because of the

18   victim, I can petition the Court within ten years.

19       Q.    Have you successfully registered as an individual

20   who has a --

21       A.    No.

22       Q.    Why is that, Mr. Sweeney?

23       A.    I moved to North Carolina, and you've got five

24   days.  I didn't make it.  So that's how I got involved in the

25   federal system.

1       Q.   All right.   So you have a conviction for felonious

2  sexual assault.   You did two to five.   Is that what you said?

3       A.   Uh-huh.

4       Q.   And after you do two to five you're required to

5  register as a sexual offender, correct?

6       A.   Yeah.

7       Q.   And you didn't because you moved to another state

8  and you missed the five days?

9       A.   Yeah.

10       Q.   Had you ever intended to register?

11       A.   Yeah.

12       Q.   What happened as a result of you not registering?

13       A.   I got 18 months in the feds.

14       Q.   So the feds came in and grabbed you and said it's

15  against the law not to register, correct?

16       A.   Yeah.

17       Q.   So you were sent back to jail for 18 months,

18  correct?

19       A.   Uh-huh.

20       Q.   And what happened after you got out?

21       A.   I lived in Manchester with my girlfriend and I sold

22  heroin.

23       Q.   In the past -- and by the way, you lived in

24  Manchester with your girlfriend and you sold heroin.   Is that

25  why you're currently incarcerated, as a result of your heroin

1    case with your girlfriend?

2         A.    Correct.

3         Q.    And what were the charges?  What are the charges

4    that are pending against you now?

5         A.    Possession of heroin with intent to distribute.

6         Q.    Have you pled guilty to those charges yet?

7         A.    No.

8         Q.    Do you even have a plea agreement from the United

9    States?

10        A.    No.

11        Q.    Do you expect to have a plea agreement soon?

12        A.    No.

13        Q.    Do you know what the terms of the plea agreement

14   would be?

15        A.    No.

16        Q.    Have you been made any promises about the terms of

17   the plea agreement?

18        A.    None.

19        Q.    You know you're going to get something, correct?

20        A.    Yeah.

21        Q.    Do you have any idea what it is?

22        A.    No.  I wish I did.

23        Q.    Now, Mr. Sweeney, is this the first time that

24   you've cooperated with law enforcement?

25        A.    Nope.

1    Q.    How many other times have you cooperated with law

2  enforcement?

3    A.    One time, and I didn't get -- I got arrested for

4  distribution of cocaine.  They took everything I owned.  My

5  salesman was an informant for the DEA.  I got out.  I

6  cooperated with them.  I bought a kilo of coke from another

7  guy and because --

8    Q.    While you were cooperating with law enforcement?

9    A.    Right.  So what happened was because I got arrested

10  for the sex thing they couldn't give me a time cut.  They

11  wouldn't give me a time cut so I got screwed.  Basically, I

12  screwed myself, you know.

13    Q.    So you got nothing in return for that?

14    A.    No.

15    Q.    Did you get anything in return for it?

16    A.    Nothing.

17    Q.    So you cooperated with DEA.  You purchased a

18  kilogram of cocaine off of a target in hopes of getting

19  something, and in the end you got what, bupkis?

20    A.    They told me that the reason why they couldn't help

21  me out with my sentence is because I got arrested for sexual

22  assault.

23    Q.    Are you testifying today because you're trying to

24  earn your way out of jail again?

25    A.    I mean, I would like a deal, you know.

1      Q.   What is your understanding of your obligation
2  today, Mr. Sweeney?  To do what?
3      A.   Tell you the truth.
4      Q.   In December 2013, or January 2014, where were you
5  living at that time?
6      A.   I just moved to 421 Heavy Street in January.
7      Q.   You said 421 Heavy Street?
8      A.   Yeah.
9      Q.   For those who don't know Heavy Street, what city is
10 that located in?
11     A.   Manchester.
12     Q.   Have you lived in Manchester for a long time, Mr.
13 Sweeney?
14     A.   Yeah.  Off and on.
15     Q.   Okay.  Heavy Street, is that near Amory Street?
16     A.   Yeah.  It's on the corner of Amory Street.
17     Q.   Do you know someplace named Amory Street House of
18 Pizza?
19     A.   Yeah.  I could see it from my bedroom window.
20     Q.   Is that a bustling place?  A lot of people going in
21 to get pizza out of that place?
22     A.   No.
23     Q.   Why do you say that?
24     A.   Because there wasn't -- there just wasn't much
25 business there.

1    Q.    Did you know who owned Amory Street House of Pizza?

2    A.    Yeah.

3    Q.    Who?

4    A.    Alkis' old man.

5    Q.    You say Alkis' old man.  Do you know the

6    defendant's father's name?

7    A.    No.  As a matter of fact, I don't.

8    Q.    Okay.  In January of 2014 did you see Alkis Nakos?

9    A.    Yeah.

10   Q.    Can you tell the jury where you saw him and what

11   happened.

12   A.    Basically, it was snowing out so I walked by the

13   restaurant and I was going to make a play, I was going to

14   sell some heroin, so I was walking on foot because I didn't

15   want to drive in the snow, and I walked by the restaurant.

16   As I was going by there, I saw Alkis outside and spoke to

17   him.

18   Q.    Okay.  What did he say to you?

19   A.    He just said, what's up.  I said, well, I'm going

20   to make a play.  And then he said, well, what are you going

21   to do.  I said, you know, I'm selling heroin, you know.

22   Q.    Yeah.

23   A.    And then I don't even know how that conversation

24   came up, but he asked me could I do anything with exotics.

25   Q.    Let me stop you.  He asked you, can you do anything

1    with exotics.  What do you understand exotics to mean?

2         A.    Like high test marijuana.

3         Q.    High grade marijuana?

4         A.    Yeah.

5         Q.    He said, can you do anything with exotics, and then

6    what did you say?

7         A.    Depends on the price.

8         Q.    All right.  And why don't you try to relay as much

9    as you can about that conversation to the jury.

10        A.    All right.  Basically, I asked him how much for it,

11   and he said, dependant on how much you take and --

12        Q.    What does that mean, dependant on how much you

13   take?

14        A.    How many pounds you take and how the quality is.

15   And I told him that basically I don't really deal with that

16   because it's too bulky and I really don't have any customers

17   for that, and then he asked me if I could do anything with

18   Molly.

19        Q.    What is Molly?

20        A.    It's MDMA.

21        Q.    Go ahead and keep explaining, if you can.

22        A.    All right.  I asked him how much.  He told me like

23   1,200 an ounce, and then I said, I know some guys that mess

24   with that, but you're probably already talking to them.

25        Q.    Okay.

1      A.    Basically, that was it.  I just --

2      Q.    Did you ask him whether he had anyone working for

3 him?

4      A.    Oh, yeah.  No, I didn't ask him if he had anybody

5 working for him, but he mentioned it.  He said -- basically

6 the conversation went -- you know, it was real brief, but he

7 basically told me that -- I said, you know, obviously you're

8 not doing -- you know what I'm saying -- obviously you're not

9 doing this on your own, and he said that he had Koustas

10 handling it.  I had Koustas handling my shit.

11      Q.    He said he had Koustas handling his shit?

12      A.    Yeah.

13      Q.    And do you know Kosmas Koustas?

14      A.    Yeah.

15      Q.    How do you know him?

16      A.    From prison.

17      Q.    What did you do at that point?

18      A.    I left and went to go sell the heroin.

19      Q.    Okay.  Do you know someone by the name of Andre

20 Watson?

21      A.    Yeah.

22      Q.    How do you know Andre Watson?

23      A.    Prison.

24      Q.    Do you know if Andre Watson knows the defendant?

25      A.    Yeah.

1      Q.    How do you know that?

2      A.    We were in prison together and Dre -- he talks a

3   lot.

4      Q.    Okay.  Well, let me ask you this.  You just

5   referred to him as Dre.  His name is Andre Watson.  Do people

6   call him Dre?

7      A.    Yeah.

8      Q.    Have you had conversations with Andre Watson, or

9   Dre, about the sale of MDMA?

10     A.    Yeah.

11     Q.    Okay.  Why don't you relay that to the jury.  And

12   before you do that, Mr. Sweeney, if you can please give them

13   a time frame when this happened.  When, in relation to your

14   conversation with the defendant outside of Amory Street

15   Pizza, did you have that conversation?

16     A.    Oh, all right.  Basically, it was in I think

17   November.  I was over at Dough Boy's house which is --

18     Q.    Who is Dough Boy?

19     A.    I think his last name is Burton.  Justin Burton or

20   something like that.  We call him Dough Boy from prison.

21     Q.    Okay.

22     A.    I was over there selling Dough Boy some heroin, and

23   he was like -- they were all doing Molly.

24     Q.    When you say they were all doing Molly, meaning

25   right there in front of you they were doing Molly?

1      A.    Yeah.

2      Q.    Okay.  Go ahead.

3      A.    Basically, they were just doing lines of it and

4  asked me if I wanted any, and I said no.

5      Q.    Okay.  And did you ask Dough Boy or Andre Watson

6  where he was getting the MDMA from?

7      A.    Yeah.  He -- this dude, like he brags a lot anyway.

8  So I thought originally like word is -- I had heard, and it

9  was just through the grapevine, that he had owed somebody a

10 lot of money.

11     Q.    Who owed?

12     A.    That Dough Boy did.

13     Q.    Okay.

14     A.    So I still dealt with him anyway because he had

15 cash.

16     Q.    Okay.

17     A.    Basically, I went over there and Dre was just, you

18 know, he was high so he was talking, and I really don't get

19 along with him either, you know.

20     Q.    Okay.

21     A.    So, yeah, he told me that he got it from Kos.

22     Q.    He got what from Kos?

23     A.    The MDMA.

24     Q.    Did he say where Kos got it from?

25     A.    Yeah.

1        Q.    From who?

2        A.    From Alkis.

3        Q.    And what about Dough Boy?  You said Dough Boy owed

4   a lot of money to someone.  Who did he owe money to?

5        A.    I'm not sure.  I mean, I could speculate but --

6        Q.    Oh, I don't want you to speculate.

7        A.    No.

8        Q.    So Andre Watson said he was getting MDMA from Kos

9   that Kos was getting from the defendant, Alkis Nakos; is that

10  correct?

11       A.    Uh-huh.

12       Q.    Have you ever seen whether the defendant, Alkis

13  Nakos, drives any automobiles?

14       A.    Yeah.

15       Q.    What car have you seen him in, if any?

16       A.    I've seen him in a black Mercedes.  That's pretty

17  much it.

18            MS. OLLILA:  Your Honor, may I just have a minute?

19            THE COURT:  Yes.

20            MS. OLLILA:  Thank you.  Excuse me, Mr. Sweeney.

21            (Pause)

22            MS. OLLILA:  I have nothing further.

23            Thank you, Mr. Sweeney.

24            THE COURT:  Attorney Sheketoff.

25            MR. SHEKETOFF:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. SHEKETOFF:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   There is one reason, and one reason only, you're on the witness stand, and that's to try to get as low a sentence as possible, correct?

A.   Yeah.

Q.   Because you're about as experienced in this system as you get, correct?  I mean, you've been working both sides of the street for a long time, haven't you?

A.   Yeah.

Q.   You're a confidential informant for the DEA and you're selling drugs at the exact same time, correct?

A.   Not at the same time but --

Q.   Oh, you would wait until your confidential informant duties are over, and then you would go back to selling drugs?

A.   Yeah.

Q.   Because that's out of some sort of loyalty to the DEA?  You wouldn't want to be doing that while you're on their payroll?

A.   No.  Originally, I did it for a sentence reduction.

Q.   Well, that was in 2001, wasn't it?

A.   Yeah.

1      Q.   All right.  So as I understood your direct
2  examination, you're selling cars in 2001 and your business
3  manager or your office manager, or your somebody, turns out
4  to be a DEA informant?
5      A.   Salesman, yeah.
6      Q.   Okay.  And so did you get arrested for that?
7      A.   Yeah.  Of course.
8      Q.   Did you plead guilty to that?
9      A.   Yeah.
10      Q.   And what did you get as a sentence?
11      A.   I got a five-to-ten with two and a half of the
12  minimum suspended.
13      Q.   You got a five-to-ten?
14      A.   Uh-huh.
15      Q.   From the feds?
16      A.   From the state.
17      Q.   Oh, from the state.  Well, weren't you cooperating
18  for the DEA at that time in 2001 when you picked up that
19  charge?
20      A.   No.  I got arrested for it, and then I cooperated.
21      Q.   All right.  Okay.  So when you got sentenced you
22  had been cooperating with the DEA, correct?  You set somebody
23  up.  You went and wired up and bought a kilo of cocaine,
24  correct?
25      A.   Correct.

1    Q.   And what was that original charge that you were

2  charged with?  Was it selling drugs or was it selling some

3  specific drug?

4    A.   Distribution of cocaine.

5    Q.   And how much cocaine were you distributing at the

6  time?

7    A.   I got arrested for selling two half ounces and two

8  ounces to an informant that was my salesman.

9    Q.   Okay.  So it dawned on you that if you cooperated

10  you might get a lesser sentence, correct?

11    A.   Yeah.

12    Q.   And of course that was what you were concerned

13  with, the lowest possible sentence, correct?

14    A.   Yeah.

15    Q.   I mean on this most recent heroin arrest with this

16  woman that you're in love with you've been held for how long?

17    A.   Eighteen months.

18    Q.   And as far as you're concerned, you've done enough,

19  correct?  You want out because you've changed your -- this

20  time you've changed your life around, correct?

21    A.   I know it's probably hard to believe, but, yeah,

22  I'm definitely all done.

23    Q.   Yeah.  And you want out, correct?

24    A.   Yeah, but it doesn't happen like that.

25    Q.   As far as you're concerned, 18 months is plenty,

1    correct?

2        A.    No.    The feds have a sliding scale.    They go by

3    your whole criminal record and the amount of heroin you were

4    caught with.

5        Q.    What's your scale?

6        A.    My scale?

7        Q.    Yeah.

8        A.    It's in the federal guidelines.

9        Q.    Yeah, but what is it?    You've figured it out,

10   haven't you?

11       A.    Yeah.

12       Q.    What are you looking at?

13       A.    37 to 46 months.

14       Q.    With your prior record?

15       A.    Yeah.

16       Q.    500 grams a week?

17       A.    No.    I got caught with 50 grams of heroin.    51.

18       Q.    All right.    So in 2001 you're busted for cocaine.

19   You become a DEA informant.    You wire up.    You meet with

20   somebody.    You buy a kilo of cocaine from them.    And then you

21   get -- I forget the exact word you used, something like

22   screwed because of this little problem like a sexual assault

23   interfered with your reward for having cooperated, correct?

24       A.    Yeah, that's --

25       Q.    I mean, that's called rape, right?    But she asked

1 for it.

2   A. No. Listen, that's not what I said, you know, and

3 it's not how I meant it, okay? It definitely was a big

4 problem. And if it happened to my daughter, I would be

5 furious.

6   Q. So when you went off to serve your five-to-ten, or

7 whatever it was for the cocaine part of it, you had already

8 taken a concurrent sentence for the felonious sexual assault

9 case?

10   A. No. I got sentenced in 2002 for distribution of

11 cocaine. Then I got sentenced in 2003 for felonious sexual

12 assault.

13   Q. Okay. So now you're in jail sometime in -- well,

14 when did you go to jail for that first time based on the

15 cocaine case?

16   A. 2002.

17   Q. They let you out to wire up and --

18   A. No.

19   Q. Okay. You were out the whole time?

20   A. I got arrested in 2001. They let me out to make a

21 buy.

22   Q. And then they put you in jail in 2002?

23   A. Correct.

24   Q. All right. And now you're at the New Hampshire

25 State Prison?

```
 1          A.    No.  I'm in Merrimack County House of Corrections.

 2          Q.    I don't mean right now today.  I'm talking about

 3     then when you first got locked up in 2002.

 4          A.    Yep.  New Hampshire State Prison.

 5          Q.    All right.  And you have a little beef with

 6     Nicholas Champagne, correct?

 7          A.    Yep.

 8          Q.    Does he break your arm?

 9          A.    No.

10          Q.    Does he punch you in the face?

11          A.    None of that.

12          Q.    None of that.  Just a little shoving back and

13     forth?

14          A.    No.  It was more like words and --

15          Q.    Not even -- no physical interaction at all?

16          A.    Well, we both stood up, and people pushed us apart

17     because they didn't want it to happen in the weight room.

18          Q.    And there was never an opportunity for it to happen

19     again while the two of you were there?

20          A.    No, there was times, but we were in different

21     units.

22          Q.    But there were times, correct?

23          A.    Yeah.

24          Q.    You were in different units?  What unit was he?

25          A.    He was in north unit.
```

1      Q.    What unit were you in?

2      A.    H building.

3      Q.    All right.  You can't physically run into each

4  other in those units?

5      A.    No.  You can run into each other at chow, the

6  weight room, school, the ball field.  You can run into each

7  other anywhere.  Medical.

8      Q.    And the beef between you and Mr. Champagne was that

9  he accused you of being a rat, correct?

10     A.    Well --

11     Q.    He said that you had informed on someone in

12  connection with your drug case, correct?

13     A.    It was more -- it was more because I was a sex

14  offender.  That's what it boils down to, you know, let's

15  not --

16     Q.    Okay.  So are you saying that he didn't accuse you

17  of being a rat, he only gave you some choice words because

18  you had committed a felonious sexual assault?

19     A.    There was a lot of words said.  Did he call me a

20  rat?  Yeah, he did.

21     Q.    Because for Nick Champagne, however he learned, he

22  knew that you had cooperated with law enforcement.  In 2002

23  he knew that you were a cooperator, correct?

24     A.    Yeah.

25     Q.    And so did a lot of other people, correct?

1        A.    No, not really.

2        Q.    Not really.  Well, anyone that was there in the

3  room -- in the weight room that day knew, correct?

4        A.    Yeah.  A lot of things get said in prison where it

5  all gets swept under the carpet, you know.

6        Q.    Okay.  But this was in fact true.  This wasn't just

7  some accusation made up out of whole cloth.  This was in fact

8  true.

9        A.    Well, I'll tell you something.  The guy that I

10  bought a kilo from turned around and bought a kilo from his

11  best friend, and then his best friend got conspiracy to sell

12  five kilos.  So it kind of got swept under the carpet.  The

13  guy couldn't sit there and call me a rat when he turned

14  around and he bought a kilo from another guy, from his best

15  friend, two weeks later.

16        Q.    Okay.  So let's focus on this.  Did Nick Champagne

17  call you a rat or not?

18        A.    Yeah.

19        Q.    And was Nick Champagne right?

20        A.    Yeah.

21        Q.    Do you think he only shared that sentiment with you

22  and no one else?

23        A.    No, because he's got a big mouth, but the chances

24  of somebody believing him --

25        Q.    I see.  I mean, someone like my client would never

1   believe him, correct?

2        A.   I don't know.  You can ask him.  Time heals a lot

3   of things.

4        Q.   Well, have you ever in your life -- and you've

5   spent basically your whole adult life selling one kind of

6   drug or another.  Cocaine.  Heroin.  What else?  Marijuana.

7   Oxycodone.  What else?

8        A.   Geez.  I've sold Ecstasy.  I've sold opiates.

9   Oxycodone.

10       Q.   Have you ever dealt with anybody that you knew was

11  a rat?

12       A.   Yeah.  Unfortunately, I have.

13       Q.   And that's how you're caught again?

14       A.   Well, there was a guy I was in prison with and

15  everybody said he was a rat, and I got out and I was in a

16  federal halfway house and I'm walking down Elm Street and he

17  pulls over and gives me a ride.

18            And then like a few months later he's like, hey,

19  I've got some heroin, can you move it.  So I started moving

20  heroin for a guy that I thought was a rat, yeah.

21       Q.   And did it work out, sir?

22       A.   No, it definitely didn't work out.

23       Q.   Would you consider yourself a genius in the drug

24  trade?

25       A.   Definitely not.

1     Q.   Okay.  All right.  So then you get out, and did you

2   say you went into the Army then?

3     A.   No.

4     Q.   The Army was before this?

5     A.   Yeah.  This was in --

6     Q.   Okay.  So you get out and you start selling drugs

7   immediately again?

8     A.   When I got out of prison in 2006?

9     Q.   Yeah, from the five-to-ten or whatever.  2006, yes.

10    A.    I didn't actually start selling drugs for -- I

11  didn't even start selling drugs until I went back on my first

12  parole violation, which is -- I did two and a half years on

13  parole without doing anything but selling cars.

14         And I did make an introduction to a guy and I got

15  paid for it, yeah.  So in a sense I was selling drugs but --

16    Q.   And then you moved somewhere?  Where did you move,

17  to North Carolina, South Carolina?

18    A.   North Carolina, yeah.

19    Q.   When was that?

20    A.   2012.

21    Q.   2012?

22    A.   Uh-huh.

23    Q.   And you were five days late -- or you had five

24  days?

25    A.   You get -- yeah, they changed the laws.  Usually

1   you have 30 days when you move to a new place, but they

2   changed the laws, and they're continuously changing the laws

3   to protect society, to protect victims, and to protect the

4   public, you know.

5        Q.   All right.  So you only had five days to register?

6        A.   Yeah.

7        Q.   And then on the -- because you thought it was 30

8   days, on the 31st day you went to register and it turned out

9   that it was too late.  Is that your story?

10       A.   No.  Basically, I was on parole as well.  So I

11  didn't report to parole so they were looking for me.

12       Q.   Yeah.  So what's this five days and failing to

13  register?  Did you register in a time frame that you thought

14  was accurate, or did you just never register and this five

15  day stuff is a smokescreen?

16       A.   I said that I was given five days and I didn't

17  register.

18       Q.   Well, did there come a time in 2012 after you moved

19  to North Carolina that you actually tried to register but you

20  found out that it was too late?

21       A.   No.  The U.S. marshals are pretty good at finding

22  you, you know, and they found me before.

23       Q.   How long after you moved to North Carolina did the

24  U.S. marshals find you?

25       A.   Within like ten days.

1    Q.    And then you got charged in federal court?

2    A.    Yeah.

3    Q.    With failure to register?

4    A.    Yeah.

5    Q.    And you decided to cooperate again, correct?

6    Didn't you sign a cooperation agreement then?

7    A.    No.

8    Q.    You just went and did your 18-month sentence?

9    A.    Yeah.

10   Q.    And when you got out -- when did you get out?

11   A.    I believe in 2013.

12   Q.    And when in 2013?

13   A.    I don't remember.  I just know 18 months from 2012

14   I got out, and I went to the federal halfway house within

15   like four months from my minimum.

16   Q.    So when were you out of the federal halfway house

17   and on your own again doing supervised release?

18   A.    I don't even remember the date.

19   Q.    I thought every convict remembers every date that

20   they were released.

21   A.    Not when there's a bunch of release dates.

22   Q.    So sometime in 2013 you're released from the

23   halfway house?

24   A.    Yeah.

25   Q.    And what are you doing?

1          A.    Selling cars.

2          Q.    Oh, you're back to selling cars?

3          A.    Yeah.

4          Q.    You didn't start the heroin business up again yet?

5          A.    Yeah, selling cars and selling heroin.

6          Q.    So you were on supervised release when you were

7     selling the heroin?

8          A.    Yeah.

9          Q.    And can you explain for the jury what supervised

10    release is as you understand it?

11         A.    Yeah.  It's kind of like parole.  It's the same

12    thing.  You've got to check in once a month online.  You've

13    got to call your PO, you know.  You've got to go see him once

14    a month.

15         Q.    What happens if you violate your supervised

16    release?

17         A.    You go back to jail.

18         Q.    Now, you claim that you had one interaction with my

19    client after you got out of prison in 2006, the New Hampshire

20    State Prison, for that first drug sentencing, the sexual

21    assault, correct?  One interaction.  That's what you claim?

22         A.    Yeah.  Other than seeing him here and there.  Yeah,

23    one time we actually had a conversation.

24         Q.    And that was in what year, 2013 or 2014?

25         A.    2014.  January.

1          Q.    You remember that clear as a bell?

2          A.    Yeah.  I remember that because I had just moved to

3     Heavy Street and then --

4          Q.    Well, when did you just move to Heavy Street?

5          A.    I moved there January 1st.

6          Q.    All right.  Do you remember --

7          A.    And the reason why that's in my mind is because I

8     got arrested February 19th.

9          Q.    So you were there for about a month and a half and

10    you got busted again?

11         A.    Yeah.

12         Q.    All right.  Do you remember the first time you

13    talked to anybody about this conversation was on October 10th

14    of 2014, and it was a proffer session with AUSA Nick

15    Abramson?  Do you remember that?

16         A.    Yeah.

17         Q.    Do you remember saying it was around Christmas of

18    2013, not January of 2014?

19         A.    No.  I don't remember that.  I remember saying --

20         Q.    All right.  Well, it certainly couldn't have been

21    around Christmas because it wasn't till January 1st that you

22    moved to Heavy Street, and your memory is that you got out of

23    your apartment on Heavy Street, you were going to make a

24    play, and you ran into my client in front of Amory Street

25    House of Pizza.

1    A.    Uh-huh.

2    Q.    Right?

3    A.    Yeah.

4    Q.    So that's your story.

5          MR. SHEKETOFF:  May I approach, your Honor?

6          THE COURT:  Yes.

7          (Attorney Sheketoff gives document to the witness)

8    Q.    You can read that to yourself, any part of it, and

9    see if it refreshes your memory that in fact you told them it

10   was around Christmas time.

11   A.    Christmas is what, December 24th, 25th.

12   Q.    Really?  You don't know when Christmas is?

13   A.    No, I'm asking you.  And then January is right

14   around the corner.

15   Q.    Did you tell him it was right around Christmas of

16   2013?  Look, if this was clear in your mind because you

17   didn't move there till January 1st, and it was after you

18   moved there, why would you tell them it was around Christmas

19   of 2013?  That's what you told them, right?

20   A.    That's what it says on the paper, but I don't

21   remember telling them around Christmas, but, yeah, it's

22   around Christmas.

23   Q.    Why would you pick around Christmas if you knew it

24   had to happen after January 1st?  That's what you're telling

25   us today.  It had to have happened after January 1st.  I was

1    coming out of my apartment on Heavy Street that I moved into

2    on January 1st, and I bumped into Alkis Nakos in front of

3    Amory Street House of Pizza.

4         A.   Yeah.  That's when I bumped into him.

5         Q.   Did you know that there was a pole camera up for

6    the entire month of January, and for that matter for the

7    entire month of December 2013 and January of 2014, and if you

8    bumped into Alkis Nakos in front of Amory Street Pizza on any

9    day of either of those two months it would be captured from

10   the pole camera?  Were you aware of that?

11        A.   I had no idea the DEA was doing surveillance.  If I

12   was privy to that, do you think I would stop and talk to him?

13        Q.   Well, we could all look at the videotape and see

14   you stop and talking to him.  That's according to your story,

15   correct?

16        A.   Yeah.

17        Q.   All right.  And you were on your way to make a

18   play, correct?

19        A.   Correct.

20        Q.   And who were you on the way to make a play to?

21        A.   I think this kid Justin.

22        Q.   What do you mean you think this kid Justin?  Did

23   you just make that up in the moment or do you actually have a

24   memory of this?

25        A.   No.

1    Q.   It was this kid Justin?

2    A.   It was either I was going to see Justin or I was

3 going to see this guy that worked at the tattoo parlor.  I

4 was probably meeting them both at the same time, jumping from

5 one car to another.

6    Q.   It was either Justin or the tattoo parlor or both

7 of them together?

8    A.   Yeah.

9    Q.   And what conversation do you have with Justin that

10 day?

11   A.   Do you got the money?

12   Q.   You're not even sure it was Justin that you were

13 going to meet, but you remember what the conversation was

14 that day?

15   A.   I don't remember the exact words, but what do you

16 think the conversation is going to be?  I'm going to go sell

17 the guy heroin.  Hey, how's your wife?  How's your kids?

18   Q.   I thought you were not sure that it was Justin that

19 you were going to see?

20   A.   I'm pretty sure.  I was probably pretty much going

21 to see Justin because I used to see him over by the

22 convenience store, and I have to walk by the pizza shop to go

23 to the convenience store.

24   Q.   Okay.  So you see Alkis Nakos right in front of the

25 pizza store, correct?

1    A.   Correct.

2    Q.   And what happened next?

3    A.   I stopped and spoke to him.

4    Q.   And he greeted you like a long lost friend,

5 correct?

6    A.   No.  He said, what's up?  I said, nothing.

7    Q.   And then what happened next?

8    A.   I said, I'm going to make a play.

9    Q.   And then did you leave and make the play and then

10 come back?

11    A.   No.  I spoke to him, finished the conversation, and

12 then went to make the play.

13    Q.   And you remember that clearly?

14    A.   Yeah.

15         MR. SHEKETOFF:  May I approach, your Honor?

16         THE COURT:  I'm sorry?

17         MR. SHEKETOFF:  May I approach?

18         THE COURT:  Yes, you may.

19         (Attorney Sheketoff gives document to the witness)

20    Q.   Would you read this yourself and see if it

21 refreshes your memory.

22         (Witness does so)

23         MS. OLLILA:  Judge, I don't necessarily object, but

24 you refresh your memory with your own report.

25         Counsel is having Mr. Sweeney refresh his

1    recollection with law enforcement reports that he's never

2    even seen, Judge.  So this is not the way to refresh

3    someone's recollection.

4            THE COURT:  You can refresh recollection with

5    anything.

6            MS. OLLILA:  Sure, Judge, but you have to ask, is

7    there something that I could use to refresh your

8    recollection?  Yes, there is.  What is it?

9            That's not what he's doing.  I'm not saying that I

10   object to this but --

11           THE COURT:  Overruled.

12   A.    So basically it's saying --

13   Q.    No, I'm not asking what it's saying.

14   A.    This is saying exactly what I said.

15   Q.    I'm not asking what it's saying.  What I'm asking

16   you is, does it refresh your recollection that when you were

17   debriefed on this occasion you said that we exchanged

18   pleasantries, I went and made the play, I came back, and

19   then we had the conversation?

20   A.    No, sir, because it doesn't say that I left and

21   made the play.  It says that we acknowledged and I stopped.

22   "They acknowledged one another, and Sweeney told Nakos that

23   he was on his way to make a play, which was code for working

24   with the drug transactions.  Nakos told Sweeney that he was

25   doing good with weed.  He continued on and conducted his

1  heroin sale and began to walk back towards Nakos."

2  This didn't happen like that.  I see what you're

3  saying, but this isn't how it happened.  I stopped and spoke

4  to him, we finished the conversation, and I went to go make

5  the play.  When I came back, he wasn't out there.

6  Q.  Okay.  But that's not what you told that agent on

7  that occasion, or is it?  Do you think that -- it's obviously

8  possible the agent could have gotten it wrong.

9  My question is, does it refresh your memory that

10  you told the agent that most of this conversation occurred

11  after you went and made your play, and then you came back and

12  saw him again?

13  A.  No, it doesn't, because that's not what happened.

14  I stopped to talk to him.

15  Q.  All right.  That was the answer to the question.

16  It doesn't refresh your memory at all?

17  A.  No, because that's not how it happened.

18  Q.  And my client then asked you, somebody he hadn't

19  seen since prison -- and what's the last year you had seen

20  him?

21  A.  I think we were -- I was on a parole violation, and

22  my kid's mother was coming up for visits and she used to meet

23  with his girlfriend.

24  Q.  Do you remember the question?

25  A.  I don't remember the date.

1      Q.   All right.  What's your best estimate of the year?

2      A.   Probably 2006.

3      Q.   All right.  So it's now eight years later, you

4  haven't seen him in eight years, and he says to you -- after

5  you tell him you're going to make a heroin play -- can you

6  move marijuana for me?

7      A.   Correct.  He didn't say can you move marijuana.  He

8  said, I'm dealing with exotics.

9      Q.   That's basically the same thing, correct?

10     A.   Yeah.

11     Q.   And then he said to you, and by the way, can you

12  move Molly for me?

13     A.   Correct.

14     Q.   And you told us today that he told you that it was

15  $1,200 an ounce for the Molly, correct?

16     A.   Yes.

17     Q.   Do you remember what you told the people that

18  debriefed you on October 10th of 2014 about the cost?

19     A.   No, because it says right here 1,200 per ounce.  I

20  mean, which police report do you want to go with, bud?

21     Q.   Right.  Because they're not quite the same,

22  correct, because that one says one thing and the first one

23  says another.

24     A.   You know, when they interview you, right, you sit

25  in the room with them and you talk to them and they ask you

1    questions, and you tell them what's up, and then they're

2    only -- like their job is they're taking notes.  They're not

3    recording it, you know, so what goes back to the paper could

4    be a little bit different.  I mean, it's not an exact

5    science.

6         Q.    So does that refresh your memory at all that when

7    you talked about this for the first time, the debriefing in

8    your case, trying to get a cooperation agreement in your

9    case, your heroin case, that you said that my client said the

10   Molly costs 2,000 an ounce?

11        A.    That's what it says on this.

12        Q.    That's a ridiculous number, isn't it?

13        A.    Yeah, it's a little expensive.

14        Q.    No one's selling Molly at 2,000 an ounce at the end

15   of -- or beginning of -- at the end of 2013 or the beginning

16   of 2014?

17        A.    Do you know the prices?

18        Q.    Well, you mean from personal experience?

19        A.    Yeah.

20        Q.    That's a ridiculous number, isn't it?

21        A.    It's a little high, yeah.

22        Q.    It's a little high.  Well, it must be a little high

23   because you corrected it to $1,200 the next time you were

24   interviewed, correct?

25        A.    That's what the report says.

1    Q.   Yeah, because if you kept it at 2,000, no one would
2  believe that you had that conversation, correct?
3    A.   Oh, I don't know.  I mean, because the conversation
4  happened.
5    Q.   And we have your word of honor for that, and you've
6  taken your oath, correct?
7    A.   Yeah.  Definitely.
8    Q.   You've taken an oath and that's -- you know, that's
9  a line you won't cross, correct?
10        I mean, if you had to make up a conversation that
11 you had with my client and it could get you years off of your
12 sentence, you wouldn't consider doing that if you swore to
13 tell the truth, correct?
14   A.   Correct.
15        MR. SHEKETOFF:  No further questions.
16        MS. OLLILA:  Nothing further.
17        THE COURT:  All right.  Mr. Sweeney, you may step
18 down.
19        All right.  Government, call your next witness.
20        (Conclusion of requested excerpt)
21
22
23
24
25

1                    C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5     foregoing transcript is a true and accurate

6     transcription of the within proceedings, to the best of

7     my knowledge, skill, ability and belief.

8

9

10    Submitted: 9-4-2015

11                              SUSAN M. BATEMAN, LCR, RPR, CRR
                                LICENSED COURT REPORTER, NO. 34
12                              STATE OF NEW HAMPSHIRE

13

14

15

16

17

18

19

20

21

22

23

24

25