UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * *
                                  *
UNITED STATES OF AMERICA          *
                                  *   14-cr-93-01-LM
          v.                      *   August 20, 2015
                                  *
ALKIS NAKOS                       *
                                  *
* * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF TRIAL TESTIMONY OF
JONATHAN VENTURINI
BEFORE THE HONORABLE LANDYA B. McCAFFERTY

Appearances:

For the Government:    Terry Ollila, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301

For the Defendant:     Robert L. Sheketoff, Esq.
                       Law Office of Robert L. Sheketoff
                       One McKinley Square
                       Boston, MA  02109

Court Reporter:        Sandra L. Bailey, LCR, CM, CRR
                       Official Court Reporter
                       United States District Court
                       55 Pleasant Street
                       Concord, NH  03301
                       (603)225-1454

```
1                    I N D E X

2

3

     Witness            Direct    Cross    Redirect    Recross
4
     JONATHAN VENTURINI
5
     By Ms. Ollila         3
6    By Mr. Sheketoff              35

7

8

9

10

11

12   Exhibits                        ID        Evid.

13   -none-

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         BEFORE THE COURT
 2              THE CLERK:  Please remain standing and raise
 3    your right hand.
 4                       JONATHAN VENTURINI
 5          having been duly sworn, testified as follows:
 6              THE CLERK:  Please be seated.  For the record,
 7    state your name and spell your last name.
 8              THE WITNESS:  Jonathan Venturini,
 9    V-E-N-T-U-R-I-N-I.
10                       DIRECT EXAMINATION
11    BY MS. OLLILA:
12         Q.   Good morning, Mr. Venturini.
13         A.   Good morning.
14         Q.   Do you want to be here?
15         A.   No.
16         Q.   Would you rather be any other place in the
17    world than here?
18         A.   Yes.
19         Q.   Do you have a family?
20         A.   Yes.
21         Q.   Where do you -- are you incarcerated?
22         A.   Yes.
23         Q.   How long have you been incarcerated?
24         A.   Fourteen months.
25         Q.   How long have you been away from your family?
```

```
 1         A.   Fourteen months.

 2         Q.   You have children?

 3         A.   Yes.

 4         Q.   Do you want to make it back to your children?

 5         A.   Yes.

 6         Q.   Have you ever been incarcerated before?

 7         A.   Yes.

 8         Q.   For how long?

 9         A.   Twenty days.

10         Q.   Mr. Venturini, if possible, if you could sit

11   up and try to speak into the microphone.  I know you

12   feel very uncomfortable today?

13         A.   Yes.

14         Q.   Why, Mr. Venturini?

15         A.   I have plenty reasons, I don't know.

16         Q.   Why are you incarcerated, Mr. Venturini?

17         A.   Distribution of marijuana.

18         Q.   Where were you charged, in what court?

19         A.   This one.

20         Q.   In this court?

21         A.   Yes.

22         Q.   In U.S. District Court?

23         A.   Yes.

24         Q.   Did you plead guilty?

25         A.   Yes.
```

```
1        Q.    Do you have an attorney?

2        A.    Yes.

3        Q.    Is your attorney in the courtroom today?

4        A.    Yes.

5        Q.    Is he here to support you?

6        A.    Yes --

7              MR. SHEKETOFF:  Objection, your Honor.

8              THE COURT:  Sustained.

9        Q.    Have you been sentenced yet?

10       A.    No.

11       Q.    Do you know when you're going to be sentenced,

12  Mr. Venturini?

13       A.    At the end of September.

14       Q.    Do you know what sentence you're going to

15  receive?

16       A.    No.

17       Q.    Has the government made any promises to you

18  about your testimony?

19       A.    No.

20       Q.    Did the government agree to a sentencing range

21  for you, Mr. Venturini?

22       A.    Yes.

23       Q.    And what is that sentencing range?

24       A.    42 to 54 months.

25       Q.    42 to 54 months?
```

```
1          A.   Yes.

2          Q.   And when I say the government, who are you

3   referring to, who is prosecuting you?

4          A.   You.

5          Q.   Was another family member of yours prosecuted?

6          A.   Yes.

7          Q.   And who was that?

8          A.   My brother.

9          Q.   Has your brother been sentenced?

10         A.   Yes.

11         Q.   What is his sentence?

12         A.   I believe 54 months.

13         Q.   Mr. Venturini, were you born in New Hampshire?

14         A.   No.

15         Q.   Where were you born?

16         A.   Cambridge, Massachusetts.

17         Q.   When did you arrive in New Hampshire, Mr.

18   Venturini?

19         A.   Late eighties.

20         Q.   Do you have an extended family, a large

21   family?

22         A.   Yes.

23         Q.   Are they supportive of you?

24         A.   Yes.

25              MR. SHEKETOFF:  Objection, your Honor.
```

1          THE COURT:  Sustained.

2     Q.    Did you go to high school in New Hampshire?

3     A.    Yes.

4     Q.    Mr. Venturini, do you know someone by the name

5  of Alkis Nakos?

6     A.    Yes.

7     Q.    How do you know him?

8     A.    Just from living in the city for a long time.

9     Q.    Have you seen him in the courtroom today, Mr.

10  Venturini?

11    A.    Yes.

12    Q.    Would you please point to him and describe an

13  article of clothing that he's wearing?

14    A.    Over there in the suit.

15         MS. OLLILA:  May the record reflect that the

16  witness has identified the defendant Alkis Nakos.

17         THE COURT:  Yes, it will so reflect.

18    Q.    Were you good friends with Mr. Nakos?

19    A.    No.

20    Q.    Were you enemies?

21    A.    No.

22    Q.    Did you like him?

23    A.    Yes.

24    Q.    Did you ever play sports with him?

25    A.    Maybe when I was younger.

1    Q.    At some point in time when you were young did

2 you start dealing controlled substances?

3    A.    Yes.

4    Q.    Did you start using controlled substances?

5    A.    Yes.

6    Q.    What controlled substances did you use?

7    A.    Marijuana.

8    Q.    Anything else, Mr. Venturini?

9    A.    No.

10    Q.    When did you start dealing, how old were you,

11 Mr. Venturini?

12    A.    I don't know an exact date.  Somewhere in the

13 twenties.

14    Q.    How was your family life at the time?

15    A.    A little hectic.

16    Q.    I'm sorry?

17    A.    I said a little hectic, but maybe just like

18 the rest of the neighborhood.

19    Q.    Did your family have a lot of money?

20    A.    No.

21    Q.    How much money did you make when you first

22 started dealing marijuana?

23    A.    Thousands.

24    Q.    Thousand what?

25    A.    I mean thousands.

1      Q.    Okay.  And what about your brother.  Was your

2  brother dealing at the same time, Mr. Venturini?

3      A.    Yes.

4      Q.    Okay.  Do you know someone by the name of Nick

5  Lawyer?

6      A.    Yes.

7      Q.    How did you meet Nick Lawyer?

8      A.    Through the neighbors.

9      Q.    And how old were you when you met Nick Lawyer?

10      A.    Eight or nine.

11      Q.    Did you become best friends with Nick Lawyer?

12      A.    Yes.

13      Q.    How long were you best friends with him?

14      A.    Till 2008.

15      Q.    What happened to Mr. Lawyer in 2008?

16      A.    He died.

17      Q.    How did he die, Mr. Venturini?

18      A.    He hung himself.

19      Q.    Did something happen to you that very same

20  day?

21      A.    Yes.

22      Q.    What happened, Mr. Venturini?

23      A.    I was in a motorcycle accident.

24      Q.    Where were you in a motorcycle accident?

25      A.    Meredith, New Hampshire.

1      Q.    Where, in Meredith, New Hampshire?

2      A.    Yes.

3      Q.    Were you hurt badly?

4      A.    Yes.

5      Q.    Did you have any head injuries?

6      A.    Yes.

7      Q.    Did that impact your ability to remember?

8      A.    Yes.

9      Q.    Has it impacted your ability to remember past

10   events, things that happened when you were young?

11     A.    No.

12     Q.    Why is that, Mr. Venturini, what part of your

13   memory is impacted?

14     A.    Short-term, a lot of stuff since 2008.

15     Q.    Before your best friend Nicholas Lawyer's

16   passing, did you and Mr. Lawyer deal marijuana together?

17     A.    Yes.

18     Q.    And where was Mr. Lawyer living at the time?

19     A.    Sullivan Street.

20     Q.    You said Sullivan Street.  Where is that?

21     A.    In Manchester.

22     Q.    Who were you getting marijuana from, if you

23   know?

24           MR. SHEKETOFF:  Well, objection.

25     Q.    Do you know who the marijuana was coming from?

1      A.   Yes.

2      Q.   Who was it coming from?

3      A.   Either my brother or another friend of mine.

4      Q.   Okay.  At some point in time did you and

5 Nicholas Lawyer -- you said another friend of yours.

6 Who was that other friend?

7      A.   Nick Champagne.

8      Q.   Okay, all right.  You don't want to be here

9 talking about Nick Champagne, do you?

10      A.   Not at all.

11      Q.   You don't want to be here talking about your

12 brother; do you?

13      A.   Nope.

14      Q.   Do you want to be here talking about Alkis

15 Nakos?

16      A.   Not at all.

17      Q.   So, Nick Champagne, how much marijuana were

18 you and Nick Lawyer getting from Nick Champagne, and I

19 want to go way back to 2007.

20           MR. SHEKETOFF:  I'm sorry, I couldn't hear the

21 year.

22      Q.   2007.

23      A.   Probably around 50 pounds at a time.

24      Q.   Fifty pounds at a time?

25      A.   Yeah.

1    Q.   What was the kind of marijuana, if you know,

2   Mr. Venturini?

3    A.   All different kinds.

4    Q.   Well, can you explain that to the jury, Mr.

5   Venturini.  Are there different types of marijuana?

6    A.   Yes.

7    Q.   Explain that, if you can, Mr. Venturini?

8    A.   There's just, I mean high quality stuff, stuff

9   that has different names, your know.

10    Q.   What are some names.  You said high quality

11   stuff and stuff that has different names.  What is high

12   quality?  How much would you pay for a pound of high

13   grade or high quality marijuana, Mr. Venturini?

14    A.   Around $3,000.

15    Q.   And what was some of the names of the

16   marijuana?

17    A.   There's Crushes and Jack Herer.  All different

18   kinds.

19    Q.   Were you and Nick Lawyer getting all sorts of

20   different strains of marijuana?

21    A.   Yes.

22    Q.   Was there any in particular that sold easier?

23    A.   Not really.  Most of the names are just made

24   up anyways.

25    Q.   Okay.  If you would get a pound of marijuana

1    for $3,000, how much would you sell it for?

2        A.   Thirty-five.

3        Q.   So you'd make how much off the top of each

4    pound?

5        A.   Five hundred.

6        Q.   And what was the profit split.  Did you split

7    it equally with Mr. Lawyer?

8        A.   Yes.

9        Q.   Did you make a lot of money, Mr. Venturini?

10       A.   Yes.

11       Q.   Do you have anything to show for it?

12       A.   Not anymore.

13       Q.   Why not anymore?

14       A.   Because it all was taken when this happened.

15       Q.   What was taken from you, Mr. Venturini?

16       A.   Money, jewelry, motorcycles.

17       Q.   Who took it from you?

18       A.   United States government.

19       Q.   You just testified that Nicholas Lawyer and

20   you were getting about 50 pounds at a time, and you said

21   that you were getting it from your brother and one of

22   your friends that you said was Nicholas Champagne.  I

23   want you to focus on Nicholas Champagne, Mr. Venturini.

24   How often were you getting marijuana from Mr. Champagne

25   and how would you physically get it?

1      A.    Well, Nick would receive it, I would just go
2  down there.
3      Q.    You said Nick would receive it.  Do you mean
4  Nick Lawyer would receive it?
5      A.    Yes.
6      Q.    He would receive it from whom?
7      A.    Nick Champagne.
8      Q.    And you would go down there and get it is what
9  you said.  What do you mean, where's there?
10     A.    To his house.  He lived on the bottom of the
11 hill.
12     Q.    You said to his house.  Whose house are you
13 referring to?
14     A.    Nick Lawyer's.
15     Q.    So, Nick Lawyer lived on Sullivan Street on
16 the bottom of a hill.  So, Nick Lawyer held on to the
17 marijuana?
18     A.    Yes.
19     Q.    By the way, Mr. Venturini, did you know at the
20 time, just yes or no, who Nick Champagne was getting the
21 marijuana from?
22     A.    No.
23     Q.    Did you know what part of the country it was
24 coming in from at the time?
25     A.    Usually everything then was coming from

1    Canada.

2         Q.    So Nick Lawyer held on to the marijuana.   Who

3    did the actual distribution of the marijuana, Mr.

4    Venturini?

5         A.    Either one of us.

6         Q.    Both of you?

7         A.    Yes.

8         Q.    And how were the profits split up.   Who held

9    on to the money?

10        A.    He did.

11        Q.    And do you remember, Mr. Venturini, can you

12   give us a time frame of when you and Nick Lawyer started

13   getting marijuana from Nicholas Champagne, what year was

14   that approximately, how long before you motor vehicle

15   accident in 2008?

16        A.    It couldn't have been any more than two years.

17        Q.    Okay, so two years before your accident?

18        A.    At the most.

19        Q.    Okay.   And how often were you getting

20   50 pounds at a time?

21        A.    It's not consistent like a real business.

22        Q.    Okay.   Once a month, twice a month, did it

23   vary?

24        A.    It varied.

25        Q.    Okay.   And Mr. Venturini, I apologize, what

1    was the month of your accident in 2008?

2         A.    June.

3         Q.    Were you in the hospital for a significant

4    period of time?

5         A.    Yes.

6         Q.    For how long, Mr. Venturini?

7         A.    Almost three months.

8         Q.    And what happened after you were in the

9    hospital.  Did you go home?

10        A.    Yes.

11        Q.    Did you have a long road to recovery?

12        A.    Yes.

13        Q.    How were you making money during that time,

14   Mr. Venturini?

15        A.    I wasn't too often.

16        Q.    Did you need money?

17        A.    Yes.

18        Q.    Did you go back to selling marijuana?

19        A.    Yes.

20        Q.    How did you get back into the business without

21   your best friend, Nick Lawyer?

22        A.    I just asked people to help me out.

23        Q.    Okay.  And who did you ask if they'd help you

24   out?

25        A.    Nick.

1        Q.    Who's Nick?

2        A.    Champagne.

3        Q.    And did Nick Champagne help you out?

4        A.    Yes.

5        Q.    Did you know who he was getting the marijuana

6   from at that point in time?

7        A.    No.

8        Q.    So, do you recall when, Mr. Venturini, you

9   started dealing again after you got out of the hospital,

10  approximately what was the time frame if you can give a

11  year.  Was it 2009?

12       A.    Probably, maybe 2010, it was a long, you know,

13  recovery.

14       Q.    Do you know that Nick Champagne was arrested

15  in July 2009?

16       A.    I don't remember the dates and times.

17       Q.    Okay.  If I represent to you that he was

18  arrested in July 2009 and incarcerated all the way up

19  until last year, you would have been dealing with him

20  before July 2009; is that correct?

21       A.    It would have had to have been.

22       Q.    Okay.  Do you recall -- do you recall where

23  Nick Champagne was living at the time, Mr. Venturini?

24       A.    I don't.

25       Q.    Do you recall that Nick Champagne got

1  arrested?

2       A.   Yeah, I believe he turned himself in at some

3  point.

4       Q.   Right.  Okay.  So Nick Champagne turned

5  himself in.  Do you know who had charged him?

6       A.   No.

7       Q.   Was it the state government, federal

8  government, if you know?

9       A.   It was the federal government.

10       Q.   Federal government?

11       A.   Yes.

12       Q.   Was it the U.S. Attorney's Office?

13       A.   I would imagine so.

14       Q.   Okay.  What happened after Nick Champagne was

15  arrested.  Did someone approach you?

16       A.   Yes.

17       Q.   Who, Mr. Venturini?

18       A.   Mr. Nakos.

19       Q.   Mr. Nakos?

20       A.   Yes.

21       Q.   And where were you when he approached you?

22       A.   I was in my yard.

23       Q.   Your yard at your house?

24       A.   Yes.

25       Q.   And what did he say to you?

1      A.    He didn't.  He just asked me.

2      Q.    Asked you what?

3      A.    What I was getting from Nick.

4      Q.    And what did you say -- strike that.  You

5   testified he asked me what I was getting from Nick.

6   What did you understand him to mean?

7      A.    Asked what I was getting, what I was paying.

8      Q.    Okay, but what does that mean, the jury needs

9   to know what that is?

10      A.    For marijuana.

11      Q.    So he said what are you getting and what do

12   you pay.  And what did you say?

13      A.    I didn't tell him.

14      Q.    Had anyone else been arrested at that point,

15   Mr. Venturini, and you became suspicious?

16      A.    Yes, but I don't know his name.

17      Q.    Do you know someone by the name of Dave?

18      A.    Yes.

19      Q.    Do you know someone by the name of Michael

20   Gardner?

21      A.    I don't know him.

22      Q.    Did you make a comment to Mr. Nakos about

23   those individuals?

24      A.    Yes.

25      Q.    What did you say to him?

1     A.    I told him that he should ask them what the

2  prices are and whatnot because I didn't know.

3     Q.    Why were you -- why were you saying that to

4  Alkis Nakos?

5     A.    I assumed he knew them.  They're from the

6  other side of town.  I'm not from over there.

7     Q.    So, why did you direct Alkis Nakos to Dave and

8  Michael Gardner?  Who did they work for?

9          MR. SHEKETOFF:  Objection.

10     Q.    Do you know who they worked for?

11     A.    I believe Nick also.

12     Q.    Okay.  And so what did you say to Mr. Nakos

13  when he asked you how much you were getting and how much

14  you were paying.  Did you end up telling him?

15     A.    No.

16     Q.    Were you happy that he was in your yard?

17     A.    No.

18     Q.    What happened after that?

19     A.    He left and I continued to play with my

20  daughter.

21     Q.    And then what happened.  Did someone else pay

22  you a visit?

23     A.    Yes.

24     Q.    Who?

25     A.    Kos.

1    Q.    You said Kos.  Do you know Kos's full name?

2    A.    I don't.

3    Q.    What does Kos look like?

4    A.    Big bald guy.

5    Q.    Do you know what his nationality is?

6    A.    Yes.

7    Q.    What is it?

8    A.    He's Greek.

9    Q.    Do you know if he's friends with Alkis Nakos?

10   A.    I believe so.

11   Q.    Why do you say that?

12   A.    I think they are family, I don't know.

13   Q.    What did Kos say to you, and where did he --

14   did he show up at your house?

15   A.    Yes.

16   Q.    Were you happy when people show up at your

17   house like that?

18   A.    No.

19   Q.    Had that ever happened before?

20   A.    I mean random people show up, but not like

21   that, you know.

22   Q.    Did Nick Champagne ever show up at your house?

23   A.    Well, he could, we were friends for 20 years.

24   Q.    Okay.  When Kos showed up, what did he say to

25   you?

1    A.    He just was wondering if I was looking for

2    anything.

3    Q.    What does that mean, he was wondering if I was

4    looking for anything, what does that mean, Mr.

5    Venturini?

6    A.    Seeing if I wanted any marijuana.

7    Q.    Did he have anything with him?

8    A.    Yeah.

9    Q.    What did he have with him?

10    A.    Just a backpack with a pound in it.

11    Q.    A backpack with a pound in it?

12    A.    Yes.

13    Q.    And did you take that backpack?

14    A.    No.

15    Q.    Why?

16    A.    A little overpriced.  A little uncomfortable

17    with people showing up at the house.

18    Q.    Okay.  Okay.  It was a little overpriced and a

19    little uncomfortable with people showing up at your

20    house?

21    A.    Yeah, I didn't like that.

22    Q.    What happened then?

23    A.    Nothing for a while.

24    Q.    And then did Kos contact you again at some

25    point?

1      A.   Yeah.

2      Q.   What happened?

3      A.   He showed up at my house again.

4      Q.   And then what happened?

5      A.   Then we met and I bought five pounds of

6  marijuana off him.

7      Q.   Okay.  So he showed up at your house again,

8  and was this after Nick Champagne's arrest, so some time

9  after July 2009?

10     A.   Yeah, had to be.

11     Q.   Okay.  All right.  So he showed back up at

12 your house again and you bought five pounds off of him?

13     A.   Yeah.

14     Q.   Five pounds of what, Mr. Venturini?

15     A.   Marijuana.

16     Q.   Did you know where the marijuana came from?

17     A.   Probably Canada.  Probably the same place.

18     Q.   Did you know who Mr. Koustas was working for?

19     A.   I assumed.  It was never spoken or told to me

20 directly.

21     Q.   Who did you assume?

22          MR. SHEKETOFF:  Objection, your Honor.

23          THE COURT:  Sustained.  Lay a foundation.

24     Q.   How long after Alkis Nakos paid you a visit

25 did Kosmas Koustas show up?

1        A.    I don't remember.  My time frame wasn't too

2   good.  I was still recovering from a serious head

3   injury.

4        Q.    Okay.  So Alkis Nakos shows up at your house

5   and he says how much were you getting from Nick

6   Champagne and what were you paying?

7        A.    Yeah.

8        Q.    And you say why don't you go ask Michael

9   Gardner and Dave; is that correct?

10       A.    I say go ask the kid who got pulled over and

11  arrested with a bunch of stuff, I don't know, he would

12  have a better idea.

13       Q.    Okay.  So you said why don't you go ask the

14  kid who got arrested and pulled over with some stuff.

15  Who was that?

16       A.    That was believed to be Michael Gardner I

17  actually said his name was, I didn't know his name.

18       Q.    Okay.  And so he leaves.  And who shows up at

19  your residence after Mr. Nakos leaves?

20       A.    Kos, but it wasn't like right after he left.

21       Q.    Oh, right, right.  I was not inferring that.

22  Now, you indicated that Kos showed up at your house with

23  a pound, showed it to you, and you thought it was a

24  little bit too expensive.  You sent him away, you

25  started playing with your daughter again; correct?

1        A.    Yes.

2        Q.    He then shows back up again and he's got five

3    pounds?

4        A.    No.

5        Q.    How did that happen, Mr. Venturini?

6        A.    He showed up and he offered me something, and

7    I told him I would look into it, and I went and checked

8    it out and I took it.

9        Q.    And where did you check it out?

10       A.    Hooksett.

11       Q.    How much did you have to pay for each pound?

12       A.    I don't remember exactly, but it was closer to

13    3,000 and 35.

14       Q.    Okay.  Is it hard to sell marijuana when you

15    buy it for $3,500 a pound?

16       A.    Yeah, if you want to sell it in bulk.

17       Q.    Okay.  Is that what you were doing, selling it

18    in bulk?

19       A.    Not at the moment.  Before, yes, but not since

20    Nick died and Nick went to jail.

21       Q.    Okay.  So you were selling it in bulk before

22    Nick Lawyer passed away and before Nick Champagne went

23    to jail; is that correct?

24       A.    Yes.

25       Q.    So when you're rebuilding the business you're

1    selling small quantities?

2         A.   Yes.

3         Q.   Do you make more money when you sell small

4    quantities or less?

5         A.   You make more off an individual pound, but

6    you're not making more off if you're selling a lot.

7         Q.   So Mr. Venturini, you had indicated that your

8    brother -- and what's your brother's name, Mr.

9    Venturini?

10        A.   Kristopher.

11        Q.   You indicated that Kristopher Venturini was

12   also selling marijuana; correct?

13        A.   Yes.

14        Q.   And he was involved in something separate; is

15   that correct?

16        A.   Yes.

17        Q.   Were you getting marijuana from your brother

18   at the time too, Mr. Venturini?

19        A.   Sometimes.

20        Q.   Why wouldn't you turn to your brother rather

21   than go to someone like Kosmas Koustas?

22        A.   I don't know.

23        Q.   Okay.

24        A.   Me and my brother bumped heads a lot,

25   especially when it comes to business.

1    Q.   Okay.  The business, have you always -- have

2  you ever been employed, Mr. Venturini?

3    A.   Before my accident.

4    Q.   Were you employed?

5    A.   Yes.

6    Q.   How were you employed?

7    A.   I was doing construction, landscaping.

8    Q.   Okay.  At some point in time did you start

9  getting more marijuana -- marijuana from your brother?

10   A.   Yes.

11   Q.   Okay.  When was that, Mr. Venturini?

12   A.   I don't know.  I'm bad with time, short-term

13  memory.

14   Q.   Okay.  Mr. Venturini, how much marijuana do

15  you think that you have dealt in your life?

16   A.   A lot.

17   Q.   What's that mean, a lot?

18   A.   Probably thousands of pounds.

19   Q.   Okay.  How much money have you made in your

20  life selling marijuana?

21   A.   I can't put an exact dollar on it.

22   Q.   Okay.  Do you have anything left to show?

23   A.   No.

24   Q.   Mr. Venturini, when you were arrested, where

25  were you brought, what courthouse?

```
1          A.    This one.

2          Q.    This courthouse, right?

3          A.    Yes.

4          Q.    And did you appear in the magistrate's

5    courtroom and were you arraigned?  Do you know what that

6    means?

7          A.    Yes.

8          Q.    Before that happened, was your house searched?

9          A.    Yes.

10         Q.    Was there any amount of currency at your

11   house?

12         A.    Yes.

13         Q.    How much currency was at your house?

14         A.    Around 40,000.

15         Q.    Forty thousand?

16         A.    Forty, fifty.

17         Q.    What happened to that money?

18         A.    It was seized.

19         Q.    By whom?

20         A.    People who did the raid, the federal

21   government.

22         Q.    Okay.  Did you have a motorcycle there?

23         A.    Yes.

24         Q.    What happened to that?

25         A.    That was taken.
```

1      Q.    What else was taken, Mr. Venturini?

2      A.    All my jewelry.

3      Q.    Let's talk a little bit about your jewelry.

4  After you were arraigned, Mr. Venturini, did you

5  cooperate with the government?

6      A.    Yes.

7      Q.    Did you meet at the U.S. Attorney's Office?

8      A.    Yes.

9      Q.    Did you meet with me?

10     A.    Yes.

11     Q.    Was your lawyer present?

12     A.    Yes.

13     Q.    Was Sergeant Norris present also?

14     A.    Yes.

15     Q.    Did you give a statement?

16     A.    Yes.

17     Q.    Did you want to cooperate?

18     A.    No.

19     Q.    When you met at the U.S. Attorney's Office and

20  you were with me, did you ask that we return something

21  to you?

22     A.    Yes.

23     Q.    What did you ask that we return to you?

24     A.    The smallest necklace out of all my jewelry

25  because my father gave it to me and he just passed away.

1      Q.    So you wanted the smallest necklace because
2  your father gave it to you.  When did your dad give it
3  to you?
4      A.    When I was probably 12.  I don't remember
5  exactly.
6      Q.    Okay.  And what did I do?
7      A.    Got it to my attorney.
8      Q.    We gave it back, right?
9      A.    Yes.
10     Q.    Was that -- did we give it back in exchange
11 for your cooperation?
12     A.    No.
13     Q.    Do you know why we gave it back?
14     A.    Not exactly.
15     Q.    Okay.  Did you ask for a surveillance system
16 that was at your house to be returned too, Mr.
17 Venturini?
18     A.    Yes.
19     Q.    Did we agree to do that?
20     A.    I believe so, but I never got it.
21     Q.    Were you nervous about the security for your
22 wife?
23     A.    Yes.
24     Q.    Has your house ever been broken into before?
25     A.    Yes.

1      Q.    What has been taken?

2      A.    Laptops, guns, a watch.

3      Q.    Mr. Venturini, you indicated guns.  Did you

4   have any guns at your residence when it was searched?

5      A.    Yes.

6      Q.    Why did you have guns there, Mr. Venturini?

7      A.    For protection and because I like guns.

8      Q.    Okay.  Was there any marijuana seized at your

9   residence?

10     A.    Yes.

11     Q.    Do you remember how much?

12     A.    Probably about half a pound.

13     Q.    Okay.  At that time were you obtaining

14   marijuana from Kosmas Koustas?

15     A.    No.

16     Q.    Okay.  At that time were you obtaining

17   marijuana from your brother?

18     A.    Occasionally.

19     Q.    Okay.  Was there someone else you were

20   obtaining marijuana from?

21     A.    A friend of mine.  Well, not really a friend,

22   just an associate.

23     Q.    Who, what was his name?

24     A.    James.

25     Q.    What was James' last name?

1          A.    I don't know his last name.

2          Q.    Okay.  When you met with me at the U.S.

3     Attorney's Office and Sergeant Norris and other law

4     enforcement, did you advise us of every individual who

5     you had been dealing with in your past?

6          A.    Yes.

7          Q.    Okay.  Did you inform us of any information

8     you had about ongoing drug dealing?

9          A.    Yes.

10         Q.    Why did you do that?

11         A.    Part of the deal.

12         Q.    What do you understand your obligation is here

13    today, Mr. Venturini?

14         A.    To be honest.

15         Q.    What do you expect to get out of it, Mr.

16    Venturini?

17         A.    Just the deal I signed, that's it.

18         Q.    Are you afraid to testify?

19              MR. SHEKETOFF:  Objection.

20              THE COURT:  Sustained.

21              MS. OLLILA:  May I have just one moment, your

22    Honor.  This is going to take about a minute, judge.

23              (Pause.)

24              MS. OLLILA:  Judge, can I just have a minute

25    because I'm looking for that document that I told

1    counsel about.

2              THE COURT:  Take your time.

3              (Pause.)

4              MS. OLLILA:  Sorry, judge.

5        Q.   Mr. Venturini, do you know someone by the name

6    of Jeremy Blevens?

7        A.   Yes.

8        Q.   How do you know Jeremy Blevens?

9        A.   Known him my whole life.

10       Q.   Do you know whether or not Mr. Blevens dealt

11   in marijuana?

12       A.   Yes.

13       Q.   How do you know that?

14       A.   I've dealt with him.

15       Q.   Did you ever provide him with marijuana?

16       A.   Yes.

17       Q.   Did he ever provide you with marijuana?

18       A.   No.

19       Q.   Does Jeremy Blevens have a cousin that you

20   know?

21       A.   Yes.

22       Q.   Who is that cousin?

23       A.   Nicholas Champagne.

24       Q.   Do you know someone by the name of Dave

25   Coulombe?

1  A. Yes.

2  Q. How would you know Dave Coulombe?

3  A. I don't know him that well.  I just met him

4 throughout living in the same city.

5  Q. Okay.  Do you know if he dealt in marijuana?

6  A. I've heard.

7  Q. Do you know Corey Buchan?

8  A. Yes.

9  Q. How do you know Corey Buchan?

10  A. Went to high school with him.

11  Q. Do you know if he dealt in marijuana?

12  A. I've also heard, I've never dealt with him.

13  Q. Mr. Venturini, there was a gun seized at your

14 residence; correct?

15  A. Yes, a few of them.

16  Q. A few of them?  Do you know what the law

17 provides for someone who has a gun in connection with

18 drug trafficking, do you know what the law provides for,

19 the punishment?

20  A. 924(c).

21  Q. Right, okay.  That's the statute 924(c).  Do

22 you know what the term of incarceration is for someone

23 who has a gun in connection with drug trafficking?

24  A. Sixty months.

25  Q. Five years?

1        A.    Yes.

2        Q.    Is it your understanding that in return for

3    your guilty plea the United States, I agreed not to

4    charge you with that gun?

5        A.    If I plead guilty, yes.

6        Q.    Okay.  Was that also part of your cooperation,

7    Mr. Venturini?

8        A.    I believe so.

9        Q.    Okay.  Do you know -- who is the judge who is

10   going to sentence you?

11       A.    Joseph DiClerico.

12       Q.    Not Judge McCafferty; correct?

13       A.    Correct.

14       Q.    Thank you, Mr. Venturini.  I have nothing

15   further.

16            THE COURT:  Attorney Sheketoff.

17                      CROSS-EXAMINATION

18   BY MR. SHEKETOFF:

19       Q.    Good morning, sir.  You even know the statute,

20   924(c), you know it by statutory reference?

21       A.    Yes.

22       Q.    And you understood at the time you made your

23   cooperation agreement with the government that no matter

24   what -- what were you charged with, by the way?

25       A.    Distribution of marijuana and conspiracy to

1    distribute marijuana.

2        Q.   All right.  And a 924(c) violation, having a

3    gun in connection with the distribution of drugs;

4    correct?

5        A.   Yes.

6        Q.   And, so, you understood before you sat down

7    with the government to talk about cooperating and being

8    of assistance to them that the 924(c) required a

9    five-year minimum mandatory sentence on and after

10   whatever you got for the drug trafficking; correct?

11       A.   Yes.

12       Q.   So, the very best any judge could do for you

13   unless the government agreed to change the charging

14   decision, was one day for distribution of drugs, and

15   five years on and after for the gun?

16       A.   Yes.

17       Q.   Okay.  And why did you have these guns?

18       A.   I wasn't a felon, there was legalized land to

19   shoot on, and I had them for protection.

20       Q.   For protection?

21       A.   Yes.

22       Q.   For protection of your drug business?

23       A.   No, just of my family.  I hadn't bought them

24   until after the accident.

25       Q.   The first time you owned a gun was after the

1   accident?

2       A.   Yes.

3       Q.   What was the date of the accident?

4       A.   June 18, 2008.

5       Q.   Okay.  The day your best friend, Nick Lawyer,

6   committed suicide and you were -- did you know about

7   that suicide when you had that accident?

8       A.   I didn't know until months later after I woke

9   up from a coma.

10      Q.   June 18th?

11      A.   Yes.

12      Q.   All right.  It's after June 18th of 2008 that

13  you start buying guns?

14      A.   Yes.

15      Q.   How many different guns did you own?

16      A.   I purchased four.

17      Q.   How many were found during the search of your

18  house?

19      A.   Three.

20      Q.   And what were they?

21      A.    .44-Magnum, 40-caliber and AR15.

22      Q.   AR15?

23      A.   Yes.

24      Q.   What's that?

25      A.   It's an assault rifle.

1      Q.    Okay, the assault rifle was for protection of

2   your family?

3      A.    No, for the shooting, I said I had land to

4   shoot on, target shooting.

5      Q.    Oh, for target shooting, okay.  Did any of

6   those handguns have a large capacity feeder?

7      A.    No.

8      Q.    There was no large capacity feeder found

9   during the search of your house?

10      A.    There was, but not for the handguns.

11      Q.    Oh, it was for the AK47?

12      A.    AR15, yes.

13      Q.    AR15?

14      A.    Yeah.

15      Q.    And that was because you liked to target

16   shoot?

17      A.    Yes.

18      Q.    And, so, when you sat down with the government

19   to make your cooperation agreement, you had been charged

20   with a 924(c) and you knew what it meant; correct?

21      A.    Well, I was researching it, yeah.

22      Q.    Yeah, you knew what it meant?

23      A.    Yeah.

24      Q.    You knew you were looking at at least five

25   years and probably a lot more than that if you didn't

1   make a cooperation deal; correct?

2        A.   I don't believe much more than that, but yeah.

3        Q.   Well, what did you think when you were sitting

4   there talking to the government for that first time, and

5   do you remember when that was?

6        A.   Sometime in the last 14 months.

7        Q.   Okay.  Do you remember that it was July 3rd of

8   2014?

9        A.   Sounds about right.

10       Q.   Okay.  And when had you actually been

11  arrested?

12       A.   I believe the 23rd or 24th of June.

13       Q.   So, you lasted about two weeks before you sat

14  down with the government to make a cooperation

15  agreement?

16       A.   Yes.

17       Q.   And you really don't want to be here?

18       A.   No.  Why would I?

19       Q.   Oh, because you're getting a huge reward for

20  being here, aren't you?

21       A.   No.

22       Q.   No.  Is the 924(c) dropped?

23       A.   Yes.

24       Q.   It's just gone; correct?

25       A.   Yup.

1    Q.   And your exposure on the drug count is what?

2    A.   I don't know exactly.

3    Q.   Well, what's the range that you've agreed to?

4    A.   The sentencing?

5    Q.   Yeah, the sentencing range?

6    A.   42 to 54 months.

7    Q.   All right.  And do you know how many years

8  42 months is?  Is it three-and-a-half?

9    A.   Three-and-a-half, four-and-a-half years.

10    Q.   So, not only are you not going to do five

11  years just for the gun, you're going to do maybe as

12  little as three-and-a-half years; correct?

13    A.   Maybe.

14    Q.   Do you know what the difference is, in other

15  words, do you know that you have what's called a C plea?

16  Do you know what that is?

17    A.   No.

18    Q.   All right.  Do you know who's going to decide

19  whether you get the three-and-a-half or the

20  four-and-a-half?

21    A.   The judge.

22    Q.   And do you know if the government is going to

23  make a recommendation whether you get three-and-a-half

24  or four-and-a-half?

25    A.   I don't know that.

1    Q.    You don't know that?

2    A.    No.

3    Q.    You don't think as you're sitting up there

4  right now that if they're pleased with what I have to

5  say they might recommend three-and-a-half, if they are

6  not pleased with what I have to say they might recommend

7  four-and-a-half?

8    A.    Yes, I know if they go over, then I can have a

9  new case, trial.

10   Q.    I'm asking something different.  I'm asking in

11 your mind you know how it is that you might end up with

12 three-and-a-half instead of four-and-a-half?

13   A.    Well, actually I get the bottom part of the

14 deal anyway as this is my first felony case ever in my

15 life, 33 years old.

16   Q.    At 32 years old your first felony, so you're

17 going to get the bottom no matter what?

18   A.    No.  I'd imagine so, though.

19   Q.    You're planning on the bottom?

20   A.    Yeah.  I don't have any violence on my record

21 or any felonies, I've never been arrested for any, so.

22   Q.    So, who were you indicted with, by the way?

23 Who is in your indictment?

24   A.    I don't know.

25   Q.    You've never seen your indictment?

1        A.    I believe I have.  I don't have a good memory,

2   though, not something I read every day.

3        Q.    You just don't have a good memory.  This is

4   something that happened, you just told us, in June of

5   2014?

6        A.    I know when I got picked up it was two days

7   prior to my daughter's birthday, so, easy day to

8   remember.

9             MR. SHEKETOFF:  May I approach, your Honor?

10            THE COURT:  Yes.

11       Q.    I'm going to show you this document and ask

12  you if you've ever seen it before?

13       A.    Yup.

14       Q.    Does that refresh your memory as to who's in

15  your indictment?

16       A.    Yes.

17       Q.    Who's in your indictment?

18       A.    Myself and Jonathan Handschumaker.

19       Q.    And who's he?

20       A.    A kid that lives in my neighborhood as always.

21       Q.    Someone you've been friends with your whole

22  life?

23       A.    Since junior high.

24       Q.    Since junior high.  Someone like Nick

25  Champagne who you've been friends with for 20 years?

1        A.    Yup.

2        Q.    Someone like Nick Champagne's cousin, Mr.

3   Blevens, who you've known your whole life?

4        A.    Yes.

5        Q.    Are you testifying against him?

6        A.    No.

7        Q.    Why is that?

8        A.    I don't know.  Maybe he already pled out.

9        Q.    Well, did he plead out already?

10        A.    I don't know.

11        Q.    Do you understand that you get a cooperation

12   agreement if you can be of, quote, unquote, substantial

13   assistance?

14        A.    No.

15        Q.    You don't understand that.  You think the

16   government would reward you for cooperation if you'd

17   said to them I know nothing?

18        A.    I believe it was just being honest.  They can

19   ask things about people and if you don't know anything

20   about them you say, no, you don't.

21        Q.    So, there is one occasion, as I understand it

22   in your entire life, that you had any interaction with

23   my client; correct?

24        A.    Yes.  I mean, we bumped into each other on the

25   street but he's only stopped by my house that once,

1    that's it.

2        Q.    One time in your entire life you had an

3    interaction with him; correct?

4        A.    No, no, we seen each other several times, we

5    talk, but we've never hung out, you know, did any

6    business together or anything like that.

7        Q.    Okay.  So, there is one time that the

8    government focused on that was of interest and they

9    asked you about; correct?

10        A.    Yes.

11        Q.    All right, when was that?

12        A.    When he stopped by my house.

13        Q.    Yeah, when?  What year?

14        A.    2008 sometime, maybe 2009.

15        Q.    Who was there?

16        A.    Me and my daughter.

17        Q.    How old was your daughter at the time?

18        A.    Five years old, maybe six.

19        Q.    Was she there for the conversation?

20            MS. OLLILA:  Objection, your Honor, to the

21    relevance.

22            THE COURT:  Relevance.

23            MR. SHEKETOFF:  Who was there for the, quote,

24    unquote, key conversation.

25            THE COURT:  Overruled.

1      Q.    Was she there?

2      A.    Yeah, it was just me and my daughter, that's

3    it.

4      Q.    Where were you?

5      A.    In the yard.

6      Q.    Doing what?

7      A.    I believe I was filling up a little blow-up

8    pool for her.

9      Q.    Blowing up a little blow-up pool?

10      A.    Yeah.

11      Q.    And this was some time in 2008 or 2009?

12      A.    Yeah.

13      Q.    Is there an easier lie to tell than a

14    conversation that occurred between just two people

15    sometime in 2008 or 2009 with the only other witness

16    being a five-year-old child?  Is there an easier lie to

17    tell?

18      A.    Probably not.  I just was with myself and

19    daughter and the conversation wasn't anything bad, we

20    didn't do anything, so, I mean.

21      Q.    Was my client under arrest when you had this

22    sit down with the government?

23      A.    Yes.

24      Q.    Had you read about it in the paper?

25      A.    No.

1      Q.   Well, how did you know he was under arrest?

2      A.   We all got picked up on the same sweep.

3      Q.   Oh, he was picked up the same day as you?

4      A.   Yes.

5      Q.   Now, I'd like to talk about the business with

6  Nick Champagne.  You were in the marijuana business

7  before you ever started dealing with Nick Champagne;

8  correct?

9      A.   Yes.

10      Q.   In fact, you basically had been in the

11  marijuana business your whole adult life?

12      A.   Most of it, yes.

13      Q.   You think that you've sold thousands of pounds

14  of marijuana?

15      A.   Probably.

16      Q.   But you have no idea how much money you made?

17      A.   No.

18      Q.   Can't even give us a rough guesstimate?

19      A.   (Nods negatively.)

20      Q.   All right, but there comes a point in time

21  when you have some sort of meeting with your lifelong

22  friend, Nick Champagne, and decide that you're going to

23  start buying marijuana from him; correct?

24      A.   Yes -- well, not really.

25      Q.   Not really.  All right, how did it start?

1     A.   I don't know.  Maybe somebody had access to

2  something, you can get rid of it, I mean, and you know

3  them, you trust them.

4     Q.   Well, did you hear some rumor that Nick

5  Champagne had access to something, did Nick Champlagne

6  come to your house and say, you know, I now have access

7  to something, do you want to be a buyer for me?  How did

8  it happen?  What was --

9     A.   I don't remember exactly how it happened.

10  We've been friends our whole life.  I mean, we stay in

11  contact no matter what, so, we're going to know what's

12  going on in each other's life.

13     Q.   All right.  So, what year did this happen?

14  You told the prosecutor you thought it was 2007?

15     A.   That's a good estimate.

16     Q.   Well, could it have been 2006?

17     A.   I don't know.  I don't know if Nick was home

18  in 2006.

19     Q.   By that you mean he was in prison?

20     A.   Yes.

21     Q.   And did you stay in contact with him when he

22  was in prison?

23     A.   Yes.

24     Q.   So, obviously you did not start this agreement

25  with him when he was in prison; correct?

1      A.    Yes.

2      Q.    So when did he get out?

3      A.    I don't remember exact dates.  I thought it

4  was maybe around 2007 sometime.

5      Q.    Okay.  Were you there -- did he come and visit

6  you the day he got out?

7      A.    Probably not that day but soon after.

8      Q.    All right.  Approximately how long was he out

9  for before you had some sort of meeting with him or talk

10  with him or communication with him where the two of you

11  decided that he was going to supply and you were going

12  to sell?

13      A.    I don't know.

14      Q.    All right.  Well, at the time you had a

15  partner; correct?

16      A.    Yes.

17      Q.    Someone you considered to be your best friend?

18      A.    Yes.

19      Q.    Did he -- and his name?

20      A.    Nicholas Lawyer.

21      Q.    Was Mr. Lawyer the one that dealt with Nick

22  Champagne or did you deal with Nick Champagne?

23      A.    Me and Nick talked a lot about it but it was

24  mostly drop-off and the place where it was would be with

25  Nick, and then me and Nick would go there and distribute

1   it.

2       Q.    So, was it clear to Nick Champagne that you

3   and Mr. Lawyer were partners?

4       A.    I think in the beginning, I don't think near

5   the end.

6       Q.    So, you have no idea how it started.  You

7   can't pinpoint it in any way except he's out of prison?

8       A.    Yup.

9       Q.    Some time in 2007?

10      A.    I assume so.  Like I said, I can't give you an

11  exact date.

12      Q.    Well, how many months did you -- do you know

13  when he got busted?

14      A.    I know it was, it must have been after July

15  sometime I think because he spent a lot of time at the

16  hospital with my mother.

17      Q.    After July of what year?

18      A.    2008.

19      Q.    So you think he was busted in July of 2008?

20      A.    Maybe after that.

21      Q.    How many months did you deal with him buying

22  this Canadian marijuana before he got busted?

23      A.    I don't know.  Sometime between whenever it

24  started in June.  In June is when I got into the

25  accident.

1    Q.    Okay.  So, how long would you estimate that

2    was.  Did you get 50 pounds one time, two times, ten

3    times?

4        A.    Numerous times.

5        Q.    How many times?

6        A.    I don't know exactly.

7        Q.    But numerous times?

8        A.    Yes.

9        Q.    Less than ten but more than five?

10       A.    That's a fair estimate I'd say.

11       Q.    How often would you have contact with Mr.

12   Champagne?

13       A.    All the time.

14       Q.    You mean every day?

15       A.    Almost.

16       Q.    And was that by cell phone or in person or

17   both?

18       A.    Both.

19       Q.    And who would collect the money that was due

20   to Mr. Champagne?

21       A.    Myself or Nick.

22       Q.    Nick Lawyer?

23       A.    Yeah.

24       Q.    And what did you do with that money when you

25   and Nick Lawyer collected it?

1        A.    Paid to who it belonged to.

2        Q.    Well, who did it belong to?

3        A.    Nicholas Champagne.

4        Q.    Right, and how -- would you deliver, would you

5    deliver the money to Nicholas Champagne?

6        A.    No.   Like I said before, I don't know where he

7    was living.

8        Q.    Oh, you spoke to him every day, but you didn't

9    know where he was living?

10       A.    No.   He would always come to my house.   Open

11   door for the kid, my whole life.

12       Q.    So, he would come to your house to pick up the

13   money?

14       A.    My house or we'd go out for lunch or Nick's

15   house, didn't matter.

16       Q.    Nick Lawyer's house?

17       A.    Yeah, whatever was easiest.

18       Q.    Did anyone -- did he have some employee that

19   came to pick up the money for him?

20       A.    Never.

21       Q.    It was always him personally?

22       A.    Yeah.

23       Q.    And how much money did you give him over that

24   several times before your car accident, I mean your

25   motorcycle accident?

1      A.    I don't know.  Probably whatever the price is

2  on the weight.

3      Q.    You don't remember what you were paying?

4      A.    No.

5      Q.    You remember you're making 500 bucks a pound?

6      A.    On average, I mean.

7      Q.    To split with you and Mr. Lawyer, or you each

8  were making 500 bucks a pound?

9      A.    Split.

10      Q.    You were making 250 bucks a pound, that is a

11  partnership, 500?

12      A.    Yeah.

13      Q.    And did you have any people that you

14  supervised or ran errands for you, did work for you?

15      A.    No.

16      Q.    Were you and Nick Champagne -- did you do

17  errands for Nick Champagne?

18      A.    No.

19      Q.    You were just a buyer, a regular buyer?

20      A.    Yeah.

21      Q.    That was your relationship with him?

22      A.    We were friends long before that.

23      Q.    But in terms of this business, you were just a

24  regular buyer?

25      A.    Yup.

1      Q.    I mean, you didn't make deliveries for him?

2      A.    Never.

3      Q.    Who delivered the marijuana to Mr. Lawyer's

4  home?

5      A.    Nick.

6      Q.    You saw him physically deliver the marijuana?

7      A.    Nope.

8      Q.    I mean, Mr. Lawyer told you that Nick had

9  delivered the marijuana?

10      A.    We just don't have random people show up at

11  our houses.

12      Q.    And when was the last time you spoke with Nick

13  Champagne?

14      A.    I don't know.

15      Q.    You have no memory at all?

16      A.    No.

17      Q.    When he was in jail was he calling you?

18      A.    Yeah.

19      Q.    How often would you speak with him when he was

20  in jail?

21      A.    Around my birthday, maybe holidays, that's

22  about it.

23      Q.    Have you seen him since he's been released

24  from jail?

25      A.    No.

1    Q.   Have you talked to him on the phone since he's

2  released from jail?

3    A.   No.

4    Q.   So, who did you -- who were your main buyers?

5  You said you were moving in bulk before your accident,

6  you had several occasions when you bought 50 pounds or

7  more, who were your main buyers, who did you sell to on

8  a regular basis?

9    A.   Nick usually handled that, and he's not around

10  to tell us.

11    Q.   All right.  So, that was Nick Lawyer's job in

12  the operation?

13    A.   Mainly.

14    Q.   So, you had regular customers, but you don't

15  know who they were?

16    A.   Well, it's not like a store, you know,

17  stocking the shelves.  Sometimes things go and sometimes

18  you're stuck with them.

19    Q.   Okay.  So, did you guys have regular customers

20  or not?

21    A.   I guess you could say so.

22    Q.   Who were they?  Only Nick Lawyer knows?

23    A.   No, I'm sure, you know, maybe my co-defendant

24  on the street, Jonathan Handschumaker.

25    Q.   He was one of the regular customers?

```
 1          A.    Yeah.
 2          Q.    What other regular customer -- did he buy
 3    50 pounds from you guys every time Nick Champagne gave
 4    you 50 pounds?
 5          A.    Nope.
 6          Q.    Well, how much did he buy?
 7          A.    Different every time.
 8          Q.    Well, what was the most he bought?
 9          A.    I don't know, I'd say 10 or 20.
10          Q.    Well, who got the other 30 or 40?
11          A.    Maybe other people Nick knew.  Maybe a friend
12    of mine.
13          Q.    What's that friend's name?
14          A.    Ceta Sar.  He's deported, though.
15          Q.    All right, well, if Nick was in charge of
16    customers, what was your role in business?
17          A.    I guess the connection was mine, so.
18          Q.    All right, so, it was because Nick Lawyer had
19    to cut you in because you're the one that had the close
20    relationship with Nick Champagne?
21          A.    Yeah.
22          Q.    So that's what you did.  You took 50 percent
23    because you had the close relationship with Nick
24    Champagne?
25          A.    Yup.
```

1    Q.   Who did the negotiations over price with Nick

2  Champagne of any particular load, you?

3    A.   Yes.

4    Q.   Who did the negotiations over quantity with

5  Nick Champagne, you?

6    A.   Yes.

7    Q.   Who kept drug records?

8    A.   I don't know.  I don't know who keeps records

9  like that, no.

10    Q.   You didn't keep records?

11    A.   No.

12    Q.   Who else was Nick Champagne selling to?

13    A.   I don't know.  We didn't talk about that.

14    Q.   You never talked about it?

15    A.   I didn't ask his business.

16    Q.   You didn't ask his business, so you never knew

17  anyone else that he was selling to?

18    A.   No.

19    Q.   And he never told you who his supplier was?

20    A.   No.  I assumed, but he never said anything.

21    Q.   He was your close friend for twenty years?

22    A.   Yeah.

23    Q.   And he never told you who his supplier was?

24    A.   No.

25    Q.   Did he trust you?

1     A.   Of course he did.

2     Q.   All right.  Did you disclose to the government

3 that you had committed some sort of mortgage fraud?

4     A.   No.

5     Q.   You mean they found that out on their own?

6     A.   Yes.

7     Q.   Did they find that out on their own before or

8 after you sat down and cooperated with them?

9     A.   I don't know.

10     Q.   So, when you sat down and cooperated with them

11 you knew that you were in the middle of a mortgage fraud

12 scheme yourself and you didn't mention it to them?

13     A.   Actually I believe it would be attempted

14 mortgage fraud because I actually never got the

15 mortgage, so.

16     Q.   So, attempt, my mistake, attempted mortgage --

17     A.   I don't believe that's a charge.

18     Q.   Hum?  I didn't hear what you said.

19     A.   I don't believe that's a charge.

20     Q.   Attempted mortgage fraud?

21     A.   Yeah, they let you get the mortgage, then they

22 can charge you with the mortgage fraud, but if you get

23 the denied, I don't think it could be.

24     Q.   Well, you got denied because the government

25 told the lender that you were lying in your -- in the

1  paperwork you gave the lender; correct?

2      A.   Yeah, I imagine so.

3      Q.   Right.  Well, you did everything you did, you

4  could do to commit the fraud?

5      A.   Yes.

6      Q.   Yeah.  You don't think you can be charged with

7  it because you never actually got the money?

8      A.   Yes.

9      Q.   Sir, when you raise your right hand and say I

10 swear to tell the truth, the whole truth, and nothing

11 but the truth, what does that mean to you?

12     A.   That means that that's what I do, that's what

13 I've done.

14     Q.   Well, on your mortgage application you had to

15 sign in under the pains and penalties of perjury, too,

16 and you lied through your teeth; correct?

17     A.   I don't believe so.

18     Q.   You don't believe you lied or you don't

19 believe you had to sign it under the pains and penalty

20 of perjury?

21     A.   Both.

22     Q.   Well, you know you lied.  You created false

23 records about a work history that were lies; correct?

24     A.   Yes.

25     Q.   All right.  So, you know you lied, but you

1  think that it wasn't under the pains and penalties of

2  perjury?

3       A.   No.

4       Q.   So, as I understand your testimony, then, when

5  you raise your right hand and swear to tell the truth,

6  we can rely that you're doing it, but in other

7  circumstances maybe yes, maybe no?

8       A.   Yes.

9       Q.   And that's because of your set of values that

10 says this is where I draw the line.  I will not lie

11 under oath; correct?

12      A.   Yes.

13      Q.   Even if it helps me, even if it helps me get

14 back to my family in less than five years and a day, I

15 wouldn't lie under oath; correct?

16      A.   Yes.

17      Q.   Because that's where you draw the line;

18 correct?

19      A.   Yes.

20           MR. SHEKETOFF:  Thank you.

21           MS. OLLILA:  Nothing further.

22           THE COURT:  All right.  Mr. Venturini, you're

23 excused, sir.  And we will also take our lunch break --

24 morning break, sorry.

25           (Conclusion of testimony.)

1

2                    C E R T I F I C A T E

3

4          I, Sandra L. Bailey, do hereby certify that

5    the foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 11/19/2015

11                                 **SANDRA L. BAILEY, LCR, CM, CRR**

12                                 LICENSED COURT REPORTER, NO. 15

13                                 STATE OF NEW HAMPSHIRE

14

15

16

17

18

19

20

21

22

23

24

25