```
               UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW HAMPSHIRE



*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                              *
UNITED STATES OF AMERICA                      *
                                              *  14-cr-93-01-LM
              v.                              *  August 19, 2015
                                              *  2:10 p.m.
ALKIS NAKOS                                   *
                                              *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

DAY 2 - AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY
AND A JURY

Appearances:

For the Government:     Terry Ollila, AUSA
                        U.S. Attorney's Office
                        53 Pleasant Street
                        Concord, NH 03301

For the Defendant:      Robert L. Sheketoff, Esq.
                        Law Office of Robert L. Sheketoff
                        One McKinley Square
                        Boston, MA  02109

Court Reporter:         Sandra L. Bailey, LCR, CM, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH  03301
                        (603)225-1454

```
 1                    I N D E X

 2

 3   Witness              Direct    Cross    Redirect    Recross

 4   JEAN DROUIN

 5   By Ms. Ollila          3
     By Mr. Sheketoff                46

 6

 7   RICHARD LAPOINT

 8   By Ms. Ollila         65
     By Mr. Sheketoff  (no questions)

 9

10   GREGORY WOODY

11   By Ms. Ollila         72
     By Mr. Sheketoff                78

12

13   MICHAEL BERGERON

14   By Ms. Ollila         80
     By Mr. Sheketoff  (no questions)

15

16

17

18
     Exhibits                          ID        Evid.
19
     Government's Exhibits 9h-1 thru 9h-7          7
20   Government's Exhibit 6a                       16
     Government's Exhibit 52c                      19
21   Government's Exhibit 52k                      23
     Government's Exhibit 17b-1                    27
22   Government's Exhibits 52h and 52i            37
     Government's Exhibit 52f                      38
23   Government's Exhibits 3c-1 and 3c-2          68
     Government's Exhibits 3c-2 and 3c-3          71
24   Government's Exhibit 9g-1a                    84
     Government's Exhibits 9g-1 and 9g-2          86

25
```

```
 1                      BEFORE THE JURY
 2            MS. OLLILA:  May I proceed, your Honor?
 3            THE COURT:  You may.  Go ahead.
 4                 DIRECT EXAMINATION cont'd
 5  BY MS. OLLILA:
 6       Q.    Good afternoon, Special Agent Drouin.
 7       A.    Good afternoon.
 8       Q.    I neglected to ask you a couple questions
 9  early on.  One was that when you initiate an
10  investigation, a large investigation, do you typically
11  give it a name?
12       A.    Yes.  Investigations that involve a lot of
13  other DEA and state investigations and other
14  jurisdictions, other states, there's just a lot of
15  information out there, a lot of evidence, we usually
16  title that investigation a name so that people know what
17  to refer to when they collect their evidence and
18  intelligence and so forth.
19       Q.    What was the name of this investigation?
20       A.    This was investigation Brownshirt it was
21  called.
22       Q.    Do you know why it was named Brownshirt?
23            MR. SHEKETOFF:  Objection.
24            THE COURT:  Maybe perhaps lay more of a
25  foundation.
```

1            MS. OLLILA:  I'm just curious, Judge.  And

2     I'll strike the question.

3       Q.    Special Agent Drouin, when individuals are

4     arrested and processed, do you have to turn over your

5     reports involving your investigation of them?

6       A.    Yes.

7       Q.    And what type of reports do you turn over?

8       A.    All the DEA investigative reports that we do,

9     any local or state reports that we collect along the

10    way, photographs, evidence, everything, lab results and

11    so forth, we turn that over for discovery.

12      Q.    What about video surveillance taken during the

13    course of the investigation, do you turn that over?

14      A.    Yes, we so.

15      Q.    And why do you turn that over?

16      A.    Well, that's all part of the discovery

17    process.  Everything we pretty much gather during the

18    investigation, we turn it over.

19      Q.    What about when individuals cooperate with

20    you, do you take their statement?

21      A.    Yes.  We usually write a report and we turn

22    that report over to the prosecutor.

23      Q.    Why?

24      A.    Because it's part of the discovery process.

25      Q.    Don't you want to shield the names of any

1  individuals who are cooperating?

2        A.    You do, yes.

3        Q.    Are you required to turn that over to

4  prosecutors?

5        A.    We have to turn that over to prosecutors, yes.

6        Q.    How many different states were involved in

7  this investigation?

8        A.    There were at least five different states

9  involved in this investigation.

10       Q.    And what were those five states?

11       A.    New Hampshire, Vermont, Massachusetts, New

12  York, two different, upstate New York, New York City,

13  Long Island, Florida, California, and Chicago, Illinois.

14       Q.    During your investigation did you gather

15  reports from all of those law enforcement agencies?

16       A.    I believe so, yes.

17       Q.    And did you turn them over to the prosecutor?

18       A.    Yes.

19       Q.    Do you know what the concept discovery is?

20       A.    The definition, no.  I know the concept, yes.

21       Q.    What is it?

22       A.    It's just a, you have a certain amount of time

23  to turn over all your reports and all your evidence that

24  you made during the course of your investigation,

25  including photographs and drug exhibits and all that to

1    the prosecutor, and they in turn have to turn that over

2    to the defense.

3         Q.   Now, let's go back to the 58-pound seizure

4    from David Coulombe where you showed the jury the dark

5    blue duffle bag that was in his motor vehicle and then

6    two other duffle bags located at 140 Allied Street, do

7    you recall that?

8         A.   Yes.

9         Q.   I'm going to show you some exhibits that have

10   been marked.  9h-1, 9h-2, 9h-3, 9h-4, 9h-5, 9h-6 and

11   9h-7.  I'll ask you to review those photographs.

12        A.   Okay.

13        Q.   Do you know what those photographs are?

14        A.   Yes.

15        Q.   What are they of?

16        A.   This is the Expedition that David Coulombe was

17   driving and the drugs that were inside.

18        Q.   Are those photographs a fair and accurate

19   depiction of the vehicle at the time it was searched and

20   seized?

21        A.   Yes.

22        Q.   Thank you.

23             MS. OLLILAL:  Your Honor, I'd ask that the ID

24   be stricken on Government's 9h-1 all the way through

25   9h-7.

1          MR. SHEKETOFF:  No objection.

2          THE COURT:  All right, those Ids are stricken.

3    9h-1 through 9h-7 are full exhibits.

4          (Government's Exhibits 9h-1 thru

5          9h-7 admitted.)

6          MS. OLLILA:  Diane, would you please pull up

7    9h-1.

8       Q.   Special Agent Drouin, you're looking at

9    Government's Exhibit 9h-1 which is entered into full

10   evidence.  What is that a picture of?

11      A.   That is the Ford Expedition that was driven by

12   David Coulombe.

13          MS. OLLILA:  Please call up 9h-2, Diane.

14      Q.   And what is this a picture of, Special Agent

15   Drouin?

16      A.   That's the rear of that same vehicle.

17          MS. OLLILA:  And Diane, please pull up 9h-3.

18      Q.   What is it that the jury is looking at in this

19   photograph?

20      A.   You're looking at the front passenger seat

21   with a trash bag on the floor in front of the seat which

22   contained marijuana.

23      Q.   Say that again?

24      A.   Which contained marijuana.

25      Q.   That white trash bag?

1    A.   Yes.

2    Q.   And there's another gray trash bag there.  Did

3  that also contain marijuana?

4    A.   I don't remember.

5    Q.   Okay.  Fair enough.

6         MS. OLLILA:  Diane, please pull up 9h-4.

7    Q.   Special Agent Drouin, what is this a picture

8  of?

9    A.   That's a hockey bag.

10   Q.   And what was contained in that hockey bag?

11   A.   The marijuana.

12        MS. OLLILA:  And Diane, please pull up 9h-5.

13   Q.   Okay, 9h-5 is now up, Special Agent Drouin.

14   A.   That's the same bag, just a different angle of

15  it.

16   Q.   Okay.  Is that the bag that you pulled out of

17  the box and showed to the jury?

18   A.   Yes.

19   Q.   And what is the tag that is on that bag?

20   A.   Says NH.

21        MS. OLLILA:  Diane, can you pull up 9h-6.

22   Q.   What is this a photograph of?

23   A.   The same bag.

24   Q.   Now, when marijuana is seized, what happens to

25  it?

1    A.    It's usually put in a drug locker or drug

2    vault.  I believe this marijuana was stored at the

3    Manchester police drug vault.

4    Q.    And was it tested?

5    A.    Yes.

6    Q.    Did it test positive for the presence of

7    marijuana?

8    A.    Yes.

9    Q.    In the approximate weight of 58 pounds?

10   A.    Yes.

11   Q.    Special Agent Drouin, the pricing of

12   marijuana, are you familiar with the pricing of Canadian

13   marijuana?

14   A.    Yes.

15   Q.    What would the pricing be per pound generally?

16         MR. SHEKETOFF:  Objection.  Just the time

17   frame.

18         THE COURT:  All right.  Ask a time.

19   Q.    In 2008, 2009 what was the pricing of a pound

20   of hydroponic Canadian marijuana, high grade?

21   A.    The high grade marijuana from Canada ranged

22   anywhere, depending on the quality, anywhere from

23   probably $2,000 a pound to upwards of $5,000 a pound.

24   Q.    Do you know whether there's a difference

25   between Canadian marijuana and Mexican marijuana?

1          A.    Yes.

2          Q.    What is the difference between the two?

3          A.    Mexican marijuana is usually lower grade.

4    It's grown outdoors in heat.  Generally the marijuana

5    that we get that comes in from Mexico is not as high

6    grade because it's grown outdoors and it's cheaper.

7          Q.    So what would a pound of Mexican marijuana

8    cost approximately?

9          A.    Probably an average --

10               MR. SHEKETOFF:  Objection, just time frame.

11               MS. OLLILA:  I'm sorry?

12               THE COURT:  Go ahead.

13         Q.    The questions I'm asking you, I'm referring to

14   the 2008 and 2009 time frame.  What would a pound of

15   Mexican marijuana be in 2008 and 2009?

16         A.    On the average around $800 a pound.

17         Q.    After February 4th did something happen on or

18   around April 2nd, 2009.  And before you answer that, do

19   you know what the videotape surveillance outside

20   residences, do you often use that?

21         A.    Yes.

22         Q.    Why do you use it and how do you use it?

23         A.    Sometimes we will set up hidden cameras on

24   usually public property and we try to set up a camera

25   that overlooks maybe a drug residence that's being used

1    for drugs or apartment building or stash house or

2    whatever.   It aids us because then we're not seen out on

3    the street in our cars which could make us on

4    surveillance.

5         Q.   What does that mean, being made on

6    surveillance?

7         A.   Well, usually the people that you're

8    investigating, you don't want them to know that they are

9    being watched, so sometimes you can set up cameras

10   looking over there, so if they look out on the street

11   they don't see a person in plain clothes just sitting

12   there in his car watching.

13        Q.   Is it your experience that individuals who are

14   involved in drug trafficking are highly cautious of

15   being surveilled by law enforcement?

16        A.   Yes.

17        Q.   Videotaping with a live feed, does that assist

18   law enforcement greatly?

19        A.   Yes.

20        Q.   Did you employ that in this case?  Did you

21   have a live feed focused on a residence in Manchester,

22   New Hampshire?

23        A.   Yes.

24        Q.   And what was the address of the address?

25        A.   10 Delaware Avenue.

1     Q.    And who was living there at the time?

2     A.    Nick Champagne.

3     Q.    Let me show you what has been marked for

4  identification as Government's Exhibit 12a.  What is

5  12a, Special Agent Drouin?

6     A.    12a looks like the email I sent to you with

7  all the photographs that we captured from 10 Delaware

8  Avenue in Manchester.

9     Q.    Now I'm going to show you Government's Exhibit

10  12b-1 all the way through 12b-11.  And these have

11  already been admitted into evidence by stipulation of

12  the parties.  Do you recognize what those pictures are?

13     A.    Yes, that's 10 Delaware Avenue.

14     Q.    Are those the photographs that you sent to me

15  in an email that was captured in Government's

16  Exhibit 12a?

17     A.    Yes.

18     Q.    Have you reviewed those photographs?

19     A.    Yes.

20     Q.    Are they a fair and accurate depiction of the

21  way that residence looked at the time that the camera

22  was up?

23     A.    Yes.

24     Q.    And I'm talking about in early 2009, okay?

25     A.    Yes.

1          MS. OLLILA:  Diane, please pull up 12b-1.

2     Q.   Special Agent Drouin, what is the jury looking

3 at now?

4     A.   So the house on the corner is the 10 Delaware

5 Avenue.

6     Q.   What color is the house that you're looking

7 at?

8     A.   I believe it's white, split level home.

9     Q.   Please pull up 12b-2.  What is this a

10 photograph of?

11     A.   The same house with a Ford Expedition pulling

12 out of the driveway.

13     Q.   Please pull up 12b-4.  Special Agent Drouin,

14 how many individuals appear to be in this photograph?

15     A.   Three.

16     Q.   Why did you want to capture a screen shot of

17 that image?

18     A.   That specific image?

19          MR. SHEKETOFF:  Object.

20          THE COURT:  What's the basis?

21          MR. SHEKETOFF:  His state of mind.  What

22 relevance is it.

23          THE COURT:  What is the relevance why he

24 wanted to capture this particular screen shot.

25          MS. OLLILA:  Because it contains a photograph

1   of the defendant.

2          THE COURT:  Okay.  You can ask him who's in

3   the photograph.

4          MS. OLLILA:  Of course.

5          THE COURT:  Okay, go ahead.

6      Q.   Special Agent Drouin, do you know any of the

7   individuals who indicated in that picture?

8      A.   Yes.

9      Q.   And who do you know?

10     A.   The person on the far right who appears to be

11  on his cellular phone is Nick Champagne.

12     Q.   Anyone else you recognize?

13     A.   The person on the far left in the black

14  T-shirt and jeans is the defendant, Mr. Nakos.

15     Q.   Do you see Mr. Nakos in the courtroom today?

16     A.   Yes, I do.

17     Q.   Could you please point to him and describe an

18  article of clothing he's wearing.

19     A.   He's wearing a gray suit with a beard next to

20  Mr. Sheketoff.

21         MS. OLLILA:  May the record reflect that the

22  witness has identified the defendant Alkis Nakos.

23         THE COURT:  The record will so reflect.

24     Q.   At the time these images were captured, did

25  Alkis Nakos look the same as he does today?

1      A.    No.

2            MS. OLLILA:  Diane, please pull up 12b-5.

3      Q.    Do you know who that individual is that is

4   represented in Government's Exhibit 12b-5?

5      A.    Mr. Nakos.

6            MS. OLLILA:  Diane, please pull up 12b-7.

7      Q.    Do you recognize the individual depicted in

8   Government's Exhibit 12b-7?

9      A.    Mr. Nakos.

10     Q.    It appears that he had a different shirt on

11  there.  Is that a sweatshirt?

12     A.    Yes.

13     Q.    What does it look like he's doing there?

14     A.    Moving furniture.

15           MS. OLLILA:  Diane, please pull up 12b-8.

16     Q.    Do you know the individual depicted in

17  Government's Exhibit 12b-8?

18     A.    Mr. Nakos.

19     Q.    Please pull up 12b-9.  Who is the individual

20  depicted in Government's Exhibit 12b-9?

21     A.    Nick Champagne.

22     Q.    And please pull up 12b-11.  Who is the

23  individual depicted in Government's Exhibit 12b-11?

24     A.    Nick Champagne.

25     Q.    Now, let me back you up.  Do you recall when

1    these images were taken?

2         A.    April 2nd, 2009.

3         Q.    Was there videotape surveillance conducted at

4    that same residence on December 30th, 2008?

5         A.    Yes.

6         Q.    Okay.  I'm showing you what has been marked as

7    Government's Exhibit 6a.  Do you recognize what that is?

8         A.    Yes.

9         Q.    Is that a copy, a CD rom of the videotape

10   surveillance that was conducted on that date?

11        A.    Yes.

12        Q.    Have you seen that videotape surveillance?

13        A.    Yes.

14        Q.    Is it a fair and accurate depiction of the

15   videotape that was captured on December 30th, 2008?

16        A.    Yes.

17             MS. OLLILA:  Your Honor, I move to strike the

18   ID on Government's 6a and have it entered into full

19   evidence.

20             THE COURT:  Any objection?

21             MR. SHEKETOFF:  No objection.

22             THE COURT:  All right, 6a is a full exhibit.

23             (Government's Exhibit 6a admitted.)

24             MS. OLLILA:  Diane, please pull up 6a.

25        Q.    Now, before you play it, Special Agent Drouin,

1    what is it we're looking at?

2        A.    That is the rear door of 10 Delaware Avenue.

3            MS. OLLILA:  Now Diane, can you do a split

4    screen on this, Diane, is that possible, and pull up

5    12b-1?

6        Q.    So 12b-1 is a photograph of what?

7        A.    That's 10 Delaware Avenue.  You're looking at

8    the front of it.

9            MS. OLLILA:  Okay, now pull up 6a again,

10   Diane, please.  You can exit out of that if you want.

11       Q.    So the photograph, the video on the left,

12   pause it, is the rear of the same residence, 10 Delaware

13   Avenue; is that correct?

14       A.    Yes.

15           MS. OLLILA:  Now Diane, what I want you to do

16   is play the video.

17       Q.    And Special Agent Drouin, before you do that,

18   did you see that the door is open on the video that is

19   depicted in Government's Exhibit 6a?

20       A.    Yes.

21       Q.    Do you recognize who is opening up that door?

22       A.    Looks like Nick Champagne.

23           MS. OLLILA:  Play it, Diane.

24           (Video being played.)

25       Q.    Do you know who was taking that video?

1     A.    Yeah, it was Sergeant Moore.

2           (Video continuing to play.)

3     Q.    Do you see what an individual is carrying out

4  of that residence?

5     A.    Yes.

6     Q.    What was it?

7     A.    A large Home Depot box.

8           MS. OLLILA:  Keep playing, Diane

9           (Video continuing to play.)

10    Q.    The second individual that came in, at the

11 time did you know who that second individual was?

12    A.    At the time I did not.

13    Q.    Were you able to identify him at that time?

14    A.    Later on we did, yes.

15    Q.    Did it become a mystery to you for a period of

16 time as to who he was?

17    A.    Yes.

18    Q.    Special Agent Drouin, let me show you, you've

19 just identified pictures of Alkis Nakos that were taken

20 from the camera while there was movement at 10 Delaware

21 Street.  Have you obtained other images of the defendant

22 Alkis Nakos?

23    A.    Yes.

24    Q.    And did you obtain those images during the

25 course of your investigation?

1      A.    Yes.

2      Q.    And why did you obtain those images?

3            MR. SHEKETOFF:  I'll object, your Honor.

4            THE COURT:  I think he's objecting to his

5      motive, his state of mind again, and so ask it

6      differently.  Go ahead.  Objection sustained.

7      Q.    Did you obtain images?

8      A.    Yes.

9      Q.    Let me show you what is marked as Government's

10     52c.  Do you recognize what 52c is?

11     A.    Yes.

12     Q.    What is that?

13     A.    That's a picture of Alkis Nakos.

14     Q.    Did you obtain that?

15     A.    Yes.

16           MS. OLLILA:  Your Honor, I'd ask that the ID

17     be stricken on Government's 52c and be entered into full

18     evidence.

19           MR. SHEKETOFF:  I'd like to look at it.

20           THE COURT:  52c did you say?

21           MS. OLLILA:  Yes.

22           THE COURT:  52c.

23           MR. SHEKETOFF:  I have no objection.

24           THE COURT:  All right, 52c is a full exhibit.

25           (Government's Exhibit 52c admitted.)

1          MS. OLLILA:   Diane, will you please pull up

2     52c.

3          Q.    Who is that depicted in Government's

4     Exhibit 52c?

5          A.    Mr. Nakos.

6          Q.    The images that you obtained from that pole

7     camera, you said you obtained them on April 2nd, 2009;

8     correct?

9          A.    Yes.

10          Q.    Did something happen two days later on

11     April 4, 2009?

12          A.    Yes.

13          Q.    What happened then?

14          A.    I was following one of the Canadian couriers,

15     actually there was two females by the name of named Neda

16     Shojaei and Kim LaPorte who are now working for the same

17     Canadian organization, and I had a GPS on the car that

18     they were driving, and I noticed that they were driving

19     to New Hampshire.  So I followed them and I saw them

20     drive up to the Burger King parking lot in Manchester

21     on, I forget the name of the road, I think it's 3A.

22          Q.    Manchester where, what state?

23          A.    Manchester, New Hampshire.

24          Q.    Okay.

25          A.    And these two females parked at the Burger

1    King in the back parking lot and they sat there and

2    waited.  And then a short time later I saw Nick

3    Champagne arrive in his silver Honda.  He took a black

4    duffle bag out of the back of his car and he walked over

5    and he handed the black duffle bag into the car that the

6    two females were in, and then he went back in his Honda

7    and left, and then Neda Shojaei and Kim LaPorte drove

8    away with that black bag.

9        Q.   Did you radio law enforcement authorities and

10    have those two females stopped?

11        A.   Yes.  I followed them a little further, they

12    made a couple stops, and then they went south back into

13    Massachusetts, and I called a Massachusetts state

14    trooper, and he conducted a traffic stop of that

15    vehicle.

16        Q.   And what was located inside the vehicle?

17        MR. SHEKETOFF:  Objection.

18        THE COURT:  What's your basis?

19        MR. SHEKETOFF:  Hearsay.

20        THE COURT:  Objection sustained.

21        Q.   Do you know what was in the vehicle, and if

22    so, how do you know?

23        A.   I know because I was on the phone with the

24    trooper who made the stop during the stop.

25        Q.   Did you see ultimately what was taken during

1      the stop?

2           A.    I saw the bags.

3           Q.    Okay.  And what was contained in the bags?

4           A.    U.S. currency.

5                 MR. SHEKETOFF:  Objection.

6                 THE COURT:  What's your objection?

7                 MR. SHEKETOFF:  Source.  I mean, it's hearsay

8      unless he tells me that he -- I thought what he said was

9      I saw the bags.  Now she's asking what's inside the

10     bags.  If he saw what's inside the bags, I have no

11     problem with it.  But I can't tell from the question

12     whether he just saw the bags and he's going to volunteer

13     what somebody told him.

14                THE COURT:  Objection sustained and Attorney

15     Ollila is going to rephrase.  Go ahead.

16          Q.    Did you see what was inside the bag?

17          A.    No.

18          Q.    Okay.  Now, what happened two days later, if

19     you know, on April 6, 2009 -- and by the way -- strike

20     that.  What happened to the two females?

21          A.    After they were stopped, I believe the next

22     day I followed the two females and they went and

23     returned rental car and got a different rental car, and

24     they were now with two other Canadian citizen females,

25     and the four of them I tracked the car down to New York

1    City.

2        Q.    Okay, I want you to stop there.  I want to

3    show you what is marked as Government's Exhibit 52k.  Do

4    you recognize what that photograph is of?

5        A.    Yes.

6        Q.    Why do you recognize it?

7        A.    Because I took it.

8        Q.    What is the photograph of?

9        A.    It's the photograph of Neda Shojaei and Kim

10   LaPorte, the two females that received the bag from Nick

11   Champagne.

12       Q.    When did you take this photograph?

13       A.    That would have been April 5th I believe.

14             MS. OLLILA:  Your Honor, I'd ask that the ID

15   be stricken and Government's Exhibit 52k be entered into

16   full evidence.

17             MR. SHEKETOFF:  No objection.

18             THE COURT:  52k is a full exhibit.

19             (Government's Exhibit 52k admitted.)

20       Q.    Please pull up 52k.  Special Agent Drouin,

21   you're looking at 52k, and who are those women?

22       A.    That's Neda Shojaei on the right and Kim

23   LaPorte on the left.

24       Q.    Did something happen on May 27, 2009, in New

25   Hampshire?

1      A.    Yes.

2      Q.    Was there a seizure of some type?

3      A.    Yes.

4      Q.    What was seized?

5      A.    A hundred pounds of marijuana.

6      Q.    Can you tell the jury how that happened?

7      A.    Yes.

8      Q.    And how did it happen?

9      A.    I was tracking another Canadian courier that

10  was working for this organization.  I saw that he had,

11  was coming down from Vermont, I believe, and he went to

12  the Tri-Town Ice Arena located in Hooksett, New

13  Hampshire.  So we went over there and did surveillance.

14  We saw him pull into the parking lot of the ice rink and

15  he met with an individual driving a Dodge Charger who we

16  identified as Michael Gardner.  I saw Michael Gardner

17  and this Canadian whose name was Jeremy St. Pierre take

18  two hockey bags out of the Canadian's car and put it

19  into Michael Gardner's Charger he was driving, and then

20  the two cars split up.

21      Q.    The Charger that Michael Gardner was driving,

22  did you know what type of plate he had as far as the

23  state was concerned?

24      A.    I forget.

25      Q.    Is Michael Gardner a resident of New

1    Hampshire?

2         A.   Yes.

3         Q.   Let me show you what is marked and entered

4    into full evidence by stipulation of the parties as

5    Government's Exhibit 17h-1 through 17h-11, and I'll ask

6    if you would review those photos.

7              (Pause.)

8         A.   Okay.

9         Q.   What are those photos of?

10        A.   Photos of the Dodge Charger that was driven by

11   Michael Gardner.

12             MS. OLLILA:  Diane, please pull up 17h-1.

13        Q.   What is depicted in 17h-1, Special Agent

14   Drouin.

15        A.   The Dodge Charger that was driven by Michael

16   Gardner.

17        Q.   Please pull up 17h-2.  And what is 17h-2 a

18   photograph of?

19        A.   Another picture of the vehicle.

20        Q.   17h-3.  What is this a photograph of, Special

21   Agent Drouin?

22        A.   Do you mind if I turn around because the image

23   is --

24        Q.   Yes.

25        A.   That's the trunk open on that vehicle.

1    Q.    Now let me show you a close-up.  17h-4.  What

2  is 17h-4?

3    A.    That was one of the duffle bags that was in

4  the trunk.

5    Q.    17h-5, please.  Special Agent Drouin, what is

6  17h-5?

7    A.    Those were the two hockey bags that were in

8  the trunk of Mr. Gardner's Dodge Charger.

9    Q.    Did you see whether or not they had any labels

10  on them?

11    A.    Yes.

12    Q.    And what are the labels?

13    A.    They both say NH.

14    Q.    I'm going to give you some gloves again and

15  ask that you put these on.

16    A.    That's okay, I don't need the gloves.

17    Q.    Oh, okay.

18          MS. OLLILA:  May the witness come over here,

19  judge?

20          THE COURT:  Yes.

21    Q.    Special Agent Drouin, I am showing you what is

22  now 17b-1 for identification.  Do you recognize what

23  this is?

24    A.    Yes.

25    Q.    What is it?

1       A.    It's one of the hockey bags that was in the

2   car.

3             THE COURT:  I'm sorry, I couldn't hear.

4             THE WITNESS:  That's one of the hockey bags

5   that was in the Charger.

6       Q.    And I'm showing you 17b-1 also.  What is this?

7       A.    That was the other hockey bag.

8             MS. OLLILA:  Your Honor, I'd ask that the ID

9   be stricken on these exhibits and they be entered into

10  full evidence.

11            MR. SHEKETOFF:  No objection.

12            THE COURT:  All right.  17b-1 -- 17b-1 and b2?

13            MS. OLLILA:  No, they're both b-1 because they

14  are in the same box.

15            THE COURT:  Okay.  17b-1 is a full exhibit.

16            (Government's Exhibit 17b-1

17            admitted.)

18      Q.    What I'd ask you to do is hold up the bag so

19  the jury can see.  And interestingly there's a sticker

20  on top.  Do you know where the sticker comes from?

21      A.    State police evidence sticker.

22      Q.    So this has nothing to do -- this is the

23  forensics examination sticker; correct?

24      A.    Yes.

25      Q.    Now, there's a label inside the duffle bag; is

```
1    that correct?
2         A.    Correct.
3         Q.    Will you please pull that out.
4         A.    (Witness doing so.)
5         Q.    And show it to the jury.  What does it say?
6         A.    NH.
7         Q.    And turn it around.  What does that say?
8         A.    50.
9         Q.    Do you know what 50 is a reference to?
10        A.    50 pounds.
11        Q.    Of what?
12        A.    Marijuana.
13        Q.    Do the same thing on the second bag.  Do you
14   recognize what this bag is?
15        A.    Yes.
16        Q.    There's another label on the bag.  What is the
17   label?
18        A.    State police evidence label.
19        Q.    Would you please pull out the tag that is in
20   the tag holder for the duffle bag and show the tag to
21   the jury.  What does it say?
22        A.    NH.
23        Q.    Turn it around.  What does it say on the back?
24        A.    50.
25        Q.    What is that a reference to?
```

```
1        A.    50 pounds of marijuana.

2        Q.    How much marijuana was seized in this bag?

3        A.    Approximately 50 pounds.

4        Q.    How much marijuana was seized in this bag?

5        A.    Approximately 50 pounds.

6        Q.    What's the value of a hundred pounds of

7   Canadian high grade marijuana?

8        A.    Anywhere from $2,000 a pound to $5,000 a

9   pound.

10        Q.    Couple hundred thousand dollars?

11        A.    Yes, minimum.

12              MS. OLLILA:  Diane, will you please pull up

13   17h-6.

14        Q.    Special Agent Drouin, what is 17h-6?

15        A.    That's a picture of the zippers and the gold

16   lock that's on the hockey bag.

17        Q.    Please pull up 17h-8.  What is this a picture

18   of depicted in 17h-8, Special Agent Drouin?

19        A.    That's the marijuana contained within the

20   hockey bags.

21        Q.    Do you see whether there's any writing on the

22   outside of the bag?

23        A.    Yes.

24        Q.    What does it say?

25        A.    Reg.
```

1    Q.    Do you know what that means?

2    A.    That's the grade, regular, they call it

3    regular.

4    Q.    Now, with respect to marijuana cases you said

5    that is the grade, is that what you just testified to?

6    A.    Yes.

7    Q.    Are there different qualities or names to

8    strains of marijuana?

9    A.    Yes.

10   Q.    How many different strains, I'm going to put

11   you on the spot here, how many different strains of

12   marijuana have you seen in your career?

13   A.    A lot of different ones.

14   Q.    What's that mean, a lot of different ones?

15   A.    I've seen different strains which I believe is

16   different grades of marijuana, different ways they grow

17   it.  They give it all names to identify the actual type

18   of marijuana that they're selling.

19   Q.    Are you able to give any types of marijuana

20   that you've ever seen?

21   A.    Did I ever write the type on the bag, is that

22   what you're asking?

23   Q.    Yes -- no, you, what are some examples of

24   strains of marijuana, the names of the strains?

25   A.    Kush , BC Bud, I've seen red, purple Kush,

1   there's different names that I've seen in the past.

2       Q.   Okay.  Special Agent Drouin, that seizure of

3   the hundred pounds -- oh, by the way, the marijuana

4   seized on that date, was it tested?

5       A.   Yes.

6       Q.   Did it test positive for the presence of

7   marijuana?

8       A.   Yes.

9       Q.   In the approximate amount of how much?

10      A.   A hundred pounds.

11      Q.   In June of 2009 what was your plan to do with

12  the end of the investigation, if you had one?

13      A.   Yes.  We identified all the Canadian couriers

14  and how they were bringing the marijuana into the

15  country from Canada.  We identified two houses near the

16  Canadian border where they were moving the marijuana

17  into once they got it across the border, so I applied

18  for and received a search warrant for both of those

19  houses and arrest warrants for many people.

20      Q.   You said arrest warrants for many people.  In

21  Operation Brownshirt do you know how many individuals

22  were arrested and prosecuted?

23      A.   In the whole operation?

24      Q.   Yes.

25      A.   At least 40.

1      Q.   Let me show you what is marked as Government's

2   Exhibit 18a for identification and I'll ask if you

3   recognize what Government's Exhibit 18a is?

4      A.   That's a search warrant for the two residences

5   in Vermont that we conducted.

6      Q.   Who is the affiant on that search warrant?

7      A.   I was.

8      Q.   Let me show you what is marked as Government's

9   Exhibit 18k-1, 18k-2, 18k-3 and 18k-4.  Do you recognize

10  what those photographs are?

11     A.   Yes.

12     Q.   What are those photographs?

13     A.   That was the house on the Canadian border in

14  Vermont located on Wallace Pond that we searched.

15     Q.   How far from Canada was that house?

16     A.   Well, it was on the pond, it was on the

17  waterfront, and half of the pond is in Canada, the other

18  half is in the U.S.

19          MS. OLLILA:  These exhibits have been entered

20  into full evidence by stipulation of the parties.

21          Diane, please pull up 18k-1.

22     Q.   Special Agent Drouin, what is that a

23  photograph of?

24     A.   That's one of the views of the house that we

25  searched on the pond, on the border.

1    Q.    Please pull up 18k-2.  What is this a

2 photograph of?

3    A.    That's right in front of the house.  That's

4 the pond.

5    Q.    Now, looking across the water to the trees,

6 what is it you're looking at?

7    A.    Canada.

8    Q.    Please pull up 18k-1 -- I'm sorry, hyphen 3 --

9 18k-3.  What is 18k-3?

10    A.    Those are the various cell phones that we

11 seized in that residence and walkie-talkies.

12    Q.    And please pull up 18k-4.  What is this a

13 photograph of depicted in 18k-4?

14    A.    Those are three hockey bags that we found in

15 the basement of that residence.

16    Q.    And can you see whether there are any markings

17 on any of those bags that are the same?

18    A.    Yes.

19    Q.    And what are the markings that are the same?

20    A.    It says ITL on the bags.

21    Q.    Let me show you again what was recovered from

22 the residence of David Coulombe and ask if there are any

23 initials that are similar on this exhibit, which is

24 Government's Exhibit 9g-4, with the photograph you're

25 looking at?

1       A.    Yes.  The label says ITL.

2       Q.    And what does the label on two of those bags

3  say?

4       A.    It's written ITL.

5       Q.    What was contained in those bags?

6       A.    Marijuana.

7       Q.    Approximately how much?

8       A.    50 pounds in each bag for a total of

9  approximately 150 pounds.

10       Q.    Was the marijuana tested?

11       A.    Yes.

12       Q.    Did it test positive for the presence of

13  marijuana?

14       A.    Yes.

15       Q.    What's the value as of 2008 and 2009 of that

16  much marijuana?

17       A.    That's at the low end 2,000 a pound, so, 200,

18  300,000.

19       Q.    Let me show you what has been marked and

20  agreed by stipulation of the parties to be entered into

21  full evidence as Government's Exhibit 18e-1, 18e-2,

22  18e-3, 4, 5 and 6.  I'll have you go through these

23  photographs, Special Agent Drouin.  Do you recognize

24  what they are?

25       A.    Yes.

35

1     Q.    What are they?

2     A.    These are photographs of the second house

3  where we conducted a search warrant in Vermont.

4     Q.    And where was that house located at if you

5  recall?

6     A.    This was in Sutton, Vermont, which is about

7  40, 30 to 40 minutes south of the Wallace Pond house.

8          MS. OLLILA:  Diane, please pull up 18e-1.

9     Q.    Special Agent Drouin, what is depicted in

10 18e-1?

11    A.    That's the house in Sutton, Vermont, that we

12 searched.

13    Q.    Please pull up 18e-2.  What is depicted in

14 this photograph?

15    A.    Three hockey bags.

16    Q.    What was located in the hockey bags?

17    A.    I believe two of them contained marijuana.

18    Q.    How much marijuana, if you know?

19    A.    A hundred pounds.

20    Q.    Was the marijuana tested?

21    A.    Yes.

22    Q.    Did it test positive for the presence of

23 marijuana?

24    A.    Yes.

25    Q.    Please pull up 18e-4.  What is this a

1    photograph of?

2         A.    The marijuana within the bag that is labeled.

3         Q.    That has a label.  Do you know what that

4    means, DSL?

5         A.    Yes.  It's short for diesel.

6         Q.    What does that mean?

7         A.    Diesel is another high grade marijuana from

8    Canada that I've seen before, another name.

9         Q.    Please pull up 18e-5.  What is this a

10   photograph of?

11        A.    That's little gold locks that we have seen on

12   the other bags.

13        Q.    Is that consistent with the gold locks on the

14   bags seized from David Coulombe containing 58 pounds of

15   marijuana and the gold locks on the bags seized from

16   Michael Gardner containing one hundred pounds of

17   marijuana?

18        A.    Yes.

19        Q.    Please pull up 18e-6.  What do you see in

20   18e-6?

21        A.    More marijuana from within the bags.

22        Q.    It says Kush.  What is Kush?

23        A.    That's another name given to a grade of

24   marijuana.

25        Q.    What type of grade is that, high grade, low

1    grade, medium grade?

2         A.    Kush is high grade.

3         Q.    Were there individuals arrested at that

4    residence?

5         A.    Yes.

6         Q.    Let me show you what is marked for

7    identification as Government's Exhibit 52h and 52i.  Do

8    you recognize those photographs?

9         A.    This is a photograph of Trevor Allain.

10             MS. OLLILA:  Your Honor, I'd ask that the ID

11   be stricken on Government's Exhibit 52h and 52i.

12             MR. SHEKETOFF:  I have no objection.

13             THE COURT:  52h and 52i are full exhibits.

14             (Government's Exhibit 52h and 52i

15             admitted.)

16             MS. OLLILA:  Please pull up 52h, Diane.

17        Q.    Who is depicted in 52h?

18        A.    That's Trevor Allain.

19        Q.    Did you ever see him in New Hampshire?

20        A.    Yes.

21        Q.    When?

22        A.    He was staying at the house in Chester with

23   the Canadian couriers and he was also in the minivan

24   that went to the warehouse and Massachusetts state

25   police stopped them when they had the Home Depot boxes

1    in the minivan.

2        Q.    Please pull up 52i.  Who is this a photograph

3    of?

4        A.    Same person.

5        Q.    Let me show you what is 52f.  I'd ask you if

6    you recognize what that photograph is?

7        A.    Yes.

8        Q.    What is it?

9        A.    That's a photograph of Nick Champagne.

10           MS. OLLILA:  Your Honor, I'd ask that the ID

11   be stricken on 52f and that it be entered into full

12   evidence.

13           THE COURT:  Any objection?

14           MR. SHEKETOFF:  I have no objection.

15           THE COURT:  52f is a full exhibit.

16           (Government's Exhibit 52f admitted.)

17            MS. OLLILA:  Please pull it up, Diane, 52f.

18       Q.    What is this a photograph of?

19       A.    Nick Champagne.

20       Q.    At some point in time you had just mentioned a

21   residence I think you said in Chester; is that correct?

22       A.    Yes.

23       Q.    What about that residence in Chester.  Was

24   there someone staying there?

25       A.    There were several Canadian couriers that were

1    staying there.

2        Q.    Did you recover ledgers from that residence at

3    the end of your investigation?

4        A.    Yes.

5        Q.    I'm showing you what has been entered into

6    full evidence by stipulation of the parties as

7    Government's Exhibit 22c, 22d and 22e.  Do you recognize

8    what those exhibits are?

9        A.    Yes.

10       Q.    What are they?

11       A.    These are the ledgers that were given to us by

12   the owner of the residence after all the couriers were

13   arrested.

14       Q.    What is a drug ledger, Special Agent Drouin?

15       A.    It's a way for the drug dealer to keep a

16   record of drugs coming in, drugs going out, and

17   collection of money, they keep their own records.

18       Q.    Has it been your experience with your

19   investigating of drug traffickers that individuals use

20   their real names in ledgers?

21       A.    No, I've never seen that happen.

22       Q.    Why?

23       A.    Because it would not be a smart move if they

24   put their real name next to any type of records dealing

25   with narcotics.

1          MS. OLLILA:  Diane, please pull up 22c.

2     Q.   This is 22c, Special Agent Drouin.

3          Ms. Ollila:  Now Diane, if you go to page

4    eight on 22c.  Now I want you to enlarge it.

5     Q.   The portion of page eight in Government's

6    Exhibit 22c, the last third of the page has been

7    enlarged.  I want you to point out to the jury whether

8    you see any references to New Hampshire?

9     A.   Yes.

10    Q.   What is the reference to New Hampshire?

11    A.   The second line.

12    Q.   And what does the second line say?

13    A.   Zingners pick up paper from NH dash 350.

14    Q.   Based upon your training and experience, what

15   is the 350 a reference to?

16    A.   $350,000.

17         MS. OLLILA:  Diane, please turn to page nine.

18    Q.   You're now looking at page nine of

19   Government's Exhibit 22c.  Do you see any reference to

20   NH?

21    A.   Yes.

22    Q.   And what is the reference you see?

23    A.   The second line says Taz brought 200 pick eye

24   drop 100 BOS 100 NH.

25    Q.   What is 100 NH a reference to?

1      A.   A hundred pounds.

2      Q.   Of what?

3      A.   Marijuana.

4      Q.   Is there a date above that?

5      A.   Yes, July 21st.

6      Q.   Of what year?

7      A.   It should be 2008.

8      Q.   Go to page ten.  So on July 21st there was a

9  hundred dropped off, hundred pounds dropped off to NH;

10 correct?

11     A.   Correct.

12     Q.   Now Special Agent Drouin, you're looking at

13 page ten of this exhibit, 22c.  There's a reference to

14 We 7 23.  What is that a reference to?

15     A.   Wednesday, July 23rd.

16     Q.   And the Monday, July 21st, was referenced the

17 page before; correct?

18     A.   Yes.

19     Q.   For a hundred pounds dropped off to NH?

20     A.   Yes.

21     Q.   What is referenced with respect to NH here?

22     A.   Third line, Zingners, and lokko drop 50 NH.

23     Q.   What does that mean?

24     A.   Another 50 pounds was brought to NH, the

25 marijuana.

1          MS. OLLILA:  Diane, please turn to page 14.

2      Q.   You're looking at page 14, the top quarter of

3  the page, and it says Monday 200.  What does it say next

4  to Monday 200?

5      A.   100 Bos, 100 NH.

6      Q.   What does Bos stand for?

7      A.   Boston.

8      Q.   What does NH stand for?

9      A.   New Hampshire.

10     Q.   What is the hundred referencing?

11     A.   Hundred pounds of marijuana.

12          MS. OLLILA:  Now Diane, please pull up

13  Government's Exhibit 22d and go to page seven.

14     Q.   Special Agent Drouin, this is page seven of

15  22d.  Do you see any reference to NH?

16     A.   Yes.

17     Q.   What is that reference?

18     A.   It says cheez and it says two NH.

19     Q.   What is that a reference to?

20     A.   I believe two hockey bags to NH.

21     Q.   How much typically was contained in each

22  hockey bag?

23     A.   50 pounds of marijuana.

24     Q.   Please turn to page 45.  Page 45 of the same

25  exhibit, the top third of that page -- the top of the

 1    page says paper.  What is that a reference to?

 2         A.    I believe it's titling the page, paper,

 3    because then it's a collection of money.

 4         Q.    Is there any reference to New Hampshire?

 5         A.    Yes.

 6         Q.    What is the reference to New Hampshire?

 7         A.    NH with an arrow 275.

 8         Q.    What does that mean?

 9         A.    Picked up $275,000 from New Hampshire.

10         Q.    Please turn to page 48.  Now Special Agent

11    Drouin, this calendar -- I want you to enlarge that.

12    This calendar actually lists the year.  What is the

13    year?

14         A.    2008.

15         Q.    The bottom of this page, which is page 48 of

16    Government's Exhibit 22d, does it have a reference to

17    New Hampshire?

18         A.    Yes.

19         Q.    What is the reference?

20         A.    Says NH two.

21         Q.    What is that a reference to?

22         A.    Two bags, two hockey bags.

23         Q.    Of what?

24         A.    Marijuana.

25               MS. OLLILA:  Diane, please pull up 22e and go

1  to page ten.  Is there a date contained on this ledger,
2  Special Agent Drouin?
3       A.   Yes.
4       Q.   What is the date?
5       A.   Sunday, August 3rd.
6       Q.   And what year is that?
7       A.   2008.
8       Q.   Is there a reference to New Hampshire?
9       A.   Yes.
10      Q.   What is the reference?
11      A.   Says Lokko pickup 200,350 from NH.
12      Q.   What does that mean?  What is 200,350?
13      A.   That's how much money they picked up.
14      Q.   From whom?
15      A.   NH.
16      Q.   Go to page 21, please.  Special Agent Drouin,
17  you are looking at page 21.  Is there a reference to NH?
18      A.   Yes.
19      Q.   And what is the reference?
20      A.   Lokko drop two NH.
21      Q.   What is that a reference to?
22      A.   Dropping two hockey bags to NH.
23      Q.   Now go to page 28.  The middle of the page on
24  page 28 has been enlarged.  Is there a reference to New
25  Hampshire?

1        A.    Yes.

2        Q.    What is the reference?

3        A.    It says resume semaine and then it says paper

4   still have NH 180.

5        Q.    Do you know what resume semaine means?

6        A.    Continue the week.

7        Q.    In Canadian?

8        A.    Yes.

9        Q.    In French?

10        A.    Yes.

11        Q.    And paper still have, what is that a reference

12   to?

13        A.    Still have to collect 180 from NH.

14        Q.    Go to page 39, please.  The bottom page of 39

15   toward the end, is there reference to NH?

16        A.    Yes.

17        Q.    What is the reference?

18        A.    Cheez collect NH 200.

19        Q.    What is 200 the reference to?

20        A.    Cheez collects 200,000 from New Hampshire.

21        Q.    Is there a date on this page?

22        A.    Wednesday, August 3rd.

23        Q.    Go to page 64, please.  Is there a reference

24   to NH on this page?

25        A.    Yes.

1      Q.    What is the reference?

2      A.    Auto drop two NH.

3      Q.    What does that mean, auto drop?

4      A.    Two hockey bags to NH they delivered.

5      Q.    And generally how much was contained in each

6   hockey bag?

7      A.    50 pounds of marijuana.

8           MS. OLLILA:  I have no further questions of

9   this witness, your Honor.

10           THE COURT:  Mr. Sheketoff.

11                  CROSS-EXAMINATION

12   BY MR. SHEKETOFF:

13      Q.    Good afternoon, Agent Drouin.

14      A.    Good afternoon, Mr. Sheketoff.

15      Q.    Welcome to New Hampshire.  So, starting with

16   those ledger books and records that the prosecutor was

17   just asking you about, was there one page in one of

18   those ledgers where a whole bunch of names were listed

19   and phone numbers were given?

20      A.    I believe so, yes.

21           MR. SHEKETOFF:  May I approach, your Honor?

22           THE COURT:  Yes.

23      Q.    I'm just going to show you this single page

24   that I have and ask you if you recognize it?

25      A.    Yes.

1          Q.    Okay.  So that's in one of these somewhere?

2          A.    Yes, it is.  It's in one of the ledger books.

3          Q.    Yes, just asked about it.  But that actually

4    lists a lot of names?

5          A.    Yes, it does.

6          Q.    So, for instance, there's an NH.  That's

7    somebody's name or reference to somebody; correct?

8          A.    Yes.

9          Q.    And then there's a phone number?

10         A.    Yes.

11         Q.    Okay.  And there's a reference to ITL?

12         A.    Yes.

13         Q.    And then there's a phone number?

14         A.    That's correct.

15         Q.    And so on.  And a lot of these references you

16   recognize from your investigation.  In other words, NH,

17   you see hockey bags with a name NH on it.  ITL, you saw

18   hockey bags with the name ITL on it; correct?

19         A.    That's correct.

20         Q.    All right.  And when did this particular

21   record come into your hands?

22         A.    I don't remember.  It was after the arrests

23   which were on June 17, 2009.  So some time after

24   June 17th.

25         Q.    Okay, so the landlord for that premises after

1  you guys left found these items there and thought they

2  might be of interest and gave them to the DEA?

3      A.   That's correct.

4      Q.   All right.  So sometime in June of 2009 or

5  shortly thereafter these came into your possession?

6      A.   I believe so, yes.

7      Q.   And one of the tools that you guys have in

8  your toolbox, so to speak, is you can subpoena records;

9  correct?

10      A.   That's correct.

11      Q.   I mean, you know, you can try and figure out

12  whose phone numbers these are?

13      A.   We can try, yes.

14      Q.   Right.  And there are different kinds of

15  phones that people in the drug trade might have.  They

16  might put a phone in their own name.  They might put a

17  phone in somebody else's name.  They might have

18  something called a burner phone where you just buy a

19  phone and throw it away.  There are different kinds of

20  ways to conduct your business; correct?

21      A.   That's correct.

22      Q.   Because cell phone companies keep records of

23  these things, and one of the things you notice is that

24  people in this industry change the phones a lot?

25      A.   That's correct.

1      Q.    So what effort was made to find out who NH,

2   that phone number, whose phone number was that?

3      A.    You're asking me whose phone number it was?

4      Q.    Yeah.

5      A.    I don't know.

6      Q.    Okay.  So what efforts were made to find out

7   whose phone number that was?

8      A.    I don't remember at the time if we, I'm

9   assuming we got a subpoena and got some phone records

10  for that phone, but I don't remember who it was

11  subscribed to or anything like that.

12     Q.    Okay.  But you do remember making at least an

13  investigative effort to figure out who that phone number

14  was a reference to?

15     A.    I believe we would have.

16     Q.    Did you ever figure out by handwriting

17  analysis or any other means to your satisfaction whose

18  writing that is in there?

19     A.    In some of the ledgers, yes.

20     Q.    Some of the ledgers were Steven Sarti's?

21     A.    Right.

22     Q.    Do you know if this is a Steven Sarti ledger?

23     A.    I don't remember if this is one of the ones he

24  pointed out.

25     Q.    Okay.  How about any other numbers on that

1    page of the ledger.  Do you recognize any of the other

2    names?

3          A.    I recognize just about all the names from the

4    investigation.

5          Q.    And could you just tell us some of the names

6    that you recognize?

7          A.    Anal, bos for Boston, Ed, Ed guy, ICE,

8    Italian, ITL, logo, NH, pink eye, Taz, Bud, and that's

9    it.

10         Q.    Okay.  So were you able to associate through

11   phone records any of those people like ITL, let's say,

12   with the phone?

13         A.    Through phone records, no.

14         Q.    Now, just to go back to this 12/30/08 video

15   that we played where you're at Nick Champagne's house

16   and there's some sort of camera taking pictures, and you

17   see somebody show up and then they leave together and

18   someone is carrying a big box, and the prosecutor said

19   to you did you know who that second person -- you

20   recognized Nick Champagne as one of them.  The

21   prosecutor said do you recognize the second person and

22   you said not, you know, at that time I didn't know who

23   it was, but I later learned who it was.  Who was that

24   second person?

25         A.    I believe it was Frank Fowle if I recall.

1      Q.   Now, sir, one of the things that the DEA has

2  available to it is a request to a judge, sometimes in

3  state court but most frequently in federal court, for a

4  wiretap application, correct?

5      A.   That's correct.

6      Q.   And during the course of your investigation,

7  your part of the investigation which went through these

8  arrests of 40 people or so in June of 2009, did you ever

9  apply for a wiretap?

10     A.   No.

11     Q.   And is it fair to say that the way you

12 understand the law, you can't get a wiretap until you've

13 -- until you've exhausted other more traditional

14 investigative means?

15     A.   That's correct.

16     Q.   In fact, there's a section in the affidavit

17 you have to prepare for a wiretap where you have to lay

18 out the traditional investigative means you've attempted

19 before you ask the federal court for a wiretap

20 authorization, correct?

21     A.   That's correct.

22     Q.   Right.  Just as a generality, what are the

23 normal investigative means that you have at your

24 disposal before you were to ask for a wiretap?

25     A.   There's surveillance, undercover, use of

1   informants, use of subpoenas, grand jury, undercover

2   purchases, trash pulls, there are so many different

3   investigative techniques.

4       Q.   There are a lot of different tools that you

5   have.  One of them that you talked to us about is a GPS

6   device; correct?

7       A.   That's correct.

8       Q.   And at least back in 2008 and 2009, as you

9   understood the state of the law, you could put a GPS

10  device on any vehicle without a court order; correct?

11      A.   That's -- in certain circumstances, yes.

12      Q.   And in connection with your part of the

13  investigation, you used a lot of GPS devices.  You

14  located this one car rental agency, you stuck a lot of

15  GPS devices on a bunch of cars, and it proved fruitful;

16  correct?

17      A.   Correct.

18      Q.   The GPS device allows you to track the vehicle

19  without physically being in eyesight of the vehicle;

20  correct?

21      A.   That's correct.

22      Q.   And in realtime?

23      A.   Yes, or close to.

24      Q.   And one of the other things you used in

25  connection with your part of the investigation was these

1    hidden cameras; correct?

2         A.    Yes.

3         Q.    So there was a camera outside of Nick

4    Champagne's residence; correct?

5         A.    Yes.

6         Q.    And that was on what street?

7         A.    It was at 10 Delaware Avenue in Manchester.

8         Q.    Did you ever learn who owned that building

9    that Nick Champagne was renting?

10        A.    I believe we learned it, I just don't remember

11   who it was.

12        Q.    Okay.  Was it a relative of Mr. Koustas?

13        A.    I don't remember.

14        Q.    And when did that camera go up?

15        A.    I actually don't remember when it went up.

16        Q.    Approximately?

17        A.    So those pictures were taken -- it probably

18   would have went up in February or March.

19        Q.    Of?

20        A.    2009.

21        Q.    And for how long was it up?

22        A.    I don't remember.  I think it was only up for

23   a few weeks.  I remember when we first put it up we had

24   some technical difficulties with it, so I can't remember

25   how long it was up for.

54

1          Q.    Okay.  Was that the only pole camera you used

2    or video undercover surveillance camera you used as part

3    of the investigation you were involved in?

4          A.    No, there was another one that I had down in

5    Waltham when the couriers were staying in a condo down

6    there.  I believe I had another one set up over in

7    Chester, at the residence in Chester looking at the

8    driveway.  I think I had a few of them.

9          Q.    And you don't need a court order for those;

10   correct?

11         A.    That's correct.

12         Q.    As long as you're placing them in a place that

13   you have a right to be, you can set up a camera and

14   watch whoever you want to watch?

15         A.    Correct.

16         Q.    The DEA actually has planes that are

17   surveillance planes that allows you to track people from

18   the air?

19         A.    We can conduct surveillance from planes if we

20   need to, yes.

21         Q.    How about -- I'm wondering about drones?

22         A.    We don't use drones.

23         Q.    All right.  And one of the things you

24   mentioned is that you can use an undercover officer to

25   meet with somebody and talk to them; correct?

1       A.    We can try to, yes.

2       Q.    Right.   Sometimes it's difficult because

3  people in the business tend to be suspicious of

4  strangers?

5       A.    That's correct.

6            MS. OLLILA:   Your Honor, I don't necessarily

7  object, but he's going way beyond the scope of direct.

8            THE COURT:   I'm going to give him some leeway

9  for now.   Objection overruled.

10      Q.    And in this case, in your part of the

11 investigation, was there an attempt to introduce an

12 undercover officer into the investigation?

13      A.    We did not, no.

14      Q.    Okay.   One of the things you can do is talk to

15 confidential informants; correct?

16      A.    Correct.

17      Q.    And one of the tools that you use with a

18 confidential informant is, if he or she agrees, they can

19 wear a body wire without a court order; correct?

20      A.    That's correct.

21      Q.    In other words, if I was one of your

22 informants and I was willing to, you could put a

23 recording device on me, send me to speak to anyone that

24 I told you I wanted to speak with and you could actually

25 record our conversation?

56

1     A.    That's correct.

2     Q.    Without a court order?

3     A.    Yes.

4     Q.    Did you use that technique during your part of

5  the investigation?

6     A.    No.

7     Q.    Okay.  And I keep saying your part of the

8  investigation.  I'm just assuming that, because you

9  stopped in June of 2009, was that the end of your

10 involvement in this investigation?

11    A.    Yes.

12    Q.    Okay.  And one of the things you've actually

13 told us about is you have certain suspicions, you see

14 certain things occur in front of you, you see boxes move

15 from a tractor-trailer into a van, and you can't see

16 inside the box but you certainly want to know what's in

17 there, you can ask local and state police to do traffic

18 stops?

19    A.    Yes.

20    Q.    And that sort of disguises the real purpose,

21 the real investigative purpose because you're not

22 showing up with a badge that says DEA that you told us

23 about.  You're letting somebody think he just had or she

24 had bad luck getting stopped for a traffic violation?

25    A.    Yes.

1       Q.    And depending on the circumstances that

2  unfold, you may be able to conduct a search of that

3  traffic stop?

4       A.    That's correct.

5       Q.    And you can use administrative warrants to get

6  various records of various institutions.  For instance,

7  you can subpoena bank records?

8       A.    Yes.

9       Q.    IRS records?

10      A.    Those are harder to get.  I think you need a

11  grand jury subpoena for those.

12      Q.    Phone records?

13      A.    Yes.

14      Q.    And the ultimate technique is the Title III

15  wiretap; correct?

16      A.    That is an advance technique, yes.

17      Q.    That you're allowed to tap phones if you make

18  the appropriate showing to a federal judge, you're

19  allowed to listen to the conversations that occur

20  simultaneously and record them; correct?

21      A.    Yes.

22      Q.    And you're allowed to put in what they call

23  bugs.  So if there was an office that was, you had

24  probable cause to believe was being used in connection

25  with some criminal enterprise you, with a federal

58

1    judge's authorization, you can put a bug in there and

2    listen to all the conversations that occur?

3         A.    That's correct.

4         Q.    Now, do you know why Nick Champagne decided to

5    move out of his house on April 2nd of 2009?

6         A.    I do not.

7         Q.    But you did, through the use of the pole

8    camera, see that he did move out; correct?

9         A.    Yes.

10        Q.    And he relocated to another address or he,

11   after moving that furniture, went back to the same

12   place?

13        A.    I don't believe he went -- I don't remember if

14   he went back or not and I don't know where he moved to.

15        Q.    Did something happen just prior to April 2nd,

16   2009, that you connect with his decision to move?

17        A.    I don't recall.

18        Q.    Okay.  In any event, whether you're a drug

19   dealer or an honest citizen, there are lots of different

20   reasons you might decide to move out of an apartment and

21   live somewhere else; correct?

22        A.    Yes.

23        Q.    Whether it was a fight with your significant

24   other, the end of a lease, or a million other reasons;

25   right?

1          A.    That's correct.

2          Q.    Was there an imminent arrest of Mr. Champagne

3    April 2nd of 2009?

4          A.    No.

5          Q.    And do you know if he left Manchester, New

6    Hampshire, and went into hiding after April 2nd, 2009,

7    or just moved to some other location?

8          A.    I don't remember.

9          Q.    In any event, there did come a time when he

10   was arrested.  That was in June?

11         A.    I believe so, yeah.

12         Q.    And did he go into hiding at that point in

13   time --

14         A.    I don't --

15         Q.    -- when an arrest warrant was to be served on

16   him?

17         A.    I don't remember.

18         Q.    Now, over the years, and you've been doing

19   this for 18 years, the price of marijuana, at least

20   Canadian marijuana, has gone up and down or just up over

21   the years?

22         A.    It's gone up and down.  It depends.

23         Q.    All right.  So let's take, I don't know, we

24   started in 2008, 2009, and you said high quality

25   Canadian marijuana would go anywhere from 2,000 to

1   $5,000 a pound?

2        A.   Yes.

3        Q.   And as we went into the future, 2010, 11, 12,

4   is it on its way up or it's on its way down?

5        A.   I believe like right now it's kind of on its

6   way down because for various reasons.

7        Q.   The supply is so big?

8        A.   Depends on supply.  There's also a big demand

9   for marijuana that's, hydroponic marijuana that's grown

10  out in California, so that's driven Canadian prices

11  down.

12       Q.   What would I expect to pay for a pound of

13  marijuana from Canada, high quality marijuana now?

14       A.   I'm --

15            MS. OLLILA:  I object on the relevance, judge.

16            THE COURT:  Overruled.

17       A.   I'm not sure what you pay now because I

18  haven't done a marijuana case like this probably in the

19  last few years, so I couldn't give you an accurate

20  depiction of what the actual prices are now.

21       Q.   All right.  Was there a time during your

22  tenure with the DEA that the cost of a pound of Canadian

23  marijuana might be as low as $800?

24       A.   I've never seen Canadian marijuana as low as

25  $800.

1      Q.    What's the closest you've seen it to $800?

2      A.    I've seen 2,000 with the hydroponic marijuana.

3  There is some outdoor marijuana that is grown up in

4  Canada that may be a little bit less, but I haven't come

5  across it.

6      Q.    Now, if I'm back in 2008 and 2009, if I'm

7  buying a pound of high quality Canadian marijuana in the

8  quantity of 50 pounds or a hundred pounds.

9      A.    Yes.

10     Q.    And I'm a regular customer, how much money am

11 I going to make a pound?

12     A.    Well, that depends on how much you sell it

13 locally.

14     Q.    Okay.  Could I make, buying it for, let's take

15 the low end, for $2,000 a pound, would it be possible to

16 make $500 a pound?

17     A.    That's possible, yes.

18     Q.    Okay.  Would it be possible that I'm only

19 making a hundred or $200 a pound?

20     A.    Yes.

21     Q.    So it depends on a number of factors?

22     A.    Depends on what you want to sell it for.

23     Q.    Now, the prosecutor asked you about some of

24 these various things, and one of the bags it said

25 regular, or you at least interpreted it to be regular;

1  correct?

2       A.   Yes.

3       Q.   Is that a high quality marijuana or is that

4  the low end of the high quality compared to kush and I

5  forget the other one you mentioned?

6       A.   From my experience in the past from

7  interviewing informants in Canada that would be more

8  towards the lower end of the hydroponic marijuana, it

9  wouldn't be as high grade as kush.

10      Q.   Okay, so it would be lower in price?

11      A.   Yes.

12      Q.   Now, you've had a lot of experience looking at

13  these drug ledgers and you do the best you can with

14  what's written down; correct?

15      A.   Yes.

16      Q.   People try and be cryptic?

17      A.   That's correct.

18      Q.   So you find a ledger in June 2009, it talks

19  about something that happened in August, you know it's

20  not August 2009, correct, because it hasn't happened

21  yet?

22      A.   Right.

23      Q.   But your best guess is that's a 2008 record;

24  correct?

25      A.   Yes.

1          Q.    And when it says two bags or whatever it said,

2     what did it say, two, just two?

3          A.    It could say two, yes.

4          Q.    You're making an educated guess that that's

5     two hockey bags?

6          A.    That's correct.

7          Q.    And when you see a number, when you see the

8     word paper, you're making an educated guess that that's

9     money?

10         A.    That's correct.

11         Q.    Now, if I'm sending somebody about $300,000

12    for something I've purchased, about how much money do

13    you think I'd put in my own pocket back in 2008, 2009?

14         A.    So if you're sending --

15         Q.    I'm sending somebody $300,000, how much money

16    would I have kept myself?  What kind of profit could I

17    expect to make under an investment of $300,000?

18         A.    So if you're actually using 300,000 to

19    purchase marijuana, how much marijuana could you get?

20         Q.    No, yeah, how much could I get and how much

21    would I be able to make off of that.  In other words, am

22    I going to become a millionaire from selling 300 pounds

23    of high grade marijuana, a half millionaire?

24         A.    No, because you have to pay for the actual

25    marijuana itself.  So if you're getting it for 2,000 a

1    pound, you're basically going to make whatever you

2    decided to charge on top of that to your customers.  So

3    if you're buying it for 2,000 and you sell it for 25

4    hundred, you're making $500 a pound, so, and then take

5    away expenses or whatever.

6         Q.    If I'm in the business for six months or

7    eight months and I've made $500,000, how many pounds of

8    marijuana have I sold?

9         A.    I couldn't answer that.

10        Q.    All right.  Totally depends on how much profit

11   I'm making?

12        A.    That's correct.

13        Q.    Now, there are people that try to avoid

14   detection by having the same customers, regular

15   customers again and again and again; correct?

16        A.    Yes.

17        Q.    Was it your -- did you ever see Nick Champagne

18   deliver, other than this one videotape, deliver to

19   someone that you believe to be a customer?

20        A.    To be a customer of Champagne's?

21        Q.    Yes.

22        A.    Other than the video --

23        Q.    You have that one video with Fowle leaving

24   with a box.

25        A.    Deliver to a customer of marijuana, no, I've

1   never seen that

2          THE COURT:  Anything further?

3          MS. OLLILA:  I have no redirect, judge.

4          THE COURT:  Agent, sounds like you can go.

5          MS. OLLILA:  Judge, I have two very quick

6   witnesses who have been waiting here all day.  Is that

7   possible?

8          THE COURT:  Very quick.  We're going to break

9   at four, so, be done by then.

10          MS. OLLILA:  Yes.

11          THE COURT:  Go ahead.

12          MS. OLLILA:  Thank you, Special Agent Drouin.

13   Richard Lapoint.

14          THE CLERK:  Please remain standing and raise

15   your right hand.

16                    RICHARD LAPOINT

17      having been duly sworn, testified as follows:

18          THE CLERK:  Please be seated.  For the record,

19   please state your full name and spell your last name.

20          THE WITNESS:  Richard Lapoint, L-A-P-O-I-N-T.

21          THE CLERK:  Thank you.

22                   DIRECT EXAMINATION

23   BY MS. OLLILA:

24      Q.   Good afternoon Mr. Lapoint.  Thank you for

25   waiting so long.  Sir, are you now retired?

1       A.    I'm sorry?

2       Q.    Are you now retired?

3       A.    As of Sunday.

4       Q.    Congratulations.

5       A.    Thank you.

6       Q.    Where did you retire from?

7       A.    Pittsburgh, New Hampshire Police Department.

8       Q.    How long were you at the Pittsburgh, New

9   Hampshire Police Department?

10      A.    Ten years part time, 30 years full time.

11      Q.    Were you the chief of police up in Pittsburgh?

12      A.    Yes.

13      Q.    For how long?

14      A.    Twenty-nine years.

15      Q.    How close is Pittsburgh, New Hampshire, to the

16  Canadian border?

17      A.    It borders Vermont, Canada and Maine.

18      Q.    Sir, were you working and employed as the

19  chief of police for Pittsburgh in June 2008?

20      A.    Yes, ma'am.

21      Q.    What about on June 27, 2008?

22      A.    I'm sorry?

23      Q.    On June 27, 2008?

24      A.    Yes.

25      Q.    Did something happen on that date?

1    A.    Yes.  I was called to a motor vehicle

2  accident.

3    Q.    Okay.  What did you do?

4    A.    I responded to the lower state garage to meet

5  with the individual who picked up the operator of a

6  pickup truck that had an accident on one of our logging

7  roads.  Once I got there I met with the individual who

8  was involved in the accident.  His name was Trevor

9  Allain.

10    Q.    Trevor Allain?

11    A.    Yes.  I asked him what had happened and he

12  said that he went into a ditch.  I asked him when the

13  accident happened.  He said 10:30 the prior night.

14    Q.    Let me just stop you there for a moment.  Sir,

15  let me show you what is marked as Government's

16  Exhibits 3c-1 and 3c-2.  Do you recognize what those two

17  photographs are of, sir?

18    A.    Yes.

19    Q.    And the motor vehicle that got into the

20  accident, what kind of motor vehicle was it?

21    A.    A Toyota Tundra 2006.

22    Q.    And what is depicted in Government's Exhibit

23  3c-1?

24    A.    This is where the pickup hit a ditch or a

25  culvert that had washed out the prior night.  It shows

1    the pickup.  It hit the further side of the ditch and

2    that's as far as it went.

3        Q.    Is that the pickup truck that you were talking

4    about?

5        A.    Yes, ma'am.

6            MS. OLLILA:  Your Honor, I'd ask that the ID

7    be stricken on Government's 3c-1 and 3c-2.

8            THE COURT:  All right, 3c-1 and 2 are full

9    exhibits.

10           (Government's Exhibit 3c-1 and 3c-2

11           admitted.)

12       Q.    Please pull up 3c-1.  Sir, what is this

13   picture that the jury is now seeing?

14       A.    I'm sorry --

15       Q.    Oh, can you see your monitor?  I'm sorry about

16   that.

17       A.    Okay.

18       Q.    In 3c-1, you were just holding on to the

19   original photograph, now it's on your monitor to your

20   left.

21       A.    Okay.

22       Q.    Is that the photograph that I just showed you

23   that was depicted in 3c-1?

24       A.    Yes, ma'am.

25       Q.    Is that the red pickup truck that you

1    responded to?

2        A.   Yes.

3        Q.   Is that the accident that had happened?

4        A.   That's the accident scene itself.

5        Q.   And you said it was Trevor Allain that was the

6    driver?

7        A.   Yes, ma'am.

8        Q.   What did you do once you saw that motor

9    vehicle?

10       A.   First I'd asked Mr. Allain some questions as

11   to where he was going, and his answers were very

12   evasive.  He wasn't familiar with the area.  I asked

13   what he was doing up there.  And he said he was going to

14   work for his uncle.  I asked where his uncle was

15   working.  And he told me that he wasn't sure but it was

16   for a female.  I asked him where the job site might be

17   and he alluded that it might be at the IGA, and that's

18   in Colebrook, New Hampshire, some ten, twelve miles from

19   where the accident scene occurred.  The accident scene

20   was on a logging road that dead ends on the Canadian

21   border.

22       Q.   So the accident where the jury is looking at

23   this picture, 3c-1, that's on a logging road that

24   borders on Canada?

25       A.   Yes, ma'am.  It dead ends on Canada.  It

1    actually crosses over to what we call Hall Stream Road

2    which is the border between Canada and the United

3    States.

4         Q.    Why is it called Hall Stream Road?

5         A.    Why is it called --

6         Q.    Is there a stream?

7         A.    Yes, ma'am.

8         Q.    Now, did you become suspicious of Trevor

9    Allain and what he was telling you?

10        A.    Yes, based on his answers to my questions and

11   the fact that he was, he showed me a Canadian driver's

12   license and he had a Canadian passport but the truck was

13   registered in New Hampshire.  That and the evasive

14   answers he gave me caused me to suspect that something

15   might be up, so I called Border Patrol to respond.

16        Q.    And did Border Patrol respond?

17        A.    Yes, they did.

18        Q.    Did you stay with Border Patrol when they

19   ended up searching the vehicle?

20        A.    I believe I left for a while, but they called

21   me right back, so I did come back to the scene.

22        Q.    Let me show you what is 3c-2.

23        A.    Ah-hum.

24        Q.    And 3c-3.  Do you recognize those photographs?

25        A.    Yes, ma'am.

1      Q.   Are they accurate depictions of the vehicle

2  and what was taken from the vehicle on June 27, 2008?

3      A.   Yes, ma'am.

4           MS. OLLILA:  I'd ask that the ID be stricken

5  on 3c-2 and 3c-3.

6           MR. SHEKETOFF:  I have no objection.

7           THE COURT:  All right, ID stricken, full

8  exhibits.

9           (Government's Exhibit 3c-2 and 3c-3

10          admitted.)

11     Q.   Please pull up 3c-2.  Sir, what was located in

12  the truck?

13     A.   Prior to locating the stuff the border patrol

14  sent a dog around the truck, but what was located was

15  U.S. currency that was wrapped in like cellophane and

16  taped up and it was approximately $275,000 I believe.

17     Q.   Please pull up 3c-3.  What is depicted in this

18  picture, 3c-3?

19     A.   That's a duffle bag that was loaded with a lot

20  of the currency.  Most of the currency was taken out of

21  the door panels, but this is where it would appear that

22  somebody was trying to load that duffle bag with the

23  currency.

24          MS. OLLILA:  No further questions.  Thank you,

25  sir.  And congratulations again.

```
1              MR. SHEKETOFF:  I have no questions.

2              THE COURT:  All right, you may be excused,

3    sir.

4              THE WITNESS:  Thank you.

5              MS. OLLILA:  The United States calls Gregg

6    Woody.

7              THE CLERK:  Please remain standing and raise

8    your right hand.

9                        GREGORY WOODY

10        having been duly sworn, testified as follows:

11             THE CLERK:  Please be seated.  For the record,

12   would you please state your name and spell your last

13   name.

14             THE WITNESS:  Gregory Brian Woody.  Last name

15   is W-O-O-D-Y.

16             THE CLERK:  Thank you.

17                     DIRECT EXAMINATION

18   BY MS. OLLILA:

19        Q.   Good afternoon, Mr. Woody.

20        A.   Good afternoon.

21        Q.   How are you employed?

22        A.   United States Border Patrol.

23        Q.   How long have you been with the U.S. Border

24   Patrol?

25        A.   Since February of 2003.
```

1       Q.      And where are you currently stationed?

2       A.      Beecher Falls, Vermont.

3       Q.      And where is Beecher Falls, Vermont, in

4    relation to the Canadian border?

5       A.      It's right on the Canadian border, ma'am, just

6    inside the state of Vermont.

7       Q.      How long have you been at the Beecher Falls,

8    Vermont, area station?

9       A.      Since September of 2007, ma'am.

10      Q.      Did something happen on June 27, 2008, that

11   you recall?

12      A.      Yes, ma'am.

13      Q.      What happened?

14      A.      I was called to the scene of a crashed

15   vehicle.  Chief Richard Lapoint from Pittsburgh Police

16   Department contacted me regarding the vehicle that had

17   crashed.  He called me because the driver was a Canadian

18   citizen and presented a Canadian driver's license.

19      Q.      What did you do?

20      A.      At the time I was a border patrol K9 handler,

21   so I responded to the scene to speak to the driver

22   regarding citizenship and his status in the United

23   States.

24      Q.      And once you got to the scene -- and by the

25   way, are you a K9 handler?

1    A.    At the time I was.  I am not now.

2    Q.    So when you got to the scene, what did you end

3  up doing?

4    A.    When I got to the scene I witnessed the

5  vehicle which had driven across an open washed out

6  ravine.  The vehicle had sustained quite a bit of

7  damage.  And I spoke to the driver of the vehicle, asked

8  him his citizenship.  He stated he was a Canadian

9  citizen.  He gave me his passport and his Canadian

10 driver's license.

11   Q.    What was his name?

12   A.    Trevor Allain.

13   Q.    Please pull up 3c-1.  Officer Woody, if you

14 look at the monitor to your left, I'd ask that you tell

15 the members of the jury whether or not you recognize

16 what's depicted in 3c-1.  Is it on your monitor to your

17 left -- is there a picture up -- Kellie?

18   A.    Yes, ma'am.  That's the vehicle that was

19 crashed out.

20   Q.    What did you do?

21   A.    I spoke to the individual who owned the

22 vehicle.  I asked him if he minded if, explained that I

23 was a border patrol K9 handler, and asked if he would

24 mind if I walked my dog around the vehicle, and he said

25 that would be fine, he basically said yes.

1    Q.    What's your dog, what's the name of your dog?

2    A.    Sil.

3    Q.    And what breed?

4    A.    German shepherd.

5    Q.    Do you still have Sil?

6    A.    I do.

7    Q.    Is he still a drug detection dog?

8    A.    He's retired.

9    Q.    What did you do?  Did the driver Trevor Allain

10   say that you could walk Sil around his car?

11   A.    Yes, ma'am, he did give consent.

12   Q.    And what did you do?

13   A.    I walked Sil around the vehicle and he alerted

14   and indicated to the presence of narcotics at the rear

15   passenger door of the vehicle.

16   Q.    What did you do then?

17   A.    Put him away and proceeded to search the

18   vehicle.

19   Q.    What is Sil's toy that you give him for a

20   reward?

21   A.    A piece of rubber hose about this long.

22   Q.    Did you give him his reward?

23   A.    Absolutely.

24   Q.    Then what did you do?

25   A.    Upon opening that rear door the interior door

1    panel was already loose, all but removed, it was just

2    basically hanging there.

3         Q.   Was that unusual to you?

4         A.   Yes.

5         Q.   Had you ever seen that before?

6         A.   Yes, I have.  The thing about vehicles that

7    are used for smuggling narcotics or money in this case,

8    the interior door panels are an excellent place for

9    people to try to conceal that sort of thing, and usually

10   they will open them up, tear them apart, put the money

11   or the drugs inside, then they will refasten them

12   because they have push fasteners that are very easy to

13   reattach, so, and that was the case here.  The door

14   handle had been removed from the metal door frame and

15   was basically hanging there.  When I opened the door, it

16   kind of sprang open and I was able to just look in and

17   see the black plastic with the tape on it from the end

18   of the door.

19        MS. OLLILA:  Please pull up, Diane, 3c-2.

20        Q.   Is this what you're referring to, Mr. Woody?

21        A.   I can barely see --

22        Q.   If you turn around, Mr. Woody.

23        A.   Yes, ma'am, that's it.

24        Q.   The monitor is better behind you.  Can you see

25   that better?

1      A.    Yes, ma'am, that's exactly it.

2      Q.    What is it that the jury's looking at?

3      A.    You're looking at bundles, if I may stand,

4  you're looking at bundles of cash that were taped that

5  were in black trash bags with masking tape around it.

6  When I initially saw them I thought it was drugs because

7  in my experience when you find bundles hid like that in

8  a vehicle it's usually narcotics, but upon grasping it

9  to remove it I could feel it felt like a, you know how a

10 deck of cards will kind of have that feel of a stack,

11 and that's obviously what it was.

12     Q.    Please pull up 3c-3.  Mr. Woody, if you turn

13 around and look at 3c-3, what is it that the jury is

14 looking at?

15     A.    This is a small handbag approximately this

16 size, and I would say that would be a foot square by

17 maybe a foot deep.  This was located on the center

18 console in the front of the vehicle.  And the lid of

19 this, it was completely unzipped.  It was, as you can

20 see, zipped on three sides, was down in and it was

21 exposed to other money that had already been removed and

22 put into this bag.

23     Q.    What did you do with the currency once you

24 seized it?

25     A.    We removed all the currency and we searched

```
 1    all the door panels that were there.  The currency was
 2    transported back to Beecher Falls Border Patrol Station,
 3    and then from that point we took it to the local bank so
 4    that it could be counted.
 5         Q.   How much currency was seized?
 6         A.   $275,999 as I recall.
 7              MS. OLLILA:  No further questions of this
 8    witness, your Honor.
 9              THE COURT:  Any questions?
10              MR. SHEKETOFF:  Just one briefly.
11                       CROSS-EXAMINATION
12    BY MR. SHEKETOFF:
13         Q.   Who was the registered owner of this vehicle?
14         A.   If I could refer to my report.
15         Q.   With the Court's permission, sure.
16              THE COURT:  Go ahead.
17         A.   The name that I have was Marco G. Lavoie.
18         Q.   And did that person have an address in New
19    Hampshire?
20         A.   It's been redacted on my report, but yes, it
21    was a New Hampshire registered vehicle, sir.
22              MR. SHEKETOFF:  Thank you, sir.
23              THE COURT:  Anything else?
24              MS. OLLILA:  No.
25              THE COURT:  All right, Officer Woody, you're
```

1      free to leave.

2              THE WITNESS:  Thank you.

3              MS. OLLILA:  For this next witness, judge, we

4      will need to --

5              THE COURT:  Take a very, very short break.

6              MS. OLLILA:  Exactly.

7              THE COURT:  All right, we're going to just

8      take a couple of minutes, you can stretch your legs, and

9      then we will bring you right back in and it will be our

10     last 15, 10 minutes.

11              (Jury exited the courtroom.)

12              THE COURT:  All right, question for counsel

13     before we go.  Juror No. 13 has trouble walking and has

14     a cane, and I would like not to switch their numbers,

15     but just switch Juror No. 1 and Juror No. 13, their

16     seats, so that he can easily exit.  Any problem keeping

17     track of that?  I'm not changing their numbers.  Juror

18     No. 1 will be sitting in Juror No. 13's seat.

19              MS. OLLILA:  No.

20              MR. SHEKETOFF:  Makes a lot of sense.

21              THE COURT:  Just confirm with 13 that he's

22     comfortable with the switch and we will make that

23     happen, and that will give Terry just another moment.

24              MS. OLLILA:  Sure.

25              (Pause.)

1          THE CLERK:  Please raise your right hand.

2                    MICHAEL BERGERON

3      having been duly sworn, testified as follows:

4          THE CLERK:  Please be seated.  For the record,

5  please state your name and spell your last name.

6          THE WITNESS:  Michael Bergeron,

7  B-E-R-G-E-R-O-N.

8          THE CLERK:  Thank you.

9                    DIRECT EXAMINATION

10  BY MS. OLLILA:

11      Q.   Thank you for waiting all day, sir.

12      A.   You're welcome.

13      Q.   How are you employed?

14      A.   I am a patrol sergeant with the Manchester,

15  New Hampshire Police Department.

16      Q.   How long have you been a patrol sergeant?

17      A.   I was just promoted last July.

18      Q.   In general what do you do -- before you were a

19  patrol sergeant were you on patrol?

20      A.   I was.  I started in patrol for approximately

21  six years, and then the time between that and the

22  current time I was a detective with the Investigations

23  Unit.

24      Q.   On February 24, 2009, what was your job at the

25  Manchester Police Department?

1    A.   I was assuming my regular duties as an adult

2  investigator with my partner Pat Houghton when we were

3  approached by Special Agent Garth Hamelin with the DEA

4  and Detective Chuck Anderson who was a Manchester Police

5  Department detective who was working as a task force

6  officer with the DEA.

7    Q.   Did they ask you to do something?

8    A.   They did.

9    Q.   What did they ask you to do?

10    A.   They asked us to assist with the surveillance

11  that they were performing on a subject inside the city

12  of Manchester.

13       MS. OLLILA:  Diane, please pull up 9h-2.

14    Q.   Sir, on your monitor, it's best if you turn

15  around, it's much easier to see if you turn around.

16    A.   Okay.

17    Q.   You can also look on your monitor but the

18  other, it's probably easier to look behind you, but

19  whichever you prefer.

20    A.   This one's on now.

21    Q.   Okay.  So, do you see a vehicle depicted in

22  9h-2?

23    A.   I do.

24    Q.   What is that picture of?

25    A.   That was the target vehicle for that night.

```
1          Q.    And do you follow that vehicle?

2          A.    I did.

3          Q.    Were you in a marked patrol car?

4          A.    It was unmarked but it was a Chevy Impala, it

5     is equipped with lights and siren.

6          Q.    Did you stop that vehicle, the vehicle that's

7     depicted in 9h-2?

8          A.    I did.

9          Q.    And did you stop it at the request of Special

10    Agent Garth Hamelin with the DEA?

11         A.    We did.

12         Q.    And what happened when you stopped it?

13         A.    Myself and Detective Houghton approached the

14    vehicle.  Detective Houghton identified the driver as a

15    David Coulombe.  I stayed on the passenger side of the

16    vehicle and made observations.

17         Q.    And what were the observations you made?

18         A.    I observed two large plastic shopping style

19    bags in the front passenger compartment and a large

20    duffle bag in the back seat.

21         Q.    Please pull up 9h-3.  What is this that the

22    jury is looking at in picture 9h-3?

23         A.    Those are the two plastic shopping bags in the

24    front seat.  There's a larger white one and a smaller

25    gray one to its left on the front passenger side floor.
```

1    Q.   Do you know what those bags contain?

2    A.   I do.

3    Q.   What did they contain?

4    A.   Marijuana.

5         MS. OLLILA:  Your Honor, I'd ask that the

6    witness step down from the witness stand.

7         THE COURT:  He may.

8    Q.   Sir, I'm showing you what has been marked as

9    9g-1a.  And if you look at the photograph there's a

10   white bag.  Do you see that same white bag that is in

11   9g-1a?

12   A.   I do.

13   Q.   Could you please hold it up for the jury.

14   A.   (Witness doing so.)

15   Q.   What is contained in that bag?

16   A.   Individual bags of marijuana.

17   Q.   Is that the marijuana that you ended up

18   seizing?

19   A.   It is.

20   Q.   Was it tested?

21   A.   It was.

22   Q.   Did it test positive for the presence of

23   marijuana?

24   A.   It did.

25        MS. OLLILA:  Your Honor, I ask that the ID be

1    stricken on 9g-1a and entered in as a full exhibit.

2             MR. SHEKETOFF:  No objection.

3             THE COURT:  All right, full exhibit.

4             (Government's Exhibit 9g-1a

5             admitted.)

6        Q.   Sir, I'd ask that you hold up one of these

7    bags of marijuana so that the jury can see it and

8    indicate whether there's any writing on it?

9        A.   There is.

10       Q.   What is the writing?

11       A.   M39.

12       Q.   Do you know whether or not that's a strain of

13   marijuana?

14       A.   I do not.

15       Q.   Okay.  Now, let me show you what is marked as

16   9g-2a, and I'll draw your attention back to the

17   photograph on the monitor.  Do you see another bag,

18   plastic bag in that front passenger side seat other than

19   the white bag?

20       A.   I do, the small gray one to its left.

21       Q.   I'm now showing you a small gray bag that was

22   in 9g-2a.  What is that?

23       A.   This is the same bag that was in the front

24   seat of the Ford Explorer.

25       Q.   What's contained in that bag?

1          A.    Marijuana.

2          Q.    Was the marijuana tested?

3          A.    It was.

4          Q.    Did it test positive for the presence of

5    marijuana?

6          A.    It did.

7          Q.    At some point in time you indicated that there

8    was a duffle bag in the back seat, is that what you

9    said?

10         A.    Correct.

11         Q.    Did you end up seizing that duffle bag?

12         A.    We did.

13         Q.    I'm showing you what has already been entered

14   into full evidence as 9g-3.  Is this the duffle bag?

15         A.    It is.

16         Q.    Does it have a label on it?

17         A.    It does.

18         Q.    And what does the label say?

19         A.    NH.

20         Q.    Was something contained in this duffle bag?

21         A.    It was 50 individual bags of marijuana.

22         Q.    Now, let me show you what has been marked as

23   9g-2 and 9g-1.  These are boxes.  Did law enforcement

24   place the marijuana in these boxes and take it out of

25   the duffle bag?

1       A.    Yes.

2       Q.    What is contained in these boxes, 9g-1 and 2?

3       A.    Twenty-five individual bags in each box of

4  marijuana.

5       Q.    Would you please hold it up and show it to the

6  jury.  If you can go toward the end.

7             So what was the weight in that blue duffle

8  bag?

9       A.    Approximately 50 pounds.

10      Q.    Was it tested?

11      A.    It was.

12      Q.    Did it test positive for the presence of

13 marijuana?

14      A.    It did.

15      Q.    And the approximate amount of how much?

16      A.    Fifty pounds.

17            MS. OLLILA:  Your Honor, I'd ask that the ID

18 be stricken on Government's Exhibit 9g-2 and 9g-1 and

19 that both be entered into full evidence.

20            MR. SHEKETOFF:  No objection.

21            THE COURT:  9g-1 and 2 full exhibits.

22            (Government's Exhibit 9g-1 and 9g-2

23            admitted.)

24            MS. OLLILA:  Nothing further.

25            THE COURT:  All right.  Anything, Attorney

1    Sheketoff?

2            MR. SHEKETOFF:  I can't think of anything,

3    your Honor.

4            THE COURT:  All right.  Well, Sergeant

5    Bergeron, I think you are done, so you may be excused,

6    sir.

7            THE WITNESS:  Thank you very much.

8            THE COURT:  You're welcome.  All right, and we

9    are at the close of today.  So you are done, but I have

10   to give you one instruction as you leave, and this will

11   be familiar to you.  I will speak up, all right, let me

12   get my microphone.  Can you hear me better now?  All

13   right.  Thank you.  Okay.

14           We are breaking for the day today and I want

15   to remind you of the instructions I gave you earlier.

16   Until the trial is over you're not to discuss this case

17   with anyone including your fellow jurors, members of

18   your family, people involved in the trial or anyone

19   else.  If anyone approaches you and tries to talk to you

20   about the case, do not tell anyone about it, don't talk

21   to your fellow jurors about it, but advise me

22   immediately.  Tell the court security officer or the

23   deputy clerk.  I would need to know and ask you

24   questions, okay?  So it's very important that you do not

25   speak to anyone or have anyone speak to you about the

1  case.

2       You may not use technology or social media to

3  communicate with anyone electronically about this case.

4  And again, do not read or listen to any news reports of

5  the trial, do not look at information about anything

6  related to the case, and remember to keep an open mind

7  until all the evidence has been received and you've

8  heard the views of all your fellow jurors.

9       We are going to be back here at 9 a.m.

10  tomorrow.  We're going to do a half-hour lunch break to

11  move and get more evidence in during the day, and that's

12  for you, per your request.  So bring your lunch and

13  we'll be prepared to hopefully only have a half an hour

14  lunch break, and the attorneys are learning that as well

15  right now.  We will end at four tomorrow.  All right?

16       We'll see you at 9 a.m.

17       (Jury exited the courtroom.)

18       THE COURT:  Is there anything that counsel

19  needs to address.  Anything, Attorney Sheketoff?

20       MR. SHEKETOFF:  No, your Honor.

21       THE COURT:  You cannot think of anything.  All

22  right, Attorney Ollila?

23       MS. OLLILA:  No, judge.

24       THE COURT:  May I ask counsel to gather your

25  things and just meet me briefly in the back room to

1     discuss tomorrow and then I'll let you go.

2                    MS. OLLILA:  Sure.

3                    THE COURT:  All right?

4                    (Court adjourned at 4:00 p.m.)

5

6

7

8

9

10

11

12                    C E R T I F I C A T E

13

14          I, Sandra L. Bailey, do hereby certify that

15     the foregoing transcript is a true and accurate

16     transcription of the within proceedings, to the best of

17     my knowledge, skill, ability and belief.

18

19

20     Submitted: 3/31/2016

21                    SANDRA L. BAILEY, LCR, CM, CRR

22                    LICENSED COURT REPORTER, NO. 15

23                    STATE OF NEW HAMPSHIRE

24

25