UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   14-cr-93-01-LM
            v.                  *   August 20, 2015
                                *   9:15 a.m.
ALKIS NAKOS                     *
                                *
* * * * * * * * * * * * * * * * *
```

DAY 3 - MORNING SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY
AND A JURY

Appearances:

For the Government:     Terry Ollila, AUSA
                        U.S. Attorney's Office
                        53 Pleasant Street
                        Concord, NH 03301

For the Defendant:      Robert L. Sheketoff, Esq.
                        Law Office of Robert L. Sheketoff
                        One McKinley Square
                        Boston, MA  02109

Court Reporter:         Sandra L. Bailey, LCR, CM, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH  03301
                        (603)225-1454

```
 1                          I N D E X

 2

 3   Witness              Direct   Cross   Redirect   Recross

 4   GREGORY KEANE

 5   By Ms. Ollila           3
     By Mr. Sheketoff               11
 6

 7   MICHAEL BERNTSEN

 8   By Ms. Ollila          13
     By Mr. Sheketoff   (no questions)
 9

10   DAVID WALSH

11   By Ms. Ollila          23
     By Mr. Sheketoff   (no questions)
12

13   JONATHAN VENTURINI (Previously transcribed under
                         separate cover.)
14
     PAUL POIRIER
15
     By Ms. Ollila          34
16

17

18

19

20

21   Exhibits                            ID       Evid.

22   Government's Exhibits 5h-1, 5h-2 and 5h-3        8
     Government's Exhibits 5j-1 thru 5j-6, and 5j-8   11
23   Government's Exhibits 17g-1 and 17g-2             0

24

25
```

```
 1                    BEFORE THE COURT
 2           THE COURT:  Good morning, members of the jury.
 3   We are going to have two witnesses, they will be very
 4   brief, and because we have to move evidence in and out
 5   of the courtroom we're going to take a brief break after
 6   the second witness and get you right back in, all right?
 7           THE CLERK:  The Court has before it for
 8   consideration today, jury trial day three, in criminal
 9   case 14-cr-93-01-LM, United States of America versus
10   Alkis Nakos.
11           THE COURT:  All right, Attorney Ollila.
12           MS. OLLILA:  Thank you very much, your Honor.
13   The United States calls Massachusetts State Trooper
14   Gregory Keane.
15           THE CLERK:  Please remain standing and raise
16   your right hand.
17                     GREGORY KEANE
18        having been duly sworn, testified as follows:
19           THE CLERK:  Please be seated.  For the record,
20   could you please state your name and spell your last
21   name.
22           THE WITNESS:  My name is Trooper Gregory
23   Keane.  Last name is K-E-A-N-E.
24                   DIRECT EXAMINATION
25   BY MS. OLLILA:
```

```
1        Q.    Good morning, trooper.

2        A.    Good morning, ma'am.

3        Q.    You just said you are a trooper.  In what

4   state do you serve as a trooper?

5        A.    Commonwealth of Massachusetts.

6        Q.    How long have you been a state trooper in

7   Massachusetts?

8        A.    Sixteen years.

9        Q.    What's your rank?

10        A.    Trooper.

11        Q.    Where are you currently assigned?

12        A.    I'm currently assigned to the Special

13   Operation Section K9 Division.

14        Q.    What is that?

15        A.    It's a specialty unit where I'm assigned a K9

16   and I go on patrol.

17        Q.    Do you have a K9?

18        A.    I do.

19        Q.    And what's the name of your K9?

20        A.    My current K9 name is Tippit.

21        Q.    Do you have a toy for Tippit as a reward?

22        A.    I do.

23        Q.    What's the toy?

24        A.    It is a fire hose.

25        Q.    Is that a common toy for a K9?
```

1     A.   It's simple and cheap, ma'am.

2     Q.   How were you assigned on December 23rd, 2008?

3     A.   I was assigned to the same jurisdiction.   I

4  was assigned a K9.   I was working an evening patrol

5  which is assigned from 3:00 in the afternoon until

6  11 a.m. at night.

7     Q.   Did you get a call from law enforcement to

8  assist?

9     A.   I did, ma'am.

10    Q.   What happened?

11    A.   I received a phone call.   I was asked if I

12  could assist with an investigation.   I was given the

13  opportunity to observe a motor vehicle that they had

14  described to me, I observed the motor vehicle make an

15  infraction, and I stopped the motor vehicle.

16    Q.   Did you approach the motor vehicle?

17    A.   I did, ma'am.

18    Q.   Did you obtain identification documents from

19  the driver?

20    A.   I did.

21    Q.   What was the name of the driver?

22    A.   Trevor Allain.

23    Q.   What did you do at that point in time?

24    A.   As I was speaking with Mr. Allain I could

25  smell an overwhelming odor of marijuana coming from

1    inside the vehicle.  After I had his identification and

2    registration I went back to my cruiser and requested

3    another trooper to assist me.

4         Q.   What kind of car was he driving?

5         A.   It was a blue Nissan Quest.

6         Q.   Could you see anything inside the Nissan

7    Quest?

8         A.   I did.  As I approached the vehicle from the

9    passenger side I observed several large boxes in the

10   rear of the vehicle.

11        Q.   What did you do after you spoke with him

12   briefly?

13        A.   I asked Mr. Allain if he had any weapons or

14   narcotics in the car and he said no.

15        Q.   Then what did you do?

16        A.   I went back to my cruiser and requested

17   another trooper.

18        Q.   And did another trooper show up?

19        A.   He did.

20        Q.   What did that second trooper do?

21        A.   That trooper arrived on-scene and observed my

22   interaction with Mr. Allain.

23        Q.   At some point in time was Mr. Allain's car

24   searched?

25        A.   It was.

1      Q.    What was found?

2      A.    Eight boxes which contained marijuana.

3      Q.    Was the marijuana tested?

4      A.    It was.

5      Q.    Did it test positive for the presence of

6 marijuana in the approximate amount of 200 pounds?

7      A.    Yes.

8      Q.    The boxes themselves, did they have a label on

9 them?

10     A.    They did.

11     Q.    What was the label?

12     A.    They were Home Depot boxes.

13     Q.    Sir, I'm showing you what has been marked as

14 Government's Exhibit 5h-2, 5h-3 and 5h-1.  Let me ask

15 you if you could review those photos, please.

16     A.    (Witness looking at photos.)

17     Q.    Have you seen those photos before?

18     A.    I have, ma'am.

19     Q.    Are they a fair and accurate depiction of the

20 Home Depot boxes that you seized that night?

21     A.    They are.

22     Q.    And what was that date again?

23     A.    That was December 23rd, 2008.

24          MS. OLLILA:  Your Honor, may the ID be

25 stricken on 5h-1, 5h-2 and 5h-3 and these exhibits be

1    entered as full exhibits.

2            THE COURT:  Any objection?

3            MR. SHEKETOFF:  No objection.

4            THE COURT:  5h-1, 2 and 3 are full exhibits.

5            (Government's Exhibit 5h-1, 5h-2, and

6            5h-3 admitted.)

7            MS. OLLILA:  Diane, would you please pull up

8    5h-1.

9        Q.   Trooper Keane, if you look to your left you

10   should see a picture on the monitor.  Do you see a

11   picture on the monitor?

12       A.   I do, ma'am.

13       Q.   What is it the jury is looking at in this

14   photograph?

15       A.   The location is the Framingham barracks which

16   is off of Route 9.  That's inside the barracks.  Those

17   boxes are the boxes I seized from Mr. Allain's vehicle

18   that contain marijuana.

19       Q.   Please put up 5h-2.  Who's the guy in this

20   picture?

21       A.   That's me, ma'am.

22       Q.   Did law enforcement often pose with drugs they

23   seize?

24       A.   Sometimes they do, but this was my first

25   seizure of that amount.

1       Q.    Are you proud of that?

2       A.    I am.

3       Q.    Are you sorry that you posed with the

4  marijuana?

5       A.    No, I'm not.

6       Q.    Okay, thank you.  Please pull up 5h-3.

7  Trooper Keane, what is the photograph that the jury is

8  looking at now in 5h-3?

9       A.    That is the vehicle that I had stopped that

10  Mr. Allain was driving at the time.  If the hatch of the

11  Nissan Quest was closed, those were the boxes I spoke of

12  earlier that I witnessed inside the car.

13      Q.    Do you mind, Trooper Keane, stepping off the

14  witness stand.  I'm going to give you some gloves

15  because I want you to open one of these boxes.

16            What I'd like you to do, Trooper Keane, is

17  just, I want you to take out just five bags that are

18  located in one of these boxes and put them on that table

19  over there if you don't mind, sir.  Five of these bags.

20      A.    (Witness doing so.)

21      Q.    There is some writing on these bags.  Were

22  these bags inventoried by law enforcement?

23      A.    They were, ma'am.

24      Q.    Let me show you what is a bag.  There is a

25  number written across the top, M39.  Law enforcement

1    didn't put that number there, did they?

2         A.    No.

3         Q.    Was it there on the marijuana when it was

4    seized?

5         A.    Yes.

6         Q.    Do the vast majority of these bags have the

7    number M39 on them?

8         A.    Yes.

9         Q.    Do you know what M39 is?

10        A.    I don't.

11        Q.    Okay.  I'll ask that you put the marijuana

12   back.

13             Now, Trooper Keane, I will ask if you stand

14   here with me, please, and I'm going to show you by

15   pointing to the exhibit and the exhibit number.

16             This first box is 5j-1.  Would you agree with

17   that?

18        A.    Yes, ma'am.

19        Q.    The second box is 5j-2.  Would you agree with

20   that?

21        A.    Yes, ma'am.

22        Q.    The third box is 5j-3.  Would you agree with

23   that?

24        A.    Yes.

25        Q.    This fourth box is 5j-4.  Would you agree with

1    that?

2         A.   Yes, ma'am.

3         Q.   The fifth box is 5j-5.  Would you agree with

4    that?

5         A.   Yes.

6         Q.   This sixth box is 5j-6.  Would you agree with

7    that?

8         A.   Yes.

9         Q.   And unfortunately we left 5j-7 in the vault,

10   but let me show you this.  5j-8, would you agree with

11   that?

12        A.   Yes, ma'am.

13             MS. OLLILA:  Your Honor, I ask that the ID be

14   stricken on all of these exhibits and they be entered

15   into full evidence.

16             MR. SHEKETOFF:  No objection.

17             THE COURT:  All right, so 5j-1 through J-6 are

18   full exhibits as well as J-8.

19             (Government's Exhibit 5J-1 thru 5j-6

20              and 5j-8 admitted.)

21             MS. OLLILA:  That's all I have for Trooper

22   Keane.

23             THE COURT:  All right.  Attorney Sheketoff.

24                      CROSS-EXAMINATION

25   BY MR. SHEKETOFF:

1      Q.    Just one question.  What was the traffic

2 violation?

3      A.    Following too closely, sir.

4      Q.    Following too closely.  You were going to stop

5 that car as soon as you saw any traffic violation of any

6 kind?

7      A.    That's correct.

8      Q.    You basically agreed to do that with whatever

9 agency gave you have the call?

10      A.    Yes, sir.

11      Q.    Okay.  And this was following too closely?

12      A.    Yes, sir.

13      Q.    Thank you, trooper.

14           THE COURT:  Trooper Keane, you're free to

15 leave.

16           THE WITNESS:  Thank you, ma'am.  Have a nice

17 day.

18           MS. OLLILA:  May we proceed, your Honor?

19           THE COURT:  You may.

20           MS. OLLILA:  The United States calls New

21 Hampshire State Police Trooper Michael Berntsen.

22           THE CLERK:  Please remain standing, raise your

23 right hand.

24                          MICHAEL BERNTSEN

25      having been duly sworn, testified as follows:

1          THE CLERK:  Please be seated.  For the record,

2     please state your name spell your last name.

3          THE WITNESS:  Michael Berntsen,

4     B-E-R-N-T-S-E-N.

5          THE CLERK:  Thank you.

6                    DIRECT EXAMINATION

7     BY MS. OLLILA:

8          Q.   Good morning, trooper.

9          A.   Good morning, ma'am.

10         Q.   How are you employed?

11         A.   I'm a state trooper with the state of New

12    Hampshire.  I've been a state trooper since 2005.  I've

13    been a full time law enforcement officer in the state of

14    New Hampshire since 1999.

15         Q.   What is the area you patrol currently?

16         A.   Currently I cover southern 89 from Warner to

17    the 89 junction.

18         Q.   What was the area you covered as a New

19    Hampshire State Police Trooper in May of 2009?

20         A.   At that time I was assigned to the Gang Unit.

21    It was a partnership detail with Manchester Police

22    Department.  I was working the Manchester area.

23         Q.   Did you get a call from law enforcement to

24    assist?

25         A.   I did.

1   Q.   And what did you do?

2   A.   I was told to be on the lookout for a vehicle

3   that was under surveillance that was believed to have

4   drugs in it.  And I was given the plate, it was a black

5   Dodge Charger, I believe it was black, and we ended up

6   finding that vehicle on Hooksett Road in Hooksett.

7   Q.   Let me just stop you for a moment.  I'm going

8   to ask you, trooper, to look at the monitor on your

9   left.

10   MS. OLLILA:  And Diane, if you would pull up

11   17h-2.

12   A.   Yes, ma'am.

13   Q.   Do you recognize the photograph?

14   A.   Yes, ma'am.

15   Q.   What is depicted in the photograph?

16   A.   That is a picture of the Dodge Charger in

17   question.  It's in the Manchester Police Department

18   garage where their evidence is kept.

19   Q.   When you first located it near Hooksett, what

20   did you do?

21   A.   We followed it and observed it for violations,

22   and as we were going up Hooksett Road I noticed that the

23   vehicle took a right into the K-Mart parking lot and

24   failed to use its required turn signal, so we activated

25   our lights and stopped the vehicle in the parking lot.

1   When we were approaching the vehicle I also noticed that

2   it appeared to be unregistered.  The registration

3   sticker showed that it expired.

4        Q.   Were you going to follow that vehicle until

5   you saw it engage in some violation?

6        A.   Yes.

7        Q.   And you did; correct?

8        A.   Yes, ma'am.

9        Q.   So what did you do at that point?

10        A.   We stopped the vehicle in the parking lot, and

11   I approached the vehicle and spoke with the operator, a

12   Michael Gardner, and I asked him for his license and

13   registration.

14        Q.   And what happened then?

15        A.   He gave me his license and registration and,

16   it wasn't the registration, it was a rental agreement.

17   The car was actually rented by a Cory Buchanan --

18   Buchan, excuse me, not by Michael Gardner.  I noticed

19   that.  And I told the gentleman why I had stopped him.

20   I went back to my car after that and ran a record check

21   on him and on the plate to the vehicle.  The vehicle was

22   actually registered, it just hadn't been, Enterprise

23   Rent-a-Car hadn't put the stickers on the plate, and Mr.

24   Gardner had a valid license.

25        Q.   What did you do then?

1        A.    I went back up and I advised him that I was

2   going to give him a warning for the violation that I

3   observed in that the plate was actually registered, and

4   I asked him for consent to search the vehicle.

5        Q.    Did he give you consent?

6        A.    He did not.

7        Q.    And then what happened?

8        A.    I explained to him that he had the right to

9   refuse to the consent for the vehicle search and that if

10  he wished to, that I was going to, refuse that is, I was

11  going to request a K9, a drug K9 come to the scene and

12  do a search of the vehicle.

13       Q.    And did a K9 show up at the scene?

14       A.    Yes.   Trooper First Class Ralston's dog Ozzie

15  came to the scene.   It's a certified dog for drugs.

16       Q.    Do you happen to know what toy Ozzie gets when

17  he detects narcotics?

18       A.    No.

19       Q.    What happened when the K9 got there?

20       A.    He did a search of the vehicle from the

21  exterior, and he is a passive alert dog, so he sits down

22  when he alerts on a vehicle, and he did alert on the

23  vehicle, he sat down.

24       Q.    You said he's a passive alert dog.   Is there

25  some other kind of K9?

1    A.    Yes.

2    Q.    And what are they?

3    A.    There's the active alert dogs.  Rather than

4  sitting down and being stationary they tend to scratch

5  at the area in question, and I've even seen some dogs

6  actually bite in the area, but Ozzie was passive.

7    Q.    And so did Ozzie alert to the presence of

8  narcotics in the vehicle?

9    A.    He did.

10    Q.    And then what happened?

11    A.    I told Mr. Gardner that the dog had alerted to

12  the vehicle and I would be applying for a search warrant

13  to search the vehicle and that he was free to go if he

14  wished, and he was subsequently picked up in another

15  part of the parking lot by someone else.

16    Q.    Did you know who that someone else was who

17  picked him up?

18    A.    No.

19    Q.    Okay.  Did you apply for a search warrant?

20    A.    I did.

21    Q.    And was it granted?

22    A.    Yes.  Concord District Court Judge Gerard

23  Boyle signed the search warrant the next day.

24    Q.    And what did you do?

25    A.    We executed the search warrant that afternoon,

1   and upon checking the vehicle in the trunk we found two

2   black hockey bags filled with marijuana.

3        Q.   Let me show you what has been entered into

4   full evidence as 17h-4, 17h-5, 17h-6, 17h-7, 17h-8,

5   17h-9 and 17h-10.

6             Trooper, I'd ask that you review those

7   photographs.

8        A.   Yes, ma'am

9        Q.   Do you recognize those photographs, trooper?

10       A.   Yes, ma'am, that's from the vehicle in

11   question and the black bags in question.

12       Q.   Are those photographs a fair and accurate

13   depiction of the marijuana at the time it was seized?

14       A.   Yes, ma'am.

15             MS. OLLILA:   Diane, please pull up 17h-4.

16       Q.   Trooper, if you look at your monitor, do you

17   see the image depicted in 17h-4?

18       A.   Yes, ma'am.

19       Q.   What is that image of?

20       A.   It's an image of the bag in question in the

21   trunk, or one of the bags right there.

22       Q.   Please pull up 17h-5.  What is the image

23   depicted in 17h-5?

24       A.   There are both bags sitting on the Manchester

25   Police Department basement garage door.

1    Q.    And please pull up 17h-6.  Trooper, what is

2  depicted in this photograph?

3    A.    It's a little lock that was on the zippers to

4  the bag in question.

5    Q.    Were both bags locked?

6    A.    I believe so, yes.

7    Q.    And please pull up 17h-10.  What is the image

8  depicted in 17h-10, trooper?

9    A.    That's all the marijuana.

10    Q.    Now, trooper, I'd ask that you step down from

11  the witness stand and put on some gloves, please.

12    A.    Yes, ma'am.

13    Q.    Was the marijuana taken out of those duffle

14  bags?

15    A.    It was.

16    Q.    Was the marijuana tested?

17    A.    It was.

18    Q.    Did it test positive for the presence of

19  marijuana?

20    A.    It did.

21    Q.    How much, the approximate weight?

22    A.    About a hundred pounds.

23    Q.    So trooper, I'm showing you what has been

24  marked as 17g-1.  Do you see that number?

25    A.    I do.

1    Q.   Do you agree that that's the number that the

2  exhibit is marked?

3    A.   Yes, ma'am.

4    Q.   And let me show you what has been marked as

5  17g-2.  Do you see that number?

6    A.   Yes, ma'am.

7    Q.   And do you agree that that is the exhibit

8  number?

9    A.   Yes, ma'am.

10    Q.   What are these two exhibits?

11    A.   They're bags of marijuana.

12    Q.   Is this the marijuana that you seized on that

13  date?

14    A.   Yes, ma'am.

15         MS. OLLILA:  Your Honor, I'd ask that the ID

16  be stricken on 17g-1 and 17g-2 and it be entered into

17  full evidence.

18         MR. SHEKETOFF:  No objection.

19         THE COURT:  All right, 17g-1 and 2 are full

20  exhibits.

21         (Government's Exhibit 17g-1 and 17g-2

22         admitted.)

23    Q.   And you said that it was a hundred pounds;

24  correct?

25    A.   Yes, ma'am.

1    Q.    What I'd like you to do in one of these bags

2  is just take out five of them, trooper, and put them on

3  this table because I want you to hold them up.

4    A.    Okay.

5    Q.    Now, for each of these bags I want you to take

6  them one at a time and hold it up in front of the jury.

7    A.    Okay.

8    Q.    Now, there's a word here.  Let me just turn it

9  around.  There's a word on this bag.  What does it say?

10   A.    It looks like the abbreviation for regular.

11   Q.    Did law enforcement write that?

12   A.    I don't know.

13   Q.    Okay.  You didn't write it?

14   A.    I did not.

15   Q.    Okay.  Pick up another bag.  Put that one

16  aside.  Show the jury.  Is there a word on that bag?

17   A.    Yes, ma'am.

18   Q.    And what is that word?

19   A.    It is again the abbreviation for regular.

20   Q.    Okay.  You can put that one down.  Third bag?

21   A.    Same, abbreviation for regular.

22   Q.    Fourth bag?

23   A.    Same, marijuana, regular.

24   Q.    And the fifth bag?

25   A.    And it's the same.

```
 1        Q.   I'll ask that you put the marijuana back in

 2   this bag.  Thank you, trooper.

 3             MS. OLLILA:  I have no further questions of

 4   this witness, your Honor.

 5             THE COURT:  All right.  Attorney Sheketoff.

 6             MR. SHEKETOFF:  I have no questions.

 7             THE COURT:  All right.  Trooper Berntsen,

 8   you're excused.

 9             THE WITNESS:  Thank you, ma'am.

10             THE COURT:  And now we're going to take a very

11   brief break to stretch your legs and we'll have you

12   right back.

13             (Jury exited the courtroom.)

14                      BEFORE THE JURY

15             THE COURT:  Attorney Ollila, call your next

16   witness.

17             MS. OLLILA:  Thank you, your Honor.  The

18   United States calls Massachusetts State Trooper David

19   Walsh.

20             THE CLERK:  Please remain standing and raise

21   your right hand.

22                      DAVID WALSH

23      having been duly sworn, testified as follows:

24             THE CLERK:  Please be seated.  For the record,

25   please state your name and spell your last name.
```

```
 1              THE WITNESS:  Trooper David Walsh, W-A-L-S-H.
 2              THE CLERK:  Thank you.
 3                        DIRECT EXAMINATION
 4   BY MS. OLLILA:
 5        Q.    Good morning, Trooper Walsh.
 6        A.    Good morning.
 7        Q.    How are you employed?
 8        A.    I am a trooper with the Massachusetts State
 9   Police.
10        Q.    How long have you been a trooper with the
11   Massachusetts State Police?
12        A.    Approximately 11 years.
13        Q.    And generally what do you do as a trooper?
14        A.    Currently I'm assigned to the Logan Airport
15   task force where we handle drug interdiction and general
16   investigation.
17        Q.    What does that mean?  Are their drugs coming
18   in and out of Logan Airport?
19        A.    Yes.
20        Q.    How big is the drug interdiction team at Logan
21   Airport?
22        A.    I have five people in my office, but we also
23   get help from outside agencies.
24        Q.    How were you employed on April 4, 2009?
25        A.    I was a trooper assigned to field services in
```

1    a marked state police cruiser.

2        Q.   What does that mean, field services?

3        A.   I basically patrolled Route 93 and 495 and

4    213, the northern area of Essex County in Massachusetts.

5        Q.   Did you receive a call and asked for

6    assistance?

7        A.   Yes.

8        Q.   What happened?

9        A.   I received a call from I believe Lieutenant

10   Quinn of the, at the time the cross border initiative

11   team, and he informed me that a car was possibly going

12   to be coming through my patrol area carrying a large

13   amount of money, to be on the lookout for that car.

14       Q.   And did you see that car?

15       A.   Yes, I did.

16       Q.   Do you remember the make and model?

17       A.   It was a gray Nissan Altima.

18       Q.   What did you do when you saw it?

19       A.   I was actually on Route 93 south in the

20   Andover stretch and I was conducting speed enforcement

21   with a calibrated light unit.  I pointed the light unit

22   at that vehicle, got two readings, one being 81 miles an

23   hour, one being 75 miles per hour in a posted

24   65-mile-per-hour zone.

25       Q.   What did you do?

1      A.    I activated a traffic stop and pulled the

2   vehicle over shortly after.

3      Q.    Then what happened?

4      A.    I exited my cruiser.  I approached the

5   driver's side of the vehicle, identified myself,

6   identified the operator and the passenger, and explained

7   the reason for the stop.

8      Q.    What happened?

9      A.    At that point I noticed in the back of the

10   vehicle behind the driver a black bag containing what

11   appeared to be a large amount of U.S. currency.

12      Q.    Did you ask the driver about the currency?

13      A.    I did.

14      Q.    And what was the driver's response?

15           MR. SHEKETOFF:  Objection.

16           MS. OLLILA:  Not for the truth of the matter,

17   judge.  It's not offered for the truth of the matter.

18   To show the reaction.  To show the reaction by this

19   individual.

20           THE COURT:  Overruled.

21      Q.    Okay.

22      A.    I asked the driver about the large amount of

23   money and she denied knowledge of it.

24      Q.    Trooper, I'm showing you Government's Exhibit

25   13d-1, d-2, d-3, d-4 and d-5, and these exhibits have

1     already been entered into full evidence.  I'd ask that

2     you review those exhibits.

3          A.   Yes, I recognize it.

4          Q.   And what are those exhibits?

5          A.   This is multiple bundles of U.S. currency in

6     elastic rubber bands.

7          Q.   Is that the currency that was located in that

8     vehicle?

9          A.   Yes.

10         Q.   Did you seize the currency?

11         A.   Yes, I did.

12              MS. OLLILA:  Diane, please pull up 13d-1.

13         Q.   And trooper, I'd ask that you direct your

14    attention to the monitor on your left.  What is the

15    picture that the jury is looking at now?

16         A.   That is a black duffle bag and a couple of

17    plastic Foot Locker shopping bags.

18         Q.   Please pull up 13d-2.  What is the image

19    depicted in 13d-2?

20         A.   The same four bags opened and you can see

21    bundles of U.S. currency inside.

22         Q.   Please pull up 13d-3.  What is the image

23    depicted in 13d-3?

24         A.   The four bags, and again, bundles of U.S.

25    currency.

1      Q.    And finally, please call up 13d-5.  And,

2   trooper, what is this image?

3      A.    Those are the bundles of U.S. currency that we

4   placed on the table at the Andover barracks in

5   preparation of counting it.

6      Q.    How much money was seized that day?

7      A.    I would have to refresh my memory with my

8   report.

9      Q.    Would your report refresh your recollection?

10     A.    Yes.

11     Q.    Let me show you what has been marked as

12   Government's Exhibit 13c for identification.

13     A.    At the time I estimated it to be over

14   $100,000, and I believe after counting it it was 19490.

15     Q.    Thank you, trooper.

16           MS. OLLILA:  I have nothing further, your

17   Honor.

18           THE COURT:  Anything?

19           MR. SHEKETOFF:  I have no questions.

20           THE COURT:  All right, Trooper Walsh, you're

21   excused.

22           THE WITNESS:  Thank you, your Honor.

23           MS. OLLILA:  Judge, may we approach sidebar

24   for this next witness for a moment?

25           THE COURT:  You may.

```
1                        AT SIDEBAR

2            MS. OLLILA:  I asked the marshals to bring

3   down Jon Venturini.  He's the first co-conspirator who

4   is going to testify.  He's not down here yet.  I said

5   15 minutes ago he'll be on about 15, 20 minutes, so

6   we're just waiting for him to get down here.

7            THE COURT:  Oh, you mean when you say get down

8   here --

9            MS. OLLILA:  He's in custody, Jon Venturini.

10           THE COURT:  Oh, I got you.  Do you know the

11  status?  Do we know the status?

12           MS. OLLILA:  Of Jon Venturini?

13           THE COURT:  Where they are?

14           MS. OLLILA:  Yes, they should be bringing him

15  down.

16           THE COURT:  Okay.  So he's here, we're just

17  waiting.

18           MS. OLLILA:  They are transporting him, yes.

19           THE COURT:  Great.  Okay.  Anything else while

20  I have you?

21           MS. OLLILA:  Excuse me, judge?

22           THE COURT:  Anything else while I have you?

23  Do you want to put anything on the record for instance?

24           MR. SHEKETOFF:  One thing, your Honor.

25           THE COURT:  Yes.
```

1          MR. SHEKETOFF:  The co-conspirator statements

2    that have been given to me have redactions in them, and

3    my sister says they are personal identifiers of some

4    sort or other, but I've never seen them.  I'd like to at

5    least see them.  If she doesn't want me to see them, I'd

6    like you to at least see them so that I can be assured

7    that there's nothing there that I should have seen.

8          THE COURT:  I would have liked to have heard

9    that argument in advance of the witness.  I would have

10   certainly indulged you.  I would have looked at them for

11   you.  But at this point, how long have you had them?

12         MR. SHEKETOFF:  The redacted?

13         MS. OLLILA:  Since January 2015.

14         MR. SHEKETOFF:  It's true, but there are many

15   of the witness statements, except for Sweeny's maybe

16   were given to me, not me, but turned over a long time

17   ago, but that there are redactions in the statements

18   that are given long before they have to be given, would

19   I consider it a courtesy to give them at all is one

20   thing.  It's when you get on the eve of trial and you

21   get the Giglio and Jencks and there are still redactions

22   in them, that's another thing.  But I haven't, before

23   the trial started, I knew that there were redactions,

24   but typically the prosecutor will at least show me what

25   the redactions are.  If it's something that, I mean

1    typically there aren't redactions, but if there are

2    redactions and it's just personal stuff, I'm not going

3    to take notes of it, I just want to see it.

4              MS. OLLILA:  Judge --

5              THE COURT:  Okay, how many pages are we

6    talking about?

7              MR. SHEKETOFF:  We're talking about half a

8    paragraph.

9              THE COURT:  Is that it?

10             MS. OLLILA:  Yes.

11             THE COURT:  Is there any reason why you can't

12   just show it to him?

13             MS. OLLILA:  None.  I don't have it here, but

14   judge, just for the record, I feel like I'm being

15   sandbagged.  He's had that statement for eight months.

16   It would have taken one phone call, when he came to the

17   U.S. Attorney's Office three weeks ago to look at the

18   exhibits, if he would have said something then he could

19   have reviewed it.  So, it will -- we can take a time out

20   and I can go and get it.

21             THE COURT:  How about this.  Can you have

22   someone get it for you and bring it and then just show

23   it to him before he begins his cross?

24             MS. OLLILA:  Well, I can't because no one

25   knows where it is.  I know where it is in my office,

1  judge, sorry.

2          THE COURT:  Okay.  Could you tell somebody

3  where it is and tell them to get it for you?

4          MS. OLLILA:  Yes.

5          THE COURT:  Do that.

6          MS. OLLILA:  That's a good --

7          THE COURT:  Why don't we see if you can send

8  your incredibly apt paralegal to go pick it up, and then

9  that way he can at least look at it, glance at it and be

10  comfortable that it is nothing that he needs to know.

11          MS. OLLILA:  There are, what I told counsel,

12  he asked me about Nicholas Champagne, and what I have

13  redacted with Nicholas Champagne's statement is the name

14  of his wife and his child and where his family members

15  reside.  That's what I redacted from Nicholas Champagne.

16          On Jonathan Venturini, I redacted the same

17  information about his family members, but there is also

18  a paragraph that Jon Venturini was redacted because it

19  involved an ongoing investigation.

20          I'm happy to share it with him, and I could

21  have done this a long time ago.

22          THE COURT:  Okay.  I doubt it's sandbagging

23  just based on my experience, limited experience, but

24  experience with Mr. Sheketoff, my sense is that he on

25  some level was expecting something out of this, this to

```
 1   be released to him.  So if you could in a way be very

 2   cooperative and open with him and allow him to see this

 3   before his cross --

 4              MS. OLLILA:  Sure.

 5              THE COURT:  -- and make that happen for me.

 6              MR. SHEKETOFF:  Thank you, judge.

 7              MS. OLLILA:  Will you give me a minute to

 8   speak to the paralegal?

 9              THE COURT:  I absolutely will.  And is Mr.

10   Venturini here?  All right.  And you're going to make

11   your objection with respect to?

12              MR. SHEKETOFF:  Co-conspirator.

13              THE COURT:  Can you do that now or do you want

14   to wait until he begins?

15              MR. SHEKETOFF:  Well, it's up to you, your

16   Honor.  Do you want to do it at the sidebar?

17              THE COURT:  We might as well and save the

18   jury's time.

19              MR. SHEKETOFF:  Since this is the first

20   co-conspirator to actually testify, I want to save my

21   rights to co-conspirator hearsay.  I'm not sure he's

22   going to offer any, but to the extent that he does, I

23   want to object.  And I think we said in a lobby

24   conference that this would preserve my rights as opposed

25   to me standing up every time he's asked a question about
```

1    what somebody else told him who's allegedly in the

2    conspiracy, and so the trial will go smoother, but I

3    have a standing objection to hearsay.  And I think we

4    said at the lobby conference if I have something other

5    than it's just a, I don't think it meets co-conspirator

6    hearsay, if I have something special to say about it I

7    will have to stand up and object and make that other

8    grounds known to the Court.

9            THE COURT:  That's correct.  And we can note

10   and adhere that standing objection with Mr. Venturini,

11   Mr. Champagne, Mr. Fowle.

12           MS. OLLILA:  And Mr. Sweeney.

13           THE COURT:  And Mr. Sweeney.  And then I will

14   reserve ruling until I have heard all the testimony, and

15   then I will make a finding, a Petrozziello finding at

16   the end of the evidence.

17           MR. SHEKETOFF:  Thank you, judge.

18           MS. OLLILA:  Thank you.

19           THE COURT:  All right, thank you.

20                   BEFORE THE JURY

21           MS. OLLILA:  May I have a moment, your Honor?

22           THE COURT:  You may.

23           (Pause.)

24           (Jonathan Venturini testimony previously

25   transcribed under separate cover.)

```
1              (Jury exited the courtroom.)

2              THE COURT:  Be back at 11:15.

3              (Recess)

4              THE COURT:  Attorney Ollila.

5              MS. OLLILA:  Thank you very much.  The United

6   States calls Paul Poirier.

7              THE CLERK:  Please remain standing and raise

8   your right hand.

9                         PAUL POIRIER

10       having been duly sworn, testified as follows:

11             THE CLERK:  Please be seated.  For the record,

12  state your name and spell your last name.

13             THE WITNESS:  My name is Paul Poirier,

14  P-O-I-R-I-E-R.

15                      DIRECT EXAMINATION

16  BY MS. OLLILA:

17       Q.   Good morning, sir.

18       A.   Good morning.

19       Q.   How are you employed?

20       A.   I am a sergeant with the State Liquor

21  Commission, Division of Enforcement and Licensing.

22       Q.   What do you do as a sergeant with the State

23  Liquor Commision?

24       A.   I'm in charge of the Special Investigations

25  Unit, the Criminal Intelligence Unit, and I do a lot of
```

1    different things.  One of our responsibilities is to

2    investigate illegal gambling at any of our licensed

3    establishments.

4        Q.   Sir, what did you do, do you have a prior life

5    than law enforcement?

6        A.   I did.

7        Q.   And what was your prior life in law

8    enforcement?

9        A.   I've been in law enforcement for 29 years.  I

10   was a police lieutenant with the Merrimack Police

11   Department where I retired in 2010 after 24 years.

12       Q.   You were at the Merrimack, New Hampshire

13   Police Department for 24 years?

14       A.   Yes, I was.

15       Q.   And what was your rank at the Merrimack Police

16   Department?

17       A.   I retired as a lieutenant there.

18       Q.   What did you do at the Merrimack Police

19   Department?

20       A.   Majority of my career I did a lot of

21   undercover work.  I was assigned to the Narcotics Unit.

22   I actually worked in the Narcotics Unit for 12 years.  I

23   was assigned to the Attorney General's Office for a

24   period of two years as an undercover investigator

25   investigating narcotics crimes throughout the state of

1    New Hampshire.  I was also assigned to DEA for a period

2    of four years, two separate two-year stints on the task

3    force as the lead investigator.  I've also been assigned

4    to the United States Marshal's office on two occasions

5    on a fugitive task force.  And I also ran the problem

6    oriented policing unit with the Merrimack Police

7    Department where we investigated all types of crimes,

8    narcotics, vice crimes, robberies, burglaries, things of

9    that nature.

10        Q.   What does it mean to be an undercover law

11   enforcement officer?

12        A.   It means you've almost got to lead a double

13   life, so to speak, when it comes to your employment.  In

14   other words, you have to be a police officer, but you

15   also have to act in an undercover role.  You have to

16   change your appearance.  You have to act sort of like

17   the people that you are investigating.  If you're

18   investigating drug dealers, you sort of got to look like

19   that, you got to act like that.

20        Q.   How many cases do you think you have

21   participated on, how many drug cases as an undercover

22   law enforcement officer?

23        A.   Well over a thousand cases over my career.

24        Q.   Now, you're obviously clean cut.  Did you look

25   clean cut when you were an undercover law enforcement

1    officer?

2        A.    I didn't always look clean cut, no, I used to

3    change my appearance.  At one point I had very long

4    hair.  I would have a goatee or a beard.  Other times I

5    was clean shaven depending on whatever the operation

6    called for.

7        Q.    And as an undercover law enforcement officer

8    how many times do you think you have purchased

9    controlled substances?

10       A.    Hundreds of times.

11       Q.    What is it, why do undercover law enforcement

12   officers purchase controlled substances from targets?

13       A.    They purchase it to obtain the evidence.

14       Q.    Do you know the concept known as a

15   confidential informant?

16       A.    I do.

17       Q.    What is the difference between a confidential

18   informant or a CI versus an undercover law enforcement

19   officer?

20       A.    An undercover informant, CI, is an individual

21   who more times often than not they are working off

22   charges or there's a reason why they're participating

23   with law enforcement, usually on other occasions because

24   they are getting paid by law enforcement, other times

25   it's for retribution.  But an undercover law enforcement

1  officer is doing it as a role, he's acting as a role as

2  part of his employment.

3       Q.   This may be obvious but I want to ask it

4  anyway.  When you were an undercover law enforcement

5  officer and you were attempting to buy controlled

6  substances, have you ever been asked by the person

7  selling the substance to you to use it in front of them?

8       A.   Yes, I have.

9       Q.   And have you ever done that?

10      A.   I have never done that ever.

11      Q.   And how do you get around that?  Isn't that

12 the easiest way to ferret out a law enforcement officer?

13      A.   Yes, it is.  It's an easy way to try to ferret

14 out who the officer is and if he's a law enforcement

15 officer.  Usually it's part of your training and you

16 usually plan for that.  So you need to come up with some

17 type of story as to why you're not going to do the

18 drugs.

19      Q.   And have you always been successful?

20      A.   Yes, I have.

21      Q.   When you act as an undercover law enforcement

22 officer, do you ever go out alone?

23      A.   No, never.

24      Q.   Why?

25      A.   It's just for safety reasons.

1    Q.    When you go into a house in order to purchase

2    drugs as an undercover law enforcement officer,

3    approximately how many individuals are backing you up on

4    surveillance?

5    A.    It could be anywhere, depending on your

6    agency, your department, it could be anywhere from two

7    to three guys up to a dozen guys.

8    Q.    What happens if you get in trouble while

9    you're inside or trying to purchase drugs?

10    A.    If you get in trouble?

11    Q.    Yes.  If something happens, if you're

12    discovered?

13    A.    If you're discovered, you better hope your

14    backup, the other officers know about it and they'd come

15    in and assist you.

16    Q.    Has it ever happened to you?

17    A.    That's never happened to me, no.

18    Q.    How would they know, if you are inside a

19    residence, how would your backup officers know?  Do you

20    wear something on your body?

21    A.    More than likely you're going to be wearing a

22    transmitter also known as a body wire, and the officers,

23    the backup officers or surveillance officers are going

24    to be monitoring that.

25    Q.    So you have a body wire on you?

1      A.    Yes.

2      Q.    And the surveillance officers can hear the

3  body wire; is that correct?

4      A.    That is correct.

5      Q.    And do you have a code word if you get in

6  trouble, are you supposed to say the code word?

7      A.    Yes, you are.

8      Q.    And can you give an example of that?

9      A.    There's many different examples.  I remember

10 one example we would just say help, or we would come up

11 with, you know, we would say a color, or we'd come up

12 with some type of phrase that we all knew, all the

13 backup officers knew that if I was in trouble or the

14 undercover was in trouble, if you heard this phrase,

15 that it was time for them to come in and assist you.

16     Q.    So you have acted as an undercover law

17 enforcement officer purchasing drugs on many, many

18 occasions obviously?

19     A.    Hundreds of occasions, yes.

20     Q.    And so with the Liquor Commission, were you

21 tasked with also purchasing drugs working for the Liquor

22 Commission?

23     A.    Yes.

24     Q.    Let me back up and ask you.  Did you

25 participate in an investigation starting in or around

1    2012 of a place known as Amory Street House of Pizza?

2         A.   Yes, I did.

3         Q.   And just very briefly what did the

4    investigation involve?

5         A.   It involved the owner and his son who owned

6    Amory Street Pizza who had some electronic video

7    gambling machines at that location and information

8    received was that the son was also involved in

9    distribution of drugs.

10              MR. SHEKETOFF:  Objection, your Honor.

11              MS. OLLILA:  I'll strike that, judge.

12              MR. SHEKETOFF:  Thanks.

13              THE COURT:  Sustained.

14        Q.   Did you go into Amory Street House of Pizza as

15   an undercover law enforcement officer?

16        A.   Yes, I did.

17        Q.   And did you go alone?

18        A.   No, I did not.

19        Q.   Was there another undercover officer with you?

20        A.   Yes, there was.

21        Q.   And who was that?

22        A.   Investigator Gregory Nye.

23        Q.   Every time you went into Amory Street House of

24   Pizza was the other investigator, Gregory Nye, with you?

25        A.   Yes, he was.

1      Q.     How long would you serve in an undercover

2   capacity.  A year, a month, two years?

3      A.     That particular investigation we were over two

4   years.

5      Q.     Why so long?  Did something happen in the

6   middle?

7      A.     Yes.  We actually initiate the gambling

8   investigation at that location and we were about to

9   execute a search warrant when I learned from state

10  police that they were conducting a rather large

11  investigation, drug investigation involving that

12  establishment and the owners of that establishment.  So

13  at that point we decided to not execute the search

14  warrant in fear that it would hinder their

15  investigation.  And so we actually hopped on board, so

16  to speak, with state police and got involved in their

17  investigation as well.

18     Q.     Okay.  Let me show you what has been marked

19  and entered into full evidence as Government's Exhibit

20  43p-1.  Do you recognize what that photograph is of,

21  sir?

22     A.     Yes.  That is Amory Street House of Pizza in

23  Manchester.

24            MS. OLLILA:  Diane, will you please pull up

25  43p-1.

1    Q.    Could you please describe to the jury what it

2 is they're seeing in this exhibit?

3    A.    The one-story building with the Amory Street

4 Pizza sign is the establishment we're speaking of.  The

5 pickup truck belongs to the owner.

6    Q.    Who was the owner?

7    A.    Cornelius Nakos.

8    Q.    And do you know whether he has any relation to

9 the defendant, Alkis Nakos?

10    A.    I know that it's his father.

11    Q.    And he's the owner, Cornelius is the owner of

12 Amory House of Pizza?

13    A.    Yes, he is.

14    Q.    Sir, do you see Alkis Nakos in the courtroom

15 today?

16    A.    Yes, I do.  He's sitting at the defense table

17 with his attorney.

18    Q.    Could you please describe an article of

19 clothing that he's wearing?

20    A.    Gray suit with a gray shirt and striped tie.

21        MS. OLLILA:  May the record reflect the

22 witness has identified the defendant Alkis Nakos.

23        THE COURT:  The record will so reflect.

24    Q.    Over the course of you acting as an undercover

25 law enforcement officer, how long would you estimate,

1    how many hours would you estimate you have spent inside

2    Amory Street House of Pizza?

3         A.   I was in that location over 50 times, and we

4    would spend anywhere between, from a half hour to just

5    over two hours each time.  On average we'd spend about

6    an hour each time in there.  I'd say I was in there at

7    least 50 or 60 hours.

8         Q.   While you were in there did you ever hear the

9    phone ring and someone place an order for a pizza or a

10   sub?

11        A.   No.

12             MR. SHEKETOFF:  Objection, your Honor.

13             THE COURT:  Overruled.

14        Q.   Did you ever hear the phone ring and have an

15   order for a pizza or sub be placed?

16        A.   No, I didn't.  I never heard an order being

17   placed for a pizza or a sub.

18        Q.   Have you ever seen a family while you were

19   there enter that establishment and order food and sit

20   down and eat it?

21        A.   No, not once.

22        Q.   Have you ever seen pizza being made and

23   delivered out of that establishment?

24        A.   No, I have not.

25        Q.   All right, I have a question for you.  Early

```
 1   on in the investigation did inspector, Investigator Nye

 2   order a pizza?

 3        A.   Yes, he did.

 4        Q.   Why would he do that?

 5             MR. SHEKETOFF:  Well, objection.

 6             THE COURT:  Sustained.

 7        Q.   Was a pizza made?

 8        A.   Yes.

 9        Q.   Did you eat it?

10        A.   I did.

11        Q.   How was it?

12        A.   Not very good.

13        Q.   Who made the pizza?

14        A.   Alkis Nakos made it for us.

15        Q.   How many individuals would come into the

16   establishment while you were there on any given night?

17        A.   Again, it depended on the time of day.  It

18   could be anywhere from zero to maybe four or five.  Not

19   very many at all.

20        Q.   When individuals would come in, would they sit

21   down and eat food?

22        A.   No.

23        Q.   What were they doing?

24        A.   They were either gambling on the video poker

25   machines or just having, drinking beer, mainly drinking
```

1    beer.

2         Q.    So there was alcohol served there; is that

3    correct?

4         A.    Yes.

5         Q.    Now, as an undercover law enforcement officer

6    are you allowed to have alcoholic beverages?

7         A.    Yes, we are.

8         Q.    And did you have alcoholic beverages?

9         A.    Yes.

10        Q.    If you were there for more than an hour or

11   two, how many alcoholic beverages would you have?

12        A.    I would have no more than three.  Our policy

13   indicates that as an undercover you're to have no more

14   than three, one per hour.  And typically if I was there

15   I would either dump it out in the urinal, I typically

16   wouldn't drink it, I would pretend like I was drinking

17   it.

18        Q.    Why would you even have a drink at all?

19        A.    You have to not to raise suspicion.  You need

20   to blend in.  If you just sit there and have a water

21   they're going to question who you are, you know, what

22   you're doing there.  People that go there mainly are

23   drinking beer and playing the electronic machines.

24        Q.    Okay.  And so you said you would never order

25   more than three.  And would you drink those alcohol

1  beverages?

2        A.   No, I would not.

3        Q.   What would you do?

4        A.   I would empty it in the urinal.

5        Q.   How would you do that, you carry your drink

6  into the bathroom?

7        A.   Yes, I would.

8        Q.   Would you please pull up 43p-2.  What is this

9  a photograph of that the jury can see?

10        A.   This is another angle of Amory Street House of

11  Pizza.

12        Q.   If you wanted to gain entry into Amory Street

13  House of Pizza, how would you gain entry?

14        A.   Through the doorway right there by the

15  windows.

16        Q.   Is it to the far part of the right of the

17  picture?

18        A.   Yes, it is.

19        Q.   Was there any other way to gain access into

20  that restaurant?

21        A.   There is a back door, but it's not typically

22  used by patrons to go in and out.

23        Q.   Would you please pull up 43p-4.  What is

24  depicted in 43p-4?

25        A.   These are the three electronic video gambling

1    machines.

2        Q.    How much would an individual have to place

3    into each machine if he or she wanted to use it in order

4    to gamble?

5        A.    You needed to place at least one dollar and it

6    takes denominations of between a 1 and a $20-bill.  So a

7    1, 5, 10 or 20.

8        Q.    Please pull up 43p-7.  Sir, what is it that

9    the jury sees in this photograph?

10       A.    That's the pantry area, the kitchen area of

11   the restaurant.

12       Q.    There is food there.  Can you see the food?

13       A.    Barely.  I can see some things on the shelf.

14   Looks like a carton of eggs.  And I can't make out what

15   everything is, but yeah, there's a few things on the

16   shelf.

17       Q.    You said that the owner was Alkis Nakos's

18   father; correct?

19       A.    Yes.

20       Q.    And what is his name again?

21       A.    Cornelius Nakos.

22       Q.    Did you see him every time you went into the

23   establishment?

24       A.    No, not every time.

25       Q.    Did you see Alkis Nakos when you went into the

1    establishment?

2         A.    No, not every time.

3         Q.    What percentage of time was Alkis Nakos there?

4         A.    I'd say maybe 20 percent of the time.

5         Q.    Did you ever see Cornelius eating any food in

6    the establishment?

7         A.    Yes, I've seen Cornelius make himself some

8    food, a lunch, a soup.  He would make himself food.

9         Q.    Do you recall the date, the first time you

10   went into Amory Street House of Pizza?

11              MS. OLLILA:  And Diane, please pull up 43p-2.

12        Q.    Do you recall the date, sir?

13        A.    I believe it was around August 29th, 2012.

14   Somewhere around there.

15        Q.    Okay.  And what was the purpose you first

16   entered in August of 2012, what was your investigation,

17   what was your plan?

18        A.    Our plan was to conduct a gambling

19   investigation into the machines and to see if we could

20   actually play the machines and get a payout.  The

21   machines themselves are not illegal, but the fact that

22   individuals who own these machines are paying out

23   patrons, that's the illegal part.  So we went in there

24   in an undercover capacity with hopes of being able to

25   get paid out from these machines.

1      Q.   Were you present at Amory Street Pizza on
2  September 6, 2012?
3      A.   Yes, I was.
4      Q.   I'm going to show you what's been marked only
5  for identification as 43b.  What happened on that date,
6  if you remember, September 6, 2012?  Who was in there
7  when you walked in?
8      A.   Alkis Nakos was in there.
9      Q.   Did you have a conversation with him?
10     A.   Yes.
11     Q.   Do you recall whether or not that was the
12  first time you had met him or had you met him before?
13     A.   That was the first time I actually met him,
14  yeah.
15     Q.   And how did it go, how long did you stay in
16  there?
17     A.   We were in there for it looks like, it looks
18  maybe -- I can't really see because it's cut off, I'm
19  sorry, and I don't recall exactly.
20     Q.   Okay.  Was it over an hour?
21     A.   It was over an hour.
22     Q.   Did you go back to that establishment on
23  March 21, 2013?
24     A.   I believe we did.
25     Q.   Let me show you what is marked only for

1    identification as 43c.  Do you recognize what 43c is?

2         A.    Yes.

3         Q.    What is it?

4         A.    This is a surveillance report and a report

5    regarding our visit on that particular date.

6         Q.    Who authored that report?

7         A.    This one is authored by me.

8         Q.    Okay.  Is it your common practice after you

9    engage in an undercover law enforcement capacity to

10   write a report about what you saw and what you heard?

11        A.    Yes, it is.

12        Q.    Why is that necessary?

13        A.    To refresh your memory for trial and for your

14   investigation.

15        Q.    How long do you wait after you leave an

16   establishment before you write the report?

17        A.    I try to write them that night if possible, if

18   it's not too late, or I write them the next day.  I

19   certainly make notes as soon as I leave there.

20        Q.    Why is that?

21        A.    So that I try to remember everything that

22   occurred inside of the establishment.

23        Q.    When you went in on March 21st, 2013, who was

24   present there, if you remember?

25        A.    Alkis Nakos was there.

1    Q.    Before you went in, is it common practice for

2  you to make note of vehicles located on the outside of

3  areas you're going to enter?

4    A.    Yes, we try to do some pre-surveillance prior

5  to entering.

6    Q.    Why?

7    A.    For our own intelligence purposes and for

8  safety reasons as well.

9    Q.    Did you do that before you entered on

10  March 21st, 2013?

11    A.    Yes, we did.

12    Q.    What did you see?  Were any vehicles parked

13  outside?

14    A.    Yes, we saw a white Mercedes SUV with New

15  Hampshire registration plates, and we later determined

16  that it was --

17        MR. SHEKETOFF:  Well, objection.  He answered

18  the question, your Honor, and now he's --

19        THE COURT:  Sustained.

20    Q.    Did you go in?

21    A.    Yes, we did.

22    Q.    Who was there?

23    A.    Alkis Nakos was there.

24    Q.    Was anyone else there?

25    A.    Yes.  There was a female there.  His

girlfriend.

Q. Did you speak with Alkis Nakos?

A. I did.

Q. And what did you talk to him about?

A. We started talking about gambling. He had mentioned Foxwoods and how he was a high roller at Foxwoods and told us that management actually knew him quite well and that they often raised the table amounts for him to buy in and which also discourages other players to sit down at the table because they know he's a high roller and he spends a lot of money at the tables.

Q. Did he talk about travel at all during that conversation on March 21st, 2013?

A. Yes, he did.

Q. What did he talk about with respect to travel?

A. Well, he talked about how he often made trips to Foxwoods. And he talked about, I believe there's a time he actually talked about going to Canada, making frequent trips to Canada.

Q. Where in Canada?

A. Montreal.

Q. Did he mention anything about having friends there?

A. Yes. He said he had a very good friend there

1    who was well-respected and well-known.  He indicated

2    that the police knew him quite well and that when he

3    goes there and visits this individual, they will go out

4    to some strip clubs and to a particular club called Opus

5    he mentioned.  He said they frequented that place.  In

6    fact, he talked about a story where he had gone there

7    one time and apparently he was driving a not so nice

8    vehicle and was trying to get a valet and couldn't get a

9    valet, and then the valet recognized his friend and his

10   friend pointed at the valet, recognized who he was, and

11   immediately parked the car for the two of them.

12        Q.    Did he mention how he met that friend?

13        A.    Yes.  He said he met him when he was in state

14   prison.

15        Q.    Did he mention the nationality of his friend?

16        A.    He said his friend was Greek.

17        Q.    Did he talk at all about any motor vehicles he

18   had at that time?

19             MR. SHEKETOFF:  Well --

20             MS. OLLILA:  Actually, strike that, judge.

21             MR. SHEKETOFF:  If he has a failure of memory,

22   your Honor, I have no problem with him refreshing his

23   memory, but he's reading the report on the witness stand

24   in anticipation of questions.

25             THE COURT:  Okay.  All right, fair enough.  It

1    might take a little longer to do it that way, but keep,

2    you can ask him the question, establish a foundation,

3    have whatever, if he says it will refresh his memory,

4    have it nearby and he can refer to it.

5         Q.   Sir, how many reports do you think that you

6    generated during the course of your investigation?

7         A.   A hundred reports.

8         Q.   Is it possible for you to memorize every

9    single one of your reports?

10        A.   No, it's not.

11        Q.   Is it possible for you to know everything that

12   was said during a particular day?

13        A.   No, it is not.

14        Q.   And you're looking at something that you have

15   in your hand.  What exhibit are you looking at?

16        A.   14-93-01 or 43c.

17        Q.   And why are you looking at it.  Is it helping

18   you to refresh your recollection about the conversation?

19        A.   Yes, it is, it's helping refresh my

20   recollection for that particular date, yes.

21        Q.   Okay.  All right.  This is what I want to do.

22   I want to ask you before you talk about these dates,

23   March 22nd, 2013, did you go to Amory Street House of

24   Pizza?

25        A.   Yes.

1      Q.   Can you tell this jury right now exactly

2  everything that happened when you were there on

3  March 22nd, 2013?

4      A.   No, I cannot, not without refreshing my memory

5  by reading my report.

6      Q.   Is there something that would help to refresh

7  your recollection?

8      A.   My report.

9      Q.   Let me show you what is marked as Government's

10  Exhibit 43c.  And I'm going to ask you to read that

11  report, and let me know when you're finished if your

12  recollection has been refreshed.

13      A.   Okay.

14      Q.   Take your time, please.

15      A.   I'm a slow reader.  Bear with me.

16      Q.   That's okay.

17      (Witness reading report.)

18      THE COURT:  While the sergeant is reading his

19  report I'm just going to explain to the jury that

20  witnesses cannot read from a report like that as

21  testimony.  What happens is, as you just heard, if a

22  witness can't remember something, they're permitted to

23  review a document that they think might help them.  But

24  it isn't proper for a witness to literally read from the

25  document, but to the extent they need to refer to it,

1    they absolutely can, so that's the reason for this

2    requirement.  Go ahead.

3         Q.   Have you read that document?

4         A.   I have.

5         Q.   Now if, when I ask you a question, if you

6    can't remember, what I want you first to say is I don't

7    remember if that happened and may I please refer to my

8    report again.  Okay?

9         A.   Okay.

10         Q.   What date are you referring to?

11         A.   March 22nd, 2013.

12         Q.   Did you go into Amory Street House of Pizza?

13         A.   Yes, I did.

14         Q.   Who was there?

15         A.   Alkis Nakos.

16         Q.   Was anyone else there?

17         A.   No.

18         Q.   Did you have a conversation with Alkis Nakos?

19         A.   Yes, I did.

20         Q.   And did you talk at all about Canada?

21         A.   Yes, we did.

22         Q.   And what was the conversation?

23         A.   We started talking about Canada and he had

24    asked me if I had checked out an escort cite that he had

25    told me about.  I told him I had not had time to check

1    it out yet, but I was intending on checking it out.  It

2    was a service that he used and he talked about a

3    specific girl named Olivia that he had seen before that.

4    We then started talking about, I told him that I had

5    been to Montreal with my cousin.  That my cousin had an

6    airplane and often flies into Montreal.

7         Q.   Is that true?

8         A.   It is not true.  It was a story that I came up

9    with.

10         Q.   And why did you come up with that story?

11         A.   I came up with that story to see what his

12    response was going to be.

13         Q.   Were you aware at the time when you said that

14    that the New Hampshire State Police were conducting a

15    drug investigation about Alkis Nakos?

16         A.   Yes.

17         Q.   And were you aware that the drug investigation

18    involved Canada?

19         A.   Yes.

20         Q.   And the receipt of marijuana from Canada?

21         A.   Yes.

22         Q.   Okay.  So you come up with a story that a

23    cousin of yours flies planes in Canada.  Is that

24    correct?

25         A.   That's correct.

1    Q.   And what else did you say?

2    A.   I told him that I had an aunt who lived there,

3  the pilot's mom, and that he often flies up there to

4  visit her.  And that in response he had asked if we had

5  to go through customs when we flew into Canada.  He said

6  that the one time that he had actually flown into Canada

7  he had to go through customs.  And I told him that there

8  was no need to go through customs, that we could just

9  fly over the border into a small airport where there was

10  no air traffic control.

11    Q.   Did he mention anything about the Hell's

12  Angels in Canada?

13    A.   Yes, he did.

14    Q.   What did he say?

15    A.   He mentioned that the Hell's Angels in Canada

16  were the real deal and that they were nothing like the

17  Hell's Angels in Manchester and that they were the real

18  deal is what he said.

19    Q.   Did someone, while you were there, did someone

20  enter that appeared to know Alkis Nakos?

21    A.   Yes.

22    Q.   Who entered?

23    A.   He was identified as Andre Watson.

24    Q.   What happened when Andre Watson came in, and

25  by the way, what does Andre Watson look like?

1      A.   He's an African American male, I'd say in his

2 early thirties, muscular built, bald head.

3      Q.   What happened when Andre Watson came in, and

4 how did you identify him?

5      A.   I obtained his license plate and that's how I

6 was able to actually identify him as well as Alkis Nakos

7 introduced him as Andre to us.

8      Q.   So you get his plate, his license plate, and

9 you run his plate, and do you see his New Hampshire

10 driver's license?

11      A.   Yes, I do.

12      Q.   You see a picture of him?

13      A.   Yes, I do.

14      Q.   And you confirm that that person depicted in

15 the New Hampshire driver's license is in fact the Andre

16 Watson that was introduced to you as Andre Watson?

17      A.   That's correct.

18      Q.   Did Andre Watson embrace Alkis Nakos when he

19 came in?

20      A.   Yes.  As soon as he walked into the

21 establishment Alkis walked from behind the bar, met in

22 the middle of the floor and they hugged each other.

23      Q.   Is that when you were introduced?

24      A.   Yes, within that time frame I was introduced

25 to him, yes.

1      Q.    Did you out of the corner of your eye see

2  Andre Watson do something with relation to you?

3      A.    Yes.  I was sitting at the bar as was

4  Investigator Nye, and Alkis Nakos was behind the bar,

5  and Andre was sitting at one of the tables, and out of

6  the corner of my eye I saw him take a picture of me with

7  his cell phone and the flash went off.  I looked over

8  quickly, and he put the phone down real fast and had a

9  surprised look on his face like he was surprised the

10  flash actually went off.

11      Q.    What did you do at that point?  Did you

12  confront him with why he was taking your picture?

13      A.    No, I did not.

14      Q.    Why didn't you?

15      A.    I didn't see a need to at that point and I

16  didn't want to cause a confrontation, nor did I want to

17  blow our cover so to speak, so, I didn't confront him on

18  that.

19      Q.    Did Alkis Nakos tell you how he met Andre

20  Watson?

21      A.    Yes, he did.

22      Q.    How did he meet Andre Watson?

23      A.    He said he had met him in state prison.  He

24  told us that Andre had actually killed a taxi driver

25  driver, had stabbed her in the back multiple times when

1 he was a teenager and went to jail for a number of

2 years.

3       Q.   Do you know someone by the name of Kaylee?

4       A.   Yes, I do.

5       Q.   Who's Kaylee?

6       A.   That is Alkis Nakos's girlfriend.

7       Q.   Did she enter the restaurant at some point on

8 March 22nd, 2013?

9       A.   Yes, she did.

10      Q.   Did you have a conversation with her?

11      A.   Yes, I did.

12      Q.   What did that conversation involve, what did

13 she say?

14      A.   I believe that conversation that particular

15 day was about Canada and she told us that, she actually

16 told me that her parents had owned a camp in Canaan,

17 Vermont.

18           MR. SHEKETOFF:  Objection, your Honor, what

19 she said.

20           THE COURT:  Hearsay?

21           MR. SHEKETOFF:  Yes.

22           MS. OLLILA:  Co-conspirator statement, judge.

23 801(b)(2)(E) --

24           THE COURT:  All right, conditionally admitted.

25           THE WITNESS:  She told me that her parents

1    owned a camp in Canaan, Vermont, near the Canadian

2    border, and that they liked to go camping up there and

3    she said that they were going to build a camp there

4    soon.

5         Q.   Do you recall how long you stayed at the

6    restaurant that day?

7         A.   I don't recall, but I think that particular

8    day we had some good conversations with Alkis, so I

9    believe we were there for probably a couple hours.

10        Q.   Did you ever see anyone order pizza?

11        A.   No, I did not.

12        Q.   Did you order any food?

13        A.   No, I did not.

14        Q.   Did the phone ever ring where someone was

15   ordering pizza?

16        A.   No.

17        Q.   Did anyone come in and order anything from off

18   the street?

19        A.   No.

20        Q.   Now, did you go back to Amory Street House of

21   Pizza on March 26, 2013?

22        A.   I believe I did.

23        Q.   Do you recall as you sit there now exactly

24   what happened that day?

25        A.   No, I do not.

1      Q.   Is there something that would help to refresh

2  your recollection as to what happened on that day?

3      A.   My report would refresh my recollection.

4      Q.   Let me show you what has been marked as

5  Government's Exhibit 43f for identification.  Do you

6  recognize what Government's 43f is?

7      A.   Yes, this is my report.

8      Q.   Sir, if you read your report, would that help

9  to refresh your recollection about that day?

10      A.   Yes, it would.

11      Q.   Would you please take your time and read that

12  report.

13           (Witness reading report.)

14      A.   This particular report has my heading on it,

15  but I believe this is Investigator Nye's report.

16      Q.   Okay.  And what is the --

17      A.   I recognize the conversation and the gist of

18  it.

19      Q.   Okay.  Did you bring your reports, Sergeant

20  Poirier?

21      A.   Yes.

22      Q.   Where are your reports for that day?

23      A.   They're on the bench over there.

24           MS. OLLILA:  Judge, may I get those?

25           THE COURT:  Yes, you may.

1          MS. OLLILA:  I apologize for that.

2     A.   Okay.

3     Q.   Why don't you go through your reports and pull

4  out the report that is dated March 26, 2013.

5     A.   May I read it?

6     Q.   Yes.

7          (Witness reading report.)

8     Q.   Have you read your report, sir?

9     A.   Yes, I have.

10     Q.   After reading the report, has that helped to

11  refresh recollection?

12     A.   Yes, it has.

13     Q.   If at any point in time I ask you a question

14  and you can't remember, why don't you say so so that I

15  can allow you to go back to your report.

16     A.   Okay.

17     Q.   Did you go into Amory Street House of Pizza

18  March 26, 2013?

19     A.   Yes, I did.

20     Q.   Who was there when you entered?

21     A.   Alkis Nakos.

22     Q.   Did you see any vehicles parked outside?

23     A.   I saw his 2011 Mercedes Benz SUV parked

24  outside.

25     Q.   Did you engage in a conversation with Alkis

1    Nakos?

2         A.    Yes.

3         Q.    And did you talk about Canada at all?

4         A.    Yes, we did.

5         Q.    And what was the conversation about Canada?

6         A.    He asked us, he asked me how we can fly into

7    Canada again without going through customs, and I

8    explained to him that we fly right into Montreal and

9    that there was no need to file a flight plan and that

10   there was many small air fields around Montreal that we

11   could just fly into.

12        Q.    While you were engaging in conversation with

13   Alkis Nakos did he bring up marijuana?

14        A.    Yes, he did.

15        Q.    And what did he say about marijuana?

16        A.    He started talking about the different strains

17   of marijuana and telling me that, you know, marijuana in

18   Mexico is not as good as the marijuana from Canada.

19        Q.    Did he say why?

20        A.    May I refresh my memory and look at this?

21        Q.    Yes.

22              (Witness reading report.)

23        A.    He didn't specifically say, you know, why it

24   was better.

25        Q.    Okay.

1          A.    But he talked about different types of

2    marijuana.  He talked about hydroponic marijuana being

3    grown around here by Asian individuals and how it's

4    grown inside of homes.  He also talked about how he and

5    his friends used to smuggle marijuana from Canada into

6    the United States with duffle bags of marijuana he

7    actually said, and he said that they would follow the

8    Indian trails through Canada to the U.S. border.  He

9    said that there was no barbed wire or nothing protecting

10   the border from him crossing.  Told me that he actually

11   knows the Indian trails quite, quite well.  But he said

12   that they would actually either use the trails, he said

13   he's done it with jet skis, snowmobiles, but he said

14   now, he says now they're using tractor-trailers to bring

15   the stuff in.

16         Q.    Did he say anything about how the smell of the

17   marijuana is masked?  Do you know what I mean when I

18   mean masked?  Hidden?

19         A.    Yes, I do know what you mean.

20         Q.    What did he say?

21         A.    May I refresh my memory?

22         Q.    Yes.

23               (Witness reading report.)

24         Q.    Let me ask you a different question.  You were

25   just saying that he was indicating how the marijuana

1  would enter into the United States, and you mentioned

2  ATVs.  Did he ever say anything about boats or canoes?

3       A.   Yes.

4       Q.   What did he say?

5       A.   He said canoes.  He said that they would

6  utilize canoes to get into the United States.

7       Q.   Did he ever talk about how much money he,

8  Alkis Nakos, would make off the top of each pound of

9  marijuana?

10      A.   Yes.  He said at the time he was paying $800 a

11 pound and that he was making three to $400 per pound as

12 profit.

13      Q.   Did he say if he had ever, did he talk to you

14 about trips he had made to Montreal?

15      A.   Yes.  He said over the last year he's made at

16 least five trips to Montreal.

17      Q.   And did he ever mention that law enforcement

18 had been watching he and his friends while they were in

19 Canada?

20      A.   Yes.

21      Q.   What did he say about that?

22      A.   He said that he actually was with his Greek

23 friend who is well-known in Montreal and that the police

24 were watching him.

25      Q.   Were watching who?

1    A.    Were watching his friend.

2    Q.    Okay.

3    A.    And as a result they got stopped and Alkis got

4  arrested for being a felon in Canada.  He said that they

5  arrested him and they took $10,000 cash off of him that

6  he had on his person, and that when he got bailed, that

7  they drove him to the, authorities drove him to the New

8  York border and dropped him off.

9    Q.    Did you ask him if he was afraid of going back

10 into Canada?

11   A.    I did.

12   Q.    And what was his response?

13   A.    He was afraid to go through customs.  He

14 wasn't afraid to go to Canada, but he was afraid to go

15 through customs.

16   Q.    Did he say how he could get into Canada?

17   A.    He said he could take the Indian trails in.

18   Q.    Say that again, he can take the what?

19   A.    The Indian trails.  He knows the trails quite

20 well.  He said he could get into Canada through the

21 Indian trails.

22   Q.    Did he mention anything about being afraid to

23 be with his friend in Canada again?

24   A.    He just said that he's afraid to be seen with

25 him in Canada because the police are watching him.

1    Q.    How long did you stay there on March 26, 2013?

2    A.    I believe we were there for a couple of hours

3 that evening.  Yeah, we were there for just over two

4 hours.

5    Q.    Did you ever see anyone eating food there that

6 day?

7    A.    No, I did not.

8    Q.    Did you eat food there that day?

9    A.    No, I did not.

10    Q.    Did the phone ring and anyone order pizza?

11    A.    No.

12    Q.    Did anyone leave that establishment with food

13 in their hand?

14    A.    No.

15    Q.    Did you go to Amory Street House of Pizza on

16 May 1st, 2013?

17    A.    Yes, I did.

18    Q.    Do you have an absolute recollection as to

19 what happened in your mind on that date?

20    A.    No, I do not.

21    Q.    Would something help to refresh your

22 recollection?

23    A.    My report would.

24    Q.    Okay.  Let me show you what is marked as

25 Government's Exhibit 43j, and I'd ask you to look at

1    this two-page document.  Is that your document?

2         A.   Yes, it is.

3         Q.   Would it help to refresh your recollection if

4    you reviewed it?

5         A.   Yes, it would.

6         Q.   Why don't you go ahead and review it.

7              (Witness reading report.)

8              THE COURT:  While he's reviewing that could

9    counsel approach.

10                        AT SIDEBAR

11             THE COURT:  Two questions.  One, most

12   importantly, the limiting instruction with respect to

13   meeting his friend in prison, you're not disputing he

14   was in prison, but I should still give them a limiting

15   instruction at some point on that.  Perhaps I could do

16   it as part of my lunch break instruction, remind them of

17   their --

18             MR. SHEKETOFF:  Sure.

19             THE COURT:  Okay.  And Kaylee is the

20   girlfriend or wife?

21             MS. OLLILA:  Girlfriend.

22             THE COURT:  Those statements, I'm not sure at

23   all how those statements could be in furtherance of,

24   unless she somehow is going to try to couple with

25   Poirier and they're going to use him as part of this

1    drug ring.  Maybe that's what you're going to tie

2    together.  But I didn't hear anything about -- she was

3    talking about we have a camp in Canada, those statements

4    didn't seem in furtherance of the conspiracy.  Are you

5    going to tie those together?

6              MS. OLLILA:  I'm going to attempt to, judge,

7    but certainly it's subject to striking if we do not tie

8    it together.

9              THE COURT:  Okay, well, can you tell me now.

10   It's close in their mind, Kaylee they might remember.  I

11   would prefer if I'm going to end up striking it to

12   strike it closer in time, but I'm not seeing how you tie

13   the statements she made to him.

14             MS. OLLILA:  Right.  We don't have

15   information, judge, that she is, we don't have direct

16   information that she is a co-conspirator.  We have

17   circumstantial evidence that she's a co-conspirator

18   because she lives with him.

19             THE COURT:  But you have to have those

20   statements.

21             MS. OLLILA:  Correct, in furtherance of the

22   conspiracy.  It's the United States' argument that she

23   was a co-conspirator, and in identifying Nakos and the

24   fact that her parents had a place on the border that

25   they visited, that would be in furtherance of because it

1  shows that she has a connection to the Canadian border

2  and that they travel up there.

3          THE COURT:  Okay, but in furtherance of the

4  conspiracy, the purpose of the statement has to be to

5  further the conspiracy.  So is she trying to engage

6  Poirier who she thinks is a, perhaps a potential dealer,

7  is she trying to engage him or --

8          MS. OLLILA:  And I think that's what she would

9  say.  By the way, judge, all the case law says that the

10  in furtherance of can be something as simple as

11  identifying a fellow co-conspirator.  It doesn't have to

12  further, doesn't have to push the conspiracy along.

13          THE COURT:  I understand that, I understand

14  that, but just being a co-conspirator is not going to

15  get the statement in.  I trust that you're going to tie

16  it back together.

17          MS. OLLILA:  Sure.  Well, obviously we'll try,

18  judge, but on her it is circumstantial evidence.  We

19  don't have direct evidence that she's dealing drugs, we

20  don't have direct evidence.  It's circumstantial.  She's

21  there, she's with him all the time.  She knows what's

22  going on.  So, I mean --

23          THE COURT:  I don't think you'll have a

24  problem with prong one nor prong two during time frame,

25  but in furtherance of I'm stuck on.

1          MS. OLLILA:  Exactly.  I have one scheduling

2    issue too, judge.

3          THE COURT:  Yes.

4          MS. OLLILA:  We are flying along.  We will be

5    done our case by Monday morning at the latest.  I

6    foresee doing closings and charge on Monday, so that is

7    to say that I might run out of witnesses today.  I have

8    Nicholas Champagne and two quick witnesses after.

9    Attorney Sheketoff just is not doing the cross I had

10   anticipated that he would do, so we may end up, I know

11   that you said only half an hour for lunch today, but we

12   may end up early, judge, and I apologize for that.  I've

13   already now scheduled --

14         THE COURT:  Nick Champagne will take some

15   time.

16         MS. OLLILA:  Yeah, oh sure, sure.

17         THE COURT:  I think we might be okay.  Might

18   be able to let them leave early.

19         MS. OLLILA:  Sure, sure, good.

20         THE COURT:  All right, good.  Excellent.

21   Thank you.

22                    BEFORE THE JURY

23       Q.   Okay, sir, have you reviewed that report?

24       A.   Yes, I have.

25       Q.   And what date are you referring to?

1       A.    It's May 1st of 2013.

2       Q.    And did you go into that restaurant, Amory

3   Street House of Pizza?

4       A.    Yes, I did.

5       Q.    Did you see anyone once you were in there?

6       A.    Yes, I saw Alkis Nakos.

7       Q.    Did you have a conversation with Alkis Nakos?

8       A.    Yes.

9       Q.    And what did the conversation consist of?

10      A.    Alkis Nakos had greeted me when I walked in

11  and he asked me about the vehicle I pulled up in, asking

12  me if it was my new car and asking me how much I paid

13  for it.

14      Q.    And was it your car?

15      A.    It was my state undercover vehicle, yes.

16      Q.    What kind of car was it?

17      A.    It was an Infinity SUV.

18      Q.    Why did you bring an Infinity SUV there?

19      A.    Well, I knew that Alkis Nakos liked sporty

20  vehicles, sport utility vehicles, so I figured that

21  would be a good conversation starter.

22      Q.    And was it a good conversation starter?

23      A.    Yes, it was.  He actually asked if he could

24  look at it.  So the two of us went outside and I opened

25  the door up.  He looked inside, looked at the vehicle,

1  commented about the navigation system and just how he

2  liked the vehicle.

3        Q.   Did he show you his vehicle?

4        A.   Yes.  Then after we got done doing that he

5  offered to show me his Mercedes which was parked out

6  front.  He actually opened up the driver's door, offered

7  me to sit inside, which I did.  He commented that he

8  didn't like it, he thought it was too small, that his

9  True Religion jeans were caught in the seats of the

10  Mercedes.  He was complaining about his jeans.

11        Q.   His what jeans?

12        A.   True Religion.  It's a brand name, expensive

13  pair of jeans.

14        Q.   How do you know that?  Do you have a pair of

15  True Religion jeans?

16        A.   I don't own any True Religion jeans, but I

17  also have a second job.  I work asset protection for

18  Saks Fifth Avenue in Boston, and I know that those jeans

19  cost anywhere from two to $400 a pair, so I'm very

20  familiar with those jeans.

21        Q.   While you were with Alkis Nakos did he talk

22  about special ordering the vehicle?

23        A.   Yes, he talked about ordering another Mercedes

24  Benz which he said was going to cost $150,000.

25        Q.   Did he say how long it would take to order?

1      A.    I believe he said it was going to take up to a

2  year to order.

3      Q.    Did you go back in on May 7, 2013, and --

4  actually strike that.  Can we just go back to May 1st,

5  2013.  How long were you there, approximately?

6      A.    I was there over an hour.  We also talked

7  while I was there, too, about a Mercedes that he had

8  purchased for his mother that he had paid $16,000 for.

9      Q.    So he, in addition to the Mercedes that was

10  outside and in addition to the Mercedes he was going to

11  special order, he told you about what other Mercedes?

12      A.    He said he bought a Mercedes Benz for his

13  mother, because I brought up Mother's Day which was

14  coming up and asked him what he was going to do for his

15  mother.  And he was upset at his mother and I asked him

16  why, and he said he bought her a $16,000 Mercedes Benz

17  and when he went with her to pick it up, he also brought

18  her to the Motor Vehicle Department to register it and

19  she had expected him not only to pay for her car that he

20  bought, but wanted her -- wanted him to pay for her

21  registration, so he was upset about that.

22      Q.    Okay.  Now, on May 7, 2013, did you go back?

23      A.    Yes.

24      Q.    By the way, on May 1st did you eat food there?

25      A.    No, I did not.

1    Q.    Did you see anyone eat food there?

2    A.    No.

3    Q.    Did you hear the phone ring and have anyone

4    order pizza?

5    A.    No.

6    Q.    Did you see anyone leave the restaurant with

7    any food?

8    A.    No, I did not.

9    Q.    May 7th you go back in?

10   A.    Yes.

11   Q.    You have an independent recollection as you

12   sit there right now what happened on May 7, 2013?

13   A.    No, I do not.

14   Q.    Would something help to refresh your

15   recollection?

16   A.    My report would help.

17   Q.    Let me show you what's marked as Government's

18   Exhibit 43k for identification and I'll ask if you

19   recognize this report?

20   A.    That is my report from that particular date.

21   Q.    Would you please read it.

22         (Witness reading report.)

23   Q.    Now that you have read it, has your

24   recollection been refreshed?

25   A.    Yes, it has.

1    Q.   Did you go into the restaurant on May 7, 2013?

2    A.   Yes, I did.

3    Q.   Who was there?

4    A.   Alkis Nakos and his girlfriend Kaylee.

5    Q.   Did you have a conversation with them?

6    A.   I did.

7    Q.   What did you talk to Alkis Nakos about?

8    A.   First talked about the new Mercedes that was

9    parked out front.

10   Q.   Was this a different Mercedes than you had

11   seen on May 1st?

12   A.   Yes, it was.

13   Q.   And what was the Mercedes parked out front on

14   this date, May 7, 2013?

15   A.   It was a brand new Mercedes with a Holloway

16   Dealership plate on it, and I talked to Alkis about it,

17   and he told me that he had just picked it up, that he

18   had turned in his other Mercedes which had $5,000 left

19   on the lease.

20   Q.   Did he say how he paid for it.  Was it check,

21   cash, did he say?

22   A.   He said he paid cash.

23   Q.   All right.  How long did you stay in the

24   restaurant that day?

25   A.   I believe it was just over an hour on that

1    particular day, yes.

2         Q.   Did you see any food being served?

3         A.   No, I did not.

4         Q.   Anyone ordering any pizza?

5         A.   No.

6         Q.   By the way, when you go in, is it at night,

7    during the day?

8         A.   Both.  I've gone in early afternoon, later in

9    the evening.

10        Q.   Have you gone in during the time where it

11   would be common for a pizza establishment to have people

12   ordering pizza?

13        A.   Yes, I've gone in noontime, 1 o'clock.  I've

14   gone in 4, 5:00, 6 o'clock at night.  Certainly around

15   the time people would normally be eating lunch or

16   dinner.

17        Q.   Did you go back on May 10, 2013?

18        A.   Yes.

19        Q.   Do you have an independent recollection as to

20   what happened during that day?

21        A.   No.

22        Q.   Is there something that could help to refresh

23   your recollection as to what happened that day?

24        A.   Yes, my report would.

25        Q.   Let me show you your last report marked as 43L

1   for identification.  Do you recognize what that report

2   is?

3        A.   Yes, that's my report from that particular

4   date.

5        Q.   Would you please read it.

6             (Witness reading report.)

7        A.   This particular report, again, it's got my

8   heading on it but this is Investigator Nye's report.

9        Q.   Why don't you look at your paperwork and see

10  if you have a report dated for the 10th, May 10, 2013?

11       A.   I do.  I have it here.

12       Q.   Okay.

13            (Witness reading report.)

14       Q.   Have you read your report?

15       A.   I have.

16       Q.   Is your recollection refreshed?

17       A.   Yes, it is.

18       Q.   Did you go in on May 10, 2013?

19       A.   Yes.

20       Q.   Who was present?

21       A.   Alkis Nakos and Kaylee Couture.

22       Q.   Did you have a conversation with Alkis Nakos?

23       A.   I did.

24       Q.   Did you have a conversation about another

25  Mercedes?

1    A.    Yes.  We had a conversation about the new

2  Mercedes that was parked out front, and he indicated

3  that he didn't like the last one that he got and that he

4  had just got this 2014 E-Class, and he said it was a

5  $65,000 car and that he was leasing it for two years.

6    Q.    So the -- you had seen on March 7th, three

7  days earlier, a different Mercedes out front; correct?

8    A.    That's correct.

9    Q.    So in three days there was a brand new

10 Mercedes out front?

11   A.    That's correct.

12   Q.    What else did he talk about?

13   A.    He was talking about there was some custody

14 issue.  He was on the phone.  It sounded like with --

15   Q.    Let me stop you there for a minute.  Did

16 someone come in at some point in time, Andre Watson?

17   A.    Yes, he did.

18   Q.    What happened when he came in?

19   A.    He had asked Andre Watson where he had parked

20 his vehicle, and Andre said I parked it around the

21 corner.  And Alkis Nakos told him to go get it and park

22 it out front, which he did.

23   Q.    At some point did Andre ask to take a test

24 drive of Alkis Nakos's brand new Mercedes?

25   A.    Yes, he did, and Alkis Nakos threw him the

1   keys and Andre left the establishment and took off with

2   the car, returning about 20 minutes later.

3       Q.   Finally, sir, did you, when you enter an

4   establishment do you take note of any sort of

5   surveillance system the establishments might have?

6       A.   Yeah, absolutely.

7       Q.   Why do you do that?

8       A.   We do that for, well, officer safety reasons,

9   we do that for evidence reasons for later on down the

10   road, we make note of all that, but we certainly want to

11   know if we're being watched as well.

12       Q.   Please pull up 43p-2.  Did you take notice at

13   Amory Street House of Pizza while you were in there

14   whether or not it had a surveillance system?

15       A.   I did.

16       Q.   What did you notice?

17       A.   I noticed that there had been a new

18   surveillance system installed inside of the

19   establishment.  There were cameras at different areas of

20   the establishment.  I remember having conversations at a

21   later date with Cornelius who told me that --

22           MR. SHEKETOFF:  Objection.

23           MS. OLLILA:  Let me strike that.

24       Q.   The surveillance system that was there, do you

25   recall how many cameras were throughout that facility?

1      A.   There were at least, I'd say at least three

2  cameras on the inside and there were three or four

3  cameras on the outside.  I don't remember the exact,

4  there were multiple cameras, and interesting enough none

5  of them were pointing at the gambling machines.

6           MS. OLLILA:  I have nothing further, your

7  Honor.

8           THE COURT:  Attorney Sheketoff, would you like

9  -- we could break, take our lunch break now, and then

10  start cross after that.

11           MR. SHEKETOFF:  That would be fine, your

12  Honor.

13           THE COURT:  All right.  Okay.  We're going to

14  take a brief lunch break.

15           THE WITNESS:  All right.

16           THE COURT:  Let me just speak briefly to the

17  jury before your short lunch break.

18           Again, rather than repeat myself over and over

19  I'm just going to remind you not to have any

20  conversations with anyone at all about this case and

21  don't do any sort of independent research or any kind of

22  research at all about the case in any manner.  Is that

23  understood?

24           And let me also mention importantly that you

25  have heard evidence that Mr. Nakos previously spent time

1    in prison.  You may consider this for the purpose of

2    deciding whether a relationship existed between Mr.

3    Nakos and Mr. Leventis as alleged by the government.

4    That is the only purpose for which you may consider

5    evidence of Mr. Nakos's prior imprisonment.  You must

6    not speculate about why Mr. Nakos was in prison.  You

7    must not use that evidence to infer that because Mr.

8    Nakos was in prison before it is more likely he

9    committed the crimes charged in this case.  Again, you

10   may only consider this evidence for one very limited

11   purpose, to decide whether a relationship existed

12   between Mr. Nakos and Mr. Leventis as alleged by the

13   government.

14            We will see you in 30 minutes.

15            (Jury exited the courtroom.)

16            THE COURT:  Come back a little after one.

17            (Luncheon recess taken.)

18

19

20

21

22

23

24

25

```
 1

 2                    C E R T I F I C A T E

 3

 4          I, Sandra L. Bailey, do hereby certify that

 5   the foregoing transcript is a true and accurate

 6   transcription of the within proceedings, to the best of

 7   my knowledge, skill, ability and belief.

 8

 9

10   Submitted: 3/31/2016

11                           SANDRA L. BAILEY, LCR, CM, CRR

12                           LICENSED COURT REPORTER, NO. 15

13                           STATE OF NEW HAMPSHIRE

14

15

16

17

18

19

20

21

22

23

24

25
```