**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6-29-2016

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   14-CR-93-01-LM
         v.                     *   August 19, 2015
                                *   9:15 a.m.
     ALKIS NAKOS               *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY TWO - MORNING SESSION
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

APPEARANCES:


For the Government:     Terry L. Ollila, AUSA
                        U.S. Attorney's Office




For the Defendant:      Robert L. Sheketoff, Esq.
                        Law Office of Robert L. Sheketoff




Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

```
                            I  N  D  E  X
```

Opening statement by Ms. Ollila, page 16
Opening statement by Mr. Sheketoff, page 42

WITNESSES:          Direct    Cross    Redirect   Recross

MARK SIMONSEN:

By Ms. Ollila      47
No cross-examination


BRANSON PERRY:

By Ms. Ollila      76
No cross-examination


JEAN DROUIN:

By Ms. Ollila     103


EXHIBITS:                          FOR ID   IN EVD

Government's Exhibit No. 1h                   67
Government's Exhibit No. 1i                   73
Government's Exhibit No. 2a-1                 85
Government's Exhibit Nos. 2f-2, 2f-3,
2f-4, and 2f-7 through 2f-15                  99
Government's Exhibit Nos. 5c-1, 5c-2
and 5c-3                                     114
Government's Exhibit No. 52o                 115
Government's Exhibit No. 9g-3                122
Government's Exhibit No. 9g-4                124

```
1                    P R O C E E D I N G S
2            THE CLERK:  The Court has before it for
3    consideration today jury trial, day two, in criminal case
4    14-CR-93-01-LM, United States of America versus Alkis Nakos.
5            THE COURT:  Good morning.  Before we begin the
6    trial I would like to tell you about what will be happening.
7    I want to describe how the trial will be conducted and
8    explain what we will be doing.
9            At the end of the trial I will give you more
10   detailed guidance in writing on how you are to go about
11   reaching your decision, but now I simply want to explain how
12   the trial will proceed.
13           This criminal case has been brought by the United
14   States Government.  I will sometimes refer to the government
15   as the prosecution.  The United States Government is
16   represented at this trial by Assistant United States Attorney
17   Terry Ollila.  The defendant, Alkis Nakos, is represented by
18   his lawyer, Robert Sheketoff.
19           The charges against Mr. Nakos are contained in the
20   indictment.  The indictment is simply the description of the
21   charges made by the government against Mr. Nakos.  It is not
22   evidence of anything.  Mr. Nakos pled not guilty to the
23   charges against him and denies committing the crimes.  Mr.
24   Nakos is presumed innocent and may not be found guilty by you
25   unless all 12 of you unanimously find that the government has
```

1    proven Mr. Nakos' guilt beyond a reasonable doubt.

2              The government has charged Mr. Nakos with two

3    violations of the federal narcotics laws.  Count 1 of the

4    indictment charges that he committed the crime of engaging in

5    a continuing criminal enterprise.

6              Count 2 of the indictment charges that he committed

7    the crime of conspiracy to distribute and possess with intent

8    to distribute in excess of a thousand kilograms or more of

9    marijuana and a drug known as MDMA.  In the indictment the

10   full name of the drug MDMA is used.  It is 34

11   methylenedioxy-methamphetamine.  During these preliminary

12   instructions I will be referring to that drug by its acronym,

13   MDMA.

14             The first step in the trial will be the opening

15   statements.  The government in its opening statement will

16   tell you about the evidence which it intends to put before

17   you so you will have an idea of what the government's case is

18   going to be.

19             Just as the indictment is not evidence, neither is

20   the opening statement.  Its purpose is only to help you

21   understand what the evidence will be and what the government

22   will try to prove.

23             After the government's opening statement Mr. Nakos'

24   attorney will make an opening statement.  At that point in

25   the trial no evidence will have been offered by either side.

1          Next the government will offer evidence that it

2     says will support the charges against Mr. Nakos.  The

3     government's evidence in this case will consist of the

4     testimony of witnesses as well as documents and exhibits.

5          Some of you have probably heard the term

6     circumstantial evidence and direct evidence.  Do not be

7     concerned with these terms.  You are to consider all the

8     evidence given in this trial, both circumstantial and direct.

9          After the government's evidence Mr. Nakos' lawyer

10    may present evidence on Mr. Nakos' behalf but is not required

11    to do so.  I remind you that Mr. Nakos is presumed innocent

12    and the government must prove his guilt beyond a reasonable

13    doubt.  Mr. Nakos does not have to prove his innocence.

14         After you have heard all the evidence on both sides

15    the government and the defendant will be given time for their

16    final arguments.  I just told you that the opening statements

17    by the lawyers are not evidence.  The same applies to the

18    closing arguments.  They are not evidence either.  In their

19    closing arguments the lawyers will be attempting to summarize

20    their cases and help you understand the evidence.

21         The final part of the trial occurs when I instruct

22    you about the rules of law which you are to use in reaching

23    your verdict.  I will give each of you a written copy of my

24    instructions and I will read them to you out loud.  After

25    hearing my instructions you will leave the courtroom together

 1   to make your decision.  Your deliberations will be secret.

 2   You will never have to explain your verdict to anyone.

 3          Now that I have described the trial itself, let me

 4   explain the jobs that you and I are to perform during the

 5   trial.

 6          I will decide which rules of law apply to this

 7   case.  I will decide this in response to questions raised by

 8   the attorneys as we go along and also in the final

 9   instructions given to you after the evidence and arguments

10   are completed.

11          You will decide whether the government has proved

12   beyond a reasonable doubt that Mr. Nakos committed the

13   charged crimes.  To help you follow the evidence I will now

14   give you a brief summary of the elements of the crimes

15   charged, each of which the government must prove beyond a

16   reasonable doubt to make its case.

17          For you to find Mr. Nakos guilty of Count 1, the

18   continuing criminal enterprise charge, you must find beyond a

19   reasonable doubt each of the following elements:

20          First, that Mr. Nakos committed a felony violation

21   of the federal narcotics laws.

22          Second, that the violation was part of a continuing

23   series of three or more offenses committed by Mr. Nakos in

24   violation of the federal narcotics laws.

25          Third, that Mr. Nakos committed the series of

1    offenses in concert with five or more persons.

2            Fourth, that Mr. Nakos acted as an organizer,

3    supervisor or manager of the five or more persons with whom

4    he acted in concert.

5            And fifth, that Mr. Nakos obtained substantial

6    income or resources from the series of violations.

7            For you to find Mr. Nakos guilty of Count 2, the

8    conspiracy charge, you must find beyond a reasonable doubt

9    each of the following elements:

10           First, a conspiracy to commit the offenses charged

11   in the indictment existed and involved two or more persons.

12           Second, Mr. Nakos joined the conspiracy with

13   knowledge of the existence of the conspiracy and its criminal

14   objectives.

15           Third, Mr. Nakos knowingly, voluntarily and

16   intentionally became a member of the conspiracy.

17           And fourth, in joining the conspiracy Mr. Nakos

18   intended to achieve the unlawful objectives of the

19   conspiracy.

20           You should understand, however, that what I have

21   just given you is only a preliminary outline.  At the end of

22   the trial I will give you a final and controlling set of

23   instructions on these matters.

24           During the course of the trial you should not talk

25   with any witness, or with Mr. Nakos, or with any of the

1   lawyers in the case.  Please don't talk with them about any

2   subject at all.

3           In addition, during the course of the trial you

4   should not talk about the trial with anyone else, not your

5   family, not your friends, not the people you work with, not

6   even your fellow jurors.  You should not discuss this case

7   among yourselves until I have instructed you on the law and

8   you've gone to the jury room to make your decision at the end

9   of the trial.

10          It is important that you wait until all the

11  evidence is received and you have heard my instructions on

12  the law before you deliberate among yourselves.

13          Further, you should not communicate with anyone

14  else or the outside world about this case during any part of

15  the trial.  This prohibition applies to both receiving

16  information and giving it.  Do not e-mail about it, text,

17  tweet or share information about it on any blog or website,

18  including Facebook, Google Plus, Myspace, LinkedIn or

19  YouTube.

20          You may not use any similar technology or social

21  medium, even if I have not specifically mentioned it here.

22  To disseminate any information about the trial during the

23  trial, whether to your family or co-worker or to the world at

24  large, would violate both my instructions and the court rules

25  and could lead to a mistrial in this case.

1             Let me add that during the course of the trial you

2      will receive all the evidence you properly may consider to

3      decide this case.  Because of this you should not attempt to

4      gather any information on your own which you think might be

5      helpful.  Do not engage in any outside reading on this case,

6      the matters in this case, or the individuals involved in this

7      case, not on the Internet, not in the library, not in your

8      own house.  Do not attempt to visit any places mentioned in

9      the case and do not in any other way try to learn about the

10     case outside the courtroom.

11             Now that the trial has begun, you must not read

12     about it in the newspapers or watch or listen to television

13     or radio reports or read Internet news reports, blogs, chat

14     rooms or anything else about what is happening here.

15             Many people watch television shows or movies about

16     courts or lawyers or the criminal justice system.  Sometimes

17     people are affected by that when they serve as jurors.

18     Television shows and movies can create false expectations

19     about real life; for example, how the trial is going to

20     proceed or what the evidence might look like.  You must

21     decide this case on the evidence before you and the law as I

22     give it to you.  Do not decide this case, even in part, based

23     on something you saw on television or in a movie.  That is

24     improper and unfair.

25             The reason for these rules, as I'm certain you will

1    understand, is that your decision in this case must be made

2    solely on the evidence presented at the trial.  I expect you

3    will inform me if you become aware of a violation of my

4    instructions.

5           At times during the trial a lawyer may make an

6    objection to a question asked by another lawyer, or to an

7    answer by a witness.  This simply means that the lawyer is

8    requesting that I make a decision on a particular rule of

9    law.  Do not draw any conclusions from such objections or

10   from my rulings on the objections.  These only relate to the

11   legal questions that I must determine and should not

12   influence your thinking.

13          If I sustain an objection to a question, the

14   witness may not answer it.  Do not attempt to guess what

15   answer might have been given had I allowed the question to be

16   answered.  Similarly, if I tell you not to consider a

17   particular statement, you should put that statement out of

18   your mind and you may not refer to that statement in your

19   later deliberations.

20          Further, a particular item of evidence is sometimes

21   entered for a limited purpose, that is, it can be used by you

22   for a particular purpose and not for any other purpose.  I

23   will tell you when this occurs and instruct you on the

24   purposes for which the item can and cannot be used.

25          During the course of the trial I may ask a question

of a witness.  If I do, that does not indicate that I have an opinion about the facts in the case.  You should not take anything that I may say or do during trial as indicating what I think about the evidence or what your verdict should be.

Let me clarify something ahead of time that may occur in this case.  During the course of the trial I may have to interrupt the proceedings to confer with the attorneys about the rules of law which should apply here. Sometimes we talk here at the bench, but some of these conferences may take time.  So as a convenience to you, and to make sure you're as comfortable as possible, I will excuse you from the courtroom.  I will try to avoid such interruptions as much as possible, but please be patient, even if the trial seems to be moving slowly, because conferences often save time for all of us.

If at any time during the trial you have a problem that you would like to bring to my attention, please inform the courtroom deputy.  This goes for all issues.  If you feel ill or need to take a restroom break, just let the courtroom deputy know.  I want you to be comfortable, so please do not hesitate to tell us about any problem.

Finally, in this trial you have the permission, my permission, to take notes during the evidence.  The fact that you've been given permission to take notes does not in any way require you to do so.  However, if you decide to take

1  notes you must observe the following limitations with great
2  care:
3              First, do not allow your note taking to distract
4  you from listening carefully to the testimony that is being
5  presented.  It's important that you observe and listen to the
6  witnesses.  If you would prefer not to take notes at all but
7  simply to listen, please feel free to do so.
8              Please remember also that not everything you write
9  down is necessarily what was said.  Thus, when you begin your
10 deliberations, do not assume simply because something appears
11 in somebody's notes that it necessarily took place in court.
12 Notes are an aid to recollection.  Nothing more.  The fact
13 that it's written down doesn't mean that it's necessarily
14 accurate.
15             With these limitations, you are granted permission
16 to take notes.  At the end of each day, and during any breaks
17 during the day, please place your notes in the envelope which
18 has been provided to you.  That envelope will be taken and
19 secured each night.  The envelope will be returned to you at
20 the beginning of each day.  At the conclusion of the case,
21 after you have used your notes in deliberations, they will be
22 collected and they will be destroyed.  Nobody will see them.
23 No one will violate the secrecy of your deliberations.
24             As you can see, we have a court reporter who is
25 creating a record of everything that happens in this trial.

1    Sometimes jurors think that they will be able to have a

2    transcript of the trial when they go back to the jury room.

3    That is not true.  You will not be given a transcript.  There

4    are a number of reasons for that, but one of the reasons is

5    strictly practical.  Usually there's just not enough time to

6    prepare one.  The court reporter has a difficult job, and

7    it's a time-consuming task to take a raw record which she is

8    creating and turn it into a final transcript.  So you will

9    not have a transcript, and you should listen therefore very

10   carefully and take whatever notes you think may be necessary

11   to help you remember the testimony.

12           If you choose not to take notes, remember that it

13   is your own individual responsibility to listen carefully to

14   the evidence.  You cannot give this responsibility to someone

15   else who is taking notes.  We depend on the judgment of all

16   members of the jury.  You all must remember the evidence in

17   this case.

18           Finally, do not discuss this case with your fellow

19   jurors until all the evidence is in, you have heard my

20   instructions on the law, and I instruct you to begin your

21   deliberations.  Similarly, do not make up your mind about

22   what the verdict should be until after you and your fellow

23   jurors have discussed the evidence and deliberated.  Keep

24   your mind open and do not ever forget that Mr. Nakos is

25   presumed innocent of these charges now, throughout this

1    trial, and throughout your deliberations until such time as

2    all 12 of you find that the government has proven each

3    element of the charged crime beyond a reasonable doubt.

4            Thank you for your attention.  We are going to take

5    a very, very brief, minutes, break before the government will

6    make its opening statement.

7            (IN COURT - NO JURY PRESENT)

8            THE COURT:  I need to ask that the individual who

9    has the child, and I'm sorry to say this, you're going to

10   have to remove the child from the courtroom.

11           It was very distracting to me to hear the child

12   throughout my instructions.  It was very distracting to me

13   yesterday when I gave my instructions initially to the jury.

14   And when the baby was making the noise I thought that you

15   would leave the courtroom, but you didn't.  I asked someone

16   to communicate to you that if the baby made noises to please

17   go ahead and leave.  You did not, so I'm going to have to ask

18   you to leave with the child now.  I'm sorry to do that.

19           MS. COUTURE:  I was told to leave if the child was

20   crying.  She wasn't crying.  She wasn't being fussy.  She

21   wasn't whining.  She was just --

22           THE COURT:  -- being a baby.  I totally understand.

23   She's not screaming and yelling, but she is loud enough so

24   that it was very distracting to me as I was giving my

25   instructions, and so I'm sorry to --

1          MS. COUTURE:  This is her father.  She hasn't been

2     able to see her father.  This is the closest she's been to

3     her dad in her entire life, and I just feel like she should

4     be here to see him.  This isn't fair.

5          THE COURT:  I totally understand, and I tried to

6     get you a warning to that effect yesterday.  Unfortunately,

7     it is very distracting, and I don't want to have that happen

8     throughout the trial.

9          So my apologies, but I'm going to have to ask you

10    to make other arrangements.

11         MS. COUTURE:  It's not right.

12         THE DEFENDANT:  Your Honor, I have some problems

13    here with my counsel.  I mean, for the past five months I've

14    seen him one time.  He refuses to divulge any information to

15    me, to give me any paperwork.  I have not received any kind

16    of mail.  I have not been in contact with him.

17         He comes to me now to ask me about certain

18    documents which he's never talked to me about which he's had

19    in his possession for months upon months.  He doesn't

20    communicate nothing with me whatsoever.  I don't know what's

21    going on.

22         I haven't got no -- like the Giglio material,

23    nothing.  I haven't reviewed any of this stuff.  I don't even

24    know if he's had it.  I don't understand what's going on

25    here.

1        He hasn't been up to see me but one time before

2   this trial took place.  The last time I seen him was over a

3   month and a half ago, and I still don't understand what's

4   going on.

5        THE COURT:  All right.  I think what we'll probably

6   do at this point in order for me to properly deal with this

7   issue is probably seal the courtroom so that I can hear from

8   Mr. Nakos.

9        So I'm going to have to have not only the baby but

10  everybody at this point remove themselves from the courtroom.

11        (SEALED PORTION OF THE RECORD)

12        (CONCLUSION OF SEALED PORTION OF THE RECORD)

13        (IN COURT - JURY PRESENT)

14        THE COURT:  Attorney Ollila.

15        MS. OLLILA:  Thank you very much, your Honor.

16        Good morning, ladies and gentlemen.  Yesterday I

17  introduced myself, and I also introduced Diane Cullen who is

18  a paralegal, and I told you yesterday that the United States

19  would have several other individuals present, and they are

20  here today.

21        I want to introduce you first to Chris True.  Chris

22  True is a legal assistant, has been my legal assistant for

23  many years with the U.S. Attorney.  She will be here to help

24  with the exhibits and with the witnesses because we have so

25  many witnesses.  Thank you, Chris.

1            Also seated at counsel table with me is Lieutenant

2    John Encarnacao.  Lieutenant Encarnacao is the lieutenant in

3    charge of the New Hampshire State Police NI Unit, Narcotics

4    Investigation Unit.  He's a long-time member of the New

5    Hampshire State Police.  Thank you, Lieutenant.

6            And Sergeant James Norris.  Sergeant Norris was the

7    lead case agent in this case.  He's also a member of the

8    state police and has been a long-time member of the New

9    Hampshire State Police.  Thank you, sir.

10           Ladies and gentlemen, as you now know from Judge

11   McCafferty, the defendant, Alkis Nakos, has been charged in

12   two distinct counts of the indictment.

13           The first count charges the defendant with

14   something the law has named a CCE, a continuing criminal

15   enterprise.  Those who engage in a CCE are organizers,

16   supervisors and managers of drug trafficking organizations

17   which commit a series of controlled substance violations over

18   an extended period of time and in doing so reap a significant

19   financial reward.

20           The defendant, Alkis Nakos, served in that role

21   during the period of 2008 through 2014.  He was the New

22   Hampshire chief of a huge marijuana trafficking organization

23   centered in Canada which smuggled thousands of pounds across

24   the border into the United States for distribution in several

25   states on the East Coast, including New Hampshire, the state

where the defendant, Alkis Nakos, lived.

You will hear that Alkis Nakos' ability to receive the marijuana -- and this is high grade marijuana, extremely expensive, high grade because it was grown hydroponically or indoors.  For each pound of the marijuana -- the Canadian marijuana you will hear ranged between 2,000 and $5,000 a pound.  His ability to receive the marijuana in New Hampshire occurred because he befriended a really high-ranking member of the Canadian drug trafficking organization, an individual by the name of Mihail Leventis, who the defendant called Mike.  The defendant met Mihail Leventis, or Mike Leventis, while the two were incarcerated together at the New Hampshire State Prison for Men.

When the defendant was released from jail he traveled to Canada, as Mihail Leventis had also been released, met with Mihail Leventis and arranged to receive marijuana in New Hampshire.

The marijuana entered the country by vehicle, by foot with couriers carrying it on their back in black hockey style duffel bags, and the marijuana entered the United States in tractor-trailers that would routinely transport over a thousand pounds of marijuana across the border.

The marijuana itself, as you now know, which went for between 2 and $5,000 a pound, would be contained in large Home Depot style boxes.  As the organization matured, the

1   marijuana would be packaged in 50-pound increments and placed

2   in black hockey style duffel bags, many of which you will see

3   in evidence.  The black hockey style duffel bags oftentimes

4   contained a label, and the label was a code for the intended

5   recipient of the marijuana.

6          Alkis Nakos and those who worked with him used the

7   code name NH, because Alkis Nakos lived in New Hampshire and

8   ran the New Hampshire end of the drug trafficking

9   organization.  But Alkis Nakos didn't act alone, because much

10  like any business, you need many workers in order to be

11  successful, and this leads to Count 2, ladies and gentlemen.

12         You heard also from Judge McCafferty that Count 2

13  charges the defendant, Alkis Nakos, with engaging in a

14  conspiracy to distribute and possess with intent to

15  distribute in excess of 1,000 kilograms.  1,000 kilograms.

16  There's 2.2 pounds per kilogram.  So 1,000 kilograms is 2,200

17  pounds.  The indictment charges him with engaging in a

18  conspiracy to distribute in excess of 1,000 kilograms of

19  marijuana and the controlled substance that Judge McCafferty

20  referred to as MDMA.  It's 34 methylenedioxy-methamphetamine.

21  The street name is known as MDMA or Molly or Ecstasy.

22         You will hear that Alkis Nakos and the drug

23  trafficking organization employed many individuals to assist

24  them.  Some individuals simply grew the marijuana, while

25  others packaged and labeled the marijuana.

1          Some in the conspiracy's job was just to carry the

2     marijuana across the border on their back.  Some simply

3     stayed at locations across the border in the United States

4     known as stash houses where the marijuana would be stored

5     until it could be ferried down along the East Coast.

6          And of course some picked the marijuana up for

7     distribution from other states and delivered it, and of

8     course the workers, the ones who were really the lowest on

9     the totem pole, the workers who obtained the marijuana, split

10    it up, and then distributed the product itself.

11         Throughout the investigation you will hear that law

12    enforcement arrested and prosecuted many individuals,

13    including some individuals who worked for the defendant,

14    Alkis Nakos, and some of them will be here to testify against

15    him.

16         One such individual is named Nicholas, or Nick,

17    Champagne.  Nicholas Champagne you will hear was arrested in

18    July 2009.  He was charged with and pled guilty to engaging

19    in a conspiracy to distribute in excess of 1,000 kilograms of

20    marijuana.  He remained incarcerated from July 2009 all the

21    way up through December 2014, and he served every single day

22    of his sentence.

23         You will hear that at the time of his arrest law

24    enforcement approached him and tried to get him to cooperate

25    or to flip against his boss, the defendant, Alkis Nakos.  But

1    Nicholas Champagne refused because he and Alkis Nakos were

2    best friends.  They were childhood friends.  They had known

3    each other since the age of 14.

4            However, now that Nicholas Champagne has served

5    every day of his sentence, now he no longer has a Fifth

6    Amendment right to refuse to testify.  And you will hear that

7    if he does refuse, he could be sent back to jail for

8    contempt.  So because Nicholas Champagne absolutely refuses

9    to give up one more single day away from his child who he

10   loves so much, he has no other choice but to testify.

11           Among other things, Nicholas Champagne will tell

12   you that he also knew Mihail Leventis, because he was

13   incarcerated at the same time the defendant, Alkis Nakos, was

14   incarcerated with Mihail Leventis.

15           You will hear that -- Nicholas Champagne will say

16   that when he was released from prison during his first prison

17   sentence in 2007 -- that is not his federal conviction.  He

18   was first released in 2007 in November -- he met with Alkis

19   Nakos and Alkis Nakos had already traveled to Canada.  Alkis

20   Nakos had already met with Mihail, or Mike, Leventis and had

21   already arranged for the marijuana to have a safe journey

22   into New Hampshire to be distributed.

23           Nicholas Champagne was going to be the lieutenant

24   for the defendant, Alkis Nakos.  Nicholas Champagne

25   distributed the marijuana to numerous individuals in New

1    Hampshire, one of whom was named Charles Fowle.  Like

2    Nicholas Champagne, Charles Fowle will be here to testify

3    against Alkis Nakos.

4         Charles Fowle will also testify that he met Nakos

5    while he and Nicholas Champagne were incarcerated together at

6    the New Hampshire State Prison.  Charles Fowle will testify

7    that he saw at the prison that Alkis Nakos and Mihail

8    Leventis were becoming good friends, and Charles Fowle will

9    testify that Alkis Nakos' connection with Mihail Leventis as

10   the high-ranking member of the Canadian drug trafficking

11   organization is what allowed Alkis Nakos to get the marijuana

12   into New Hampshire.

13        Charles Fowle will testify that after Nicholas

14   Champagne was arrested in July of 2009 Alkis Nakos replaced

15   Champagne with a new lieutenant, a new lieutenant by the name

16   of Kosmas Koustas.  Under the direction of Alkis Nakos,

17   Kosmas Koustas took over the day-to-day distribution of the

18   marijuana on behalf of Nakos.  You will hear that Charles

19   Fowle and Kosmas Koustas remained working for Alkis Nakos

20   until their arrest in 2014.

21        So how did it all start, ladies and gentlemen?  The

22   testimony will make it clear that the case against Alkis

23   Nakos and the Canadian drug trafficking organization started

24   with the seizure of a drug ledger in February, February 21,

25   2008, by a savvy border patrol agent, a U.S. Customs border

1    patrol agent.  And you say what is a ledger?  When drug

2    dealers deal drugs -- when you're dealing so much drugs, it's

3    literally impossible not to have some notations about the

4    quantity of marijuana that's coming across the border, the

5    intended recipient, monies owed, monies due to be paid.  That

6    in law enforcement is simply known as a drug ledger.  But

7    what you will see is that the business would never use

8    anyone's real name, because if law enforcement ever got ahold

9    of that drug ledger they would be able to connect the dots.

10          You will hear that the first page of the extensive

11   drug ledger recovered by the border patrol agent represented

12   the distribution of 1300 pounds of marijuana that was going

13   to occur in the following week.  The drug ledger was seized

14   on February 21, 2008, so you would expect that throughout the

15   rest of February those 1300 pounds would be distributed, and

16   you'll see on the drug ledger next to individuals' code names

17   is the amount of marijuana that they are slated to receive.

18          On the first page of that ledger you will see a

19   reference NH, a reference to the defendant, Alkis Nakos, and

20   you will also see that next to NH is the number 50.  That

21   simply meant that Alkis Nakos' operation was slated to

22   receive 50 pounds of marijuana that following week.

23          What you will also see, which is very important, is

24   on that very same page, just two inches below where Alkis

25   Nakos' name, NH, is listed, along with 5-0, 50 pounds of

marijuana, there's a reference to 2 mill drop.  That means
that the marijuana that is going to be distributed, sent to
the United States, distributed by Alkis Nakos and others
involved, $2 million is going to be received and dropped off
somewhere.

Within one week of getting that ledger an Oklahoma
state trooper was conducting his normal shift out on a
throughway in Oklahoma when he observed a car being driven by
a young man, and that car was a gray Toyota Tundra that had
New Hampshire plates on it.

Because this Oklahoma trooper knows that that
throughway is used by drug traffickers, and because that car
committed a traffic violation, the trooper pulled him over.
The trooper ended up seizing in that car, in secreted areas
in the car, $2 million in U.S. currency.  It matched exactly
what that ledger had predicted, that $2 million was going to
be dropped somewhere.

Now, you'll hear that when state troopers recover
that much currency they bring it to the attention of the Drug
Enforcement Administration, the DEA, because the DEA is
charged with investigating large drug trafficking
organizations that occur over many states.  The Oklahoma
state trooper forwarded the information to DEA in New
Hampshire and Massachusetts, and they initiated an
investigation which would come to be known as Operation

1    Brownshirt.

2              Because members of the border patrol now knew that

3    they were dealing with an extensive marijuana operation, they

4    were on the lookout for individuals who were crossing the

5    border from Canada into the United States either on foot, in

6    motor vehicles, or in tractor-trailers.

7              In November 2008 members of the Customs and border

8    patrol saw two men that were carrying large hockey style

9    duffel bags cross from Canada into the United States.  When

10   border patrol agents attempted to approach them, both men

11   dropped those bags and ran.  One of them was apprehended

12   right away.  The two bags contained exactly what you would

13   think it contained, 50 pounds each, for a hundred pounds of

14   marijuana that was seized by law enforcement.

15             Law enforcement, members of the Customs and Border

16   Protection patrol, followed that second individual to a

17   residence a short distance away, and that residence was a

18   stone's throw away from the Canadian border.  It was a stash

19   house.  It was where the marijuana was being held before it

20   crossed into the United States.

21             They executed a search warrant on that residence,

22   and they recovered two more large hockey bags, each of which

23   contained 50 pounds of marijuana.  And those hockey bags,

24   much like the other hockey bags seized in this case, also had

25   what you will see is a brass colored lock on the exterior

1  simply locking the hockey bag so no one could get in to get

2  the marijuana.

3          Although law enforcement in New Hampshire, New

4  York, Massachusetts, and Vermont were now working jointly to

5  understand the depth of the drug trafficking organization, it

6  was really difficult to understand the full reach without

7  being able to detect and monitor the vehicles utilized by the

8  numerous coconspirators.

9          But law enforcement had discovered during their

10  investigation that many of the vehicles that were being

11  utilized by the couriers were rented in New Hampshire at a

12  rental company known as Buy Here Pay Here.

13          So law enforcement went to that rental company and

14  started placing GPS tracking devices on vehicles that were

15  scheduled to be rented by Canadians, and that happened.  This

16  allowed law enforcement to monitor the couriers, the

17  deliverers, as they obtained the marijuana and then delivered

18  it to its intended recipient.

19          By December 2008, almost seven months before the

20  arrest of Nicholas Champagne in July, law enforcement placed

21  a GPS tracking device on a vehicle that was rented at Buy

22  Here Pay Here in New Hampshire, and they followed that

23  vehicle to a warehouse in Waltham, Massachusetts, and they

24  sat and they watched that vehicle.

25          The vehicle was met by a second vehicle at that

same warehouse, but that second vehicle didn't have a GPS
tracking device on it because law enforcement didn't know
about that vehicle.  Law enforcement saw those two vehicles
leave the area and go to a Home Depot and get a lot of Home
Depot boxes and travel back to the warehouse.

Law enforcement then saw a large tractor-trailer
pull into that warehouse.  Law enforcement saw the
individuals in the cars meet with the tractor-trailer
operator, and then everyone went inside.

Within a short period of time law enforcement then
saw Home Depot boxes being placed in both vehicles; the one
vehicle that didn't have a tracking device on it and the
vehicle that did have a tracking device on it.

Because law enforcement believed that those
vehicles now contained marijuana that was hidden in the Home
Depot boxes, they wanted the vehicles to get far enough away
from the warehouse because law enforcement didn't want this
organization to know that they were on to them, that they had
located the warehouse.  So law enforcement waited, and the
vehicle that didn't have the tracking device was stopped
several miles away.  In fact, more than several miles away.

But the vehicle wasn't stopped by members of the
DEA because that would never happen.  The DEA would never
stop a vehicle and go up and show their badge, DEA, because
that would be obvious.  The drug traffickers would know

1    instantly that law enforcement were on to them.

2           So what did the DEA do?  They called a

3    Massachusetts state trooper, gave the Massachusetts state

4    trooper the information about the vehicle, and the

5    Massachusetts state trooper pulled the vehicle over for a

6    traffic violation.  The Massachusetts state trooper ended up

7    seizing 200 pounds of marijuana that was located in eight

8    separate Home Depot boxes.

9           Because the tracking device had been placed on the

10   one vehicle that traveled from New Hampshire down to Waltham,

11   Massachusetts, law enforcement did monitor it as it came back

12   into New Hampshire, and it went to 10 Delaware Avenue, the

13   then address of Nicholas Champagne who was working for the

14   defendant, Alkis Nakos.

15          Although law enforcement believed that the Home

16   Depot boxes were being taken out of that vehicle and brought

17   into 10 Delaware Avenue, it was dark and their vantage point

18   was poor so they couldn't know for sure.

19          However, one week later, on December 30, 2008, law

20   enforcement conducted videotaped surveillance of 10 Delaware

21   Avenue and saw Nicholas Champagne and Charles Fowle leaving

22   the residence with a large Home Depot box.

23          By January 2009, six months before the arrest of

24   Nicholas Champagne, law enforcement monitored another vehicle

25   as it traveled to Waltham, Massachusetts, went to the

1   warehouse, left the warehouse, and traveled back to 10

2   Delaware Avenue in Manchester, New Hampshire.

3          The testimony will establish that because law

4   enforcement knew that marijuana was being distributed by

5   Nicholas Champagne on behalf of the defendant, Alkis Nakos,

6   from 10 Delaware Avenue, they planned to intercept a load

7   coming out the door if the opportunity arose.

8          Before their opportunity arose, there was a

9   tractor-trailer containing 1,357 pounds of marijuana that was

10  stopped along the U.S.-Canada border.  Although the marijuana

11  was packaged separately as if to label all of the marijuana

12  going to its intended recipient, the largest bulk of that

13  marijuana, 200 pounds, was labeled with the initials NH,

14  representing the defendant Alkis Nakos' New Hampshire cell of

15  the organization.

16         In February 2009, five months before Nicholas

17  Champagne's arrest, law enforcement seized 58 pounds of

18  marijuana that had been distributed by Nicholas Champagne to

19  an individual by the name of David Coulombe.  The marijuana

20  was contained in black hockey style duffle bags that had a

21  brass colored lock on the exterior.  There was a label on the

22  outside of that black hockey style bag and it read NH, a

23  clear reference to the Nakos organization.  The seizure of

24  about 60 pounds of marijuana that ranged between 2 and $5,000

25  a pound meant that about $150,000 or more was just lost.

1          You will hear, ladies and gentlemen, that when
2    seizures start occurring, lots of money is lost.  Someone
3    needs to be accountable.  And when that happened,
4    coconspirators working together start to get suspicious and
5    start changing up their mode of operation.  It wasn't at all
6    surprising then that law enforcement saw Nicholas Champagne
7    leaving, moving out of 10 Delaware Avenue in Manchester, New
8    Hampshire.
9          But what you'll also see is that when large drug
10   trafficking organizations start taking on water, which like
11   any large corporation, you start to see the leadership paying
12   visits, and that's exactly what happened here.  When Nicholas
13   Champagne was moving out of 10 Delaware Avenue on April 2,
14   2009, who showed up to assist?  The defendant, Alkis Nakos.
15   Law enforcement were watching and took pictures of the two as
16   they swiftly moved Nicholas Champagne out.
17         Within two days of seeing Nicholas Champagne and
18   Alkis Nakos move him out of 10 Delaware Avenue, Nicholas
19   Champagne delivered $194,000 in currency to two female
20   Canadian couriers whose job it was to just pick up money.
21   The women were stopped and law enforcement seized $194,000
22   located in the backseat, and they claimed they didn't even
23   know how the money got there.  They claimed they didn't know
24   it was there.
25         You will hear that things really started to unravel

for this organization in May of 2009, two months before the
arrest of Nicholas Champagne, when law enforcement seized
another 100 pounds of marijuana from Nakos' New Hampshire
organization valued at over $300,000.  Much like the 58-pound
seizure, the 100-pound seizure was conveniently located in
black hockey style duffel bags that had labels on the outside
NH.

By June 2009 law enforcement in New Hampshire, New
York, Massachusetts, and Vermont conducted two search
warrants at two locations located in Vermont near the
Canadian border.

Alkis Nakos wasn't charged in 2009 because he was
really smart.  He just was.  He remained securely hidden
behind a curtain.  He never dared go near that marijuana.  He
didn't need to.  He had his workers doing it for him.

But because law enforcement didn't arrest him, it
didn't mean that they went away, that they packed their bags
and just went home.  Law enforcement know enough to know that
the likes of Alkis Nakos don't stop dealing.  Instead, they
take a time-out, wait until the coast is clear, and start
again, and he did.

By 2011 the Canadian drug trafficking organization
resumed activities, and Alkis Nakos utilized additional
coconspirators, including Charles Fowle and Kosmas Koustas,
neither of which had been arrested, to help him with the

1  organization.

2          In fact, Kosmas Koustas took over Nick Champagne's

3  role.  As Alkis Nakos had done in 2008 and 2009, he was

4  extremely careful and neither stored nor touched nor went

5  near the marijuana.  He remained hidden and simply monitored

6  the activities of his coconspirators.

7          But you will also hear that during the same time

8  the Nakos end of the drug trafficking organization changed

9  with the times, as oftentimes drug conspiracies do.  In

10 addition to providing marijuana, which they had been since

11 2008, Alkis Nakos and his organization now had MDMA, Ecstasy,

12 Molly, 34 methylenedioxy-methamphetamine, for sale.  This

13 time, however, law enforcement utilized a wire tap, listening

14 to telephones on a wire tap.  Law enforcement listened to the

15 telephones of Kosmas Koustas, Charles Fowle, and a third

16 individual who was getting marijuana from the Alkis Nakos

17 organization, an individual by the name of Jeremy Blevens,

18 the cousin of Nicholas Champagne.

19         Although law enforcement never expected to hear

20 Alkis Nakos being so careless as to talk about drugs on the

21 telephone, he would never do that, they knew that Alkis Nakos

22 would have some contact at some point with his

23 coconspirators, with his workers, with Kosmas Koustas, the

24 new lieutenant.  They knew it was only a matter of time.

25 They would watch and wait and see when Alkis Nakos met up

1    with Kosmas Koustas.

2            The very first night of the wire tap, October 23,

3    2013, law enforcement monitored the wire and heard Kosmas

4    Koustas speaking with the individual in Massachusetts and

5    arranging to go down and pick up a load of marijuana, and he

6    did.

7            As soon as he was on his way back, who did he call?

8    He called Charles Fowle and Jeremy Blevens.  Their job wasn't

9    to go to Massachusetts to pick up the marijuana.  That was

10   Kosmas Koustas' job.  Their job was to remain in New

11   Hampshire, get the marijuana and distribute it, and that's

12   what their role was.  So as Kosmas Koustas is traveling back

13   in his car, who is he calling?  He's calling Charles Fowle

14   and Jeremy Blevens.

15           But what you'll also hear about extensive drug

16   trafficking organizations is that there's a rule.  You never

17   talk on what is known as a dirty phone to the leader of the

18   organization.  So what you will see is that as Kosmas Koustas

19   is driving back from Massachusetts to New Hampshire he uses

20   one phone, the dirty phone, to call Charles Fowle and Jeremy

21   Blevens, and he has another phone with him at the same time,

22   and you'll see that phone.  You'll see the records for that

23   phone.  And who is he calling on that phone?  He's calling

24   the defendant, Alkis Nakos.

25           The testimony and the telephone records will

1   unequivocally show that in the days prior to the time that
2   Koustas would travel down to Massachusetts in order to obtain
3   a quantity of marijuana he was in constant telephone contact
4   with Alkis Nakos on that clean phone.
5          But law enforcement knew that it was just going to
6   be a matter of time before Kosmas Koustas met with Alkis
7   Nakos, so they conducted surveillance at a couple of places
8   where they thought they might meet.  One of those locations
9   was Alkis Nakos' residence, 366 Arah Street in Manchester,
10  New Hampshire.
11         You will hear that on December 7, 2013, after
12  Kosmas Koustas came back from Massachusetts with a load of
13  marijuana, after he dropped the marijuana off, he traveled to
14  Alkis Nakos' residence late that night and met there for
15  about fifteen minutes.  He did so because he needs to report
16  to his boss.
17         On a separate occasion when Kosmas Koustas returned
18  from New Hampshire with marijuana, law enforcement saw him
19  meet at a residence known at 140 Porter Street.  It was
20  Kosmas Koustas' father's residence.  While law enforcement
21  were there, they saw the defendant Alkis Nakos' Mercedes-Benz
22  pull in, go inside, and stay for a short period of time.
23         When a search warrant was executed at that
24  residence sometime later, law enforcement seized a black
25  hockey style duffel bag, and inside that duffel bag -- of

course there was no marijuana.  It had been distributed.  But there was a little piece of paper and it said Diamond Kush times 50.  You will hear that Diamond Kush is a strain of marijuana.  There are many different strains of marijuana. Fifty, a hundred different names for different strains of marijuana.  M236, M39, Jack Herer, you name it, there are different strains.  Diamond Kush times 50.  And on the opposite side of that piece of paper it said BOS, Boston, because the marijuana had been picked up in Massachusetts.

You are going to hear that during the entire time frame of this conspiracy, 2008 to 2014, Alkis Nakos claimed to be employed as a pizza chef at his father's pizza restaurant in Manchester, New Hampshire, a pizza restaurant known as Amory Street House of Pizza.

That pizza shop is interesting because it was a legitimate pizza shop at one period of time, but it's been several years since any pizza has been seen coming out of the restaurant.

You will hear that during the 2008 through 2013 time frame Alkis Nakos filed tax returns and received refunds based upon his claim to make $30,000 a year as a pizza chef at Amory Street House of Pizza.

During the same time frame, 2008 to 2014, law enforcement had a videotape surveillance camera showing the front door of Amory Street House of Pizza.  They had a live

1    feed connected to the front.

2           You will hear law enforcement testify that during

3    that approximate one-year period they never once saw a pizza,

4    a sub, or any food item come out of that pizza shop, nor did

5    they ever see any families going in to eat or order pizza

6    there.  And they would know.  Law enforcement would know,

7    ladies and gentlemen, because for about a one-year period of

8    time there was a law enforcement officer by the name of Paul

9    Poirier.  He is an undercover law enforcement officer.  He

10   was in Amory Street House of Pizza intentionally trying to

11   befriend Alkis Nakos to gain information.

12          You will hear that although Alkis Nakos never

13   talked about pizza, never talked about subs, never talked

14   about the restaurant business in any capacity, he always

15   talked about Montreal, he always talked about his several

16   Mercedes-Benz vehicles, and he always talked about his

17   frequent travels to Canada.  But because law enforcement, the

18   undercover law enforcement officer Paul Poirier is very good

19   at what he does, Alkis Nakos would sometimes slip up and talk

20   about the marijuana.  After all, Alkis Nakos must have

21   thought he had a lot to be proud of.  He made a lot of money

22   through the marijuana business.

23          You will hear that although Alkis Nakos claimed to

24   make $30,000 a year during the period of 2008 to 2014, during

25   the period of 2011 to 2014 he had no less than four separate

Mercedes-Benz vehicles.  And he actually talked to Paul

Poirier, the undercover law enforcement officer, about

special ordering a $150,000 Mercedes-Benz that Alkis Nakos

said would take two years to deliver.

The testimony will demonstrate that Alkis Nakos

loved expensive items and often wore those items proudly that

he would obtain through his travels to New York, for example,

to go on shopping sprees.  He proudly wore a Gucci belt

buckle that he obtained during one of his trips.

In fact, in 2012 the defendant, Alkis Nakos,

reported a burglary at his home.  And when law enforcement,

members of the Manchester police, responded to make a report

for the burglary, Alkis Nakos was ready and he provided them

with receipts for jewelry that had been stolen from his

residence.  One receipt was for a $9,000 Rolex watch.

Another was for a $5,000 necklace.  Another was for a $4,000

ring.  In fact, Alkis Nakos told the law enforcement officer

that a $200 bottle of Cristal champagne had been taken from

his residence.

He also had extensive home renovations done on his

home in 2011.  You will hear from one of the contractors who

was there, and that contractor will say that during the

winter of 2011 Alkis Nakos paid about $100,000 in cash for

renovations.  And he wanted to pay the contractors cash as

long as they agreed that no paper trail would be in existence

1  for the work they had done.

2      When law enforcement searched Alkis Nakos' home in

3  2014, they seized over $150,000 in money bands that

4  represented money, cash, that had been taken out of banks by

5  Alkis Nakos during the period of time.

6      Law enforcement also seized over $12,000 in

7  currency at his residence.  $6,380 of that currency, which

8  consisted of forty-five 100s, thirty-seven 50s, one 20, and

9  one 10 was located inside the sleeve of a Timberland shirt

10  that was hanging in the master bedroom closet.

11      Another $10,000, which consisted of four 100s,

12  sixteen 50s, and one hundred and forty 20s, was located in a

13  separate shirt also located in the master bedroom closet.

14      Law enforcement will testify that several months

15  before the search of the defendant's residence law

16  enforcement stopped him on the highway.  And you will hear

17  that Alkis Nakos was with -- present with another

18  coconspirator, someone by the name of Christopher Ranfos.

19  Christopher Ranfos was someone who like Charles Fowle, who

20  like Jeremy Blevens, got some of the marijuana and

21  distributed it.  Alkis Nakos was located in one of his

22  Mercedes-Benz with Christopher Ranfos.

23      Law enforcement seized about $9,000 in currency

24  from Alkis Nakos and they seized about $9,000 in currency

25  from Christopher Ranfos, but they also seized in Alkis Nakos'

1    money a small amount of Canadian currency.

2              What was really interesting about that stop you

3    will hear is that just two days earlier, on March 15, 2014,

4    law enforcement watched Christopher Ranfos as he met with

5    Kosmas Koustas, obtained a quantity of marijuana, and then

6    turned it over to some other waiting purchaser.

7              You will absolutely hear that this defendant, Alkis

8    Nakos, is an extremely arrogant man.  He likes to live the

9    high life and sometimes his ego got the better of him.  This

10   happened during several conversations that he had with Paul

11   Poirier, the undercover law enforcement officer, that was

12   located at Amory Street House of Pizza.

13             During one conversation the defendant, Alkis Nakos,

14   openly talked about the quality of the Canadian marijuana

15   coming into the country and said how it was far superior to

16   the marijuana entering the country from Mexico.

17             He told the same undercover law enforcement

18   officer, Paul Poirier, about how he and his friends smuggled

19   duffel bags containing marijuana through the woods across the

20   Canadian border into the United States, and he openly told

21   Paul Poirier that off of each pound of that marijuana he got

22   to pocket between 3 and $400 in U.S. currency.

23             Alkis Nakos proudly told the undercover law

24   enforcement officer that he had been in Canada one time and

25   was stopped by law enforcement because he was with someone

who law enforcement were watching.  The defendant, Alkis

Nakos, told the undercover law enforcement officer that when

law enforcement in Canada stopped him they took about $10,000

in U.S. currency off of him.

Alkis Nakos was most certainly referring to Mihail,

or Mike, Leventis who he frequently went to see in Canada

because the New Hampshire cell is going to meet with the

upper echelon in Canada.  And you will see and hear that the

testimony that Alkis Nakos -- excuse me, the statement that

Alkis Nakos told Paul Poirier about the money being seized

from him in Canada was confirmed when law enforcement

executed the search warrant at his house.

During the search warrant law enforcement seized

Alkis Nakos' computer.  One of the many documents seized on

that computer was a letter from Canadian authorities

addressed to Alkis Nakos, 366 Arah Street, Manchester, New

Hampshire, and in reference to the $10,000 that had been

seized from him.

Alkis Nakos' computer also contained many other

things.  One of them was a search term, a Google search term,

how to erase text messages from iPhones.

The examination also demonstrated that Alkis Nakos

monitored several DEA press releases involving certain drug

arrests and seizures that had occurred in New Hampshire.

You will hear, ladies and gentlemen, that when

1 individuals are arrested and prosecuted -- individuals like

2 Nicholas Champagne who was arrested in 2009, that when they

3 are arrested and prosecuted, prosecutors are obligated to

4 turn over what's called discovery, and discovery consists of

5 all the law enforcement reports surrounding their arrest.

6 The discovery includes marijuana quantities seized, the names

7 and the statements of anyone who may have cooperated with law

8 enforcement.

9    You will hear that located on the defendant Alkis

10 Nakos' computer in addition to his Google searches, in

11 addition to monitoring DEA press releases, the defendant

12 maintained 1,500 pages of discovery that had been turned over

13 during Operation Brownshirt.  That discovery is still on his

14 computer today because it's at the New Hampshire State Police

15 forensics lab.

16    Nakos' organization came to an end in March and

17 June of 2014.  In March of 2014 law enforcement engaged in a

18 high-speed chase going over a hundred miles an hour on 93

19 south near Londonderry as they attempted to stop Kosmas

20 Koustas who had just returned from Massachusetts.  Kosmas

21 Koustas was finally arrested after he abandoned his car.

22    Law enforcement executed a search warrant at his

23 residence, and they seized two pounds of MDMA, an

24 extraordinary amount of MDMA, two guns, 15 telephones, an

25 electronic money counter, one pound of marijuana which not at

1    all surprisingly was labeled NH, and three new and unused

2    BlackBerry cell phones that were located with the marijuana.

3            Ladies and gentlemen, the testimony will show that

4    the defendant Alkis Nakos' reign has come to an end.  The

5    evidence will show that he organized, managed, and supervised

6    a vast drug conspiracy that was responsible for the

7    distribution of controlled substances in New Hampshire.

8            At the conclusion of the evidence I will come

9    before you again and ask that you return the only verdict

10   consistent with the evidence in this case, and that is of

11   course verdicts of guilty.  Thank you.

12           THE COURT:  Attorney Sheketoff.

13           MR. SHEKETOFF:  Thank you, your Honor.

14           Good morning.  Once again, I'm the foreigner from

15   Massachusetts.  My name is Robert Sheketoff.  I brought a law

16   student with me, and we represent the defendant in this case,

17   my client.

18           Now, that was a very interesting speech, and the

19   Judge told you that, you know, it's not evidence of any kind.

20   It's just a lawyer's viewpoint of what the evidence will

21   show.

22           Now, it's unlikely that I'm going to call any

23   witnesses in this case.  I may, but it's unlikely.  So I'm

24   going to use the opening statement in a slightly different

25   way than the prosecutor did, and that is to try and focus

1    your attention on what's really in controversy in this case,

2    what's really at issue, so that you'll understand the

3    examinations, the cross-examinations that I conduct, and you

4    will see what the defense's theory is so that you can

5    evaluate it during the course of the trial.

6            Now, the prosecutor said NH is my client.  That's

7    the -- my client.  That's what NH means.  That's the real

8    issue in the case.  Who is NH?  And I ask you to pay

9    particular attention to that question.

10           This is not a case about, from the defense point of

11   view, whether there's a drug trafficking organization in

12   Canada or that there was a drug trafficking organization that

13   was in New Hampshire and in other states.  That's not the

14   issue in this case.  The issue in this case is who is NH.

15           And the prosecutor told you, quite frankly, that

16   she's got at least two witnesses, Mr. Fowle, and more

17   importantly Mr. Champagne, who are going to tell you that,

18   yeah, NH is Mr. Nakos.

19           And your job as jurors is to carefully evaluate

20   that testimony, to size it up, to use your common sense, to

21   think about the rewards and inducements that were made to say

22   that, to think about the logic of their stories of what makes

23   sense and what doesn't make sense, and to evaluate whether or

24   not that's believable testimony that you're going to rely on

25   beyond a reasonable doubt, and maybe they'll have some other

1    alleged coconspirator who will come in here and add to that

2    in one way or another.

3            You have to carefully evaluate and think about

4    their testimony, because you may have noticed something else

5    about the prosecutor's opening statement.  My client is a

6    genius.  He's the most careful, most intelligent person that

7    ever lived, and because he's a genius he's not ever going to

8    touch the marijuana.  He's not ever going to say anything on

9    the telephone.  He's not ever going to be caught doing

10   anything wrong.

11           Well, that's one possibility.  That's one

12   possibility.  And I'm going to try and suggest to you during

13   the course of the trial with my examination and the evidence

14   that there's another possibility; that is, he wasn't doing

15   anything wrong.

16           Now, my client, as you all learned during jury

17   impanelment and as you will hear clearly in the evidence,

18   grew up in Manchester, New Hampshire, and then in the New

19   Hampshire State Prison.  That's where he grew up.  He went

20   there at age 18.

21           His family, the evidence will show, was other

22   prisoners that he came of age with in that prison.  Mihail

23   Leventis, the Canadian big shot.  Kosmas Koustas, who at

24   various points in time was like a brother to my client, a

25   very, very dear friend, someone that you may question his

1    judgment about choosing someone like that as a friend, but he

2    grew up with that person in a very tough setting.  And

3    Nicholas Champagne, another person that was like my client's

4    brother for a large part of his life, someone he trusted and

5    befriended and treated as a brother.

6              He grew up with these people in that prison

7    setting, and they also grew up with Mihail Leventis.  They

8    were in that same prison with him.  It's very convenient to

9    now say, oh, the connection was this guy.

10             And people like Fowle and others like him, and this

11   is going to be the real issue in the case for you, are they

12   workers for my client or are they workers for Mr. Champagne

13   followed by Mr. Koustas?  Mr. Champagne gets moved out of an

14   apartment by Mr. Nakos?  Yeah, they're friends.  He moved him

15   out of an apartment.

16             Mr. Koustas meets with my client at his father's

17   house and other places?  Yeah, they're friends.  They talk

18   all the time on the phone.  All the time.

19             I suggest that the evidence will show that these

20   lieutenants are not lieutenants.  They're the captains; that

21   Captain Champagne recruited Captain Koustas to take Captain

22   Champagne's place.

23             You will learn during the course of this trial that

24   the federal government and the law enforcement agencies that

25   work with the federal agencies have all kinds of weapons to

1    fight this war on crime, on drugs.  All kinds of weapons.
2    GPS tracking devices.  Pole cameras where they can take
3    pictures of everything that goes in and out of a certain
4    place for years at a time.  Some of these things you need
5    warrants for.  Some of them you don't.  Wire taps where they
6    can listen to every phone conversation that takes place on a
7    phone.  One-party consent wires where you can -- if I say to
8    you Nicholas Champagne is selling drugs and he'll talk to me
9    about it, you can put a wire on me -- you'll learn this
10   during the course of the trial -- and have me have a
11   conversation with him and record it.  You don't even need a
12   warrant for that.
13            At the end of this trial you're going to have to
14   decide, is the reason they have nothing but the word of very
15   untrustworthy people, is the reason because he's a genius, or
16   because he wasn't doing anything?
17            Not everyone that goes to prison and comes out of
18   prison is a lifetime criminal.  The recidivist rate is not
19   100 percent.  It's not even close to 100 percent.
20            Listen to the evidence very carefully, very
21   carefully.  At the end of this case I will stand up and say
22   to you they have nothing but the word of untrustworthy people
23   who in your common sense you know you cannot rely on.  That's
24   what they have and nothing more.  Thank you.
25            THE COURT:  All right.  Thank you, counsel.

1          What we're going to do now is take a brief morning

2     break, very brief, ten, fifteen minutes, and then we'll come

3     back and hear from witnesses and then get your lunch break,

4     all right?

5               (RECESS)

6          THE COURT:  Attorney Ollila, you may call your

7     first witness.

8          MS. OLLILA:  Thank you, your Honor.  The United

9     States calls Mark Simonsen.

10                       MARK SIMONSEN

11          having been duly sworn, testified as follows:

12          THE CLERK:  For the record, would you please state

13    your name and spell your last name.

14          THE WITNESS:  It's Mark Simonsen.  Last name is

15    spelled S-I-M-O-N-S-E-N.

16          THE CLERK:  Thank you.

17          MS. OLLILA:  May I proceed, your Honor?

18          THE COURT:  Yes, you may.

19                     DIRECT EXAMINATION

20    BY MS. OLLILA:

21     Q.    Good morning, sir.

22     A.    Good morning.

23     Q.    Could you let this jury know how you are employed?

24     A.    With the United States Border Patrol.  I'm a

25    supervisory border patrol agent with the Intelligence

1    Division.

2         Q.    What does that mean?

3         A.    We gather intelligence, and then we disseminate it

4    to the fields hopefully to effect arrests off that

5    intelligence.

6         Q.    How long have you been with the U.S. Customs and

7    Border Patrol?

8         A.    I've been 20 years.

9         Q.    And generally what have you done over the last 20

10   years?

11        A.    I started out as a border patrol agent in

12   Brownsville, Texas, was there for a couple of years.  Then I

13   came up as a border patrol agent in Swanton, Vermont, and was

14   a canine handler after that, intelligence agent after that,

15   and now supervisory intelligence agent.

16        Q.    Would you explain to the jury what it means to be a

17   canine handler on the border.  Why would law enforcement need

18   canines along the U.S.-Canada border?

19        A.    My canine was trained to detect hidden humans or

20   narcotics.  When people smuggle stuff across the border, they

21   often hide it in places, in vehicles and whatnot, and he's

22   trained to detect that, or also if humans were hidden in a

23   trunk or in box cars or something like that, he's also

24   trained to detect them in that.

25        Q.    What are some things that are smuggled across the

1    border between Canada and the United States?

2        A.   Oh, lots of, of course, narcotics, marijuana,

3    cocaine, heroin, hash.  Lots of different narcotics found in

4    rugs, toothpaste, anything.  There's lots of -- humans.

5        Q.   How many drug cases have you handled while being

6    with the Customs and border patrol with respect to marijuana

7    in particular?

8        A.   Hundreds.

9        Q.   And what type of cases do you see as part of the

10   border?

11       A.   What kind of --

12       Q.   Meaning are they all smuggling cases?

13       A.   Yes.

14       Q.   And how does marijuana, how does it get from Canada

15   into the United States?  What type of cases do you see?

16       A.   Because of the area that I work in, a lot of it

17   is -- it's unique where I am.  So the river -- there's the

18   Saint Lawrence River, and that accesses the border between

19   the United States and Canada there, so a lot of it is boated

20   across the river.

21       Q.   Say that again.  It's boated across the river?

22       A.   Yes.

23       Q.   And I failed to ask you, where are you working

24   right now?

25       A.   I'm in Massena, New York.

1    Q.    And where is Massena, New York, in relation to the

2    border?

3    A.    It's right on the borders.

4    Q.    And you indicated you had been working in did you

5    say Swanton, Vermont, at one point?

6    A.    Yes.  Swanton, Vermont.

7    Q.    And where is that in relation to the U.S.-Canada

8    border?

9    A.    Right on the border.

10   Q.    Now, you were just talking about how marijuana

11   would come into the United States and you said by boat.  How

12   else?

13   A.    Also on foot.  They can walk it across through the

14   unguarded portions of the border where there's not a port of

15   entry.  In between the ports of entry they will walk it

16   across.  Other times there's locations that they can drive it

17   across the border.

18   Q.    What do you mean when you say there's a port of

19   entry?  What is that?  Can you describe it?

20   A.    A port of entry is where people report.  When

21   you're legally coming to the United States from Canada you

22   have to go through a port of entry.  That's where the Customs

23   officers would check your status to make sure that you are

24   okay to enter and then they allow you to enter there and they

25   inspect your vehicles and whatnot.

1      Q.    When vehicles show up at the port of entry are they

2  subject to inspection and search?

3      A.    Yes.

4      Q.    Do you have to have any reason to search them?

5      A.    No.

6      Q.    How often do you search vehicles at the port of

7  entry?

8      A.    I personally do not.  I patrol the outside to the

9  border.  But they do it all day long every vehicle that goes

10 through.

11     Q.    When you patrol, what is the land mass you're

12 required to patrol?

13     A.    Meaning?

14     Q.    Meaning the area.

15     A.    We patrol anywhere along the border.  My sector is

16 Swanton sector, and it covers all of the way from New

17 Hampshire to the upper parts of New York.

18     Q.    How many miles is that approximately?

19     A.    I do not know.  I'm sorry about that.

20     Q.    That wasn't a trick question.  So how in the world

21 could you stop all drug trafficking between Canada and the

22 United States if the border is that extensive?

23     A.    You can't.

24     Q.    When you patrol are you on foot, are you in a

25 vehicle?

1   A. A mix.  I've been on foot, vehicle.  We have

2 four-wheelers, snowmobiles, but I was usually in a vehicle or

3 on foot.

4   Q. Your vehicle, is it a marked vehicle?

5   A. Over the years I've had several different vehicles.

6 I did start in marked units.  I am now in plain clothes,

7 unmarked vehicle.

8   Q. So if you were patrolling the border in your

9 vehicle and I drove by you, would I be able to tell that you

10 were with the border patrol?

11   A. At this time, no.

12   Q. In 2008 would I be able to tell that?

13   A. You may or may not.  It would have depended.  My

14 canine vehicle was a white vehicle.  It had a government

15 plate on it, so if you're really looking closely.  And it

16 also has a very distinct cage that's behind it so you might

17 be able to tell.

18   Q. Where were you on February 21, 2008?

19   A. I was working at the Burke, New York, station

20 border patrol.  I was a canine handler.  I was working a

21 midnight shift.

22   Q. And again, how far is the Burke station from the

23 border of Canada?

24   A. About 400 miles.

25   Q. Say that again.

1      A.    About 400 miles.  Somewhere in there.

2      Q.    And what were your duties that night?

3      A.    Patrol with the canine.

4      Q.    Do you know the concept known as a scout vehicle?

5      A.    Yes.

6      Q.    What is that?

7      A.    We see it a lot with smuggling cases, whether it's

8  humans or narcotics, they'll run a scout vehicle.  The scout

9  vehicle usually drives ahead.  The scout would be ahead of

10 the vehicle that would contain the narcotics or the illegal

11 aliens, and they will look or scout for law enforcement in

12 the area and let the other vehicle know if there's anything

13 that they should be concerned about so they can turn around

14 or go a different way.

15     Q.    The area you patrol, is it highly isolated?  Is

16 there a lot of cars up there?

17     A.    No.  Not on the midnight shift there isn't.  But

18 weekends it's a little busier.  It's not real busy, no.

19 There's a lot of farmland.  It's not a super busy area.

20     Q.    Did something happen on February 21, 2008, that

21 made you suspicious?

22     A.    Yes.

23     Q.    What happened?

24     A.    I was patrolling on State Route 122, which is very

25 close to the Burke station, and I was driving down the road

1    and I noticed -- it was 1:00 in the morning so there wasn't a

2    lot of traffic at all.  I hadn't seen any vehicles yet in

3    fact on the State Route 122.

4            I had a red maroon Tundra with a Massachusetts

5    plate.  I met them as I was going.  And then right behind

6    them was another red Grand Prix with a New York plate.  The

7    New York plate was a different New York plate.  Local

8    plates -- the first three numbers on a local plate are pretty

9    common, like FR for us was very common.  GLZ.  There's

10   different -- you start to learn the plates.  So this one

11   seemed off.  It wasn't the same.

12        Q.   So you saw two vehicles.  Did it appear that the

13   vehicles were traveling in tandem?

14        A.   Yes.

15        Q.   Now, when you saw them, did you pass them or did

16   you come up behind them?

17        A.   I passed them, but I immediately turned around and

18   then came up behind them.

19        Q.   So you pass them, you come up behind them, and what

20   happens?

21        A.   At the time the vehicle, the Grand Prix, was --

22   they were doing around 60 miles an hour in a 55 zone, which

23   is pretty common, pretty normal, but then they immediately

24   slowed down to, I can't remember, I think it was around 40

25   miles an hour, slowed down real fast, but the pickup kept

1  going the same speed, and then they would speed back up and
2  then slow back down and --

3      Q.    What was the speed limit on that road?

4      A.    55.

5      Q.    Okay.  So did you make anything of it?

6      A.    Yeah, it was very odd, not common, you know, to
7  have them speed up and, you know, when you're doing 60, drop
8  to 40, and then one time to 30.  In my experience I would say
9  that it draws attention to them, and sometimes that's done
10 purposely and that's where we get into -- I considered that
11 to possibly be like a block vehicle.

12     Q.    You mean a scout vehicle?

13     A.    No.  I consider a scout different.

14     Q.    Okay.

15     A.    A scout would ride ahead --

16     Q.    Okay.

17     A.    -- of the load.  Whatever they're protecting, the
18 scout vehicle would ride ahead of that and scout and say,
19 okay, look, there's law enforcement up here, you need to turn
20 around.

21     Q.    Could you describe what you mean by I considered
22 that to be a blocking vehicle?  What do you mean by that?

23     A.    The blocking vehicle would be more to block law
24 enforcement from the lead vehicle.

25     Q.    Had you ever seen that in drug smuggling before?

1          A.    Yes.

2          Q.    And what is that?  What does the blocking vehicle

3    do?

4          A.    It draws attention to itself so that it gets pulled

5    over and stopped, ties up law enforcement so that the other

6    vehicle can continue driving.

7          Q.    You indicated that the vehicle that was what you

8    think was the blocking vehicle sped up, slowed down, sped up.

9    Did it do anything else?

10         A.    Yes.  Both the passenger and driver flipped lit

11   cigarette butts out at the same time, towards the back, which

12   was odd to me, again drawing more attention.  I do remember

13   that it was kind of erratic.  It didn't cross a line, but it

14   would touch one line and then go to the other line.

15         Q.    How far were you behind that vehicle when the

16   driver and passenger threw their cigarette butts out?

17         A.    I was fairly close because I was getting the

18   license plate and running the license plate at that time.  So

19   I was within a couple car lengths.

20         Q.    What did you do when you saw that?

21         A.    I waited for record checks to come back to see

22   where it was registered out of, and then once I did that I

23   ended up making a stop on the vehicle.

24         Q.    Did you stop one vehicle or both?

25         A.    I stopped one at the time.

1      Q.    Okay.  And let's just stop right there.  What did
2  you do?  You stopped one vehicle.  Did you walk up to it?
3      A.    Yes.
4      Q.    And did you ask for the license and registration of
5  the driver?
6      A.    Yes.
7      Q.    Who was the driver?
8      A.    Steven Sarti.
9      Q.    What did you do then?
10      A.    I asked him for the -- I could smell -- as soon as
11  I walked up to the vehicle I could smell what I know to be
12  marijuana coming from the inside of the vehicle.  I asked him
13  for identification.  Asked the passenger for identification.
14  They were both nervous acting, their hands were shaking, and
15  the passenger wouldn't make eye contact, was kind of staring
16  straight ahead.  So I advised them at that point -- I asked
17  them a couple questions about where they were coming from,
18  where they were going.  Mr. Sarti told me that he --
19            MR. SHEKETOFF:  Well, objection.
20      Q.    Let me ask you this.  What did you end up doing
21  with that vehicle?
22      A.    I ended up having -- advising them that I was going
23  to allow my canine to do an exterior sniff of the vehicle.
24      Q.    And did you?
25      A.    Yes.

1    Q.   What's your canine's name?

2    A.   Dasty B.

3    Q.   Dasty B?

4    A.   Yes.

5    Q.   Why is your canine named Dasty B?

6    A.   Well, there's more than one -- the government has a

7    lot of dogs, obviously.  So if there's more than one Dasty,

8    he's Dasty B if he's the second one.  And there could be a

9    Dasty C or there could be a Dasty D.

10    Q.   If you are a canine handler, do you have to engage

11    in training?

12    A.   Yes.

13    Q.   How much training?

14    A.   We train weekly for eight-hour blocks, and then we

15    also do -- initially go to El Paso, Texas, for like three

16    months.

17    Q.   When you got your canine out of your vehicle and

18    had Dasty B engage in a search of the vehicle you had pulled

19    over, how do you conduct the search?  What do you do

20    physically with Dasty B?

21    A.   You do a high/low presentation of the vehicle on

22    the exterior of it.

23    Q.   What does that mean?

24    A.   He's on lead.  And I'll put my hand low on the

25    vehicle, high, gives him his sniff points and gets his head

1  working up and down the vehicle, and I walk him around the

2  exterior of the vehicle.

3      Q.   So if you are with him on lead and you go down, is

4  his job to go down with you and smell?

5      A.   Yes.

6      Q.   And you go up and down?

7      A.   Yes.

8      Q.   And Dasty B follows your lead?

9      A.   Yes.

10     Q.   And what is he trying to do with respect to where

11 his nose is?  He's looking for what?

12     A.   He's looking for scent.  So scent of narcotics,

13 scent of humans, whatever it is, so we present high and low

14 so that we don't miss a seam if there's a seam on the door or

15 anything like that.  It's just to get his head going up and

16 down, up and down, so that he can gather the scent on the

17 entire vehicle that way.

18     Q.   And what happened?

19     A.   When I got to the passenger side of the vehicle,

20 the window was down partially.  So when I presented high, he

21 attempted to jump inside the vehicle through the window.

22     Q.   What does that mean to you as a canine handler?

23     A.   I'd call that an alert.  It means that he's

24 alerting to the vehicle, that he wants to get in there, that

25 there's something possible that he wants.  But when he

1    couldn't get in the window he immediately got out and then he

2    indicated, which means that he sat.  He does a pinpoint stare

3    at the door, and he's telling me that there's something

4    there.

5           Q.   So you engage in training with Dasty B.  And when

6    Dasty B detects the scent of narcotics, what is the signal

7    that he gives to you?

8           A.   His sit and his pinpoint stare.

9           Q.   Okay.  Pinpoint stare.  He doesn't move?  He stares

10   at a location?

11          A.   Uh-huh.

12          Q.   Then what do you do when he signals?

13          A.   If it's on the exterior, then I would let him into

14   the vehicle.

15          Q.   And did you do that?

16          A.   Yes.

17          Q.   And what happened?

18          A.   He immediately went to the front passenger seat.

19   He was alerting throughout the vehicle.  He sat on the seat

20   of the vehicle and stared at the floor.

21          Q.   Okay.  And then what did you do?

22          A.   I rewarded him, which is we give him his toy for --

23          Q.   Why do you reward the dog?  So you're a canine

24   handler.  And when a dog alerts, what is it you give him?

25          A.   I believe that day it was a -- it's a green

1    hydraulic hose, about a one-foot piece of hydraulic hose.

2    The thing behind it is to not let him -- he doesn't think

3    that he's finding narcotics.  He thinks he's finding his toy.

4    So it's kind of a trick you do for the dog.  When he

5    indicates and alerts, he stares, he's staring there, you

6    throw a toy in and he thinks that the toy popped out of where

7    he's staring.  So to him, he just found his toy.  So that's

8    how he works.  That's what he works for is that toy.

9         Q.    So you gave him the piece of hose?

10        A.    Yes.

11        Q.    How long do you let him have the hose as a reward?

12        A.    You play tug-of-war with him for just a couple of

13   minutes, tug-of-war, and then you take it away from him and

14   hide it.

15        Q.    The occupants of that car, where were they when you

16   were doing the search with Dasty B?

17        A.    Standing on the side of the road.

18        Q.    And how many occupants of the car were there?

19        A.    Two.

20        Q.    You just identified Steven Sarti.  Who was the

21   second individual that was located in the passenger seat of

22   that car?

23        A.    Ryan Meyers.

24        Q.    Ryan Meyers?

25        A.    Yes.

1      Q.   Now, as you were engaging in the search of the car

2   with Dasty B, whatever happened to the other vehicle that

3   kept on going?

4      A.   During the interview of Sarti at the vehicle he had

5   mentioned that he had rented the vehicle in Boston.

6           MR. SHEKETOFF:  Objection.

7           THE COURT:  Objection.  You'll rephrase?

8           MS. OLLILA:  I'll move on.

9           THE COURT:  Okay.  Objection sustained then.

10          MR. SHEKETOFF:  I'm sorry, your Honor?

11          THE COURT:  Objection sustained.  You can go ahead

12   and move on.

13     Q.   At some point in time was that other vehicle

14   stopped by law enforcement?

15     A.   Yes.

16     Q.   After Dasty B alerted, did you do anything with the

17   vehicle?  Did it stay right there or did it go anywhere else?

18     A.   By then I had another agent that was there, so I

19   put Dasty back in the vehicle and I traveled to the other --

20   the pickup truck that was stopped with the Massachusetts tag.

21     Q.   So you went ahead and went to that vehicle,

22   correct?

23     A.   Correct.

24     Q.   What did you do at that vehicle?

25     A.   I again did an exterior sniff of the vehicle with

1  my canine.

2      Q.   What happened?

3      A.   He alerted immediately to the -- I think it was the

4  back passenger's door.

5      Q.   Then what did you do?

6      A.   I let him inside, where he alerted and indicated to

7  the door panel.

8      Q.   Did you go in and look at the door panel?

9      A.   Yes.

10      Q.   Did anything look unusual?

11      A.   Yes.  Throughout all the door panels, the flooring

12  and whatnot.

13      Q.   What looked unusual?

14      A.   You could tell that the pins that hold the plastic

15  in had been replaced and a lot of them were pulled out.  The

16  door panels were very loose.  The plastic portion on the

17  inside was very loose.  The carpet was also pulled up in

18  spots and not tucked underneath the moldings.

19      Q.   Had you ever seen that before?

20      A.   Yes.

21      Q.   How many times do you think you've seen that?

22      A.   Numerous.  I don't know.  Maybe a hundred.  I'm not

23  sure.

24      Q.   And it's a sign of what?

25      A.   For me when we see it after an alert it's a sign

1    that there was something hidden in those areas or those areas

2    were pulled out for some reason, whether it was to hide

3    narcotics or whatever.

4         Q.   You have indicated during your testimony that you

5    have participated in hundreds of smuggling investigations; is

6    that correct?

7         A.   Correct.

8         Q.   And of those, was your testimony that over a

9    hundred involved marijuana?

10        A.   Yes.

11        Q.   Now, what about the concept of a drug ledger?  Do

12   you know what that is?

13        A.   Yes.

14        Q.   Have you ever seized drug ledgers?

15        A.   Yes.

16        Q.   Approximately how many times?

17        A.   Maybe -- I'm guessing maybe 20.  15, 20, I'm

18   guessing.

19        Q.   What is a drug ledger?

20        A.   It's just -- they'll have either a notebook or

21   papers, stuff that's written down that will indicate what

22   they've moved for drugs or what they've collected for money,

23   or sometimes locations, sometimes phone numbers.  Just

24   different information about smuggling events that occurred.

25        Q.   When you've come across drug ledgers like that,

1    what do you do with the drug ledgers?

2         A.   Depending on the case, if you had the drugs in the

3    vehicle I would seize it and take care of it.  If it's not,

4    then lots of times we make photocopies of it and then hold it

5    for intelligence reasons and for further investigation.

6         Q.   So now Dasty B alerted to both vehicles.  What

7    happens then?

8         A.   Both vehicles are brought back to the Burke border

9    patrol station where they can be gone through more, checked

10   over more thoroughly.  And I was -- the Sarti vehicle, the

11   red Grand Prix, went through that and checked for anything

12   indicating smuggling events, intelligence, pocket trash we

13   call it, papers that people might just throw on the floors or

14   whatnot or have in their glove boxes that would indicate

15   phone numbers or locations or anything like that.

16        Q.   You just said the red Grand Prix, the vehicle that

17   Sarti was driving and also the vehicle that Ryan Meyers was

18   in; is that correct?

19        A.   Correct.

20        Q.   Did you go through that vehicle?

21        A.   Yes, I did.

22        Q.   Did you locate anything?

23        A.   Yes, I did.

24        Q.   What did you locate?

25        A.   A lot of, we call it shake, or it seemed like they

1  would spread pieces of marijuana throughout the floor of the

2  vehicle.  There was a lot of it on the floor.  There was

3  Zippo rolling papers, and then there was a device that's used

4  to crush marijuana buds to make them small enough to roll

5  into marijuana that was in there, and also cell phones.  And

6  then I found what I thought was -- what I believed to be a

7  drug ledger inside of a bag inside the vehicle also.

8      Q.   Inside that first vehicle being driven by Steven

9  Sarti and Ryan Meyers; is that correct?

10     A.   Correct.

11     Q.   And you said you found what you would term is a

12 drug ledger; is that correct?

13     A.   Correct.

14     Q.   Where was Steven Sarti and Ryan Meyers while you

15 were going through their car?

16     A.   They were in the office part.  I was in the garage

17 part.

18     Q.   Could they see what you were doing?

19     A.   No.

20     Q.   When you found that drug ledger, what did you do

21 with it?

22     A.   I gave it to another agent and asked him to make a

23 photocopy of it while I continued the search.

24     Q.   And did the agent make a copy?

25     A.   Yes.

```
1       Q.    The photocopy that he made, did he give it to you?
2       A.    Yes.
3       Q.    And did you review the photocopy?
4       A.    Yes.
5       Q.    Let me show you what has been marked as
6   Government's Exhibit 1h for identification, and I'll ask that
7   you go through this document, sir, and indicate whether or
8   not you recognize what that document is.
9       A.    Yes.
10      Q.    What is it?
11      A.    It's the ledger that I found that day.
12            MS. OLLILA:  Your Honor, I would ask that the ID be
13  stricken on Government's Exhibit 1h and it be entered into
14  evidence.
15            THE COURT:  Any objection?
16            MR. SHEKETOFF:  No objection, your Honor.
17            THE COURT:  All right.  Exhibit 1h is a full
18  exhibit.
19            (Government's Exhibit No. 1h Admitted)
20            MS. OLLILA:  Diane, please pull up 1h.
21      Q.    Sir, you stopped the vehicle on what date exactly,
22  the vehicles?
23      A.    It was February 21, 2008.
24      Q.    And what day of the week did that fall on?
25      A.    It was a Thursday.
```

1      Q.   Now, what is pulled up on the screen is the first

2  page of Government's Exhibit 1h.  At the top of the page --

3  is any of this your handwriting?

4      A.   No.

5      Q.   This is the ledger that was seized from a bag in

6  the Sarti/Meyers car; is that correct?

7      A.   Correct.

8      Q.   The first line indicates first Monday?

9      A.   Yes.

10     Q.   Based upon your understanding of drug ledgers, what

11  does that mean?

12     A.   Well, it would depend on when it happened.  So it

13  would be either the first Monday of the month or the first

14  Monday of the trip.  It just depends on that.

15     Q.   Okay.  So it was a Thursday.  Could it be the

16  following Monday?

17     A.   Yes.

18     Q.   And if you look down below where it says first

19  Monday, can you see where it says second Wednesday?

20     A.   Yes.

21     Q.   What would that be?

22     A.   That would be the following Wednesday.

23     Q.   What about underneath that reference, it says third

24  Thursday, what would that be?

25     A.   That would be the next Thursday.

1    Q.   Now, where it says third Thursday, if you look
2  right below, it says ITL-150, can you see that?
3    A.   Yes.
4    Q.   Based upon your understanding of drug ledgers, what
5  is that a reference to?
6    A.   In this instance here when you look at it, it's 150
7  pounds, and ITL would be whoever they delivered that to.
8    Q.   What about below ITL?  It says NH.  Do you see
9  that?
10   A.   Yes.
11   Q.   What does it say next to NH?
12   A.   50.
13   Q.   And what would that be a reference to?
14   A.   50 pounds of marijuana.
15   Q.   Of what?
16   A.   Of marijuana.
17   Q.   Now, I want you to keep going down.  Under NH it
18 says Mark, then it says Ed, and then it says block.  What
19 does it say underneath block?
20   A.   2 mill drop, 1 percent equals 20K equals 300.
21   Q.   2 mill drop.  Based upon your training and
22 knowledge of drug ledgers, what does that mean?
23   A.   That means that they dropped $2 million in proceeds
24 and they got 1 percent of that for making the run.  So they
25 got paid $20,000 to drop off $2 million.

1    Q.   This page -- is there any way to determine on this

2    page how much marijuana is going to be delivered and how

3    much -- strike that -- how much marijuana is going to be

4    delivered?

5    A.   Yeah.  They spelled it out pretty easy.

6    Q.   All right.  And I want you to explain and walk the

7    jury through it, and start with the first Monday.  Do you see

8    at the top of the page where it says first Monday?

9    A.   Yeah.

10    Q.   Right next to it it says 200.

11    A.   Right.

12    Q.   What does it say below 200?

13    A.   100.

14    Q.   Now if you go to the far right of the top of the

15    page, what does that say?

16    A.   Equals 300.

17    Q.   So 200 plus 100 equals 300?

18    A.   Yes.

19    Q.   And that says the first Monday, correct?

20    A.   Yes.

21    Q.   Now go down to the second entry, second Wednesday?

22    A.   200, 100, equals 300 again.

23    Q.   Okay.  Now go down to the third Thursday.  This is

24    the third trip?

25    A.   Uh-huh.  150, 50, 50, 50, so equals 300.

1      Q.   So at this point in time with these three entries,
2  how much marijuana is represented?
3      A.   900 pounds.
4      Q.   By the way, do you know how much a pound of
5  Canadian marijuana goes for?
6           MR. SHEKETOFF:  Objection, your Honor, unless I get
7  a time frame.
8           THE COURT:  I think that's fair.  He's looking for
9  a time frame.
10     Q.   During this time frame the price for Canadian
11  marijuana, hydroponic marijuana?
12     A.   It hasn't changed a lot.  At the time on the
13  reservation they were selling it from anywhere from 1600 to
14  2,000 to the smuggler and then the smuggler was getting about
15  4,000.
16     Q.   Now, on the last entry where it says fourth Monday,
17  is it fair to say that this page alone represents about one
18  week of marijuana that is going to be dropped?
19     A.   Yes.
20     Q.   Now, if you look where it says the fourth Monday,
21  how much marijuana is represented there?
22     A.   400 pounds.
23     Q.   So how much total marijuana during this approximate
24  one week time frame was going to be dropped?
25     A.   1300 pounds.

1    Q.   In addition to seizing the ledger, did you seize
2  anything else?
3    A.   Yes.
4    Q.   What?
5    A.   I took the phone numbers out of the phones that
6  were in the vehicle and wrote them down.
7    Q.   Did you ever tell Steven Sarti or Ryan Meyers that
8  you had taken the ledger and copied it?
9    A.   No.
10   Q.   Why wouldn't you tell them that?
11   A.   Because of the amounts that were in the ledger I
12 knew that it was going to be part of an investigation or may
13 have already been part of an investigation, so I didn't want
14 to compromise that at the time.
15   Q.   You indicated you found some telephones and you
16 went into the telephones and wrote -- what did you write down
17 from the telephones?
18   A.   All the incoming, outgoing, and all other contacts.
19   Q.   Let me show you what's been marked as Government's
20 Exhibit 1i for identification, sir.  Do you recognize what
21 Government Exhibit 1i is?
22   A.   Yes.
23   Q.   What is it?
24   A.   It's the numbers that I wrote down out of the two
25 Nextel phones that were found in the front seat.

1        Q.    Of which car?

2        A.    Of the red Grand Prix that Steven Sarti was

3   driving.

4        Q.    And the handwriting on that page is your

5   handwriting?

6        A.    Correct.

7              MS. OLLILA:  Your Honor, I would ask that the ID be

8   stricken on Government's 1i and it be entered into full

9   evidence.

10             MR. SHEKETOFF:  No objection.

11             THE COURT:  1i is a full exhibit.

12             (Government's Exhibit No. 1i Admitted)

13             MS. OLLILA:  Thank you.  Please pull up 1i.

14        Q.    Okay.  Now, what Diane has just done is enlarged

15   about a third of that page.  Is this your handwriting?

16        A.    Yes.

17        Q.    And do you see a reference to NH?

18        A.    Yes.

19        Q.    What is next to NH?

20        A.    7048.

21        Q.    What does that mean?

22        A.    That would be the number that the Nextel phone --

23   Nextel phones are like a push-to-talk phone and they connect

24   by a pin almost like -- it's just a four-digit number, it's

25   not a full phone number, and that would be the number of

1    somebody's Nextel phone.

2         Q.   Do drug traffickers often use Nextel phones?

3         A.   Yes.

4         Q.   And they use push to talk; is that correct?

5         A.   Correct.

6         Q.   So there's no telephone number they have to dial.

7    They just have to dial those digits, correct?

8         A.   Yes.

9         Q.   And so what were the digits next to NH?

10        A.   7048.

11        Q.   Now, what Diane has just done on Government's

12   Exhibit 1i is she highlighted and enlarged the section right

13   below what you were testifying to.

14             What do these numbers represent?  This is your

15   handwriting.  What were you writing down?

16        A.   I was writing down the calls that were received.

17        Q.   Calls that were received or made?

18        A.   Yes.  I don't know right now without looking.  I'm

19   not sure if these were outgoing or incoming.

20        Q.   So whether someone called in or the person holding

21   the phone called out, these were times and dates when calls

22   either came in or went out from that telephone?

23        A.   Correct.

24        Q.   Is there an indication that a call was either

25   received or sent to NH?

1        A.    Yes.

2        Q.    When did that call occur?

3        A.    At 3:34 p.m. on February 18th.

4        Q.    Next to 3:34 p.m. it says 2 -- is that an 18 next

5   to it?  Is your 8 a little off?

6        A.    Yeah, when I make my 8s I do a double circle so...

7        Q.    Does that mean that someone either called NH or NH

8   called into that phone on February 18th?

9        A.    Correct.  Yes.

10        Q.    And how many days was that prior to you stopping

11   these vehicles?

12        A.    Three.

13        Q.    Okay.  What did you do after you seized these

14   ledgers?

15        A.    After that I returned the ledger back to the bag.

16   We ended up releasing the vehicles and the people.

17        Q.    Did you find any marijuana in any of the vehicles

18   other than what was located on the floor?

19        A.    No.

20              MS. OLLILA:  I have nothing further of this

21   witness, your Honor.

22              THE COURT:  Attorney Sheketoff.

23              MR. SHEKETOFF:  I have no questions.

24              THE COURT:  All right.  Well, Agent Simonsen,

25   you're excused.

1           THE WITNESS:  Thank you.

2           THE COURT:  You may call your next witness.

3           MS. OLLILA:  The United States calls Branson Perry.

4                    BRANSON PERRY

5           having been duly sworn, testified as follows:

6           THE CLERK:  For the record, please state your name

7    and spell your last name.

8           THE WITNESS:  Branson Perry.  Last name P-E-R-R-Y.

9           THE CLERK:  Thank you.

10                   DIRECT EXAMINATION

11   BY MS. OLLILA:

12      Q.   Sir, you don't sound like you're from around here.

13      A.   No, ma'am, I'm not.

14      Q.   Do we all sound funny to you?

15      A.   Absolutely.

16      Q.   Where are you from?

17      A.   I'm from Oklahoma.

18      Q.   Were you born and raised in Oklahoma?

19      A.   Yes, ma'am.

20      Q.   What do you do for a living?

21      A.   I'm an Oklahoma state trooper.

22      Q.   How long have you been an Oklahoma state trooper?

23      A.   Since January of 1995, a little over 20 years.

24      Q.   What do you do as a state trooper?

25      A.   I'm currently assigned to the DEA task force in

1    Tulsa to the highway group.  I've spent the majority of my

2    career as a canine handler and work in highway interdiction

3    efforts on the interstate system in Oklahoma.

4         Q.   What does that mean, highway interdiction?

5         A.   We make a lot of traffic stops on the interstate

6    system.  I specifically work I-40, I-44 and I-35, they're all

7    corridors that travel through the state of Oklahoma, and we

8    make high-volume traffic stops for various traffic code

9    violations, and during that traffic stop we seek out

10   criminals.  We try to catch people trafficking narcotics,

11   guns, currency, wanted people, anybody that's involved in

12   some type of criminal activity that's using a motor vehicle

13   as its transportation, we'll try to get in the middle of

14   that.

15        Q.   Okay.  You used a term, a corridor.

16        A.   Yes, ma'am.

17        Q.   What do you mean by that?

18        A.   Oklahoma, as you know, is right in the middle of

19   the United States.  Those are our three major interstates

20   that intersect in Oklahoma, and therefore we have people that

21   travel through Oklahoma from all parts of the United States,

22   the East Coast, West Coast, the north border, as well as the

23   southern border.  So they meet in Oklahoma, in the Oklahoma

24   City area.

25        Q.   Are those roads frequently traveled by drug

1  traffickers?

2       A.   Yes, ma'am.

3       Q.   And is it your job to try to stop those drug

4  traffickers?

5       A.   Absolutely.

6       Q.   Are you tasked with seizing contraband, drugs,

7  narcotics and currency?

8       A.   Yes, ma'am.

9       Q.   How many motor vehicle stops do you think you have

10  conducted where you have seized either drugs or currency?

11       A.   Several thousand.  A lot.  That's been my only job

12  for approximately 18 years.

13       Q.   Are you good at what you do?

14       A.   I think so.

15       Q.   You said you are a canine handler.  What's your

16  dog's name?

17       A.   Tack, T-A-C-K.

18       Q.   Was your canine Tack also -- did you have him on

19  March 5th, 2008?

20       A.   No, ma'am.

21       Q.   Did you have a different canine then?

22       A.   Yes, ma'am.

23       Q.   And what canine did you have then?

24       A.   His name was Kilo.

25       Q.   Kilo as in K-I-L-O?

1    A.    Yes, ma'am.

2    Q.    What does kilo stand for?

3    A.    Kilogram.

4    Q.    For those not in the drug business, what does that

5  mean?

6    A.    It's just a street term that we coined for

7  identifying a specific amount of narcotics.

8    Q.    What kind of dog was Kilo?

9    A.    German Shepherd.

10    Q.    What happened to Kilo?

11    A.    He retired.

12    Q.    How long does a canine remain a drug canine?

13    A.    It depends on the dog really, whether or not they

14  sustain any injuries during the job, whether they get sick,

15  get diseases or anything like that.  Kilo worked with me from

16  2007 until 2011, I believe, and I had a -- I took about a

17  year out of the canine division for some personal reasons,

18  and I gave that dog to our tactical team.  But I've had --

19  I've handled five dogs in my career with the highway patrol.

20    Q.    In March of 2008 when you were a canine handler for

21  Kilo, was Kilo with you every day?

22    A.    Yes.

23    Q.    And where would Kilo be with you?

24    A.    I've got a -- I drove a Tahoe.  That's the vehicles

25  that are issued to the troopers that carry canines.  We have

what we call a three-quarter kennel, meaning three-quarters
of the backseat is dedicated to a canine cage, and there's
one small seat directly behind the driver's seat that I can
put a prisoner in that seat.  So he would go to work with me
every day.  He stays at my house.  I've got a kennel at home,
and he's one of the family.

    Q.   When you would stop a motor vehicle if you were out
on the interstate, what would you do with Kilo?  Would he
remain in your car?

    A.   Yes, ma'am.

    Q.   Would you open his cage once you got out of the
car?

    A.   Yes, I would.

    Q.   Why would you do that?

    A.   We operate what we call full patrol dogs.  In other
words, they have dual purposes.  Kilo is obviously a drug
dog.  He's also an officer protection dog or apprehension
dog, meaning he bites people.

        One of the measures that we use to keep us safe on
our job is if things go wrong on a traffic stop with a
motorist, we're allowed to bring that dog out to protect us.
And so I would leave my door cracked or I'd leave my window
down, and he's trained -- if there's a confrontation between
myself and an individual, he'll self deploy.  He'll come out
and help me.

1      Q.   So if you leave your door cracked or the window

2  open and Kilo -- does Kilo watch you as you're at another

3  vehicle?

4      A.   Yes, ma'am.

5      Q.   And if he were to see a confrontation, what would

6  Kilo do?

7      A.   He'd join in.

8      Q.   Now, when you engage in motor vehicle stops,

9  Trooper, do you have a video of them?

10      A.   Yes, ma'am.

11      Q.   Why is that?

12      A.   All our cars are equipped with a Watchguard video

13  camera system.  They video what's in front of the patrol car

14  as well as what's going on inside.  That video camera is

15  activated when I turn my emergency lights on to make a

16  traffic stop, and it's documented on video as well as audio

17  during the course of that stop.

18      Q.   Did you engage in a motor vehicle stop on March 5,

19  2008, of a vehicle that had a New Hampshire license plate?

20      A.   Yes, ma'am.

21      Q.   And why did you stop the vehicle?

22      A.   I just started my tour of duty on I-40 west of

23  Oklahoma City that evening, and I was sitting in the center

24  median.  It was approximately 10, 11:00 at night.  I was

25  working traffic, working radar, looking for violations.  I

1    observed a violation.  A motorist failed to yield to the

2    nonadjacent lane.

3         Q.    What does that mean?

4         A.    That means -- the interstate system that we work on

5    is four-lane divided, meaning two lanes are eastbound, two

6    lanes are westbound, and there's a big grass median in the

7    middle of those lanes.  That's where I'm sitting.

8         I was working radar watching the westbound lanes of

9    traffic.  In Oklahoma it's a primary reason to pull somebody

10    over if a motorist approaches an emergency vehicle on the

11    shoulder that has its emergency lights on and they do not get

12    over into the far inside lane, and in this particular case a

13    vehicle was approaching one of my partners.  I make it a

14    habit of watching vehicles that are around our other partners

15    that have their lights on.  He did not yield to that lane

16    like he should have, and I waited for a few more cars to pass

17    by and I pulled out and went and chased that vehicle down and

18    made a traffic stop.

19         Q.    Did you walk up to the motor vehicle?

20         A.    Yes.

21         Q.    Did you identify yourself?

22         A.    Yes.

23         Q.    And did you indicate why you were stopping the

24    motor vehicle?

25         A.    Yes, I did.

1        Q.    Did you find out who the driver was of the vehicle?

2        A.    Yes, I did.

3        Q.    What kind of vehicle was it that you pulled over?

4        A.    It was a Toyota Tundra pickup truck, four-door

5   pickup truck.

6        Q.    Who was the driver?

7        A.    A gentleman named Brandon Anderson.

8        Q.    Was there a passenger in the car?

9        A.    Yes, ma'am.

10       Q.    Was it a male or a female?

11       A.    Female.

12       Q.    And what was her name?

13       A.    Amber Schoenwald.  I'm probably not pronouncing

14   that right but...

15       Q.    As you approach the motor vehicle, is there a

16   videotape of your interaction with the two individuals in the

17   Toyota Tundra?

18       A.    Yes, ma'am.

19       Q.    And do you keep the video rolling the entire time?

20       A.    Yes, ma'am.

21       Q.    And is that part of your obligation as a law

22   enforcement officer to have that video rolling?

23       A.    Yes, ma'am.

24       Q.    Before you got out of the car, what did you do with

25   Kilo?

1      A.    I just reached back and opened the slider like I

2   normally do and exited my patrol car and made a passenger

3   side approach to the truck.

4      Q.    Trooper Perry, I'm showing you what's been marked

5   as Government's Exhibit 2a-1 for identification, sir.  Have

6   you seen this before?

7      A.    It's been a while.  Yes, ma'am.

8      Q.    And what is it?

9      A.    It's a DVD copy of the traffic stop that we're

10  talking about that I made March 5, 2008.

11            MS. OLLILA:  Your Honor, I would ask that the ID be

12  stricken on Government's 2a-1 and that it be entered into

13  full evidence.

14            THE COURT:  Any objection?

15            MR. SHEKETOFF:  Well, can we see you very briefly

16  at sidebar?

17            THE COURT:  Yes, you may.  Please approach.

18            (SIDEBAR)

19            MR. SHEKETOFF:  I know the prosecutor said that she

20  did not plan on playing the sound.

21            THE COURT:  Correct.

22            MR. SHEKETOFF:  Since the way she offered it, I

23  have to object to that exhibit because it has sound on it.

24  So without the sound I have no objection.

25            MS. OLLILA:  What I have advised counsel and what

1  we'll do is -- this copy has sound, but we're not going to

2  play the sound.  The copy -- we will replace this copy for

3  the jury with a copy that has -- that does not have sound.

4  So for our purposes here we will play it.  It's going to be

5  exactly the same, but there will be no sound that comes out

6  of it.

7          MR. SHEKETOFF:  So my only objection is to the

8  sound.  So if you're going to correct that --

9          THE COURT:  You just wanted to clarify that.  Okay.

10          MS. OLLILA:  Sure, sure.

11          THE COURT:  You can explain to the jury they're not

12  hearing anything.

13          MS. OLLILA:  Correct, correct.

14          MR. SHEKETOFF:  Thank you, Judge.

15          (CONCLUSION OF SIDEBAR)

16          MS. OLLILA:  Your Honor, I would ask that the ID be

17  stricken on 2a-1 and that it be entered into full evidence.

18          MR. SHEKETOFF:  Only the objection I had at

19  sidebar.

20          THE COURT:  All right.  2a-1 is a full exhibit.

21          (Government's Exhibit No. 2a-1 Admitted)

22          MS. OLLILA:  Diane, please pull up 2a-1.

23     Q.    So Trooper Perry, what is it that the jury is

24  looking at right now?

25     A.    Well, there's a split screen video.  The bottom

1    part is the inside of my Chevy Tahoe.  You're looking at the

2    passenger seat on the left, the driver's seat, which is my

3    shoulder on the right, and the canine kennel behind it.  The

4    above portion is what's going on in front of the patrol car,

5    which is the Toyota Tundra that I'm preparing to stop.

6        Q.   So the bottom part of this video is you and Kilo.

7    It's showing inside your car?

8        A.   Yes, ma'am.

9        Q.   And the top is showing the Toyota Tundra that you

10   are now pulling over; is that correct?

11       A.   Yes, ma'am.

12       Q.   Now, I'm not going to play the volume.  I'm going

13   to play just a few minutes, and I want you to explain as the

14   video is rolling what is happening, what you're doing.

15       A.   Okay.  My emergency lights are active.  You can see

16   the reflection in the tailgate.  I'm wanting the pickup truck

17   to yield to the shoulder, and they do so right there.  I tell

18   my partner -- I'm working with a few guys that night.  I tell

19   them that I'm going to be out on this traffic stop

20   approximately around the 114 mile marker.  This is a very

21   rural area west of Oklahoma City.

22       Q.   Why would you do that?  Why would you give somebody

23   that information?

24       A.   I'm by myself, and this is the way we conduct our

25   business.  And they'll check on me from time to time.

1    Q.   Now, it appears at this point you're getting out of

2    your car, and you pull that gate open in the back?

3    A.   Yes.  My window's down.  The gate's open.  My

4    canine you can see stick his head out.  He's just watching

5    me.  This is an exercise to him.  It's something that we

6    train repeatedly with.  He understands what he's supposed to

7    do, you know, if I needed him.  He's not going to get out on

8    his own without due cause.

9         I'm talking to -- I asked the passenger -- motioned

10   for her to roll the window down.  A female passenger and male

11   driver.  She rolls the window down just a few inches.  It's

12   very cold outside.  I told him why I stopped him, that he

13   failed to yield in adjacent lane when he passed the emergency

14   vehicle, and go ahead and grab your driver's license and come

15   on back here and have a seat.  And so I step to the rear, and

16   I'm waiting for the driver to step to the rear and meet me.

17   Q.   And you're bringing the driver into your vehicle;

18   is that correct?

19   A.   That's correct.

20   Q.   And so as the video is playing, now it's at marker

21   1:52.  That means it's 1:52 into the stop; is that correct?

22   A.   That's correct.

23   Q.   Now what's happening now?

24   A.   I thanked him for coming back.  I explained to him

25   that I'm only going to issue him a courtesy warning for the

1   violation, meaning there's not going to be any cost or fine

2   involved, and I simply begin casual conversation with

3   Brandon.  He begins asking me certain types of questions.

4   He's visually acknowledging that I have a canine right here.

5        Q.   Does he ever say anything about Kilo?

6        A.   No, he did not.

7        Q.   Are you looking for certain signs from Mr. Anderson

8   as you're sitting speaking to him?

9        A.   Yes, ma'am.

10       Q.   What signs are you looking for?

11       A.   Well, in this type of law enforcement we -- I

12  contact the innocent motoring public more than I contact the

13  criminal element, obviously, and so I have what we call a

14  plumb line of what the innocent motoring public is.  And when

15  I'm out looking for criminals, I'm looking for increased

16  stress and anxiety, people that aren't able to hold it

17  together when this encounter with law enforcement happens.

18            And what I mean by hold it together, there's an

19  array of things.  Everybody's different.  Some people start

20  sweating.  Some people start shaking.  Their hearts beat

21  rapidly.  These things don't ever calm down.  Instead they

22  continually get worse.  And those are the people that we end

23  up finding these large amounts of narcotics, large amounts of

24  currency in their vehicles.  It's natural for people to get

25  nervous when they get stopped.  At some point when they're

1    not involved in criminal activity, they're not getting a

2    citation, they calm down.  That's the consistency.  That's

3    what I'm looking for.

4        Q.   So when you advised Brandon Anderson -- when he got

5    in your car and you're giving him a courtesy warning, did you

6    see any signs from him that he was calming down?

7        A.   No, I did not.

8        Q.   What did you see?

9        A.   Instead Brandon increasingly became more nervous

10   and stressed out.  I noticed -- I say that because I noticed

11   his heart rate, his carotid artery continued to beat rapidly.

12   His breathing was erratic.  There was trembling in his voice

13   when he spoke.  There was increased exhalation of air when he

14   said certain words, simply because of the diaphragm being

15   tight.  These are things that are very specific to stress and

16   anxiety that we see on motor vehicle traffic stops, people

17   that are involved in criminal activity.

18       Q.   Trooper Perry, I want you to explain that a little

19   bit further.  You said that when individuals who are engaged

20   in illicit activity -- when they speak, they exhale more.

21       A.   Yeah.

22       Q.   What does that mean?  Can you give an example of

23   that?

24       A.   You know, when people are trying to calm down --

25   obviously there's consequences involved in our life when

1    we're doing something wrong and now we're in front of the

2    police and --  so the stress and anxiety is there.  When that

3    happens, what I've seen in my career is people's

4    diaphragms -- it gets hard to breathe, and they'll say words

5    like California and there's an increased amount of air that

6    comes out after the pronunciation or enunciation of that

7    word.  And Brandon did this a lot.  A lot of intentional --

8    he was struggling to swallow.  It was just very purposed when

9    he swallowed.

10            And then of course the sweaty palms.  When I shook

11   his hand -- this was a very short contact I had with Brandon.

12   When I shook his hand and thanked him for his time as I give

13   him his driver's license and insurance and warning, his hands

14   were soaking wet.  It was 17 degrees outside.  It's very cool

15   in my car because I've got a dog.  You know, my hands aren't

16   that sweaty, you know.  All this as an aggregate, as a

17   totality, means something to me.

18       Q.   As you're sitting there speaking to Mr. Anderson,

19   you're seeing all these signs, what are you thinking and

20   what's your strategy?

21       A.   My thoughts are his story, I didn't believe it.

22   There was visually a very large amount of luggage.  His story

23   was that his girlfriend lived in California.

24            MR. SHEKETOFF:  Objection.

25            THE COURT:  What's your objection?

1          MR. SHEKETOFF:  His story.  What Brandon is telling

2     him.

3          MS. OLLILA:  It's not offered for the truth, your

4     Honor.  It's offered to indicate why this trooper saw signs

5     of deception.

6          THE COURT:  Okay.  Objection overruled.

7     A.   His story was that his girlfriend flew from

8     California to the Boston area to see him, where he says he

9     lives, in the New Hampshire/Boston area, and now they're

10    taking a road trip back, and there was a gigantic amount of

11    luggage in the vehicle and the road trip just didn't make any

12    sense to me, especially when I went and talked and visited

13    with Ms. Schoenwald.  It just seemed like she came to see

14    him, and now the reason for the trip was maybe something

15    other than a vacation.  Spending a vacation driving in a

16    vehicle is not a vacation to me.

17    Q.   So, Trooper Perry, the time marker is now at 7:29,

18    7 minutes and 30 seconds into the stop.  You're out of the

19    car now back at the Toyota Tundra.  What are you doing back

20    at the Toyota Tundra?

21    A.   Asking for the insurance and registration for the

22    truck.

23    Q.   Is it your intention to speak to Amber Schoenwald?

24    A.   Yes, ma'am.

25    Q.   And do you speak to her briefly?

1      A.    Yes, I do.

2      Q.    And what do you do after you get the insurance

3 information?  Are you going to come back to your car?

4      A.    Yes, I do.

5      Q.    And what are you going to do?

6      A.    Close out my contact, my legal reason for being

7 there, which is the warning.  I'll finish my document and

8 I'll have Mr. Anderson sign it.

9      Q.    And so at this point have you formulated a strategy

10 of what else you might do?

11      A.    Yes.  I'm convinced that something other than a

12 traffic violation is going on here today, whether it be

13 possession of narcotics, I don't know what it is, but

14 something is going on and I'm going to satisfy that curiosity

15 by asking Brandon for consent to search his truck.

16      Q.    And do you do that?

17      A.    Yes, I do.

18      Q.    What does he say?

19      A.    He initially says, yes, that's fine.

20      Q.    And then what happens?

21      A.    I make sure that he -- I make sure that he was

22 clear on what he was allowing me to do just as a courtesy.

23 He seemed like he was very hesitant to give me consent.  He

24 didn't really act like he wanted to, but he said it anyway,

25 and so I went ahead, Brandon, are you sure you're giving me

1    consent to search inside your truck, and at that time he

2    says, no, I'm not, and he refused.

3             MS. OLLILA:  Now, I'm going to have Diane stop and,

4    Diane, I'm going to have you fast forward to minute marker

5    16:23 if you can.

6             (Brief pause)

7        Q.   Now, what is happening at this point in time,

8    Trooper Perry?  The time marker is 15:19?

9             MS. OLLILA:  Is that going, Diane?

10       A.   It's 15:19.

11       Q.   Okay.  What are you doing at this point?

12       A.   I'm going to assume -- most likely I'm waiting for

13   my partner to get there.  Brandon refused.  So in Oklahoma,

14   the area that we're allowed to operate is I have reasonable

15   suspicion and I can articulate I believe criminal activity is

16   going on.  He refused me, and so therefore I detained him.

17   At that point he is not free to go.  He cannot leave until I

18   walk my canine around the outside of the vehicle, which is

19   simply a free air sniff.  If my canine does not alert, I let

20   him go.  If my canine alerts, I have probable cause right

21   then and there to search the vehicle.

22             At this time I ran my canine around the vehicle and

23   he alerted to both driver and passenger sides of the vehicle.

24       Q.   The marker now is 16:21.  The video is showing you

25   and a dog.  Is that Kilo to the right side?

1      A.    Yes, ma'am.

2      Q.    And what are you going to do?

3      A.    I'm starting him at the front of the vehicle, which

4 is a matter of course.  We do that pretty consistently.  I'll

5 check the traffic here, and then I'll deploy the dog on the

6 vehicle and he'll start sniffing the outside of the car.

7      Q.    What do you do?  Do you use any hand signals for

8 Kilo to go up or down?

9      A.    Just targeting, check here, check here, check here,

10 up and down.

11      Q.    If Kilo is going to have a positive alert, what is

12 his positive alert?  What does it look like to you?

13      A.    The final indication -- we have what we call an

14 alert, which is a change of behavior, meaning he smells

15 something, he's changed his pattern, he's stopped, he's

16 turned around, he's trying to get to the source, and when he

17 believes he's at the source he'll do an indication.  He is an

18 aggressive alert dog or an aggressive indicating dog; in

19 other words, he'll scratch at whatever he believes is the

20 source of the odor.  And he does that ultimately on the

21 passenger side of the truck right there.

22      Q.    Is that what he's doing right now at minute marker

23 17:38?

24      A.    Yes, ma'am.

25      Q.    And he's jumping up and scratching; is that

1  correct?

2      A.   Yes, ma'am.

3      Q.   Now, you weren't here, but the witness who

4  testified before you has a passive alert dog.  What's the

5  difference between a passive alerter and an aggressive

6  alerter?

7      A.   It's just the final indication.  I've had both.

8  And the final indication on a passive is a sit, or a lay

9  down, or just a complete stopping of movement is a passive

10  alert.

11     Q.   What happens -- what are you doing right now in the

12  vehicle, which is at 18:07?

13     A.   I put the dog inside the truck, just let him sniff

14  around and let him indicate inside the truck.

15     Q.   When you look inside the truck, does anything look

16  unusual to you?

17     A.   A lot of luggage.  Just a whole lot of luggage

18  that's in the backseat of the truck.

19     Q.   What about the doors on the truck?  Does anything

20  look unusual to you?

21     A.   Visually, no.  Everything looks fine.

22     Q.   So what are you going to do?

23     A.   I put Kilo up.  I've got one of my partners, Cody

24  Ide, present with me, and then we will start a systematic

25  search of the vehicle.  In other words, we search the vehicle

1   systematically kind of the same every time.  And I believe we

2   start in the driver's compartment, move back to the

3   passenger.  Then we start checking natural voids, like the

4   doors.  We'll shake the doors and those type of things, start

5   looking for anomalies, places where narcotics is typically

6   hidden.

7             MS. OLLILA:  Diane, what I'll ask you to do is to

8   pause it and to go to, if you can, 23, minute marker 23.

9       Q.    Now we're at minute marker 23:39, and it looks like

10  you're at the driver's side door.  What are you doing and

11  what do you have in your hands, if anything?

12      A.    The rear driver's side door when we shook it, you

13  could hear something knocking around inside the door.  We

14  examined the seal where the actual trim attaches to the metal

15  had been messed with, and we start taking vacuum-sealed

16  bundles of currency out of the door.

17      Q.    You're throwing something on the hood of your

18  trunk.  What is that that you're throwing?

19      A.    That's money.  That's U.S. currency.

20      Q.    How much money did you end up seizing from that

21  vehicle?

22      A.    $2.1 million in --

23      Q.    Give or take?

24      A.    Yeah.  I don't remember the exact number, but it

25  was a lot.

1     Q.    There's another trooper there at this point in

2   time.

3     A.    Yes.

4     Q.    And is he just helping you to open the areas of the

5   vehicle?

6     A.    Yes.

7     Q.    When you open them, what are you -- were there

8   hidden voids in the car?

9     A.    Yeah, there's voids inside all the doors.  That's

10  natural.  That's where the window rolls down and whatnot, and

11  they just exploited that.  I mean it's very common.  It's

12  very common.  This is not the first time we found money

13  inside doors.  They just cram it in there until they can't

14  get any more in there and they move to the next door, and

15  that's what they did in this case.  We found money in several

16  different places besides doors.

17        MS. OLLILA:  Now, Diane, I want you to pause it and

18  bring it up just a little bit to 29 if you can.

19     Q.    We're at minute marker 27:42, and it will probably

20  be another minute, but what are you doing at this point in

21  time?

22     A.    Taking money out of doors.  The plan at this point

23  is to get as much of the evidence out of the vehicle, get it

24  secured, and take all the evidence and the vehicle to our

25  office in Oklahoma City, and that's what we do.  And then we

1   conduct a more specific, very slow methodical search for

2   documents as well as additional evidence.

3      Q.   You located a lot of money in the side door panels

4   of the motor vehicle.  Was there any money in duffel bags?

5      A.   Yes.

6      Q.   How many duffle bags did you see?

7      A.   There were two duffel bags that were on the floor

8   in the rear of the truck behind the driver's seat and behind

9   the passenger's seat.  They were average size duffel bags and

10   they both had money inside those duffel bags, and then

11   Brandon and Amber's luggage were stacked on top of those

12   duffel bags.  I didn't get to it until several hours after

13   the stop.

14      Q.   We are at minute marker 29:02.  What is going on

15   right now?

16      A.   Just taking more money out of the truck, figuring

17   out where we're going to put it all at this moment.

18      Q.   I'm just going to ask you to hold on for 30

19   seconds.

20      A.   Yes, ma'am.

21      Q.   Where are Brandon and Amber at this point in time?

22      A.   They were -- Brandon was -- at this point he's in a

23   pair of handcuffs, both of them, but they're sitting in my

24   driver's seat.  That rear jump seat I told you that's behind

25   my driver's seat, that's where Amber's sitting.

1     Q.    Can they see what you're doing?

2     A.    Yes.

3     Q.    Now what are you doing?

4     A.    Putting more money on the hood.

5     Q.    Trooper Perry, I'm going to show you what has been

6     marked as Government's Exhibit 2f-2, 2f-3, 2f-4, 2f-7, 2f-8,

7     2f-9, 2f-10, 2f-11, 2f-12, 2f-13, 2f-14 and 2f-15, and ask

8     you to go through those exhibits and let the jury know if you

9     know what they are.

10     A.    Yes, I do.  I took all these pictures.  This is

11     back at our office in Oklahoma City.  Do you want me to name

12     off the --

13     Q.    No.  Did you take all of those pictures?

14     A.    Yes, ma'am.  I took every one of these myself.

15     Q.    Are the pictures a fair and accurate depiction of

16     the motor vehicle at the time you stopped it and the recovery

17     of currency?

18     A.    Yes, ma'am.

19           MS. OLLILA:  Your Honor, I would ask that the ID be

20     stricken on the exhibits and they all be entered into full

21     evidence.

22           MR. SHEKETOFF:  I have no objection.

23           THE COURT:  Those exhibits are full exhibits.

24           (Government's Exhibit Nos. 2f-2, 2f-3, 2f-4,

25           and 2f-7 through 2f-15 Admitted)

1          MS. OLLILA:  Diane, please pull up 2f-6.

2     Q.   What is the picture that the jury is seeing right

3 now?

4     A.   It's the rear of Brandon Anderson's truck that I

5 stopped with a New Hampshire license plate.

6          MS. OLLILA:  Diane, please pull up 2f-7.

7     Q.   What is this a photograph of?  And is that you or

8 someone else?

9     A.   That's my supervisor, Lieutenant Jean Ides.  I had

10 found some tools in the truck, some nut drivers.  They were

11 brand-new and there was one missing.  And so nut drivers held

12 this panel on.  That voided area where those gallon bags -- I

13 believe there were 17 one-gallon bags of money inside that

14 voided area.  That back windshield rolls down, and so they

15 exploited that voided area to put the additional currency in

16 there as well.

17          MS. OLLILA:  Diane, now please go to 2f-8.

18     Q.   Trooper Perry, you're now looking at 2f-8.  What is

19 this a photograph of?

20     A.   That's the same -- that's the rear -- the picture

21 you just saw, the rear window cavity of the cab.  That's more

22 money on the inside.

23          MS. OLLILA:  Diane, please pull up 2f-10.

24     Q.   Trooper Perry, what is this a photograph of?

25     A.   That's the money that I took out of the rear voided

1  area, the rear window.  That's all of it.  I just stacked it

2  up on the seat.

3      Q.   But that's not all the money you recovered?

4      A.   No, no, no.  That's just -- I took the money in

5  bulk in the areas that I found.  Like all the money I took

6  out of the doors, I took a photograph of.  All of the money I

7  took out of the back glass, I took a photograph of.  All the

8  money I took out of the duffel bags, I took a photograph of.

9      Q.   Trooper Perry, what is located in 2f-11, the

10 picture you're looking at right now?

11     A.   That's the money that I took out of the doors.

12     MS. OLLILA:  Diane, please pull up 2f-12.

13     Q.   2f-12, Trooper Perry, what is this?

14     A.   That's the two duffel bags that were located in the

15 floor of the pickup truck.

16     MS. OLLILA:  Diane, please pull up 2f-15.

17     Q.   What is this a photograph of, Trooper Perry?

18     A.   That's the money in its totality.  That's all of

19 it.

20     Q.   Do you know the exact total?

21     A.   I don't remember.  I used to.

22     Q.   Was it about 2 million --

23     A.   It was over 2 million, yes, ma'am.

24     Q.   Like $2,001,000?

25     A.   Something like that, yeah.

1          MS. OLLILA:  Diane, please pull up 2f-14.

2     Q.    What is this a photo of?

3     A.    That's me and Kilo and all the money.

4     Q.    Do you often pose with Kilo when you have a seizure

5  like that?

6     A.    Yes, I do.

7     Q.    Are you proud of that?

8     A.    Yeah.  I'd hang on to that one.

9     Q.    Was that the largest seizure you had ever engaged

10  in at the time?

11    A.    No.

12    Q.    Okay.  What was the largest seizure?

13    A.    4.2 million.

14         MS. OLLILA:  I have no further questions, your

15  Honor.

16         THE COURT:  Attorney Sheketoff.

17         MR. SHEKETOFF:  I have no questions.

18         THE COURT:  All right.  Trooper Perry, you're

19  excused.

20         You may call your next witness.

21         MS. OLLILA:  The next witness will probably be a

22  two-hour witness, Judge.

23         THE COURT:  All right.

24         MS. OLLILA:  The next witness is Trooper Jean

25  Drouin.

```
 1                         JEAN DROUIN
 2           having been duly sworn, testified as follows:
 3           THE CLERK:  For the record, please state your name
 4  and spell your last name.
 5           THE WITNESS:  Jean Drouin, D-R-O-U-I-N.
 6                      DIRECT EXAMINATION
 7  BY MS. OLLILA:
 8      Q.   Good afternoon, sir.
 9      A.   Good afternoon.
10      Q.   How are you employed?
11      A.   I'm with the DEA.
12      Q.   How long have you been with the DEA?
13      A.   Coming up on 18 years.
14      Q.   What do you generally do for the DEA?
15      A.   Assigned to the New Hampshire office.  I work drug
16  investigations.
17      Q.   Approximately how many drug investigations have you
18  had the occasion to work?
19      A.   I've been involved in hundreds of drug
20  investigations in my career.
21      Q.   Have you been involved in marijuana investigations?
22      A.   Yes.
23      Q.   Cocaine investigations?
24      A.   Yes.
25      Q.   Heroin investigations?
```

1    A.   Yes.

2    Q.   MDMA investigations?

3    A.   Yes.

4    Q.   Does MDMA have a street name?

5    A.   Ecstasy.

6    Q.   Is it also known as Molly?

7    A.   Yes.

8    Q.   In February 2008 did you initiate an investigation

9  after receiving some information that $2 million had been

10 seized in Oklahoma?

11   A.   Yes.

12   Q.   How did you get that information?

13   A.   We received the information -- my partner, Special

14 Agent Hanlon, found out about the seizure because he knew the

15 trooper who made the stop out in Oklahoma.

16   Q.   Is that trooper Branson Perry?

17   A.   Yes.

18   Q.   The trooper who testified before you?

19   A.   Yes.

20   Q.   So did Branson Perry forward that information to

21 your partner?

22   A.   I believe so, yes.

23   Q.   And you said your partner is also DEA Agent Garth

24 Hanlon?

25   A.   That's correct.

1      Q.    What did you do when you got that information?

2      A.    We started to gather the information from the stop,

3  from the money seizure.  We knew that the vehicle that was

4  stopped was registered out of New Hampshire, so we knew there

5  was a New Hampshire connection with this stop, and then we

6  started to gather phone records and other things that he

7  obtained from that stop.

8      Q.    At some point in time did you learn that prior to

9  Trooper Perry's stop of the motor vehicle on March 5th that

10  there had been the seizure of drug ledgers by a border patrol

11  agent on February 21, 2008?

12      A.    Yes.

13      Q.    Did you make any common link between the two, that

14  is, the drug ledger seized on February 21, 2008, and the

15  $2 million seizure conducted by Trooper Perry on March 5,

16  2008?

17              MR. SHEKETOFF:  Objection.

18              THE COURT:  What's the basis?

19              MR. SHEKETOFF:  His opinion.

20              MS. OLLILA:  I'm asking him what he did factually

21  to make the connection.

22              THE COURT:  The question was:  Did you make any

23  common link between the two?

24              MR. SHEKETOFF:  So I have no objection to her

25  asking about various items, but asking for his opinion I

1   object to.

2          MS. OLLILA:  I wasn't asking him his opinion.

3          THE COURT:  I think the question was, did you make

4   any common link.  Perhaps you could rephrase the question.

5          MS. OLLILA:  Sure.

6      Q.   Did you uncover any facts that established a

7   connection between the February 21, 2008, ledger seizure and

8   the March 5, 2008, $2 million stop?

9          MR. SHEKETOFF:  Objection.

10          THE COURT:  Same basis?

11          MR. SHEKETOFF:  Yes.

12          THE COURT:  Okay.  Objection overruled.  Go ahead.

13      A.   We made a couple of links.  Number one, the phone

14   records that came from Mr. Anderson's phone, his current

15   contacts, recent contacts in his phone.  There were several

16   contacts, but two of them of interest were local phone

17   numbers.  One of them was a 603 number, which is a New

18   Hampshire area code, and also a 617, which is Boston.

19          Associated names with those phone numbers was Goofy

20   for the 617 number and Jim for the 603 number, who we

21   identified afterwards is Jim Thistle's telephone -- cellular

22   phone number.  Goofy was the name that was used for Steven

23   Sarti from talking to the agent out in -- the 2/21 stop from

24   February 21st, Steven Sarti was stopped in that, and that was

25   the nickname known for him was Goofy.

1    Q.   So Brandon Anderson who was stopped on March 5,

2    2008, with $2 million, had telephone contact with someone by

3    the name of Goofy?

4    A.   Yes.

5    Q.   And Goofy's real name was Steven Sarti; is that

6    correct?

7         MR. SHEKETOFF:  Objection.

8         THE COURT:  He's objecting to the conclusion that

9    Goofy's real name is Steven Sarti.

10        MS. OLLILA:  Okay.

11        THE COURT:  Objection sustained.

12   Q.   Do you know Goofy's name?

13   A.   Steven Sarti.

14        MR. SHEKETOFF:  Objection.

15        THE COURT:  Objection sustained.

16   Q.   What other connection did you make and what did you

17   do at that point, Special Agent Drouin?

18   A.   Well, I know that also on the February 21st stop

19   Steven Sarti and Ryan Meyers were in one vehicle and they

20   stopped another vehicle that was driven by Charles Keyes.

21   Q.   And did Charles Keyes have any common contacts that

22   you discovered?

23   A.   Yes.  We discovered from looking at the cellular

24   phone records of Jim Thistle, which is the 603 number, that

25   that number was in contact with a cellular phone that was

1  subscribed to Charles Keyes.

2       Q.   What did you do at this point in time?

3       A.   We just continued our investigation.

4       Q.   Did you learn about anything that happened on June

5  27, 2008?

6       A.   Yes.

7       MS. OLLILA:  Chris, can I have Government's Exhibit

8  3b, please.

9       Q.   What did you learn?

10      A.   We learned that --

11      MR. SHEKETOFF:  Objection.

12      THE COURT:  Objection; what did you learn, per se.

13      Q.   What did you learn from the police?  I'm sorry.

14      A.   We -- I received information from the Pittsburgh

15 Police Department and border patrol about a Toyota Tundra

16 that was stuck in the woods along the Canadian border.

17      Q.   And was there anything seized from the Toyota

18 Tundra?

19      A.   Yes.

20      MR. SHEKETOFF:  Objection.

21      THE COURT:  When Attorney Sheketoff objects -- are

22 you having trouble hearing him?

23      MS. OLLILA:  I actually can't hear him, Judge.

24      THE COURT:  All right.  And then I just need to

25 either sustain or overrule, and I need to understand the

1   basis of the objection.

2            I believe the basis is hearsay.

3            MR. SHEKETOFF:  Yes.

4            THE COURT:  It's what did you learn, what did you

5   hear, so if you can correct that.  So objection sustained.

6            MS. OLLILA:  Sure.

7        Q.   After receiving information what did you do

8   literally, you as an agent?  What other investigation did you

9   conduct?

10       A.   Are you talking about the June 27th --

11       Q.   No.  After June 27th what did you do?

12       A.   We continued our investigation and tried to find

13  out more about this organization.

14       Q.   Okay.  And did you?

15       A.   Yes.

16       Q.   Did you do something in or around December 2008?

17       A.   Yes.

18       Q.   What did you do?

19       A.   I identified several Canadian couriers that were

20  operating in the southern New Hampshire area, and I started

21  to conduct surveillance of these couriers.  They were

22  utilizing a car rental service to get their vehicles, and I

23  started to attach GPS devices to these vehicles that they

24  were using so that I could follow them around.

25       Q.   You just mentioned a car rental place.  What was

1    the name of that car rental place?

2         A.    It was called Buy Here Pay Here.

3         Q.    Where was it located?

4         A.    In Derry.

5         Q.    So you discovered that they were utilizing cars

6    that they would get at Buy Here Pay Here, correct?

7         A.    Yes.

8         Q.    And you placed GPS tracking devices on some of the

9    cars?

10        A.    Yes.

11        Q.    Were you able to initially place GPS tracking

12   devices on all of the cars?

13        A.    I believe most of them.

14        Q.    What happened on December 22, 2008?

15        A.    I was conducting surveillance on two Canadian

16   citizens by the name of Dejan Andzic and Adrien Nyangwila, if

17   I said his name right.  They were staying at the La Quinta

18   hotel in Salem, and I followed them and they went to a

19   warehouse in Methuen, Massachusetts.  They both went to the

20   warehouse.

21             Actually, I'm sorry.  Let me back up.  On the 22nd

22   I followed them to a Home Depot first.  And they went to the

23   Home Depot and they bought Home Depot boxes, like several,

24   the big packing style Home Depot boxes, and then they went

25   back to the hotel.

1        The following day, which was the 23rd, I followed

2   Dejan Andzic.  I saw him meet up with Trevor Allain, and they

3   went to the warehouse in Methuen.

4        Q.   What happened then?

5        A.   They waited at the warehouse for a little while and

6   then a tractor-trailer arrived from Canada.  It had a

7   Canadian license plate on it.  Dejan Andzic waved down the

8   tractor-trailer, and the tractor-trailer then backed into a

9   loading dock at the warehouse.  Andzic and Trevor Allain went

10  into the warehouse with the driver of the tractor-trailer.

11  They were there for some time.

12       The tractor-trailer and the driver eventually left

13  the warehouse and Trevor Allain then left and went back to

14  Home Depot and bought more Home Depot boxes, and he came

15  back, and then Trevor Allain and Dejan Andzic were both

16  driving Nissan Quest minivans, and they both backed the

17  minivans up to the loading dock.  It was getting dark.  We

18  saw them open the hatch of the minivans, and then eventually

19  both the minivans left together and went their separate ways.

20  And we conducted, and I was part of it, conducted

21  surveillance of these two minivans after they left the

22  warehouse.

23       Q.   Did you have GPS tracking devices on both of the

24  vans that were at the warehouse?

25       A.   No.  I believe I only had one on the vehicle that

1    Dejan Andzic was driving.  The one that Trevor Allain was

2    driving, we just followed that car.

3         Q.   So the vehicle that Trevor Allain was driving did

4    not have a GPS tracker?

5         A.   No.

6         Q.   What did you do at that point?  Did you want to

7    stop it?

8         A.   We did stop it.

9         Q.   Why did you stop it, and did you physically stop

10   it?

11        A.   No.  I asked state police to stop it.

12        Q.   Why would you ask them to stop it?

13        A.   Because we didn't want to compromise our

14   investigation.  It looks more normal if a state police

15   officer does it in a marked police cruiser as a traffic stop

16   than it would a DEA agent stopping it in plain clothes with a

17   badge.  I think it would compromise the investigation if we

18   did it in that manner.

19        Q.   So you had a state trooper stop that vehicle,

20   correct?

21        A.   Yes.

22        Q.   Do you know what was located in the vehicle?

23        A.   Home Depot --

24             MR. SHEKETOFF:  Objection.  Foundation.

25             THE COURT:  Foundation.  Go ahead.

1           MS. OLLILA:  I'll strike the question, Judge.

2           THE COURT:  All right.

3      Q.    Did you follow the vehicle driven by Trevor Allain

4 that had the GPS -- excuse me, Dejan Andzic that had the

5 tracking device?

6      A.    Yes.

7      Q.    Where did you follow it to?

8      A.    I believe it went to a gas station in Salem and

9 then to a hotel in Salem and met up with another vehicle

10 there that also came from the same car rental company, and

11 then --

12     Q.    I'm sorry.  Go ahead.

13     A.    And then it went to Manchester, New Hampshire.

14     Q.    I'm going to show you what is marked as

15 Government's Exhibit 5c-1, 5c-2, 5c-3.  Do you recognize what

16 those photos are?

17     A.    Yes.

18     Q.    What are those photos?

19     A.    Those are photos of the tractor-trailer that Trevor

20 Allain and Dejan Andzic met up with that came to the

21 warehouse in Methuen.

22          MS. OLLILA:  Your Honor, I would ask that the ID be

23 stricken on Government's 5c-1, 5c-2 and 5c-3 and that they be

24 entered into full evidence.

25          THE COURT:  Any objection?

1           MR. SHEKETOFF:  No objection.

2           THE COURT:  They may be entered into evidence as

3     full exhibits.

4           (Government's Exhibit Nos. 5c-1, 5c-2

5           and 5c-3 Admitted)

6           MS. OLLILA:  Diane, please pull up 5c-1.

7      Q.   Can you see 5c-1, Special Agent Drouin?

8      A.   Yes.

9      Q.   And what is 5c-1?

10     A.   It's the tractor-trailer that met up with Dejan

11    Andzic and Trevor Allain.

12     Q.   Okay.  I'll show you Government's Exhibit 52o.

13    I'll ask if you recognize 52o.

14     A.   Yes.

15     Q.   What is that?

16     A.   That's the warehouse in Methuen that the

17    tractor-trailer went to when it met up with Andzic and

18    Allain.

19          MS. OLLILA:  Your Honor, I would ask that the ID be

20    stricken on Government's Exhibit 52o and it be entered into

21    full evidence.

22          MR. SHEKETOFF:  No objection.

23          THE COURT:  Entered as a full exhibit?

24          MS. OLLILA:  Yes, Judge.

25          THE COURT:  It is so entered.

1          (Government's Exhibit No. 52o Admitted)

2          MS. OLLILA:  Dena, please pull up Exhibit 52o.

3     Q.    Is this the warehouse that you were describing?

4     A.    Yes.

5     Q.    What did you do with the vehicle that had the GPS

6     that was being driven by Dejan Andzic?

7     A.    We followed it.

8     Q.    And where did you follow it to?

9     A.    Manchester.

10    Q.    Where in Manchester?

11    A.    I believe it went to the Dunkin' Donuts on Candia

12    Road.

13    Q.    And then where did it go?

14    A.    Then it went to 10 Delaware Avenue in Manchester.

15    Q.    Did you know who was living at 10 Delaware Avenue?

16    A.    At the time, no.

17    Q.    Did you later as part of your investigation

18    discover who lived there?

19    A.    Yes.

20    Q.    Who?

21    A.    Nick Champagne.

22    Q.    What did you do when you saw the vehicle arrive at

23    10 Delaware Avenue?

24    A.    I saw someone standing outside.  It was getting

25    dark and the minivan pulled into the driveway next to that

1    person that was standing outside, and then the hatchback to

2    the van opened and we saw the boxes go inside 10 Delaware.

3         Q.    And then what did you do?

4         A.    I don't remember what I did afterwards.

5         Q.    Why not execute a search warrant at 10 Delaware

6    Avenue at that point in time, Special Agent Drouin?

7         A.    Well, we had just seized the marijuana from Trevor

8    Allain on the first stop, and if we had tried to do something

9    again here that would compromise our investigation and we

10   would have been back to square one.

11        Q.    So what was your strategy at this point in time?

12        A.    Was to just observe where these boxes were going,

13   who was picking them up, where they were being kept, trying

14   to identify the Manchester portion of this investigation.

15        Q.    After December, did you go back to that warehouse

16   in or around the end of January 2009?

17        A.    Yes.

18        Q.    What was the purpose of going back there, sir?

19        A.    We -- I believe one of the people who were driving

20   -- Dejan Andzic and Adrien Nyangwila, we followed them back

21   there.  I believe they were in the Nissan Quest again, and I

22   probably had a GPS on the vehicle.  And we followed it back

23   to that warehouse in Methuen and we saw them meet up with

24   another tractor-trailer from Canada, same thing, backed into

25   the loading docks, minivan backed in, and then they left with

1  boxes.

2       Q.    Before that, on December 30, 2008, did law

3  enforcement conduct any surveillance at 10 Delaware Avenue?

4       A.    Yes.

5       Q.    Why did you do that?

6       A.    Because we wanted to -- we had seen the boxes going

7  in there and we wanted to start conducting surveillance there

8  so we could see who's coming in and out of that location.

9       Q.    And what did you see on December 30, 2008, at 10

10  Delaware Avenue?

11       A.    We saw Nick Champagne meet up with somebody in that

12  house, at the house.

13       Q.    At some point in time did you learn who that

14  individual was?

15       A.    Yeah.  Eventually we learned -- several weeks later

16  we learned who Nick Champagne met up with.

17       Q.    And who did he meet up with?

18       A.    It was Fowle.

19       Q.    Do you remember his first name?

20       A.    No.  I think it was -- I don't remember the first

21  name.

22       Q.    Okay.  So on December -- excuse me, January 23,

23  2009, when you went back to the warehouse, what happened?

24       A.    On January 23rd?

25       Q.    Yes.

1      A.    Dejan Andzic and Adrien Nyangwila backed the

2    minivan up, loaded boxes up, left.   Then we followed them to

3    a house in -- eventually they made it to a house in Chester,

4    New Hampshire, where a lot of these Canadian couriers were

5    staying there at this house, and we saw them go into the

6    garage at the house at that residence.

7      Q.    Did you see them do anything else?

8      A.    I can't remember if it was -- I believe it was the

9    next day.

10      Q.    Okay.

11      A.    I need to look in my report, but I believe it was

12    the next day Dejan Andzic left with the van from that house

13    and he made a couple deliveries.

14      Q.    Would that be on January 24th, 2009?

15      A.    Yes.

16      Q.    And where did he go when he made the deliveries?

17      A.    The first one was to -- we followed him to

18    Burlington, Massachusetts, and he met up with a couple

19    individuals over there that were driving pickup trucks.   And

20    then when he left there he went back -- I followed him back

21    to the house in Chester where he picked up more boxes from

22    Home Depot and he drove those boxes up to Manchester, back to

23    10 Delaware.

24      Q.    10 Delaware Avenue?

25      A.    Yes.

1      Q.    And that was the residence of whom again?

2      A.    Nicholas Champagne.

3      Q.    What did you do after that on January 24th?  What

4  was your strategy then?

5      A.    Just to keep working on this crew, this Canadian

6  crew that was delivering marijuana all over the country, and

7  to exploit and find out more about the New Hampshire

8  connection, who in New Hampshire was receiving all this

9  marijuana and distributing it.

10     Q.    Did something happen on February 24, 2009, which

11 resulted in the seizure of marijuana?

12     A.    Yes.

13     Q.    Do you know an individual by the name of Dave

14 Coulombe?

15     A.    Yes.

16     Q.    Was marijuana seized from him?

17           MR. SHEKETOFF:  Objection.  I can't tell if she's

18 calling for hearsay or not.

19           THE COURT:  Okay.  Would you rephrase the question.

20     Q.    What happened on February 24, 2009?

21     A.    I was tracking the vehicles again.  I believe at

22 that point the Canadian couriers were no longer staying in

23 Chester, New Hampshire, and they had moved into a condo in

24 Waltham, Massachusetts, and I was conducting surveillance on

25 them down there and tracking them.  And they were also

staying at a house up in Woodstock, Vermont.  So I was
tracking the minivan, and I saw that it was driving from
Woodstock, Vermont, down to Waltham, Massachusetts, and then
we saw it drive to Manchester, and I went out with some of
the agents in my group and we conducted surveillance of that
van as it came to New Hampshire.

We saw the van went to the Wendy's on Candia Road
right across the street from McDonald's and met up with a
person who was driving a Ford Expedition.

Q.    Okay.

A.    And then the van left the Wendy's and drove to 140
Allied Street in Manchester.

Q.    Did you discover who was living at 140 Allied
Street in Manchester?

A.    I don't think I remember who was living there.  I
know who was there afterwards.

Q.    Who was there?

A.    David Coulombe.

Q.    And then what happened?

A.    So the Canadian went back to Wendy's, and then the
Expedition left Wendy's and we lost surveillance on the
Expedition, but then we found it again at 140 Allied Street.
Saw the owner -- saw David Coulombe bring a bag from 140
Allied Street into the Expedition and then it left, and then
we called for a Manchester police cruiser to stop the

vehicle, the Ford Expedition.

Q.   Do you know whether or not the Manchester police stopped the vehicle?

A.   Yes.

Q.   Was a search warrant executed at some point in time?

A.   Yes.

Q.   Were you present when it was executed?

A.   Yes.

Q.   Were you present when you saw what was inside the vehicle?

A.   Yes.

Q.   What was inside the vehicle?

A.   It was a large hockey bag that was black or dark blue, I can't remember, a large hockey bag that was full of marijuana.

Q.   Do you know how much marijuana it was filled with?

A.   I believe it was like 58 pounds or close to.

Q.   Special Agent Drouin, let me just get you some gloves.

A.   Do you want me to come down?

Q.   No, that's okay.  I'll bring it to you.  I just want you to have gloves on.

You just testified that there was either a black or a dark blue duffel bag inside the motor vehicle that

1    contained marijuana; is that correct?

2         A.    Yes.

3         Q.    I'm showing you what has been marked as

4    Government's Exhibit 9g-3 for identification.  I would ask

5    that you come down, open this box, and hold that bag up for

6    the jury.

7         A.    That's it.

8         Q.    Now, if you hold it up, your right hand is touching

9    a label on the outside.  What does that label say?

10        A.    NH.

11        Q.    Is there a lock on that bag?

12        A.    Yes.

13        Q.    What color is that lock?

14        A.    Gold.

15             MS. OLLILA:  Your Honor, I would ask that the ID be

16   stricken on Government's Exhibit 9g-3 and that it be entered

17   into full evidence.

18             MR. SHEKETOFF:  No objection.

19             THE COURT:  All right.  9g-3 is a full exhibit.

20             MS. OLLILA:  Thank you.

21             (Government's Exhibit No. 9g-3 Admitted)

22        Q.    After the marijuana was located was there a search

23   warrant executed?

24        A.    Yes.

25        Q.    Where was it executed?

1     A.    At 140 Allied Street in Manchester.

2     Q.    Were you present?

3     A.    I was there at some point, yes.

4     Q.    And did you see the evidence that was recovered?

5     A.    Yes.

6     Q.    I'm showing you what has been marked as

7  Government's Exhibit 9g-4 for identification.  Sorry.  I

8  should have told you not to take the gloves off.

9     A.    I should have kept the gloves on.

10    Q.    Do you recognize what this exhibit is?

11    A.    Yes.

12    Q.    9g-4, what is the exhibit?

13    A.    Bags that were found in 140 Allied Street.

14    Q.    Let me ask you to hold up the first bag and show it

15  to the jury.

16          MS. OLLILA:  Your Honor, may I have the witness

17  come over closer to the jury?

18          THE COURT:  Yes.

19    Q.    I want you to hold it up.  Now, on the front of the

20  bag there appears to be a label and it says -- what does it

21  say?

22    A.    ITL.

23    Q.    I'm going to pull out a label inside.  What does

24  that label say?

25    A.    50 Reg.

1        Q.    What does that mean?

2        A.    I believe it's 50 pounds of regular.

3        Q.    Of regular what?

4        A.    Marijuana.

5        Q.    Is there a lock on the outside of that bag?

6        A.    Yes.

7        Q.    Is it similar to the lock that was found on the

8    dark blue bag in Mr. Coulombe's motor vehicle?

9        A.    Yes.

10       Q.    Was there another bag located in -- or seized from

11   140 Allied Street?

12       A.    Yes.

13       Q.    Why don't you just hold it up for the jury.  Is it

14   consistent with that first bag that you were just showing the

15   jury?

16       A.    Yes.

17            MS. OLLILA:  Your Honor, I would ask that the ID be

18   stricken on 9g-4 and that it be entered into full evidence.

19            MR. SHEKETOFF:  No objection.

20            THE COURT:  9g-4 is a full exhibit.

21            (Government's Exhibit No. 9g-4 Admitted)

22            THE COURT:  We're getting very close to our lunch

23   break so you let me know, a signal.

24            MS. OLLILA:  And we have some things to bring to

25   the courtroom, Judge.

1          THE COURT:  All right.  So is now a good time to

2    break then?

3          MS. OLLILA:  Sure.

4          THE COURT:  Okay.  Excellent.  We will take a

5    one-hour lunch break and we will be back here to start right

6    around 2:00.

7          (IN COURT - NO JURY PRESENT)

8          THE COURT:  I know you're going to bring in

9    evidence.

10         MS. OLLILA:  Yes.

11         THE COURT:  Are you going to bring that in

12   immediately after the break?  I know there was going to have

13   to be a recess with respect to the jury, bringing them in and

14   out.

15         MS. OLLILA:  Well, with respect to this witness,

16   and I'll confer with Attorney Sheketoff, I'm trying to do

17   this as efficiently as possible.  I have the agents here who

18   can testify that they seized it.  But I know Special Agent

19   Drouin who was just testifying, he was there during this

20   marijuana.  So I can get the marijuana in through him without

21   having to bring the other agent in.  So that's what I'm

22   hoping to do, Judge, because I have witness after witness

23   testifying about the marijuana.

24         THE COURT:  Okay.  And how many times will you

25   bring marijuana into the courtroom?  Is it just once today

1    and then --

2                   MS. OLLILA:  Yes.  Yes.

3                   THE COURT:  Just a single exhibit?

4                   MS. OLLILA:  No.  So this transaction involved 58

5    pounds.  So that will be one transaction.  There's another

6    transaction involving a hundred pounds.  That will also

7    happen today, and it will happen with a different witness,

8    Judge.  So I'm hoping to do them back to back.

9                   THE COURT:  Okay.  All right.  Just signal to me --

10   once you confer with Attorney Sheketoff, signal to me, you

11   know, exactly how you want to handle that in terms of getting

12   it in and getting it out in the most efficient way.

13                  MS. OLLILA:  Sure.  We'll confer during the lunch

14   break, Judge.

15                  THE COURT:  Okay.  Is there anything else counsel

16   needs me for?

17                  MR. SHEKETOFF:  No, Judge.

18                  THE COURT:  All right.  Great.  We'll be back at

19   2:00.

20                  (Lunch recess)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 3-31-16

         SUSAN M. BATEMAN, LCR, RPR, CRR
11       LICENSED COURT REPORTER, NO. 34
         STATE OF NEW HAMPSHIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25