**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 6-29-2016**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   14-CR-93-01-LM
            v.                  *   August 21, 2015
                                *   9:35 a.m.
        ALKIS NAKOS            *
                                *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF JURY TRIAL
DAY FOUR - MORNING SESSION
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

APPEARANCES:


For the Government:      Terry L. Ollila, AUSA
                        U.S. Attorney's Office




For the Defendant:      Robert L. Sheketoff, Esq.
                        Law Office of Robert L. Sheketoff




Court Reporter:         Susan M. Bateman, LCR, RPR, CRR
                        Official Court Reporter
                        United States District Court
                        55 Pleasant Street
                        Concord, NH 03301
                        (603) 225-1453

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **NICHOLAS CHAMPAGNE:** | | | | |
| By Mr. Sheketoff | | 6 | | 37 |
| By Ms. Ollila | | | 29 | |
| **DEREK DANIS:** | | | | |
| By Ms. Ollila | 42 | | | |
| By Mr. Sheketoff | | 58 | | |
| **DAVID GIVENS:** | | | | |
| By Ms. Ollila | 72 | | 85 | |
| By Mr. Sheketoff | | 79 | | 90 |
| **THOMAS WHELAN:** | | | | |
| By Ms. Ollila | 91 | | | |
| By Mr. Sheketoff | | 95 | | |
| **STEFAN CZYZOWSKI:** | | | | |
| By Ms. Ollila | 97 | | | |

| EXHIBITS: | FOR ID | IN EVD |
|---|---|---|
| Defendant's Exhibit No. 1. | | 42 |
| Government's Exhibit No. 50a. | | 47 |

```
 1                      P R O C E E D I N G S
 2            THE CLERK:  The Court has before it for
 3   consideration today jury trial, day four, in criminal case
 4   14-CR-93-01-LM, United States of America versus Alkis Nakos.
 5                 (IN COURT - NO JURY PRESENT)
 6            THE COURT:  Okay.  With respect to the one juror,
 7   I'm looking into it, and you can as well, in terms of what's
 8   required, but it looks like -- our initial review indicates
 9   that the juror filled out the questionnaire at a time when he
10   was residing in New Hampshire and then moved to Vermont.  So
11   that's what we have.
12            It looks like, upon first review, that's going to
13   be okay.  If it's not, I will raise it with you and we will
14   talk about how we handle that.
15            MR. SHEKETOFF:  That's fine with us, your Honor.
16            THE COURT:  All right.  And what about the audio
17   piece?  Let me know how you want to handle that.
18            MR. SHEKETOFF:  So we've -- with your clerk's help
19   I've marked it as Defendant's 1 for ID.  It's with Diane's
20   help that the computer has been set up.  I think I can play
21   it on my laptop.
22            THE COURT:  Is there going to be a dispute about it
23   coming in as a full exhibit?
24            MS. OLLILA:  No.
25            THE COURT:  No dispute?  Do you want it in as well?
```

1           MR. SHEKETOFF:  Yes, your Honor.

2           THE COURT:  All right.  Well, then --

3           MS. OLLILA:  Oh, no.  No, I don't object to playing

4    it, but I object to it being admitted as an exhibit.  It's

5    rank hearsay.  He can cross-examine Mr. Champagne with it.

6    It cannot be admitted as an exhibit.

7           THE COURT:  That the jury could listen to?

8           MS. OLLILA:  Correct, correct.  That's not proper

9    under the rules of evidence.

10          THE COURT:  Well, I was thinking you would want it

11   in as a full exhibit --

12          MS. OLLILA:  No.

13          THE COURT:  -- and that he may have objections to

14   it.

15          MS. OLLILA:  No.

16          THE COURT:  Well, we'll deal with that at our first

17   break, but for the time being it's going to be played.

18   Attorney Sheketoff has that set up, and you can just

19   obviously let the jury know what they're listening to.

20          MR. SHEKETOFF:  What about these headsets?  That I

21   hadn't thought about.

22          THE COURT:  Do they need those?

23          MR. SHEKETOFF:  I don't know.

24          THE CLERK:  I can check with the jury when I go

25   back there to bring them out and have them raise their hand

1    or something if they need it.

2              THE COURT:  I've understood that they're very

3    helpful for everybody to have them on so you can hear the

4    audio.

5              THE CLERK:  Do you want me to pass them out?

6              THE COURT:  I've never used them before so I'm

7    going to rely on you to set those up.

8              THE CLERK:  Okay.

9              THE COURT:  And I think each individual earpiece

10   has to be set up; is that right?

11             THE CLERK:  Yes.

12             THE COURT:  Okay.  Just so long as it doesn't take

13   up a lot of time.  Let me hear the volume of it.  Perhaps I

14   could just hear a little bit of it.

15             MS. OLLILA:  I think it's not going to be a

16   problem.  We're going to have a lot of audio calls through

17   Trooper Norris, that's why we're going to have them set up,

18   but the sound is no problem on this call.

19             THE COURT:  Can you play a little bit of it and

20   just let me see that I can hear it?

21             (Audio played at this time)

22             THE COURT:  Okay.  All right.  You can turn it off.

23             I can hear it.  I'm just not sure -- I guess after

24   the jury listens to it for a bit they can distinguish who's

25   speaking, but I can hear it.  The audio is fine.  So we'll

1   wait and see if a juror has an issue.

2           MS. OLLILA:  I don't have a problem with that at

3   all.

4           THE COURT:  All right.  Anything else before the

5   jury comes in?

6           MS. OLLILA:  No, Judge.

7           THE COURT:  All right.  Bring them in.

8           Are you seeking a limiting instruction with that,

9   with the audio?

10          MS. OLLILA:  No.

11          (IN COURT - JURY PRESENT)

12          (Deputy clerk swears in the witness again)

13          THE COURT:  Attorney Sheketoff.

14          MR. SHEKETOFF:  Thank you.

15                      NICHOLAS CHAMPAGNE

16                  CONTINUED CROSS-EXAMINATION

17   BY MR. SHEKETOFF:

18      Q.   Good morning, Mr. Champagne.

19      A.   Good morning.

20      Q.   At the end of the day yesterday the Court pointed

21   out that my math -- and she didn't say it this way -- stinks.

22          6,000 pounds times $100 I kept yelling at you

23   yesterday was $6 million, but it's $600,000 correct?

24      A.   Yes.

25      Q.   And that was based on the amount of money that you

say you gave my client.  That would have been 6,000 pounds.
$150,000.  $25 a pound.  I got that part right.  And if you
had sold 6,000 pounds, you would have made at least $600,000,
correct?

     A.   Give or take.

     Q.   Give or take.  But you told us yesterday that you
made anywhere from 100 to $300 a pound, correct?

     A.   Sometimes.

     Q.   All right.  What would make the difference?  Why on
some loads would you make a hundred a pound and on other
loads 300 a pound?

     A.   Depending on the price I paid for it.

     Q.   Well, who determined the price you paid?

     A.   The Canadians.

     Q.   What?

     A.   The Canadians.  The people I got the marijuana
from.

     Q.   And who determined the price you sold it for?

     A.   I did.

     Q.   So why did you sell it making a profit of a hundred
sometimes and 300?  Market conditions?

     A.   Yeah.

     Q.   So if you had averaged 300 a pound, it would have
been $1,800,000, and if you averaged 200 a pound, the halfway
point between 100 and 300, it would have been a million two

1    that you made, correct?

2         A.    If the math is correct, yes.

3         Q.    This time the math is correct.

4               And you told us yesterday that you told the

5    government when you were debriefed a year ago that you had

6    made a million dollars.  Then when I showed you the briefing

7    interview you said, okay, I told them 500,000, right?

8         A.    Five hundred.  A million.  I didn't keep track

9    exactly how much money I made.

10         Q.    It's not much of a difference, huh, 500 or a

11    million?

12               By the way, have you spoken to anyone from law

13    enforcement between the time you got off the stand yesterday

14    till this morning?

15         A.    No.

16         Q.    No?

17         A.    (Nods negatively.)

18         Q.    Have you been interviewed by anyone from the time

19    you got off the stand yesterday till today?

20         A.    No.

21         Q.    Discussed your testimony from yesterday with

22    anyone?

23         A.    No.

24         Q.    Now, did you know someone by the name of Charles

25    Fowle?

1    A.    Yes.

2    Q.    And did you ever sell him marijuana?

3    A.    I did.

4    Q.    And when was that and what did you sell him?

5    A.    Anywhere from five pounds to fifty pounds of

6    marijuana.

7    Q.    Say that again.

8    A.    Can you rephrase your question, please?

9    Q.    Sure.  Charles Fowle, how did you know him?

10    A.    Through prison, through friendship, and as

11    childhood friends.

12    Q.    Right.  He's one of your guys, correct?

13    A.    He sold drugs for me, yes.

14    Q.    And he sold drugs for you, meaning he worked for

15    you?

16    A.    No, he didn't work for me.  He made his own

17    choices.  He bought drugs from me.  Excuse me.

18    Q.    All right.  And when did you first sell him

19    marijuana in connection with this Canadian marijuana you were

20    getting and how much did you sell him?

21    A.    I don't remember times or dates.  Maybe mid-2008,

22    May, June.  A few pounds to start out, a few pounds here and

23    there, and then I would give him like 25, 50 pounds at the

24    most.

25    Q.    Do you remember telling the lead investigator

1  during your debriefing that during the end of 2008 you sold

2  Charles Fowle a couple of pounds of marijuana on three or

3  four different occasions?

4      A.    A couple of pounds of stuff.

5      Q.    Well, is a couple of pounds on three or four

6  separate occasions the same as 50 pounds?

7      A.    After a while it can become -- yeah, a couple

8  occasions.  It could be 5 pounds once.  10 pounds the next

9  time.  5 pounds another time.  It all adds up to about 25 to

10  50 pounds.

11      Q.    Yeah, but you told them when you were debriefed a

12  year ago that at the end of 2008 you sold Charles Fowle a

13  couple of pounds of marijuana on three or four different

14  occasions.  Those were your words.

15      A.    So if it was the end of 2008, then that's when it

16  was.  Like I said, it's been over six years.  I'm not great

17  with times and dates.  Too much information.  I've got enough

18  stuff going on in my life.

19      Q.    Okay.  Do you know who Fat Mike is?

20      A.    Fat Mike?

21      Q.    Yeah.

22      A.    Yes, I do.

23      Q.    Who is that?

24      A.    It's Corey Buchan's cousin.

25      Q.    And what was your relationship to him?

1    A.    I don't really talk to him.

2    Q.    What?

3    A.    I don't talk to him.

4    Q.    Do you know somebody by the name of Sweeney?

5    A.    Sweeney?  Yes, I do.

6    Q.    Who's that?

7    A.    Which one?  I know a bunch of Sweeneys.

8    Q.    Well, the one you beat up in prison.

9    A.    The one I beat up in prison?  I don't recall

10   beating up anybody named Sweeney in prison.

11   Q.    Okay.  So did you ever interact with any Sweeney in

12   the drug business?

13   A.    No, I haven't.

14   Q.    Did you ever beat up any Sweeney while you were in

15   prison?

16   A.    No, I haven't.

17   Q.    Now, sir, do you remember yesterday I said that I

18   had heard one of your conversations?

19   A.    Sure.  I'm sure you have.

20   Q.    And that you appeared a little different in the

21   conversation than you do on the witness stand?

22   A.    I don't know how you can tell a difference.  I was

23   on the telephone.

24   Q.    I don't mean physical appearance.  I mean

25   personality.

1      A.    I'm the same all the time.

2      Q.    You're the same all the time?

3      A.    Yeah.

4      Q.    So the personality that we saw yesterday is your

5  personality?

6      A.    Yeah.

7      Q.    It's the same all the time?

8      A.    All the time.

9            MR. SHEKETOFF:  Your Honor, I would like to play an

10  audiotape.

11            MS. OLLILA:  No objection, Judge.

12            THE COURT:  All right.

13      Q.    I would ask you to listen to this, Mr. Champagne,

14  and see if you recognize --

15            THE COURT:  Before you touch play, let me just let

16  the jury know that if you need assistance hearing, actually

17  hearing the audio, let me know.  We do have earbuds that are

18  designed to help you hear.  So just signal me and then we'll

19  stop it and we'll get you the ear buds.  It might take a

20  moment.

21            Go ahead, Attorney Sheketoff.

22            MR. SHEKETOFF:  Thank you.  I'm going to give it my

23  best, your Honor.

24            THE COURT:  All right.

25            (Defendant's Exhibit 1 played)

1        Q.    Do you recognize the voices on that tape recording?

2        A.    Sure.

3        Q.    Who are they?

4        A.    Me and Kos.

5        Q.    You and Kosmas Koustas?

6        A.    Yes.  Me and Kosmas Koustas.

7        Q.    And that's a call you placed to Kosmas Koustas in

8   March of 2014, a little over a year ago?

9        A.    Was it?  I don't know the exact date.  It could

10  have been.

11        Q.    Okay.  Did you talk to Kosmas Koustas on a regular

12  basis while you were serving your sentence?

13        A.    Once in a while.  Not on a regular basis.  Maybe

14  once a month.

15        Q.    All right.  And during the course of this

16  conversation we hear you say, bring my father down, correct?

17        A.    Sure.

18        Q.    And he's the person you ask to bring your father

19  down, Kosmas Koustas?

20        A.    Yeah.

21        Q.    And you say, bring my father down because there's

22  something I want to talk to him about that I don't want to

23  talk on a recorded line, correct?

24        A.    Yeah.

25        Q.    Because every call that you make from the prison is

1   recorded, correct?

2        A.   Yep.

3        Q.   And you're aware of that, correct?

4        A.   Yeah.

5        Q.   And when you want to have a private conversation

6   with someone, like your father, you don't want it to be

7   recorded?

8        A.   Well, no.

9        Q.   Your father was managing your business relations

10  then, wasn't he?

11       A.   No.

12       Q.   Did Kosmas Koustas visit you at prison?

13       A.   A couple times.

14       Q.   Are those conversations recorded?

15       A.   No.

16       Q.   Do you mean you're allowed to be in a visiting room

17  and have a contact visit?

18       A.   Yes.

19       Q.   And it's not recorded?

20       A.   No.

21       Q.   Now, do you remember telling me right before I

22  played that tape that you didn't know anyone by -- well, you

23  knew people by the name of Sweeney, but you never beat up

24  anyone by the name of Sweeney?

25       A.   Sure.

1          Q.     Do you say on that tape, I beat that guy up in
2     prison?
3          A.     Sweeney?
4          Q.     Yeah.
5          A.     Yes.
6          Q.     So why do you feel you can tell me before I play a
7     tape recording that you never beat up anyone by the name of
8     Sweeney, you don't know what Sweeney I was possibly talking
9     about because there are so many Sweeneys, but on the tape --
10         A.     There is.  There's a bunch of Sweeneys.
11         Q.     Yeah, I know.  And on the tape you say, "I beat him
12    up."
13         A.     Well, be more specific in who you're talking about.
14         Q.     All right.  Do you know the specific name of the
15    person that you beat up?
16         A.     Well, it would help with details.
17         Q.     No.  Do you know the name of that person?
18         A.     Do I know?
19         Q.     Yeah, that you're talking about who got caught up
20    in operation, whatever, street sweeper, and has been a rat
21    for a long time, and you've known he's a cooperator and he
22    set up somebody else a long time ago, and when you were in
23    prison with him you beat him up.  Do you know that person's
24    name?
25         A.     Yeah.

1     Q.    What's his name?

2     A.    Dave Sweeney.

3     Q.    And when you tell Kosmas Koustas in March of 2014

4     that you beat up Mr. Sweeney, was that the truth or was that

5     a lie?

6     A.    It was the truth.

7     Q.    All right.  Where did you beat him up?

8     A.    Somewhere in the prison.

9     Q.    When?

10    A.    I don't know.  I don't remember the exact date.

11    Q.    I'm talking about was it before you came out in --

12    A.    It was long before I came out of the State Prison.

13    Probably like the middle of my sentence.

14    Q.    So we're talking -- you came out of State Prison in

15    November of 2007?

16    A.    Yeah.  So we're talking maybe 2004, 2003 sometime,

17    maybe even 2002.

18    Q.    You beat him up in the prison?

19    A.    Yeah.

20    Q.    And he's not your boy, as you say on the tape,

21    correct?

22    A.    I think I made that pretty clear.

23    Q.    And you considered him a rat?

24    A.    Yeah.

25    Q.    And what is a rat?

1    A.    Informant.  Somebody that cooperates with

2  authority.

3    Q.    Okay.  So if you know somebody is a rat, you don't

4  deal with them, correct?

5    A.    Right.

6    Q.    I mean, you would never talk to Dave Sweeney about

7  selling drugs, would you?

8    A.    No.

9    Q.    You would never participate in any drug conspiracy

10  with Dave Sweeney, would you?

11    A.    No.

12    Q.    You would never solicit his help in any way,

13  correct?

14    A.    No.

15    Q.    Because you would believe from the day you beat him

16  up into the future that if he had a chance he would stab you

17  in the back?

18    A.    I wouldn't talk to him if I seen him.  So I

19  wouldn't really even care.  I haven't seen that kid in maybe

20  ten to twelve years.  If I did see him, I probably wouldn't

21  even recognize him.  If I did recognize him, I wouldn't have

22  nothing to say to him.  I really don't care.

23    Q.    Well, you talked about him -- you had apparently

24  read about it in the paper.  It was enough of a topic of

25  interest to talk to Kosmas Koustas about it.

1      A.   You read about a lot of people in the newspaper.
2 It's the local news.
3      Q.   One of the things that people do while they're in
4 prison is read a lot of newspapers and watch the local news
5 and talk about the legal gossip, so to speak?
6      A.   Sometimes.  When you're living in Pennsylvania and
7 your local paper is from New Hampshire, why not?  It is big
8 news.
9      Q.   All right.  So you were at this point in time
10 serving your federal sentence in an institution in
11 Pennsylvania?
12      A.   Yes.
13      Q.   And if Kosmas Koustas wanted to visit you, he had
14 to go to Pennsylvania to do that?
15      A.   Yes.
16      Q.   And where in Pennsylvania are you, in Philadelphia
17 or Pittsburgh?
18      A.   Minersville, Pennsylvania.
19      Q.   Minersville?
20      A.   Yeah.
21      Q.   Where is Minersville in relation to Philadelphia
22 and Pittsburgh?  How do you get there?
23      A.   I don't know.  I probably couldn't get there again
24 if I tried.
25      Q.   Well, people visited you.  Didn't you have

1   discussions with them about how they got there?  Could they

2   drive or could they fly somewhere?

3        A.   Drive.

4        Q.   What was it that you had to talk to your father

5   about if it wasn't your business?

6        A.   My business?  Well, I'm getting ready to come home.

7   I would need help getting an apartment, need help with

8   clothes, need help with just personal stuff, you know, my

9   son's mother.

10        Q.   Well, why couldn't you talk about that on the

11   phone?

12        A.   I'm on a fifteen minute phone call.  It's a lot of

13   stuff to talk about in one fifteen minute phone call.

14        Q.   Well, there's a fifteen minute phone call and then

15   it cuts off, correct?

16        A.   Yeah.  And then you can't call back for another

17   hour, and then another 15 minute phone call and you can't

18   call back for another hour, and then another fifteen minute

19   call after that hour.

20            It's a lot of information to try get in in a

21   fifteen minute phone call.  So, yes, I would like to see my

22   father before I come home.

23        Q.   To talk about something private with him.

24            By the way, the way you act on that phone call,

25   that's your normal personality, correct?

1        A.    No.

2        Q.    You mean you act differently with Kosmas Koustas

3   than you do with most people?

4        A.    Not really.  What's the difference between now and

5   then?  I was swearing a little?

6        Q.    That's the only difference?

7        A.    I can definitely get up here and cuss, but I'm sure

8   the Judge wouldn't like it and I'm sure other people wouldn't

9   like it.  I do have a six-year-old kid.  I have learned to

10  control my words a little.

11       Q.    And that's the difference, that you cussed on that?

12       A.    How else was I acting, you tell me, if I act so

13  different?

14       Q.    All right.  Sir, let's talk about your original

15  charges that grew out of this Canadian drug dealing that you

16  were doing.

17             You found yourself charged, you gave yourself --

18  you surrendered, and you read the indictment, correct?

19       A.    Yes.

20       Q.    And after you were indicted there was a superseding

21  indictment changing the indictment a little bit, correct?

22       A.    Yes.

23       Q.    It added a quantity into the indictment.  It added

24  the allegations that there were a thousand pounds -- strike

25  that -- a thousand kilograms involved, correct?

1     A.    Yes.

2     Q.    And you knew when you read that that you were then

3  facing a ten year minimum mandatory sentence, correct?

4     A.    I did.

5     Q.    And you knew that the government had the power to

6  file what's called an 851 saying that because you had a prior

7  drug conviction your minimum mandatory sentence was doubled

8  to 20 years, correct?

9     A.    Yes.

10    Q.    And you understood what a minimum mandatory

11 sentence meant.  It meant that no judge could give you less

12 than 20 years, correct?

13    A.    Yes.

14    Q.    And the government, therefore, had a lot of power

15 in your case, correct?

16    A.    Apparently.

17    Q.    Well, in your mind, I'm talking about, they had a

18 lot of power?

19    A.    Yeah.

20    Q.    And you had a lawyer?

21    A.    I did.

22    Q.    And was it the first time you used that lawyer?

23    A.    Yes.

24    Q.    All right.  And like many defendants is it fair to

25 say that you didn't totally trust that lawyer?

1    A.    At first, no.

2    Q.    Okay.  And you wanted others to look at your

3  discovery and help you decide what you should do with your

4  case, correct?

5    A.    I wanted others?

6    Q.    Yeah.

7    A.    Sure.

8    Q.    Well, you specifically told your lawyer to give all

9  your discovery to my client, didn't you?

10    A.    No.

11    Q.    Well, you didn't know he did that?

12    A.    No.  He was allowed to go and look at my discovery

13  and go down to the office and stuff.

14    Q.    Didn't you tell your lawyer to give that discovery

15  to my client?

16    A.    No.  Never.

17    Q.    You wanted his opinion because at the time he was

18  like your best friend, correct?

19    A.    Sure.  He understood my situation probably better

20  than others.

21    Q.    You discussed it with him even over a recorded line

22  from the prison, what should I do with this case, who's going

23  to rat on me, what should I do?

24    A.    Sure.

25    Q.    Of course you did, correct?

1      A.    Yeah.

2      Q.    And you wanted his advice on what you should do,

3 correct?

4      A.    Yeah.

5      Q.    And then the government made it difficult for you

6 because they offered to not file the 851, correct?

7      A.    Yep.

8      Q.    And you would no longer be facing a 20-year minimum

9 mandatory sentence.  Now your minimum mandatory was ten

10 years, correct?

11     A.    Yes.

12     Q.    And they offered to let you plead guilty to some

13 quantity below the ten year minimum mandatory, correct?

14     A.    Yes.

15     Q.    Even though the real quantity was 2, 3, 4, who

16 knows, times the 1,000 kilos, they offered to let you plead

17 to a quantity significantly below the 1,000 kilos, correct?

18     A.    Yes.

19     Q.    And then you would no longer be facing a ten year

20 minimum mandatory sentence?

21     A.    Yes.

22     Q.    And they offered you a deal where your lawyer could

23 ask for a certain number of years and they would ask for ten

24 years, correct?

25     A.    Yes.

1    Q.    How many years did they allow your lawyer to ask

2    for?

3    A.    My charge got bumped down to I believe it was a

4    mandatory five years.

5    Q.    All right.  So your lawyer could ask for five, and

6    they were going to ask for ten?

7    A.    Yes.

8    Q.    And you needed to make a big decision, correct?

9    A.    I made a decision.  I pled guilty.

10   Q.    Right.  But you needed to make a big decision about

11   whether or not you were going to just take a sentence

12   somewhere between five or ten or you were going to roll the

13   dice, correct?

14   A.    It was logical thinking.  Ten years sounded better

15   than doing life in prison.

16   Q.    Right.  I'm not saying it wasn't logical thinking

17   to accept the deal.

18   A.    Yes, I made a decision.  I accepted it.

19   Q.    Right.  And you sought people's advice about

20   whether or not you should accept that deal, correct?

21   A.    Of course.

22   Q.    And you asked my client whether or not you should

23   accept that deal?

24   A.    Yes, I did.

25   Q.    And he needed to know what your discovery was

1  before he could tell you what in his opinion you should do,

2  correct?

3       A.   He had already seen my discovery up to that point

4  so he didn't need to know nothing.  He knew exactly what was

5  going on.

6       Q.   So you were fully aware that he had seen your

7  discovery?

8       A.   Yeah.  He was allowed to go down and sit at my

9  lawyer's and go through my discovery and if he seen something

10  give advice.  He was aware of my situation.  He knew full

11  well what was going on.

12       Q.   At some point did you give my client a big fat gold

13  chain?

14       A.   Yeah.  When we were younger.

15       Q.   How old?

16       A.   I don't know.  He was out of prison.  My mother

17  was -- it was probably like I think when he got out of

18  prison.  I think he got out in like 2003.  2002, 2003,

19  somewhere around there.  So, I don't know, he might have been

20  22, 23, give or take.

21       Q.   All right.  So you gave him this?

22       A.   Yeah.

23       Q.   And what did it cost you?

24       A.   I don't know.  At the time gold was cheap.  I don't

25  remember.  A thousand dollars, $800, $700.

1    Q.   By the way, one of the things the government asks
2  for in your indictment which you probably read -- you read
3  your indictment, correct?
4    A.   It's been a long time.
5    Q.   Yeah, but you read it when it came out?
6    A.   Yeah, about six years ago.  Yes, I did.
7    Q.   You were aware that they were looking in the
8  indictment for a forfeiture of $6 million?
9    A.   Yeah.
10    Q.   And what did they take from you financially?
11    A.   Nothing.  I didn't have nothing to take.
12    Q.   Not one penny?
13    A.   No.
14    Q.   Well, they had your -- you still have the
15  motorcycle.
16    A.   Worth like $6,000.
17    Q.   But they didn't take that?
18    A.   No.
19    Q.   Did you buy your father a car just before you
20  turned yourself in?
21    A.   I bought my father a car?  No, I didn't.  I gave
22  him a car I owned.
23    Q.   You gave him your car?
24    A.   I gave him a car I owned, yes.  I didn't buy him a
25  car.  It was my car that I gave to him.

1    Q.    Okay.  What was that car worth?

2    A.    Ten grand, twelve grand.  I made payments on it.

3    Q.    They didn't take that?

4    A.    No.

5    Q.    Did you buy your girlfriend a car?

6    A.    No.  Never.

7    Q.    And you didn't bury any money anywhere?

8    A.    No.  I wish I did.  I would have something to live

9    for.

10    Q.    So when you say on the phone call that she keeps

11    asking for money, you don't know where it all goes, who's

12    giving her money?

13    A.    She works for a living.  She has her own money.

14    Q.    But you weren't -- do you remember saying on the

15    phone call she asks my father for money?

16    A.    Yeah.  She was asking my father for help.

17    Q.    He asks me whether I should give it or not?

18    A.    Yeah.

19    Q.    So you never told your father prior to March of

20    2014, when you're a few months away from getting into the

21    halfway house, give her money?

22    A.    No.

23    Q.    So the government took not one penny from you?

24    A.    No.

25    Q.    I'm going to show you what's been previously marked

1    Government's Exhibit 22c.  Do you see that list of entries?

2          A.    Yeah.

3          Q.    Did you write that?

4          A.    No.

5          Q.    Do you recognize the person's handwriting?

6          A.    No.

7          Q.    Do you know who B-O-S is?

8          A.    No.

9          Q.    Do you know who C-H-I-C, Chic, is?

10         A.    No.

11         Q.    Do you know Ed?

12         A.    No.

13         Q.    Do you know I-T-A-L?

14         A.    No.

15         Q.    Do you know Locco?

16         A.    No.

17         Q.    Do you know NH?

18         A.    It could have been me.

19         Q.    Well, is that your number?

20         A.    No.  Not that I recognize.  It could have been a

21    prepaid phone that I had thrown away.  It's not a number I

22    remember, though.  I've had multiple numbers in my life.  I

23    don't remember every one of them.

24              MR. SHEKETOFF:  Thank you.

25              THE COURT:  Attorney Ollila.

REDIRECT EXAMINATION

BY MS. OLLILA:

Q.   Mr. Champagne, Mr. Sheketoff was talking to you about your indictment and when the last time was you read your indictment, and he -- do you recall him saying that?

A.   I do.

Q.   And what was your answer as to the last time you read your indictment?

A.   It was like six years since I seen it.

Q.   And he also seemed to infer that the government was seeking from you $6 million, right?

A.   It seemed like that, yeah.

Q.   Is that what you understood him to be doing?

A.   Yes.

Q.   And that seemed to tie into yesterday, his heavy sighs about, you made $6 million, where's the $6 million.  Do you recall that?

A.   Yeah.

Q.   Let me show you what's marked as 54c, and this is a copy of the indictment.  How many people are you charged with in that indictment?

A.   Eighteen people.

Q.   How many people?

A.   Eighteen.

Q.   And what is the government seeking in total from

1  all those people on page 2 of that indictment?

2         A.    $6 million.

3         Q.    The government was never seeking $6 million from

4  you, were they?

5         A.    No.

6         Q.    Mr. Sheketoff did that on purpose to you, didn't

7  he?

8         A.    I guess so.

9         Q.    Just like yesterday when he asked you if you could

10 read and pretended like he was trying to be kind to you,

11 right, Mr. Champagne?

12               MR. SHEKETOFF:  Objection.

13               THE COURT:  Objection sustained.  A little

14 argumentative.

15        Q.    And then he came up and showed you your statement

16 and he said to you, where's the $6 million listed in that

17 statement, Mr. Champagne.  Is that what he said?

18        A.    Yes.

19        Q.    How much time did he talk to you yesterday about

20 $6 million?

21        A.    A few minutes.

22        Q.    What is a few minutes to you?

23        A.    I don't know.  He asked me a few times about it.

24 So maybe like between five and ten minutes.

25        Q.    Okay.  Five and ten minutes.  Right before

1    4 o'clock, right?

2          A.    Yeah.

3          Q.    And what did you say about $6 million?

4          A.    He was absolutely insane if he thought I made

5    $6 million and I have nothing to show for it.

6          Q.    And he kept at it, didn't he?

7          A.    He did.

8          Q.    And he said, how can that be, right?

9          A.    Yes.

10         Q.    And he said 6,000 pounds.  He came up with that

11   number 6,000 pounds, right?

12         A.    Yes.

13         Q.    That you got from the Canadians, right?

14         A.    Yes.

15         Q.    Through Alkis Nakos' arrangements, right?

16         A.    Yes.

17         Q.    He came up with that number and he said a hundred

18   dollars a pound that you made off the top of it, correct?

19         A.    Yes.

20         Q.    And then he said, and that means you made

21   $6 million, doesn't it?

22         A.    Yes.

23         Q.    And what did you say?

24         A.    He's insane.

25         Q.    What is 6,000 pounds times $100 a pound?

1    A.    $600,000.

2    Q.    So he spent ten to fifteen minutes badgering you

3 when it was Mr. Sheketoff who just got the math wrong, wasn't

4 it?

5    A.    Yes.

6    Q.    And if you look at your statement, Mr. Champagne,

7 what do you say to the government that you made?

8    A.    $500,000.

9    Q.    Exactly consistent with what the numbers showed,

10 wasn't that, Mr. Champagne?

11    A.    It was.

12    Q.    Were you paying Alkis Nakos money off the top of

13 every pound of marijuana that you made?

14    A.    I did.

15    Q.    Were you?

16    A.    Yes.

17    Q.    Is there any doubt in your mind of that?

18    A.    No.  None.

19    Q.    Who went to Canada to meet with Mihail Leventis?

20    A.    Alkis did.

21    Q.    Did you go there with him to meet with Mihail

22 Leventis?

23    A.    No.  Never.

24    Q.    Where did you go when Goofy, or Steven Sarti,

25 showed up?  Where did you have to go?

1        A.      We met at his restaurant.

2        Q.      Whose restaurant?

3        A.      Alkis' father's.

4        Q.      And who dictated where you would meet?

5        A.      I think he did.  He arranged it at first.

6        Q.      Who made those arrangements to meet?

7        A.      Alkis.

8        Q.      And when you got to his father's pizza shop, who

9   was there?

10       A.      Just Alkis at first.  We actually had to wait for

11  Sarti to get there.

12       Q.      Okay.  So Alkis was there.  You had to wait for

13  Steven Sarti, the person you know as Goofy, to get there?

14       A.      Yes.

15       Q.      And he was there the entire time, wasn't he?

16       A.      Yes.

17       Q.      You were told how it was going to go, weren't you?

18       A.      Yes, I was.

19       Q.      This is going to be on a BlackBerry.  You're going

20  to get instructions on the BlackBerry, correct?

21       A.      Yes.

22       Q.      And because you're going to get this weight, this

23  high-grade marijuana, you need to pay Mr. Nakos money off the

24  top of every pound, correct?

25       A.      Eventually that's what the discussion came to, yes.

1    Q.   Now, the other thing is, did you understand what

2  Mr. Sheketoff was doing when he started talking about your

3  father?

4    A.   Yeah.

5    Q.   What do you think he was trying to get to?

6    A.   Getting my father involved saying he ran an

7  operation for me while I was in prison.

8    Q.   Yeah.  So here's your father who can't even drive

9  to see you, right?

10    A.   He could.  He was capable of it, but he was 65

11  years old and I would rather him not.

12    Q.   So you're asking a friend to bring your father?

13    A.   Yes.

14    Q.   A 65-year-old man who Mr. Sheketoff is accusing of

15  taking over your business?

16    A.   Yes.

17    Q.   That was a sigh.  Why did you just sigh?

18    A.   My father had nothing to do with anything I do.

19    Q.   Did you have your father take over your business?

20    A.   No, I didn't.

21    Q.   Mr. Champagne, did you beat up David Sweeney in

22  prison?

23    A.   Yes.

24    Q.   Why wouldn't you say that?  What's the big deal?

25    A.   I don't know.

1    Q.    Do you think the jury believes that there aren't
2    fist fights in jails every day?
3    A.    I doubt it.
4    Q.    Why didn't you say, yeah, I did, I'm proud of it?
5    A.    I don't know.
6    Q.    Why would you do that?  Why would you deny it?  Why
7    does it matter?
8    A.    I don't know.
9    Q.    Are you ashamed of your conduct in the past?
10   A.    Some of it, yeah.
11   Q.    The other thing that Mr. Sheketoff did was --
12   strike that.
13         Is Mr. Nakos somehow a legal genius?
14   A.    No.
15   Q.    So Mr. Sheketoff tried to get you to say that you
16   gave Mr. Nakos the discovery, correct?
17   A.    Yes.
18   Q.    Did you?
19   A.    No.
20   Q.    You said that he was allowed to go down to your
21   attorney's office to look at discovery, correct?
22   A.    He was.
23   Q.    Mr. Sheketoff tried to make it seem like there was
24   a reason for Alkis Nakos to have your discovery on his
25   computer, correct?

1          MR. SHEKETOFF:  Objection.  Mr. Sheketoff tried to

2     make it seem like?

3          MS. OLLILA:  I'm sorry.

4          THE COURT:  If you could rephrase the question and

5     not make it so much about the attorney.

6          Q.   Did you have anyone give Alkis Nakos your discovery

7     so he could have it on his computer?

8          A.   No.  Never.

9          Q.   Did you rely on Alkis Nakos because somehow he knew

10     about the federal sentencing guidelines and he knew more than

11     your lawyer?

12          A.   No.

13          Q.   Attorney Sheketoff talked about you had all this

14     money and the government didn't take your motorcycle.  In the

15     call that Attorney Sheketoff played for you you're speaking

16     to Kosmas Koustas and you want him to bring your father to

17     see you and you say -- someone says, what did you do with all

18     the money, or what happened to the money, and you said, I

19     wish I knew.  What was that a reference to?

20          A.   Girls spending money.

21          Q.   Did you have any money, Mr. Champagne?

22          A.   All said and done, no.

23          Q.   Is anything left?

24          A.   I have nothing.  I have a motorcycle that doesn't

25     run.

1    Q.    What do you have to your name today?

2    A.    Clothes from before.  Some sneakers.  Not too much.

3    Q.    What do you stand to gain by testifying?  What?

4    A.    Nothing.

5    Q.    No.  There's got to be something.  What are you

6    going to gain out of this?

7    A.    My freedom.  Staying out of prison for something I

8    had nothing to do with.

9    Q.    You're already out of prison.

10   A.    I am now.

11   Q.    What would make you go back to prison?

12   A.    Nothing.  I'm never ever going back to prison.

13   Q.    What do you get, other than a big headache, for

14   being here today?

15   A.    Nothing at all.

16          MS. OLLILA:  Nothing further.

17          THE COURT:  Go ahead, Attorney Sheketoff.

18                      RECROSS EXAMINATION

19   BY MR. SHEKETOFF:

20   Q.    Mr. Champagne, if you thought that I was suggesting

21   that your father was taking over your business, I apologize.

22          I'll say it straight out.  What I'm suggesting is

23   that you gave your business to Kosmas Koustas, didn't you?

24   A.    No, I didn't.

25   Q.    You just gave your father your money to hide when

1  you went to prison and that's why you needed to see your

2  father, to decide on disbursements from the money that you

3  had hid, correct?

4       A.   No, it wasn't.

5       Q.   All right.  Let's talk about your math.  My math

6  has been -- is very well-known to this jury at this point.

7  Let's talk about your math.

8            In your debriefing at the U.S. Attorney's Office

9  with the lead investigator there one year ago you estimated

10  for them that your total involvement in the Canadian

11  marijuana was 1,000 pounds, did you not?

12       A.   Give or take.  It could have been more.

13       Q.   Do you remember telling them that your best

14  estimate was 1,000 pounds?

15       A.   Yeah.

16       Q.   You remember that?

17       A.   It's right here in front of me.

18       Q.   And that was an out-and-out lie, wasn't it?

19       A.   No.

20       Q.   Do you remember telling them that you were making

21  100 to $200 for each pound?

22       A.   100, 200, 300.

23       Q.   No, I'm asking whether you told them you made 100

24  to 200.  I didn't mention 300.

25       A.   I was pretty clear with telling them, yeah, I made

a hundred or $200 a pound.

Q.   Yeah, a hundred to 200.  Today -- or yesterday, and again today, you're saying, well, maybe sometimes it was 300.

All right.  So if you brought in 100 (sic) pounds and you made $200 a pound, how much money would you have made?

A.   Twenty grand.

Q.   Okay.  Your math is as bad as mine.  You would have made $200,000.

A.   A hundred pounds of it --

Q.   A thousand pounds, which is what you told them you brought in.

A.   Oh, yeah, 200,000.

Q.   $200,000.  So your math is just as bad as mine, correct?

A.   I wasn't thinking.  I was thinking profit not -- sorry.  Excuse me.

Q.   Well, you told them you only brought in a thousand pounds, that you made $500,000, and you only made a hundred to $200 a pound?

A.   Sometimes, yes.

Q.   That math is as bad as mine, correct?

A.   Sure.

Q.   Yeah.  So you either brought in a lot more than a thousand pounds or you made a lot more than a hundred to $200

a pound, correct?

A.    Sometimes I did.  Sometimes I didn't.

Q.    Do you have a tattoo on your arm that says death before dishonor?

A.    I do.

Q.    What's that mean?

A.    A stupid code of silence.

Q.    And you repeat again today that you have not been offered to have the government file a motion to cut your supervised release from three years to one and a half years?

A.    I haven't seen no documentation or been made no promises.

Q.    You haven't seen no documentation?

A.    I haven't seen no documentation and I haven't heard no promises, no.

Q.    No one has informed you that the government intends to file such a motion?

A.    No.

Q.    Do you have any idea why the government would tell me that they intend to file such a motion and not tell you?

A.    I have no idea.  I want this to be over with.  I could really care less after this.  I'm ready to do my four years of probation once I'm out of here, and that's pretty much what I've been ready for.

Q.    Is your lawyer here again today?

1          A.    No, he isn't.

2          Q.    So it's your testimony that you told your lawyer

3     that Mr. Nakos could look at your discovery but he couldn't

4     take it?

5          A.    Yes.

6          Q.    Why would you tell him that?

7          A.    He was a friend of mine that I relied on for

8     information and advice.

9          Q.    But why would you tell him he couldn't take it?

10         A.    Why would he need it?

11         Q.    It's a lot of discovery, isn't it?

12         A.    Yeah.

13         Q.    So it's your testimony that your lawyer gave it to

14    him without your permission?

15         A.    Excuse me?

16         Q.    It's your testimony that your lawyer gave it to him

17    without your permission?

18         A.    I don't think my lawyer ever gave him anything.

19               MR. SHEKETOFF:  Nothing further.

20               MS. OLLILA:  Nothing further.  Thank you.

21               THE COURT:  All right.  Mr. Champagne, you're

22    excused.

23               Call your next witness.

24               MS. OLLILA:  Derek Danis.

25               MR. SHEKETOFF:  Your Honor, I'm not sure if I moved

1   this into evidence.

2             MS. OLLILA:  No objection.

3             THE COURT:  No objection?

4             MS. OLLILA:  No objection.

5             THE COURT:  All right.  What's that exhibit number?

6   Defendant's Exhibit 1?

7             MR. SHEKETOFF:  Defendant's 1.

8             THE COURT:  Full exhibit.  Go ahead.

9             (Defendant's Exhibit No. 1 Admitted)

10                           DEREK DANIS

11            having been duly sworn, testified as follows:

12            THE CLERK:  For the record, please state your name

13  and spell your last name.

14            THE WITNESS:  Derek Danis, D-A-N-I-S.

15                       DIRECT EXAMINATION

16  BY MS. OLLILA:

17       Q.   Good morning, Mr. Danis.

18       A.   Good morning.

19       Q.   How are you employed?

20       A.   I have my own accounting firm.

21       Q.   Where is your accounting firm?

22       A.   In Bedford, New Hampshire.

23       Q.   What do you do as an accountant?

24       A.   Everything from bookkeeping all the way up to tax

25  preparation.

1      Q.    When you say tax preparation, what does that mean?
2 Can you explain it more fully?
3      A.    Just preparing individual tax returns, business tax
4 returns.
5      Q.    Are you familiar with someone by the name of Alkis
6 Nakos?
7      A.    Yes.
8      Q.    Will you look around the courtroom and let me know
9 if you see him anywhere in the courtroom?
10     A.    Yes, I do.
11     Q.    Would you please identify him by describing an
12 article of clothing that he's wearing?
13     A.    Blue shirt, blue tie.
14          MS. OLLILA:  May the record reflect that the
15 witness has identified the defendant, Alkis Nakos?
16          THE COURT:  Yes.
17     Q.    Have you served as a personal accountant for Alkis
18 Nakos for a period of time?
19     A.    Yes, I have.
20     Q.    And by that I mean have you prepared his taxes?
21     A.    Yes.
22     Q.    Let me show you what has been marked as Exhibit 50a
23 for identification.  I would ask that you go through this
24 exhibit and take a look.
25     A.    Okay.

1    Q.    Do you recognize those documents?

2    A.    Yes, I do.

3    Q.    Did you send those documents somewhere?

4    A.    To the Internal Revenue Service.

5    Q.    Did you provide a copy of those documents to me?

6    A.    Yes.

7    Q.    Were you subpoenaed to do so?

8    A.    Yes, I was.

9    Q.    And is that the copy that you provided to the

10   United States Government, to me?

11   A.    I believe it is.

12   Q.    Okay.

13         MS. OLLILA:  I would ask that the ID be stricken on

14   50a and that it be entered into full evidence.

15         MR. SHEKETOFF:  Objection.

16         THE COURT:  Do you want to approach?

17         MR. SHEKETOFF:  Yes.

18         (SIDEBAR)

19         MR. SHEKETOFF:  It's a relevance and a 403

20   objection.  It's really other crimes evidence by the

21   government's theory.

22         MS. OLLILA:  Oh.  I wasn't sure if he was done.

23         THE COURT:  I just want to make sure I understand

24   it.

25         MR. SHEKETOFF:  The other general thing that we

1    discussed which is -- and I shouldn't have said relevance,

2    it's such a shorthand for it.  If you don't have some sort of

3    financial analysis to pick out little pieces of someone's

4    financial background and to say this shows he had more money

5    than he could possibly have, I don't think it's fair.

6                 THE COURT:  Okay.

7                 MS. OLLILA:  This is not an issue of other crimes,

8    Judge.  In order to establish a CCE I have to demonstrate

9    that this defendant earned substantial amounts of money.

10               In order to determine where his money comes from,

11   the baseline is looking at his taxes.  If he's filing W-2s

12   and his accountant is filing taxes each and every year

13   representing he makes $30,000, and the United States has

14   evidence which suggests that he has a lot more than $30,000

15   coming in, it goes to show the issue of unexplained money,

16   unexplained wealth, which is what the United States is

17   required to establish in order to meet the element of a CCE.

18               What you will see, Judge, is Mr. Nakos claimed

19   roughly $30,000 a year during the period of 2008 through

20   2013, I've limited it to that time frame alone, and he claims

21   about $30,000 a year.  He also gets refunds.

22               I'm not going to have Mr. Danis talk about the

23   refunds, because then that might be construed as other

24   crimes, he's committing tax fraud.  I'm not going to elicit

25   that at all, Judge.

1          MR. SHEKETOFF:  Then why introduce the exhibit?

2          THE COURT:  All right.  The evidence is relevant

3   with respect to the CCE charge and her burden of proof with

4   respect to his wealth and the income he's receiving from this

5   alleged drug conspiracy.

6          So with respect to relevance, it is relevant.  With

7   respect to your 403 argument, 404 argument, the evidence has

8   special relevance because of the CCE charge, and ultimately I

9   believe that the probative value is not substantially

10   outweighed by the prejudice.

11          Based on your relevancy arguments with respect to

12   the way in which the jury would use it as evidence, I believe

13   that you can establish that on cross and you can challenge

14   the weight of this evidence effectively on cross-examination,

15   but I do find that it is admissible.

16          MS. OLLILA:  Thank you, Judge.

17          MR. SHEKETOFF:  I never quarrel with the Court's

18   ruling, almost never, but does the fact that you think it's

19   relevant and probative value outweighed on Count 1 mean that

20   I'll get a limiting instruction that it doesn't apply to

21   Count 2?

22          THE COURT:  Can you give me a limiting instruction?

23          MR. SHEKETOFF:  Yes.  This is evidence admitted

24   solely on the issue of Count 1.

25          MS. OLLILA:  But Judge --

1          THE COURT:  Let me think about that.  Let me think

2     about that.  I think there's some merit to what he's saying,

3     so tell me why not.

4          MS. OLLILA:  Because, Judge, much like a CCE, part

5     of the United States' proof in establishing a conspiracy is

6     showing that there's money, unexplained amounts of money.

7     That's always relevant for a conspiracy case.

8          So if he's claiming he is making $30,000 a year and

9     has $100,000 in his bank account in the same year, that goes

10    to show that he has unexplained wealth.  It's highly relevant

11    from both counts, Judge.

12         THE COURT:  That makes sense to me.  Renew your

13    argument at a time when we go for a break and propose a

14    limiting instruction.  But I think the evidence is relevant,

15    the unexplained wealth on both counts, for the reasons the

16    government stated.

17         MS. OLLILA:  Thank you, Judge.

18         MR. SHEKETOFF:  Thank you.

19         THE COURT:  Objection is noted.

20         (CONCLUSION OF SIDEBAR)

21         MS. OLLILA:  Judge, the United States moves the

22    admission of 50a into full evidence.

23         MR. SHEKETOFF:  Same objection.

24         THE COURT:  50a is a full exhibit.

25         (Government's Exhibit No. 50a Admitted)

1        MS. OLLILA:  Diane, will you please pull up Exhibit

2   50a and go to page 46.  Hold on.

3        Q.   Mr. Danis, the jury is now looking at Exhibit 50a;

4   is that correct?

5        A.   Yes.

6        Q.   And that is a document you just had in your hand.

7   In fact, I'm going to give you the original in the event you

8   want to hold onto the original.

9        A.   Okay.

10       Q.   And I'm going to ask you to explain -- and by the

11   way, this is -- if you look on the monitor, what is it that

12   the jury is looking at?

13       A.   All right.  Well, the top is just name, address,

14   and it goes down --

15       Q.   And who's the name and what is the address?

16       A.   Alkis Nakos, and it's 366 Arah Street, Manchester,

17   New Hampshire, 03104.  Filed as a single individual.

18   Basically gets one exemption per IRS law.  Then it goes down

19   to where all the income is stated.

20       Q.   What is the income that is stated for 2008?  What

21   does Mr. Nakos claim he's making for income?

22       A.   Okay.  Let me see.  It's blurry on the screen.

23       Q.   Actually, hold on.

24       MS. OLLILA:  Diane, why don't you pull up page 54

25   of the same exhibit.

1    Q.   Let me show you this copy, Mr. Danis.  2008.  When
2  you file taxes -- oh, okay.  All right.  When you file taxes
3  for individuals, do you get a copy of their W-2?
4    A.   Yes.
5    Q.   What is a W-2?
6    A.   A W-2 is the wages that were earned from the
7  employer.
8    Q.   And what does it show with respect to the wages
9  that were earned by Mr. Nakos in 2008?
10   A.   $31,800, which is in box 1 -- well, 3 and 5 of the
11 W-2.
12   Q.   Okay.  If you look at the monitor again --
13        MS. OLLILA:  Go to page 46.
14   Q.   -- is that consistent with line 7 on page 1 of the
15 2008 tax return?
16   A.   Yes, it is.
17   Q.   So Mr. Nakos claimed he made $31,800 in 2008?
18   A.   Correct.
19   Q.   And his employer was?
20   A.   Amory House of Pizza.
21   Q.   Now let's do the same for 2009.
22        MS. OLLILA:  Diane, please pull up page 36.
23        MR. SHEKETOFF:  This is one exhibit?
24        MS. OLLILA:  Yeah, it's one entire exhibit spanning
25 2008 through 2013, the tax returns.

1      Q.    Do you have 2009 in front of you?

2      A.    Yeah.

3      Q.    It's also on your monitor.

4      A.    Yes.

5      Q.    What does the W-2 reflect how much money Mr. Nakos

6  made in 2009?

7      A.    $30,600.

8      Q.    Who was his employer?

9      A.    Amory House of Pizza.

10     Q.    Did Mr. Nakos have any other source of income?

11     A.    For that year just interest income.  That's it.

12     Q.    Okay.  What was the interest income he had?

13     A.    $1,990.

14     Q.    And that was from what?

15     A.    Bank interest earned.

16     Q.    What does that mean?  If you make that much

17  interest in the bank, how much money do you think he had in

18  the bank?

19     A.    Offhand -- a decent amount.  I don't know because I

20  don't remember what the rates are.

21     Q.    What does that mean, a decent amount, 5,000,

22  10,000, or a hundred thousand?

23     A.    Honestly, I don't know.

24     Q.    Okay.  So he earned a thousand dollars interest

25  from money he had in a bank account and his income was

1    $30,600 that year?

2         A.   Yes.

3         Q.   Did he have any other employment that you knew of?

4         A.   Not that I'm aware of.

5         Q.   When you file someone's tax returns, do you ask for

6    all of their employment records?

7         A.   Yes, I do.

8         Q.   Would there be a reason someone would leave out

9    some other employment?

10             MR. SHEKETOFF:  Well, objection, your Honor.

11             THE COURT:  Overruled.

12        Q.   Would there be a reason someone would leave out

13   some other employment?

14        A.   To avoid paying taxes on it, I guess.

15             MS. OLLILA:  Diane, please go to page 28.

16        Q.   Mr. Danis, I would ask that you look at the 2010

17   return.

18        A.   Okay.

19        Q.   And how much did Mr. Nakos claim he was making in

20   2010?

21        A.   $27,600.

22        Q.   Who was his employer?

23        A.   Amory House of Pizza.

24        Q.   Was there any other income that he claimed that

25   year?

1      A.    $707 of bank interest.

2      Q.    And that's interest he earned because he had a

3  significant amount of money in the bank, right?

4      A.    Correct.  Yes.

5      Q.    Did he have any other income that year that he

6  reported to you?

7      A.    No.

8            MS. OLLILA:  Please go to page 17 for 2011.

9      Q.    Now, 2011 was a little bit different, right, Mr.

10 Danis?

11     A.    Correct.

12     Q.    What was the amount of money Alkis Nakos was

13 claiming that he made at Amory Street pizza in 2011?

14     A.    $31,200.

15     Q.    But he won a jackpot that year at Foxwoods, didn't

16 he?

17     A.    Yes.

18     Q.    With the slots, didn't he?

19     A.    I believe so.  I don't know if I have -- but I know

20 there was a big win that year.

21     Q.    And when individuals win money gambling, are they

22 required to report it as income?

23     A.    Yes.  Usually you're given a form W-2G from the --

24 from Foxwoods, or Mohegan, wherever it came from.

25     Q.    And Foxwoods also sends that to the IRS, correct?

1      A.    Correct.

2      Q.    So if Mr. Nakos didn't claim it, the IRS would know

3  about it, wouldn't they?

4      A.    They should, yes.

5      Q.    So he claimed additional income in 2011 because he

6  won a slots, right?

7      A.    If it was, I'm not sure what it was, but yes, from

8  gambling from Foxwoods or --

9      Q.    How much did he win?

10     A.    $108,690.

11     Q.    Did he have any other forms of income that year?

12     A.    Just bank interest of $147.

13           MS. OLLILA:  Please go to page 10, Diane.

14     Q.    2012.  Do you have that in front of you, Mr. Danis?

15     A.    Yes, I do.

16     Q.    What did Alkis Nakos report for 2012 for income?

17     A.    Wages was $31,200 from Amory House of Pizza.

18     Q.    Did he have any gambling winnings that year?

19     A.    Yes, he did.  $75,822.

20     Q.    And did you receive information from Foxwoods about

21  his gambling winnings?

22     A.    Yes.

23     Q.    And did you report that income?

24     A.    Yes.

25     Q.    If Mr. Nakos didn't report it on his IRS taxes,

1    would the IRS independently know?

2         A.    Yes.

3         Q.    Did he have any other forms of income in that year?

4         A.    Bank interest of $199.

5               MS. OLLILA:  Please go to page 1, Diane.

6         Q.    2013.  How much did Mr. Nakos make in 2013?

7         A.    His wages was $18,000.

8         Q.    That's what he got for working at Amory Street

9    House of Pizza?

10        A.    Well, there's two different -- there's something

11   else on line 21 that I can explain.

12        Q.    Okay.  Go ahead.  What is on line 21?

13        A.    Okay.  Basically we had discussed putting him on

14   the Amory House of Pizza as a partnership with his father

15   just because of his father's -- oh, what's the word I'm

16   looking for -- his English is broken.  It was easier to talk

17   with Alkis in regard to the business to, you know, make sure

18   this gets signed so there was more of an understanding of

19   what was going -- business taxes, what taxes to pay, that

20   type of thing.  So we had discussed starting a partnership

21   with Alkis and his dad, and so that's -- the $10,500 is a

22   guaranteed payment which is done on -- so instead of

23   receiving a W-2, there's a special line on the partnership

24   return that shows the guaranteed payment.  So he gets the

25   money directly.  So he just gets a check instead of a W-2

1    wage.

2         Q.    Let me ask you this.  Did you prepare the taxes for

3    Amory Street House of Pizza also?

4         A.    Yes, I have.

5         Q.    And how long had you or have you been doing that?

6    For how many years?

7         A.    I think I started in 2002 or 2003.  I'm not sure

8    offhand.

9         Q.    Let's start from 2013 back.  Is Amory Street House

10   of Pizza a business that earns a substantial income every

11   year?

12        A.    Like gross earnings or --

13        Q.    Yes.

14        A.    What do you mean by substantial?

15        Q.    How much money were they declaring on their tax

16   return, if you know?

17             MR. SHEKETOFF:  Objection.  If there's a return,

18   that's one thing.

19             THE COURT:  Can you approach?

20             MS. OLLILA:  Sure.

21             (SIDEBAR)

22             THE COURT:  Before we start, let me just ask

23   Attorney Sheketoff -- just put one word in your objection so

24   I know what your objection is.

25             MR. SHEKETOFF:  I apologize, your Honor.

1          THE COURT:  Because otherwise I'm just tempted to

2     -- unless I see it and it's obvious to me, I'm going to

3     overrule it, but I'm doing my best.

4          MR. SHEKETOFF:  She's asking for what's in a

5     document without producing the document, and I think what's

6     in the document -- the document speaks for itself.

7          THE COURT:  Well, you were going to ask him what

8     income -- if he knew what income there was for the House of

9     Pizza?

10          MS. OLLILA:  Right.

11          MR. SHEKETOFF:  She actually said declared on their

12     tax return.

13          MS. OLLILA:  Right.  And I will try to be more

14     artful.  I'm trying to establish that there was not a lot of

15     money.  He will testify that the money that was being

16     generated by Amory Street pizza was going to fund the W-2 for

17     Alkis Nakos, that there was not any money left over, and I'll

18     establish that Cornelius Nakos wasn't generating any money

19     from that business.  That's what I'm trying to establish.

20          THE COURT:  Okay.  All right.  All right.  I'm

21     going to allow this line of questions.  One thing that may

22     help is to state the objection, especially if you could just

23     rephrase it, and my guess is I'll just order you to rephrase

24     and you can quickly keep us moving.

25          MS. OLLILA:  Sure.  Thank you.

1          MR. SHEKETOFF:  Thank you, Judge.

2          (CONCLUSION OF SIDEBAR)

3     Q.   Mr. Danis, you testified that you prepared the tax

4     returns for Amory Street House of Pizza, correct?

5     A.   Correct.

6     Q.   And Cornelius Nakos; is that correct?

7     A.   Correct.

8     Q.   Did Cornelius Nakos draw a significant amount of

9     money out of the Amory Street House of Pizza?

10    A.   No.

11    Q.   Okay.  What do you mean by that?

12    A.   Basically his income revolves around rental income

13    because he has a multi-family unit.  So his major source of

14    income comes from that.

15    Q.   What about Cornelius Nakos?  Was he declaring any

16    income from Amory Street House of Pizza?

17    A.   Yes.

18    Q.   What was he declaring?

19    A.   I don't have that in front of me so I don't know.

20    Q.   Was it a significant amount?

21    A.   No, it was not.

22    Q.   And again, what do you mean by that?

23    A.   I'll guess in between a 500 and $2,000 net income.

24    Q.   A year?

25    A.   Yes.

1  Q. In one year Cornelius Nakos was claiming that his

2 net income from Amory Street House of Pizza was between 500

3 and $2,000?

4  A. I'm guessing.  And I think it's a fair guess not

5 having it in front of me.

6  Q. And did that remain consistent for 2012, 2011,

7 2010 --

8  A. It fluctuated.  That spectrum was what I'm -- for

9 2009 to 2013.  It could have gone above that.  But not

10 knowing and not looking at it, I don't know exactly.

11  Q. Do you have a recollection as to whether or not

12 Cornelius Nakos ever claimed more than $5,000 of income from

13 Amory Street House of Pizza during that time frame?

14  A. He may have.  I'm not sure.

15  Q. Would that surprise you?

16  A. I know there were a couple years where the income

17 was up there, but I don't know what years those were.

18  Q. All right.  Sorry.  This is me being inartful.

19 When you say the income was up there, what do you mean?

20  A. 5,000.  Maybe 5,000, $10,000 range.

21   MS. OLLILA:  Okay.  Nothing further.

22   THE COURT:  Attorney Sheketoff.

23      CROSS-EXAMINATION

24 BY MR. SHEKETOFF:

25  Q. Good morning, sir.

1      A.    Good morning.

2      Q.    You would go by the pizza store, or the bar, on a

3 regular basis, pick up the receipts and things of that

4 nature, the sales slips, and keep the books for them, so to

5 speak, correct?

6      A.    Correct.

7      Q.    Right.  So this was a real business that had real

8 receipts, that ordered real amounts of liquor, that had real

9 food, that had a cash register tape, and that generated real

10 income, correct?

11     A.    Correct.

12     Q.    Now, when you were there did you notice that there

13 were these gambling poker machines there?

14     A.    Yes.

15     Q.    By the way, one of the reasons you keep a tape of

16 the register is you owe sales tax, correct?

17     A.    Correct.

18     Q.    And they actually paid sales tax, correct?

19     A.    Correct.  Every month.

20     Q.    Did you ever notice the poker machines?

21     A.    Yes.  They were right on the wall.

22     Q.    Okay.  Did you ever play a poker machine?

23     A.    No, I have not.

24     Q.    All right.  And if you generate income from those

25 poker machines, that would be illegal income, correct?

1      A.    From the -- there's the amusement side of things,

2  and then basically the way I understand it to work is the

3  companies -- I don't know if it was Manchester Music or

4  Tri-State Amusement, but each -- I think it was -- I think it

5  was every week they would come in, collect the money that was

6  in the machines, and this went with the juke box, that type

7  of thing.  So those companies would come in, take the money,

8  and then it would be split 50/50.  I think 50/50.  I'm not

9  sure.

10     Q.    Right.  And do you know if they were in fact at

11  Amory paying out on those machines?

12     A.    No, I do not.

13     Q.    All right.  So if you were paying out on those

14  machines, that would be illegal income, correct?

15     A.    Correct.

16     Q.    Do you know if the -- all right.

17           So did Cornelius Nakos ever file what's called a

18  Fifth Amendment tax return?

19     A.    Not that I'm aware of.

20     Q.    All right.  Do you know what a Fifth Amendment tax

21  return is where you don't list the source of income, you just

22  write Fifth Amendment next to it?

23     A.    No.  I never heard of that.

24     Q.    All right.  So you never had a discussion with him

25  about that?

1          A.    No.

2          Q.    Do you have any idea how much money was being

3     generated by the poker machines?

4          A.    Just from whatever the slips that came in.  Offhand

5     I don't, but basically that would be one of the monthly slips

6     that would be in the monthly pick-ups that I did.

7          Q.    Now, if I settle an insurance claim and am paid a

8     chunk of money, let's say my roof falls in, or jewelry or

9     things of that nature are stolen from my house, do I declare

10    that as income?

11         A.    The insurance proceeds?

12         Q.    Yeah.

13         A.    To the extent of whatever the value that you lost

14    would have been.  Not the whole thing.  Like if your roof

15    caved in, that's not income to you because that's replacing

16    property.

17         Q.    Okay.  Well, what about if someone steals a piece

18    of jewelry out of my house and I put in an insurance claim

19    and it's paid, is that income that I have to report?

20         A.    I don't believe so.

21         Q.    All right.  And what if my mother gives me $15,000?

22    Do I have to report that?

23         A.    I'm sorry.  I didn't hear the question.

24         Q.    What if my mother gives me $15,000?  Do I have to

25    report that?

1      A.   No, if it's set up as a loan or --

2      Q.   Well, what if it's an outright gift?  How much can

3  a person give as a gift where there's no gift taxes of any

4  kind and it's not reported income?

5      A.   It fluctuates year to year because they've raised

6  the amounts, but I think it's 14,100, or something like that,

7  for 2014.  So each year it would be a little -- they change

8  it every few years.

9      Q.   Now, sir, do you know anything about the cash

10  transaction reporting requirements?

11      A.   For?

12      Q.   Well, if I deposit $10,000 in cash, or $10,001 in

13  cash into a bank account, let's say Citizens or any other

14  bank, is the bank required to file a cash transaction report?

15      A.   Yes.

16      Q.   And if I -- and that's a report that goes to the

17  IRS?

18      A.   Correct.

19      Q.   And if I file a -- if I take out $10,001 or any

20  amount above that from my bank account, does the bank file a

21  cash transaction report?

22      A.   I don't believe they do.

23      Q.   If I pay a merchant more than $10,000 in cash,

24  10,001 or more, does the merchant have to file a cash

25  transaction report?

1     A.    Only when it's deposited.  It would be when the
2  merchant makes that deposit at their bank.
3     Q.    All right.  So if someone has an account -- someone
4  pays you $10,001 as a fee for your work, do you have to
5  file -- you, before you put it in the bank, have to file a
6  cash transaction report?
7     A.    Me personally?
8     Q.    Yeah.
9     A.    We do not, no.  It's only something that's done
10  with the bank.
11     Q.    Do you know anything about the nature of his
12  insurance claims over the last -- from 2008 to 2013?
13     A.    Alkis'?
14     Q.    Yes.
15     A.    No.
16     Q.    Do you know if you can have winnings in Canada --
17  if you have winnings in Canada at a casino, if it has to be
18  reported on your tax return?
19     A.    I would think it would be because there is a, like
20  a tax treaty between Canada and the United States where
21  income has to be claimed in one place or the other.  So there
22  is some sort of -- because I have clients that have pensions
23  and whatnot in Canada, but as long as they file them on the
24  U.S., the 1040, then it's considered as filed and taxes have
25  been paid on it.

1       Q.    When a casino pays out $75,000 -- or let's say

2   $88,000 on one hit, do they give you the whole amount of

3   money or do they withhold the taxes?

4       A.    Usually they withhold on the bigger winnings.

5       Q.    All right.  Do you know what the sort of baseline

6   is before they withhold?

7       A.    No, I do not.

8       Q.    So if I win $2,000 at Foxwoods or at the Mohegan

9   Sun, do you know if they withhold?

10      A.    It may be up to the taxpayer's discretion.  I don't

11  know.

12      Q.    So on these two years where he had significant

13  income from Foxwoods -- was it Foxwoods?

14      A.    I believe -- yes.

15      Q.    Did Foxwoods withhold taxes on these?  In other

16  words --

17      A.    No, they did not.  We actually made -- let's see,

18  what year is this?  In 2011 when he hit the slot I actually

19  prepared an estimated payment for him just planning out the

20  year.  So the taxes were paid by him.  And if so, he cut a

21  check for $12,000 to the IRS for the taxes for that winnings.

22      Q.    For the 88,000.

23      A.    For 108,000.

24      Q.    Okay.  So when he hit the slot for $88,000, did

25  Foxwoods withhold some of that money or gave him the whole

1  88,000?

2      A.    They gave him the whole amount.

3      Q.    Right.  And later he paid taxes on it?

4      A.    Correct.

5      Q.    He declared that on the form that -- the 2011?

6      A.    Yeah.  The 2011 -- line 21 under other income.

7      Q.    And in 2012 when Foxwoods -- I assume it's

8  Foxwoods -- paid him $75,822, did they withhold or did he

9  have to report the taxes?

10      A.    Nothing was withheld on that, and then he had a

11  balance due at the end of the year.  So we didn't make an

12  estimated payment that year.

13          MR. SHEKETOFF:  Thank you, sir.

14          MS. OLLILA:  Nothing further.

15          THE COURT:  All right.  Mr. Danis, you may be

16  excused.

17          THE WITNESS:  Thank you.

18          THE COURT:  It's time for our morning break, so we

19  will take a ten, fifteen minute break and then we'll come

20  back in.

21          (IN COURT - NO JURY PRESENT)

22          THE COURT:  Let me just -- before we excuse

23  counsel, this is a perfect break because I could give a

24  limiting instruction as you requested, that it may only be

25  considered for the CCE count.

1            However, the research that I'm doing is showing me

2       that not in this circuit, but out of this circuit such

3       evidence has been deemed admissible on both.

4            What I would like you to do is to provide me

5       something in the short break if you could.  Obviously if you

6       find nothing and you're resting just on your argument, you

7       obviously preserved the issue.  I was just hopeful that

8       perhaps you could give me some more direction on that.

9            MR. SHEKETOFF:  Here's my problem, your Honor.  I

10      can't get on the Internet, I don't think.  Could I get on the

11      Internet?

12           THE COURT:  You can.  It's a guest WiFi so you

13      should be able to quickly do some research -- or your

14      assistant.

15           MR. SHEKETOFF:  Thank you.

16           THE COURT:  All right.  So if you're able to do

17      that and can let me know, I will entertain the argument.  At

18      this point what I'm finding is suggesting that my ruling at

19      this point is correct, so I'm going to allow it as a full

20      exhibit on both counts.  I am going to research this during

21      the break.

22           MS. OLLILA:  Thank you, Judge.

23           THE COURT:  Thank you.

24           (RECESS)

25           (In Court with counsel and Juror No. 9)

1          THE COURT:  Juror No. 9, how are you sir?

2          THE JUROR:  Very well.

3          THE COURT:  I am sorry to bring you out here.  I

4    just have to ask a couple of questions about your residency.

5          You live in Vermont now?

6          THE JUROR:  I just moved there July 1st.

7          THE COURT:  Okay.  When you filled out the juror

8    questionnaire for this district, were you living in New

9    Hampshire?

10         THE JUROR:  I was.

11         THE COURT:  How long had you lived in New

12   Hampshire?

13         THE JUROR:  I was born in New Hampshire.  I spent

14   one year living in Alaska in 2006 to 2007.  Other than that

15   I've been in New Hampshire.

16         THE COURT:  The whole time?

17         THE JUROR:  Yeah.

18         THE COURT:  Okay.  All right.  I think that's all I

19   need to know.

20         Does anybody else want to ask a question?  Okay.

21   That's the only thing I need to know.  Thank you.  Sorry to

22   bring you out here.

23         THE JUROR:  You're welcome.

24         (Juror No. 9 leaves the courtroom)

25         THE COURT:  We will look into that issue, and we'll

1  deal with that issue perhaps at the end of the day.  How does
2  that sound?
3           MR. SHEKETOFF:  That's fine.
4           THE COURT:  The question of the full exhibit tax
5  returns, which were exhibit what, Attorney Ollila, 50a?
6           MS. OLLILA:  50a.
7           THE COURT:  50a have been admitted as a full
8  exhibit.  That means the jury will consider it as they decide
9  both the CCE charge, Count 1, and Count 2.
10          I want to give Attorney Sheketoff an opportunity to
11 make a full argument, preserve every argument that he may
12 have with respect to that issue, and then give Attorney
13 Ollila a chance as well to preserve that issue before we
14 bring the jury in.
15          Attorney Sheketoff, go ahead.
16          MR. SHEKETOFF:  Okay.  Well, just briefly, your
17 Honor, because most of this has been said.  And thank you for
18 the opportunity to look for some cases, but I could not find
19 one.
20          You've already determined that it's relevant as a
21 general principle on both counts.  So the 403 analysis I
22 think is slightly different on each.
23          On Count 1 I would ask that the jury be instructed
24 that it's limited to the issue of substantial income, or
25 whatever the exact phrase is, and that they get an

1    instruction that this evidence is admitted solely on the

2    issue of whether or not he derived substantial income.

3    That's my entire presentation.

4              THE COURT:  Okay.  All right.

5              Attorney Ollila.

6              MS. OLLILA:  Thank you, your Honor.

7              As your Honor knows, one of the essential elements

8    in order for the United States to establish a CCE is that the

9    defendant gained a substantial income during the course of

10   engaging in the continuing criminal enterprise.

11             The fact that the defendant during the period of

12   the CCE and the conspiracy count -- it runs 2008 through

13   2013.  The fact that the defendant had an income which

14   represented approximately $30,000 a year is significant

15   because the United States' evidence will show that he had a

16   substantial more amount of income, cash, cash in the bank.

17   He spent a lot of money on his house, renovations on his

18   house.  That's particularly relevant, Judge, for not only the

19   CCE but the conspiracy.

20             And the case law suggests that the United States is

21   entitled to offer tax returns in order to establish a

22   baseline income for the defendant so that if there is

23   unexplained wealth that is circumstantial evidence of a

24   defendant conspiring to distribute any controlled substance

25   as alleged in Count 2 and Count 1.

1          THE COURT:  Thank you.

2          I have done a little bit of research -- I should

3     credit my law clerk who has done the research -- and have

4     found a Second Circuit and Eighth Circuit case, not a First

5     Circuit case, however.  But those cases, U.S. v. Baker, U.S.

6     v. Barnes, one of which -- Barnes is actually a case where

7     the evidence was admitted under a CCE and a conspiracy count,

8     I believe.

9          The Eighth Circuit case explains the relevance on

10    the conspiracy charge simply as unreported income was

11    probably derived from illegal activities, and the prosecutor

12    is permitted to make that argument.

13         And I find that the probative value of this

14    evidence is not substantially outweighed by any prejudice,

15    and I believe that Mr. Sheketoff's cross-examination can poke

16    holes in the weight that the jury gives to this evidence but

17    that the evidence is admissible.

18         Also, let me also say that the CCE and the

19    conspiracy charges in the indictment are so interrelated and

20    interwoven that telling the jury that they can consider it on

21    one count but not the other I think would be a difficult task

22    for any juror.

23         All right.  Now what I'm thinking is we'll go for

24    another 45 minutes, take our lunch break, and then we'll be

25    back.  Does that work for everybody?

 1          MR. SHEKETOFF:  Yes, your Honor.  But how long is

 2  the lunch break?

 3          THE COURT:  About half an hour.

 4          MR. SHEKETOFF:  Half an hour.  Could I convince you

 5  to make it 35 minutes, which that extra five minutes -- I was

 6  late in coming back yesterday, but I can get down there, grab

 7  a sandwich, and get back.

 8          THE COURT:  We can do 45 minutes.

 9          MR. SHEKETOFF:  40 would be plenty.  Thank you.

10          THE COURT:  All right.  Okay.  I'll give the jury a

11  nod on that.  Okay.  I believe we're ready.

12          (IN COURT - JURY PRESENT)

13          THE COURT:  We had a few legal issues to iron out,

14  so that's the reason it took a little longer.  What we're

15  going to do is hear witnesses for the next 45 minutes and

16  then take a lunch break at 1.  If you're feeling hungry, I

17  just wanted to make sure you knew when lunch was coming.

18          All right.  Go ahead, Attorney Ollila.

19          MS. OLLILA:  Thank you very much, your Honor.

20          The United States calls David Givens.

21                        DAVID GIVENS

22          having been duly sworn, testified as follows:

23          THE CLERK:  For the record, would you please state

24  your name and spell your last name.

25          THE WITNESS:  It's David Givens, G-I-V-E-N-S.

1          THE CLERK:  Thank you.

2                    DIRECT EXAMINATION

3   BY MS. OLLILA:

4       Q.   Are you as cold as I am?

5       A.   It's pretty cold in here.

6       Q.   Good morning, Mr. Givens.  Thank you for taking

7   time out of your day to come here.

8            How are you employed?

9       A.   I'm self-employed.

10      Q.   You're self-employed doing what, Mr. Givens?

11      A.   Construction.

12      Q.   Were you subpoenaed to be here today?

13      A.   Yes.

14      Q.   Do you want to be here today?

15      A.   No.

16      Q.   You are self-employed with construction.  Do you

17  have your own company?

18      A.   Yeah.

19      Q.   What's the name of your company?

20      A.   G & F Enterprise.

21      Q.   G & F Enterprise?

22      A.   Yeah.

23      Q.   What does that stand for?

24      A.   Givens & Family.

25      Q.   Okay.  How long have you had Givens & Family

1  construction?

2       A.   Givens & Family is fairly new.  I switched over

3  because my other company was DJK, which stands for me, my

4  wife, and my daughter, and I had another daughter so I felt

5  it wasn't fair.  Long story.

6       Q.   Okay.  All right.

7            So how long have you been in the construction

8  business?

9       A.   Since I was about 16.

10      Q.   Did you learn it from a family member?

11      A.   No.  Self-taught.  Just first job, last job.

12      Q.   How do you do?

13      A.   I do pretty well.

14      Q.   You provide well for your family?

15      A.   Yeah, yeah.

16      Q.   Have you lived in New Hampshire for a long time?

17      A.   Yeah.  Since sixth grade.

18      Q.   Where did you go to high school?

19      A.   West.

20      Q.   Do you know someone by the name of Alkis Nakos?

21      A.   I do, but not from school.  We did go to the same

22  school but --

23      Q.   How do you know him?

24      A.   Just from working for him.

25      Q.   At some point in time did you start working for

1  him?

2       A.    Yeah.  I did a project for him.

3       Q.    When was that?

4       A.    When?

5       Q.    Yes.

6       A.    Maybe five years ago.  It was 2010 -- '9, '10.

7       Q.    Okay.

8       A.    It was a while ago.  Like five years.

9       Q.    How did you meet him?  Did he call you on the

10  telephone and ask you?

11      A.    No.  Just an acquaintance.  Through an

12  acquaintance.

13      Q.    I'm going to ask you, Mr. Givens, do you see Mr.

14  Nakos in the courtroom today?

15      A.    I do.

16      Q.    Could you please point to him and describe an

17  article of clothing that he's wearing?

18      A.    He's wearing a suit.

19      Q.    Is he in the middle or on the side?

20      A.    He's in the middle.

21            MS. OLLILA:  Your Honor, may the record reflect

22  that the witness has identified the defendant, Alkis Nakos?

23            THE COURT:  Yes.

24      Q.    So you said about five years ago, 2009, 2010, you

25  were doing construction for him?

1       A.   Yeah.

2       Q.   Where?  What residence?

3       A.   At his house.

4       Q.   And what's the address?

5       A.   Oh.  Arah Street.

6       Q.   Okay.  All right.  When you are going to do some

7    work, do you go over and do a bid for the work?

8       A.   Yeah, yeah, yeah.

9       Q.   And did you go over to his Arah Street residence

10   and give him an invoice for what you were going to do?

11      A.   Yeah.  I typed up something and kind of went over

12   briefly, you know, what we were going to do as far as like

13   the project.

14      Q.   What did he want done to his residence?

15      A.   He just wanted more space.  Another bedroom.  Just,

16   you know, basically add on.  Make it a little bit bigger.

17      Q.   How much was that going to cost?

18      A.   At that point -- originally when I first met -- I

19   would have to like start from the beginning because it won't

20   make sense to anybody.

21      Q.   Okay.

22      A.   He was a friend of a friend, an acquaintance,

23   whatever.  I agreed to provide some service, do some work for

24   him, and -- you know, not necessarily the whole project, but

25   bits and pieces of it.

1      Q.    Okay.  It was a big project?

2      A.    Yeah.  I mean, it was an addition on his house.

3      Q.    And so you agreed to do some of the work, correct?

4      A.    Right.

5      Q.    And did you provide him with some sort of written

6  paperwork that said how much the estimate would be?

7      A.    Yeah.  In the beginning, yeah.

8      Q.    And what did he do with that paper?

9      A.    Well, we had to change a few things.  And then at

10  that point, you know, wasn't really keen on, you know,

11  keeping receipts or whatever.  It was kind of more of like a

12  handshake and a word of mouth, this is what I'm going to do,

13  so no documents were provided, you know, for the project.

14  Nothing in writing was set in stone.

15      Q.    I want to back up because it looks like you might

16  be nervous.  Are you nervous?

17      A.    No.  I'm freezing.

18      Q.    Okay.

19      A.    I mean, I'm not going to lie.  I've never been in

20  court before and I really don't want to be here but --

21      Q.    I know.  I know.  I apologize for that.

22      A.    Yeah.

23      Q.    So I just want to make sure I heard you correctly.

24  You provided him with paperwork.  What was his response?

25      A.    Basically, there was no paper trails.  We're not

1  going to -- you know, we're not going to basically keep, you

2  know, an estimate or whatever.

3       Q.   He didn't want any paper trails?

4       A.   Right.

5       Q.   And so what was your reaction to that?

6       A.   At that point in time I was just like whatever.

7  Okay.  It didn't really bother me.

8       Q.   Was he going to pay you by check?

9       A.   I didn't know at that point.  When we were first

10 meeting, I didn't know how he was paying.

11      Q.   And did you learn at some later point how he was

12 going to pay?

13      A.   Yeah.

14      Q.   What did he say?  How was he going to pay?

15      A.   Basically, you know, everybody wants a good deal.

16 They want the best deal.  So, you know, basically he would

17 pay me in cash for the project, and in turn I would give him,

18 you know, a good deal.

19      Q.   So he always paid you cash?

20      A.   Yeah.

21      Q.   All right.  How long did the project take?

22      A.   It took -- I'm trying to think now.  I mean, it

23 took a good solid winter to complete.  A few months, you

24 know.

25      Q.   How many contractors came in and out of the place?

1      A.    Maybe six, seven.

2      Q.    Okay.  Did you sit down with Mr. Nakos and help him

3  price certain things, such as toilets, tubs, and things like

4  that?

5      A.    No.  He went and picked out all his own fixtures

6  and whatnot.

7      Q.    Were they expensive items?

8      A.    Yeah, yeah.

9      Q.    All right.  Well, why don't you list some of them.

10     A.    Well, I mean we did a bathroom.  So he bought a

11  toilet, sink.

12     Q.    What about the tub?  What did that cost?

13     A.    The tub?  I would have to really go back and look.

14  A hundred percent -- I don't know.  If I had to guess, it was

15  $2,000, you know, 5,000, 3,000, 4,000.  I don't know a

16  hundred percent what he actually paid for it.  I know in a

17  bulk of what things -- everything, you know.

18     Q.    Everything cost in total?

19     A.    Yeah.

20     Q.    And what was that?

21     A.    It was probably around 11,000.

22     Q.    For the bathroom.

23           Now I'm talking about the entire project.

24     A.    Oh, the entire project?  I would have to really dig

25  deep.  I mean, that was a few years ago, and I haven't really

1    put too much thought into that.  The entire project -- I

2    mean, it was probably around 100,000 all said and --

3         Q.    $100,000?

4         A.    Yeah.

5         Q.    Provided in cash?

6         A.    Not necessarily to me.

7         Q.    Okay.

8         A.    Yeah.

9         Q.    And did you ever get a check from him?

10        A.    No.

11             MS. OLLILA:  Nothing further.

12                        CROSS-EXAMINATION

13   BY MR. SHEKETOFF:

14        Q.    Good afternoon, sir.  You're a contractor, and one

15   of the things you do is remodel houses, correct?

16        A.    Yeah.

17        Q.    And customers and contractors often have a falling

18   out before the end of any project, correct?

19        A.    Sometimes, yeah.

20        Q.    Well, this is not the first falling out that you

21   had with a customer, correct?

22        A.    That I have?

23        Q.    Yeah.

24        A.    That I know of, yeah.

25        Q.    And he sued you in state court over this project,

1    correct?

2        A.   He tried to, yeah.

3        Q.   What do you mean he tried to?  He brought a lawsuit

4    against you.

5        A.   He brought a lawsuit, but to my knowledge it got

6    dropped.  So there was no -- nothing had become of it except

7    for that it dragged on for three years and that was it.

8        Q.   Okay.  Well, did you hire a lawyer and file an

9    answer?

10       A.   Oh, yeah, yeah.

11       Q.   And what was he claiming in the lawsuit?  Do you

12   remember?

13       A.   He just wanted me to finish a set of stairs and

14   cleaning.  It got really nit-picky, you know, claiming things

15   that I really wasn't responsible for.

16       Q.   So let me see if I understand.  You're telling us

17   that you personally were given over a hundred -- or

18   approximately $100,000 in cash?

19       A.   No.  Alkis tried suing me for $100,000.  He

20   personally did not hand me $100,000 cash.

21       Q.   Okay.  So he brought a lawsuit where he claimed

22   that he had given you $100,000?

23       A.   Exactly.

24       Q.   And he brought it in the New Hampshire state court

25   system?

1       A.    Yeah.  We never went to court so I don't --

2       Q.    Well, you hired a lawyer.

3       A.    Exactly, yeah.

4       Q.    Didn't you tell the private investigator that it

5  had cost you $15,000 in legal fees?

6       A.    Yeah, 12,000.  Yeah.

7       Q.    Right.  So you told him that if he paid in cash you

8  would actually give him a discount, correct?

9       A.    No.  I never said that if you pay me in cash I'll

10  give you a discount.  Everybody is always trying to get a

11  good deal so they wave cash around expecting people to jump.

12            Cash or check to me goes in the same place.  It

13  gets deposited in my banking account and gets spit out at the

14  end of the year to the IRS.  I don't hide anything.

15       Q.    All right.  So it didn't matter to you.  But your

16  testimony is that he thought it mattered to you, correct?

17       A.    No, not at all.  I mean, he was going to pay cash

18  whether I was there or not, you know, whether it was me or

19  somebody else.

20       Q.    And what kind of cash did he pay?  In other words,

21  did you and he drive to the bank, did he go inside, take

22  money out of the bank, and give it to you in cash?

23       A.    No, no.  Nope.

24       Q.    That never happened?

25       A.    Not that I know of.  No, not to my knowledge.  I've

1   never been to the bank, you know, with him before.

2          I received money with bank wraps on it, so I just

3   assumed that things came from the bank.  I can't personally

4   remember going to a bank and withdrawing money.  It's just

5   not something that -- me and him didn't have that kind of

6   relationship.

7          Q.   Okay.  But you remember the bank bands around the

8   money?

9          A.   Right.  That's why I really didn't --

10         Q.   Did they say something like St. Mary's, or do you

11  remember what it was?

12         A.   $10,000.

13         Q.   But did it say the name of the bank on the band?

14         A.   No.  Not that I -- I wasn't looking.

15         Q.   So every time he paid you in cash it was with

16  banded money?

17         A.   I honestly couldn't answer that honestly because I

18  don't recall.  I don't think so.

19         Q.   All right.  Did you ever see any evidence that he

20  was drug dealing?

21         A.   No, no.

22         Q.   Did you ever have any suspicion that he was drug

23  dealing?

24         A.   No.

25         Q.   Was there a time when federal agents or law

1    enforcement agents visited the job site while you were there

2    actually working on the project?

3          A.    No.  Nobody ever came to his personal house to see

4    me there.  They came to my house.

5          Q.    All right.  So there was a point in time -- do you

6    remember when that was?  Was it while you were actually

7    working on the project?

8          A.    Yeah.  I mean, I was working at his house, yeah,

9    and I'm assuming that's why they wanted to talk to me or

10   whatever.

11         Q.    All right.  And you think this was sometime in 2009

12   or 2010 or during the --

13         A.    During the time period that I was working over

14   there.

15         Q.    And the time period -- you think it was the winter.

16   You think it was the winter from 2009 into 2010, or you're

17   just not sure?

18         A.    I honestly don't know.  This is all just being

19   brought up -- it's in the past for me, and I don't really --

20   we did go to court for three years about this, and it has

21   been something that has been over and done with, and I'm here

22   again today.

23         Q.    In a freezing cold courtroom.

24         A.    Yeah.

25         Q.    Did the agents tell you something like, keep

1  working on the house?

2       A.   No, not that I know of.  Keep working -- I don't

3  honestly remember details.  Like I said, it was like four or

4  five years ago.  I know that they had spoke to me.  Word for

5  word what they said, I don't remember.

6       Q.   All right.  Did you tell the homeowner, my client,

7  that law enforcement had come by to talk to you about your

8  work on his house?

9       A.   Not that I remember.

10      Q.   Did they say anything to you about being able to

11 buy the house back when they were done?

12      A.   I don't remember those exact words.  Like I said,

13 it was a long time ago, and I don't remember exact details of

14 conversations that really didn't mean too much to me at the

15 time so I can't pinpoint.

16      Q.   Right.  So he sued you for 100,000.  How much had

17 he actually paid you?

18      A.   Me personally?

19      Q.   Yeah.

20      A.   I honestly would have to just sit here and like add

21 it up in my head.  I mean, like I said, it was a while ago.

22 I know he -- some of the money he paid me didn't

23 necessarily -- wasn't mine.  I did have a couple people that

24 I know that I had gotten in contact with to help out with the

25 project.  So, I mean, money went to them.  The same thing,

1    you know, with a few other people that -- I had brought in

2    some people that I know, and I physically was the one to pay

3    them.

4          Alkis paid me.  I paid them.  So me personally,

5    what I took in through the whole project, or how much cash

6    did he give?  What is it that you want to know exactly?

7          Q.   Fair question.  I'm not asking how much you

8    personally made on the project.  I'm asking you how much

9    cash.

10         A.   He probably paid me maybe 50, $60,000, if I had to

11   just throw a number out there.

12              MR. SHEKETOFF:  Okay.  Thank you.

13                       REDIRECT EXAMINATION

14   BY MS. OLLILA:

15         Q.   Let me follow that up.

16              You were just saying -- and Mr. Sheketoff didn't

17   ask you to explain that -- that Alkis Nakos gave you money

18   for people you had brought to the job site?

19         A.   Right.

20         Q.   So he paid you 50 or $60,000.  How much money did

21   he give to you approximately to pay all those subcontractors

22   who came to the house?

23         A.   I would have to like add up like --

24         Q.   Okay.

25         A.   -- the scope of work that was done there.  I mean,

1    there was a foundation that was supplied, excavating that was

2    supplied, a concrete slab that was supplied, framing

3    materials that were supplied.

4         Q.   Really expensive, right?

5         A.   Yeah, yeah.

6         Q.   So the money -- the cash that went through your

7    hands -- how much cash went through your hands?

8         A.   Oh, like I said, I would have to like sit and --

9    everything -- I don't want to say anything that I don't

10   really know.

11        Q.   Okay.

12        A.   Like his attorney had said before -- we had gone to

13   court about this.  So everything that I would say -- or any

14   numbers, any money, has already been like out in the open.

15        Q.   You got 50 or 60,000 for yourself, correct?

16        A.   No.  Not me.  Like not me personally.  I did the

17   framing.  He paid me 15,000 to do the framing.  I did the

18   floors.  He paid me.

19        Q.   You're doing it in steps; is that correct?

20        A.   Yeah.  Exactly.  Exactly.  Exactly.

21        Q.   Okay.  And so over the winter of 2009, 2010,

22   approximately?

23        A.   Yeah.

24        Q.   It was 50 or $60,000 plus whatever was paid to

25   contractors; is that correct?

1          This is what I want to do.  When law enforcement
2    approached you, did you sit down with law enforcement?
3          A.    When?  Like when I got subpoenaed?
4          Q.    Yes.
5          A.    Yeah, yeah.  We talked.  We talked like outside my
6    house, yeah.
7          Q.    All right.
8          A.    I just threw out numbers at that point.  Now that
9    I'm under oath it's like I don't really -- you know, I don't
10   want to say something that I don't really know a hundred
11   percent sure.
12         Q.    Absolutely.
13         A.    Yeah.
14         Q.    And I hope you don't misunderstand what I'm saying.
15   I only want you to say what you remember.  I don't want you
16   to make up a number.
17         A.    Oh, no.  Definitely I'm not.  That's why I'm
18   hesitant.  He paid me cash for the job.
19         Q.    Okay.
20         A.    It wasn't a ten dollar job.  I know me
21   personally -- I probably made 25 to 30 grand off the project.
22   There was a foundation, plumbing, electrical, other things
23   that I accepted money and personally paid other people -- I
24   accepted money to pay other people to get the project done
25   which totalled about maybe 60,000.  According to the lawsuit,

1    a hundred thousand.  So I don't know.  Do you know what I

2    mean?  I don't know.

3         Q.   Why would he sue you for the recovery of a hundred

4    thousand dollars if he didn't pay you a hundred thousand

5    dollars?

6              MR. SHEKETOFF:  Objection.

7         A.   I'm not sure.

8              MR. SHEKETOFF:  Withdrawn.

9              THE COURT:  All right.  Objection overruled.

10        Q.   In his lawsuit did he seek recovery from you of a

11   hundred thousand dollars?

12        A.   Yes, yes.

13        Q.   As you sit here today, you don't know how much --

14   because you can't add it up, how much he paid you during that

15   period of time?

16        A.   Right.  And it wasn't -- he was trying to come

17   after me for a hundred thousand.  I originally was like, you

18   didn't pay me a hundred thousand, so I naturally fought it or

19   tried to fight it.

20        Q.   What happened to the lawsuit?

21        A.   I don't know.  It just kind of got dropped and it

22   went away, as far as I know.  That was it.

23        Q.   Attorney Sheketoff did bring up that a law

24   enforcement officer spoke to you during that same time frame

25   that you were doing work on Mr. Nakos' house, correct?

1      A.    Yes.

2      Q.    And that law enforcement agent was an FBI agent,

3 correct?

4      A.    Yeah.

5      Q.    And his name was Mark Alford, correct?

6      A.    I don't know.  I don't remember his name.  I know

7 there was a Manchester police officer and a federal somebody,

8 and I couldn't point them out if I saw them today.

9      Q.    Did you become nervous when law enforcement

10 officers had approached you to talk about the person you were

11 doing work for?

12     A.    Not necessarily nervous because at that point, you

13 know, I had already been working on the project for quite a

14 while.

15     Q.    Okay.

16     A.    And obviously whatever was going on is not -- you

17 know what I mean?  As far as I knew, he was straight up.

18     Q.    Did you tell anyone that law enforcement had

19 approached you?

20     A.    Yeah.  I mean, my wife.  They came to my house.  My

21 wife.  I did tell a couple buddies of mine.

22     Q.    Okay.  Did you tell any of the subcontractors who

23 were also on the job?

24     A.    No, no.

25     Q.    Okay.

1          A.   No.

2               MS. OLLILA:  I have nothing further, Judge.

3          Thank you, sir.

4               THE COURT:  All right.  Attorney Sheketoff.

5               MR. SHEKETOFF:  Thank you, Judge.  Very briefly.

6                         RECROSS-EXAMINATION

7     BY MR. SHEKETOFF:

8          Q.   Did the agent, whether it was Mark Alford or

9     somebody else, actually leave you his business card?

10         A.   I don't honestly remember.

11         Q.   Do you remember giving my client that business

12    card?

13         A.   I don't.

14              MR. SHEKETOFF:  Thank you.

15              THE COURT:  Are you done?

16              MS. OLLILA:  Thank you, Mr. Givens.

17              THE COURT:  Mr. Givens, you may be excused, sir.

18              We're going to do something about the temp in here,

19    but unfortunately we didn't get to it.

20              MS. OLLILA:  May I proceed, Judge?

21              THE COURT:  Yes.

22              MS. OLLILA:  The United States calls Officer Thomas

23    Whelan.

24                         THOMAS WHELAN

25              having been duly sworn, testified as follows:

1          THE CLERK:  For the record, could you please state

2     your name and spell your last name.

3          THE WITNESS:  First name is Thomas.  Last name is

4     Whelan, W-H-E-L-A-N.

5          THE CLERK:  Thank you.

6                         DIRECT EXAMINATION

7     BY MS. OLLILA:

8        Q.   Good afternoon, sir.

9        A.   Good afternoon.

10       Q.   How are you employed?

11       A.   Manchester Police Department.

12       Q.   How long have you been with the Manchester Police

13    Department?

14       A.   I've been on the job since 2005.

15       Q.   And generally what do you do?

16       A.   Patrol.

17       Q.   Were you working on patrol on August 3, 2012?

18       A.   I was.

19       Q.   And were you asked to respond to a residence for a

20    report of a burglary?

21       A.   I was.

22       Q.   Was that residence 366 Arah Street in Manchester,

23    New Hampshire?

24       A.   That's correct.

25       Q.   And did you respond to that location?

1          A.    I did.

2          Q.    Who did you meet?

3          A.    Mr. Alkis Nakos who lived there.

4          Q.    When you answered, you sort of pointed with your

5    right hand over to your left.  Do you see Mr. Nakos in the

6    courtroom today?

7          A.    I believe that's him at the defense table.  His

8    appearance has changed a little bit but --

9          Q.    How has his appearance changed a little bit?

10         A.    He has a beard and his hair is a lot longer.

11         Q.    What did it look like when you saw him in 2012?

12         A.    He had short hair.  I believe it was shaved.

13         Q.    Did he have any facial hair?

14         A.    I don't believe he did.

15               MS. OLLILA:  May the record reflect that the

16   witness has identified the defendant, Alkis Nakos?

17               THE COURT:  Yes.

18         Q.    When you got there, did you speak to Mr. Nakos?

19         A.    I did.

20         Q.    And did he report a burglary?

21         A.    He did.

22         Q.    And what did he say to you?

23         A.    He told me that he arrived home at around 4:30 that

24   afternoon and discovered his back door was open.

25         Q.    Did he indicate that there are a number of items

1    that were missing?

2         A.    He did.

3         Q.    And did you take a report of the items that he

4    relayed to you that had been taken?

5         A.    I did.

6         Q.    Did he provide you receipts for those items that

7    had been taken?

8         A.    Yeah.   I believe he had an appraisal of some of the

9    items.

10        Q.    Do you recall what those items were?

11        A.    Yes.

12        Q.    What were those items?

13        A.    He reported -- and I may need to reflect on my

14   report.

15        Q.    Did you write a report after you left?

16        A.    I did.

17        Q.    And would that report help to refresh your

18   recollection as to what Mr. Nakos claimed had been taken and

19   the dollar values of what he claimed had been taken?

20        A.    Yes, it would.

21             MS. OLLILA:   Your Honor, I'm showing the witness

22   44a for identification.

23        Q.    Officer Whelan, I would ask that you refer to the

24   last page, and let the Court know if that refreshes your

25   recollection about what Mr. Nakos reported was taken.

1    A.    Yes.

2    Q.    And what did he report had been taken?

3    A.    He reported one triple row diamond channel ring

4 valued at $4,255.

5    Q.    What else?

6    A.    One Franco link 14 karat white gold necklace valued

7 at $9,909.

8    Q.    What else?

9    A.    One diamond Jesus head 14 karat white gold

10 medallion valued at $7,105.

11    Q.    What else?

12    A.    And one Rolex watch valued at $9,000.

13    Q.    I'm not asking you to get these numbers exactly

14 correct, but can you do some math as you're sitting there and

15 tell the jury what the total dollar value of those items of

16 jewelry would be approximately?

17    A.    It was right around $30,000 approximately.

18    Q.    Did he report anything else taken?  Any alcohol

19 taken from his house?

20    A.    He did.  He reported that a bottle of Cristal

21 champagne valued at $200 was taken as well from the kitchen.

22    Q.    Have you ever had Cristal champagne?

23    A.    No, I haven't.

24    Q.    Would your wife ever allow you to buy that?

25          MR. SHEKETOFF:  Objection, your Honor.

1          THE COURT:  Overruled.  Go ahead.

2     A.   Probably not.

3     Q.   What else was taken, if anything?

4     A.   I think he also reported that a PlayStation was

5 removed from his bedroom and some other items in his bedroom,

6 a camera and some money from -- some euro from Greece.

7          MS. OLLILA:  I have nothing further for this

8 witness.

9          THE COURT:  Attorney Sheketoff.

10                    CROSS-EXAMINATION

11 BY MR. SHEKETOFF:

12     Q.   So if you come home and you find that your house

13 has been broken into, what is the recommended course of

14 action?  To call the police?

15     A.   Correct.

16     Q.   And he called the police, and you got some radio

17 call and you responded?

18     A.   Essentially.

19     Q.   Okay.  And you had complete access to the home?

20     A.   Did I?

21     Q.   Yeah.

22     A.   I was inside the home, yeah, with him.

23     Q.   Okay.  So I guess I'm -- did you at some point tell

24 him that detectives were going to come and try and take

25 prints?

1      A.    Yes.

2      Q.    So when a burglary occurs basically the whole home

3 is the scene of the crime, correct?

4      A.    Yeah, you could say that.

5      Q.    And so you got to -- you or fellow officers or

6 detectives got to go into the bedrooms, into various areas of

7 the house and look around, correct?

8      A.    Correct.

9      Q.    To see if there was any evidence.

10           These were his estimates of what the jewelry was

11 worth, or he actually had some appraisal that somebody else

12 had done and gave you a copy of that appraisal?

13     A.    I believe he had an appraisal.  To the best of my

14 recollection, he had appraisals for the jewelry.

15     Q.    Okay.  So he told you what was missing.  He showed

16 you some sort of appraisal from somebody as to the jewelry,

17 correct?

18     A.    Yes.

19           MR. SHEKETOFF:  All right.  Thank you.

20           MS. OLLILA:  Nothing further.

21           THE COURT:  Mr. Whelan, you're excused.  Thank you,

22 sir.

23           You may call your next witness.

24           MS. OLLILA:  Officer Stefan Czyzowski.

25                    STEFAN CZYZOWSKI

1          having been duly sworn, testified as follows:

2          THE CLERK:  For the record, please state your name

3    and spell your last name.

4          THE WITNESS:  Stefan Czyzowski, C-Z-Y-Z-O-W-S-K-I.

5                       DIRECT EXAMINATION

6    BY MS. OLLILA:

7          Q.   Good afternoon, sir.

8          A.   Good afternoon.

9          Q.   How are you employed?

10         A.   With the New Hampshire Department of Safety,

11   Division of State Police, as a state trooper.

12         Q.   How long have you been a state trooper with the New

13   Hampshire State Police?

14         A.   Since August 2006.

15         Q.   Generally, what are your duties as a member of the

16   New Hampshire State Police?

17         A.   I'm currently a patrol trooper out of Troop B in

18   Hillsborough County.

19         Q.   What does that mean?  What area do you cover?

20         A.   All of Hillsborough County.  Mainly the highways of

21   93, Route 293, 101, and the Everett Turnpike.

22         Q.   And what are you tasked with doing?

23         A.   Enforcing motor vehicle laws, criminal laws,

24   responding and investigating accidents and responding to

25   emergency calls in the county areas, places that don't have

1  police departments.

2       Q.   When individuals like yourself are troopers -- are

3  you ever loaned out to other law enforcement agencies to

4  be -- to participate in things called gang task forces?

5       A.   Yes.

6       Q.   Have you ever done anything like that?

7       A.   Yes.

8       Q.   When did you do that?

9       A.   In 2012 and 2013 I was assigned to the Manchester

10 Police Department Street Crimes Unit.

11      Q.   Why?

12      A.   We had a partnership in cooperation with them.

13 Since Officer Michael Briggs was killed, they were asking

14 basically for help.  So they would take a few troopers, take

15 a few I think sheriffs at that time, and partner them up with

16 Manchester police officers to kind of take back crime in the

17 city.

18      Q.   Were you acting as a New Hampshire State Police

19 trooper on March 17, 2014?

20      A.   Yes.

21      Q.   Were you in a marked car?

22      A.   Yes, I was.

23      Q.   Did you have a uniform on just like you do today?

24      A.   Yes, I did.

25      Q.   Where were you located at approximately 6:30 p.m.?

1        A.    On the Everett Turnpike.

2        Q.    What happened?

3        A.    I was on patrol in the area of Exit 7.  I was

4    assigned to an extra duty detail of traffic enforcement

5    because it was the holiday.  Being March 17th, they

6    oftentimes will have extra four-hour or five-hour details

7    where they will have troopers go and be proactive, go stop

8    cars, try to slow down the public, be seen, respond to

9    accidents, and be that extra patrol.

10            I was assigned to one of those.  I was nearing the

11   end of that shift and I was traveling on the Everett Turnpike

12   southbound in the city of Nashua.

13       Q.    Did you see a motor vehicle?

14       A.    I did.

15       Q.    Did that motor vehicle engage in an infraction?

16       A.    It did.  It was a black Mercedes sedan.

17       Q.    Do you run registration checks when you look at a

18   plate?

19       A.    Yes.

20       Q.    Did you do that?

21       A.    Yes.

22       Q.    Who was it registered to?

23       A.    Alkis Nakos.

24       Q.    Do you see Alkis Nakos in the courtroom today?

25       A.    Yes, I do.

1      Q.    And could you please point to him and describe an

2   article of clothing he's wearing?

3      A.    He's seated at the defense table wearing a dark

4   sports coat with a blue shirt, striped tie, and he has a

5   beard.

6            MS. OLLILA:  May the record reflect the witness has

7   identified the defendant, Alkis Nakos?

8            THE COURT:  Yes.

9      Q.    Did he look the same on March 17, 2014, as he does

10  today?

11     A.    He had a beard.  I think his hair was shorter

12  though.

13     Q.    Okay.  So you saw that the -- what kind of Mercedes

14  was it?

15     A.    It was a E350 black sedan, brand-new.

16     Q.    What did you do?

17     A.    When I was behind it, I observed that it was

18  following another vehicle closely.

19     Q.    Did you know anything at all about the name Alkis

20  Nakos at the time you pulled the motor vehicle over?

21     A.    No.

22     Q.    Did you have any knowledge at all that the

23  Narcotics Investigation Unit of the New Hampshire State

24  Police were up on a wire in a case involving him?

25     A.    No.

1      Q.   Is that something that you would know as a trooper?

2  Would you know what the Narcotics Investigation Unit was

3  doing?

4      A.   Very unlikely.

5      Q.   Why is that unlikely?

6      A.   Because they have these investigations that they

7  have to keep secretive.  We don't generally see the narcotics

8  guys very often.  I'll see them being on the SWAT team

9  because if we have to serve a warrant maybe they will come in

10  and inform us of what we're about to do.  Other than that, we

11  don't really deal with them.  They have a separate area,

12  separate car.  Everything is separate.

13      Q.   Is it because they have to remain secret?

14      A.   Yes.

15      Q.   So even though you're part of them, part of the

16  same brotherhood, you don't know what they do?

17      A.   Correct.

18      Q.   What happened when you stopped the brand-new black

19  Mercedes?  What did you do?

20      A.   I pulled him over right in the area of Exit 6.

21  There were two people in the car.  Alkis was driving.

22  Christopher Ranfos was in the passenger seat.

23      When I went up to the car I approached it on the

24  passenger side, and I did that for my safety because what

25  oftentimes people will see is that cruisers are getting hit,

1   and it's very dangerous for us to walk up on the driver's

2   side of a car.

3       Q.   So you walked up to the passenger side?

4       A.   Yes.

5       Q.   And was the window of the passenger side open or

6   closed?

7       A.   It was open.

8       Q.   And how far open?

9       A.   All the way down.

10      Q.   Was anything -- could you see anything coming out

11  the window?

12      A.   The passenger, Christopher Ranfos, already had his

13  ID out and was handing it to me.

14      Q.   Did you find something unusual about that?

15      A.   Yes.

16           MR. SHEKETOFF:  Objection, your Honor.

17           THE COURT:  What's the relevance?

18           MR. SHEKETOFF:  Relevance.

19           THE COURT:  What's the relevance?

20           MS. OLLILA:  It goes to show that

21  co-conspirators -- why they're trying to hide what they're

22  doing, Judge.

23           THE COURT:  Overruled.

24      Q.   Go ahead.

25      A.   Yes, it was unusual.  In over nine years of doing

1    this, this has never happened before.  I've never had a

2    passenger already have their ID out before I would ask for it

3    or anything like that.

4        Q.    Do you typically ask passengers for identification?

5        A.    Not always.  You know, occasionally if I see the

6    passenger -- that maybe there's a bottle of alcohol in the

7    back seat and the passenger looks like they're 18 years old,

8    maybe I'll ask for their ID.  If they're not wearing their

9    seatbelt and they look under 18 years old, maybe I'll ask for

10   their ID.  Something along those lines.

11       Q.    So Mr. Ranfos, Christopher Ranfos, already had his

12   ID out for you?

13       A.    Yes.

14       Q.    Then what happened?

15       A.    So I gathered the information for the stop and I

16   went back to my cruiser.

17       Q.    Did you get the driver's license of the driver,

18   Alkis Nakos?

19       A.    Yes.

20       Q.    Did it show his address?

21       A.    It did.  I don't remember what the address was.  I

22   know that he gave me his registration as well.

23       Q.    Do you remember the address on the registration?

24       A.    It was Pine Street in Manchester.

25       Q.    Pine Street in Manchester?

1          A.    Yes.

2          Q.    Do you know anything about Pine Street in

3    Manchester?

4          A.    Yes, I do.  I'm very familiar with it when I was on

5    the Street Crimes Unit.

6               MR. SHEKETOFF:  Objection.

7               THE COURT:  Objection on the floor.  Just a moment,

8    officer.

9               MR. SHEKETOFF:  Well, he's answered the question

10   that was put, your Honor.  He's offering more now.  Do you

11   know anything about Pine Street?  Yes.  I would like to hear

12   the next question.

13         Q.    All right.  When you went back to your motor

14   vehicle, what did you do?

15         A.    I conducted a motor vehicle query using our

16   computer and dispatch to run Alkis Nakos and Christopher

17   Ranfos.

18         Q.    And did you see anything?

19         A.    Yes.  The dispatcher informed me that Christopher

20   Ranfos had a non-extraditable warrant out of Florida for

21   dangerous drugs.

22         Q.    Then what did you do when you saw that?

23         A.    I inquired further with some of my contacts with

24   the Manchester Police Department.

25         Q.    Okay.  So you're in your car.  You had a record

1   check run on Christopher Ranfos and Alkis Nakos, correct?

2       A.   Yes.

3       Q.   And you saw that Mr. Ranfos had a non-extraditable

4   warrant out of Florida; is that correct?

5       A.   Yes.

6       Q.   And you said you called someone in law enforcement?

7   Why would you do that?

8           MR. SHEKETOFF:  Objection.  Relevance.

9           THE COURT:  Overruled.

10      A.   We oftentimes use this networking to solve a lot of

11  crimes.  Guys will talk to other guys from different parts of

12  the state and maybe it will ring a bell from something that

13  happened before and say, oh, yeah, that guy, you know, was

14  seen robbing this house.  I think he may be tied in to this.

15  It's a big network.

16      Q.   Who did you call?

17      A.   Officer Mike Donahue from the Manchester Police

18  Department.

19      Q.   And what did Mike Donahue say with respect to Alkis

20  Nakos?

21          MR. SHEKETOFF:  Objection.

22          MS. OLLILA:  Not offered for the truth of the

23  matter asserted.

24          THE COURT:  What's it offered for, briefly?

25          MS. OLLILA:  To show the reaction of this law

1    enforcement officer, what he did next.

2         MR. SHEKETOFF:  Well, he did what he did.

3         THE COURT:  Overruled.  Go ahead.

4    Q.   Go ahead.

5    A.   So I called Mike and I said, Mike, I've got these

6    two guys stopped.  I'm going to run some names by you and see

7    if they ring a bell, because I don't want to get involved

8    with anything that maybe something was going on, or if they

9    have any light to shed on these two individuals.  It's the

10   networking.

11        So as soon as I told him the two names, Mike said,

12   you're joking, and I said, no, I'm not joking.  Why would I

13   be joking?  And he says, we're running surveillance on these

14   guys right now.  You need to call your narcotics unit right

15   now.

16   Q.   Did you call the narcotics unit?

17   A.   Yes.

18   Q.   Who did you speak to?

19   A.   Retired Sergeant Robert LaFoley.

20   Q.   Do you know who took Sergeant LaFoley's position as

21   the sergeant in NIU?

22   A.   I believe Sergeant Norris did.

23   Q.   And that's James Norris who's seated at counsel

24   table?

25   A.   Yes.

1      Q.    Was he also in NIU at the time?

2      A.    Yes.

3      Q.    So when you spoke to Sergeant LaFoley, did you run

4   those names by Sergeant LaFoley?

5      A.    Yes.

6      Q.    And did he give you instructions on what to do?

7      A.    He said that he was going to be contacting the U.S.

8   Attorney's Office, and he says, play the stop out as if you

9   had never talked to me.  Just continue your stop as if we

10  hadn't spoken and do what you need to do, and I'll get back

11  in touch with you.

12     Q.    Do you know if he contacted the U.S. Attorney's

13  Office?

14          MR. SHEKETOFF:  Objection.

15     A.    Yes.

16          THE COURT:  Sustained.

17     Q.    Okay.  What did you do?  He said, play it out as if

18  we never spoke, right?

19     A.    Right.

20     Q.    Play out the motor vehicle stop, correct?

21     A.    Correct.

22     Q.    And what did you do then?

23     A.    So at that point I went back to the car and I asked

24  to speak to Christopher Ranfos outside the car, and he did,

25  he got out, and I spoke with him about his warrant, about his

1    drug history, and I continued the stop from there.

2         Q.   And then what happened?

3         A.   When he had gotten out, I noticed that he had two

4    big bulges in each pocket.  For my safety, I didn't know what

5    these bulges were, so I conducted a pat-frisk, patted the

6    outside of his pockets.

7              As soon as I touched the pockets, I immediately

8    recognized his pockets contained a large amount of cash.

9    It's a different feeling you have.  After doing this for a

10   long time you can feel whether it's a cell phone, whether

11   it's a gun, whether it's a wad of cash, or something that you

12   can articulate pretty quickly.  So I immediately recognized

13   it was a large amount of cash.

14             I asked him how much cash he had, and he told me he

15   had a few thousand.  Two to three.  I asked him if I could

16   see the cash.  He was a little hesitant at first, and when he

17   removed the stack of cash, it was bound together with elastic

18   bands, and there were $100 bills and $20 bills.

19        Q.   Then what did you do?

20        A.   I asked him about the other pocket, and he told me

21   that it was again more cash, two or three thousand, but he

22   did not want to show me how much he had.

23        Q.   Then what happened?

24        A.   I asked him what he did for work, and he said that

25   he saves and that he does HVAC.

1       Q.    Where is Alkis Nakos at this time?

2       A.    Still in the driver's seat.

3       Q.    What happened then?

4       A.    So I asked Mr. Ranfos about his warrant and the

5  drug history, and he told me it was for the sale of a quarter

6  of a pound of marijuana back in Florida.  He was very calm.

7  He indicated he had no intention of going back to Florida,

8  and that he didn't really care about it.

9       Q.    At some point in time did you then speak to Alkis

10 Nakos, the driver of the Mercedes?

11      A.    Yes.

12      Q.    What happened when you spoke to him?  What did he

13 say?

14      A.    I spoke to him outside the car.  At first when I

15 spoke to him he didn't really want to get out of the car, and

16 I told him he didn't have to get out but that I wanted to

17 speak with him for safety reasons.  He's still in the car and

18 I'm standing on the side of the road near the travel portion

19 of the lane.  So he says, for you I'll get out.  So he did.

20      Q.    How was his attitude toward you?

21      A.    Very calm.

22      Q.    Okay.

23      A.    He got out of the car, and I spoke with him about

24 knowledge of Christopher Ranfos' warrant, or how he knew him

25 and all of that.  Tried to figure out does he know that the

 1   passenger in this car has a warrant for dangerous drugs out

 2   of Florida.

 3        Q.   Let me ask you this.  At some point in time did you

 4   do a pat-frisk of Alkis Nakos in order to determine whether

 5   he had any currency on him?

 6        A.   Yes.  When he had exited the car, we walked back to

 7   the rear.  Same thing.  He had bulges in both of his pockets.

 8        Q.   Did you ask him about it?

 9        A.   I did.

10        Q.   And what did he say?

11        A.   Cash.  Same thing.  2,000.

12        Q.   And what was your response?

13        A.   I asked him what he was doing for work, and where

14   he was going, and why he had so much money with him.

15        Q.   Did he say what he did for work?

16        A.   He said he worked at his father's pizza restaurant

17   in Manchester.

18        Q.   And what happened?  At some point in time did you

19   call a canine to the scene?

20        A.   Yes.  After I asked for consent to search the car.

21             MR. SHEKETOFF:  Objection, your Honor.  Can we see

22   you at sidebar?

23             THE COURT:  Yeah.  Come on up.

24             We're close to our lunch break so I'll check in

25   with counsel about that issue as well.

1              (SIDEBAR)

2              MR. SHEKETOFF:  I think his refusal to give consent

3    is not admissible evidence against him.  She gave a very

4    leading question to try and avoid it, but he wants to

5    volunteer it, which is what he started to do.

6              THE COURT:  Let me just look at it again.  The

7    testimony thus far is that he called a canine to the car.

8              MS. OLLILA:  Right.

9              THE COURT:  After he had asked him for consent to

10   search.

11             MS. OLLILA:  Right.  That's it.

12             MR. SHEKETOFF:  I was afraid of where he was going.

13             THE COURT:  At this point there's nothing yet, but

14   I appreciate the objection.  See if you can guide him.

15             MS. OLLILA:  Of course.  And I did not -- I am not

16   going to ask anymore questions about consent.  I'm going to

17   ask about the canine search.

18             MR. SHEKETOFF:  I concede she was trying to lead

19   him away from this, but I thought he was going to volunteer

20   it.

21             THE COURT:  I can see why with respect to this

22   witness.  We'll take a break for lunch before you cross.

23             Are you almost done with him?

24             MS. OLLILA:  Maybe five more minutes.  Maybe.

25             THE COURT:  All right.  Good.

1          (CONCLUSION OF SIDEBAR)

2          THE COURT:  Another five minutes or so Attorney

3    Ollila has with Trooper Czyzowski, and then we'll break for

4    lunch and have cross-examination.

5      Q.    Trooper Czyzowski, did a canine unit respond to the

6    area?

7      A.    Yes, it did.

8      Q.    Was the canine walked around the vehicle?

9      A.    Yes.

10     Q.    Did it have a positive alert?

11     A.    Yes.

12     Q.    Was a search warrant obtained on the vehicle?

13     A.    Yes.

14     Q.    What happened to Alkis Nakos and Christopher

15   Ranfos?  Were they able to walk away?

16     A.    Yes.

17     Q.    Did they walk off the highway?

18     A.    Yes.

19     Q.    Did you execute the search warrant?

20     A.    Yes.

21     Q.    At some point in time did law enforcement follow

22   Mr. Nakos and Mr. Ranfos and take anything from them?

23     A.    The night of the stop?

24     Q.    Yes.  What did law enforcement get?

25          MR. SHEKETOFF:  Objection.

```
 1                 THE COURT:  Relevance.
 2                 MR. SHEKETOFF:  No personal knowledge.
 3                 THE COURT:  All right.  Foundation then.
 4          Q.    Let me ask you this.  When you took the
 5     currency when you saw the currency, did you later see that
 6     same amount of currency that had been on Mr. Ranfos and Mr.
 7     Nakos?
 8          A.    Yes.
 9          Q.    Did you count it?
10          A.    Yes.
11          Q.    So you saw it in your hand?
12          A.    Yes.
13          Q.    How much currency did Mr. Ranfos have on him?
14          A.    I don't remember the breakdown.  I remember the
15     total of everything that we seized.
16          Q.    Okay.  Now, before I help to refresh your
17     recollection about the total and the amounts, do you remember
18     with respect to the money received from Alkis Nakos whether
19     there was any Canadian currency in it?
20          A.    Yes, there was.
21          Q.    Was there Canadian currency?
22          A.    Yes.
23                 MS. OLLILA:  May I have a moment, Judge?
24                 THE COURT:  Yes.
25          Q.    Did you prepare reports for this case, sir?
```

1          A.    Yes.

2          Q.    And if you reviewed your report, would that help to

3     refresh your recollection about how much money was seized?

4          A.    Yes.

5          Q.    Oh.  In fact, do you have your report with you?

6          A.    Yes.

7          Q.    You could have made this a lot easier.  Why don't

8     you refer to your report.

9                (Witness does so.)

10         A.    Do you want the total money seized out of the

11    vehicle or --

12         Q.    Just from both individuals.  How much money was

13    taken from Alkis Nakos?

14               MR. SHEKETOFF:  Well, if it calls for personal

15    knowledge, I have no problem.

16         Q.    Do you have personal knowledge, and did you count

17    that money yourself?

18         A.    Yes.

19         Q.    Okay.  How much money was taken?

20         A.    From Christopher Ranfos it was $9,451.  From Mr.

21    Nakos there was $6,471 the night of the stop.

22         Q.    Say again.

23         A.    That was the night of the stop.

24         Q.    And was there more currency recovered when there

25    was a search warrant executed on the vehicle?

1          A.    Yes.

2                MR. SHEKETOFF:  Objection.

3                THE COURT:  Does he know?

4          Q.    Do you know?

5          A.    Yes.

6          Q.    What additional amount of currency was seized?

7          A.    From the car there were two different wallets that

8     were indicated from Mr. Nakos.  One was $895.  One was $700.

9     Then there was 1,065 euros, which was at the time equivalent

10    to $1,480, 20 Canadian currency which was equivalent to

11    $17.80, and then $100 in Mr. Ranfos' wallet.

12         Q.    So generally about $9,451 from Christopher Ranfos.

13               And what would be the total taken from Alkis Nakos?

14    Was it approximately the same, right around $9,000?

15    Something less?

16         A.    It was the 6,000, and then plus a few thousand.

17               MS. OLLILA:  Nothing further of this witness,

18    Judge.

19               THE COURT:  All right.  We're going to take our

20    lunch break, and it's going to be a 40-minute lunch break,

21    thereabouts, and then we'll be back with cross-examination.

22               (RECESS)

23

24

25

1                      C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate

6    transcription of the within proceedings, to the best of

7    my knowledge, skill, ability and belief.

8

9

10   Submitted: 3-31-16

     **SUSAN M. BATEMAN, LCR, RPR, CRR**
11   LICENSED COURT REPORTER, NO. 34
     STATE OF NEW HAMPSHIRE
12

13

14

15

16

17

18

19

20

21

22

23

24

25