UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * *
                                *
UNITED STATES OF AMERICA        *
                                *   14-CR-93-01-LM
         v.                     *   August 24, 2015
                                *   1:20 p.m.
     ALKIS NAKOS                *
                                *
* * * * * * * * * * * * * * * * *


TRANSCRIPT OF JURY TRIAL
DAY FIVE - AFTERNOON SESSION
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY


APPEARANCES:


For the Government:      Terry L. Ollila, AUSA
                         U.S. Attorney's Office




For the Defendant:       Robert L. Sheketoff, Esq.
                         Law Office of Robert L. Sheketoff




Court Reporter:          Susan M. Bateman, LCR, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

I N D E X

WITNESSES:          Direct       Cross       Redirect       Recross

DAVID SWEENEY:

(Transcribed previously under separate cover)


ALLISON OUELLETTE:

By Ms. Ollila       3
By Mr. Sheketoff                7


STEVEN PUOPOLO:

By Ms. Ollila      14
By Mr. Sheketoff               19


ERIC PICHE:

By Ms. Ollila      35                          60
By Mr. Sheketoff               53                          61


EXHIBITS:                                    FOR ID     IN EVD

Government's Exhibit Nos. 51h-51l                        32
Government's Exhibit No. 60b                             38
Government's Exhibit No. 60j                             40
Government's Exhibit No. 60p                             50

<pre>
 1                    P R O C E E D I N G S
 2           (Testimony of David Sweeney transcribed previously
 3      under separate cover)
 4           THE COURT:  All right.  Mr. Sweeney, you may step
 5      down.
 6           Government, call your next witness.
 7           MS. OLLILA:  The United States calls Allison
 8      Ouellette.
 9                      ALLISON OUELLETTE
10           having been duly sworn, testified as follows:
11           THE CLERK:  For the record, would you please state
12      your name and spell your last name.
13           THE WITNESS:  Allison Ouellette, O-U-E-L-L-E-T-T-E.
14                      DIRECT EXAMINATION
15      BY MS. OLLILA:
16        Q.   Good afternoon, Ms. Ouellette.  I am very sorry
17      that you have to be here today.  Let me ask you to pull up in
18      your chair as much as possible and try to speak loudly.
19      Would you like some water?
20        A.   No, thank you.
21        Q.   Okay.  Do you know Alkis Nakos, Ms. Ouellette?
22        A.   I do.
23        Q.   Do you see him in the courtroom today?
24        A.   I do.
25        Q.   Could you please point to him and describe an
</pre>

1    article of clothing that he's wearing?

2         A.   He's seated over there with the red and gray tie

3    on.

4              MS. OLLILA:  May the record reflect that the

5    witness has identified the defendant, Alkis Nakos?

6              THE COURT:  Yes.

7         A.   I'm sorry.

8              (Witness crying)

9         Q.   How do you know Alkis Nakos, Ms. Ouellette?

10        A.   I've known him since I was 15.

11        Q.   Were you with him for a period of your life, Ms.

12   Ouellette?

13        A.   Yes.

14        Q.   Did you stay with him while he was in prison?

15        A.   We were friends, yes.

16        Q.   Were you with him after he was released?

17        A.   Yes.

18        Q.   Did you live with him for a period of time?

19        A.   Yes.

20        Q.   Where did you live?

21        A.   We lived at Pine Street together in separate units

22   and we lived together at Washington Park, and then we bought

23   a home together at 366 Arah Street.

24        Q.   How long did you stay with Mr. Nakos?

25        A.   I don't know the exact time frame.  Four or five

years.

Q.   Do you recall when you two parted ways?

A.   I moved out in November of 2009.

Q.   Why did you move out?

A.   Our relationship just wasn't going any further.

Q.   Do you know someone by the name of Mike Leventis?

A.   Yes.

Q.   How do you know Mr. Leventis?

A.   I met him a couple times.

Q.   Where did you meet him a couple times?

A.   I went to Canada with Alkis a few times.

Q.   How many times is a few times?

A.   I don't know exactly.  Maybe four or five.

Q.   Okay.  And you -- where did you go with Mr. Nakos?

A.   We went -- we would go to dinner.  We went to a
hockey game or a sporting event.

Q.   When you saw Mike Leventis on the four or five
times you saw him, was it always in Canada?

A.   I believe so, yes.

Q.   Did you ever -- if you remember, Ms. Ouellette, you
may not remember -- did you ever see Mike Leventis in New
Hampshire?

A.   I don't recall, no.

Q.   Do you know Mr. Leventis's heritage?

A.   I don't.

1    Q.   His nationality, what language did he speak?

2    A.   I believe he was Greek.

3    Q.   Okay.  Did you ever hear Mr. Nakos speak Greek to

4  Mr. Leventis?

5    A.   I don't know if it was him or not.

6    Q.   Okay.  When you were in Canada with Alkis Nakos and

7  Mr. Leventis was there, would they speak English?

8    A.   Yes.

9    Q.   Did they ever speak Greek in Canada?

10    A.   Not that I remember, no.

11    Q.   Okay.  You said that you left in November of 2009;

12  is that correct?

13    A.   (Nods affirmatively.)

14    Q.   Before you left did you ever know Alkis Nakos to

15  gamble?

16    A.   I wouldn't call him a gambler, no.

17    Q.   Did you ever know him to win money?

18    A.   A couple times we went to Foxwoods.

19    Q.   Okay.  And how much money would he win?

20    A.   Not very much.  A couple thousand.  He put a $20

21  bill in once and got 1300, so it's not like -- it wasn't

22  large amounts.

23    Q.   So you've known Mr. Nakos for a very long time,

24  correct?

25    A.   (Nods affirmatively.)

1      Q.   Now, in the 2000s, maybe 2008, 2009, when you were

2   with him, Amory Street Pizza actually sold pizza, right?

3      A.   Uh-huh.

4      Q.   And you were there, right?

5      A.   Yes.

6      Q.   And they had food there, right?

7      A.   Yes.

8      Q.   After you and Mr. Nakos parted ways did you know

9   much about what happened in his life?

10      A.   No.

11      Q.   Did you stay in contact with him much?

12      A.   Occasionally if there was a piece of mail or if we

13   had a question, we would talk.

14      Q.   Did you know anything about money he had?

15      A.   No.

16      Q.   Did you ever talk about money together when you

17   were together?

18      A.   No.

19      Q.   Did you keep your financial affairs separate?

20      A.   Yes.

21           MS. OLLILA:  Nothing further, Judge.

22           THE COURT:  Anything, Attorney Sheketoff?

23           MR. SHEKETOFF:  Thank you, your Honor.

24                      CROSS-EXAMINATION

25   BY MR. SHEKETOFF:

1      Q.   Good afternoon.  It's fair to say that you still
2  have great affection for him, correct?
3      A.   Yes.
4      Q.   The thought of being used as a witness against him
5  is very difficult for you, correct?
6      A.   Yes.
7      Q.   During the course of your relationship with him you
8  had a good relationship, correct?
9      A.   Yes.
10      Q.   You felt that he was honest with you, correct?
11      A.   Yes.
12      Q.   Did you ever see anything that he did that made you
13  suspect that he was involved in an ongoing drug organization
14  or drug business?
15      A.   No.
16      Q.   At some point after living together in two separate
17  places you guys decided to buy a house, correct?
18      A.   Yes.
19      Q.   And it was at Arah Street?
20      A.   Yes.
21      Q.   Was that a no-money-down purchase?
22      A.   We did not put any money down.
23      Q.   You had to take out a mortgage?
24      A.   Correct.
25      Q.   Now, at the time what were you doing for a living?

1      A.   I was a district manager for General Nutrition

2 Center, known as GNC.

3      Q.   And as a district manager, what were your

4 responsibilities?

5      A.   I had to oversee multiple stores, cash audits,

6 merchandise, managers, basically making sure that those

7 stores ran to the best of their ability.

8      Q.   All right.  And what was your educational

9 background?

10      A.   I graduated high school.

11      Q.   All right.  Now, what do you do today?

12      A.   I'm a personal banker at a financial institution.

13      Q.   And since graduating high school -- what year did

14 you graduate high school?

15      A.   '97.

16      Q.   Since then you've been gainfully employed?

17      A.   Yes.

18      Q.   Do you have any criminal record of any kind?

19      A.   Absolutely not.

20      Q.   Were you caught for speeding?

21      A.   I'm sorry?

22      Q.   Were you ever caught for speeding?

23      A.   Yes.

24      Q.   How about following too closely?  Just kidding.

25      A.   Sorry.  (Laughing.)

1          Q.    So you put your name on the mortgage, too?

2          A.    Yes.

3          Q.    And who was the bank that gave you guys the

4    mortgage?

5          A.    I have no idea.

6          Q.    You don't remember?

7          A.    That was so long ago.

8          Q.    How big was the house?

9          A.    Three bedrooms.

10         Q.    What would you say in square feet, 2,000, 4,000,

11   6,000?

12         A.    No.  Under 1500, I believe.

13         Q.    And was it beautifully furnished?

14         A.    No.

15         Q.    On several occasions you recall going to Canada and

16   meeting someone by the name of Mike Leventis, correct?

17         A.    Yes.

18         Q.    And you would meet him and you would go to dinner,

19   you would go to hockey games or other sporting events and

20   things of that nature, correct?

21         A.    Yes.

22         Q.    Ever hear any conversation between him and my

23   client about drugs?

24         A.    No.

25         Q.    Did they ever leave you and have private

1    conversations?

2         A.    Not to my knowledge.

3         Q.    And how did you guys enter Canada on those

4    occasions?

5         A.    Through the border.

6         Q.    With a passport?

7         A.    Correct.

8         Q.    Together?

9         A.    Uh-huh.

10        Q.    Would you drive or would you fly?

11        A.    Drive.

12        Q.    All right.  During 2008 and 2009, to the best of

13   your knowledge he was working at the pizza shop, correct?

14        A.    Correct.

15        Q.    You knew his dad.  It was his business, correct?

16        A.    Correct.

17        Q.    You knew his mom?

18        A.    Yes.

19        Q.    She did not work at that business?

20        A.    No.

21        Q.    Do you know what she did?

22        A.    Nope.

23        Q.    Did she approve of you even though you weren't

24   Greek?

25        A.    In the very beginning of our friendship there was

1  some turmoil, but that was over 15 years ago.

2      Q.   Did you ever eat at the pizza shop?

3      A.   Yes.

4      Q.   Did he ever cook at the pizza shop?

5      A.   Yes.

6      Q.   Was he the worst pizza chef ever?

7      A.   I'm sorry?

8      Q.   Was he the worst pizza chef ever?

9      A.   No.  Actually the opposite.

10     Q.   You thought his pizza was really good?

11     A.   Yeah.

12     Q.   Did you ever pitch in and help there?

13     A.   Absolutely.

14     Q.   Would you describe it as a neighborhood bar?

15     A.   Yeah.

16     Q.   Were there a lot of people that came in there again

17 and again and again, the same people, I mean?

18     A.   Yes.

19     Q.   All seemed to know each other?

20     A.   Yes.

21     Q.   And to the best of your knowledge they lived in the

22 neighborhood?

23     A.   Yes.

24     Q.   Did you know Nicholas Champagne?

25     A.   Yes.

1    Q.   Was he close friends with Alkis Nakos?

2    A.   Yes.

3    Q.   Would he come to your house?

4    A.   Not often, no.

5    Q.   Did you ever hear the two of them engage in a

6  conversation about drugs?

7    A.   No.

8    Q.   I'm not asking you what your opinion is, but do you

9  have an opinion about him, Mr. Champagne?

10   A.   I wouldn't have an opinion, no.

11   Q.   How about Kosmas Koustas, did you know him?

12   A.   I do.

13   Q.   And how did you know him?

14   A.   We all grew up together.

15   Q.   And where was that?

16   A.   We all met around the same age, when we were 15,

17  and just hung out mostly when we were kids, growing apart as

18  we got older.

19   Q.   Do you know if Kosmas Koustas was ever at your

20  house -- wherever you were living with my client, was he ever

21  there before you left in November of 2009?

22   A.   He was not there to my knowledge.

23   Q.   Do you know whether or not they had had a falling

24  out to your knowledge prior to -- well, during the period of

25  time while you were living together?

1      A.     They were not in good standing or in contact to my

2   knowledge.  They did not conversate.

3              MR. SHEKETOFF:  Nothing further.

4              MS. OLLILA:  Nothing further.

5              THE COURT:  Thank you.  You may step down.

6              MS. OLLILA:  The United States calls Steve Puopolo.

7              Your Honor, I have failed to introduce Dena Blanco.

8   She is from the U.S. Attorney's Office assisting us.

9                          STEVEN PUOPOLO

10             having been duly sworn, testified as follows:

11             THE CLERK:  For the record, please state your name

12   and spell your last name.

13             THE WITNESS:  Steven Puopolo.  Last name is

14   P-U-O-P-O-L-O.

15                       DIRECT EXAMINATION

16   BY MS. OLLILA:

17     Q.     Good afternoon.  How are you employed?

18     A.     I'm a trooper with the New Hampshire State Police

19   presently assigned as a detective with the Narcotics

20   Investigations Unit.

21     Q.     Were you so assigned during October, November and

22   December of 2013?

23     A.     Yes.

24     Q.     Were law enforcement up on a wire during those

25   months?

1    A.    We were.

2    Q.    Were you assisting law enforcement with the

3    conducting of surveillance during the course of that wire?

4    A.    I was.

5    Q.    Were you conducting surveillance on December 5,

6    2013?

7    A.    Yes.

8    Q.    And can you tell the ladies and gentlemen of the

9    jury what your role was and what you saw.

10   A.    In the evening hours of that day I was assigned as

11   a surveillance personnel to respond to the employed location

12   of Mr. Kosmas Koustas, which was Foodtec Solutions, a food

13   company.

14   Q.    Was that in Needham, Massachusetts?

15   A.    It was.

16   Q.    And did you do that?

17   A.    I did.

18   Q.    And what did you see?

19   A.    During that period of time I was tasked with

20   maintaining a stationary surveillance location inside the

21   garage of the building, the garage being directly attached to

22   the office portion of the building.  To access one you needed

23   to access the other.

24        During that period of time my vehicle was parked

25   stationary.  I saw Mr. Koustas exit the building and walk

1  over to a black four-door Honda Accord that was parked

2  adjacent to me with one empty parking spot between us to the

3  left of me.

4       Q.   Could he see you in your motor vehicle?

5       A.   I was leaning further back in my seat.  If he had

6  looked in the vehicle, it was plain that there was a person

7  there.

8       Q.   Okay.  So what happened?  What did you see?

9       A.   At that period of time he walked to the rear of his

10  vehicle, opened up the trunk, took out a black

11  leather-looking gym bag and walked over to the rear driver's

12  side door of his vehicle, opened the door of the vehicle and

13  put the bag inside, and then went back to the trunk, picked

14  out a cardboard box and then brought that to the rear of the

15  vehicle as well and put it in the passenger side of the

16  vehicle.

17       Q.   What was your role after that with surveillance?

18       A.   When he exited the vehicle, I called out what I

19  could make of the license plate of the vehicle to the

20  surveillance units, and I remained in the garage until he

21  departed at which time the other surveillance units picked up

22  surveillance of him.

23       Q.   Did you ever pick up surveillance again that night?

24       A.   On that night, I did not.  No.

25       Q.   What about on December 7, 2013?  Were you tasked

1  with engaging in surveillance?

2      A.   I was.  On that evening the personnel manning the

3  wire, the telephone intercept, they received notification

4  that Mr. Koustas was going to be traveling to Millbury,

5  Massachusetts, to meet an unknown male individual.

6          During that time surveillance units were tasked to

7  go out there and subsequently intercept the meet or observe

8  the meet.

9          During that time Mr. Koustas arrived on scene

10  driving the same black four-door Honda Accord that he had

11  been driving the day before.  He arrived at a mall known as

12  the Shoppes at Blackstone.  It's a large outdoor mall, but

13  there's no indoor venue to it.

14          And he subsequently met up with a person driving a

15  foreign import, I think it was a Subaru station wagon, a

16  blue/green color.  From there he had followed that individual

17  to a residence in Millbury on Colbrook Street where we

18  maintained surveillance contact with him for an extended

19  period of time.

20      Q.   What's that mean, an extended period of time?

21      A.   Well, you know, maybe greater than fifteen minutes

22  but less than two hours.  The period of time would -- you

23  would count it as time out of your day like.

24      Q.   So what did you observe after Mr. Koustas arrived

25  at 4 Colbrook Road in Millbury, Massachusetts?

1    A.    I was assigned -- he had pulled in the driveway

2  there along with the black -- I'm sorry, the green,

3  blue/green import station wagon type vehicle, and we had made

4  -- and I had made several passes by the location during that

5  period of time to --

6    Q.    Why?  Why did you do that?

7    A.    To make sure he was there and to try to get a

8  vantage point onto the goings on at that location.  It's

9  not -- for surveillance techniques, we don't remain

10 stationary if we don't need to in one location because it's

11 out of the ordinary if you were to see somebody sitting on

12 your street.

13         He subsequently left there and drove back the way

14 that he had come in, and then traveled up on the highway

15 through Worcester and subsequently to New Hampshire.

16    Q.    Which leads me to my next question.  Millbury,

17 Massachusetts, is that right next to Worcester,

18 Massachusetts?

19    A.    It's an outskirt town.

20    Q.    And you said he traveled back to, where did he go?

21    A.    He went to Manchester, New Hampshire, after that.

22    Q.    Where in Manchester, New Hampshire?

23    A.    140 South Porter Street.

24    Q.    Did you conduct any additional surveillance that

25 night from 140 Porter Street?  Did you observe Kosmas Koustas

1    travel anywhere else?

2         A.    He stayed at 140 South Porter Street for a period

3    of time, and then he left there and went to 366 Arah Street

4    in Manchester.

5         Q.    Do you know who lives at 366 Arah Street in

6    Manchester?

7         A.    The defendant, Alkis Nakos.

8         Q.    What time did Kosmas Koustas get to 366 Arah Street

9    in Manchester on December 7th?

10        A.    In the vicinity of 9, 10 o'clock at night.  In that

11   area.

12             MS. OLLILA:  I have nothing further of this

13   witness, your Honor.

14             THE COURT:  Mr. Sheketoff.

15                        CROSS-EXAMINATION

16   BY MR. SHEKETOFF:

17        Q.    Good afternoon, Trooper.

18        A.    Good afternoon.

19        Q.    So on December 7th, when Kosmas Koustas returned to

20   New Hampshire and drove up to 140, you saw him park the

21   vehicle?

22        A.    Yes.

23        Q.    And 140 is his dad's residence, as you understand

24   it?

25        A.    140 is the residence I think of Andreas.  It was

1    Andreas Koustas.  A relative.

2         Q.    A relative.

3         A.    Is what we know.

4         Q.    Okay.  Did you see him take anything out of the

5    vehicle?

6         A.    I did not personally, no.

7         Q.    Do you know -- were you the only trooper doing

8    surveillance?

9         A.    No.  There were several of us.  Upwards of ten, I

10   believe.

11        Q.    Do you know if anyone claims that they saw him take

12   anything out of his vehicle, just a yes or a no?

13        A.    No.

14        Q.    And then he went to my client's house directly from

15   140?

16        A.    Yes.

17        Q.    And did you see him park?

18        A.    Over the radio I heard the transmissions that he

19   had exited his vehicle, walked up the driveway, and that a

20   surveillance motion light had gone on at the rear of the

21   residence.

22        Q.    Okay.  Do you know if anyone saw him take anything

23   into the defendant's house?

24        A.    Not that I know of, no.

25             MR. SHEKETOFF:  Thank you, sir.

1          MS. OLLILA:  Nothing further.  Thank you.

2          THE COURT:  All right.  Thank you, Trooper.  You

3     may step down.

4          MS. OLLILA:  Your Honor, the United States calls

5     its last witness, New Hampshire State Police Trooper Eric

6     Piche.

7          THE COURT:  We're very close to an afternoon break,

8     so how long will this witness be?

9          MS. OLLILA:  15, 20 minutes.

10          THE COURT:  All right.  Why don't we take an

11     afternoon break before we hear from the last witness.

12          MR. SHEKETOFF:  May we see you just briefly, your

13     Honor, about this witness?

14          THE COURT:  You may.  Let's let the jury exit.

15          (IN COURT - NO JURY PRESENT)

16          MR. SHEKETOFF:  So I believe this witness is going

17     to talk about what was seized from my client's home, and I

18     can't tell, I'm not sure if the government intends to put on

19     the actual documents from the Koustas discovery.

20          MS. OLLILA:  Oh, no.

21          MR. SHEKETOFF:  No?

22          MS. OLLILA:  It's exactly what I've shown you when

23     you came to review the exhibits at the U.S. Attorney's

24     Office.

25          There were 1500 pages of discovery, Judge, and what

1    I've advised defense counsel is that I didn't print out those

2    1500 pages.  In fact, I told him I could certainly do so.

3    But what I am introducing is the book marked pages, and you

4    can see very clearly it's discovery pages 1 through 597.  And

5    I've shown this to defense counsel.  I'm not introducing the

6    actual discovery, because frankly I believe it will be

7    prejudicial to this defendant.  So I'm introducing the record

8    of the receipt by this defendant of the discovery.

9           You've already seen this, counsel.

10          THE COURT:  Just the fact that he had the

11   discovery, that's what you're introducing this for?

12          MS. OLLILA:  Yes.

13          THE COURT:  Okay.  Does that clear up any potential

14   issue?

15          MR. SHEKETOFF:  Yes, your Honor, because I was

16   concerned about whether we were getting 1500 pages of

17   discovery.

18          MS. OLLILA:  No.

19          MR. SHEKETOFF:  So I don't know what else they

20   intend to put in from this search.

21          THE COURT:  Why don't you make that clear so we can

22   clear this up.

23          MS. OLLILA:  Sure.  I have already done that, but

24   I'll do it again on the record.

25          The exhibits that are marked for entry are the

1   documents that are discovery, 51j, which is Google searches

2   conducted by the defendant in which he engages in a search of

3   getting text messages off of iPhone, and he also engages in

4   the search of Special Agent Mark Alford, who is the FBI agent

5   search.

6           THE COURT:  And do you have any objection to --

7           MR. SHEKETOFF:  To that one I do, and perhaps your

8   Honor would be willing to look at that one and decide whether

9   it comes in or not.  I have a 403 objection to it.

10          THE COURT:  Can I see it?

11          MS. OLLILA:  Of course.

12          THE COURT:  We'll just make sure we cover these

13  before the jury comes back in, and I appreciate you bringing

14  it to my attention.

15          MS. OLLILA:  Oh, sure.

16          THE COURT:  Tell me what I'm looking at.  Google

17  searches?

18          MS. OLLILA:  That's a printout of the forensics

19  report of the Google searches conducted by the computer

20  located at the defendant's residence.

21          THE COURT:  How was this generated?

22          MS. OLLILA:  It was generated by a forensics

23  report, and counsel has stipulated that the United States is

24  not required to bring the forensics examiner.  But this is a

25  document that the forensics examiner produced, and it was

1   based upon what the forensics examiner took off of Mr. Nakos'

2   computer.  And if you look at the first entry at the top of

3   the page, it will say how to get messages off of iPhone --

4   text messages off of an iPhone.

5           THE COURT:  Okay.  And this is the forensics

6   interpretation of --

7           MS. OLLILA:  No, it's not the forensics

8   interpretation.  It's literally --

9           THE COURT:  The Google search.

10          MS. OLLILA:  -- the Google search.  And if you look

11  at the column to the right, you will see when it was

12  searched, the date it was searched.

13          THE COURT:  This date here?

14          MS. OLLILA:  Exactly, Judge.

15          THE COURT:  Okay.  All right.

16          MS. OLLILA:  And the same applies -- counsel

17  brought this up with respect to Mark Alford when counsel

18  questioned one of the witnesses, and the question was:  Did

19  you seize Mark Alford an FBI agent's business card at the

20  time of the search of the residence?

21          When David Givens, the contractor testified, he

22  testified that an FBI agent came to see him and talked to him

23  about Alkis Nakos, and he also testified that he had engaged

24  in work at Mr. Alkis Nakos' residence.  The Google search is

25  Mark Alford, FBI, and you'll see when the search occurred on

1    that document.

2          It's relevant because why Mr. Nakos would want to

3    be engaging in a Google search of the FBI is directly

4    implicated to the fact that he would want to know if law

5    enforcement were watching him because he's engaged in the

6    distribution of controlled substances.

7          THE COURT:  Well, how is doing a search of Mark

8    Alford going to tell him that?  How would doing a search of

9    him tell him whether that guy is surveilling him?

10         MS. OLLILA:  He wants to find out who Mark Alford

11   is, which is why he types in, Judge, FBI.

12         THE COURT:  Okay.  What's your objection?

13         MR. SHEKETOFF:  Well, this may be a fine

14   distinction, your Honor, but I didn't stipulate.  What I said

15   was that I'm not going to object to not having a keeper of

16   the records.  She doesn't have to bring this person in.  I'm

17   not contesting that he got this off a computer.  It's a

18   little different to say that I stipulate.  She can introduce

19   it through whatever witness she wants.

20         THE COURT:  Okay.

21         MR. SHEKETOFF:  So are these all the Google

22   searches on the computer or just ones that this person

23   selected out as relevant?  To suggest that these are the only

24   Google searches on the computer I think is misleading.  And

25   plus, I don't know what the relevance of someone doing a

1  Google search is period.

2          THE COURT:  Well, all of that would go really to

3  the weight of this.  If she can establish that it increases

4  the probability of -- and it passes the relevance test.  So

5  your argument was prejudice.  How is prejudice implicated,

6  and just how does it substantially outweigh the probative

7  value?

8          MR. SHEKETOFF:  What is the relevance that he did a

9  Google search on how to get text messages off your iPhone?

10  When was that search?  I don't have it in front of me right

11  now.

12          THE COURT:  The date and time is November 2013 in

13  the evening.

14          MS. OLLILA:  Which is particularly relevant, Judge,

15  because it shows that he continued to engage in the

16  distribution of narcotics and would have reason to try to

17  ensure that text messages were not on his telephone.

18          THE COURT:  And Special Agent Mark Alford, that has

19  come up, I can see that name being somehow relevant to the

20  government's case, but I'm not seeing the prejudice enough to

21  exclude it.  So I hear your argument.  It's overruled.  I'll

22  allow Exhibit 51 -- it looks like j or i -- 51 for ID.  I am

23  not going to exclude it under 503.  I've done the balancing

24  test, and I find that the prejudice is really minimal and the

25  probative value is enough to get past that balancing test.

1  So that comes in.  You're not fighting about authentication

2  or foundation?

3          MR. SHEKETOFF:  No, I'm not, your Honor.

4          MS. OLLILA:  Judge, I'll also show you 51i, and

5  this is another report, and it's the cookies carved.  And if

6  I knew what cookies carved was, I would let you know.

7          THE COURT:  Do you object to this one?

8          MS. OLLILA:  These are all the searches the

9  defendant has done with respect to places to go in Canada,

10  and that's relevant because the United States' argument is

11  that he was traveling to Canada often in order to meet with

12  Mihail Leventis.

13          THE COURT:  Okay.  I don't believe that's in

14  dispute.

15          MR. SHEKETOFF:  Right.

16          THE COURT:  What's the prejudice?  Anything?  Okay.

17  All right.  So there's no real argument with respect to 51i.

18          MS. OLLILA:  And Judge --

19          THE COURT:  Did you say 51j or -- it's hard to tell

20  the difference.

21          MS. OLLILA:  I know.

22          THE COURT:  But I think the first was 51j and this

23  is 51i, the second one.  All right.  So both are okay.

24          MS. OLLILA:  And this is 51k.

25          THE COURT:  Can you just show it to Attorney

1    Sheketoff first and let him refresh his recollection as to

2    that exhibit?

3              MS. OLLILA:  Oh, sure.

4              THE COURT:  Is that okay, or do you object to that?

5              MR. SHEKETOFF:  No, it's just another -- it's like

6    a Google search, a Safari search.

7              MS. OLLILA:  It's a Safari history search, Judge,

8    not Google.  And it's relevant because it happened on

9    December 30, 2013, and it shows that the defendant is still

10   maintaining a watch as to DEA press releases that were sent

11   out, and he goes on the www.justice.gov file -- website,

12   excuse me, and there are also indications that he did a

13   Safari search of police seize drugs, 400,000 cash, in

14   Danville on December 23, 2011.

15             THE COURT:  Okay.  Any objection to this one --

16             MR. SHEKETOFF:  Yes, your Honor, because --

17             THE COURT:  -- 51k for ID?

18             MR. SHEKETOFF:  -- I don't think what you're

19   reading is of any relevance.  That you go on a government

20   website and read what's on the government website, that makes

21   you more or less likely to be a criminal?  I just don't get

22   that.

23             THE COURT:  Well, I can tell you it's very hard to

24   see, it's so small, but maybe some jurors can see this.  It

25   looks like there are sites in the Safari history.  It looks

1    like we've got record numbers, we have a URL, a title, and a

2    last visited date and time, and it looks like there are

3    searches at the justice.gov site and also the FBI.

4            MS. OLLILA:  Correct.

5            THE COURT:  Several searches.  I'm not seeing

6    anything particularly prejudicial, but I can see minimal

7    relevance with respect to this in terms of, you know, looking

8    at FBI sites, the government site.  I think it's -- give

9    me -- what's the prejudice from this?

10           MR. SHEKETOFF:  I just don't see any relevance.

11   She's going to use it against him in closing argument.  I

12   think you have to make a lot of leaps to use it against him

13   in closing argument.  That he visits some FBI site or some

14   Justice Department site suggests that he's more likely to

15   have committed a crime, I just don't see that link.

16           THE COURT:  All right.  I think it meets the

17   minimal relevance, but I'm really not seeing any prejudice to

18   51k so I'm going to allow it.  But obviously, you know,

19   arguments have to be limited to evidence and --

20           MS. OLLILA:  Of course.

21           THE COURT:  Of course.  And so to the extent there

22   are searches involving the FBI and the Department of Justice,

23   that's what they are.  To make them out into anything more

24   would be mischaracterizing these exhibits.  So I think

25   they're of minimal relevance.  There's no real prejudice.  So

1    I think these come in.  Are there any others?

2          MS. OLLILA:  Yes, Judge.  There's one more, and

3    this is an iOS notes backup, and these are text messages that

4    had been stored on Mr. Nakos' computer.  When I say text

5    messages, I mean SMS and MMS messages, and these are relevant

6    because he's talking about going to Montreal.  He's talking

7    about when he's heading to Montreal.

8          There's one that's contained on page 7 that says --

9    he's responding to a request from a friend.  He says to his

10   friend, "Plus the cops took 15,000 from me while I was up in

11   Montreal.  It was a mess."  That's highly relevant because it

12   goes to cross-corroborate that the defendant was in Montreal

13   and had an amount of money seized from him.

14         Also on page 6 of this exhibit, which is 511,

15   there's a reference that the defendant has frequently gone up

16   to Montreal and he talks about crazy moments he's had

17   traveling in different places, strip clubs, Montreal, Boston,

18   Foxwoods, too many fun times.  It just goes to

19   cross-corroborate the fact that he goes to Montreal often.

20         There is another message on page 10 where the

21   defendant says, "Well, I need to have fun after working all

22   the time.  Thinking of heading to Montreal next month."

23         Those are highly relevant because it's the United

24   States' argument that this defendant travels to Montreal

25   frequently because he is the organizer of a drug conspiracy

1    and needs to do so.

2         THE COURT:  All right.  So explain the basis to

3    keep this out.  It seems to support your argument also that

4    he goes to Canada a fair amount.  What's the prejudice?

5         MR. SHEKETOFF:  Well, I'm hard pressed, your Honor.

6         THE COURT:  I appreciate the honesty.  And is there

7    anything in here that you're going to take particular issue

8    with that was just described?

9         MR. SHEKETOFF:  Not at all.

10        THE COURT:  All right.  Okay.  So these exhibits --

11   and let me just for the record -- this one, there's no issue

12   with this?

13        MS. OLLILA:  That is the discovery one, Judge.

14        THE COURT:  51b, that was the first one?

15        MS. OLLILA:  Correct.

16        THE COURT:  And that just indicates that there was

17   a date of delivery of the discovery to Mr. Nakos.

18        MS. OLLILA:  And that he had the discovery on his

19   computer, Judge.

20        THE COURT:  Okay.  All right.  So we've got 51h.

21   We have 51k.  We have 51j and 51i.  We have 51l.  All of

22   which come in under 401, 402, and are not excluded under 403

23   after doing the balancing test with respect to probative

24   value needs to be substantially outweighed by the prejudice.

25   And there's probative value in each one, some minimal, but

1   there's certainly not substantial prejudice such that it

2   would outweigh the probative value.  Anything further?

3               MS. OLLILA:  Judge, I just double checked the

4   exhibits.

5               THE COURT:  These are coming in.

6               (Government Exhibit Nos. 51h, 51i, 51j, 51k

7               and 51l Admitted)

8               MS. OLLILA:  This is 51g.  It's a letter from the

9   Montreal police referencing the seizure of approximately

10  $10,000 in Canadian currency from the defendant and a

11  BlackBerry telephone on November 30, 2011.  It confirms that

12  the defendant did have currency seized from him in Montreal.

13  That was printed from his computer, Judge.

14              THE COURT:  Do you have any objection to that, 51g?

15              MR. SHEKETOFF:  Well, I think that that was sent to

16  him by his lawyer, so I'm not --

17              THE COURT:  Okay.

18              MR. SHEKETOFF:  So I think it's an attorney-client

19  privileged communication.

20              THE COURT:  Do you have anything that would tell me

21  otherwise?

22              MS. OLLILA:  Yes.  I'm not sure where Attorney

23  Sheketoff is coming up with that.  That was printed right off

24  of his computer.

25              MR. SHEKETOFF:  I know, but wasn't there a cover

1   letter?  Wasn't there correspondence back and forth between

2   his Canadian lawyer and him about fighting this?

3            THE COURT:  This one you're making a stronger

4   argument.

5            MR. SHEKETOFF:  Well, I just remember this

6   correspondence, your Honor.  I can't honestly say that I

7   recall that this is attached to that.

8            THE COURT:  All right.  I think you've gotten in

9   other evidence of this, including text messages from Mr.

10  Nakos.

11           MS. OLLILA:  Judge, this is not a letter from his

12  attorney.

13           THE COURT:  It could have been attached to a letter

14  from counsel, and Attorney Sheketoff seems to think he's seen

15  such a thing.  That to me is a fairly compelling argument

16  that that exhibit, 51g, is out.  And frankly, you've gotten

17  that testimony in through Agent Poirier.  You're getting it

18  in through his own text messages.

19           MS. OLLILA:  Good point, Judge.  Good point, Judge.

20           THE COURT:  This is attorney-client privilege.

21  It's out.

22           THE CLERK:  Your Honor, could I clarify one thing?

23           THE COURT:  You've got some issues with exhibits?

24           THE CLERK:  Well, you had mentioned 51b, then 51h.

25           MS. OLLILA:  51g.

1          THE CLERK:  No, the one prior to that.

2          MS. OLLILA:  It's 51h, 51l, 51k, 51j, 51i.

3          THE CLERK:  All right.  Thank you.

4          THE COURT:  Thank you.  Okay.  Is there anything

5     else before I run up to chambers and come running back down?

6     And I'll let you run as well.

7          MR. SHEKETOFF:  Thank you, your Honor.  Just one

8     thing, which is can I state my rights based on our discussion

9     or do I have to stand up and object to each one of these

10     again?

11          THE COURT:  Oh, your 401, your relevance arguments,

12     they are preserved.

13          MR. SHEKETOFF:  Thank you, your Honor.

14          THE COURT:  Let's call them preserved.

15          MR. SHEKETOFF:  Thank you, your Honor.

16          THE COURT:  Is there anything else?  We've got one

17     witness?

18          MS. OLLILA:  That's it, Judge.

19          THE COURT:  And then you'll make a motion.

20          MR. SHEKETOFF:  Yes, your Honor.

21          THE COURT:  And then we'll have time for witnesses

22     as well.  So you can let me know what you're going to do.  I

23     think what I would do is take your motion under advisement

24     depending upon what happens and give you a ruling after we

25     get the jury out.

1        So we'll just take a brief recess and I'll just

2   come back in.

3        (RECESS)

4        THE COURT:  You may call your next and last

5   witness.

6        MS. OLLILA:  Thank you very much, your Honor.  The

7   United States calls Eric Piche.

8                          ERIC PICHE

9        having been duly sworn, testified as follows:

10       THE CLERK:  For the record, please state your name

11   and spell your last name.

12       THE WITNESS:  My name is Eric Piche.  Last name is

13   spelled P-I-C-H-E.

14                     DIRECT EXAMINATION

15   BY MS. OLLILA:

16       Q.   Good afternoon, sir.

17       A.   Good afternoon.

18       Q.   How are you employed?

19       A.   I'm employed by the New Hampshire Department of

20   Safety, Division of State Police, as a state trooper.

21       Q.   Where are you currently assigned?

22       A.   I am currently assigned as a detective and

23   technical investigator with the Narcotics Investigations Unit

24   within the State Police.

25       Q.   Are you someone known as the administrator of the

1  wire room?

2       A.    I am.

3       Q.    What is an administrator of the wire room?

4       A.    Essentially the administrator for the wire room

5  would be the person that's responsible for the general

6  maintenance of the system, the provisioning of any court

7  ordered pen register trap and traces or Title 3 wiretap

8  intercepts.

9       Q.    Are you the technical guru for the state police

10 NIU?

11      A.    I am.

12      Q.    Is that the only function you serve in the NIU?

13      A.    I generally assist case agents with general

14 assistance on cases such as surveillance and stuff like that.

15      Q.    Have you ever served as the evidence technician

16 with the recovery of evidence that has been seized in

17 connection with search warrants?

18      A.    I have.

19      Q.    Were you the evidence technician for the search of

20 366 Arah Street in Manchester, New Hampshire?

21      A.    I was.

22      Q.    And who was living at that residence?

23      A.    The defendant, Alkis Nakos, was.

24      Q.    What is an evidence technician?

25      A.    Essentially the evidence -- people get different

1   assignments when you go to execute a search warrant.  Someone

2   may be responsible for taking photographs.  Someone may be

3   the evidence technician.  Essentially the evidence technician

4   is the person that will set up and collect and document where

5   evidence was found within a location, who it was found by,

6   such things as that, and what was done with it after it was

7   found, like was it sent to the state police lab, was it sent

8   to the narcotics unit storage facility.

9        Q.   Is the evidence technician used for record keeping

10  with respect to writing the number of every exhibit and

11  indicating in a report where it was seized?

12       A.   Yes.  That's correct.

13       Q.   And have you done that in this case?

14       A.   Yes, I have.

15       Q.   Was there a lot of documentation seized from

16  defendant Nakos' residence?

17       A.   Yes, there was.

18       Q.   I'm not going to introduce a lot, but I want to

19  show you what has been marked for identification as

20  Government's Exhibit 60b.  I would ask, Trooper Piche, if you

21  would take a look at 60b.  Do you recognize what that is?

22       A.   Yes, I do.  It was bank records that were found.

23       Q.   And were they seized from the defendant, Alkis

24  Nakos' residence?

25       A.   They were.

1          MS. OLLILA:  Your Honor, I would ask that the ID be

2     stricken on 60b and it be entered into full evidence.

3          MR. SHEKETOFF:  No objection.

4          THE COURT:  60b is a full exhibit.

5          (Government's Exhibit No. 60b Admitted)

6          MS. OLLILA:  Dena, will you please pull up 60b.

7     Q.    Now, Trooper Piche, I'm going to hand you the

8     original.

9     A.    Okay.

10    Q.    And I want you to indicate what that document is.

11    A.     It is a TD Bank Elite Savings statement addressed

12    to Alkis Nakos, and it appears to be for the time period of

13    December 16, 2009, to January 4, 2010.

14    Q.    December 16, 2009, through January what 2010?

15    A.    January 4, 2010.

16    Q.    And if you can see on 60b, was there a deposit made

17    into that Elite Savings account on December 16, 2009?

18    A.    Yes, there was.

19    Q.    And what was that deposit amount?

20    A.    The deposit was made for $130,000.

21    Q.    And what was the balance in the account at the end?

22    A.    The balance at the end was $133,822.15.

23    Q.    Were there also receipts recovered during the

24    search at Alkis Nakos' residence?

25    A.    Yes, there were.

1    Q.   Let me show you what is marked as 60j, but I want
2    to confer -- is that a J?  60j.  Do you recognize what 60j
3    is?
4    A.   Yes.  Those are Gucci receipts that were found at
5    the residence.
6    Q.   Do you know what Gucci is?
7    A.   It's a high-end clothing store, I guess.
8    Q.   Do you own anything from Gucci?
9    A.   No, I do not.
10   Q.   What are the dates on those receipts?
11   A.   The first one is dated it looks like July 13, 2010.
12   They're both dated July 13, 2010.
13   Q.   And I want you to look at the time between the two
14   purchases.  Were there two purchases at Gucci on that date?
15   A.   There were.
16   Q.   And what was the time between each purchase?
17   A.   The first purchase was made at 7:08 p.m. and the
18   second purchase was made at 7:14 p.m.
19   Q.   And how much was the first purchase for?
20   A.   The first purchase was for $462.72.
21   Q.   And what about the second purchase?
22   A.   $185.09.
23        MS. OLLILA:  Your Honor, I would ask that the ID be
24   stricken on 60j and it be entered into full evidence.
25        MR. SHEKETOFF:  I have no objection.

1          THE COURT:  60j is a full exhibit.

2          (Government's Exhibit No. 60j Admitted)

3          MS. OLLILA:  Please pull up 60j, Dena.

4          I'm going to withdraw having her pull it up, Judge.

5     Q.    Trooper Piche, was there a computer seized at the

6  residence?

7     A.    Yes, there was.

8     Q.    And was the computer sent to the New Hampshire

9  State Police Forensic Laboratory for an examination to be

10 conducted?

11    A.    Yes, it was.

12    Q.    And was that examination conducted?

13    A.    Yes, it was.

14    Q.    And was a copy made of the hard drive of that

15 computer?

16    A.    Yes.  The analysis was placed onto two disks.

17    Q.    Okay.  And did you receive those two disks?

18    A.    I did.

19    Q.    Now I'm going to show you some exhibits that were

20 taken off of those two disks, which consisted of the hard

21 drive of the computer, and these exhibits have been entered

22 into full evidence, 51h, 51i, 51j, 51k, 51l.  Why don't you

23 review those documents.

24    A.    Yes.  These are all -- were taken from the lab

25 analysis off of the computer that was located at Mr. Nakos'

1    residence.

2             MS. OLLILA:  Dena, please pull up 51h.

3        Q.   Now, Trooper Piche, I just had Dena put in yellow

4    highlights a document that was taken off of Alkis Nakos'

5    computer which is named discovery page 1 through 597.  Do you

6    see that?

7        A.   Yes, I do see that.

8        Q.   Now, below that listing is a created date.  What

9    was the created date?

10       A.   It looks like the created date was July 9, 2009.

11       Q.   And if you go two lines below that, it says access

12   date, and I'm assuming that is the last time that file was

13   accessed.  What is that date?

14       A.   That date is November 3, 2011.

15       Q.   And the discovery pages 1 through 597, do you know

16   what that discovery is?

17       A.   Yes.  I reviewed those files from the forensic

18   analysis and they appear to be the Brownshirt discovery

19   package, or Operation Brownshirt.

20       Q.   On that same document, what Dena has just

21   highlighted appears to be at the bottom of the page.  And if

22   I'm correct, does it say discovery page 1,347 through 1,524?

23       A.   Yes, it does say that.

24       Q.   And what is the created date of that file?

25       A.   That was created on December 1st, 2009.

1        Q.    And what was the last access date?

2        A.    It looks like November 3, 2011.

3        Q.    And how many pages of discovery are contained

4   there?

5        A.    In that particular section?

6        Q.    Yeah, page what through what?

7        A.    Page 1,347 to page 1,524.

8              MS. OLLILA:  So Dena, now go to page 2.

9        Q.    Trooper Piche, you are now looking at page 2 of

10  51h, and Dena has highlighted in the middle of the page, and

11  she's highlighted discovery page 657 through 911; is that

12  fair?

13       A.    Yes, that is.

14       Q.    And what was the created date on that file?

15       A.    The created date was September 9, 2009.

16       Q.    And what was the last accessed date?

17       A.    Again, November 3, 2011.

18       Q.    And is that also Operation Brownshirt discovery?

19       A.    Yes.

20       Q.    I don't know whether I asked you this, but the

21  pages 1347 through 1524, did that also consist of Operation

22  Brownshirt discovery?

23       A.    Yes, it did.

24       Q.    Trooper Piche, I'm showing you what is marked as

25  51j and entered into full evidence.  Do you recognize what

1    that document is?

2         A.    Yes.   This is part of the forensic analysis done by

3    the forensic lab on the computer that was located in Mr.

4    Nakos' residence.

5         Q.    Thank you, Trooper Piche.

6               MS. OLLILA:   Dena, please bring up 51j.

7         Q.    Dena has pulled up page 1 on 51j.

8               MS. OLLILA:   And can you enlarge that, too, Dena?

9         Q.    And I want to ask you -- there's a reference to

10   record No. 45.   Do you see that reference?

11        A.    Yes, I do.

12        Q.    And was this a Google search?

13        A.    Yes.   It appears to be.

14        Q.    Was it a Google search conducted on the computer

15   seized from Alkis Nakos' residence?

16        A.    Yes.

17        Q.    And what was the Google search?

18        A.    Getting text messages off of iPhones.

19        Q.    And when was that Google search conducted?

20        A.    The forensic report is showing November 5, 2013.

21              MS. OLLILA:   Now, Dena, back out of that.   I want

22   you to highlight here and here and enlarge that.

23        Q.    The reference below that Dena has just pulled up is

24   another record, record 207.   Do you see that record?

25        A.    I do see it.

1        Q.    What is the Google search conducted?

2        A.    It appears that the search was for Special Agent

3   Mark Alford, New Hampshire.

4        Q.    And what date was the Google search conducted?

5        A.    The forensic analysis is showing March 21, 2011.

6        Q.    Do you know who Special Agent Mark Alford is?

7        A.    Yes, I do.  He's a special agent with the FBI.

8        Q.    Let me show you what has been marked 51k and

9   entered into full evidence, and this is a Safari history.  Do

10  you recognize this Safari history?

11       A.    Yes, I do.  This is part of the forensic report

12  from the lab on Mr. Nakos' computer.

13             MS. OLLILA:  Please put up 51k, Dena.  Now, can you

14  enlarge that whole area?

15       Q.    This is incredibly difficult to see, Trooper Piche,

16  so I'm going to try to have you read it.  How is your

17  eyesight by the way?

18       A.    It's fair.

19       Q.    I want you to advise the jury what this page

20  consists of.

21       A.    It consists of a bunch of web pages that were

22  visited on Safari.

23       Q.    Now, the very first entry, what is the web page

24  that was visited on that date?

25       A.    The actual URL is

1    http://www.justice.gov/dea/division/Bos/Boston_2013.

2        Q.    And was there an indication as to what was searched

3    on that site?

4        A.    Yes.  There is a title in the report and the title

5    would be dea.gov/news from DEA, domestic field division, New

6    England news releases 2012.

7        Q.    And what was the date that DEA press releases were

8    searched?

9        A.    December 30, 2013.

10       Q.    And I want to draw your attention to the third

11   entry from the bottom.  The third entry from the bottom, what

12   is the -- what was the search conducted on the third entry

13   from the bottom?

14       A.    Under the title field it states:  Police seize

15   drugs, 400K cash in Danville.

16       Q.    Do you know where Danville is?

17       A.    Yes, I do.

18       Q.    In what state is Danville located?

19       A.    New Hampshire.

20       Q.    And what is the date that that search was conducted

21   on?

22       A.    That search was conducted on December 23, 2011.

23       Q.    Thank you.  Let me show you what is 51l and has

24   come into full evidence.  Do you recognize what this is?

25       A.    Yes.  This is more of the forensic report that was

1    issued from the forensic analysis of Mr. Nakos' computer

2    found at his residence.

3              MS. OLLILA:  Dena, please turn to page 4, and I

4    want you to --

5         Q.   Can you see the area that was just highlighted?

6         A.   Yes, I can.

7         Q.   And what is the date that that message was sent or

8    received?

9         A.   November 21, 2011.

10        Q.   And was it sent or received?

11        A.   It's showing -- the report here is showing sent.

12        Q.   And what is said?  What is the sent message?

13        A.   The sent message is:  At center ice almost opposite

14   the benches and in Montreal.  Jewelry is way too expensive

15   right now so doesn't matter who.  I know, but I do have a guy

16   if you need.

17             MS. OLLILA:  Now, Dena, please turn to page 7 of

18   the same exhibit.

19        Q.   Trooper Piche, can you see what this SMS message

20   was?  Was it sent or received?

21        A.   It's showing sent.

22        Q.   And what date was it sent?

23        A.   October 10, 2011.

24        Q.   Could you please read it?

25        A.   I'm assuming you want the very top where it says

1    Montreal.

2         Q.    The top where it says crazy.

3         A.    "Crazy moments we had lots.  Saint Thomas, Super

4    Bowl, Vegas, Cali, Greece, Rome, Pats, games, Celtics, strip

5    clubs, Montreal, Boston, Foxwoods, which was the first time I

6    went and was with you."

7              And then it looks like there's a type of smiley

8    face, "Newport, and the list goes on.  Too many fun times cuz

9    we both fun people."

10             MS. OLLILA:  Now, turn to the next page, Dena,

11   please, page 8.

12        Q.    You are now looking at page 8 of 511, Trooper

13   Piche?

14        A.    Yes.

15        Q.    And can you please read that SMS text -- is that an

16   SMS message by the way?  Is it a text message?

17        A.    The report is showing it as an SMS.

18        Q.    Okay.  Was that sent or received?

19        A.    The report is showing it's sent.

20        Q.    And what date was it sent?

21        A.    December 21, 2011.

22        Q.    And what is the message?

23        A.    "Plus the cops took 15k from me while I was up in

24   Montreal.  It was a mess."

25             MS. OLLILA:  Dena, please go to page 9.

1      Q.   You're now on page 9.  Do you see that there's an
2  SMS message that has been highlighted?
3      A.   Yes, I do.
4      Q.   Was it sent or received?
5      A.   The report is showing sent.
6      Q.   And what date was it sent?
7      A.   November 18, 2011.
8      Q.   And what is the message?
9      A.   "I'm just packing up my things right now.  Gonna go
10  to Montreal tomorrow."
11           MS. OLLILA:  Finally, Dena, on page 11.
12      Q.   Trooper Piche, you are now looking at page 11 of
13  the same Government's Exhibit 51l.  This SMS message, when
14  was it sent or received?
15      A.   It's showing September 20, 2011.
16      Q.   And was it sent or received?
17      A.   It's showing sent.
18      Q.   And what was the message?
19      A.   "Well, I have to be.  Need to have fun after
20  working all the time.  Thinking Montreal next month."
21      Q.   51i, which is a Google analytics referral cookie
22  carve.  Do you recognize what that is?
23      A.   Yes, I do.  This is, again, part of the forensic
24  analysis that was done of the computer located at Alkis
25  Nakos' residence.

1           MS. OLLILA:  Please pull that up, Dena, 51i.

2      Q.    Trooper Piche, we won't go through all of these,

3  but what is contained within this exhibit?  Let me give you

4  the original.  I'm sorry.  Sorry about that.

5      A.    It appears to be key words that were searched at

6  some point on that computer.

7      Q.    And what were the key words that were searched?

8      A.    Going from the top to bottom the key words are

9  Place d'Armes Montreal, Off the Hook Montreal, Hotel Le

10  Germain Montreal, another Montreal.

11     Q.    Are the vast majority of references to places

12  searched in the area of Montreal, Canada?

13     A.    Yes.  They appear to be.

14     Q.    Now, one last thing that I want you to do, Trooper

15  Piche.  Did you -- when you were the evidence technician at

16  366 Arah Street, did you end up seizing a glass container

17  that contained a lot of money bands?

18     A.    Yes, we did.

19     Q.    And it is marked as 60p for identification.  Do you

20  recognize what that is?

21     A.    Yes, I do recognize it.

22     Q.    And I'm holding in my hand some of those money

23  bands that had been taken out.  Do you recognize that?

24     A.    I do recognize those.

25     Q.    Were these taken out of 60p?

1      A.    Yes, they were.

2            MS. OLLILA:  Your Honor, I would ask that 60p the

3      ID be stricken and it be entered into full evidence.

4            THE COURT:  Any objection?

5            MR. SHEKETOFF:  No objection.

6            THE COURT:  All right.  It's a full exhibit.

7            (Government's Exhibit No. 60p Admitted)

8      Q.    Trooper Piche, in 60p, there are a lot of money

9      bands in there, correct?

10     A.    That's correct.

11     Q.    And I don't want you to take those out, but what I

12     want you to do is I want you to add up, if you can, the years

13     and the money taken out.  And I'm first going to hand you

14     money bands that are dated in 2010, and I just want you to

15     tell the jury how much that represents in cash taken out by

16     Alkis Nakos.

17     A.    There's two $5,000 money bands here, so that would

18     be a total of 10,000.

19     Q.    And is that 2010?

20     A.    Yes, that's correct.  There's an indication of 2010

21     on here.

22     Q.    Is there handwriting on both of those money bands?

23     A.    There is.

24     Q.    And with respect to the handwriting, is the

25     handwriting dated a certain year?

1    A.    Yes, it is.

2    Q.    Okay.  So are those both dated in 2010?

3    A.    Yes, they are.

4    Q.    Why don't you put those aside, and I'm going to

5  give you 2011, and I want you to advise the jury how many

6  money bands represented cash being taken out in 2011.

7    A.    They're dated 2011 and it's -- 1,000 plus 5,000 is

8  6,000, and another 5,000 is 11,000, 16,000, 17,000, 18,000.

9    Q.    If you could set those aside.  And that was 2011,

10  correct?

11    A.    That's correct.

12    Q.    Now I want you to go to 2012 and add them up if you

13  can.

14    A.    5,000, 10,000, 15,000, 20,000, 25,000, 30,000,

15  35,000, 40,000, 45,000, 50,000, 55,000, 60,000, 61, 62, 63,

16  64, 65,000.

17    Q.    And what year was that?

18    A.    2012.

19    Q.    That's cash taken out of a bank?

20    A.    Yes.

21    Q.    I want you to go to 2013 and add those up for the

22  jury.

23    A.    There's a couple of $10,000 ones in here so 10,000,

24  20,000, 25,000, 30,000, 35,000, 40,000, 45,000, 50,000,

25  51,000.

1          Q.    Okay.  2012 -- excuse me.  2013.

2          A.    We just did '13, right?

3          Q.    Oh, I'm sorry.  I actually gave you the wrong one.

4     Let me give you --

5          A.    That's '12.  Did we do that?  Yeah, we did that

6     one.  It was 65, right?

7          Q.    Let me give you '14.  I'm sorry about that.  2014.

8     Sorry.  That was my mistake.

9          A.    5,000, 10,000, 15,000, 20,000, 21,000, 22,000,

10    23,000, 24,000, 25,000, 26,000, 27,000, 28,000, 29,000,

11    30,000, 31,000, 32,000, 33,000 in 2014.

12         Q.    In 2014 you said how much, 32,000?

13         A.    33,000.

14         Q.    33.  Can you add all those funds up between 2010

15    and 2014?  I'm going to see how good you are at math.

16         A.    177,000.  Does that sound right?

17         Q.    That's just cash taken out of a bank.  Does that

18    include the rest of the money bands that are contained in

19    60p?

20         A.    No, it does not.

21              MS. OLLILA:  I have nothing further, Judge.

22              THE COURT:  All right.  It's 4:00.  Attorney

23    Sheketoff, this would normal ly be the time we would end our

24    day.

25              MR. SHEKETOFF:  It's up to you, your Honor.

1          THE COURT:  Well, ultimately I think it's up to the

2     jury.  Your cross, half hour, hour?

3          MR. SHEKETOFF:  No.  Much less than that.  Much

4     less.

5          THE COURT:  15 minutes maybe?

6          MR. SHEKETOFF:  Yes.

7          THE COURT:  I'll let the jury assess that.  Keep

8     going?  I'm getting unanimity.  Is that right?  Is there

9     anybody who's going to run into a problem with that?  Okay.

10     Go ahead.

11          MR. SHEKETOFF:  If anybody runs into a problem,

12     please raise their hand.

13                         CROSS-EXAMINATION

14     BY MR. SHEKETOFF:

15     Q.    Those money bands, they're all from the banks

16     except for the ones that are from casinos?  I mean, can you

17     tell the difference between a casino one that's signed by the

18     pit boss and a bank one?

19     A.    I believe most of them appear to be -- I think

20     there may have been some of those bands in there that may

21     have said Foxwoods.  I would have to look at them again.

22     Q.    All right.  Do others say St. Mary's or different

23     banks on them?

24     A.    I would have to look at them again.

25     Q.    Well, you refer to them as cash from banks,

1   correct?

2       A.   Yes.  They did appear -- I believe that some of it

3   was marked St. Mary's or something.

4       Q.   All right.  Those are bands that you would get if

5   you went to a bank and they gave you cash, correct?

6       A.   Yes.  I would assume so.

7       Q.   And the banks keep records, correct?

8       A.   Yes, they do.

9       Q.   So if I withdrew 20,000 or 50,000 or 60, you could

10  look at my records and see exactly when I did it, correct?

11      A.   Yes.

12      Q.   You could even see the deposits that were put in

13  there, correct?

14      A.   That's correct.

15      Q.   So, for instance, the 12/16 deposit, that was the

16  very first thing you were asked about for $130,000, you could

17  actually go to the bank and see that there was a withdrawal

18  from St. Mary's Bank of 129,000, and 130,000 was put into the

19  second bank on December 16th.  All the same day.  You could

20  see that if you wanted to, correct, from the records?

21      A.   Yes.  I assume bank records would show that, yeah.

22      Q.   And they even keep records of the checks that you

23  deposited, correct?

24      A.   Yes.

25      Q.   And do you know from your role as the evidence

1    administrator from this search and the wire room whether or

2    not this investigation included getting copies of the St.

3    Mary's Bank records and every other bank record for my

4    client's accounts?  Do you know if it did or not?

5         A.   I'm not sure if every single account was

6    subpoenaed.  I wouldn't know that.  I'm a support role.  That

7    would be a case investigator type function.

8         Q.   And if I'm trying to keep my cash secret, do I put

9    it in the bank and then take it out of the bank in chunks of

10   money over $10,000?  Is that the way to be secretive?

11        A.   Probably not.

12        Q.   Well, okay.  Now, Operation Brownshirt is the

13   investigation of Mr. Champagne and others, correct?

14        A.   Yes.  That's correct.

15        Q.   And all this computer stuff that you found -- not

16   you personally but was reported to you, was on the

17   computer -- was what we call Bates stamped, correct?

18        A.   Yes.  That's correct.

19        Q.   And Bates stamped is something that the U.S.

20   Government does when it hands over discovery, correct?

21        A.   Yes.  That's correct.

22        Q.   All right.  So isn't it fair to say it's obvious to

23   you that that was discovery Bates stamped by the government

24   handed over to somebody that ended up on his computer?

25        A.   Yes.  That's correct.

1     Q.    You don't know whether Mr. Champagne's lawyer gave
2  him that Bates stamped discovery or not?
3     A.    I have no idea where that discovery -- how he came
4  into possession of it.
5     Q.    And the dates on that, the date of July 9th for the
6  first portion of that discovery created on July 9th or
7  something like that, is that the day the U.S. Attorney's
8  Office created it?  Is that the day it went on this computer
9  for the first time?  Do you have any way of knowing that?
10    A.    I'm not familiar with actually running that
11 particular analytical software so I couldn't say for certain.
12 It could be one -- I would say it would be one or the other.
13    Q.    Okay.  And Mark Alford, the FBI agent -- during the
14 course of the search of my client's house did you find a
15 business card from Mark Alford saying that he was with the
16 FBI and on the back of that card the name of his partner?
17    A.    I don't recall to be honest with you, but it is
18 possible.  There was so much that was seized.  I couldn't
19 remember every single piece of paper without looking through
20 it.
21    Q.    Okay.  So this search was conducted in June of
22 2014?
23    A.    That's correct.
24    Q.    Kosmas Koustas had been chased by the New Hampshire
25 State Police a couple of months earlier and arrested for the

1   violations having to do with that chase.  Do you know that?

2        A.   That sounds familiar, yes.

3        Q.   All right.  That was in the newspaper and stuff, or

4   at least his friends knew about the fact that he had been

5   chased?

6        A.   I would assume so.  I believe it was in the

7   newspaper.

8        Q.   Okay.  And now a couple of months later you're

9   conducting a search of my client's house, correct?

10       A.   That's correct.

11       Q.   And who did he live there with?

12       A.   I believe he lived there with his girlfriend and

13   son.

14       Q.   Right.  And there was one computer in the house?

15       A.   No.  There were several other computers in the

16   house as well.

17       Q.   And is it clear to you based on the analytics of

18   this computer that he had this computer for some period of

19   time?

20       A.   Yes, it is.

21       Q.   Because one of the dates you read to us was 2011.

22   Were there dates even earlier than that?

23       A.   I'm trying to think.  Yes, there were.

24       Q.   So if I had a computer in my house and I didn't

25   want you to know what was on it, would I leave it in my

1    house?

2          A.    You may.

3          Q.    Right.  I could be foolish, not be that smart, and

4    leave it in my house, correct?

5          A.    You could, yeah.  It's possible.

6          Q.    And the money bands, they were in a glass jar in

7    plain view in the house?

8          A.    Yes, they were.

9          Q.    And how about the guns?  Were there any guns?

10         A.    I don't believe there were guns seized.

11         Q.    How about drugs?

12         A.    I don't believe there were drugs seized either.

13         Q.    How about scales?

14         A.    I would have to review the report to be certain on

15   that.

16         Q.    How about records of illegal transactions?

17         A.    Again, I would have to review the report, but I

18   don't recall any ledgers.

19         Q.    How about the furnishings in the house, luxurious?

20         A.    The house appeared to be undergoing some

21   renovations.  There was actually some beautiful marble floors

22   in there that were just put in.  It looked like the bathroom

23   was all being done in marble.

24         Q.    How about the furniture?

25         A.    The furniture was nice.  The living room set

1    appeared to be nice.

2         Q.    Are there pictures of this?

3         A.    Yes, there are.

4         Q.    How many square feet was the house?

5         A.    I'm not sure.

6         Q.    Were there many, many other Google searches or have

7    we seen them all?

8         A.    The analysis contains a large amount of data, so I

9    would assume that there was more.

10        Q.    Okay.  So some were selected out to make into an

11   exhibit?  In other words, that's not every Google search,

12   every Safari search or --

13        A.    Well, there was -- I mean, I'm assuming that this

14   Google analytics report probably searches for some stuff, but

15   there was multiple forensic tools from the forensic report

16   that were run.  So you might get some stuff on Google.  You

17   might get some different stuff using some other different

18   things, the carve-out of different types of computer

19   software.  I mean, there was literally -- some of it had to

20   be put onto a Blu-ray disk, so that just goes to show how

21   much data was on the computer.

22        Q.    So there was a ton of stuff on the computer?

23        A.    Yes.

24        Q.    And we've seen the most interesting stuff here in

25   the courtroom, right?

1      A.    I would say that the most interesting, that's

2    probably a matter of opinion but...

3      Q.    Right.  Okay.  Anything that had any computer

4    memory to it whatsoever was taken, correct?

5      A.    Yes.  I believe that the majority of it was.

6      Q.    Anything, whether it was a cell phone, a computer,

7    a laptop, anything?

8      A.    Yes.

9      Q.    Now, the letter from Montreal -- or the SMS message

10   from Montreal, do you know who that's to?  Do you know if

11   that's to his brother?

12     A.    I don't know, no.

13           THE COURT:  Any further questions, Attorney

14   Sheketoff?

15           MR. SHEKETOFF:  No.

16           MS. OLLILA:  Your Honor, I need to follow up,

17   because I really neglected to ask an important question.

18           THE COURT:  Okay.

19           MS. OLLILA:  And I apologize, Trooper Piche, but

20   I'm going to put you on the spot.

21                        REDIRECT EXAMINATION

22   BY MS. OLLILA:

23     Q.    I didn't ask, was there cash seized at Mr. Nakos'

24   residence?

25     A.    Yes, there was.

1    Q.   Okay.  And where was the cash seized, if you

2  remember?

3    A.   I believe it was in various locations.  Some of it

4  was tucked into clothing, I believe, like in his master

5  bedroom closet.

6    Q.   Was there an amount of money, approximately $6,300

7  tucked into a shirt of a Timberland -- into the sleeve of a

8  Timberland shirt located in his master bedroom closet?

9    A.   Yes, there was.

10    Q.   Do you know, was there -- in that currency was

11  there 140 $20 bills?

12    A.   Yes, there was.

13    Q.   Was there another amount of currency seized in a

14  separate shirt in the master bedroom closet?

15    A.   Yes, I believe there was.

16    Q.   Was that approximately $4,000?

17    A.   That sounds about right.

18    Q.   Was approximately $12,000 in U.S. currency seized

19  from Mr. Nakos' residence?

20    A.   Yes, there was approximately $12,000 seized from

21  the residence.

22         MS. OLLILA:  Nothing further.

23                  RECROSS-EXAMINATION

24  BY MR. SHEKETOFF:

25    Q.   Was there a surveillance system there?

1          A.    Yes, there was, sir.

2          Q.    And did you download that surveillance system?

3          A.    Yeah.  The surveillance system was sent to the

4     forensic lab and the forensic lab carved all the images and

5     placed them onto a hard drive.

6          Q.    And what did the surveillance system depict?  I

7     mean, what was shown on the surveillance system?

8          A.    There was cameras throughout the house.  There was

9     some cameras -- it was a relatively higher end, in my

10    opinion, surveillance system.  There were some cameras

11    outside.  There were some cameras also inside of the -- that

12    covered the living room and kitchen area in the residence.

13         Q.    And can you tell from the data associated with

14    those pictures when the pictures are taken?

15         A.    I would have to review the report, but I think -- I

16    can't recall.  I would have to review the report to tell

17    exactly when they were taken, but I think it was a little

18    ways back up until the present.

19         Q.    Well, was it from the burglary at his home till the

20    present when you went in there?

21         A.    That could be fair to say.  I'm not a hundred

22    percent sure when the burglary is but...

23         Q.    Okay.  So there are surveillance cameras on the

24    outside and on the inside of that house that go on literal ly

25    for years, correct?

1      A.    Yes, it very well could be.  Yes.  That's correct.

2      Q.    The images are all saved?

3      A.    Yes.

4      Q.    Could someone look at those images?

5      A.    Well, yes, I did review some of them.  But

6  unfortunately when the forensic lab -- the way that they had

7  to forensically examine those drives, they weren't able to

8  extract that stuff as video so it was extracted as still

9  photographs, and there were well over two million still

10 photographs.  So we scrolled through as best we could, but to

11 try to look at two million photographs, it was difficult.

12     Q.    How about for any particular date that you were

13 interested in?

14     A.    I can't remember exactly what dates I had looked

15 at.  I remember trying to go through it from start to finish.

16 The problem is when you have video like that, like one

17 second -- literally one second of video, depending on the

18 frame rate set on the camera and the recorder, there could be

19 15 photographs that capture one second of video on one

20 camera.

21     Q.    So it's a lot of work, but there are dates that you

22 might be interested in, correct?  In other words, is there

23 one photograph from that video surveillance that went on

24 inside and outside his house for over a year -- is there one

25 of those photographs that you found of interest, a single

```
 1    one?
 2         A.    No, there was not.
 3              MR. SHEKETOFF:  Nothing further.
 4              MS. OLLILA:  Nothing further, Judge.
 5              THE COURT:  All right.
 6              MS. OLLILA:  Nothing further.
 7              THE COURT:  All right.  Trooper Piche, you may step
 8    down.
 9              MS. OLLILA:  The United States rests.
10              THE COURT:  All right.  Would counsel briefly
11    approach before I dismiss the jury.
12              (SIDEBAR)
13              THE COURT:  I'm just inquiring in terms of
14    tomorrow.
15              MR. SHEKETOFF:  So I would like to do this out loud
16    in front of my client, but he's told me that he doesn't want
17    to testify.
18              THE COURT:  Okay.
19              MR. SHEKETOFF:  And I'm going to call no witnesses,
20    except the stipulation, in quotes, the stipulation about the
21    offer to cut his --
22              THE COURT:  Deal.
23              MR. SHEKETOFF:  Right.
24              THE COURT:  And you guys agreed on the language of
25    that?
```

1           MR. SHEKETOFF:  No.

2           MS. OLLILA:  No.  What we can do, Judge, is I'll

3   take that letter and I'll redact every single thing in it

4   except that -- I think it's a sentence.  I would be happy to

5   do that.

6           MR. SHEKETOFF:  That would be fine.

7           MS. OLLILA:  Sure.  And you can introduce it as

8   a --

9           MR. SHEKETOFF:  As Defendant's 2.  That would be my

10  plan.

11          THE COURT:  I'll tell the jury then that it's

12  likely we will come in in the morning and have closing

13  arguments.

14          MS. OLLILA:  Good.

15          MR. SHEKETOFF:  Thank you.

16          (CONCLUSION OF SIDEBAR)

17          THE COURT:  I'm going to send you home for the

18  evening.  In the morning at 9 a.m. we will start the day.  It

19  is likely to start with closing arguments in the case.  So 9

20  a.m. tomorrow.  You are under oath to follow my instructions

21  which I will not repeat because I've repeated them to you ad

22  nauseam, but you are still under those instructions.  Please

23  follow them.  I'll see you in the morning.

24          (IN COURT - NO JURY PRESENT)

25          THE COURT:  All right.

1          MR. SHEKETOFF:  Your Honor, we've already discussed

2     this, but just for the record I think I have to move for

3     judgment of acquittal on both counts.

4          I'm not going to bore you with my reasons.  You've

5     heard me out, you've given me plenty of time to state them,

6     and you've in fact responded to them.  But I want to save my

7     rights by actually moving for judgment of acquittal on Counts

8     1 and 2.

9          THE COURT:  All right.  Having scrutinized all of

10    the evidence in a light most hospitable to the government's

11    theory of the case, I find that a rational fact-finder could

12    conclude beyond a reasonable doubt that the defendant has

13    committed both counts.  So that motion is denied.

14         Now, Petrozziello rulings.  I want to make sure I

15    have all the declarants.  I can actually -- my understanding

16    of the declarants -- let me just go over them.

17         I can tell you that Kalee Couture is going to be

18    out.  I didn't hear anything with respect to the first prong

19    of that requirement.  And let me give you the list of

20    declarants as I understand them to be, and I want Mr.

21    Sheketoff to add to that if I have forgotten any.

22         All right.  Kosmas Koustas, Jeremy Blevens, Charles

23    Fowle, Johnathan Venturini.  There was also reference to

24    FNU/LNU, but there really were hardly any statements from

25    him.  It was during the conversation with Kosmas Koustas when

1    he was fleeing.  There was barely anything that FNU/LNU said.

2    I'm not sure if he's technically one of your declarants,

3    Attorney Sheketoff.  I'm not going to treat him as a

4    declarant unless you tell me I should.

5         And then there was UM, unidentified male, 16.

6    There were I believe at least five recorded conversations

7    with UM 16, I believe also referred to as Sieger.  And then

8    there was also Cornelius Nakos, one statement primarily made

9    by him.  Are there other declarants?

10        MR. SHEKETOFF:  Yes.

11        THE COURT:  Okay.

12        MR. SHEKETOFF:  According to Mr. Sweeney, Andre

13   Watson was a declarant to him.

14        THE COURT:  Yes.  Thank you.

15        MS. OLLILA:  And Dough Boy.

16        THE COURT:  I don't remember Dough Boy making

17   statements exactly, did he?  Can you remind me, what were

18   Dough Boy's --

19        MS. OLLILA:  My recollection is that Mr. Sweeney

20   testified that he was with Andre Watson and Dough Boy, and I

21   know that Andre Watson advised Mr. Sweeney that Alkis Nakos

22   was providing him, Andre Watson, with MDMA.  I cannot recall

23   whether Mr. Sweeney said that Dough Boy said the same thing.

24   Dough Boy had owed someone money, and I just can't recall off

25   the top of my head if he said to David Sweeney that that was

1  Alkis Nakos, Judge.  I just bring it up because I can't

2  remember.

3          THE COURT:  I thought he referenced Dough Boy as

4  owing money but I still dealt with him because he had some

5  cash, but I don't remember Dough Boy making any statements.

6  Do you recall, Mr. Sheketoff?

7          MR. SHEKETOFF:  I don't recall any, your Honor.

8          THE COURT:  Well, I'm going to withhold on Dough

9  Boy and review my notes, and I would like you to do the same

10  bringing to my attention any actual statements.  My memory is

11  that he was described as being present, as being somebody

12  that Mr. Sweeney was dealing with, but I don't recall

13  statements.  I do now recall the statements allegedly made by

14  Andre Watson.

15          Now, Kalee Couture, that was a very small -- there

16  was a very small amount of testimony.  Obviously I'll

17  instruct the jury to disregard it.  It was conversations with

18  I believe Agent Poirier about camps in Canada.  I find that

19  there just isn't any evidence that she was part of any

20  conspiracy at all.  So I will not -- and I will instruct the

21  jury they are to disregard any statements of Kalee Couture.

22          With respect to all of the others, though, Kosmas

23  Koustas, Jeremy Blevens, Charles Fowle, Johnathan Venturini,

24  UM 16, as well as Andre Watson, I find in light of all the

25  evidence that the Petrozziello conditions, all four, really

1    all five, are met by a preponderance of the evidence with

2    respect to each declarant; that by a preponderance a

3    conspiracy existed; that Mr. Nakos was a part, a member of

4    that conspiracy; the declarant was also a member of the

5    conspiracy; the declarant statement was made during the

6    conspiracy and in furtherance of the conspiracy.  And I would

7    repeat those findings for each one of the separate declarants

8    with the exception of Kalee Couture.

9         All right.  And we will revisit Dough Boy

10   specifically in the morning.

11        All right.  Anything further you would like to put

12   on the record at this stage?

13        MR. SHEKETOFF:  Just to save my rights under

14   Petrozziello.  I don't want to argue it, your Honor.  You

15   obviously have given it thought, but I respectfully disagree.

16        THE COURT:  All right.  Your objection is noted.

17   And I want to give you each the latest copy of the jury

18   instructions, so if the clerk could just pass those out.  The

19   special verdict form might be the best place to start because

20   that's where there's the most radical change and it will

21   reflect our conversation this morning, but -- so I would just

22   start with that, if you would.  Now, I'll let you read that

23   and I'll ask you a couple of questions.

24        MS. OLLILA:  The special verdict is fine for the

25   United States, your Honor.

1          THE COURT:  And we obviously -- Mr. Sheketoff put

2    all kinds of arguments on the record this morning with

3    respect to my jury instructions.  With respect to this

4    special verdict form, do you have any objections beyond those

5    that you made this morning?

6          MR. SHEKETOFF:  No.  Not beyond what I said this

7    morning.  I think this verdict form is true to your view of

8    the law, your Honor.

9          THE COURT:  I will say, as well, question 2 comes

10   from the Pizzaro decision.  So I am in an abundance of

11   caution adding question 2 to comply with the holding of that

12   decision so that there is a finding with respect to the

13   conspiracy at large, with respect to quantity, and then a

14   separate finding with respect to this defendant.  It has to

15   be reasonably foreseeable to him that the conspiracy involved

16   that amount.  That's the holding in Pizarro, and those two

17   questions reflect that.

18         Okay.  You will -- as you go through the jury

19   instructions, you will see other matters reflected in these

20   that we discussed this morning.  Obviously read it again very

21   carefully tonight and we'll meet at 8 a.m. to go over final

22   instructions, and then I will have to obviously make any

23   adjustments before we start at 9 a.m., or I could obviously

24   after closings, in the morning break, make further

25   adjustments.  So we will meet at 8.  I will need a

1    stenographer there.

2            The government has rested.

3            Mr. Sheketoff, are you putting on any evidence?

4            MR. SHEKETOFF:  I am not, your Honor, except for

5    the letter from the U.S. Attorney's Office stating that

6    there's a benefit contemplated for Mr. Champagne.

7            THE COURT:  Okay.  All right.  So then -- and

8    there's no disagreement about that exhibit.

9            Are there any stipulations, specific stipulations?

10   I added a paragraph about stipulations.  Should I then remove

11   that from the jury instructions?

12           MR. SHEKETOFF:  My answer would be yes, but I

13   pledged that I would not argue certain things to the jury

14   such as they didn't prove that this was marijuana or this was

15   MDMA, because I said she could ask any witness that question,

16   I wasn't going to fight about it, and I will be punished

17   during closing.  I didn't want to call it a stipulation

18   because --

19           THE COURT:  You could just say there's no dispute

20   in your closing.

21           MS. OLLILA:  Sure.

22           THE COURT:  All right.  Well, I'll take that

23   paragraph out if there are technically really no formal

24   stipulations as to evidence.

25           I just feel like there was one other thing I needed

1   to go over.  Anything else?

2          MS. OLLILA:  Were you going to review with the

3   defendant his decision not to testify, Judge?  I don't know

4   whether you typically do that.

5          THE COURT:  Well, I assume -- Mr. Sheketoff

6   indicates there's going to be no further evidence and that

7   Mr. Nakos has decided that he's not going to testify.  I will

8   give the jury that instruction that they are not obviously in

9   any way to construe that -- he has an absolute right not to

10  testify.

11         Mr. Nakos, you're not going to testify?  Is that

12  your decision?

13         THE DEFENDANT:  Yeah, I don't believe so.

14         THE COURT:  All right.

15         THE DEFENDANT:  I do want witnesses, and he's

16  refusing to present any witnesses for me.

17         MR. SHEKETOFF:  That should be clear on the record,

18  your Honor.  It's not my obligation to listen to my client on

19  who to call as a witness unless it's him.  That is my

20  obligation.

21         THE COURT:  That is absolutely correct.  Okay.  All

22  right.  So I'll meet counsel at 8 a.m. for final jury

23  instructions and the final Petrozziello ruling on Dough Boy.

24  That shouldn't take very long.

25         And then we'll do hopefully closings right at 9,

1    and then we'll take a break and I'll do jury instructions.

2              And then for alternates I'm going to literally let

3    the jury see myself pick out of a hat so they know it's

4    random -- pick out of a bowl two numbers, and those will be

5    the alternates.

6              MR. SHEKETOFF:  Your Honor, is there a time limit

7    on closing arguments?

8              THE COURT:  What do you need?

9              MS. OLLILA:  I need an hour and ten maybe total.

10             THE COURT:  What do you need?

11             MR. SHEKETOFF:  I'll never go over an hour.

12             THE COURT:  That's going to be fine then, and then

13   any rebuttal.  Okay.  All right.  Well, good.  I'll see you

14   at 8 a.m.

15             (Jury trial in recess for the day at 4:30 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

    I, Susan M. Bateman, do hereby certify that the

foregoing transcript is a true and accurate

transcription of the within proceedings, to the best of

my knowledge, skill, ability and belief.

Submitted: 3-31-16

SUSAN M. BATEMAN, LCR, RPR, CRR
LICENSED COURT REPORTER, NO. 34
STATE OF NEW HAMPSHIRE