**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7/13/2016

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA

v.

ALKIS NAKOS

* * * * * * * * * * * * * * * * * *

14-cr-93-01-LM
August 20, 2015
1:05 p.m.

Day No. 3 - Afternoon Session
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY
and a jury

Appearances:

For the Government: Terry L. Ollila, AUSA
U.S. Attorney's Office
53 Pleasant Street
Concord, NH 03301

For the Defendant: Robert L. Sheketoff, Esq.
Law Office of Robert L. Sheketoff
One McKinley Square
Boston, MA 02109

Court Reporter: Diane M. Churas, LCR, CRR
Official Court Reporter (ret.)
Dianechuras@hotmail.com

# I N D E X


| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PAUL POIRIER | | | | |
| By Mr. Sheketoff | | 3 | | 27 |
| By Ms. Ollila | | | 26 | |
| NICHOLAS CHAMPAGNE | | | | |
| By Ms. Ollila | 29 | | | |
| By Mr. Sheketoff | | 79 | | |
| KEITH KERTZ | | | | |
| By Ms. Ollila | 118 | | | |
| GREGORY WILLOUGHBY | | | | |
| By Ms. Ollila | 123 | | | |

| EXHIBITS: | ID. | Evid. |
|---|---|---|
| Government's Exhibit 52D | | 59 |
| Government's Exhibits 59A-1 through 59-A6 | | 120 |
| Government's Exhibits 59-P1 through 59-P7 and 59P-10 and 59P-11 | | 124 |

BEFORE THE JURY

(Sergeant Paul Poirier resumed the stand.)

CROSS-EXAMINATION (cont'd)

BY MR. SHEKETOFF:

THE COURT: Attorney Sheketoff, go right ahead.

MR. SHEKETOFF: Thank you, your Honor.

Q. Good afternoon, sir.

A. Good afternoon.

Q. Now, you told us that this investigation began when?

A. It actually began in 2011, December of 2011, when we received a tip about the location.

Q. Okay. And that tip involved, I assume because of your agency, illegal gambling going on on those premises?

A. Yes, sir.

Q. Someone claimed that they had lost thousands of dollars there?

A. Yes.

Q. And your agency is in charge of things like that; correct?

A. Yes.

Q. What kind of laws are you charged to enforce with the agency you are presently at?

A. RSA 179, the liquor laws, as well as we also enforce gambling at any licensed establishments via statute.

Q. So this place we have been calling a pizza shop has a liquor license; correct?

A. Yes.

Q. During the 50 or so times that you were there over the course of a two-year period or year-and-a-half period or whatever, people bought beer there frequently?

A. Yes.

Q. In fact, in some of your reports you refer to it as a bar; correct?

A. Yes.

Q. And this is in a relatively rough part of town?

A. Yes.

Q. It's not a wealthy part of Manchester?

A. That's correct.

Q. And you saw a lot of the same people in there over the course of a year and a half spending their paycheck; correct?

A. Yes.

Q. And you noticed things like if you serve a patron who's already had too much to drink.

A. Yes.

Q. I mean, that's something a bar is not supposed to do, and you could actually lose your license for that; correct?

A. That's correct.

Q. And you saw that occur; correct?

A. Yes.

Q. And are there rules about how much food you have to serve in order to be a bar?

A. Yes. There has to be a certain ratio of food as opposed -- depending on the type of license you have, as opposed to in ratio -- this would be a clear ratio between alcohol and food.

Q. It appeared to you from your 50 times there, there was a lot more liquor being sold than food; correct?

A. All I saw was liquor being sold, yes.

Q. Well, didn't you the first time you were there see people eating?

A. I don't recall that. I recall one of the first times I was there I ordered a pizza.

Q. And do you recall an occasion where you saw my client walk in with groceries, including a big bag of flour?

A. Yes.

Q. And is it your testimony you never saw anyone

eat anything there besides yourself?

A. I saw Kaylee one time eating a sandwich there, Kaylee Couture was eating a sandwich, but it appeared she had brought it in because I remember that there was a brown bag, like it was out of a sub shop bag, on the table. I saw Cornelius Nakos eating there, but I also saw him cooking a soup on the stove for himself.

Q. Okay. You never saw any other customer eating there. That's your testimony?

A. I saw -- one evening I saw -- it was -- I was told it was from Cornelius Nakos that it was his nephew. He came in there with a bunch of friends. I don't recall exactly what they ate, but they were drinking. They might have had something to eat. They might have gotten a pizza. It was one of the very, very rare times I ever saw anybody eating there.

Q. Well, how many times did you actually show up at the dinner hour, from 5 to 6:30?

A. Quite a few times.

Q. How many is quite a few? Are you talking 30 of the 50 times? Ten of the 50 times?

A. Yeah, it could have been up to 30 times.

Q. Thirty times you were there at the dinner hour?

A. Sure.

Q. How many times were you there at the lunch hour?

A. I would say fewer times. I would say maybe ten times, twelve times at the lunch hour.

Q. So the vast majority of your trips were at the lunch hour or the dinner hour?

A. It was at the dinner hour or a little bit after dinner.

Q. Now, at some point I believe you told us this morning that the nature of the investigation changed because you had some interaction with other law enforcement agents?

A. Well, the scope of our investigation, the gambling aspect, stayed the same for the most part, but, sure, we got additional information that state police was investigating a large narcotics case involving Alkis Nakos and that establishment.

Q. When did you get that information?

A. To give you the exact date, I'd have to refresh my memory looking at my reports.

MR. SHEKETOFF: With the Court's permission, could he refresh his memory.

THE COURT: Certainly.

(Pause.)

THE WITNESS: May I look at my own folder

there?

MR. SHEKETOFF: Where is your own folder.

THE WITNESS: Brown folder right there.

Q. So I'm just going to suggest 4/2/13.

A. We learned about the state police investigation prior to this date, prior to this date.

Q. So when did you learn about it? You don't have to be exact. Is it months before 4/2/13? How long into your investigation were you? Let me put it that way.

A. I would say we were probably, again, eight months or so into the investigation.

Q. And it started in December of --

A. Actually we got the information December 2011. In June of 2012 my agency started investigating it. In August of 2012 I became --

Q. You went in for the first time?

A. I took charge of the investigation, and I was placed in the unit that oversees these types of investigations. So around August of 2012 is when we actually picked up pace on the investigation.

Q. So you think it was sometime in early 2013 that you learned about it?

A. Late 2012, probably -- yeah, sometime early 2013. I don't have the exact date.

Q. That's fine. That's your best estimate. And you actually had a meeting with the DEA and the state police; correct?

A. Yes.

Q. And by that time you had been going in for some period of time; correct?

A. That's correct.

Q. And from your point of view, you told us about that one incident where someone took a picture of you; correct?

A. Right.

Q. In your mind that person was suspicious of you; correct?

A. That's correct.

Q. And wanted to check you out in some kind of way.

A. Right.

Q. Were there other patrons during the course of your being there that appeared to be suspicious of you. In other words, not want to have conversations that you were present at?

A. Yes, there were other persons there like that.

Q. But from your point of view, by late 2012 or early 2013, you had already developed some sort of relationship with my client where he appeared to talk

freely to you; correct?

A. What do you mean talk freely?

Q. Well, he told you about his cars, about his marijuana, about all kinds of stuff according to you.

A. Yes. We had conversations. We had developed a rapport. He did talk about that stuff.

Q. Okay. So it appeared to you that he trusted you; correct?

A. He probably trusted me to a point. I don't think he trusted me explicitly.

Q. So he would tell you about smuggling marijuana across the border and he didn't really trust you explicitly?

A. No. When he spoke about that, he was talking in past tense.

Q. In fact, he was talking in very past tense because he was talking about $800 a pound; correct?

A. Not necessarily.

Q. Isn't that what you wrote in the report, that he told you that he was buying it for $800 a pound?

A. I did write that, yes.

Q. And that would be very past tense, wouldn't it?

A. No, it wouldn't. Not if you're buying large quantities.

Q. Oh, you think you could buy large quantities of Canadian marijuana in 2010, 2009, 2008, 2007, 2011, 12, 13, or 14 for $800 a pound?

A. If you've got a good source who you've been dealing with for years and you're buying large quantities, that's quite possible.

Q. Isn't it also quite possible that he was talking about the time before he went to prison?

A. That's possible as well.

Q. When did you write these reports in relation to when the incidents occurred?

A. Typically that evening or the following day.

Q. So if I look at your reports, I will see the date that the incident took place and I will see the same date for the date of the report or the next day?

A. No.

Q. Why not?

A. Why? Because typically they're put onto a thumb drive, and then when I get into the office -- I may not make it in the office for three, four, five days. When I get in the office, I import my report into a system called IMC, which is the database that we use. Once it's imported into there, so you cut and paste it from your thumb drive into this IMC system, and then I will date stamp it from there. So you will see a

discrepancy in the dates.

Q. Will I see a discrepancy between your report and your fellow Agent Nye's report for certain conversations?

A. I don't know what Investigator Nye wrote. I can't speak to that.

Q. You mean in preparation for trial today, in preparation for your testimony, you didn't look at the various reports that you and -- do you call him Officer Nye?

A. Investigator Nye.

Q. Investigator Nye wrote?

A. I looked at my reports.

Q. You didn't look at his?

A. No.

Q. And during the course of this investigation you never looked at his?

A. At some point during the course of the investigation, yes, I approved his reports.

Q. Did you notice any discrepancies between your version of conversations and his?

A. Not off the top of my head, no.

Q. Do you have a clear memory of that?

A. No.

Q. In any event, sometime in late 2012 or early

2013, you sat down with the DEA and state police and the nature of this investigation changed, correct, from your point of view?

A. The scope of my investigation stayed the same.

Q. Well, for instance, you didn't seek a search warrant you told us because you didn't want to mess up their investigation.

A. That's right.

Q. And you continued to show up there many more times and engaged my client in conversations; correct?

A. Yes.

Q. And now you had in your head at least the fact that this might be useful to the DEA or the state police?

A. Yes.

Q. And you said you took notes, not while the conversation is going on, but after the conversations occurred, when you left you took notes.

A. That's true.

Q. Where are those notes?

A. They no longer exist. They're destroyed.

Q. Did the state police or the DEA ask you to continue your investigation? In other words, did they ask you to keep going with it?

A. Yes.

Q. And did they ask you to wear a body wire?

A. I wore a wire on one occasion when I went in there, yes.

Q. And what occasion was that?

A. On one occasion when state police and DEA were assisting in the surveillance.

Q. So they were actually outside the premises while you were inside?

A. Yes.

Q. Do your reports indicate what date that would have been?

(Pause.)

A. April 2nd, 2013.

Q. Is that one of the conversations you've told us about?

A. Excuse me?

Q. Is that one of the conversations you told us about when the prosecutor was asking you questions?

A. No, because this was not a conversation -- Alkis Nakos was not present during this particular date. Cornelius Nakos was there.

Q. So did you record your conversation with Cornelius Nakos?

A. It was not recorded. The body wire was worn strictly for officer safety purposes.

Q. Okay. So if you put a wire on, you have the ability to transmit to other officers outside of the establishment so that if something during the course of the conversation puts you in danger, others could respond; correct?

A. That's correct.

Q. And you also have the ability to record and you can do that simultaneously. You can transmit and record.

A. Well, that depends on what type of body wire you're talking about. If you have the capabilities with that transmitter, yes, you can do that. This particular transmitter I was wearing that day didn't have that capability to record from it.

Q. Okay. Was that your agency's transmitter or was that a DEA or state police transmitter?

A. State police transmitter.

Q. I take it your testimony would not be that the state police don't have the kind of transmitters I'm talking about. They just didn't choose to give you that kind on that day. They gave you only one that would transmit.

A. Right. That particular one they gave me only transmitted.

Q. What I'm saying is you know, do you not, from

your experience in law enforcement that they have the technology to do both. This is not sophisticated technology anymore.

A. Sure. And on that particular date we also didn't obtain a one-party to do that, to record that conversation that you're referring to.

Q. Was the DEA involved in the investigation at that point in time?

A. Yes.

Q. So it's your view -- and I'm not asking you to be a legal expert. I'm just asking for your view. It was your view that you would need a warrant to do a one-party consent body wire as an undercover officer in that establishment?

A. You don't need a warrant, but you need authorization from the Attorney General's or someone from the county attorney's office who has the authority to give you the authorization to do that.

Q. Or if the DEA is involved -- and I'm asking for your view -- you don't need anybody's authorization. You can just do it.

A. You will have to ask a DEA agent about that.

Q. In any event, on that one occasion they sent you in there, you were going to try and speak to my client, but he wasn't there.

A. Are you asking?

Q. On April 2nd they sent you in there with a transmitter. You were going to attempt -- the idea was to speak with my client, but he wasn't there.

A. Correct.

Q. His father was there.

A. That's true.

Q. The person that owned the establishment.

A. Right.

Q. Did you ever go back a second time with any kind of wire?

A. I don't believe so.

Q. Do you know why?

A. We just chose not to.

Q. Now, sir, did you ever drink in that establishment or every beer you bought you threw out in the bathroom?

A. No, I drank.

Q. How about your -- Investigator Nye?

A. He drank as well.

Q. And as I understood your testimony, the most you or he would ever have is three beers?

A. That's correct.

Q. Did either of you ever play the video poker games?

A. We both did.

Q. From the picture that we saw, there are three video poker games; correct?

A. Yes.

Q. And it says something over it "for entertainment only"?

A. Yes.

Q. That's not true; correct?

A. That's correct.

Q. So you put money into the machines, and if you accumulate a certain number of points and if you're just into playing video poker in a place where a sign like that would be true, you might compete with someone for the number of points you could score, but it doesn't really matter if you paid your money; correct?

A. Right, but I've never seen that happen.

Q. Right. Do you know of any video poker game, a machine in any jurisdiction that you cover, that is played for entertainment only?

A. No, I do not.

Q. So it's sort of a wink and a nod industry, that every bar and club and establishment that has these games, that they know the law or they're told the law, which is they can't use them to generate income. In fact, everyone does.

A. Every investigation that I've conducted where those machines are, they pay out, and that's what our agency is there for, to regulate those machines and police those machines and those licensed establishments that are licensed by our agency.

Q. What happens if you get caught paying out?

A. It's a criminal offense. It's a felony. Person's arrested. The machines are seized and they go through the criminal process.

Q. And could you lose your liquor license?

A. Absolutely lose your liquor license.

Q. And even with those penalties, at least in every investigation you've done, that's what these establishments are doing. They're generating income by paying out on the machines.

A. Sure.

Q. How long does it take to play a video poker game?

A. It could take seconds. Depending on your gambling habit, it could take a few seconds. You could be there for hours. I've seen people put in a hundred dollars and they're there for two minutes and it's gone. Depending on how big of a gambler you are.

Q. And these machines work on the same basic principles that casinos work on. There are odds and the

odds are in favor of the house.

A. They're in favor of the house and can be set by the house.

Q. With these machines they can be set by the house.

A. That's correct.

Q. If you go to someplace like Foxwoods, do you know if the odds are regulated by the state of Connecticut in any way?

A. They are regulated.

Q. So you're better off at Foxwoods than you are at an establishment in New Hampshire that has some video poker games in terms of your chance of winning.

A. Yes, because all these poker machines they have what's called a dip switch in them, and a dip switch is a switch that controls the odds of machines. And all these establishments, they can change that dip switch for the odds to be in favor of the house, which is what they all do.

Q. Did the state of New Hampshire lose any money on these machines or did it come out ahead?

A. Oh, no, we lost money on them.

Q. How much money did you lose?

A. On this particular case?

Q. Yeah. Approximately.

A. Maybe a couple thousand dollars total.

Q. Now, during the course of these conversations with my client, he told you that he was an avid gambler, did he not?

A. He did.

Q. And he told you that he gambled in Las Vegas. He gambled at both casinos in Connecticut. Did he tell you he gambled in Canada also?

A. I don't recall him talking about gambling in Canada, no. I don't recall that.

Q. But the others he did talk about?

A. Yes.

Q. And he claimed to be up; correct?

A. Yes.

Q. And do you know if these various casinos actually have recordkeeping capabilities? In other words, does Foxwoods for tax and other reasons have to keep records?

A. Yes, they do.

Q. Same with Mohegan Sun and various casinos in Las Vegas?

A. Yes.

Q. Now, one of the things you were putting out there for my client was the capability of flying into Canada and for that matter flying out of Canada without

having to deal with Customs because some relative of yours had a private jet. I know that story wasn't true, but it was bait so to speak. Correct?

A. Yes.

Q. In the year and a half or two years, whatever it was that you offered bait, he never took any bait; correct?

A. No, that's not true.

Q. Oh, he agreed to go -- to use your services to do something illegal?

A. Not to do something illegal. He had asked me when we were going to fly to Connecticut.

Q. He wanted to fly to Connecticut to go to the casino; correct?

A. That's correct.

Q. But he never enlisted your help or took the bait on doing anything that had to do with drug dealing; correct?

A. No, but I didn't push it. I brought it up.

Q. You offered the opportunity, but you are an experienced investigator and you knew that if you went too hard, you would be suspected; correct?

A. No.

Q. All right. Explain.

A. That's not what happened. I basically dropped

the subject of the plane after speaking with state police and the direction that they wanted to go, too, with the case.

Q. But in any event, the only thing that you think was questionable that he asked you to do during this entire period was take the private jet and fly him to one of the casinos in Connecticut.

A. I didn't think it was questionable.

Q. I mean, that's perfectly legitimate. If you know someone with a private jet, it's easier than driving down there; correct?

A. Sure.

MR. SHEKETOFF: Thank you.

MS. OLLILA: May we approach for a moment, your Honor.

AT SIDEBAR

MS. OLLILA: I have one redirect question and it's based upon Attorney Sheketoff's cross. It appears that he's attempting to lay the foundation for the argument in closing that these gambling machines generated a source of income that can justify the source of income that Alkis Nakos had.

When Sergeant Poirier was in Amory Street House of Pizza, he spoke to Cornelius Nakos, and Cornelius Nakos said that the machines generated $500 a

week in profit. I think that that's fair game given that Attorney Sheketoff has opened the door, and he is now going to argue in closing that there is a source of money that Mr. Nakos was collecting, and he's going to try to justify the enormous amount of money by claiming that it came from the video poker machines.

So the one question I'm going to ask is: Did you speak to Cornelius Nakos? Yes, I did. Did he tell you how much money those machines were generating a week? Yes, he did. How much? $500.

THE COURT: And so you're making an opening the door argument.

MS. OLLILA: Yes.

THE COURT: It's hearsay so how do you get past that?

MS. OLLILA: Because there is a separate conspiracy, your Honor. Attorney Sheketoff is the one who opened the door to talk about the gambling conspiracy. So Mr. Nakos, Cornelius Nakos, is engaged in a conspiracy with his son to get payouts. So it is a co-conspirator statement in furtherance of the gambling conspiracy. I never brought it up during direct. It was Attorney Sheketoff. And he brought it up intentionally because he wants to be able to argue in closing that the defendant had a source of income. So

truly it's not about this conspiracy, but it is a gambling conspiracy that Attorney Sheketoff brought up, and it is in furtherance of that conspiracy how much money is being made, Judge.

MR. SHEKETOFF: How's that in furtherance?

MS. OLLILA: It goes to show what money is being generated by those poker machines. Of course that's in furtherance.

MR. SHEKETOFF: But he has to be saying it in furtherance of the conspiracy. How could saying it to this guy be in furtherance of the conspiracy?

MS. OLLILA: Because he's trying to induce Sergeant Poirier to gamble on those machines. He was having that conversation when he was making a payout to Sergeant Poirier.

I'm simply doing it, Judge, because it's got to be fair play. He can't be allowed to open the door without Sergeant Poirier being able to answer what those machines were generating.

MR. SHEKETOFF: My objection is hearsay. It's not that she can't get into this topic. She can call Cornelius and put him on the stand and ask him.

MS. OLLILA: He's going to take the Fifth Amendment, Judge. And it is a co-conspirator statement. It's the co-conspirator statement that Attorney

Sheketoff was talking about the conspiracy. He talks about Nakos and his father with the machines, yes.

MR. SHEKETOFF: Same objection, your Honor.

THE COURT: All right. I think it's close, but I think that the co-conspirator hearsay exception would apply because Cornelius is speaking to him. He thinks he's undercover. He thinks he's perhaps dealing with him, and he's talking about the video poker, and it's a statement of Nakos, his co-conspirator, his dad, with respect to the gambling.

I also think that you did open the door to the topic. So I'm going to allow the redirect.

MR. SHEKETOFF: I don't argue that it's not relevant. I only argue that it's hearsay.

IN OPEN COURT

REDIRECT EXAMINATION

BY MS. OLLILA:

MS. OLLILA: Sergeant Poirier, I only have two questions for you.

Q. Attorney Sheketoff brought up the issue of the video poker machines and you had initially testified that they were dollar machines. Is that correct?

A. Yes.

Q. Now, at some point in time did you have a conversation with Cornelius Nakos about the amount of

money that those machines were generating as of the time of your investigation?

A. Yes.

Q. The three machines were generating a sum total of how much money a week?

MR. SHEKETOFF: Objection to the phrasing of that question.

Q. What did he say to you?

MR. SHEKETOFF: Okay. The objection at the sidebar, same objection.

THE COURT: Your objection is noted.

A. He told me that the machines were only making $500 a week.

Q. Were only making $500?

A. Yes.

MS. OLLILA: Nothing further.

THE COURT: Anything further?

MR. SHEKETOFF: I do have a recross.

RECROSS-EXAMINATION

BY MR. SHEKETOFF:

Q. Do you have your report for 4/12/13?

A. Yes.

Q. And, by the way, was Cornelius Nakos sober when he made that comment to you? Not the 4/12 comment, the comment about the machines made $500 a week.

A. I've just got to look on my report here.

(Pause.)

A. I don't see where I say he was not.

Q. Was he often not sober?

A. No. He was often drinking, but I wouldn't say he was drunk.

Q. Do you remember being told that back in the old days when there were four machines there, they were making $3,000 a week?

A. That's something that another individual stated inside the bar, not Connie.

Q. In any event, it was 2013 that Connie Nakos told you that the machines were making $500 a week or 2012?

A. Again, I'd have to find the exact report.

Q. In any event, it was in that time period?

A. Yes.

MR. SHEKETOFF: Thank you.

MS. OLLILA: I have nothing further.

THE COURT: Great. Sergeant Poirier, you're free to go. Next witness.

MS. OLLILA: United States calls Nicholas Champagne.

NICHOLAS CHAMPAGNE

having been duly sworn, testified as follows:

THE CLERK: For the record, please state your name and spell your last name.

THE WITNESS: Nicholas Champagne, C-H-A-M-P-A-G-N-E.

DIRECT EXAMINATION

BY MS. OLLILA:

Q. Good afternoon, Mr. Champagne.

A. Good afternoon.

Q. I'm going to ask you a favor, Mr. Champagne, to try to speak as loudly as possible, and, if possible, can you speak into the microphone, that will help to project your voice. Do you want to be here today?

A. No.

Q. Have you ever found yourself in a situation like this?

A. Never.

Q. Have you ever cooperated against one of your friends?

A. Never.

Q. Would you ever want to cooperate against one of your friends?

A. No, never.

Q. Do you have your attorney here with you today?

A. I do.

Q. Has he represented you the entire time during

the course of this prosecution?

A. He has.

Q. Have you met with me before?

A. I did last year.

Q. Was I present with law enforcement when we met?

A. You were.

Q. Did you want to be there?

A. No.

Q. Were you happy about it?

A. Not at all.

Q. Do you dislike me?

A. Yes.

Q. You started to shake your head no.

A. I do.

Q. Why?

A. Because you're law enforcement.

Q. Where did you grow up, Mr. Champagne?

A. Manchester, New Hampshire.

Q. Are you a lifelong resident of Manchester, New Hampshire?

A. I am.

Q. How was your family life as a child?

A. Troubled.

Q. In what way, Mr. Champagne?

A. Lots of drugs and alcohol.
Q. Lots of drugs and alcohol?
A. Yeah.
Q. Can you expand on that? What do you mean by that, Mr. Champagne?
A. My mother and father were drug addicts and alcoholics.
Q. Your mom and dad?
A. Yes.
Q. Are your mom and dad still alive, Mr. Champagne?
A. No. My mother passed away. My father's no use.
Q. So your father's still alive?
A. Yes.
Q. Are you married?
A. No.
Q. Are you a dad?
A. I am.
Q. Is that the best thing that's ever happened to you?
A. It is.
Q. You come to tears when you talk about your child, don't you?
A. Pretty much, yes.

Q. Where were you when your child was born?
A. At the hospital.
Q. Have you been away from your child for a period of time?
A. I have.
Q. For how long?
A. Five years.
Q. Say that again?
A. Five years.
Q. Do you regret being away for five years?
A. Every single day.
Q. Do you ever want to go back to jail again?
A. No, never.
Q. Will you ever go back to jail again?
A. I'm going to try my damndest not to.
Q. Are you employed?
A. I am.
Q. How long have you been employed?
A. Thirteen months now.
Q. You work really hard?
A. I do.
Q. You work every day?
A. I do.
Q. Do you see your child every day?
A. I do.

Q. Do you have a great relationship with your child now?

A. Yes, I do.

Q. Do you intend to ever be away from your child again?

A. No, never.

Q. Were your parents there for you, Mr. Champagne?

A. On and off.

Q. Do you want to be the same parent that your parents were to you?

A. No.

Q. Is that what's motivating you today?

A. Yes.

Q. Do you have any criminal convictions, Mr. Champagne?

A. I do.

Q. How many convictions?

A. I've been convicted ten times on felony charges.

Q. You've been convicted ten times on felony charges, is that what you said?

A. Ten felony convictions.

Q. Will you tell the jury what are some of the felony convictions. For doing what, Mr. Champagne?

A. Selling drugs.

Q. Have you been selling drugs for most of your life?

A. Since early teens, yes.

Q. Since early teens?

A. Yes.

Q. What age do you first recall selling drugs?

A. 13, 14.

Q. What were you selling at that time?

A. LSD, crack.

Q. LSD and crack. What is crack for someone who doesn't know.

A. Crack cocaine.

Q. What is that, crack cocaine. What's it look like?

A. It's a tiny piece of white powdery substance that is like a rock.

Q. Looks like a powdery rock, is that what you said?

A. Yes.

Q. You were how old when you started selling crack cocaine?

A. 13, 14 years old.

Q. How does someone 13 or 14 get a hold of crack cocaine?

A. Older influences.

Q. Older influences, is that what you said?

A. Yes.

Q. Were you taking care of yourself at that age, Mr. Champagne?

A. Pretty much.

Q. Did you have to make money for yourself?

A. Yes.

Q. Did you make a lot of money?

A. Enough to get by.

MR. SHEKETOFF: Your Honor, I just can't hear the witness.

MS. OLLILA: Mr. Sheketoff can't hear you, Mr. Champagne. I know you're very quiet. I'm really sorry, but if you can try to speak up as much as possible.

Q. And the question was, how much money did you make as a 12 or 13-year-old selling crack cocaine?

A. I don't know. Maybe a few hundred dollars a week.

Q. Did you ever give your parents any money?

A. No.

Q. Did you go home every night to your parents?

A. Sometimes.

Q. Where'd you stay?

A. Crack houses, at other friends' houses, stuff

like that, on the streets.

Q. Did you have any assistance?

A. I have a brother and I have a sister.

Q. Are they still around?

A. My brother still is. My sister passed away.

Q. How much of your life have you spent incarcerated?

A. Twelve years.

Q. How old are you, Mr. Champagne?

A. 34.

Q. That's about a third of your life. Are you done with that?

A. I am.

Q. At some point in time did you start selling marijuana?

A. Yes.

Q. How old were you when you first started selling marijuana?

A. Mid teens, 15, 16 years old.

Q. You said you have had about ten felony convictions and you've served about 12 years and you mentioned selling crack cocaine. What are some of your other felony convictions? Are they all drug related?

A. The majority of them.

Q. Any violent felonies?

A. No.
Q. Are you a violent guy, Mr. Champagne?
A. No.
Q. Are you pretty passive?
A. Yes.
Q. Have you ever owned a gun?
A. Yes.
Q. Why?
A. Protection.
Q. Have you ever used that gun?
A. No.
Q. Protection for what?
A. Myself.
Q. Were you in jail in 2005 and 2006?
A. I was.
Q. Were you in jail with any of your friends?
A. Bunch of them.
Q. And can you name some of those friends that you were in jail with?
A. Be more specific.
Q. Do you know Alkis Nakos?
A. I do.
Q. Were you ever incarcerated with him?
A. At a time I was, yes.
Q. At a time. Do you recall when?

A. Might have been around that time, 2005, 2006.

Q. 2005, 2006. Mr. Champagne, I know this pains you to do this.

MR. SHEKETOFF: Objection, your Honor.

MS. OLLILA: Strike that.

THE COURT: All right. She's stricken that. Rephrase your question.

Q. Do you see Mr. Nakos in the courtroom today, Mr. Champagne?

A. I do.

Q. Would you please point to him and describe an article of clothing he's wearing.

A. He's wearing a black suit coat.

MS. OLLILA: May the record reflect that the witness has identified the defendant, Alkis Nakos.

THE COURT: Yes.

Q. You sighed pretty heavily doing that. Why?

A. It's a tough thing to do.

Q. What's a tough thing to do?

A. Somebody that I spent a good portion of my life knowing.

Q. Is Alkis Nakos one of your very good friends?

A. At one point in my life he was, yes.

Q. What happened?

A. Age I guess, distance, different class of

friends, I don't know, time I suppose.

Q. When you were in jail in 2006, were you released at some point in 2007?

A. I was.

Q. Do you remember when, Mr. Champagne?

A. November 2007.

Q. Do you remember all the dates when you were released? Do they stick out in your mind?

A. Pretty much, yes.

Q. So you were released in November of 2007. What did you do when you were released?

A. Worked.

Q. Doing what?

A. I worked at a restaurant.

Q. Okay. Did you start back again selling marijuana?

A. Eventually, yes.

Q. How quickly after your release?

A. Few months.

Q. And where were you getting that marijuana when you were first released?

A. From a Mexican guy.

Q. From a Mexican guy?

A. Yes.

Q. What's the quality of Mexican marijuana?

A. Terrible.

Q. It's terrible?

A. Yeah, it's not too good.

Q. What's the quality of Canadian marijuana?

A. Very good.

Q. So if you had your druthers, if you had your choice, what would you prefer, Mexican or Canadian marijuana?

A. Canadian.

Q. So the marijuana you were obtaining when you first got out of jail, it was Mexican marijuana?

A. Yes.

Q. Did you want a better quality?

A. Eventually, yeah.

Q. How did you get the better quality of marijuana?

A. Through a source.

Q. Who was that source?

A. It was a Canadian source.

Q. How did you learn about that Canadian source?

A. I met him while I was in state prison.

Q. And what was the name of that Canadian source?

A. Mihail.

Q. Do you know Mihail's last name?

A. Leventis.

Q. When you were incarcerated with Mihail Leventis, was Alkis Nakos incarcerated at the same time?

A. Yeah. I think we were all together, yes.

Q. Was the defendant, Alkis Nakos, good friends with Milhail Leventis?

MR. SHEKETOFF: Objection to the leading, your Honor.

Q. Do you know if they were friends?

THE COURT: Objection overruled.

Q. Do you know?

A. They were friendly.

Q. When you were released at some point after November 2007, did you have a conversation with Alkis Nakos about getting Canadian marijuana?

A. Yes, I did.

Q. Can you tell the jury what that conversation was?

A. I just asked when he went up to see Mihail -- because he was friends with him. He had contact with him prior to me coming home. And it was just about him hooking me up with a source of better marijuana from Canada.

Q. Let me stop you because you're being very quiet and I want to be sure that I hear you right. Correct me if I'm wrong. You said before you were

released, Alkis Nakos went up to see Mihail; is that correct?

A. No, he was in contact with him.

Q. I'm sorry, he was in contact with him. Alkis Nakos was in contact with Mihail.

A. Yes.

Q. And then what else did you say?

A. After I was released, sometime after I was released that he had went up to see Mihail.

Q. You said after you were released he went up to see Mihail. Who is he?

A. Alkis.

Q. Why did he go up to see Mihail?

MR. SHEKETOFF: Objection.

Q. Do you know?

A. No, I don't.

THE COURT: I'm sorry. Did you say no?

MS. OLLILA: He said I don't know.

THE COURT: Okay. Objection overruled. Go ahead.

Q. Did you meet with Alkis Nakos after he came back from Canada?

A. I did.

Q. Where did you meet?

A. I don't know. I think he came to see me at

the restaurant maybe I was working at.

Q. And what was the conversation?

A. It was about getting me a better source of marijuana.

Q. It was about getting you a better source of marijuana?

A. Yes.

Q. And what did he say?

A. He just explained the details to me of how it had come down in pricing and stuff like that.

Q. He explained the details to you how it would come down in the pricing. When you say he explained the details, who are you referring to?

A. Alkis.

Q. And he said how it would come down. Come down from where?

A. Canada.

Q. And what is "it" a reference to?

A. Marijuana.

Q. And you said he explained the pricing. What did he say about the pricing of the marijuana?

A. Just how much it would be, how much quantity you had to get to get it.

Q. Let's talk about that a little bit. Is it fair to say that the more quantity you buy, the lower

the price is?

A. Sometimes.

Q. And are there times when the price is still just as high if you buy a lot of quantity?

A. Yeah.

Q. Why is that, Nick?

A. I don't know. Depending on the time of the year it is I guess. I don't know how it works.

Q. So let's just back up a little bit. Nakos said how the pricing would work. How did he say the pricing would work?

A. He said it only comes certain amounts.

Q. And what were those amounts?

A. Fifty-pound packages.

Q. It would come in 50-pound packages. And then what else did he say, Mr. Champagne?

A. Just the price of it.

Q. And what was the price going to be?

A. Anywhere from 23 to $2,600.

Q. 23 to $2,600 per what?

A. Per pound.

Q. Per pound. So the minimum you could order would be how much?

A. 50 pounds.

Q. And did you agree to that?

A. I did.

Q. Why did you agree to that?

A. Because it was an opportunity for me to make money.

Q. Was the market better for Canadian marijuana? Meaning, did you have more customers who wanted Canadian marijuana versus Mexican marijuana?

A. Yes.

Q. So how quickly after you had that conversation with Alkis Nakos did you start getting marijuana?

A. Probably a few weeks.

Q. Did you ever travel to Mr. Nakos's pizza place known as Amory Street House of Pizza?

A. I've been there, yes.

Q. Did you ever meet with Mr. Nakos with any other Canadian that was involved?

A. I did, yes.

Q. And do you have any recollection about what the time frame was, Mr. Champagne?

A. I don't know. Again, the year, probably like January or February.

Q. Of what year?

A. 2008.

Q. January, February 2008. So you had been released in November of 2007. So by January, February.

And Nakos had already gone to Canada obviously; is that correct?

A. Yes.

Q. So why did you go to the restaurant?

A. To meet with one of the Canadian sources.

Q. And who was there at the restaurant?

A. Me, a kid named Goofy, and Alkis.

Q. And what was the conversation?

A. Just how -- he brought like a communication device for me.

Q. Who brought a communication device for you?

A. The kid Goofy.

Q. Then what was going to happen?

A. I would start communicating with him and receiving marijuana.

Q. Now, let's just back up. He brought a communication device. I think this is obvious, but what do you mean by a communication device?

A. A cellphone.

Q. A cellphone?

A. Yes.

Q. Do you remember what kind of cellphone?

A. It was a BlackBerry.

Q. Are BlackBerries still around?

A. I don't know.

Q. So Goofy brought you a BlackBerry cellphone?
A. Yes.
Q. And while Goofy is talking to you, where is Alkis Nakos?
A. He's right there with me.
Q. He's right there listening. Is he part of the conversation?
A. Not really.
Q. Is he listening?
A. Yes.
Q. Let me also back up and talk to you about telephones, Mr. Champagne. You have been dealing controlled substances for a long time; correct?
A. Yes.
Q. How many cellphones do you think you've owned in your life?
A. I couldn't -- quite a bit.
Q. What's that mean, quite a bit?
A. Hundreds.
Q. Why?
A. To avoid the authorities maybe.
Q. What's that mean? You have hundreds of cellphones to avoid the authorities. What does that mean for someone who's not in the business and doesn't understand?

A. You are always worried about your phone being tapped.

Q. Do you get phones in your own name?

A. No, you buy prepaid phones.

Q. What does that mean, you buy prepaid phones. Is that like one of the phones you get at Walmart?

A. Yeah, you buy them at Walmart and just throw them away when you're done with them.

Q. Is there any paper trail with respect to that phone and you?

A. No.

Q. Why is that, in the business?

A. To avoid authorities.

Q. Mr. Champagne, Goofy gave you a communication device, and what did he say about that communication device?

A. That's how we'd communicate.

Q. And how were you going to communicate? Were you going to talk to someone or some other way?

A. Through text.

Q. Through text messages?

A. Yes.

Q. Did Goofy say how far in advance you would be notified that a quantity of marijuana was coming down?

A. Within a couple days.

Q. And after that meeting, how long did it take before you got the first load of marijuana?

A. Maybe a week.

Q. A week. And how did it happen?

A. I sent him a text. After that it was just communication through text to set up an arrangement with a place to meet.

Q. And where was the arrangement and where was the place you met?

A. I think the first time it might have been at Derryfield Park or something.

Q. Is that in Manchester?

A. Manchester, yes.

Q. And who did you meet there? Did you even know who you were going to meet?

A. No. It was just random Canadian kids I believe.

Q. Random Canadian kids?

A. Yes.

Q. Did you pull in your vehicle?

A. Yes.

Q. Did you see another vehicle?

A. Yes.

Q. Did you ever see the license plate on the vehicle you would be meeting?

A. No.
Q. You never noticed if it was a New Hampshire plate, New York, or any other plate?
A. No.
Q. So what did you do when you would pull in? How would you know who to look for?
A. Because they would always -- we'd communicate with a prepaid phone beforehand so I would know what type of vehicle he was in.
Q. Okay. So you would know the vehicle you were looking for?
A. Yes.
Q. You'd pull in and how would the exchange go?
A. I'd pull in. He'd open the trunk, I'd open my truck, take out the package, throw it my trunk and leave.
Q. You'd take out the package, throw it in your trunk and leave. What would it be contained in, Mr. Champagne?
A. Usually big large black duffel bags.
Q. Was there a lock on the duffel bag at all?
A. Most times, yes.
Q. Where was the lock?
A. On the zipper.
Q. Was there any label on the packaging, on the

outside of the duffel bag?

A. Sometimes there would be.

Q. What would that be sometimes?

A. Usually NH.

Q. Was there any other labeling that you saw?

A. No, never.

Q. Did you ever see ITL?

A. No.

Q. Okay. What would you do with the marijuana?

A. Distribute it.

Q. How long would it take you to distribute it?

A. Couple weeks.

Q. And how much were you charging for the marijuana?

A. Depending on what I paid for it, anywhere between like 26, $2,800 a pound.

Q. How much were you making per pound off the marijuana?

A. Sometimes only a hundred, sometimes 2 or 300.

Q. Anywhere between a hundred or 2 or $300?

A. Yes.

Q. Mr. Champagne, do you have money buried somewhere?

A. I don't.

Q. How much money have you made dealing drugs in

your life?

A. I don't know. I couldn't put a number on it. I'd spend it as fast as I made it.

Q. Do you have anything to show for it?

A. Not really.

Q. Do you even own a vehicle?

A. I do now, yes.

Q. Okay. After the marijuana would be sold -- by the way, let me just back up. Who would you sell it to? Were there certain people that you sold it to?

A. I had people I'd sell it to, yes.

Q. Can you name some of those people?

A. Kid named Corey, kid named Nick.

Q. Let's talk about Corey. What is Corey's last name? Do you know his last name?

A. Buchan.

Q. Corey Buchan.

A. Yes.

Q. So if you would get a 50-pound load of marijuana, how much would you typically sell to Corey Buchan?

A. Most of the time 50 pounds, the whole package.

Q. Now, what about this kid Nick? What was Nick's last name?

A. Nick Lawyer.

Q. L-A-W-Y-E-R?

A. I don't know.

Q. Okay. And how often did you sell to Nick Lawyer?

A. Probably every couple weeks.

Q. And what quantities would you sell to him?

A. Usually 50 pounds I'd give to him, too.

Q. So 50 pounds also. So you gave 50 pounds to Corey Buchan and 50 pounds to Nick Lawyer?

A. Yes.

Q. Do you know, Mr. Champagne, if Nick Lawyer had a partner?

A. No.

Q. You didn't know at that time?

A. No.

Q. When you would give them the marijuana -- is it cash and carry, meaning here's 50 pounds, give me the money now. Would they give you the money right away or would you front the marijuana?

A. I'd front it.

Q. What does that term mean in drug dealing? What does that mean, to front the product?

A. Basically a loan.

Q. It's a loan? You give them the marijuana and then you wait for your money?

A. Yes.

Q. How long would it generally take before you'd get your money back?

A. Maybe a week.

Q. Is there any honor in the drug business?

A. No.

Q. Do drug dealers rip each other off?

A. Sometimes.

Q. Have you ever been ripped off?

A. No.

Q. Do you know if Alkis Nakos has ever been ripped off?

A. No.

Q. After the first 50-pound load -- let's back up. So Goofy gives you the cellphone and says this is how it's going to work and a text message is going to come in. Text message comes in, you find out where to go, it's right around Derryfield. You meet the kid, you get the marijuana, you sell it. How quickly are you getting another package?

A. Every two weeks.

Q. Every two weeks. And is it always at least 50 pounds?

A. Yes.

Q. Did you ever get less than 50 pounds?

A. No.

Q. Did you ever get more than 50 pounds?

A. I have on occasion.

Q. What does that mean, on occasion?

A. As my clientele picked up and people got familiar with me, I'd get more quantities.

Q. So as your clientele picked up, you got more clients; is that correct?

A. Yes.

Q. So you identified Corey Buchan and Nick Lawyer as two of your early customers. Is that right, Mr. Champagne?

A. Yeah.

Q. Did you ever have a third individual?

A. I had a few other people.

Q. Okay. Who?

A. Jonathan Venturini, Charlie Fowle.

Q. Who else?

A. Kosmas Koustas. More or less he was inclined more or less to help me get rid of it.

Q. Oh, he wasn't a client. He helped you get rid of it?

A. Yes.

Q. Do you know someone by the name of Dave Coulombe?

A. I do.

Q. How do you know him?

A. Grew up with him.

Q. At some point did you get so busy that you needed help?

A. I did.

Q. Who did you turn to for help?

A. Kos for a little while and Dave Coulombe.

THE COURT: We're going to just have him speak up so Attorney Sheketoff can hear him. It's not your fault. It's just that the mic is a little too far away.

MS. OLLILA: Sure. I'm so sorry. I know you don't like me coming near you.

THE COURT: The closer you get to the mic, the less we'll have to do that.

Q. You just said that as your clientele picked up you needed help, and the people that helped you were Kos, Kosmas Koustas.

A. Yes.

Q. And you said Dave Coulombe?

A. Yes.

Q. How do you say his last name?

A. Coulombe.

Q. Okay. Did you tell Mr. Nakos that Dave Coulombe was going to help you?

A. Yes.
Q. And did he approve?
A. It wasn't his choice.
Q. How much weight were you giving to Dave Coulombe?
A. He would take anywhere from 25 to 50 pounds.
Q. How often?
A. Every couple weeks.
Q. How much marijuana were you moving a month?
A. I mean, in a month, anywhere from 100 to 400 pounds.
Q. Anywhere from 100 to 400 pounds?
A. Yes.
Q. Would you always meet different Canadians in order to receive it?
A. Yes, it would always be different people.
Q. Do you remember any of their faces?
(Witness shakes head negatively.)
Q. Do you remember when we met with you we showed you some pictures of individuals, Mr. Champagne?
A. Yes.
Q. Did you identify some of those individuals as individuals you had met before?
A. Yes, I did.
MS. OLLILA: Just give me a second. Please

pull up 52H.

Q. Mr. Champagne, if you look at the monitor to your left, can you see that clearly?

A. Yes.

Q. Is there a picture showing up there?

A. Yes.

Q. Do you recognize who that individual is?

A. I think so, yes.

Q. Okay. And what do you recognize about this individual?

A. He used to deliver marijuana.

Q. He used to deliver marijuana?

A. Yes.

Q. Where would you meet him to obtain the marijuana?

A. Could be anywhere.

Q. Could be anywhere?

A. It was in the Manchester area.

Q. I'm going to show you, Mr. Champagne, an exhibit which is marked 52D. Do you recognize this individual?

A. I do.

Q. Who's that individual?

A. Goofy.

Q. That's Goofy, the individual who met you at

Amory Street House of Pizza and gave you the cellphone?

A. Yes.

MS. OLLILA: Your Honor, I'd ask that the ID be stricken off 52D and it be entered into full evidence.

THE COURT: Any objection?

MR. SHEKETOFF: I have no objection, but can we see you at sidebar?

THE COURT: Yes. 52D is a full exhibit.

(Government's Exhibit 52D admitted.)

AT SIDEBAR

MR. SHEKETOFF: The debriefing document that I was given has no indication whatsoever that photographs were shown to this person.

MS. OLLILA: It's because they were shown a week and a half ago when we engaged in trial prep and there was no report generated, and that's very typical. If there was anything that was exculpatory or impeachable that came as a result of that trial prep, I would have turned it over. For example, when we engaged in the trial preparation of Charles Fowle, while we were talking to him, he said that he used marijuana 20 times during the course of his incarceration at Strafford. I immediately did a letter to defense counsel divulging that information because it's impeachment information.

There was nothing that this witness said during the course of the trial preparation session that was impeachable in any way, shape, or form. If it would have been, I would have disclosed it to Attorney Sheketoff.

MR. SHEKETOFF: I thought photograph identifications were automatic Rule 16 disclosures.

MS. OLLILA: They are not. This is not an instance where we have a bank teller doing a photo array. This is an instance where Mr. Champagne knows these individuals. He looked at the photo, identified the individual that -- we didn't tell him who it was. This is not a photo array type of case that Mr. Sheketoff is referring to.

MR. SHEKETOFF: Okay. So I don't have the rule in front of me and I don't know exactly what it says, but I thought this was Rule 16, automatic discovery, and if there are agent notes of this interview, since this is the most important witness in the case --

MS. OLLILA: There are no agent notes. No one was taking notes.

By the way, Judge, for the record, Attorney Sheketoff -- the picture that this witness was just shown, Attorney Sheketoff has had it in discovery for

well over a year. This has been an exhibit that was marked for trial. Attorney Sheketoff came to the U.S. Attorney's Office two weeks ago, looked at all the exhibits for trial. So this is not that Attorney Sheketoff is surprised that this photo is in existence.

MR. SHEKETOFF: I'm not surprised that the photo is in existence. I'm surprised it was shown to this witness and he identified the person.

THE COURT: Are you surprised that this witness is able to do this ID?

MR. SHEKETOFF: Yes and no. I mean, nothing surprises me anymore, your Honor. But he met him, according to his testimony, I think, one time. So that he was able to pick him out --

MS. OLLILA: No, I will ask him how many times he met him.

THE COURT: That seems to go to the weight and you can cross him on that.

MR. SHEKETOFF: What I was looking for is some sort of discovery about this -- you know, that he was shown photographs. I thought I was entitled to that. Maybe Rule 16 is more restrictive than I think it is.

THE COURT: Well, if you can give me something between now and then, perhaps I can issue some instruction, but what I'm hearing does not sound like

anything that would warrant striking it.

MR. SHEKETOFF: No, I agree, your Honor. I was looking for more, you know, who knows what's coming next now that I know there was a photo spread for everybody.

THE COURT: I guarantee to you at a break that if you were to sit down with this particular prosecutor and ask for it, I bet she would tell you.

MS. OLLILA: Of course.

THE COURT: But in any event, I'm going to allow it. Is there anything else you want to bring up while we are up here?

MS. OLLILA: No, but I probably should make this record, Judge. When John Venturini was testifying, counsel came to sidebar and indicated that -- had an issue with the redactions to John Venturini's report, and counsel correctly noted that one paragraph of I believe a two or three-page report had been redacted, and I advised your Honor that I would send someone from the U.S. Attorney's Office to go and get those reports. I did. I got an unredacted copy and turned it over to defense counsel. I put it on the podium. He had it available for him when he was engaging in the cross-examination of John Venturini and he still has an unredacted copy.

MR. SHEKETOFF: I didn't know that.

MS. OLLILA: Attorney Sheketoff, I handed it to you.

MR. SHEKETOFF: You may have, but it was in the middle of my examination. I thought what I actually said to you was don't worry about it.

MS. OLLILA: I handed it to you.

THE COURT: Right. I saw that. I can see why he would not necessarily focus on it in the moment of preparing his cross. So I can see there would be perhaps a miscommunication there. We can deal with that issue.

MR. SHEKETOFF: But in any event, your Honor, what I thought happened was she told me she couldn't find it. It wasn't in the file that she thought it was in. I said forget about it. Don't worry about it. It's not that important to me. So I'm not beefing about it.

THE COURT: You were just putting that on the record.

MS. OLLILA: Of course.

MR. SHEKETOFF: I'm putting on the record that I told her she could forget about it.

MS. OLLILA: Thank you, Judge.

IN OPEN COURT

MS. OLLILA: Your Honor, I'd ask that the ID be stricken on 52D and it be entered into full evidence.

THE COURT: 52D is a full exhibit.

MS. OLLILA: Please pull up 52D.

Q. Mr. Champagne, the individual you are looking at on the monitor depicted in 52D, how did you know him? By what name?

A. Goofy.

Q. Did you ever get more than a hundred pounds at a time?

A. Couple times.

Q. When you say a couple times, what would the quantity be that you'd get, Mr. Champagne?

A. Most would be 200 pounds.

Q. Mostly 200 pounds?

A. The most would be 200 pounds.

Q. Oh, the most. Why get so much during any particular transaction?

A. Sometimes it'd be forced upon me. I wouldn't even have a choice to take it.

Q. It would be forced upon you?

A. Pretty much, yes.

Q. How much did you have to pay Mr. Nakos off the top of every pound of marijuana?

A. I believe it was $25 every pound.

Q. So every pound that you got, you had to pay Mr. Nakos $25?

A. Yes.

Q. How would you get him the money?

A. Anytime really. Didn't really matter when I gave it to him. When I see him.

Q. Did you deliver the money to him or did he come and pick it up from you?

A. It wouldn't really matter. Sometimes I would give it to him. Sometimes he'd be at my house and I'd give it to him at my house. We really had no set date or location or anything like that.

Q. How long did you continue to distribute that Canadian marijuana, Mr. Champagne?

A. Pretty much to the day I got arrested.

Q. Did you get arrested or did you self-surrender?

A. I self-surrendered.

Q. Do you remember when you self-surrendered?

A. I believe it was sometime in July 2009.

Q. And who did you self-surrender to?

A. To this building, the U.S. Marshal.

Q. This building; right?

A. Yes.

Q. How did you know that there was a warrant out

for your arrest?

A. News.

Q. News?

A. Yes.

Q. On the TV?

A. Yes.

Q. Were there setbacks in the business? Meaning, was there marijuana interdicted?

A. Excuse me?

Q. I'm sorry about that. Was marijuana ever taken by law enforcement?

A. Yeah.

Q. Do you remember -- Dave Coulombe, was any marijuana taken from him?

A. Yes.

Q. How much, if you remember?

A. I don't remember.

Q. Do you know where he got that marijuana?

A. Yes.

Q. Where did he get it from?

A. From me.

MS. OLLILA: Now, I'm going to direct your attention to the monitor still. I'm going to ask -- Diane, if you pull up 5H-1. 9H-1.

Q. You're looking at the screen, Mr. Champagne.

Do you see 9H-1?

A. Yes.

Q. Do you recognize that vehicle?

A. Yes.

Q. Whose vehicle was that?

A. That was mine.

Q. Did you give it to someone. Was someone using it?

A. Yes.

Q. Who was using it?

A. David Couloumbe.

Q. Why was David Couloumbe using your vehicle?

A. Transportation purposes. I don't know. It was just kind of a free vehicle to use.

Q. Okay. Do you know if there was any marijuana seized from that vehicle?

A. I do.

MS. OLLILA: Please pull up 9H-5.

Q. Mr. Champagne, if you can look at your monitor, what do you see in your monitor?

A. Black duffel bag.

Q. Is that consistent with the duffel bags that you would receive coming from Canada?

A. Yes.

Q. Is this the duffel bag that you had given to

David Couloumbe?

A. I don't know. Possibly.

Q. If I represent that it was seized out of the car, would you have any reason to dispute that?

A. No.

Q. Mr. Champagne, do you remember meeting any Canadian women and dropping off money?

A. I do.

Q. Do you remember if any of that money was taken by law enforcement?

A. I do.

Q. Do you remember when that was?

A. In 2009 sometime.

Q. It was obviously before your arrest in July; correct?

A. Yes.

Q. What happened? Where did you meet those women and how much money did you give them?

A. I met them at a parking lot.

Q. You met them at a parking lot?

A. Yes.

Q. How many women were there?

A. It was two I believe.

Q. And what did you do?

A. Met them there, gave them a bag of money and

left.

Q. How much money did you give them?

A. 194,000 in that bag.

Q. Where did that money come from? From the distribution of what?

A. Marijuana.

Q. And what happened?

A. I drove away.

Q. You drove away?

A. Gave them the money and I drove away.

Q. Did you find out that that money was seized?

A. Later on, yes.

Q. At some point in time -- by the way, where were you living at the time, Mr. Champagne?

A. Time of what?

Q. Early 2009, January 2009.

A. January 2009 I was living on Cypress Street in Manchester, New Hampshire.

Q. How about December 2008?

A. Still on Cypress Street.

Q. Did you ever live at 10 Delaware Avenue?

A. I never lived there, no.

Q. Oh, okay. Well, what was that place to you?

A. Drug stash house.

Q. Will you explain that to the jury. What do

you mean when you say a drug stash house?

A. A safe house, basically a safe place to keep it that no one knew about.

Q. So how long would you hold on to the marijuana before you got rid of it?

A. Maybe a day or two.

Q. And when you would hold on to it, it would go to 10 Delaware Avenue?

A. Most of the time, yeah.

Q. Did individuals ever go there to pick up marijuana?

A. Some people, yes.

Q. Who were those people?

A. David Couloumbe was there, Jonathan Venturini has been there, Alkis has been over there a few times, Kosmas has been over there, Charlie Fowle has been over there.

Q. Let's talk about Charlie Fowle. Did you ever provide marijuana to Charlie Fowle?

A. I did.

Q. And has he been at 10 Delaware Avenue?

A. Yes.

Q. Mr. Champagne, I'm going to show you what's been entered into full evidence as Government's Exhibit 6A and it's a surveillance video taken outside of 10

Delaware Avenue. And I will ask that you confirm with your monitor on your left.

MS. OLLILA: And go ahead and play it, Diane, 6A.

(Played recording.)

MS. OLLILA: Pause it for a second.

Q. Who was that at the door, Mr. Champagne?

A. Me.

Q. And is that the residence -- the stash house, 10 Delaware Avenue?

A. That was the backside of it, yes.

Q. It looks like you are looking towards the camera. Are you looking at something?

A. Yes.

Q. Did you make Bobby Moore in his vehicle?

A. I believe it was him, yes.

Q. Were you always looking out for law enforcement?

A. Yes.

Q. Why?

A. Paranoia.

Q. Say again?

A. Paranoia.

Q. Okay. And what did you see outside your front door?

A. Outside my front door?

Q. When you are looking out, what are you looking at here?

A. There was a bird bath there and the parking lot and there was a Caravan in the parking lot.

Q. A Caravan. And was there something suspicious about the Caravan?

A. Yeah. I believe it to be Sergeant Bobby Moore's vehicle, yes.

Q. You believe it to be Sergeant Bobby Moore's vehicle. Is Bobby Moore a legend in Manchester?

A. Yes.

Q. Drug dealers in Manchester know who Bobby Moore is?

A. Definitely do.

Q. You are always on the lookout for Bobby Moore.

A. Yeah.

Q. If he was in your area looking at you, was that trouble?

A. Oh, yeah.

Q. Did you think you saw him here?

A. Here?

Q. In this video.

A. Yeah, I believe so, yes.

MS. OLLILA: Go ahead and play it.

(Played recording.)

MS. OLLILA: And stop.

Q. Do you recognize who that person is?

A. Yes.

Q. Who?

A. Charlie Fowle.

Q. What was he doing at that residence?

A. Coming to get marijuana.

Q. How much marijuana was he coming to get?

A. I don't remember.

MS. OLLILA: Go ahead and play.

(Played recording.)

MS. OLLILA: And stop it.

Q. What did Charlie Fowle carry out of that residence?

A. A box.

Q. And what kind of box was it?

A. A U-Haul box.

Q. What was contained in it?

A. Marijuana.

Q. How much marijuana?

A. I don't remember.

Q. If you thought you saw law enforcement across the street, why'd you go through with that transaction?

A. I don't know.

Q. What happened after December 30, 2008? Did you continue to still deal?

A. A little bit, yes.

Q. Did you leave this stash house at some point in time?

A. Yes.

Q. When did you leave it, if you remember?

A. Early 2009 sometime.

Q. Why did you leave?

A. I thought it was marked. I thought the police had come on to it.

Q. You thought it was marked. You thought the police had come on to it. What does that mean in drug language? Heat it up, what does that mean?

A. Hot spot.

Q. It's a hot spot meaning what?

A. Cops know about it.

Q. Cops know about it. So you're going to leave; right?

A. Yes.

Q. Did you leave?

A. Yes.

MS. OLLILA: Please pull up 12B-1.

Q. You're looking at an aerial view of a residence, a white residence. What is that residence?

A. Delaware Street.

Q. And is that the residence that you used as a stash house?

A. Yes.

MS. OLLILA: Please pull up 12B-5.

Q. Do you recognize who this individual is in this picture, Mr. Champagne?

A. Yes.

Q. Who's that?

A. Alkis.

Q. Was he helping you?

A. Yes.

MS. OLLILA: Please pull up 12B-7.

Q. Who is depicted in this photograph?

A. It's me.

Q. Is that you or Alkis?

A. It might be him.

Q. Okay.

MS. OLLILA: 12B-8, please.

Q. Who is depicted in 12B-8?

A. Alkis.

Q. Is he helping you move?

A. Yes.

MS. OLLILA: And finally 12B-9.

Q. Who's depicted in that picture?

A. It's me.
Q. Do you know someone by the name of Jeremy Blevens, Mr. Champagne?
A. I do.
Q. Who is Jeremy Blevens?
A. My cousin.
Q. He is your cousin?
A. Yes.
Q. How? He's related to you in what way?
A. My father is his mother's sister.
Q. Your father is the brother to his mother?
A. Yes.
Q. Did you ever provide Jeremy Blevens with marijuana?
A. Yes.
Q. Approximately how many times?
A. Couple, few. I don't know.
Q. Did you ever use his residence to store marijuana?
A. I have.
Q. How many times do you think?
A. Maybe a dozen.
Q. And how much marijuana would you store there?
A. Anywhere from 50 to a hundred pounds.
Q. Anywhere from 50 to a hundred pounds?

A. Yes.

Q. Mr. Champagne, when you turned yourself in in July 2009, did you remain incarcerated?

A. I did.

Q. Until when?

A. August of last year.

Q. August of last year?

A. Yes.

Q. When you got out of prison, were you sent to the street or a halfway house?

A. To a federal halfway house.

Q. And when were you released from the federal halfway house?

A. August of this year.

Q. August of this year?

A. Yes.

Q. Did you run your drug business from jail?

A. No.

Q. Are you sure of that?

A. Never. I don't think it would be able to go unnoticed.

Q. You don't think it would go unnoticed. Did you have the capacities to run a drug business of this extent from a Bureau of Prisons facility?

A. There's no way probably without bringing some

type of attention to yourself.

Q. Would you have done that if you could get away with it?

A. Probably not. It would be insanity.

Q. Why would it be insanity?

A. There's no way -- I don't think you'd be able to get away with it, so why try to get away with something that's almost -- it's impossible to get away with.

Q. So as of August 2009, you've been out of the picture completely?

A. Yes.

Q. Have you had any involvement at all from July 2009 all the way up to today in drug dealing?

A. No.

Q. Are you sure of that, Mr. Champagne?

A. Positive.

Q. Are you sure you paid Mr. Nakos an amount of money for every pound of marijuana you received?

A. I did.

Q. Are you sure?

A. Yes.

Q. Are you lying to gain some kind of favor from the government?

A. No.

Q. What's in it for you now, Mr. Champagne?

A. Absolutely nothing. Besides humiliation.

Q. Besides humiliation?

A. Yes.

Q. Why are you humiliated by telling the truth, Mr. Champagne? Most people, that wouldn't humiliate most people.

A. I don't know.

Q. Why not?

A. Their own friendships, their own family relations, all sorts of things come in play here.

MS. OLLILA: Thank you, Mr. Champagne. Nothing further.

THE COURT: We're going to take an afternoon break and we'll be back for the last hour.

(Recess taken.)

THE COURT: Attorney Sheketoff.

MR. SHEKETOFF: Thank you.

CROSS-EXAMINATION

BY MR. SHEKETOFF:

Q. Good afternoon, Mr. Champagne.

A. Good afternoon.

Q. So I've heard some of your jail phone calls, so I know this isn't your normal personality. Can you drop the routine and answer the questions in a loud

voice?

A. Yes, sir.

Q. Describe your organization, sir, the organization you ran from the time you got out of jail in 2008.

A. 2007.

Q. 2007, to the time you were arrested -- strike that -- to the time you surrendered yourself in July of 2009. Who was the head of that organization? You?

A. There wasn't no head.

Q. What?

A. There wasn't no head. I controlled what I did.

Q. You controlled what you did?

A. I wouldn't consider myself a head of anything.

Q. Well, did anyone work for you? Did you supervise or manage anybody?

A. I didn't supervise or manage anybody. I sold drugs.

Q. So no one worked for you?

A. I wasn't a boss, no. I didn't pay people. I wasn't a manager, no. I sold drugs to people.

Q. What about Kosmas Koustas?

A. Did he work for me? No.

Q. Didn't you send him to make pickups for you?

A. Sometimes we'd pick up packages and it would be for him, more or less for him.

Q. So no one at all worked for you?

A. No.

Q. You were on your own and you just had regular customers?

A. Yeah.

Q. And you paid nobody to do any work for you. You just sold them drugs.

A. Sold them drugs.

Q. And apparently you sold them a lot of drugs; correct?

A. Yeah.

Q. You told the prosecutor when she was asking you questions before the afternoon recess that for every pound you sold you gave my client $25?

A. I did. That was an arrangement that we made with the Canadians.

Q. And you told the prosecutor and the case agent when you were debriefed for the first time in July of 2014, about a year ago, that in total you gave my client $150,000.

A. Give or take, yeah.

Q. That would be 6,000 pounds. You sold 6,000 pounds from the time you got out to the time you

surrendered yourself in July of 2009?

A. It's possible. I didn't keep count.

Q. You didn't keep any ledger of any kind?

A. No, never.

Q. 6,000 pounds. Did you tell us before the break that you were making a certain dollar amount per pound yourself?

A. Yep.

Q. And what did you tell us? I was having a hard time over there.

A. Anywhere between a hundred and $300 per pound.

Q. You would put in your own pocket?

A. Some of it, yeah. I'd spend most of it.

Q. I mean, it was yours to spend?

A. Yeah.

Q. You did things like buy the fanciest Harley Davidson you could possibly buy.

A. I bought a Harley Davidson, yes.

Q. What is it, a 30, $50,000 bike?

A. It's worth about $8,000 today, yeah. Don't even run.

Q. You still have it?

A. Yeah, I do.

Q. The government didn't take it from you?

A. No.

Q. So you had a hundred to $300 a pound to spend as you saw fit?

A. Yeah, do whatever I want with.

Q. All right. Well, let's take the low end. 6,000 pounds times $100 a pound. How much money is that?

A. I don't know.

Q. Well, you apparently earned it. Six million dollars?

A. I don't think I ever seen a million dollars in my life, never mind $6 million.

Q. So the math is wrong, huh? Maybe you didn't pay my client $25 a pound and pay him $150,000. Maybe that's possible. Because if you did and the rest of your story is true, you put $6 million in your own pocket.

A. Six million dollars, no, never.

Q. Well, what did you put in your own pocket?

A. Few hundred thousand dollars maybe. It all got spent.

Q. A few hundred thousand?

A. Yeah.

Q. Do you remember what you told the case agent at your debriefing on July of 2014 how much money you made?

A. About a million dollars.

Q. You told him a million dollars?

A. Yeah.

Q. Well, why would you tell them a year ago a million dollars, which by the way you didn't, and tell us today a few hundred thousand?

A. It could have been any number. I don't know. I don't remember the numbers. I didn't keep track of anything.

Q. So because you didn't keep track of anything, you feel you can say whatever comes into your head at the moment?

A. The most I ever made or had was a few hundred thousand dollars, but if you do the math with whatever, yeah, I could have made a million dollars, give or take. $6 million, that's absolutely insane.

Q. Well, those are the numbers that came out of your mouth, sir. $25 a pound, $150,000 to my client during this year and a half so to speak.

A. It's not unreasonable.

Q. Not unreasonable. Then you made six million?

A. That's unreasonable.

Q. Low end.

A. Not even near it.

Q. All right. So was my client your boss?

A. No. Never had a boss.

Q. You never had a boss. In fact, when the prosecutor was asking you questions, she asked you about what my client had to say about your selling to two particular people, and you said it was none of his business.

A. It wasn't. I never implied to anybody that he was ever my boss. He set up a transaction for me, and after the transaction, he got a percentage of what I made. That was part of the original agreement.

Q. That was the original agreement. Because he had the connection to Mr. Leventis; correct?

A. Yes.

Q. Because he had the connection to Mr. Leventis, he arranged with Mr. Leventis to sell to you, not to him, and then he relied on you to give him $25 for every pound that you sold from Mr. Leventis.

A. Yes.

Q. That's your story.

A. Yes.

Q. When did my client get out of the New Hampshire State Prison when the two of you were there together?

A. Sometime the middle of --

Q. 2005?

A. 2005, 2006, somewhere like that. He got out like a year or two before I was released.
Q. Around two years before you, didn't he?
A. I don't remember exact dates.
Q. You remember your exact date.
A. It's my exact date. Why wouldn't I?
Q. What was your exact date?
A. November of 2007.
Q. By that exact date, you mean you walked out of the New Hampshire State Prison and you walked into a halfway house?
A. No. I walked out free out of a halfway house in November 2007. I went to a halfway house in, I believe, August of 2007.
Q. When did Leventis get out of the New Hampshire State Prison?
A. Sometime probably 2005, 2006, somewhere around there. I don't remember exactly.
Q. Do you remember my client got out, then Leventis got out about a year later, then you got out about a year after that?
A. Give or take, yeah.
Q. So you sat at the New Hampshire State Prison in the north section with Mr. Leventis for about a year before he got out? Was my client gone already?

A. No.

Q. All right. Were you and Mr. Leventis in the same part of the prison together for some significant period of time?

A. Yes.

Q. What period of time?

A. Few months. I don't know. Might have been a year.

Q. Few months or a year.

A. I don't know exactly how much time. I come across so many people in my incarceration stays.

Q. Did you have a friendship with Mr. Leventis?

A. I was friendly with him, yes.

Q. Did Mr. Leventis tell you to contact him when you got out?

A. Never.

Q. Never?

A. No.

Q. Do you remember telling the lead investigator during your debriefing that you met Leventis while the two of you were serving prison terms at the New Hampshire State Prison and that when Leventis --

MS. OLLILA: Is he reading, your Honor? Because if he's reading from a report, he's not trying to refresh the recollection.

MR. SHEKETOFF: No, I'm asking him if he remembers saying this.

THE COURT: This is a prior inconsistent statement allegedly. Go ahead. Overruled.

MR. SHEKETOFF: Yeah.

Q. Do you remember saying that when Leventis was released, he gave you his contact information in order for you to contact him once he was released?

A. I don't remember that, no.

Q. Now, I don't mean to embarrass you, because you've told us that you went -- that you had a problem in your family upbringing from a very young age and you ended up in the New Hampshire State Prison at a very young age. Do you know how to read?

A. Yes, I do.

MR. SHEKETOFF: May I approach, your Honor?

THE COURT: Yes.

Q. I'm going to show you this document and ask you if -- you can read any part of it you want. I'm going to ask you to just read the first paragraph and see if it refreshes your memory that when you were being debriefed one year ago and a month or so, that that's what you said.

A. Yes, apparently that's what I said.

Q. Okay. So why do you deny it now?

A. I did a lot in the last year. I don't remember exact details of every conversation I have.

Q. Do you know why Alkis Nakos and Leventis didn't start dealing Canadian marijuana into New Hampshire until after you were released from prison?

A. Excuse me?

Q. Yeah. Why did Leventis and my client wait until after you were released?

A. He didn't go up to Canada until after I was released from prison.

Q. But why wait?

A. I don't know.

Q. You had as much, if not more, contact with Leventis than my client ever had; correct?

A. No.

Q. Leventis was my client's friend?

A. Yes.

Q. And was it just out of kindness to my client that Leventis said to you as he left New Hampshire State Prison, here's my number, give me a call.

A. I'm sure he's like that with many people.

Q. I'm sorry?

A. I'm sure he was like that with many people. Leventis was a friendly person.

Q. So you get out and you're -- from the halfway

house, and the first thing you do is start selling marijuana?

A. Yes.

Q. Mexican marijuana, low-grade marijuana?

A. Yes.

Q. For a few months you said?

A. For a few months.

Q. Well, that would take us into early 2008, a few months. If you got out in November of '07, you started the day after you got out, a few months would take us into early 2008. How old were you then?

A. 28 I believe, 27, 28.

Q. And the first contact that you have, the first sort of job you pick after getting out, is with someone that you called a Mexican guy?

A. First job I had?

Q. Yeah.

A. First job I had was working for a pizza place.

Q. Oh, okay. So when you're in the halfway house, before November of 2007 when you're released, when you were in the halfway house you have to work; correct?

A. Yes.

Q. Someone gave you a job; correct?

A. Yes.

Q. That was Kosmas Koustas?
A. Correct.
Q. He owned the pizza store at the time?
A. Yes.
Q. So your first job out of the halfway house -- or while you are in the halfway house out of the New Hampshire State Prison is with Kosmas Koustas?
A. Yes.
Q. Did you meet him while you were in the halfway house?
A. Kosmas?
Q. Yeah.
A. No. I've known Kosmas all my life.
Q. He's a friend of yours?
A. At the time, yes.
Q. At the time. And just to make it clear, Kosmas Koustas is someone that you talked into getting into the marijuana business?
A. I talked him into it? No.
Q. Oh, he was already in it?
A. I don't know what he was doing.
Q. Well, how did you recruit him to be a buyer, as you say, for the marijuana that you were selling from the Canadian source that you were giving my client $25 a pound?

A. I was friends with him. He knew I was getting weed, marijuana.

Q. Okay. So you liked him?

A. Sure.

Q. You were fond of him. Is that what you said?

A. Sure.

Q. Can you talk up a little bit?

A. Sure.

Q. So you asked him if he wanted to purchase from you?

A. Yeah.

Q. And how much did he purchase from you?

A. Maybe ten pounds at the top.

Q. Didn't you tell the lead investigator when you were being debriefed that you had sent Mr. Koustas to pick up marijuana and that these loads were 50 to a hundred pounds?

A. To pick 'em up, yes. Not to sell.

Q. All right. So he did work for you?

A. No.

Q. He just did errands for you for the fun of it?

A. For himself. He had stuff to gain out of it, too, make money for himself.

Q. Okay. So you would say to Kosmas Koustas someone's just dropped 50 to a hundred pounds somewhere,

go and get it for me, bring it back to me, and then I will sell you some of it.

A. Sure.

Q. Well, is that what happened?

A. Yeah.

Q. But he wasn't working for you?

A. No.

Q. You weren't bossing him around or organizing him in any way?

A. Never a boss of nobody.

Q. Did you come to the conclusion at some point in time that you could remove yourself from this and give the whole business to Kosmas Koustas?

A. I tried that, yes.

Q. So that thought occurred to you? You had that plan at some point?

A. I tried it.

Q. What happened?

A. Didn't work out.

Q. What do you mean it didn't work out?

A. Didn't work out.

Q. Well, what happened?

A. Didn't work out.

Q. So while you're in the halfway house, you are working at Kosmas Koustas' pizza place; correct?

A. Yes.

Q. And you're dealing with -- and then you get out. You stop working at the pizza place?

A. No, I continued to work there.

Q. You continued to work there, but you had the Mexican connection.

A. Yes.

Q. What's that person's name?

A. Called him Big Mex.

Q. Big Mex. So that's it. That's as much as we are going to get out of you?

A. His first name was Patricio. Last name was Paladin.

Q. Do you still have a relationship with that person?

A. No.

Q. And what quantities was he selling you?

A. It was just small quantities, 10 to 20 pounds.

Q. So this is in early 2008?

A. Yes.

Q. And then the big meeting happens; correct?

A. Yep. If that's what you want to call it, a big meeting.

Q. Well, it's a big meeting. You're going to get this huge source of supply in Canada from a guy you

barely know, Mihail Leventis, and you're going to be giving my client $25 a pound. Pretty big meeting, isn't it?

A. It's huge.

Q. Huge. You don't know but it might have made you a million dollars, or maybe 6 million, or maybe a few hundred thousand, or maybe half a million. It was going to make you money; correct?

A. Yeah.

Q. And that's what you were living for; correct? That was your total moral code at that time in your life, making money.

A. Yeah.

Q. But that's completely gone now; right?

A. Yeah.

Q. You're not interested in that anymore. You've had a complete life transformation; correct?

A. Yes.

Q. Money is the furthest thing from your life now.

A. Yes.

Q. Okay. And where is this big meeting? Where does it take place?

A. At Amory House of Pizza, his restaurant, his father's restaurant, Alkis' father's restaurant. Excuse

me.

Q. I thought there was a meeting before that meeting?

A. No. Alkis went to Canada to see Mihail.

Q. I thought he came to your house and you had some discussion and he told you what was going to happen.

A. We met afterwards, yes.

Q. That sort of slipped your mind?

A. I don't know. You're asking the questions.

Q. Maybe it didn't even happen?

A. No, it happened.

Q. And the two people there were you and my client; right?

A. Yes.

Q. At some point you guys were like brothers; correct?

A. Yeah.

Q. Like brothers?

A. At one point in our lives, yeah.

Q. That's while you were in the New Hampshire State Prison together?

A. Before that, prior to that.

Q. Even before that.

A. And after that for a little while, yeah.

Q. And after that. Then it's really, really difficult for you to testify against your brother, isn't it?

A. Definitely.

Q. It's really difficult; right?

A. It is very difficult.

Q. And you're getting no reward for it whatsoever; correct?

A. I get nothing out of this.

Q. Nothing.

A. No.

Q. Get your supervised release cut in half?

A. No.

Q. No?

A. As of right now, no. I haven't signed any formal agreements or made any agreements to anything.

Q. You don't know that your lawyer's been promised that your supervised release is going to be cut in half?

A. I never been promised nothing. I was forced to come onto this stand.

Q. My question is you don't know that your lawyer's been promised that the government is going to make a motion to cut your supervised release in half?

A. I haven't been promised nothing from my lawyer

or the government. I was subpoenaed to come here today.

Q. So, again, it's clear to you that no promise has been made to you?

A. No promises have been made to me.

Q. Now, you have that second meeting at my client's father's pizza store. Had you ever been in that pizza store before?

A. Have I? Yes, multiple times.

Q. Ever bought a beer in there?

A. A beer? No, I don't drink.

Q. Okay. Ever played the video poker games?

A. On occasion out of boredom, yeah.

Q. Ever ordered food?

A. I would make the food myself.

Q. What'd you make?

A. Whatever they had. I don't know. Sometimes a pizza, sometimes a sub. I don't know.

Q. And Goofy comes to this meeting?

A. Correct.

Q. And when is this meeting?

A. 2008.

Q. When in 2008?

A. January, February. It was sometime after New Year's.

Q. March or April?

A. No.

Q. Day or night?

A. It was nighttime.

Q. It was nighttime.

A. Um-hum.

Q. How late?

A. Probably six, seven o'clock at night.

Q. Any other patron in the establishment?

A. I don't remember.

Q. And Goofy's there and Goofy gives you a BlackBerry that's encrypted; correct?

A. Yes. That's what he told me, yes. He told us.

Q. That's what he told you?

A. He told me and Alkis.

Q. Did he give Mr. Nakos, your friend, an encrypted BlackBerry?

A. No. Just gave it to me.

Q. So you're the one that gets the encrypted BlackBerry.

A. Yes.

Q. And you're the one that has all the contact with Goofy.

A. Yeah. No, not with Goofy, with Mihail.

Q. Oh, you don't even deal with Goofy after that.

You deal straight with Leventis?

A. Yeah.

Q. Leventis tells you how much you're getting; correct?

A. He asked me how much I needed.

Q. Oh, Leventis would ask you in an encrypted text message how much do you need?

A. Yeah.

Q. You'd answer?

A. Yes.

Q. Did you check with Mr. Nakos to find out how much you should answer?

A. No. Why would I do that?

Q. And you'd get an encrypted text message back directing you to meet somebody who is driving a specific kind of car?

A. Yes.

Q. And you would go and meet that person yourself personally?

A. Yeah.

Q. And would you actually look at the marijuana yourself personally?

A. Yeah.

Q. And why would you do that?

A. Quality, grade.

Q. You mean once you accepted it, it's yours and your problem?

A. Yeah.

Q. And when you had that kind of money invested, you wanted to actually look at it to see if you were getting ripped off?

A. Sure, sometimes.

Q. Sometimes. And what would you do with it once you picked it up?

A. Take it someplace to pass it out.

Q. Where?

A. Depends on the time. I don't know.

Q. This only went on for a year and a half or so.

A. At the beginning it was different places until we got a system figured out.

Q. Who's we that got the system figured out?

A. Me. Not we, me. Excuse me. Until I figured out how to easily and best way to distribute it.

Q. Who were your main customers?

A. At the time Corey Buchan.

Q. You mean at the very beginning Corey Buchan was your main customer?

A. Yeah.

Q. Do you remember what you told the lead investigator at the debriefing?

A. There was a kid, Nick Lawyer. There's another kid, Matty Ireland.

Q. My question is do you remember who you said was the main person that bought from you when you gave this debriefing about a year ago.

A. I don't remember now.

Q. Who do you say it is today that was your main customer?

A. Excuse me?

Q. Who today as you're sitting here right now was your main customer?

A. My main customers was Corey Buchan and Nick Lawyer.

Q. Did you mention Corey Buchan's name at the debriefing?

A. I have in the past. I don't know if it got written down.

MR. SHEKETOFF: May I approach, your Honor?

THE COURT: Yes.

Q. You didn't write this. I'm not suggesting that you did. But could you read it and see if it refreshes your memory in any way as to whether or not you mentioned Corey Buchan as being your number one customer when you were debriefed a year ago.

A. I don't see his name anywhere, no.

Q. Do you think that -- was there a person taking notes at the debriefing?

A. I don't know.

Q. Was it tape-recorded?

A. I don't know. It's not my problem, not my problem to deal with that stuff. I was being asked questions and I was answering questions.

Q. Well, you were asked who your main customers were, and you gave the name of Mr. Lawyer. You just didn't mention Mr. Buchan?

A. Buchan was mentioned.

Q. Oh, you're saying it was mentioned and it's just not in the report.

A. I'm not in charge of that stuff. I don't write this stuff.

Q. Right, you're not. Didn't my client tell you from the minute you started in the halfway house through your self-surrender in July of 2009 that you were a fool to be back in this business?

A. No, not at all.

Q. Didn't you lie to him repeatedly about what you were up to and what you were doing?

A. No. He knew what I was doing.

Q. Because you were honest with him?

A. Why would I lie?

Q. Yeah. That's not something you do; right?

A. Everybody lies in their entire life.

Q. I'm sorry?

A. Everybody lies, especially in the drug trade.

Q. All right. So you knew that Lawyer was one of your main customers; correct?

A. Yes.

Q. You had no idea that John Venturini was his partner?

A. At the time, no.

Q. At the time you had no idea?

A. No.

Q. You had no idea that John Venturini made the introduction between you and Mr. Lawyer and as a result of that introduction got 50 percent of the proceeds of their sales because he made the introduction to you. You weren't aware of that?

A. No.

Q. John Venturini is someone you knew from childhood?

A. Yeah. So is Nick Lawyer.

Q. And Nick Lawyer is someone that you knew from childhood?

A. Yeah.

Q. Were you closer to one of them than the other?

A. I was.

Q. To who?

A. Jonathan.

Q. And could Nick Lawyer -- strike that. How was it that you came to sell to Nick Lawyer? What occurred that Nick Lawyer became your number one customer?

A. I've known Nick my whole life. So I knew what he was up to when I came home. It was only a matter of having a conversation with him.

Q. So you actually remember having a conversation with Nick Lawyer in which you said to him I've now got a Canadian connection. I want to be selling to you. Do you want to buy from me?

A. Sure.

Q. And Jonathan Venturini had nothing to do with that conversation?

A. He wasn't in the picture at the time, no.

Q. And this had to be after you were released; correct?

A. Yeah.

Q. So we are talking after November of 2007?

A. Yes.

Q. And then how much did Venturini start buying from you?

A. After Nick died, probably 50 to a hundred

pounds.

Q. Well, how much -- I said that wrong and I apologize. How much did Lawyer start buying from you?

A. He would take anywhere from 50 to a hundred pounds, too.

Q. So once Nick died, Nick Lawyer died, Jonathan Venturini took up right where Nick had left off.

A. Yeah.

Q. No change at all.

A. No.

Q. I thought he had a motorcycle accident on the day that Nick Lawyer died and was in the hospital for months and took a year -- you know, he had a serious brain injury and it took him a long time to recover.

A. He was in the hospital for about a month.

Q. Did you notice any difference when he got out of the hospital in terms of his thinking ability?

A. Definitely a little slower.

Q. Little slow?

A. Um-hum.

Q. But he was still taking 50 to a hundred pounds from you?

A. Yeah

Q. How often was he taking that?

A. Every couple weeks.

Q. Every couple of weeks?

A. Yeah. Sometimes once a month. Depends.

Q. How much would you estimate you sold him? Three or four or five pounds or 200?

A. Who? What was that?

Q. Venturini.

A. What did you ask?

Q. How much would you estimate you sold him? Three or four or five pounds or 200?

A. Maybe a couple hundred pounds.

Q. Did you know a John Garrity?

A. I do know him, yes.

Q. Did he work for you?

A. Never.

Q. Did he collect money for you?

A. No.

Q. Did he collect money from Venturini or Lawyer for you?

A. No.

Q. Did you ever have anyone that collected money for you?

A. No. I usually collected the money myself.

Q. How about Charles Fowle? What role did he play in the organization?

A. Just bought weed from me.

Q. I'm sorry?
A. Just bought weed from me, marijuana from me.
Q. That's all Charles Fowle did was buy from you?
A. Yeah.
Q. How much did he buy from you?
A. Anywhere from 25 to a hundred pounds at a time.
Q. On how many occasions did he buy that much marijuana from you?
A. I don't know, maybe a dozen.
Q. A dozen?
A. Yeah.
Q. So a conservative estimate would be 300 pounds he bought from you?
A. Give or take, yeah. I don't know. It's been a long time.
Q. And how would you deliver to him?
A. Sometimes he'd pick it up at the place I had or bring it to him.
Q. And we saw a video of him picking up a box from your place?
A. Yeah.
Q. Sometimes he would do that and sometimes you would deliver to him?
A. Yes.

Q. And how would you get money from him?

A. Same way. Go pick it up or meet me and drop it off.

Q. Did you ever ask him to drop it off to somebody else besides you?

A. I have.

Q. Who have you asked him to drop it off to?

A. I think he dropped it off to Kos sometimes. He might have dropped it off to Alkis, too. I don't remember. It's been a long time.

Q. And what would Alkis do with the money if it was dropped off to him?

A. I'd go pick it up from Alkis.

Q. Oh, he would do you the favor of collecting it for you?

A. Yeah.

Q. And you actually recall that occurring?

A. Huh?

Q. You actually recall that occurring or that's a possibility?

A. Yeah, sometimes it would happen like that.

Q. Sometimes it would happen like that. What's your relationship with Charles Fowle?

A. Childhood. I know him from my childhood.

Q. He's another childhood friend of yours?

A. Yeah.

Q. Is there anyone in your organization that wasn't a childhood friend of yours?

A. No.

Q. Did Charles Fowle have a relationship with Mr. Nakos?

A. They're friendly with each other. They knew each other.

Q. How about John Garrity? Did he have a relationship?

A. I don't think so.

Q. Now, what was Mr. Blevens' role in your organization?

A. He just -- sometimes he'd buy weed -- buy marijuana from me. Sometimes he'd just let me leave it at his house.

Q. So that was one of your stash houses?

A. Yes.

Q. Did you have a girlfriend at this time?

A. I did.

Q. And did you buy a bunch of furniture and move into that address that we saw the videotape of, planning to move in there with her?

A. I did, but it never occurred.

Q. Yeah, it never occurred. You told us it was

just a stash house; correct?

A. I said I never lived there. I never lived there.

Q. You bought furniture and you furnished the place and you intended to move there with your girlfriend; correct?

A. Still didn't mean I lived there.

Q. You weren't going to live there?

A. It was a thought. Originally I was going to try to maybe move there, but I never moved.

Q. All right. You usually put real furniture in a stash house?

A. Sure.

Q. Sure?

A. Why not?

Q. You mean that's what you did with your stash houses? You put real furniture in them?

A. It was the only stash house I've ever had.

Q. That was the only one?

A. Yeah.

Q. Who owned that house?

A. Kos's cousin.

Q. Kosmas Koustas's cousin?

A. Yeah.

Q. Why'd you move the furniture out of that

house?

A. Because I had to move into another place and took the furniture from that place there.

MR. SHEKETOFF: You're going to have to speak up because I'm old and I can't hear you as well as some other people might be able to. Talk up. I've heard you on the phone. I know how you talk.

THE WITNESS: No, you don't. I've mumbled my whole life. It's always been my problem, so you obviously don't know how I speak.

A. But to answer your question, I rented another apartment and I used that furniture out of that place and put it in the apartment that I rented to live in.

Q. And who'd you move in there with?

A. By myself.

Q. All right. So of all your childhood friends that you were actually selling marijuana to on a daily or weekly basis and collecting money from, who did you ask to come and help move you?

A. Alkis.

Q. Because it's such an honor to get to move you?

A. No, I asked for help and he helped me.

Q. Why him? Your boss.

A. My boss? Who ever said he was my boss? Why him? Because he was close to me. He had a truck.

Q. Because he had a truck. How did you send the money to Canada?

A. People would come pick it up.

Q. Where?

A. Wherever I meet 'em.

Q. So you'd get an encrypted text on the BlackBerry?

A. I would send a text to Mihail and he'd arrange for somebody to come pick up the money.

Q. How would you square up with Alkis Nakos? He would just take your word for how many pounds you bought?

A. Sure.

Q. And you were honest with him?

A. Not always.

Q. If a load got busted, whose responsibility was that?

A. Depending on where it was at.

Q. Well, if it got busted after it got delivered to you.

A. It would be my responsibility.

Q. And did you pay Mr. Nakos for those loads?

A. I don't recall.

Q. You don't recall?

A. I don't know. There was so much money going

back and forth, I don't remember a lot of stuff.

Q. All right. Now, you told the prosecutor that -- and the rest of us that you read something in the newspaper and you knew there was a warrant for you and you surrendered yourself?

A. I went on the run for a little while.

Q. So did someone tip you off that warned you that you were about to be busted?

A. No.

Q. You know you're under oath.

A. Somebody tip me off?

Q. Yeah.

A. I don't remember.

Q. I mean, you were one of the main targets of the investigation. You don't think the police showed up at your door in the early morning hours of the day the warrant came out to find you?

A. I don't recall.

Q. You were gone already; right?

A. Was I? I might have been. I don't know.

Q. Might have been. And where did you hide out?

A. Stayed all over the place, wherever I could find a place to stay.

Q. All right. Well, who did you stay with?

A. Stayed sometimes with my son's mother.

Sometimes I stayed with Alkis. Sometimes I stayed up north at a camp my aunt had. There would be like little motels I'd stay at.

Q. For how long were you on the run?

A. No more than a month.

Q. And then you, quote, unquote, surrendered yourself?

A. Yeah.

Q. Why?

A. Tired of running.

MR. SHEKETOFF: I will probably be shorter, your Honor, if we stop a little earlier.

MS. OLLILA: Can we approach on that issue, Judge?

THE COURT: Sure.

AT SIDEBAR

MS. OLLILA: I know that Mr. Sheketoff wants to have the night to regroup and do more cross on Mr. Champagne, but I have a witness who's been here for two solid days. It's his child's birthday tomorrow. He flew in from Florida. Can we maybe go a little late?

MR. SHEKETOFF: Oh, I have no problem letting this witness leave the stand and getting her witness on and off.

MS. OLLILA: No, that's not my -- my point is

to go until Mr. Champagne is done, and then that witness will be five minutes, Judge, five minutes.

MR. SHEKETOFF: Okay. I'll go another hour and a half.

MS. OLLILA: He won't do it.

MR. SHEKETOFF: Yeah, I will.

THE COURT: You have no problem though with her putting on her five-minute witness?

MR. SHEKETOFF: No. That's a courtesy. I would never object to that.

THE COURT: Why don't you do that and then he will continue with Mr. Champagne tomorrow morning.

MS. OLLILA: Sure.

THE COURT: No?

MS. OLLILA: Mr. Sheketoff is claiming he's going to have an hour and a half with Mr. Champagne.

MR. SHEKETOFF: No, I'm saying I could do it. I'm capable.

MS. OLLILA: No. My question is how much longer do you have. I'm just trying to gauge where we're at. How much longer.

MR. SHEKETOFF: We always stop at four. I can't make the jury angry by not stopping at four. How much more do I have? Maybe 30 minutes, and I think it will be less if I have a chance to figure out what he

said and see where I am.

THE COURT: Why don't we do this. Why don't we do your five-minute witness so he can go. We'll bring Champagne back on tomorrow morning first thing.

By the way, I think there was math error just to let you know.

MS. OLLILA: There's a huge math error.

THE COURT: 6,000 times a hundred, 600,000.

MR. SHEKETOFF: I'm sorry.

THE COURT: Just so you know and maybe you can --

MS. OLLILA: Yeah, your math error.

THE COURT: In any event, also while I've got you here, I looked at Rule 16. I couldn't find anything to support the argument. I just want to put that on the record. I looked at it looking for any nugget that would support the argument.

MR. SHEKETOFF: Maybe it's our local Rule 16.

MS. OLLILA: There's no rule.

THE COURT: I didn't see anything. In any event, I just want to bring that to your attention, and then I'm going to keep you for just a minute when the jury leaves to go over some issues.

MS. OLLILA: Thank you.

MR. SHEKETOFF: Okay.

THE COURT: So Mr. Champagne is going to be done now and then come back tomorrow.

IN OPEN COURT

THE COURT: So that we can all leave around four o'clock, which is really what we promised you, we're going to do something now, which is to have Mr. Champagne step down by agreement of counsel, and Attorney Ollila has a witness who's been here a rather long time but is a very short witness. So her witness will get us to the four o'clock time or thereabouts, close, and then Mr. Champagne will come back in the morning tomorrow. Okay?

Thank you, Mr. Champagne. You may step down.

KEITH KERTZ

having been duly sworn, testified as follows:

THE CLERK: For the record, please state your name and spell your last name.

THE WITNESS: Keith Kertz, K-E-R-T-Z.

DIRECT EXAMINATION

BY MS. OLLILA:

Q. I'm so sorry. You've been waiting for two days?

A. Very comfortable seats out there.

Q. You don't live in New Hampshire, do you?

A. No.

Q. Do you have a flight back to the state where you live in tomorrow?
A. I have it tonight.
Q. Excuse me, tonight. How are you employed, sir?
A. I work for U.S. Customs and Border Protection in Port Canaveral Florida.
Q. Where did you work on January 21st, 2009?
A. Highgate Springs, Vermont.
Q. Where is that in relation to the Canadian border?
A. It is on the Canadian border.
Q. Did you intercept a truck on the border?
A. Yes.
Q. Did you do an inspection of the truck?
A. Yes, we did.
Q. What was found in the truck?
A. 1,357 pounds of marijuana.
Q. Was that the largest seizure you had ever participated in?
A. Yes.
Q. Let me show you what's marked as 59A-1, 59A-2, 59A-3, 59A-4, 59A-5, and 59A-6. Do you recognize those photographs?
A. Yes. I took them all. Yes, I do.

Q. Are they a fair and accurate depiction of the truck that you stopped and seized of 1,357 pounds of marijuana found on January 21, 2009?

A. Yes, it is.

MS. OLLILA: Your Honor, I'd ask that the ID be stricken on these exhibits and they be entered into full evidence.

THE COURT: Any objection?

MR. SHEKETOFF: I have no objection.

THE COURT: Full exhibits.

(Government's Exhibits 59A-1 through 59A-6 admitted.)

MS. OLLILA: Please pull up 59A-1.

Q. Is this the truck, Mr. Kertz?

A. Yes, it is.

Q. What license plate did it have?

A. The next picture has the license.

Q. 59A-2?

A. The next picture has the license plate.

Q. 59A-2?

A. That is the license plate.

Q. And where is it from?

A. Ontario, Canada.

MS. OLLILA: Please pull up 59A-3.

Q. What is the photograph depicted in 59A-3?

A. That was the cargo that was inside of the truck which consisted of paper towels with the marijuana underneath of it.

Q. So there was legitimate cargo in that tractor-trailer?

A. Yes.

Q. And the legitimate cargo was paper towels?

A. Yes.

Q. And was there something else other than paper towels in that cargo?

A. Yes, marijuana.

Q. 59A-4. What is the picture that the jury is looking at right now?

A. That is what the pallets looked like as we took them out of the truck.

Q. Did you notice something different between the taping on the boxes?

A. Yes. The taping that we found with the marijuana inside the boxes, it was double taped.

MS. OLLILA: 59A-5, please.

Q. And why don't you point that out to the jury. Which of those two boxes that are depicted in 59A-5 is double taped?

A. The box on the left is the double-taped box. We found them on the bottom. And the box on the right

was the single-taped box.

Q. Did you open up some of those boxes to determine there was marijuana in them?

A. Yes, we did.

MS. OLLILA: Please pull up 59A-6.

Q. What is that?

A. That is the marijuana that we found in the boxes.

Q. Marijuana tested positive in the approximate amount of 1,357 pounds; correct?

A. That is correct.

MS. OLLILA: You're on your way back home.

THE WITNESS: Thank you.

THE COURT: Attorney Sheketoff, did you have any questions.

MR. SHEKETOFF: I have no objection. I mean, no questions. I'm sorry.

MS. OLLILA: I do have one more DEA agent who catalogued the marijuana. Might be two minutes. Although we can come back tomorrow.

THE JURY: Do it.

THE COURT: Do it.

MS. OLLILA: Thank you.

THE COURT: All right. So you may go home. Thank you very much for staying. You're excused.

THE WITNESS: Thank you.

MS. OLLILA: Thank you, Mr. Kertz.

GREGORY WILLOUGHBY

having been duly sworn, testified as follows:

THE CLERK: For the record, please state your name and spell your last name.

THE WITNESS: Gregory Willoughby, W-I-L-L-O-U-G-H-B-Y.

DIRECT EXAMINATION

BY MS. OLLILA:

MS. OLLILA: You're about to be the fastest witness on record.

THE WITNESS: Good.

Q. How are you employed?

A. I am a special agent with the Drug Enforcement Administration.

Q. Were you involved with the seizure of 1,357 pounds of marijuana?

A. I was.

Q. And did you catalog the marijuana?

A. I did.

Q. Did you take pictures when you catalogued the marijuana?

A. I did.

Q. Did you make notation of whether there were

letters contained on some of the marijuana that you catalogued?

A. Markings, yes.

Q. Markings. Did you ever notice the marking NH?

A. I did.

Q. What did that consist of from the 1,357 pounds?

A. There were I believe about 200 pounds or so.

Q. What was the largest segment of marijuana?

A. I believe it was for NH.

Q. Let me show you what's 59P-1, P-2, P-3, P-4, P-5, P-6, P-7, P-10 and P-11. Go through those photographs. Do you recognize them?

A. I do.

Q. And is that the depiction of the marijuana?

A. It is, yes.

MS. OLLILA: I'd ask that the ID be stricken, Judge, and all of these exhibits be entered into full evidence.

THE COURT: Any objection?

MR. SHEKETOFF: No.

THE COURT: All right. Full exhibits.

(Government's Exhibits 59P-1 through 59P-7 and 59P-10 and 59P-11 admitted.)

MS. OLLILA: I will pull up a few pictures.

And thank you for waiting by the way. Please pull up 52P-1.

Q. What is depicted in 52P-1?

A. I believe that was a photo that was taken at the border of the marijuana.

Q. Is that all of the marijuana taken out of those boxes or only a small portion?

A. I'm not sure. I wasn't at the scene. I was not at the border. I didn't inventory it until it got to Boston.

Q. Okay. I apologize. Where did you count the marijuana? Where had the marijuana been transported to?

A. The marijuana was moved to the CBP office in Boston, Massachusetts.

Q. What does that mean, the CBP office?

A. It was the Customs and Border Protection. They moved it to the Boston drug vault.

Q. And is that when you went and catalogued it?

A. That's where I was, yes.

Q. How long did it take you to catalog that much marijuana?

A. It was two days.

Q. And were you alone?

A. No, I had help. At the time it was ICE. It's now HSI. So, you know, a Customs agent.

Q. Two solid days to catalog this?

A. It wasn't two solid days. I think the first day we probably took a few hours to do it, and then the second day we did it, it was probably a little bit longer.

MS. OLLILA: Please pull up 52P-5.

Q. What is it a picture of?

A. Those are photos of the actual packages that were inside the boxes.

Q. Did you write anything on those packages?

A. We did not, no.

Q. There's blue writing. What does that blue writing say?

A. NH. And then there were also -- it says regular, which would -- from my training and experience was a lower or -- high-quality marijuana but a lower grade, on the lower grade end of it.

MS. OLLILA: Nothing further, Judge.

THE COURT: Any questions, Attorney Sheketoff?

MR. SHEKETOFF: No, your Honor.

THE COURT: All right. You're excused. Thank you, sir.

THE WITNESS: Thank you, your Honor.

MS. OLLILA: Nothing further, Judge. Thank you.

THE COURT: All right. So we are at the end of the day, and I'm going to remind you once again of my previous instructions. Just shorten them a little bit. Don't discuss anything with anybody. Don't use technology or social media to communicate. Don't read or listen to newspapers or any reports. Don't look up any information. Keep an open mind until all the evidence has been received and you have heard the views of your fellow jurors.

And before I let you go, I will say we think that the trial will end -- that it will not take the entirety of next week. It may end -- the evidence may come in and end as early as Monday. So I thought I'd give you have that good news or that possibility, but, again, we've obviously -- we thought it was going to go the entirety of next week. We don't know exactly what's going to happen, but I wanted to give you a sense that we thought it might end earlier in the week and then you would begin deliberations.

That having been said, we'll see you in the morning at nine a.m.

(Jury left.)

BEFORE THE COURT

THE COURT: All right. Let me speak briefly with counsel. I want to bring up -- seeing as we may

end sometime on Monday and depending upon what Attorney Sheketoff has planned, I want to just make sure we go over jury instructions in a timely manner and I want to give you time to make arguments and I want to have time to research your positions. So what I'd like to do is meet at eight a.m. tomorrow with you, if you could, up in my conference room, and that way you can bring to my attention -- you've had a draft copy of my -- very rough draft of what I expected to give by way of instructions at the beginning of the trial. I think I gave them to you the day of jury selection or the day before. I emailed them to you the day before.

MS. OLLILA: Right.

THE COURT: So you've had those. We just haven't talked about them yet. So I'd like to begin that conversation tomorrow morning at eight. So I will meet with you then. And is there anything else?

MS. OLLILA: No, Judge.

MR. SHEKETOFF: No, your Honor.

THE COURT: All right. Good. Thank you. See you in the morning.

(Adjourned at 4:10 p.m.)

C E R T I F I C A T E

I, Diane M. Churas, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 4/14/16

**DIANE M. CHURAS, LCR, CM**
LICENSED COURT REPORTER, NO. 16
STATE OF NEW HAMPSHIRE