```
                  UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW HAMPSHIRE


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                                *
UNITED STATES OF AMERICA             *
                                     *   14-cr-93-01-LM
             v.                      *   August 21, 2015
                                     *   2:00 p.m.
ALKIS NAKOS                          *
                                     *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

Day No. 4 - Afternoon Session
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY
and a jury

Appearances:

For the Government:     Terry L. Ollila, AUSA
                        U.S. Attorney's Office
                        53 Pleasant Street
                        Concord, NH 03301

For the Defendant:      Robert L. Sheketoff, Esq.
                        Law Office of Robert L. Sheketoff
                        One McKinley Square
                        Boston, MA 02109

Court Reporter:         Diane M. Churas, LCR, CRR
                        Official Court Reporter (ret.)
                        Dianechuras@hotmail.com

1                              I N D E X

2

3

4     WITNESS:          DIRECT     CROSS     REDIRECT     RECROSS

5

      STEFAN CZYZOWSKI
6
      By Mr. Sheketoff              6
7

8     JAMES NORRIS

9     By Ms. Ollila      8

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        IN CHAMBERS
2              THE COURT:  I believe this issue was discussed
3    outside of the presence of a stenographer, so I want to
4    make sure this issue gets on the record.
5              Attorney Sheketoff, after he was finished with
6    Mr. Champagne, we had a meeting without a stenographer
7    and Attorney Sheketoff raised the issue of wanting to
8    introduce evidence of the deal that the prosecutor
9    has -- and it's undisputed, has offered through the
10   lawyer, through Nick Champagne's lawyer, that she will
11   reduce his supervised release by half for testifying.
12   And we debated that off the record, and I just want to
13   make sure we get this on the record.
14             I have studied the issue and it is -- based on
15   my research it is clearly admissible.  So it comes in as
16   bias.
17             MS. OLLILA:  Okay.  Sure.
18             THE COURT:  As opposed to an extrinsic
19   evidence of impeachment of a collateral matter.  It
20   really goes to his bias.  So it is admissible.  So if
21   you can just agree to admit the letter.
22             MS. OLLILA:  I can't though because it
23   includes a Giglio of all the other witnesses, some of
24   whom we're not even offering.
25             MR. SHEKETOFF:  It would have to be a redacted
```

```
 1   portion of the letter.
 2           THE COURT:  Yes.  Can you redact the letter?
 3           MS. OLLILA:  Why don't we just draft up a
 4   stipulation that United States through counsel for Mr.
 5   Champagne told counsel that we would reduce Champagne's
 6   SR by a year and a half.
 7           MR. SHEKETOFF:  I'm more than willing to do it
 8   by stipulation.
 9           MS. OLLILA:  Oh, you draft the stipulation.
10           MR. SHEKETOFF:  You want me to draft it.
11   Okay.
12           THE COURT:  All right.  So we've got that
13   issue covered.  That is coming in.  I'm ruling that is
14   admissible.
15           The other issue that's lingering is the juror
16   from Vermont.  How do you want to handle that?
17           MR. SHEKETOFF:  So I personally don't see an
18   issue there.
19           THE COURT:  Do you have any issue?
20           MS. OLLILA:  No, of course not.
21           THE COURT:  So we'll just keep him on.  And
22   you don't even think I should use a predesignated --
23           MR. SHEKETOFF:  Here's my view, your Honor.  I
24   would defer to whatever you think.  If you think that's
25   helpful in some way, then I'm not going to object to it.
```

1  You know, I mean, I can't read these jurors.  He's not

2  someone that I feel has turned against me and wants to

3  stab me in the back.  I had a juror once look at me and

4  say I'd like to take you outside and beat your brains

5  out.  That juror I definitely figured was not on my

6  side.

7          THE COURT:  Well, one thing I don't want to do

8  is pick the alternates.  Clearly, I'm not going to be

9  picking them.  I'm also not going to tell them that I'm

10  randomly selecting alternates because I'm not doing

11  that.  So what I will do, with no objection on the floor

12  here and nobody has any problem, is just keeping him in

13  the mix and moving along.

14          MR. SHEKETOFF:  That's fine.

15          THE COURT:  Then that's what we will do.  And

16  I will randomly select them, as I said.  I will pull the

17  numbers out of a hat right in front of them with you

18  present and that's how we'll handle it.  Is everybody

19  good with that?

20          MS. OLLILA:  Can you give us five minutes so

21  she can find where the transcript was and I can listen

22  to it?

23          THE COURT:  Absolutely.  Any other issues?

24          MS. OLLILA:  No.

25          THE COURT:  Thank you very much.

```
 1                    (Brief recess taken.)

 2                         BEFORE THE JURY

 3             (Stefan Czyzowski resumed the stand.)

 4             THE COURT:  Attorney Sheketoff.

 5                      CROSS-EXAMINATION

 6  BY SHEKETOFF:

 7        Q.   Good afternoon, Trooper.

 8        A.   Good afternoon.

 9        Q.   When you spoke with both Mr. Ranfos and my

10  client, they both told you that they were on their way

11  to Foxwoods; correct?

12        A.   Yes.

13        Q.   And the direction they were traveling when you

14  stopped them would be the direction you would travel

15  from Manchester if you wanted to go to Foxwoods.

16        A.   South, yes.

17        Q.   And did I understand your testimony correctly

18  that in the cash that my client had there was one $20

19  Canadian bill?

20        A.   No.  I think the Canadian currency and the

21  euros were in the vehicle.

22        Q.   Okay.  The total cash from the vehicle --

23        A.   Um-hum.

24        Q.   -- was one $20 Canadian bill?

25        A.   I don't know if it was one bill.  It was 20
```

1    Canadian currency.

2         Q.    Okay.   So it might have been more than one

3    bill, but it added up to $20 or it might have been

4    under?

5         A.    Yes.

6         Q.    Do you remember what day of the week this was?

7         A.    Tuesday or Wednesday.

8         Q.    Do you remember what time it was?

9         A.    The car stop?

10        Q.    Yeah.

11        A.    6:30 at night.

12        Q.    Do you remember if there were any bags in the

13   car?   In other words, did it appear like wherever they

14   were going they were planning to stay overnight?

15        A.    There was a bag that Mr. Ranfos identified as

16   his in the front seat with him.   Mr. Nakos said that he

17   had a backpack in the trunk, but he did not want to show

18   me.

19        Q.    But you got a warrant; correct?

20        A.    Yes.

21        Q.    And you saw what was in the bag in the back,

22   in the trunk?

23        A.    Yes.

24        Q.    So whatever was in the bag you guys saw?

25        A.    Yes.

1        Q.    And were there clothes in the bag?

2        A.    Yes.

3              THE COURT:  Anything further?

4              MS. OLLILA:  Nothing further.

5              THE COURT:  Trooper Czyzowski, you may be

6    excused, sir.  Call your next witness.

7              MS. OLLILA:  Sergeant James Norris.

8                          JAMES NORRIS

9        having been duly sworn, testified as follows:

10             THE CLERK:  For the record, please state your

11   name and spell your last name.

12             THE WITNESS:  James Norris, N-O-R-R-I-S.

13                     DIRECT EXAMINATION

14   BY MS. OLLILA:

15       Q.    Good afternoon.

16       A.    Good afternoon.

17       Q.    Sir, how are you employed?

18       A.    By the New Hampshire Department of Safety,

19   Division of State Police.

20       Q.    How long have you been with the New Hampshire

21   State Police?

22       A.    Since March of 2003.

23       Q.    And what have your duties been since March of

24   2003?

25       A.    Patrol as well as an assignment to the

1    Narcotics and Investigations Unit.

2        Q.    When were you assigned to the Narcotics and

3    Investigation Unit?

4        A.    September of 2010.

5        Q.    And generally what do you do in the Narcotics

6    Investigation Unit?

7        A.    When I came into the unit I came in as an

8    undercover trooper, and we purchase drugs through

9    informants and through undercover buys, investigating

10   mainly narcotics cases as well as other crimes, vice

11   crimes.

12       Q.    How many times do you believe in your career

13   you have acted as an undercover law enforcement officer

14   and purchased controlled substances?

15       A.    Hand-to-hand purchases, probably a safe

16   estimate would be maybe 20 or 25 times.

17       Q.    So you just said a term known in law

18   enforcement.  You said "hand-to-hand purchases."

19       A.    Yes.

20       Q.    Is there some other type of purchase?

21       A.    Through an informant.

22       Q.    And is that known as a controlled purchase?

23       A.    Yes.

24       Q.    What is the difference, hand-to-hand versus

25   controlled purchase of controlled substances?

1    A.    A hand-to-hand purchase would be if I met a

2  suspect and obtained drugs directly from them.

3  Sometimes you may be accompanied by a confidential

4  informant who might purchase the drugs in your presence,

5  or if you did a controlled purchase where you sent that

6  person alone, the confidential informant to purchase

7  drugs from the suspect.

8    Q.    So if you're going to send a confidential

9  informant into a residence, what measures do you take to

10  determine the veracity, that they're going to tell the

11  truth about what happens inside?

12         MR. SHEKETOFF:  Objection.

13         THE COURT:  On what basis?

14         MR. SHEKETOFF:  Relevance.

15         THE COURT:  Overruled.  Go ahead.

16    A.    Would you repeat the question, please.

17    Q.    Sure.  When you send a confidential informant

18  in to engage in a drug transaction, do you put anything

19  on their body?

20    A.    Sometimes, yes; sometimes, no.

21    Q.    And if you are going to, what is it you put on

22  their body?

23    A.    Digital transmitting device.  Sometimes it

24  transmits only.  Sometimes it transmits and records the

25  conversation.

1     Q.    What about you as an undercover law

2  enforcement officer?  Would anything be on your body?

3     A.    Yes.  Same thing, either a digital transmitter

4  or digital transmitter/recorder.

5     Q.    Were you the lead case agent on an operation

6  which became known as Operation Murphy's Law?

7     A.    Yes, I was.

8     Q.    Was Operation Murphy's Law a continuation of

9  something known as Operation Brownshirt?

10    A.    Yes, it was.

11    Q.    What is Operation Murphy's Law?

12    A.    It was a continuation of Operation Brownshirt

13 which involved marijuana coming in from Canada into the

14 United States.

15    Q.    While you were engaged in the investigation,

16 did you conduct surveillance?

17    A.    Yes.

18    Q.    And when law enforcement conducts

19 surveillance, do you ever go out alone and conduct

20 surveillance?

21    A.    If you were to go out alone, it would be

22 surveillance that would be low risk, something as simple

23 as going past a location to grab a registration plate of

24 a vehicle.  Something like that you would perhaps go out

25 alone.  If you were going to do any type of surveillance

1    that involved sitting on a location for a long period of

2    time and then perhaps following somebody, that's

3    something that you would have to have other people with

4    you.

5         Q.   Would you ever have the capacity, you alone,

6    to engage in surveillance of a target without being

7    detected?

8         A.   That would be very difficult.

9         Q.   So how many surveillance units do you use when

10   you're attempting to follow a motor vehicle?

11        A.   It varies on who is available.  Obviously the

12   more people that you have, the better off you are.

13   Sometimes there might only be a handful of people, three

14   or four, but obviously that makes it more difficult.

15        Q.   You heard Trooper Czyzowski testify before

16   your testimony that the NIU, or the Narcotics

17   Investigation Unit, is an entity in and of itself within

18   the state police.  Is that correct?

19        A.   Yes.

20        Q.   Do you have your own -- the NIU have its own

21   office space?

22        A.   We do have our own office space.

23        Q.   And it's not part of state police headquarters

24   in Concord; correct?

25        A.   No, it's not.

1      Q.    Why do you have your own separate office

2    space?

3      A.    We have our separate office space as a secret

4    location, so to speak.

5      Q.    Why?

6      A.    So that people don't know who you are or what

7    you are doing for purposes like surveillance or making

8    undercover purchases.

9      Q.    Would it be a smart idea to have undercover

10   law enforcement officers if your office was up at state

11   police headquarters walking in and out?

12     A.    That would not be a good idea.

13     Q.    You have your own office space.  Is there a

14   room within the NIU office space that contains what is

15   known as the wire equipment?

16     A.    Yes.

17     Q.    What is that?

18     A.    That's computer equipment used to obtain

19   either toll information, pen register information, which

20   is numbers being dialed by a certain phone, and also

21   wiretap information, which would include that same pen

22   information, the numbers being dialed by a particular

23   phone accompanied by voice.

24     Q.    Let me back up and try to have you explain a

25   bunch of those things.  So you have a room at NIU and

1    that room is utilized for part of the investigation; is

2    that correct?

3         A.    Yes.

4         Q.    And that room is a special room; is that

5    correct?

6         A.    It's its own separate room within the office,

7    yes.

8         Q.    And you just testified that you would keep

9    toll records there; is that correct?

10        A.    Pen register information, yes.

11        Q.    Do you know the concept of toll records?

12        A.    Yes.

13        Q.    What is a toll record?

14        A.    Numbers dialed or numbers coming into a

15   particular phone.

16        Q.    Do you often when you are conducting an

17   investigation get the toll records for certain

18   telephones that you suspect might be connected with drug

19   trafficking?

20        A.    Yes, we do.

21        Q.    And is that common?

22        A.    Yes, it is.

23        Q.    Let me show you what counsel has stipulated to

24   being admitted as 38RR and 38EE.  And I want you to look

25   at both of these exhibits and indicate whether or not

1    you know what they are.

2         A.   Yes, I do.

3         Q.   And what are they?

4         A.   These are toll records we received for a

5    particular phone number.

6         Q.   And who was associated with that phone number?

7         A.   This phone was subscribed to Kosmas Koustas.

8         Q.   During the course of your investigation did

9    you also get toll records for a telephone subscribed to

10   Alkis Nakos?

11        A.   Yes.

12        Q.   And those toll records, did it involve

13   telephone number 966-8239.

14        A.   Yes, it did.

15        Q.   And that number, 966-8239, was in whose name?

16        A.   Alkis Nakos.

17        Q.   You mentioned the concept of a pen register.

18   What is a pen register?

19        A.   A pen register is authorized through the

20   court.  In our wire room the computer system will notate

21   numbers that are being received by that particular phone

22   number as calls come in and also any calls going out.

23   So it records all that information.

24        Q.   So if you applied to the court and the Court

25   granted a pen register from my telephone and I had my

1    telephone in my hand, as some call is coming in, you at

2    the narcotics investigation wire room would see the

3    exact number that was calling into my telephone?

4         A.   Yes.

5         Q.   And would you see that in realtime?

6         A.   That would be in realtime, yes.

7         Q.   Now, you indicated that was a pen register.

8    What is a trap-and-trace device?

9         A.   I'm not sure.  I believe it's the same thing

10   essentially.

11        Q.   Okay.  So is there a way with a pen register

12   and a trap-and-trace device to monitor calls coming into

13   my telephone and also calls going out of my telephone?

14        A.   Yes, calls being received, calls being made.

15        Q.   So you can see that as law enforcement.  And

16   what would the value of that be for a law enforcement

17   officer conducting a drug investigation?

18        A.   You would know a particular phone number of

19   your target, you would know calls being placed by

20   possible associates, and that information would be of

21   value.

22        Q.   You've heard the testimony that individuals

23   who are careful and who engage in a lot of drug

24   trafficking don't always keep the same phone, so why

25   even bother?

1    A.   It's true that they go through a tremendous

2    amount of phones at times, but we've found that even if

3    you have a particular phone number, that might be good

4    for a week, it might be good for a month.  So you are

5    able to obtain as much information as possible no matter

6    what the duration is of how long they've had that phone.

7    Q.   All these things that you are doing, do they

8    cost money?

9    A.   Pen registers do cost money, yes.

10   Q.   You also testified that -- you used the term

11   "a wiretap."  Is a wiretap listening to someone's

12   telephone calls in realtime?

13   A.   Yes, it is.

14   Q.   Have you been the affiant on a wiretap or what

15   is known in the law as a Title III application?

16   A.   Yes.

17   Q.   You've obviously -- you must watch TV and

18   watch the news.

19   A.   Sometimes.

20   Q.   You've heard on TV undoubtedly about the NSA

21   and how the NSA monitors individuals' telephone calls;

22   correct?

23   A.   Yes, I have.

24   Q.   How easy is it to go up on a Title III

25   wiretap?

1      A.   It's very difficult, time consuming.

2      Q.   How long does it take?

3      A.   It all depends.  In the case at hand, it took

4  a very long time.

5      Q.   What does that mean, a very long time?

6      A.   I would say about a year and a half.

7      Q.   So there's no magic switch that gets flipped

8  and tomorrow you can listen to someone's telephone.

9      A.   No, ma'am.

10     Q.   What do you have to do in order to get

11 authorization to listen to someone's telephone calls in

12 realtime?

13     A.   You need to have a Title III wire intercept

14 warrant, and to get to that point, you need to exhaust

15 other investigative means.

16     Q.   What does that mean, exhaust other

17 investigative means?

18     A.   Such as physical surveillance, electronic

19 surveillance outside of the wiretap, undercover

20 purchases, controlled buys with an informant, things of

21 that nature.

22     Q.   Is that because wiretaps are incredibly

23 intrusive?

24     A.   Yes, they are.

25     Q.   And the law wants to make sure that law

1    enforcement do everything in their power to get the

2    target through other means.

3         A.    Yes.

4         Q.    And if all of those other means fail, what's

5    the matter of last resort?

6         A.    Wiretap.

7         Q.    And is that why it took over a year?

8         A.    Yes.

9         Q.    Now, how long -- if the Court grants a

10   wiretap, how long would the authorization be for?  What

11   period of time?

12        A.    A 30-day period.

13        Q.    And what happens after 30 days after you're

14   listening to someone's telephone calls?

15        A.    As far as the court is concerned?

16        Q.    Yes.

17        A.    You need to reapply for an extension.

18        Q.    And if you reapply for an extension, how

19   lengthy is that process?

20        A.    It's going to involve the investigation that

21   led up to the initial wire intercept order and then

22   everything that you've obtained and observed, all the

23   evidence you've collected from the point that you went

24   up on that wiretap to the point where it expired and

25   you're asking for it now to be extended.

1      Q.    You've testified that before you receive

2  authorization to go up on a wiretap, you have to exhaust

3  all of your investigative techniques.   Correct?

4      A.    Yes.

5      Q.    Do you know the concept known as a dirty call?

6      A.    Yes.

7      Q.    What is that concept in law enforcement?

8      A.    A call being placed that would have some type

9  of criminal discussion.

10      Q.    So does that mean I would have to call you and

11  say can I get a pound of marijuana.   If I called you and

12  said that to you on the telephone, is that a dirty call?

13      A.    That would be an example of a dirty call.

14      Q.    What if I called you and said I want some

15  Kush.   Would that be an example of a dirty call?

16      A.    If you knew what Kush meant, yes.

17      Q.    So what about for those -- do you need a dirty

18  call for the target telephone that you want to listen to

19  before getting authorization to listen to that phone

20  call?

21      A.    Yes.

22      Q.    How in the world would you get a dirty call if

23  you don't have confidential informants willing to make

24  those dirty calls for you?

25      A.    Unless an undercover was able to make that

1   phone call, you would not be able to.

2       Q.   How would you ever get a dirty call into

3   someone at the top of an organization?

4       A.   I don't know that you could.

5       Q.   How easy is it to intercept over a wiretap

6   individuals who are at the upper echelon of drug

7   conspiracies?

8       A.   Very difficult as you would not be able to get

9   a dirty phone call into their line.

10      Q.   So why bother in this case, Sergeant Norris?

11      A.   It's what we do.

12      Q.   What is your goal?  Is your goal to get the

13  lower level individuals and see if they can lead to the

14  upper echelon individuals?

15      A.   That's one strategy.

16      Q.   Did you receive authorization for a wiretap in

17  this case?

18      A.   Yes.

19      Q.   And before you did that, did law enforcement

20  engage in some surveillance of targets?

21      A.   Yes.

22      Q.   Now, obviously today you're talking about

23  Alkis Nakos.  Did this investigation involve a lot of

24  individuals?

25      A.   Yes, it did.

1      Q.    Was there surveillance conducted on

2   April 20th, 2013, in or around Amory Street Pizza?

3      A.    Sunday, April 28th, yes.

4      Q.    I'm sorry.  And what did you see on that date?

5   And if you don't have a recollection, just let me know

6   and I will get you an exhibit.

7      A.    That surveillance I do know the basic gist,

8   but if I had a report to help recollect everything, that

9   would help.

10      Q.    Trooper Norris, I'm going to hand you what has

11   been marked as 34A for identification and ask if you

12   recognize what that document is.

13      A.    Yes.  This is a surveillance report that I

14   completed for Sunday, April 28, 2013.

15      Q.    And you wrote that report; is that correct?

16      A.    Yes, I did.

17      Q.    If you want to review it, please do, prior to

18   you testifying about what happened on that date.  Do you

19   recall what happened on that date with respect to

20   surveillance?

21      A.    Yes, I do.

22      Q.    What was your focus on that date?

23      A.    We were watching Amory Street Pizza.

24      Q.    Why were you watching Amory Street Pizza?

25      A.    To see if any of the targets in our

1    investigation arrived.

2         Q.    Who was the target of your investigation?

3         A.    Kosmas Koustas and Alkis Nakos.

4         Q.    And did either of the targets arrive at that

5    facility on August 28, 2013?

6         A.    Yes, they did.

7         Q.    What did you see?

8         A.    I observed Mr. Nakos arrive driving a white

9    Mercedes SUV and park in front of the business late

10   morning.

11        Q.    And then what did you see?

12        A.    At that point he exited the vehicle, appeared

13   to be carrying some type of black bag with an attached

14   strap, and he entered the business ultimately.

15        Q.    Then what happened?

16        A.    I believe after that he exited the pizza shop

17   and began to walk away in a westerly direction away from

18   the business.

19        Q.    And then what happened?

20        A.    A short time later he was observed walking

21   back towards the restaurant and appeared to be pointing

22   to a vehicle that was in the area.

23        Q.    And then what happened?

24        A.    That vehicle appeared to be a silver Nissan I

25   believe, a small sedan, an Altima.  That vehicle

1  stopped, and we believed that was operated by Kosmas

2  Koustas who exited that vehicle.

3       Q.   And then what happened?  Did you see Kosmas

4  Koustas meet with Alkis Nakos?

5       A.   Yes.

6       Q.   Do you recall how long they met?

7       A.   I don't think it was an extended period of

8  time.  Maybe half hour or 40 minutes maybe.

9       Q.   At some point in time during the course of

10  your surveillance, did you see another vehicle pull up,

11  a Honda Civic?

12       A.   Yes, later on that day.

13       Q.   And what did you see?

14       A.   We saw an individual exit that Honda Civic in

15  the same general area at the pizza shop.

16       Q.   Who was that individual?

17       A.   We believed that individual to be Andre

18  Watson.

19       Q.   Did you hear Sergeant Paul Poirier talking

20  yesterday, testifying that when he was an undercover law

21  enforcement officer in Amory Street Pizza, that he was

22  introduced to Andre Watson?

23            MR. SHEKETOFF:  Objection, relevance, what he

24  heard in the courtroom.

25            MS. OLLILA:  Let me rephrase it.

1          Q.    Is this the same Andre Watson?

2          A.    Yes.

3          Q.    Okay.  And let me ask you this.  We were

4     talking about the wire room at the New Hampshire State

5     Police, NIU.  Can anyone just walk in the wire room at

6     any point in time?

7          A.    No.

8          Q.    Why not?

9          A.    We have a select group of people that have

10    been what's called minimized that are authorized into

11    the wire room.

12         Q.    Why?  Why are only certain people allowed in?

13         A.    Due to the nature of the investigation, the

14    warrant that has been authorized as we spoke about, the

15    phone calls that are being listened to, things of that

16    nature are sensitive, and the people that are allowed

17    into the wire room have knowledge of the case, know

18    what's going on, and you don't want anybody outside to

19    hear those conversations.

20         Q.    What if you obtained a Title III intercept, a

21    wiretap for my telephone, and I'm a drug dealer and I'm

22    talking to my friend Diane about dealing drugs.  But

23    then I hang up from Diane and I call my mother and I

24    want to talk about a family event that is coming up.

25    Are you allowed to listen to my telephone call with my

1   mother?

2       A.   No.   Once we've determined that it's non-

3   criminal in nature, the phone call recording is stopped

4   at that point.

5       Q.   Why don't you explain that.  Is that what you

6   mean by minimization?

7       A.   Minimized, yes.  You've stopped the recording

8   of that conversation once you've determined that it's

9   noncriminal in nature.

10       Q.   So you are only authorized to listen to

11   telephone calls that are criminal in nature?

12       A.   Yes.

13       Q.   What happens if I call my friend Diane and her

14   and I are dealing drugs together and I start talking

15   about a party that she and I are going to, and we talk

16   about that party for 15 minutes and we never talk about

17   drugs in that conversation.  But if you are a law

18   enforcement officer and you had heard that she and I

19   talked before about drugs, could you listen to that

20   conversation?

21       A.   We would listen to that conversation.

22       Q.   What is the concept of spot checking known as?

23       A.   In the example that you gave, were speaking to

24   your mother about a noncriminal issue and you minimized

25   the phone call or stopped recording, you would spot

1    check it periodically, whether it be 30 seconds,

2    one minute, to check to see if that's the conversation

3    that's still going on.  Is it still noncriminal.  If you

4    listen in and obviously that's changed, then you leave

5    it recording.  If it's continued to be a noncriminal

6    conversation, you will minimize again.

7         Q.   So as a telephone call is coming into the wire

8    room, is it being recorded on a Blu-ray disk in

9    realtime?

10        A.   Yes.

11        Q.   And is it there forever to stay?

12        A.   Yes.

13        Q.   So if you and I are speaking and I'm your

14   mother and -- I'm not old enough to be your mother, by

15   the way.  Probably am.

16        A.   No.

17        Q.   And we are talking and you -- when you were

18   talking about minimization, you kept on pushing

19   something.  Is there a button you push to minimize?

20        A.   Yes.  It's computerized so you would click on

21   a certain button to minimize the phone call.

22        Q.   So once you hit that button to minimize, is my

23   call to you, is it gone?  Is it being recorded on that

24   same Blu-ray?

25        A.   No.  Once you hit that button to minimize the

1    phone call it's stopped, and there is no conversation

2    being recorded at that time.

3         Q.    If you do a spot check ten minutes later and

4    you hit it again to listen, that spot check is being

5    recorded; correct?

6         A.    That enables the recording again, yes.

7         Q.    So if during your spot check you and I are

8    still speaking about a family party after about

9    35 seconds, then what do you do as a law enforcement

10   officer?

11        A.    You would hit minimize again.

12        Q.    So wiretap is highly restrictive; is that

13   correct?

14        A.    Yes.

15        Q.    What if I'm a drug defendant or individual

16   dealing drugs and I call my attorney and I wanted to

17   speak to my attorney about my case.  Is law enforcement

18   authorized to record my conversation with my attorney?

19        A.    No.

20        Q.    Is law enforcement authorized to record my

21   conversation with my doctor?

22        A.    No.

23        Q.    Is law enforcement authorized to record my

24   conversation with my priest?

25        A.    No.

1      Q.    My minister?

2      A.    No.

3      Q.    My psychotherapist?

4      A.    No.

5      Q.    Is that because there are conversations that

6  the law recognizes as sacrosanct?

7      A.    Yes.

8      Q.    In the wire room you talked about how you get

9  toll records, pen register information, trap-and-trace

10 device, and obviously the Title III wire intercept.

11 What about something known in the business as a pole

12 camera.  What is that?

13     A.    It would be a covert camera, sometimes

14 referred to as a pole camera because very often you will

15 put them on a telephone pole.

16     Q.    When you place them, do you place them in

17 public areas?

18     A.    Yes.  As I said, typically a telephone pole,

19 in a public area.

20     Q.    If you were going to place it on someone's

21 private land, would you need a search warrant to do

22 that?

23     A.    Yes.  If you were going to be on private

24 property, you would need a search warrant.

25     Q.    During the course of your investigation, did

1    you have covert cameras placed?

2         A.   Yes.

3         Q.   Was one covert camera placed at Amory Street

4    Pizza?

5         A.   In that area, yes.

6         Q.   Okay.  Why?

7         A.   To capture activities that were going on at

8    the business.

9         Q.   Now, if you were in the wire room -- how big

10   is the wire room?  For example, like, compared to this

11   courtroom, how big would the wire room be?

12        A.   The wire room would probably be from the back

13   row of the jury maybe to yourself wide, and from where

14   I'm seated, probably to the first row of seats towards

15   the back of the courtroom.

16        Q.   So it's fairly large?

17        A.   A good-size room.  There's a lot of computer

18   equipment in it.

19        Q.   Are there individual monitors, computer

20   stations, set up?

21        A.   Yes, there are.

22        Q.   What's the purpose of a computer station to be

23   set up in the wire room?

24        A.   That's where you would monitor the phone call

25   or see telephone calls being placed or received and pen

1    register information.

2        Q.    So you literally see it as it's coming in on a

3    computer monitor; is that correct?

4        A.    Yes, ma'am.

5        Q.    And you hear it in realtime with headphones on

6    as you are sitting at a computer terminal; is that

7    correct?

8        A.    Yes, it is.

9        Q.    Why do you have so many computer terminals?

10   How many people can monitor the same conversation?

11       A.    You have one monitor per conversation, but

12   there is numerous terminals in there because you may be

13   up on different wiretaps at the same time.  You might

14   have other organizations, whether it be another federal

15   organization utilizing the wire room for a separate

16   wiretap, or you might just have several different lines

17   in your particular case that you are working on.

18       Q.    Okay.  So if you go up on one line, which is

19   known as a target telephone; correct?

20       A.    Yes, it is.

21       Q.    You go up on my telephone line because I'm a

22   drug dealer, and you don't refer to it as my telephone

23   number.  You refer to it as target telephone number one;

24   correct?

25       A.    Yes.

1    Q.   So the very first target telephone you are up

2    on, you are up on for 30 days, and in order to keep

3    listening, you need to go re-up; is that correct?

4    A.   Apply for an extension known as a re-up, yes.

5    Q.   If I'm on my telephone during that 30 days on

6    target telephone number one and I called Diane and speak

7    about drug dealing, and Diane is clearly my source of

8    supply, would you want to go up on her telephone?

9    A.   Yes.

10   Q.   And would you then seek application to go up

11   on target telephone number two?

12   A.   Yes.

13   Q.   And so at the same time you at the state

14   police could be up on TT1 and TT2, target telephone one

15   and target telephone two.

16   A.   Yes.

17   Q.   In addition to that, this is not the only

18   investigation going on in the state of New Hampshire at

19   that time, was it?

20   A.   No, it was not.

21   Q.   Was it the only investigation that you had?

22   A.   It was the one that I was focusing most of my

23   time on, yes.

24   Q.   So you allow other law enforcement agencies

25   within the state to also utilize the wire room; correct?

1        A.    Yes.

2        Q.    Now, you just described how the computer

3   monitors are there so that you can monitor the telephone

4   calls and also to monitor the pen register information

5   coming in.  So the dial digits or digits coming into my

6   telephone; is that correct?

7        A.    Yes.

8        Q.    What about the pole camera or the covert

9   camera that you place?  How do you see that in live

10  time?

11       A.    We have a large-screen television monitor

12  inside the wire room that you can view the live feed

13  from the pole the camera's on.

14       Q.    So if you turn around and look at the flat

15  screen behind you, can you compare that to the flat

16  screen that's in the wire room?

17       A.    It's very similar.

18       Q.    Now, how many covert cameras can you watch at

19  the same time on the flat screen?

20       A.    I'm not sure what the capabilities are.  I

21  know that there have been at least three up at the same

22  time.  But I'm not a very technologically savvy guy when

23  it comes to that sort of thing.  So I'm not sure if

24  there's more that you can put up, but I've seen at least

25  three.

1    Q.    What about Amory Street House of Pizza.  And I

2    can't remember if you said this.  How long was that

3    covert camera up faced at that location?

4    A.    It would be an estimate.  I would estimate

5    maybe a year.

6    Q.    And where was the camera facing?  Towards what

7    part of that pizza establishment?

8    A.    That camera would have been on the eastern

9    side of the business focusing towards the front roadway

10   and front door of the business.

11   Q.    Could you see people going in?

12   A.    You could observe the front door, yes.

13   Q.    Could you see people coming out?

14   A.    Yes.

15   Q.    Did you have someone sitting there every

16   second of every day watching Amory Street House of

17   Pizza?

18   A.    No.

19   Q.    Could that ever happen?

20   A.    No.

21   Q.    How often did you watch the live feed to Amory

22   Street House of Pizza?

23   A.    Weekly, periodically through the week.

24   Q.    Were there other law enforcement officers who

25   were also doing the same thing you were?

1        A.    Yes.

2        Q.    So if it was their shift, they would be in the

3   wire room.  They could conduct their business and watch

4   the TV monitor; is that correct?

5        A.    It would be running at the same time, yes.

6        Q.    Did you ever at any point in time while you

7   were watching the live feed to Amory Street House of

8   Pizza see anyone come out of there with any food

9   whatsoever?

10       A.    I never observed that.

11       Q.    You had testified that you did surveillance on

12  April 28, 2013.  And you also testified it took over a

13  year to go up on the wire.  Is that correct?

14       A.    Approximately, yes.

15       Q.    Now, the application itself, the affidavit,

16  I'm not going to hold you to it, but how lengthy was

17  that, do you recall?

18       A.    I don't have the exact page number amount, but

19  I would estimate it to be a hundred plus pages.

20       Q.    A lot of work.

21       A.    Yes.

22       Q.    Tremendous amount of time.

23       A.    Yes.

24       Q.    When you're going to go up on a wire, as you

25  are preparing, do you have to have a team of law

1  enforcement officers who are going to assist?

2       A.   Yes, we did.

3       Q.   Why?

4       A.   Due to the manpower that was needed for things

5  such as monitoring the target telephones, surveillance

6  in the field, things of that nature.

7       Q.   So you have individuals in the wire room

8  monitoring the calls, and you have surveillance in the

9  field.  Why do you need surveillance in the field if you

10 are listening to telephone calls?

11      A.   Listening to the phone calls gives you what's

12 being said, but then to corroborate that out in the

13 field, you'd be able to identify vehicles, meeting

14 places, see things being exchanged.  Things that you can

15 see physically through surveillance, you wouldn't be

16 able to do that if you are just listening to the phone

17 call only.

18      Q.   So you have a whole team available at your

19 disposal; is that correct?

20      A.   Yes.  There was numerous law enforcement

21 personnel that were assigned to this.

22      Q.   I'm going to ask you this.  So was

23 October 23rd, 2013, the very first night that the wire

24 received authorization from the court?

25      A.   Yes.  It was October 23rd, 2013.

1      Q.   And so when the court authorizes a wiretap

2   intercept -- by the way, whose telephone was going to be

3   intercepted on October 23rd, 2013?

4      A.   Telephone being utilized by Kosmas Koustas.

5      Q.   Why Kosmas Koustas?

6      A.   He was the target of the investigation.

7      Q.   Did you obtain telephone toll records that

8   covered the period before October 23rd?

9      A.   Yes.

10         MS. OLLILA:  Diane, pull up 38RR, please.  And

11   turn to page 87.

12      Q.   Now, Sergeant Norris, I have just had Diane

13   highlight two calls in yellow.  Do you see those two

14   calls highlighted?

15      A.   Yes, I do.

16         MS. OLLILA:  Now, Diane, I want you to enlarge

17   that.

18      Q.   And she's enlarging it, and it's on page 84 of

19   the Metro PCS records; is that correct?

20      A.   Yes, it is.

21         MS. OLLILA:  We're having technical

22   difficulties.

23      Q.   Okay.  Now, the only thing I want to focus

24   your attention on is these are the telephone toll

25   records of Kosmas Koustas; correct?

```
 1        A.   Yes.

 2        Q.   And I want you to look at the second entry.

 3   If you look far to the right, there's a checkmark.  Can

 4   you see that checkmark?

 5        A.   Two of them, yes.

 6             THE CLERK:  Your Honor, I still have 38RR as

 7   ID.

 8             MS. OLLILA:  I'm sorry.  When I showed it to

 9   him, the parties had stipulated to the admission.

10             THE CLERK:  Prior to trial or just recent?

11             MS. OLLILA:  And I thought I had made a

12   record.  Yeah, prior to trial.  And also, Kellie, 38RR

13   and EE are entered into full.  Sorry, Kellie.

14        Q.   So, Sergeant Norris, I want you to look at the

15   second reference in yellow and it would be 10/22/2013,

16   9:01:35.  What does 9:01:35 mean?

17        A.   9:01:35 is 9:01:35 in the morning.

18        Q.   9:01 a.m.?

19        A.   Correct.

20        Q.   And is there an outgoing call?

21        A.   Yes.

22        Q.   Kosmas Koustas is making an outgoing call.

23   Who's he calling?  What's the telephone number?

24        A.   603-966-8239.

25        Q.   Whose telephone number is that?
```

1      A.    Alkis Nakos.

2      Q.    How long do they speak for?

3      A.    Two minutes, 48 seconds.

4      Q.    Now I want you to look further down on

5 October 22nd, 2013, at 9:05 for 14 seconds.

6      A.    That's an outgoing call to the same telephone

7 number that lasted 1 minute, 21 seconds.

8      Q.    So within four minutes there are two telephone

9 calls that Kosmas Koustas is having with the defendant,

10 Alkis Nakos?

11      A.    The phones are in contact, yes.

12      Q.    And that is how long before the wiretap

13 intercept was authorized?

14      A.    This was the prior day.

15      Q.    Why would you want to look at the telephone

16 records the prior day?  To show what?

17      A.    Through the investigation we had received toll

18 records and we wanted to see who Kosmas Koustas was

19 talking to right up until the point where we activated

20 the wire.

21      Q.    So October 23rd, 2013, the very next day, the

22 wire was authorized; correct?

23      A.    Yes.

24      Q.    Now, when a wire is authorized, there's no

25 magic switch in your office that you turn on; correct?

1    You've got to ship it out to the telephone company;

2    correct?

3         A.    Yes.

4         Q.    And the telephone company is actually the

5    entity that gives you the data; correct?

6         A.    Yes.

7         Q.    So was that information shipped out to the

8    telephone company?

9         A.    Yes, it was.

10        Q.    And did the telephone company set your wire

11   room up instantly?

12        A.    The wire room was activated, yes.

13        Q.    Now, in addition to listening to my telephone

14   calls, if you have a Title III intercept on me, is there

15   a such thing as intercepting my text messages?

16        A.    Yes.

17        Q.    Wire intercepts are listening to someone's

18   calls; correct?  What is an electronic intercept?

19        A.    Interception of data such as text messages.

20        Q.    So in this instance did you have authorization

21   for both electronic and wire intercepts?  Electronic

22   meaning text messages and wire meaning listening to the

23   line.

24        A.    Yes, text messages were authorized as well.

25        Q.    In order to get authorization to receive text

1    messages, do you have to have the same prerequisites?

2    That is, a dirty text into the line you want to go up

3    on.

4         A.    Yes.

5         Q.    And did you have that here?

6         A.    Yes, we did.

7         Q.    You're not always going to have that; correct?

8         A.    Not always.

9         Q.    So if after 30 days, during the first 30 days,

10   you got authorization to go up on my telephone because

11   there was a dirty text message to me, drug related, what

12   happens if during the next 30-day cycle there are no

13   more dirty drug-related text messages between you and

14   me?

15        A.    You would not be authorized to receive text

16   message data at that point.

17        Q.    And did that happen here?

18        A.    Yes, it did.

19             MS. OLLILA:  Judge, I'm about ready to start

20   playing some of these calls.  So what I want to do is

21   pass out the transcripts to the jury, if that's

22   possible, Judge.

23             THE COURT:  Okay.  Why don't you go ahead and

24   get that started.  I would like the jury's attention,

25   and I will give the jury instructions with respect to

1    the transcripts.

2             MS. OLLILA:  Of course.

3             THE COURT:  All right.  You are about to

4    listen to tape-recordings that have been received in

5    evidence.  Listen very carefully.  You are also going to

6    be given written transcripts of these audio recordings

7    to help you identify speakers and to help you listen to

8    the tapes.  The transcripts are not evidence.  The tape-

9    recording itself is evidence of its own contents.  Where

10   there is a difference between the transcript and a

11   tape-recording, you must rely on what you hear rather

12   than what you read.

13            Transcripts of recorded conversations can be

14   difficult to make.  Whether the typewritten transcript

15   correctly or incorrectly reflects the conversation or

16   the identity of the speaker is entirely for you to

17   decide based upon what you hear on these recordings,

18   what you hear about the preparation of the transcripts,

19   and your own examination of the transcripts.  If you

20   decide that the transcript is incorrect or unreliable,

21   you should disregard it to that extent.

22            Go ahead.

23            (Passed out binders to jury.)

24       Q.   So, Special Agent Norris, I would draw your

25   attention to the very first transcript located in your

1  binder, which is the same exact binder that the jury

2  has, and I draw your attention to 38L.  What is 38L?

3      A.   I'm sorry, I want to make sure I'm on the

4  right page.  38L you said?

5      Q.   What is it that the jury is looking at?  You

6  are looking at the same exact thing, Sergeant Norris.

7      A.   This is what's known as a line sheet.

8      Q.   What is a line sheet?

9      A.   Something that's generated from the wire room

10  during the wiretap.

11      Q.   And why is it generated?

12      A.   It's a record of what took place.  As target

13  information, such as the name, phone number, date, time.

14  There is also a synopsis of what transpired.

15      Q.   So what happened during this text message?

16  Was it a text message, first of all?

17      A.   This is a text message, yes.

18      Q.   When was it sent or received?

19      A.   The start time on this is 18:29:21.

20      Q.   And what does that mean?  You minus two hours,

21  so it's 6:29 p.m.?

22      A.   6:29 p.m., yes, in military time.

23      Q.   And underneath it says duration 000.  Why does

24  it say that?  Do text messages not have a duration?

25      A.   They don't have a duration.  If this was a

1    phone call, it would have duration.

2        Q.    Underneath it says, "direction, incoming."

3    What does that mean?

4        A.    Incoming would mean the text message is being

5    received by the target phone as opposed to an outgoing,

6    which would be the target phone sending an outgoing text

7    message.

8        Q.    Let me direct your attention to the very top

9    of 38L.  It says target, Kosmas Koustas.  Is that

10   correct?

11       A.    Yes.

12       Q.    And then underneath the target, Kosmas

13   Koustas, it says line ID, 508-479-6296.  Is this target

14   telephone number one?

15       A.    Yes, it is.

16       Q.    Is this the first telephone you went up on?

17       A.    Yes.

18       Q.    During the course of the investigation, did

19   you go up on other telephones?

20       A.    Yes.

21       Q.    Why did you go up on other telephones?

22       A.    As the investigation went along, there was

23   other people identified and there was other information

24   available to go up on additional phones.

25       Q.    Were you also required to go up on other

1   phones because Kosmas Koustas would hold on to a phone

2   for a week and then drop it?

3        A.    Depending on the phone.

4        Q.    What happens if someone who's dealing

5   narcotics has a telephone for two weeks and you have

6   authorization to go up on that phone and you are up for

7   two days and then they get rid of that phone?  What do

8   you have to do?

9        A.    Start over.

10        Q.    When you start over do you have to have a

11   dirty call into that telephone?

12        A.    Yes.  The same rules would apply as the

13   initial intercept.

14        Q.    And if you didn't have a confidential

15   informant who even knew what that new line was, how in

16   the world do you even figure out what the new telephone

17   number is?

18        A.    It's very difficult.

19        Q.    Is it incredibly difficult to trace drug

20   traffickers through telephones?

21        A.    It is challenging, yes.

22        Q.    Not impossible; correct?

23        A.    It's not impossible.

24        Q.    So also back on 38L, if you look to -- there

25   is a box that says "synopsis."  What does that mean?

1      A.   That has the text message info, what was

2 stated in the text message.  It also shows the direction

3 as in above as well, that it was an incoming text

4 message, and it provides a phone number from which that

5 text message was sent.  There's also a section that says

6 "monitored by," and that was the trooper that actually

7 physically observed that text message come into the wire

8 room.

9      Q.   On one of the computer monitors; correct?

10      A.   Yes.

11      Q.   So this text message was received from

12 508-450-0224?

13      A.   Yes, it was.

14      Q.   Did you have any idea who that was?

15      A.   No.

16      Q.   And the subscriber information says unknown.

17 What is subscriber information in law enforcement?

18      A.   Subscriber information would be if you were to

19 obtain a telephone -- cellular telephone and provide

20 your information to the phone company, maybe for billing

21 purposes, depending on what type of phone it was.

22      Q.   So for my telephone, Verizon would have -- my

23 subscriber information would be Terry Ollila; correct?

24      A.   Depending on the type of phone that you have,

25 yes.  If you had a plan that you paid for month to

1   month, yes, you would provide them with your subscriber

2   information that would have your name and billing

3   information.

4        Q.   Individuals who are engaged in drug

5   trafficking, do they frequently put their own telephones

6   in their own name?

7        A.   They may have a telephone in their own name.

8   They also may have what is known as a burner phone.

9        Q.   What's that mean, a burner phone?

10       A.   A phone that they can easily dispose of.  A

11   phone that you can buy that's prepaid that you didn't

12   have to carry a month-to-month bill that you would have

13   to pay.  That phone can simply be purchased at a store,

14   such as a Walmart or a Rite-Aid or things of that

15   nature.  To activate the phone you don't have to provide

16   particular information about your identity, and then

17   once that phone has been used for its purpose, it can be

18   disposed of.

19       Q.   Underneath the subscriber information where it

20   says "unknown," it says, "user UM16."  What does that

21   mean, UM16?

22       A.   I believe that's Unknown Male No. 16.  16

23   would refer to the session where there was actual voice

24   I believe for this particular phone number.  So there

25   was a call after this text message.  Obviously when the

1    text message came in, they had no idea of gender, of who

2    placed that, but then when the phone receives a phone

3    call and there's conversation, you're able to then

4    identify if it's a male or a female on the other end of

5    the phone, and then you would assign it, if there

6    identity is not known, a UM or a UF, for unknown female,

7    unknown male.

8         Q.   Now let's back up.  You get Title III

9    authorization to go over my telephone.  You go up today

10   and someone calls me.  Is that going to be Session No.

11   1, that call?

12        A.   Yes.

13        Q.   As soon as I hang up I send an outgoing text

14   to my friend.  Is that Session No. 2?

15        A.   Yes.

16        Q.   As soon as I send that text, I get a reply

17   text from that same friend.  Is that Session No. 3?

18        A.   Yes.

19        Q.   So when you're talking about sessions, it's

20   literally either the call that's coming in -- it's a way

21   to identify the call or the text message.

22        A.   Yes.

23        Q.   So in this instance, if you look at the top of

24   the page, it says Session No. 7.  So was there activity

25   before this call, this text message?

1      A.    There would have been six other sessions prior

2  to this because this is No. 7.

3      Q.    So you don't identify this unknown male until

4  Session 16; correct?

5      A.    Session 16, without having it in front of me,

6  I would safely say that there was a phone call there

7  that they were able to identify it as a male.

8      Q.    I want you to tell the jury what the incoming

9  text message to Kosmas Koustas said on this date,

10  October 23rd.

11      A.    The text message content says:  Let me know

12  when you are 20 away.

13      Q.    I will ask that you now go to 38M.  These are

14  transcripts.  Are you at 38M?

15      A.    Yes.

16      Q.    These transcripts, who were they prepared by?

17      A.    Members in the wire room, members of law

18  enforcement.

19      Q.    Is there an order to which you are required to

20  prepare this transcript?

21      A.    I'm not sure what you mean.

22      Q.    Do you always prepare every transcript the

23  same way, with the same header?

24      A.    Yes, the same information.  It would be fill

25  in the blank.  So some of it would self-populate, such

1   as the case number, things of that nature.  Then as you

2   got down you would complete the transcript yourself.

3       Q.   And on this call, 38M, who is -- is it an

4   incoming call or an outgoing call?

5       A.   The direction on this is outgoing, so it was

6   an outgoing phone call.

7       Q.   And target telephone is calling what telephone

8   number?

9       A.   The associate number, the number it's calling,

10  is 603-315-9033.

11      Q.   Who had that telephone number?  Did you

12  connect that to Jeremy Blevens at some point in time?

13      A.   Yes.

14           MS. OLLILA:  Diane, I'm going to have you

15  play -- it's going to be 38A-2A.

16           Now, Judge, I'm going to have her play this

17  through twice because I want the jury to be able to

18  adjust their volume.  So we'll do it twice.

19           (Played recording.)

20           MS. OLLILA:  Stop, Diane.

21      Q.   You heard a reference, all right, can you

22  still get that girl.

23           Now, you are in drug law enforcement; correct?

24      A.   Yes.

25      Q.   Is it common for individuals who are talking

```
 1   about drugs to use the term, can you get some MDMA for
 2   me?
 3        A.   No, that wouldn't be common.
 4        Q.   What do you know "girl" to be a reference to?
 5        A.   Girl, Molly, being a girl's name.
 6        Q.   So Molly is a girl's name; correct?
 7        A.   Yes.
 8        Q.   And is Molly known as a coded word for some
 9   drug?
10        A.   Yes.
11        Q.   And what is that drug?
12        A.   MDMA.
13        Q.   Is that also known as Ecstasy?
14        A.   Yes.
15        Q.   So Jeremy Blevens says to Kosmas Koustas:  All
16   right, can you get that girl.
17        A.   Yes.
18             MS. OLLILA:  Now go ahead and play, Diane.
19             (Played recording.)
20             MS. OLLILA:  Stop.
21        Q.   So what does this conversation involve based
22   upon your training and understanding?
23        A.   That Jeremy Blevens is asking Kosmas Koustas
24   if he can obtain MDMA for him.
25        Q.   So does Kosmas Koustas say, of course, I have
```

1    it right here.

2           A.    No, he says he can make a phone call.

3           Q.    He's got to call someone else?

4           A.    To call somebody else, yes.

5                 MS. OLLILA:  Go ahead and play, Diane.

6                 (Played recording.)

7                 MS. OLLILA:  Stop.

8           Q.    Okay.  Jeremy Blevens says:  I mean, I finally

9    got rid of the Jack.

10                Based upon your training and experience, what

11   is Jack a reference to?

12          A.    Jack Herer or Jack Roth marijuana, strain of

13   marijuana.

14          Q.    Have you ever heard of the term "Kush"?

15          A.    Yes.

16          Q.    What is that a reference to?

17          A.    A strain of marijuana.

18          Q.    Have you ever heard the term "Orange"?

19          A.    I believe this was the first time I'd seen

20   Orange.

21                MS. OLLILA:  Go ahead and play, Diane.

22                (Played recording.)

23                MS. OLLILA:  Stop.

24          Q.    Sergeant Norris, Jeremy Blevens said:  My

25   buddy had some stuff just like the Kush for, like, 27.

1  What is he referring to, for, like, 27?

2      A.    Could be a reference to a pound of marijuana

3  costing $2,700.

4      Q.    So when he says, 27, he doesn't mean $27.  He

5  means $2,700?

6      A.    That's what I take that to mean, yes.

7          MS. OLLILA:  Keep playing.

8          (Played recording.)

9          MS. OLLILA:  Stop.

10     Q.    So Jeremy Blevens is talking about how he has

11  Kush, he has Orange.  He's complaining because it's

12  2,700.  The price is too high, but he says:  But if you

13  can get me this Chick.  Is that correct?

14     A.    Yes.

15     Q.    Now, what do you understand him to be

16  referring to when he says, if you can get me this Chick?

17     A.    I understood this to be Molly or MDMA.

18     Q.    And then what is Kosmas Koustas's response?

19     A.    He says:  Okay, we can do that.  Let me find

20  out and I will let you know.

21     Q.    He says:  Let me find out.  Does he say he has

22  it instantly?

23     A.    That's not what it says.

24          MS. OLLILA:  Keep going, Diane.

25          (Played recording.)

1              MS. OLLILA:  Stop.

2        Q.   He paid five of them and he paid three Gs.

3    What does that mean?

4        A.   He got five of them.  It would be five pounds.

5    Three Gs per pound, or $3,000 per pound.

6              MS. OLLILA:  Keep going.

7              (Played recording.)

8              MS. OLLILA:  Stop.

9        Q.   I told him I might be able to get him the Kush

10   for three, one, if I could take a five pack.  What does

11   that mean?

12       A.   It would mean grabbing five pounds of

13   marijuana.

14       Q.   For how much a pound?

15       A.   At a price of three, one, or $3,100.

16             MS. OLLILA:  Keep going, Diane.

17             (Played recording.)

18             MS. OLLILA:  Stop.

19       Q.   Sergeant Norris, in the drug trade do

20   individuals who are dealing drugs always and only deal

21   with one another?

22       A.   Not always.

23       Q.   Would they go to anyone who could provide them

24   with product at a cheaper rate?

25       A.   Yes.

1     Q.   Is it common for individuals in the drug trade

2  to use numerous sources of supply?

3     A.   Yes.

4     Q.   And what is a source of supply?

5     A.   Somebody providing drugs to that person.

6     Q.   So when Jeremy Blevens is talking about his

7  friend in Cali can get him some serious stuff, is he

8  talking about a different source of supply?

9     A.   That's what that is a reference to, yes.

10         MS. OLLILA:  Keep going, Diane.

11         (Played recording.)

12         MS. OLLILA:  Stop.

13     Q.   Do drug dealers rob one another?

14     A.   They do.

15     Q.   If a drug dealer gets robbed and his drugs are

16  taken from him, how often do drug dealers call law

17  enforcement, call 911, and say, my ten pounds of

18  marijuana were just stolen from me?

19     A.   It's pretty rare, but I believe it may happen.

20     Q.   Do you ever see drug dealers who rob one

21  another because they know the drug dealer that they're

22  robbing is not going to report it to law enforcement?

23     A.   Most likely.

24     Q.   Is Jeremy Blevens talking about someone named

25  Fat Mikey who's going around robbing drug dealers?

1      A.   Yes, he is.

2      Q.   Is that a problem in the drug business?

3      A.   Yes.

4           MS. OLLILA:  Keep going, Diane.

5           (Played recording.)

6           MS. OLLILA:  Stop.

7      Q.   Okay.  Now, this is an important line.

8           MR. SHEKETOFF:  Objection, your Honor.

9           MS. OLLILA:  I'm sorry.

10          THE COURT:  Sustained.

11     Q.   I'm sorry.  Sergeant Norris, Jeremy Blevens

12  appears to be talking with Kosmas Koustas about meeting

13  up and giving money.  Correct?

14     A.   Yes.

15     Q.   And he says:  But I don't know -- just -- just

16  find out because if you can do that, you know, I'll --

17  I'll get all this for you.  That way, you know -- but if

18  he can't, I still want to meet you that way you got

19  yours, do you know what I mean?  What does that mean,

20  you got yours?

21     A.   That he's able to provide him with currency.

22     Q.   So Jeremy Blevens wants to meet up with

23  Koustas to provide him with currency; correct?

24     A.   Yes.

25     Q.   And then what is Koustas's response?

1          A.    No, I got you.  No, it's not even mine.

2          Q.    It's not even mine.  The currency is not even

3     his.  Correct?

4          A.    That's what this is referencing, yes.

5                MS. OLLILA:  Go ahead, play.

6                (Played recording.)

7          Q.    At some point in time are you monitoring -- do

8     you continue to monitor Kosmas Koustas's telephone and

9     is he sending text messages to the individual who was

10    first referenced in 508-450-0224?

11         A.    Yes.

12         Q.    That first text message said:  Let me know

13    when you are 20 away.

14                Do Kosmas Koustas and that individual engage

15    in more texts in order to confirm when Kosmas Koustas is

16    going to arrive?

17         A.    Yes.

18         Q.    And was there ultimately a call when Kosmas

19    Koustas arrived?

20         A.    I believe there was.

21         Q.    Now, let me ask you this.  Did you know at

22    that time what kind of vehicle Kosmas Koustas was

23    driving?

24         A.    At that particular time?

25         Q.    Did he have a GTI, Volkswagen GTI?

1        A.    Yes, he did.

2        Q.    Now, in addition to your law enforcement

3   techniques, do you know what is also referred to as a

4   bumper beeper?

5        A.    I have heard of it referred to as a bumper

6   beeper, yes.

7        Q.    What would law enforcement call it?

8        A.    A GPS tracker.

9        Q.    Do you have the ability as a law enforcement

10  officer to put tracking devices on motor vehicles?

11       A.    With a warrant, yes.

12       Q.    So you get a search warrant; correct?

13       A.    Yes.

14       Q.    And did you get a search warrant in this case?

15       A.    I did.

16       Q.    Now, let me ask you this.  Now, you didn't

17  have a search warrant to put a tracking device on Kosmas

18  Koustas's car at this point in time; correct?

19       A.    That's correct.

20       Q.    When you are on a cellular telephone, do you

21  understand the concept of cell site location data?

22       A.    The concept, yes.

23       Q.    Okay.  So if I am on my cellphone right now

24  standing in Concord, New Hampshire, in the federal

25  building, and I get a search warrant or a warrant for

```
 1    cell site location device, you get it from my phone, can

 2    the telephone company tell you as a law enforcement

 3    officer what general location my telephone is in?

 4         A.   Yes.

 5         Q.   So within half a mile; is that correct?

 6         A.   It depends but, yes, they give you a general

 7    location, sometimes more accurate than others depending

 8    on I believe the information that they have to work

 9    with, such as how many cellphone towers might be in the

10    area.

11         Q.   And why would you want cell site location data

12    for my telephone if you are a law enforcement officer?

13         A.   To know where you are.

14         Q.   Why not follow me with your vehicle?

15         A.   If you have a cell site location, it makes it

16    easier because you don't have to have that person

17    following a vehicle all the time.  You will know exactly

18    where it is where the phone call was placed.

19         Q.   Did you receive cell site location information

20    for this telephone?

21         A.   Yes.

22         Q.   Did you discover that night of October 23rd,

23    when Kosmas Koustas was in his car going to meet

24    someone, what general area he ended up in?

25         A.   This particular time he was in the Worcester
```

```
 1   area.
 2        Q.   Worcester where?
 3        A.   Massachusetts.
 4        Q.   The next transcript you have, is it 38Q?
 5        A.   Yes.
 6        Q.   Is that what it is?  Why don't you turn to it.
 7             MS. OLLILA:  And, Diane, play 38A-2B.  38A-2B.
 8             (Played recording.)
 9        Q.   Sergeant Norris, if you turn, your next
10   transcript should be 38R.  Is it 38R?
11        A.   Yes.
12             MS. OLLILA:  Diane, play 38A-2C.
13             (Played recording.)
14        Q.   Now, if you turn your transcript, the next one
15   should be 38S.  Is it 38S?
16        A.   Yes, it is.
17             MS. OLLILA:  Diane, please play 38A-2D.
18             (Played recording.)
19             MS. OLLILA:  Pause it.
20        Q.   Based upon your training and experience, what
21   are these calls a reference to?  What's going on?
22        A.   This is Kosmas Koustas and UM16 having
23   conversations about meeting and about traveling to a
24   location where I believe they were going to obtain
25   marijuana.
```

1    Q.    And Kosmas Koustas said he's going to have to

2    go in from the side.  He doesn't have room in the back.

3    Is that correct?

4    A.    Yes.

5    Q.    At some point in time -- you're not

6    surveilling Kosmas Koustas at this time; correct?

7    A.    That's correct.

8    Q.    You're night number one, you're hour number

9    two into the wire; correct?

10   A.    Approximately, yes.

11   Q.    How far is the area of Worcester,

12   Massachusetts, away from the wire room?

13   A.    Depending on traffic and things like that, I

14   would say maybe two hours.

15   Q.    Did you have the ability that night to

16   scramble and try to find Kosmas Koustas, where he was

17   located in Worcester, Mass.?

18   A.    No, we did not.

19   Q.    Did you intend to still keep listening and try

20   to surveil him or pick him up once he came back to New

21   Hampshire?

22   A.    Yes, we did.

23   Q.    What are the locations you sent surveillance

24   officers to?

25   A.    I believe surveillance went to 267 Waverly

1    Street.

2         Q.    And whose residence is that?

3         A.    That was the residence of Charles Fowle.

4         Q.    And you said 267 Waverly Street.  Is that in

5    Manchester, New Hampshire?

6         A.    I'm sorry, yes, it is.

7         Q.    And where does Charles Fowle fit into this

8    equation?

9              MR. SHEKETOFF:  Objection.

10        Q.    Do you know?

11             MR. SHEKETOFF:  Objection.

12             THE COURT:  Overruled.  You can approach.

13             MS. OLLILA:  Judge, I'll strike it.

14        Q.    Did you send law enforcement to 267 Waverly

15   Street?

16        A.    Yes.

17        Q.    Now, the next transcript you should have

18   should be 38T.  Do you have 38T?

19        A.    Yes.

20             MS. OLLILA:  Now, before you play that, Diane.

21        Q.    If you look at 38T, this is a new number.

22   Kosmas Koustas is placing a call to a different

23   telephone number, 603-960-1617.

24        A.    That's correct.

25        Q.    Who's that?

1      A.    Charles Fowle.

2            MS. OLLILA:  Go ahead and play 38A-2E.

3            (Played recording.)

4            MS. OLLILA:  Pause that.

5      Q.    Do drug dealers often talk on the telephone

6  explicitly?

7      A.    I'm sorry?

8      Q.    Charles Fowle says he's trying to do that,

9  he's trying to do that thing.  What did you understand

10 him to mean?

11     A.    Looking to meet up for a drug transaction.

12           MS. OLLILA:  Keep going.

13           (Played recording.)

14     Q.    So at the time of this call it was 8:11;

15 correct?  Approximately 8:11.

16     A.    Yes.

17     Q.    And Kosmas Koustas is on his way back from

18 Massachusetts near Worcester.  Is that correct?

19     A.    That's correct.

20     Q.    As he's driving back, are law enforcement

21 traveling to the area to try to surveil Kosmas Koustas

22 arrive in or around Charles Fowle's residence at 267

23 Waverly Street in Manchester?

24     A.    Yes.

25     Q.    Your next transcript should be 38W.  Do you

1    see 38W?

2         A.   Yes, I do.

3              MS. OLLILA:  Diane, please play 38A-2F.

4              (Played recording.)

5              MS. OLLILA:  Stop.

6         Q.   What does Koustas say?

7         A.   Says:  Yeah, I was just about to call you,

8    too, and this mother-fucker boss, he's at the Red Sox

9    game.

10             MS. OLLILA:  Keep going.

11             (Played recording.)

12        Q.   Now, in the very first call that Kosmas

13   Koustas had with Jeremy Blevens, that's the call when

14   Jeremy Blevens is saying:  Hey, can you do this Chick,

15   can you do this Chick, I would like the Molly.  Correct?

16        A.   Yes.

17        Q.   And Kosmas Koustas doesn't say yes, yes, of

18   course.  What does he say during this -- he says during

19   that call, I will check and get back to you.

20        A.   That's correct.

21        Q.   Now, during this call -- which was less than

22   an hour later, approximately?

23        A.   I'd have to look back.

24        Q.   Two hours later.  Koustas calls Blevens and

25   what does he say?  Does he have an answer for him?

1       A.    He's checking in.  Blevens is checking in to

2  see how he's making out, and the reply that I just read.

3       Q.    Was what?

4       A.    Would you like me to read it again?

5       Q.    Yes.

6       A.    Yeah, I was just about to call you, too, and

7  this mother-fucker boss, he's at the Red Sox game.

8       Q.    So Koustas doesn't have an answer for Blevens;

9  correct?

10      A.    That's correct.

11            MS. OLLILA:  Go ahead and play.

12            (Played recording.)

13      Q.    That call occurred at 8:30.  At 8:58 is there

14  another call?  And let me direct your attention to

15  transcript 38S.

16      A.    Yes.

17      Q.    What time does that call occur?

18      A.    8:58:17.

19            MS. OLLILA:  Diane, would you please play

20  38A-2G.

21            (Played recording.)

22            MS. OLLILA:  Pause that for a second.

23      Q.    I'm sorry, I neglected to say this or to ask

24  you this question.  During this call who was Kosmas

25  Koustas calling?

1      A.    Charles Fowle.

2            MS. OLLILA:  Go ahead and play.

3      Q.    Had law enforcement surveilled Kosmas

4  Koustas's and Charles Fowle's residence at this time?

5      A.    Yes.

6            (Played recording.)

7      Q.    So Koustas says:  All right, let me give you a

8  call right back.

9            Your next transcript should be 38Y.  Do you

10 have 38Y in front of you?

11     A.    Yes.

12            MS. OLLILA:  Diane, please pull up 38A-2H.

13            (Played recording.)

14     Q.    Okay.  Now, the next day is October 24th,

15 2013; correct?

16     A.    Yes.

17     Q.    Now, Jeremy Blevens had asked Kosmas Koustas

18 for some Molly on October 23rd, and Kosmas Koustas said,

19 ah, my boss is at the Red Sox.

20     A.    That's correct.

21     Q.    And Blevens said, ah, don't worry about it.

22 The next day is October 24th.

23            MS. OLLILA:  Diane, I want you to pull up 38RR

24 and go to page 94.  38RR and go to page 94.

25     Q.    So now, Sergeant Norris, this is the next day,

1    October 24th, 2013; correct?

2         A.    Yes.

3         Q.    And I want you to tell the jury at 10:48:14,

4    does Kosmas Koustas receive an incoming call?

5         A.    Yes.

6         Q.    And who's calling him?

7         A.    The phone number is 603-966-8239.

8         Q.    And who's that phone registered to?

9         A.    Subscribed to Alkis Nakos.

10         Q.    The same date at 1:45 p.m., does Kosmas

11    Koustas place an outgoing call?

12         A.    Yes.

13         Q.    And who does he call?

14         A.    That same telephone number as the call from

15    10:48.

16         Q.    And who's that number come back to?

17         A.    Subscribed to Alkis Nakos.

18         Q.    And how long do they speak on the telephone?

19         A.    That call had a duration of 9 minutes,

20    26 seconds.

21              MS. OLLILA:   Diane, please turn to page 95.

22         Q.    Now, Trooper Norris, you are now looking at

23    the same telephone records for the same exact date;

24    correct?

25         A.    October 24th, 2013.

1        Q.   And is there another call -- outgoing call to

2   966-8239?

3        A.   Yes, at 6:39:41 p.m.

4        Q.   And how long's the conversation last?

5        A.   Duration appears to be 4 minutes, 24 seconds.

6        Q.   So that's 6:30, correct, 6:30 at night?

7        A.   Correct.

8        Q.   Sergeant Norris, if you turn your transcript

9   to 38Z.  Do you have 38Z?

10       A.   Yes, I do.

11       Q.   If you are at that transcript, who is Kosmas

12   Koustas calling referenced in this transcript?

13       A.   Jeremy Blevens.

14       Q.   And is it also on October 24th, 2013?

15       A.   Yes, it is.

16       Q.   Is it after a period of time after Kosmas

17   Koustas spoke to the number associated with Alkis Nakos?

18       A.   Yes.

19            MS. OLLILA:  Go ahead and play 38A-2I, 38A-2I.

20            (Played recording.)

21            MS. OLLILA:  Pause that.

22       Q.   Is it clear to you that Kosmas Koustas now has

23   the MDMA?

24       A.   That's what I believe given the conversation,

25   yes.

 1          Q.    Who was Kosmas Koustas speaking to before he

 2    is speaking to Jeremy Blevens?

 3          A.    Phone associated with Alkis Nakos.

 4                MS. OLLILA:  Go ahead and keep playing.

 5                (Played recording.)

 6                MS. OLLILA:  Stop, please.

 7          Q.    He says:  I want to do two actually because my

 8    other buddy is going to want a halfy.  In drug lingo

 9    what does that mean?

10          A.    They're talking about quantities.

11          Q.    And what is "two" a reference to?

12          A.    To this I'm not sure as far as what that

13    quantity would be.

14          Q.    What does it mean a halfy?  My other buddy is

15    going to want a halfy.

16          A.    It would be half of whatever it is they're

17    talking about.

18          Q.    Is MDMA generally sold in ounce quantities?

19          A.    It would be sold in ounce quantities.  A halfy

20    could be a reference to half ounce.

21                MS. OLLILA:  Okay.  Go ahead and play.

22                (Played recording.)

23                MS. OLLILA:  That's okay, Diane.

24          Q.    That was October 24th at approximately

25    8:47 p.m.  Is that correct, Sergeant Norris?

1       A.   Yes.

2       Q.   Sergeant Norris, if you turn to the next

3  transcript.  It should be 38AA.  Do you have that in

4  front of you?

5       A.   Yes, I do.

6            MS. OLLILA:  And, Diane, please pull up

7  38A-2J.

8            (Played recording.)

9       Q.   So Jeremy Blevens called Kosmas Koustas?

10      A.   Yes.

11      Q.   And they are making arrangements to meet at a

12  Boston Market?

13      A.   Yes.

14      Q.   Did you send surveillance units out there?

15      A.   Surveillance units were sent out there.

16      Q.   And what did they see?

17      A.   They observed a meeting between --

18           MR. SHEKETOFF:  Objection.

19           MS. OLLILA:  Strike that.

20           THE COURT:  Sustained.

21      Q.   The very next day was October 25th, correct,

22  2013?

23      A.   Yes.

24           MS. OLLILA:  Diane, I want you to pull up 38RR

25  and go to page 98.

1      Q.    Now, Sergeant Norris, you are looking at the

2    Metro PCS telephone records of Kosmas Koustas.  By the

3    way, I neglected to ask you this.  The Metro PCS records

4    that you are looking at, what is that number that Kosmas

5    Koustas -- what is his number Kosmas Koustas is using?

6      A.    603-261-0853.

7      Q.    That is not the number that Kosmas Koustas is

8    calling Jeremy Blevens or Charles Fowle on; correct?

9      A.    That's correct.

10     Q.    And that's not the number that Kosmas Koustas

11   is having text message exchanges and telephone

12   conversations with a source in Massachusetts; correct?

13     A.    That's correct.

14     Q.    This is a completely different number;

15   correct?

16     A.    That's correct.

17     Q.    So I want you to look at that record and it

18   should say at 9:27 a.m.  Does Kosmas Koustas call

19   someone?

20     A.    Yes, there's an outgoing call.

21     Q.    And whose he call?

22     A.    Cellphone 603-966-8239.

23     Q.    How long do they talk?

24     A.    Duration of the call was 6 minutes,

25   48 seconds.

1     Q.   By the way -- whose number is 966-8239?

2     A.   It's subscribed to Alkis Nakos.

3     Q.   By the way, if this number that Kosmas Koustas

4  had, if that were the target telephone, we'd be

5  listening to the call; right?

6     A.   Correct.

7     Q.   But we don't have any dirty calls on this

8  line; correct?

9     A.   Correct.

10     Q.   So we don't have authorization to go up on

11  that phone; is that correct?

12     A.   That is correct.

13     Q.   What is the second reference on that same

14  page?  Is there another call to the same number,

15  966-8239?

16     A.   There's an incoming call at 10:42:57 and also

17  an outgoing call at 10:43:26.

18         MS. OLLILA:  Diane, please go to page 99.

19  Highlight it in yellow, second to the last one.

20         (Pause.)

21     Q.   So, Sergeant Norris, on October 25th, 2013, is

22  there another incoming call to Kosmas Koustas's line?

23     A.   Yes.

24     Q.   And what's the associated number?

25     A.   603-966-8239.

73

```
 1          Q.    And who's that associated with?

 2          A.    Subscribed to Alkis Nakos.

 3          Q.    Now, the next transcript you will have should

 4     be 38II.  Do you have that?  38II.

 5          A.    Yes.

 6                MS. OLLILA:  Diane, will you please play

 7     38A-2K.  And before you play it --

 8          Q.    Sergeant Norris, with this transcript what

 9     date are we talking about now?

10          A.    This transcript is 11/4/2013.

11          Q.    So approximately how long after October 23rd,

12     2013?  Two weeks approximately, give or take?

13          A.    Just under, yes.

14          Q.    So the marijuana has already been delivered

15     and we're about a week and a half, two weeks later?

16          A.    Correct.

17                MS. OLLILA:  Go ahead and play it, Diane.

18                (Played recording.)

19                MS. OLLILA:  Pause that.

20          Q.    Charles Fowle just said:  Someone kicked in my

21     door and robbed my house the other night.  Did you hear

22     that?

23          A.    Yes.

24          Q.    And he talked about what they took, and he

25     says:  And a little bit of bud, not much.  What do you
```

1    understand "bud" to mean?

2         A.    Marijuana.

3              MS. OLLILA:  Keep playing.

4              (Played recording.)

5              MS. OLLILA:  Pause that.

6         Q.    Charles Fowle says:  How long has it been now?

7    Kosmas Koustas says two weeks.

8              What was two weeks earlier?  What was the

9    significance of two weeks earlier?

10        A.    That would be the first day of the wiretap

11   where we observed through the phones that he traveled to

12   Worcester, Massachusetts.

13        Q.    And what is Kosmas Koustas trying to do with

14   Charles Fowle now?

15        A.    Collect money.

16             MS. OLLILA:  Keep playing.

17             (Played recording.)

18             THE COURT:  Attorney Ollila, it's 4 o'clock.

19             MS. OLLILA:  Yes, all done.

20             THE COURT:  Good breaking time.

21             MS. OLLILA:  For today.

22             THE COURT:  For today.  All right.  So now we

23   come to the weekend break, and it's very, very important

24   as you are away from the court for a couple days to

25   follow my same instructions.  No discussions with

1  anybody -- and you can blame that on me.  Blame it on

2  the Court.  I've been instructed, I took an oath, I have

3  promised, and the judge has ordered me not to talk to

4  anybody.  If people try to talk to you, tell them I

5  can't even talk to my own jurors about this case.  I

6  certainly can't talk to you.

7         You may not speak to anybody about the case.

8  Don't do any research about the case.  And when I say

9  communicate, obviously I'm talking about verbal, I'm

10  also talking about electronic, any sort of

11  communication, no news with respect to this.  If you see

12  anything, I need to know about it right away.  Just

13  don't watch anything if for some reason you see

14  something.  Most importantly, keep an open mind.  And

15  then we will be back here Monday at nine a.m.

16         We do expect it will not take the entirety of

17  next week.  Again, we think the evidence may be in as

18  soon as Monday or Tuesday, probably Tuesday.  That's our

19  hope, but we don't think it's going to take the full

20  week.

21         Very important for you to follow my

22  instructions this weekend.  What you are doing here is

23  very important.  You may have noticed when you walk in

24  this courtroom, everybody is standing up in honor of

25  you, including me, because what you do is so important.

1          Follow my instructions this weekend.  Have a

2     good weekend and we'll be back in on Monday.

3               (Jury left courtroom.)

4                    BEFORE THE COURT

5          THE COURT:  All right.  Counsel, just for the

6     record, I want to put on the record and confirm with Mr.

7     Sheketoff that the motion is unsealed.

8          MR. SHEKETOFF:  It is unsealed.  I mean, I'm

9     set.  I'm not objecting to unsealing it.

10         THE COURT:  So Attorney Sheketoff is allowing

11    his Rule 29 motion to be unsealed.

12         MS. OLLILA:  Can I get a copy of it, Judge.

13         THE COURT:  Well, it would be unsealed so I

14    think it would be on the docket at some point.  In any

15    event, the answer is, yes, we'll make that happen.

16         MS. OLLILA:  Thank you.

17         THE COURT:  Jury instructions, we need to have

18    an opportunity for counsel to place objections on the

19    record and make arguments with respect to jury

20    instructions.  So what does eight a.m. on Monday sound

21    like for you?  And I can give you my what will be at

22    that point pretty close to a final draft and hear your

23    arguments and then make final rulings and final

24    adjustments to those instructions.  And we'll have a

25    final charging conference.

1          MR. SHEKETOFF:  Are we making new citizens on

2     Monday?

3          THE COURT:  I don't think so.  It's usually a

4     Friday.  It's usually only once a month.  Is there

5     anything else before the weekend?  All right.

6          THE CLERK:  I have housecleaning.

7          THE COURT:  All right.  Well, you keep them

8     here for your housecleaning.  Meanwhile I will clean my

9     bench and remove myself.

10          THE CLERK:  38EE and 38RR I have marked as ID.

11     Have you guys stipulated to that?

12          MS. OLLILA:  Yes.  And when Sergeant Norris

13     was on the stand, one of the early things I did with him

14     was I walked up and I showed them to him and I said both

15     parties have stipulated to their admission.  I'm sorry,

16     Kellie.  I should have turned to you and said that they

17     were admitted.

18          THE CLERK:  Okay.  I wanted to make sure they

19     were marked.

20          MR. SHEKETOFF:  There are markings on those

21     exhibits now.  Are there clean ones that are going to

22     the jury?

23          MS. OLLILA:  No, but -- oh, Diane said clean

24     ones go.

25          MR. SHEKETOFF:  Then that's fine.  And I did

1   agree, if they are records that are kept in the regular

2   course of business, it's no problem to have them

3   admitted, but there are counsel's markings on them.  And

4   if the witness put markings on them, it would be one

5   thing.  On the other hand, I might not object.  I'd have

6   to think about it over the weekend.  Do you care whether

7   you get the marked up one?

8            MS. OLLILA:  We'll check -- I don't even

9   know -- we'll check them, Judge.

10            THE CLERK:  Either that or admitted upon

11   redaction.

12            MS. OLLILA:  Oh, she says the one in JERS is

13   clean.

14            THE CLERK:  Right.  But I need the paper ones

15   as well.  They both go back.

16            MS. OLLILA:  Oh, sure.  Okay.

17            (Adjourned at 4:05 p.m.)

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3          I, Diane M. Churas, do hereby certify that the

4    foregoing transcript is a true and accurate

5    transcription of the within proceedings, to the best of

6    my knowledge, skill, ability and belief.

7

8

9    Submitted: 4/14/16     _____

10                          DIANE M. CHURAS, LCR, CM
                            LICENSED COURT REPORTER, NO. 16
11                          STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```