```
              UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW HAMPSHIRE


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                        *
UNITED STATES OF AMERICA                *
                                        *   14-cr-93-01-LM
              v.                        *   August 24, 2015
                                        *   8:05 a.m.
ALKIS NAKOS                             *
                                        *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

                    Day 5 - Morning Session
                      TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE LANDYA B. MCCAFFERTY
                         and a jury


Appearances:

For the Government:     Terry L. Ollila, AUSA
                        U.S. Attorney's Office
                        53 Pleasant Street
                        Concord, NH 03301

For the Defendant:      Robert L. Sheketoff, Esq.
                        Law Office of Robert L. Sheketoff
                        One McKinley Square
                        Boston, MA 02109

Court Reporter:         Diane M. Churas, LCR, CRR
                        Official Court Reporter (ret.)
                        Dianechuras@hotmail.com

1                            I N D E X

2

3

4      Chambers conference, page 3

5

6      WITNESS:          DIRECT      CROSS     REDIRECT        RECROSS

7

       JAMES R. NORRIS
8
       By Ms. Ollila      32                    130
9      By Mr. Sheketoff              88                        135

10

11
       EXHIBITS:                               ID.    Evid.
12
       Government's Exhibit 41KK-6                     75
13     Government's Exhibit 41JJ-2                     76
       Government's Exhibit 41JJ-1                     77
14     Government's Exhibit 41JJ-3                     78
       Government's Exhibit 41JJ-4                     78
15     Government's Exhibit 41KK-1                     79
       Government's Exhibit 41KK-2                     79
16     Government's Exhibit 41KK-7                     80
       Government's Exhibit 41KK-5                     81
17     Government's Exhibit 41KK-3                     81
       Government's Exhibit 41KK-4                     82
18     Government's Exhibit 41KK-8                     83
       Government's Exhibit 41LL-2                     85
19     Government's Exhibit 41LL-3                     86

20

21

22

23

24

25

```
 1                        IN CHAMBERS
 2            THE COURT:  All right.  We are on the record
 3  on Monday morning just to have what would probably be a
 4  penultimate charging conference.  We've had a couple of
 5  conversations and counsel have reviewed my prior draft.
 6  And now I just want to go over these most latest
 7  instructions and make sure that all arguments are on the
 8  record and that I have enough time to draft them finally
 9  before we get to the close of the case.
10            So first question I have to ask -- and this
11  came up this weekend as I was drafting and editing and
12  making the final changes, and I looked through the
13  government's proposed instructions.  There is no request
14  in there for any lesser included plain vanilla
15  conspiracy.
16            MS. OLLILA:  Right.
17            THE COURT:  So it's an all or nothing.  You
18  want a thousand --
19            MS. OLLILA:  Yes.
20            THE COURT:  That makes sense with the way the
21  case is tried.
22            MS. OLLILA:  Right.
23            THE COURT:  You're not requesting any lesser
24  included plain vanilla conspiracy; i.e., if the jury
25  does not find the quantity alleged but finds some lesser
```

1    quantity.

2             MS. OLLILA:  Well, that was included -- you

3    have a special verdict.

4             THE COURT:  That was confusing.  Because you

5    hadn't requested it, I had included it in the special

6    verdict form the first draft I gave you.

7             MS. OLLILA:  Oh, sure, sure.

8             THE COURT:  But, frankly, it was nothing that

9    had been requested by counsel.  So I removed it because,

10   frankly, the conspiracy as charged is conspiracy at

11   large, greater than a thousand kilograms of pot and

12   MDMA.  Reasonably foreseeable to this defendant, a

13   thousand kilograms or greater.  And if the jury in this

14   case doesn't buy the tractor-trailers and the quantity,

15   they aren't buying much of anything.  So ultimately my

16   question to the government is do you want a lesser

17   included.

18            MS. OLLILA:  Yes, Judge.  And when you were

19   talking about a lesser included, I wasn't understanding

20   that you were referring to the special verdict.  You may

21   remember at the final pretrial, when we were talking

22   about jury instructions, you were saying you wanted them

23   a week in advance, and I had given some thought to

24   having a special verdict form with respect to the series

25   of three, and at the same time we were talking about the

1    special verdict with respect to the weight.  So I think

2    that is absolutely necessary in any conspiracy case

3    that, if the jury doesn't find over a thousand kilos,

4    they've got to find something less.  So it goes zero to

5    a hundred, hundred to a thousand, thousand or more.

6              THE COURT:  Okay.  That wasn't in the original

7    proposed instructions.  So I reworked these this weekend

8    with it in mind that this was an all or nothing, that

9    the government was requesting an all or nothing

10   conspiracy.

11             MS. OLLILA:  No, I wasn't, Judge, and when I

12   saw your instructions --

13             THE COURT:  My first draft?

14             MS. OLLILA:  Right.  I didn't assume that that

15   would be taken out because we never discussed taking it

16   out when we were talking about objections.

17             THE COURT:  You are correct.  I did it this

18   weekend because it wasn't consistent with the other

19   elements that were requested.  I want to make sure

20   Attorney Sheketoff weighs in on this as well.

21             MR. SHEKETOFF:  Well, I actually have a case

22   that I've argued to the First Circuit that I'm awaiting

23   a decision on where I argued that a lesser included

24   offense -- that one wasn't a conspiracy, but it was

25   possession with intent to distribute -- was required if

1    any rational juror could come to that conclusion.

2          So I think the case law is that one of the

3    parties has to request it, but I think it would be

4    better case law to say, if any rational jury could

5    conclude it, then the Court should give it whether the

6    parties want to go all or nothing or not.  In other

7    words, I think if a rational jury could reach that

8    verdict, they should be instructed on it no matter how

9    much the parties want to gamble.

10          THE COURT:  Right.  Then this is how I would

11    envision my new draft coming out.  This is on Count 2,

12    the conspiracy.  You're going to have to understand that

13    I need to now rework it based on this.  So what I would

14    understand being the best way to handle this for a jury

15    would be as follows.  Instruct them on the plain vanilla

16    conspiracy, it's illegal to agree, to sell or possess

17    with intent to sell any amount of controlled substances.

18    Plain vanilla.

19          MS. OLLILA:  Right.

20          THE COURT:  And then explain to the jury that

21    a special verdict form is going to them and explain the

22    special verdict form and that they have various

23    questions they need to answer.  And I would include in

24    that special verdict form then a finding beyond a

25    reasonable doubt of quantity as one option, conspiracy

1    at large.  Okay?  And a separate finding beyond a

2    reasonable doubt that this defendant -- it was

3    reasonably foreseeable to this defendant that the

4    conspiracy involved that amount.  And then, if not, what

5    quantities do you find, and give them essentially the

6    quantities that they can check off.  So that's how I

7    would envision Count 2.

8            MS. OLLILA:  The first draft.  And, Judge, you

9    had said that I didn't request it, but I'm looking at my

10   jury instructions and the very last page of the special

11   verdict that included that does have all of the --

12           THE COURT:  Okay.  As I was reading through

13   everything this weekend, I did not see that.

14           MS. OLLILA:  I'm sorry, Judge.

15           THE COURT:  That's okay.  I can rework that,

16   put the plain vanilla conspiracy in there, and then the

17   quantities in addition.

18           So Count 2 will look different and it will be

19   consistent with what I just described, and I will get

20   you a draft of that.  And I will add obviously to the

21   special verdict form the extra quantity findings and

22   questions.

23           All right.  So that issue -- now that I'm

24   clear on that.

25           MS. OLLILA:  Sorry about that, Judge.

1          THE COURT:  That's okay.  I made all the

2     stylistic changes requested by Attorney Sheketoff.  I

3     have not come up with, as you described it, a heftier

4     reasonable doubt instruction.  So I'm hoping that you

5     can propose one to me this morning.

6          MR. SHEKETOFF:  Yes.  And I apologize for not

7     making it to the office this weekend because that was

8     one of the two things I wanted to do at the office.  The

9     other was read my mail.

10          THE COURT:  Well, we still have time for that.

11     You can submit that at our final charging conference,

12     and maybe I can find one as well.

13          Okay.  Major changes then, my major changes

14     frankly were to give you that fifth element, but now

15     that we are doing it in the special verdict form, the

16     aggravated crime of conspiracy --

17          MS. OLLILA:  Doesn't in and of itself prove

18     that.  It's a special verdict.  You're right.

19          THE COURT:  Exactly.  So I had restructured

20     everything and added that fifth element that you had

21     requested, but now I think that just moves to a special

22     verdict form.  And I will make sure in the special

23     verdict form indicating, you know, they need to find

24     this beyond a reasonable doubt, that it was reasonably

25     foreseeable to him, and I will explain it in the special

1  verdict form.

2          MS. OLLILA:  Good, good, good.

3          THE COURT:  I don't know if you saw the

4  conspiracy case that came out Friday from the First

5  Circuit.  That was one of the issues.

6          MS. OLLILA:  No.  Okay.  So what did it say,

7  Judge?

8          THE COURT:  The question in that case was

9  whether or not it was really clear to the jury that they

10  had to make that quantity and reasonable foreseeability

11  finding beyond a reasonable doubt.  It was just in the

12  special verdict form, didn't contain any -- as I recall,

13  didn't contain any specific language, but of course

14  throughout the instructions the jury had been told

15  beyond a reasonable doubt, and so the Court found that

16  it was -- that if there was any error, it was harmless.

17          MS. OLLILA:  Harmless.

18          THE COURT:  Correct.  That the jury

19  instructions as a whole made it clear.  So I will make

20  it clear and we won't have that issue.

21          Okay.  I have also added -- because the

22  indictment charges distribution and possession with

23  intent to distribute in Count 2 and its conjunctive,

24  I've added a paragraph.  You don't have to find that

25  there were both types.  Either/or is sufficient.  Okay?

1   I'm preempting the question, what if we find there was

2   distribution but no possession with intent to distribute

3   or vice versa.

4           MR. SHEKETOFF:  So I have a client that wrote

5   to the First Circuit saying these are the issues I want

6   my lawyer to raise.  This is before I filed my brief,

7   and one of the issues he wanted me to raise, and

8   therefore I did, was if you charge possession with

9   intent to distribute and distribution.

10          Since the First Circuit, unlike some other

11  circuits, says these are completely distinct and

12  separate crimes, do the quantity allegations have to go

13  to both.  In other words, you can't aggregate possession

14  -- well, he possessed with intent to distribute

15  500 kilograms, but he distributed 500 kilograms.  That

16  doesn't add up.  That may be a thousand, but it

17  doesn't -- it can't be.  It has to be -- one or the

18  other has to at least have been a thousand because

19  they're separate crimes.

20          MS. OLLILA:  But if you distribute in excess

21  of a thousand, you've obviously possessed with intent to

22  distribute.  So as long as you distribute.

23          MR. SHEKETOFF:  Not necessarily.

24          MS. OLLILA:  How?  If you distribute, how can

25  you not possess with intent?

1          MR. SHEKETOFF:  You can be an aider and

2    abettor and never have possession of it yourself.  So

3    the First Circuit has law that these are distinct and

4    separate crimes.  And so my client found that somewhere

5    with some jailhouse lawyer I think and --

6          THE COURT:  Came up with a creative argument.

7          MR. SHEKETOFF:  So I argued that, I mean, in a

8    brief to the First Circuit.  Saved my rights on that

9    one.

10          THE COURT:  So I have added that paragraph.

11    It's at pages 18 to 19 if you are looking at the draft

12    now.  Obviously that's going to change as I rewrite the

13    conspiracy.

14          I think the same thing goes for the

15    conjunctive with respect to MDMA and pot because if the

16    jury comes in with a question, well, what if we find

17    there was no MDMA.  I'm going to look for law on that.

18    I found one Eighth Circuit law very clearly allows it,

19    one or the other.  So I'm looking into that.  I haven't

20    added it yet.  But I'm just preempting a question.

21          MR. SHEKETOFF:  So I think there is some

22    tension in the law.  I think the law is basically as you

23    said, your Honor.  There's case law out there that says

24    you charge two separate drugs.  You prove one of them.

25    You've proved the conspiracy charged in the indictment,

1    or at least close enough.  It's not a big enough

2    constructive amendment that it means anything.

3            But there's this other set of concepts out

4    there that you have to prove the conspiracy that you

5    charged.  And there's some tension between these two

6    concepts.  So I'm going to take the legal position.  I'm

7    not pretending the case law is in my favor on this.  I

8    don't think it is.  But I'm going to take the legal

9    position that if you throw something in there like

10   Molly, in order for the conspiracy that you prove to be

11   substantially similar to the conspiracy that you

12   charged, you have to do that, too.  So I'm going to save

13   my rights on that.

14           THE COURT:  All right.  Noting your objection,

15   and obviously it's preserved now, I am going to look for

16   language, probably a very short couple of sentences, to

17   explain to the jury that it's not required that they --

18   even though it's charged with an "and," it would be

19   illegal for anyone to conspire to distribute, possess

20   with intent to distribute that amount of marijuana or

21   any amount of marijuana, whether or not the Molly was

22   part of that conspiracy.

23           I understand your argument.  They have charged

24   MDMA and pot and they're stuck with that, but I'm going

25   to look for an instruction that will explain to the jury

1    that it's not required that they find both.

2         I added -- and this one you will want to be

3    heard on.  I have researched the question of whether or

4    not aiding and abetting the distribution, possession

5    with intent to distribute can --

6         MS. OLLILA:  Act as a series of violations.

7         THE COURT:  Yes, for the element in the CCE

8    charge of the continuing series of violations.  And the

9    law is fairly strong and clear on that, that aiding and

10   abetting can, in fact, act as a source for those

11   violations.

12        So my aiding and abetting instruction in the

13   current draft is at page 25, and I know your objection

14   to that and a larger objection, so I will let you make

15   that, Attorney Sheketoff.  Let me just finish going

16   through the changes that I've made since our last

17   meeting.

18        I added a stipulation paragraph just to

19   explain the stipulation.  That's at page 12 right now.

20        I deleted the instruction regarding you've

21   heard evidence that the defendant has been convicted of

22   a crime.  And it was an instruction in bold and it was

23   there just in case the defendant would testify.  I've

24   taken it out just so that -- I can put it back in, if

25   necessary, but I've taken it out for now.  So that's

1    deleted presuming he does not testify.  And I have

2    obviously an instruction about his right not to testify.

3              Okay.  I think I've gone over the things that

4    I've added.  Let's go to the bigger questions in the

5    defendant's Rule 29 ex parte motion, Document No. 179.

6    It's now been unsealed.  And the first argument is that

7    Count 2 fails to allege the element of the aggravated

8    conspiracy that has been charged with respect to the

9    quantity being in excess of a thousand kilograms.  And I

10   will let Mr. Sheketoff make his argument.  Go ahead.

11             MR. SHEKETOFF:  I don't have much more to say

12   than I put in the papers, your Honor, but my basic

13   theory is this.  That after Alleyne, minimum mandatories

14   are considered aggravated crimes.  You're entitled to a

15   grand jury indictment on that crime and to some sort of

16   notice I guess it is.  And the way the government has

17   charged that crime is the way we used to do it

18   pre-Alleyne.  Where they have definitely made a charge

19   of a thousand kilos, that would raise the maximum

20   penalty, but since the element required to raise the

21   minimum is that you personally were involved with it or

22   it was reasonably foreseeable to you.  And I know in

23   Massachusetts that's how they charge it now.  I

24   assumed -- and it's only an assumption -- that main

25   justice told them this is how you charge it now.

1     But in any event it's not in there, and I know

2   because we've had an unrecorded lobby conference that

3   you talked about actual notice from the entire

4   indictment.  But my position is it's not in there, and

5   since it's not in there, the grand jury didn't act on

6   it, and, therefore, there is no minimum mandatory

7   charged in Count 2.  So the jury shouldn't be instructed

8   about that.  And the government's not entitled to that

9   if they get a conviction to a sentencing hearing where

10   they can argue that there's a minimum mand.  It still

11   charges a crime.  It charges a serious crime, but it

12   doesn't charge a minimum mandatory aggravated

13   conspiracy.

14          THE COURT:  Go ahead, Attorney Ollila.

15          MS. OLLILA:  I think, just briefly, Judge, the

16   case law is clear that you will read the indictment as a

17   whole, and I think, if you read the indictment as a

18   whole, the United States more than sufficiently charged

19   the minimum mandatory quantity and so therefore the

20   count survives.

21          THE COURT:  I think best practices would be to

22   include that element.  There is no question but that

23   after Alleyne that Attorney Sheketoff is correct.  It

24   should be included as an element in the indictment.  I

25   would put Alleyne and Apprendi together when I say that.

1           However, at this stage we are deep into the

2    trial, and I have to look at the question of has this

3    defendant received notice of this charge.  And I see two

4    issues really.  Notice to the defendant at this point,

5    and, secondly, I think Alleyne clearly requires a jury

6    finding beyond a reasonable doubt on that particular

7    element that Mr. Sheketoff is describing with respect to

8    the aggravated crime of conspiracy with respect to a

9    specific quantity.

10          On the noticed question, looking at the

11   indictment as a whole, there can be no question but that

12   the defendant is on notice that the government believes

13   that it is reasonably foreseeable to him that the

14   conspiracy at large would involve a quantity of cocaine

15   in excess -- marijuana in excess of a thousand

16   kilograms.  Because that specific amount is charged in

17   the indictment, Count 2, Count 1 places the defendant at

18   the top of that alleged conspiracy.  And so I believe

19   there are no notice problems.  In fact, I think Count 1

20   is the 10,000-pound gorilla version of notice to a

21   defendant that he is being charged with the aggravated

22   crime.

23          So I don't see any notice problems with

24   respect to the indictment as a whole, and I can cure the

25   failure to include the element by requiring that the

1  jury find that element beyond a reasonable doubt in my

2  instructions.  So that's my ruling with respect to that

3  argument.

4          MR. SHEKETOFF:  And not to quarrel with your

5  ruling, your Honor, but my rejoinder would be that you

6  can be guilty of a CCE even if you are a minor manager.

7  You don't have to be the head of the organization to be

8  guilty of a CCE.  You could be -- I don't know.  Who do

9  we have in this case.  You could be Fowle -- we haven't

10 heard from him yet -- who is involved in a series of

11 these things and manages one other person directly and

12 knows about a whole bunch of other people.  In any

13 event, that's my rejoinder.

14         THE COURT:  Okay.  I think that's a good

15 point.  And just to clarify, the CCE charge coupled

16 with -- Count 1 coupled with Count 2 I believe is

17 sufficient to place this defendant on notice that he's

18 being charged with the aggravated conspiracy.  But I

19 think you make a good point.

20         With respect to the missing element number one

21 in the CCE charge, I want you to go ahead.

22         MR. SHEKETOFF:  Okay.  So on Count 1, your

23 Honor, this is totally a creature of statute.  I guess

24 most of our crimes are.  And the statute lays out two

25 elements.  Element one is that there's basically a drug

1    violation that's a felony.  And then element two has a

2    whole bunch of things with it.  One of them is that that

3    particular element one is part of a series, etc.  So

4    they just leave out in Count 1 element one.  It's gone.

5    It doesn't exist.  They say everything that they're

6    required to say about element two, which has multiple

7    parts, but it's not in it.

8             So, again, because we have the unrecorded

9    lobby, you told us that your view was that the

10   indictment as a whole tells you that Count 2 is what's

11   in Count 1, and my rejoinder is just that it's not

12   there.  You know, it has to be there.

13            THE COURT:  Go ahead, Attorney Ollila.

14            MS. OLLILA:  And I think Attorney Sheketoff

15   has articulated what the United States's position is.

16   That Count 2 makes it clear that that is the predicate

17   that the United States is relying on, and so that is

18   more than enough to sustain the indictment as a whole.

19            THE COURT:  I think, best practices again,

20   would be for that element to be expressly included and a

21   continuing criminal enterprise charged, that it

22   expressly incorporates Count 2.  However, in this case I

23   do find that the indictment as a whole is sufficient to

24   place this defendant on notice of the charged crime and

25   that that element is frankly charged and described in

1    Count 2.

2            Your other argument with respect to the

3    continuous series of violations.

4            MR. SHEKETOFF:  Right, your Honor.  As we went

5    along in the trial, it occurs to me that -- with your

6    help, it occurs to me that there are other things one

7    could say about Count 1, the second element, which has

8    many parts to it, including the series, which all the

9    case law says -- I think there's a Supreme Court case on

10   it that says the series, each individual series, has to

11   be found by the jury unanimously beyond a reasonable

12   doubt.  It wouldn't do any good for six jurors to think

13   one, two, and three are the series and for another six

14   jurors to think, no, three, four, and five are the

15   series.  There's some case law about this, the

16   difference between what's an element and what's a means

17   to accomplish that element.  And I think even the

18   Supreme Court suggests that the distinction is not

19   always that clear.

20           So I want to take the position, your Honor,

21   that the series has to be somewhere in the indictment.

22   What is it that we are choosing from?

23           Just like in a RICO charge.  This is only my

24   second CCE in a career that's gone on for way too long

25   I'm sure, but I've had many RICO cases.  And in RICO

1    cases they articulate what the predicate acts are.  They

2    spell out each and every one.

3         And I'm not sure, as we are about to finish

4    the government's evidence in this case, which predicate

5    acts are in there.  And if you're going to articulate to

6    them any specific predicate acts, because some of the

7    acts that we have heard about may be tied to the

8    Canadian larger conspiracy in some sense, it's not clear

9    to me that my client would have even known about those

10   in any way, shape, manner, or form.

11        So I'm taking the position that the failure to

12   say in Count 1 what the potential acts are that could

13   form the series is a constitutional violation, just like

14   not saying what -- that there's that element one.  And

15   if you look at the whole indictment, you can't figure

16   this out from the whole indictment.

17        And at my client's suggestion, I'm also going

18   to take the position that you have to name the five

19   people.  I mean, you may not have to prove all five

20   because you could name ten, you know.  So I'm going to

21   take the same position with the people that he

22   supposedly supervised, that they have to be named or

23   described in some form or fashion, and the jury has to

24   be told to unanimously -- they have to agree unanimously

25   on the five.  I don't think the case law supports me on

1    that, unlike the series, but I don't see a distinction.

2    If you have to prove that you supervise five people, it

3    seems to me you should be able to tell me who they are.

4              THE COURT:  All right.  Just to deal with the

5    last issue first.  The case law is clear that the jury

6    does not have to be unanimous about the named -- any

7    specific five individuals.  They do have to be

8    unanimous, however, that there were at least five.

9              With respect to the continuing series of

10   violations, let me just say that there is support for

11   the argument you are making in a First Circuit case,

12   which I just called up on my computer so I could read it

13   to you.  It's Soto Beniquez.  And let me just read from

14   this decision.  I'm going to say that this decision gave

15   me pause, but it also is internally -- at least in my

16   opinion, internally consistent.  I'm just going to go

17   over that with you now on the record and then point out

18   that the Federal Jury Instructions is the source that

19   I'm ultimately relying on to make sense of the language

20   in this case.

21             But let me just read from Soto Beniquez.

22   Quote, we think it preferable for predicate offenses to

23   be alleged in the CCE count, but at least where the CCE

24   count incorporates by reference predicate offenses

25   charged elsewhere in the indictment, failure to list

1    predicate offenses in the CCE count itself is not

2    reversible error because the defendant has been provided

3    fair notice.

4           Then I'm going on down through the decision,

5    and it appears to support your argument, Attorney

6    Sheketoff.  It then goes on to point out -- let me just

7    read because this is the defendant's argument in Soto

8    Beniquez.  Defendants also argue that in the indictment

9    the predicate offenses for the CCE charge were based on

10   the conspiracy count, but at trial the government used

11   evidence of uncharged narcotics offenses to establish

12   the predicate offenses.  Thus, defendants argue,

13   although the CCE charge remain the same, the facts used

14   to prove the series elements of the charge were

15   different from those set forth in the indictment.

16          Slightly different than the argument you are

17   making.  But as you go down to the ultimate conclusion,

18   the Court writes, and I quote, here defendants were not

19   prejudiced.  The indictment charged them with violations

20   of narcotics laws from January 1990 to March 1994.  The

21   use of narcotics offenses in that time period should

22   have been no surprise to them.

23          So reading Soto Beniquez, I certainly -- I

24   think as a prosecutor I would include those details in

25   my indictment just because Soto Beniquez seems to

1    suggest that that is critical.

2           When I read, however, through the case law

3    throughout the circuits as compiled in the Federal Jury

4    Instructions treatise, I find fair clarity that courts

5    across the country are allowing allegations in the

6    indictment as a whole to fulfill the defect of which you

7    have -- to which you've objected.

8           Let me just -- I can go right to the

9    conclusion.  Let me just read from it.  Because we are

10   talking now -- I'm talking about the treatise, and it's

11   the Model Jury Instruction 56-28, second element,

12   continuing series of violations.

13          So this instruction itself indicates to the

14   jury as written here, these violations do not have to be

15   convictions or separate counts in the indictment.  They

16   may be overt acts charged in the conspiracy count of the

17   indictment or even acts not mentioned in the indictment

18   at all as long as the defendant had the intent to

19   violate the narcotics laws when he committed these acts.

20   It goes on in the comment to that instruction and I will

21   just read one sentence, the concluding sentence.

22          Consequently, the predicate narcotic offenses

23   needed to satisfy the second element need not be charged

24   in separate counts in a Section 848 indictment.

25          The next paragraph of that comment is:  It is

1    sufficient to charge the alleged series as overt acts in

2    the conspiracy count that usually is the first count in

3    such indictments, and it has even been indicated that

4    the predicate violations need not be charged in the

5    indictment at all if the evidence at trial discloses at

6    least three other narcotics violations not specifically

7    named in the indictment.

8            The treatise authors go on to criticize the

9    wisdom of that but note that this is the apparent

10   majority approach to CCE -- the second element of CCE

11   charges.

12           I am going to follow the majority approach.

13   Your objection is duly noted.  And as we get to our

14   final charging instructions, I think we can discuss the

15   issue further of the three predicate violations because

16   the jury -- you are correct.  The jury absolutely must

17   find those three unanimously and beyond a reasonable

18   doubt, which I will tell them.  So we can discuss that

19   at our final charging conference.

20           MR. SHEKETOFF:  All right.  And, your Honor,

21   just as a general question, if you've saved my rights at

22   the charging conference, do I have to object at the end

23   of the charge and go over these with you again?

24           THE COURT:  You mean after I finish formally

25   charging the jury?

```
 1                MR. SHEKETOFF:  Yes.

 2                THE COURT:  All your objections in my view of

 3    things are preserved as long as you've made them along

 4    the way.  I've heard them and I've been able to either

 5    accept those or reject them on the record.

 6                MR. SHEKETOFF:  And I agree with you.  That is

 7    the majority view.  There's no question about it.  I

 8    just think it's wrong.

 9                THE COURT:  As does, I think, the treatise

10    authors, and there's some indication that the First

11    Circuit may look at this very closely as well.

12                But at this point I don't have enough in front

13    of me.  I have the majority rule and it's fairly

14    persuasive that courts have gone ahead and allowed an

15    indictment such as this to go forward.

16                MR. SHEKETOFF:  I understand.  And, in fact,

17    the only way the government can save its rights on this

18    is for you to take the position it's denied, and if I

19    lose the trial, then I get to litigate it.  Otherwise

20    the government is just out of the box on it.  So I

21    understand.

22                THE COURT:  A couple of other issues.  Are

23    there other jury instructions, questions of law that we

24    need to cover now, at least at this penultimate -- I

25    want you to understand we'll have one last on the
```

1    record.

2              MS. OLLILA:  No, I have nothing, Judge.

3              MR. SHEKETOFF:  I don't either.

4              THE COURT:  I will rework that conspiracy.  It

5    will be simpler actually because the plain vanilla

6    conspiracy elements are very -- yes.  And so then it

7    will describe that count to them, and then I will

8    explain the aggravated crimes.  I won't use that

9    language, but in the special verdict section of my jury

10   instructions, and then of course the special verdict

11   form will be consistent with that.  As soon as I get

12   that drafted, I will try to put that in bold so you can

13   immediately -- your attention is drawn to it and you can

14   review that tonight, if not sooner.

15             A couple of other minor things.  At a point --

16   and I don't recall specifically.  Testimony was -- and

17   it was not objected to, about Andre Watson and his prior

18   criminal conduct, and I didn't hear an objection.  I

19   assume for whatever reason you don't have any problem

20   with that testimony coming in.

21             MR. SHEKETOFF:  Well, I should have moved to

22   strike it, but then it just --

23             THE COURT:  Draws more attention.

24             MR. SHEKETOFF:  I didn't know he was --

25   whoever it was, I didn't know they were going to

```
1    volunteer that level of detail.  Who was it?

2              THE COURT:  I think it might have been

3    Poirier.

4              MS. OLLILA:  Paul Poirier.  It's spelled right

5    out in his report.

6              MR. SHEKETOFF:  I'm not saying it wasn't in

7    his report.  I'm just saying there are lots of things in

8    people's reports that --

9              THE COURT:  I thought, because you didn't

10   object, that there had to be some strategy that you just

11   didn't care, but I also thought it was inappropriate and

12   improper and it was not something that he should have

13   said.  And I would be open to any sort of instruction

14   you would want on that, but obviously at this point in

15   time, it would draw the attention of the jury to it.  So

16   you can think about that.

17             Let me just also say with respect to

18   objections, and I've said this obviously before and I

19   just need you to be louder and give me a basis.  Just

20   one word is fine.  And if I don't quite understand it, I

21   may ask you to come up.

22             But Attorney Ollila is quick to, I think,

23   adjust and try to reword the question to prevent the

24   delay.  So I completely appreciate that, but I think

25   sometimes what happens is he gets a little railroaded.
```

1    And let me describe just one example of it, if I can

2    recall it correctly.  There was -- I think it was a

3    question that was about -- oh, did you hear the

4    testimony yesterday about Andre Watson?  And this was to

5    Detective Norris.  Objection.

6              Here testimony, relevance, was the objection.

7    I look over.  I'm thinking, hmmm, let me think about

8    that for a minute.  Meanwhile, you said, let me

9    rephrase.  You rephrased a question and your rephrased

10   question was, was it the same person.

11             So essentially you rephrased quickly.  And I

12   don't mean in any way to cast aspersions at all on your

13   intention there.  I think you just perhaps didn't hear

14   him.  But ultimately your question usurped his objected

15   question, and there really wasn't time at that point.

16   And so as I'm listening to it, it really wasn't that

17   objectionable ultimately, and you didn't renew the

18   objection, but I think if we could just slow down a

19   little bit, it would help this new judge as I try to

20   rule on the individual objections.  And I appreciate

21   your ability to quickly rephrase.  And sometimes that

22   works, but I think I need to rule on his objection and

23   then we can go from there.  It might slow things down a

24   bit.

25             MR. SHEKETOFF:  With some of these objections,

1    I'm just afraid if we start down that road, where are we

2    going next?  Did you hear him say this?  Did you hear

3    him say that?  Did you hear him say that?  It's not like

4    I've tried with her before so I know that this is just

5    one thing.  I personally think it's inappropriate to

6    have some agent sit at counsel table who's the chief

7    agent in the case and then get up and testify and start

8    commenting -- because you have this ability to keep them

9    in the courtroom, start commenting about what other

10   people have said when he should really have been

11   sequestered if he was the chief agent.  The First

12   Circuit has said, no, they're allowed to have somebody

13   sit there.  So sit there is fine, but then to start

14   talking about what other people said in the courtroom --

15   I don't know, because I haven't tried with her before,

16   if this is the beginning of a flood or, you know, one

17   little drip.  One little drip I will live with.

18           THE COURT:  Well, what we can do is simply,

19   Judge, can we approach.  Approach, and then we can

20   confirm -- especially if it's in an area you have real

21   concerns about, I encourage you to do that.  We haven't

22   had many sidebars.  The two of you have been wonderful

23   about the jury's time.  I really appreciate that.  We

24   are coming near the end and now I'm urging you to slow

25   down a little bit.  I probably should have gone over

1    this a little sooner.

2            But in any event, everything is going fine.  I

3    just wanted to make sure that with respect to

4    objections, that there is a ruling on them, and then you

5    can adjust after the ruling.  Because if his objection

6    is sustainable -- sometimes you see that it is and you

7    immediately rephrase and that's fine.  But I think a

8    loud objection that she can hear and the basis that she

9    can hear would assist.

10           MR. SHEKETOFF:  Okay.

11           MS. OLLILA:  And that issue on Andre Watson,

12   so often I don't understand your objection.  You say

13   objection and you don't say what it is.  Sometimes --

14   you did -- I think it was on Friday -- say hearsay, and

15   so I understand right away.  The Andre Watson objection,

16   I wasn't really sure what you were getting to.  I could

17   have easily had Sergeant Norris testify -- and it was

18   really sloppy and stupid.  Did you hear the testimony.

19           That's not the way I do it.  I could have had

20   him testify, did you run the motor vehicle plate on the

21   car outside?  Yes, I did.  Who did it come back

22   registered to?  Andre Watson.  Did you see the person go

23   in?  Yes, I did.  Did you subsequently identify him?

24   Yes, I did.  Andre Watson.

25           I could have easily done it that way and it

```
 1    was sloppy.  I was trying to hurry and I just did not

 2    understand where you were going with it or what your

 3    objection was.

 4              THE COURT:  And I think very experienced

 5    judges appreciate that approach because it keeps things

 6    moving, and if they don't understand the objection, ask

 7    for a basis.  I'm just going to ask for objection with

 8    basis, if you could.  That would be very helpful to me.

 9              MR. SHEKETOFF:  Yes, your Honor.

10              THE COURT:  Anything else?  I think we're

11    ready to go.

12              MS. OLLILA:  I think we are.

13              MR. SHEKETOFF:  Are we really going to finish

14    today?

15              MS. OLLILA:  We're really going to finish

16    today.

17              THE COURT:  We can be off the record at this

18    point.

19              (Chambers conference adjourned at 8:50 a.m.)

20                        BEFORE THE JURY

21              THE CLERK:  Court has before it for

22    consideration today jury trial day five, Criminal Case

23    No. 14-cr-93-01-LM, United States of America versus

24    Alkis Nakos.

25              THE COURT:  Good morning, members of the jury.
```

1   We will continue now with testimony.  Attorney Ollila.

2           MS. OLLILA:  Judge, I have some bad news to

3   start the day.  Diane broke her arm over the weekend.

4   However, we now have Cindy Budahn, who's also a

5   paralegal at the U.S. Attorney's Office.  She's been at

6   the U.S. Attorney's Office for 29 years, and she is an

7   excellent paralegal and she will assist for the last few

8   days of trial.  Thank you.  May I proceed?

9           THE COURT:  Yes, you may.

10          (Sergeant James Norris resumed the stand.)

11              DIRECT EXAMINATION (cont'd)

12  BY MS. OLLILA:

13          MS. OLLILA:  Judge, if it's okay, we will pass

14  out the transcripts because we will start off the

15  morning with more Title III intercepts.

16          THE COURT:  As you're handing those out, let

17  me just remind the jury, as I instructed you on Friday,

18  those transcripts are merely to assist, but it is your

19  conclusion with respect to what is on those tapes that

20  governs.  You are the sole factfinders, but the

21  transcripts will be there to assist you as you listen to

22  the audio.

23          MS. OLLILA:  Thank you, your Honor.

24      Q.   Good morning, Sergeant Norris.

25      A.   Good morning.

1      Q.    We left off on Friday on November 4th, 2013,

2   and the jury had just heard a call between Kosmas

3   Koustas and Charles Fowle, and during the call Kosmas

4   Koustas had asked Charles Fowle where he was with that.

5   What is your understanding of what "that" was a

6   reference to?

7      A.    As far as where he was with the sale of the

8   marijuana he had received.

9      Q.    I want to direct your attention to the

10   transcript, which you must have in front of you.  The

11   transcript number would be 38JJ, 38JJ.  Do you have that

12   transcript in front of you, Sergeant Norris?

13      A.    Yes, I do.

14      Q.    What is the date of this call?

15      A.    November 9th, 2013.

16      Q.    And what was law enforcement doing on that

17   day?  Did you have any surveillance out?

18      A.    We did.

19      Q.    Why?

20      A.    In reference to a phone call that was

21   intercepted.

22      Q.    And why did you send out surveillance because

23   of an intercepted telephone call?

24      A.    To observe a meeting.

25      Q.    And who was the meeting going to occur

1    between?

2         A.    Kosmas Koustas and Jeremy Blevens.

3         Q.    And is it the same Jeremy Blevens that Kosmas

4    Koustas called when he was on his way back from

5    Massachusetts on October 23rd, 2013?

6         A.    Yes.

7               MS. OLLILA:  Cindy, could you please play

8    38A-2L, 28A-2L.

9               (Played recording.)

10        Q.    What happened after you received that call?

11   What did law enforcement observe?

12        A.    A meeting between Jeremy Blevens and Kosmas

13   Koustas.

14        Q.    Did you see any exchanges?  And how long were

15   those two in the area of the Game Stop?

16        A.    Without a report I'm not sure I can recall.

17        Q.    Let me direct your attention to the very next

18   day, November 10th, 2013.  I'm going to draw your

19   attention to transcript 38NN, not 38MM, 38NN as in

20   Nancy.  Was there a call received between Kosmas Koustas

21   and Jeremy Blevens on that date?

22        A.    Yes.

23        Q.    Did law enforcement monitor the call?

24        A.    Yes.

25              MS. OLLILA:  Cindy, will you please play

1    38A-2N.

2            (Played recording.)

3        Q.    Sergeant Norris, Jeremy Blevens says:  This

4    kid was asking if I could get him something today, but

5    he's going to supposedly have a G from me.  What do you

6    understand a G to be a reference to?

7        A.    $1,000.

8        Q.    And then Jeremy Blevens says:  And I think I

9    will only have a G on me.  And what do you understand

10   that to be a reference to?

11       A.    $1,000.

12       Q.    So Jeremy Blevens is going to have how much

13   money to purchase something?

14       A.    $2,000.

15            MS. OLLILA:  Keep playing.

16            (Played recording.)

17       Q.    Sergeant Norris, that was November 10th, 2013;

18   correct?

19       A.    Yes.

20       Q.    Did you get ready to send out surveillance

21   units as a result of that call?

22       A.    I believe we did.

23       Q.    Why?

24       A.    To observe a meeting.

25       Q.    Now, on the same day, let me show you what has

1   been marked as Government's Exhibit 38-OO.  On that same

2   date, was there a text message that was received by

3   Kosmas Koustas from Jeremy Blevens?

4        A.   Yes.

5        Q.   And what did the text message say?

6        A.   The text message read:  That's a go.  I'm

7   going to Weare real quick.

8        Q.   What did you understand that to mean, that's a

9   go?

10       A.   The meeting that the drug deal was set and

11  they were ready to go.

12       Q.   Let me draw your attention to the transcript,

13  which should be 38PP, not 38-OO, 38PP.  Do you have 38PP

14  in front of you, Sergeant Norris?

15       A.   Yes, I do.

16       Q.   And who are the participants to this call?

17       A.   Kosmas Koustas and Jeremy Blevens.

18       Q.   And is Kosmas Koustas calling someone or is

19  Jeremy Blevens calling him?

20       A.   This is an outgoing phone call from Kosmas

21  Koustas to Jeremy Blevens.

22            MS. OLLILA:  Cindy, please play 38A-2O.

23            (Played recording.)

24       Q.   So Jeremy Blevens says to Kosmas Koustas:

25  Hey, do you have, ah, one of them number things with

1    you?  What do you understand that to mean?

2         A.   A scale.

3         Q.   Why would individuals need a scale?

4         A.   To weigh the drugs.

5         Q.   Do you recall on October 23rd, 2013, Jeremy

6    Blevens asked Kosmas Koustas for "that girl"?

7         A.   Yes.

8         Q.   And what was that a reference to?

9         A.   Molly, MDMA.

10        Q.   Do individuals who are purchasing MDMA

11   typically weigh the product out before they get it?

12        A.   You would weigh product if you received it,

13   yes.

14        Q.   In this call what is your understanding of

15   what is going to be exchanged?

16        A.   Based on the context of the phone call, I

17   believe it to be Molly or MDMA.

18             MS. OLLILA:  Go ahead and play that.

19             (Played recording.)

20        Q.   What happened after this call occurred, if you

21   recall?

22        A.   I do not.

23        Q.   Okay.  What I want to do is I want to direct

24   your attention to December 3rd, 2013.  You had testified

25   on Friday that when Kosmas Koustas was coming back from

1    Massachusetts and before he went, he would call a

2    certain telephone number.  Do you recall that testimony?

3         A.   Yes.

4         Q.   And who was the telephone number subscribed

5    to?

6         A.   Alkis Nakos.

7         Q.   At some point on or around December 3rd did

8    law enforcement gain information that Kosmas Koustas was

9    going to make another trip to Massachusetts to obtain

10   what you believed would be a quantity of marijuana?

11        A.   I believe so, yes.

12        Q.   And let me draw your attention to 39EE, page

13   91.  So, Sergeant Norris, what I want you to do -- Cindy

14   just highlighted a call in yellow.  Why don't you tell

15   the jury what the date of the call is.

16        A.   December 3rd, 2013.

17        Q.   Is that an outgoing or incoming call?

18        A.   That's an outgoing call.

19        Q.   Who's placing the call?

20        A.   The call was placed by Kosmas Koustas's

21   telephone.

22        Q.   And who is he contacting?

23        A.   Phone number 603-966-8239.

24        Q.   And who is that subscribed to?

25        A.   Alkis Nakos.

1          MS. OLLILA:  Now, Cindy, please turn to page

2    92.

3      Q.   On the same date, Sergeant Norris, at

4    10:10 a.m., is there another call between Kosmas Koustas

5    and Alkis Nakos?

6      A.   Yes.

7      Q.   And who was placing the call?

8      A.   Another outgoing call from Kosmas Koustas's

9    phone.

10     Q.   How long does the call last?

11     A.   Four minutes, 36 seconds.

12          MS. OLLILA:  Cindy, now go to page 93.

13     Q.   Sergeant Norris, you are now looking at page

14   93 of Government's Exhibit EE.  Do you see what has been

15   highlighted in yellow?

16     A.   Yes.

17     Q.   Does that also reflect a call on December 3rd,

18   2013?

19     A.   It does.

20     Q.   Who was placing the call?

21     A.   Outgoing phone call from Kosmas Koustas's

22   phone.

23     Q.   To whom?

24     A.   Phone subscribed to Alkis Nakos.

25     Q.   And how long does the conversation last?

1      A.    Eight minutes, 38 seconds.

2            MS. OLLILA:  Now, Cindy, please go to page 94.

3      Q.    Sergeant Norris, you are now looking at page

4  94 of Government's Exhibit 39EE.  Do you see that there

5  is a yellow highlight in one of the boxes?

6      A.    Yes.

7      Q.    And what time is the call made?

8      A.    7:35:05 p.m.

9      Q.    Who is making the call?

10     A.    It's an outgoing phone call from Kosmas

11 Koustas's phone.

12     Q.    To whom?

13     A.    Phone subscribed to Alkis Nakos.

14     Q.    And how long does the conversation last?

15     A.    Two minutes, 5 seconds.

16     Q.    When law enforcement see this, what is it that

17 you are believing is going to occur, if anything?

18           MR. SHEKETOFF:  Objection, speculation.

19           THE COURT:  Sustained.

20     Q.    On December 4th, 2013, were law enforcement

21 monitoring the wire of Kosmas Koustas?

22     A.    Yes.

23           MS. OLLILA:  Cindy, please pull up page 97.

24     Q.    Sergeant Norris, you are now looking at page

25 97 of Government's Exhibit 39EE.  What date are these

```
 1   calls made?

 2        A.   December 4th, 2013.

 3        Q.   And the first call, what time does it occur?

 4        A.   9:15:41 in the morning.

 5        Q.   How long does the conversation last?

 6        A.   Six minutes, 39 seconds.

 7        Q.   Is there another conversation on that date?

 8        A.   Yes.

 9        Q.   And what time did it occur?

10        A.   9:38:37 a.m.

11        Q.   And how long did the conversation last?

12        A.   Six minutes, 49 seconds.

13             MS. OLLILA:  Cindy, please pull up page 99.

14        Q.   On the same date -- strike that.  What date is

15   this page referencing?

16        A.   This page is for December 4th, 2013.

17        Q.   At 7:41:44 p.m., is there an outgoing call

18   made?

19        A.   Yes.

20        Q.   Who is making the call?

21        A.   Outgoing call from Kosmas Koustas's phone.

22        Q.   And what number is he contacting?

23        A.   603-966-8239.

24        Q.   Whose number is that registered to?

25        A.   Alkis Nakos.
```

1          MS. OLLILA:  On page 100, Cindy.

2     Q.   You are now on page 100 of Government's

3 Exhibit 39EE.  Is there an outgoing call made by Kosmas

4 Koustas at 8:28:26 p.m.?

5     A.   Yes.

6     Q.   And who is he contacting?

7     A.   603-966-8239.

8     Q.   The following day, December 5th, 2013, I will

9 direct your attention to these same records.

10         MS. OLLILA:  Cindy, please go to page 103.

11     Q.   Is there a reference on December 5th, 2013, to

12 an outgoing call being placed by Kosmas Koustas at

13 10:31:57?

14     A.   Yes, there is.

15     Q.   And who is he contacting?

16     A.   603-966-8239.

17     Q.   And how long does the conversation last?

18     A.   Ten minutes, 43 seconds.

19     Q.   At some point in time, Sergeant Norris, do law

20 enforcement intercept text messages between Kosmas

21 Koustas and an individual believed to be a courier in

22 Massachusetts?

23     A.   On what date?

24     Q.   On December 4th and 5th.  And before you

25 answer that, let me show you what's marked as

1    Government's Exhibit 39P for identification.  I'd ask

2    that you look through Government's Exhibit P for

3    identification.  Do you recognize those documents?

4         A.   Yes.

5         Q.   What are they?

6         A.   Line sheets from the wiretap on 508-479-6296.

7         Q.   And who had that number, 508-479-6296?

8         A.   Kosmas Koustas.

9         Q.   And those line sheets you're referring to, can

10   you explain again to the jury what you mean by a line

11   sheet?

12        A.   The information for the line that you were up

13   on, including the date, the time, direction of the phone

14   call, and the synopsis.

15        Q.   Are those line sheets a reflection of text

16   messages sent and received between December 4th and 5th,

17   2013?

18        A.   Yes.

19        Q.   Now, Sergeant Norris, early on in your

20   testimony you testified that in order to get

21   authorization to go up on a Title III intercept, a

22   wiretap, you needed to have probable cause that a dirty

23   call had been committed.  Correct?

24        A.   Yes.

25        Q.   So if you're calling me, you and I are dealing

1   drugs together, the only way law enforcement can listen

2   to our conversations is that they first have a dirty

3   call; correct?

4        A.   Yes.

5        Q.   And the same applies to text messages; is that

6   correct?

7        A.   Yes.

8        Q.   And what happens if during the original

9   30 days of the intercept, there's not a dirty text

10  message.  Do you then get reauthorization to go up for

11  another 30 days?

12       A.   No.

13       Q.   So during this period of December 4th and

14  December 5th, 2013, did law enforcement have

15  authorization to intercept text messages between Kosmas

16  Koustas and whomever he's speaking to?

17       A.   No.

18       Q.   Were you operating blind at this point with

19  respect to text messages?

20       A.   Yes.

21       Q.   You are seeing that Kosmas Koustas is sending

22  text messages to a 508 number.  Is that correct?

23       A.   Yes, it is.

24       Q.   And what is the number?

25       A.   508-723-3101.

1    Q.   Did you attempt to determine the subscriber to

2    that telephone?

3    A.   We would have.

4    Q.   And were you able to?

5    A.   I don't believe so, no.

6    Q.   Now, was that the same telephone number that

7    Kosmas Koustas was contacting in Massachusetts via text

8    message on October 23rd, 2013, the very first night of

9    the wire?

10   A.   I don't believe so, no.

11   Q.   Is it common to see individuals who are

12   dealing in drugs frequently drop their telephones?

13   A.   Yes, it is.

14   Q.   Was it surprising to you that you were seeing

15   a brand-new number that Kosmas Koustas was contacting?

16   A.   No, I was not.

17   MS. OLLILA:  Cindy, please go to page 104.

18   Q.   On December 5th at 2:31:24 p.m., is there an

19   outgoing call made by Kosmas Koustas?

20   A.   Yes.

21   Q.   And who's he contacting?

22   A.   Phone number 603-966-8239.

23   Q.   How long does the conversation last?

24   A.   Five minutes, two seconds.

25   MS. OLLILA:  Now, Cindy, I want you to pull up

1  but not play yet 38A-2P.

2      Q.   Now, Sergeant Norris, if you would turn your

3  transcripts to 39R.  By the way, at this point in time,

4  Sergeant Norris -- you referred to a GPS tracking

5  device; is that correct?

6      A.   Did we apply for one?

7      Q.   Yes.

8      A.   Yes, we did.

9      Q.   So at this point in time did you have a GPS

10 tracking device on Kosmas Koustas's car?

11     A.   Yes.

12     Q.   And what kind of car was he driving?

13     A.   A Volkswagen.

14     Q.   How do you get a GPS tracking device?  What do

15 you have to do?  Where do you have to go to get it as

16 far as authorization to put the GPS tracking device?

17     A.   You have to have court authorization.

18     Q.   And do you have to establish that Kosmas

19 Koustas was using the car that you want to place the

20 tracker on in assisting him to deal drugs?

21     A.   Yes.

22     Q.   And did you do that?

23     A.   Yes, we did.

24     Q.   So at this point in time you were up on a

25 wire, but you also have a tracking device on Kosmas

1    Koustas's car.  Is that correct?

2         A.   Yes.

3         Q.   Are you able to follow him?

4         A.   Yes.

5         Q.   Did the tracking device show where he went on

6    December 5th, 2013?

7         A.   I don't believe it did, no.

8              MS. OLLILA:  Cindy, I want you to play 38A-2P.

9              (Played recording.)

10        Q.   So, Sergeant Norris, on this date you received

11   court authorization to have a GPS tracker on Kosmas

12   Koustas's Volkswagen GTI; correct?

13        A.   Yes.

14        Q.   Did law enforcement want to conduct

15   surveillance on Kosmas Koustas on this day,

16   December 5th, 2013?

17        A.   Yes.

18        Q.   And did you conduct surveillance?

19        A.   Yes.

20        Q.   And was Kosmas Koustas driving the Volkswagen

21   GTI?

22        A.   No, he was not.

23        Q.   Although he was not driving the car, did you

24   watch him?  Did you follow him?

25        A.   Yes, there was surveillance established on

1    him.

2         Q.    So when you engage in surveillance without the

3    assistance of a GPS tracking device, how do you

4    literally follow someone?

5         A.    You have to have them in sight.

6         Q.    And how many individuals does it take to

7    surveil a target?

8         A.    It varies.

9         Q.    What did law enforcement see with respect to

10   Kosmas Koustas?

11        A.    I believe we located Mr. Koustas at his place

12   of employment in Needham, Massachusetts.

13        Q.    And what was his place of employment?

14        A.    I believe it was called Food Tech Solutions.

15        Q.    So Kosmas Koustas actually had a job?

16        A.    Yes, he did.

17        Q.    So what did you do?  Did you follow him from

18   Food Tech Solutions to somewhere?

19        A.    I believe we observed him leaving the

20   business, but due to traffic I believe we lost contact

21   with the vehicle fairly quickly.

22        Q.    At some point did you pick him back up?

23        A.    I don't recall if we picked him back up

24   around that timeframe.

25        Q.    Did he ever show back up in New Hampshire?

1          A.    Yes, he did.

2          Q.    Now, the call that the jury just heard, I want

3     you to look at that transcript, 39R, and I want you to

4     tell the jury what time that conversation occurred.

5          A.    This started at 7:53:52 p.m.

6          Q.    So right before 8:00 at night on December 5th;

7     correct?

8          A.    Yes.

9          Q.    So if Koustas is in the area of Worcester or

10    Millbury, Massachusetts, at 8:00, how long would it take

11    him to get back to Manchester?

12         A.    Depending on traffic, I would estimate maybe

13    an hour and a half, two hours.

14         Q.    So what time would you expect Koustas to be

15    pulling back into New Hampshire if this call occurred at

16    8:00 p.m.?

17         A.    Probably around 10:00 p.m.

18              MS. OLLILA:   Now, Cindy, I want you to go to

19    the 39EE and pull up page 106.

20         Q.    So, Sergeant Norris, I want you to direct your

21    attention to the highlighted area of this page, and I

22    want you to tell the jury what time that call is made.

23         A.    9:37:31 p.m.

24         Q.    And is that on December 5th?

25         A.    Yes, it is.

1    Q.    What is the telephone number that Kosmas

2  Koustas is calling?

3    A.    603-966-8239.

4    Q.    What is the telephone number that Kosmas

5  Koustas is using to call 603-966-8239?

6    A.    603-261-0853.

7    Q.    That is not the telephone that you're up on

8  the wire on; correct?

9    A.    That's correct.

10   Q.    So Kosmas Koustas has two telephones with him?

11   A.    That would be my belief, yes.

12   Q.    How long does the conversation last?

13   A.    One minute, 27 seconds.

14   Q.    At 9:37 p.m.; correct?

15   A.    Correct.

16   Q.    Do law enforcement observe Kosmas Koustas come

17  back into New Hampshire?

18   A.    We did observe him in New Hampshire, yes.

19   Q.    Where did he go?

20   A.    I believe it was 140 South Porter Street,

21  Manchester.

22   Q.    140 South Porter Street, Manchester.  Who

23  resides there, if you know?

24   A.    We believed it to be the residence of his

25  father.

1      Q.   Of whose father?

2      A.   Kosmas Koustas.

3      Q.   So 140 Porter Street in Manchester, New

4  Hampshire, is Kosmas Koustas's father; correct?

5      A.   Yes.

6      Q.   What time did Kosmas Koustas arrive at 140

7  Porter Street?

8      A.   I don't know off the top of my head.

9      Q.   At some point in time, do law enforcement

10 observe some other vehicle pulling into 140 Porter

11 Street?

12     A.   Yes.

13     Q.   And what time is that?

14     A.   I'm sorry, what kind of vehicle?

15          MR. SHEKETOFF:  Objection, your Honor.  I

16 can't follow if this is hearsay or personal observation.

17          THE COURT:  Can you ask personal observation.

18     Q.   Did you personally observe.

19     A.   The vehicle arrive?

20     Q.   Yes.

21     A.   No, I did not.

22     Q.   Do you know what time the vehicle arrived?

23          MR. SHEKETOFF:  Objection.

24          THE COURT:  Sustained.

25     Q.   On December 6th, the next day -- by the way,

1    let me clarify something.  Did you see Kosmas Koustas

2    pull into 140 Porter Street or was that other

3    surveillance officers?

4        A.    I believe someone else might have seen him

5    pull in.

6        Q.    Okay.  I apologize for that.  The very next

7    day was December 6, 2013; correct?

8        A.    Yes.

9             MS. OLLILA:  Cindy, please pull up page 109.

10       Q.    When you were surveilling Kosmas Koustas on

11   December 5th and you went to Massachusetts, what did you

12   believe he was doing in Massachusetts?

13            MR. SHEKETOFF:  Objection.

14            THE COURT:  Foundation?

15            MR. SHEKETOFF:  Well, calls for speculation,

16   what he believed he was doing.

17            THE COURT:  Sustained.

18       Q.    You were up on a wiretap, correct, Sergeant

19   Norris?

20       A.    Yes.

21       Q.    And what does the wiretap involve?  What were

22   you listening for?

23       A.    Drug dealings.

24       Q.    What would Kosmas Koustas do when he went to

25   Massachusetts?

1      A.    He would either work or meet with an

2  individual in the Worcester area.

3      Q.    To do what?

4      A.    We believed he was picking up drugs.

5      Q.    So now on December 6, 2013, in this page that

6  Cindy has pulled up, the very next day after

7  December 5th when Koustas returns from Massachusetts,

8  does he receive an incoming call?

9      A.    Yes.

10     Q.    Who's he receive the incoming call from?

11     A.    603-966-8239.

12     Q.    How long does the conversation last?

13     A.    39 minutes, one second.

14         MS. OLLILA:   Cindy, will you please pull up

15  38A-2Q.

16     Q.    Sergeant Norris, if you turn your transcripts

17  to 39U.  Are you at 39U?

18     A.    Yes.

19     Q.    Did Kosmas Koustas receive an incoming call?

20     A.    Yes.

21     Q.    Did he receive the incoming call from the same

22  exact number, 508-723-3101, that he contacted the day

23  before on December 5th, 2013?

24     A.    Yes.

25     Q.    And was this the very same number that between

1    December 4th and December 5th, 2013, there were in

2    excess of ten text messages between Kosmas Koustas and

3    this number?

4         A.   Yes.

5         Q.   And did you have any information at all to

6    understand what was being said in those text messages?

7         A.   No.

8         Q.   So during this telephone call on December 6,

9    2013, do the two engage in a conversation?

10        A.   Yes, they do.

11             MS. OLLILA:  Cindy, go ahead and play it.

12             (Played recording.)

13        Q.   Sergeant Norris, the individual in

14   Massachusetts calls Koustas and says:  I was just

15   calling to let you know, um, I was supposed to have

16   gotten that for you.  What do you understand "that" to

17   mean?

18        A.   We believe that to be marijuana.

19             MS. OLLILA:  Go ahead and play.

20             (Played recording.)

21             MS. OLLILA:  Okay.  I want you to rewind it to

22   the beginning.

23        Q.   The individual says he was supposed to receive

24   it, like, an hour ago, but I haven't heard from them

25   yet.  Is that correct?

1      A.   Yes.

2           MS. OLLILA:   Now, Cindy, I want you to replay

3  the whole thing.

4           (Played recording.)

5      Q.   So the individual says -- excuse me, Kosmas

6  Koustas says:   It's going to be no good, Roy.   Correct?

7      A.   Yes.

8      Q.   What do you understand that to mean?

9      A.   That it's not going to take place.

10     Q.   What's not going to take place?

11     A.   The drug transaction.

12     Q.   Who was telling who that the drug transaction

13 was not going to take place?

14     A.   Kosmas Koustas was telling the user of the

15 other telephone.

16     Q.   Who had Kosmas Koustas engaged in a 39-minute

17 conversation with before calling this number?

18     A.   603-966-8239.

19     Q.   And who's that number subscribed to?

20     A.   Alkis Nakos.

21     Q.   The male says:   Did you hear it's not going to

22 be good.   And what does Kosmas Koustas say?

23     A.   Yeah, no go.

24          MS. OLLILA:   Go ahead and play.

25          (Played recording.)

1      Q.    So Kosmas Koustas says:  Maybe tomorrow or the

2   next day.  What do you understand him to mean?

3      A.    That the drug transaction would be good to go

4   tomorrow or the next day.

5      Q.    And what is the next day?

6      A.    That would have been December 7th.

7      Q.    Of what year?

8      A.    2013.

9      Q.    And what does the individual say to Koustas?

10     A.    He says all right.

11     Q.    He says:  Thank you for letting me know.

12  Correct?

13     A.    Yes, he goes on to say that.

14     Q.    So that individual in Massachusetts had no

15  idea that a transaction had been cancelled; is that

16  correct?

17     A.    According to this, yes.

18     Q.    Is that your understanding from the

19  transcript?

20     A.    Yes.

21     Q.    On December 7th, 2013, are law enforcement

22  monitoring the wire?

23     A.    Yes.

24          MS. OLLILA:  Cindy, please pull up 38A-2R.

25     Q.    And, Sergeant Norris, I'd ask that you direct

```
 1    your attention to transcript 39V.  Are you at 39V?

 2         A.   Yes, I am.

 3         Q.   Is it an outgoing call or an incoming call?

 4         A.   This was an outgoing telephone call.

 5         Q.   And who's calling?  Who's doing the calling?

 6         A.   Kosmas Koustas.

 7         Q.   And what is the number he's calling?

 8         A.   A Massachusetts number.

 9         Q.   And what is that number?

10         A.   508-723-3101.

11         Q.   Is that the same exact number that he called

12    -- that he received a call from the day before, on

13    December 6, 2013, and he said, it's going to be no go,

14    Roy?

15         A.   Yes.

16         Q.   So he's calling that same number on December

17    7th; correct?

18         A.   Correct.

19              MS. OLLILA:  Cindy, why don't you go ahead and

20    play 38A-2R.

21              (Played recording.)

22         Q.   I just don't know where we'd be able to do it.

23    What's your understanding of what that means?

24         A.   A place where they were going to conduct a

25    drug transaction.
```

1      Q.   Do individuals who conduct drug transactions

2  do it out in broad daylight?

3      A.   They may.

4           MS. OLLILA:  Go ahead.

5           (Played recording.)

6      Q.   I have to go and get that for you.  What do

7  you understand "that" is?

8      A.   I believe he was referencing the marijuana.

9           MS. OLLILA:  Go ahead and play.

10          (Played recording.)

11     Q.   Sergeant Norris, if you turn your transcript

12  to 39W.

13          MS. OLLILA:  And, Cindy, if you'd queue up

14  38A-2S, please.  Are you at 39W, Sergeant Norris?

15     A.   Yes, I am.

16     Q.   What time does this conversation occur?

17     A.   6:23:29 p.m.

18     Q.   Is it an outgoing or incoming call?

19     A.   Incoming call.

20     Q.   Who's calling Kosmas Koustas?

21     A.   Telephone number 508-723-3101.

22     Q.   Is it the same number that Kosmas Koustas had

23  been speaking with on December 5th and December 6th and

24  having text message exchanges with on December 4th and

25  December 5th?

1       A.    Yes.

2             MS. OLLILA:  Go ahead and play that, Cindy.

3             (Played recording.)

4       Q.    What time was that call, Sergeant Norris?

5       A.    6:23:29 p.m.

6       Q.    Would you expect Kosmas Koustas to be arriving

7  back in Manchester at some point that night?

8       A.    Yes.

9       Q.    And did he?

10      A.    Yes, he did.

11      Q.    Where did he go?

12            MR. SHEKETOFF:  Well, objection, your Honor.

13            MS. OLLILA:  Strike that, Judge.

14      Q.    Three days later on December 10th, 2013 --

15            MS. OLLILA:  Cindy, please pull up 39EE and go

16  to page 124.

17      Q.    This is three days later on December 10th,

18  2013.  Does Kosmas Koustas have any outgoing calls?

19      A.    Yes.

20      Q.    Who is he calling?

21      A.    On the 10th at --

22      Q.    At 2:57:44.

23      A.    Telephone No. 603-966-8230.

24            MS. OLLILA:  Thank you, Cindy.

25      Q.    And what time is that?

1          A.    That would be 2:57:44 p.m.

2          Q.    Now, about one hour later, if you look at your

3     transcript, 39AA, about one hour later, does Kosmas

4     Koustas make a telephone call to someone?

5          A.    He receives a telephone call.

6          Q.    I'm sorry, who's he receive the call from?

7          A.    Charles Fowle.

8          MS. OLLILA:  Cindy, I'd ask you to pull up

9     38A-2T, 38A-2T.

10         Q.    And approximately how long is this

11    conversation after Kosmas Koustas had a conversation

12    with 966-8239?

13         A.    It was approximately an hour later.

14         MS. OLLILA:  Go ahead and play it, Cindy.

15         (Played recording.)

16         Q.    What do you understand Kosmas Koustas to be

17    saying?  This is the welfare place.  If you want to find

18    customers you come here.

19         A.    I believe he's referencing drug customers.

20         MS. OLLILA:  Go ahead.

21         (Played recording.)

22         Q.    Charlie Fowle says to Kosmas Koustas, I will

23    have something for you today.  What do you understand

24    that is a reference to?

25         A.    Money.

1          MS. OLLILA:  Go ahead and play.

2          (Played recording.)

3     Q.    Charlie Fowle says:  Well, how is it?  And

4  Kosmas Koustas says, I got different stuff.  Different

5  things happen.  What do you understand that's a

6  reference to?

7     A.    Different type or strain of marijuana.

8     Q.    How many days had it been since he returned

9  from Massachusetts?

10     A.    I believe it was three.

11          MS. OLLILA:  Go ahead and play, Cindy.

12          (Played recording.)

13     Q.    Now, Sergeant Norris, the wire -- how many

14  target telephones did law enforcement go up on during

15  the course of this wire?

16     A.    I believe it was six.

17     Q.    And why don't you tell the jury whose

18  telephones that you went up on.

19     A.    I believe it was four lines for Kosmas

20  Koustas, one line for Charles Fowle, and one for Jeremy

21  Blevens.

22     Q.    Now, why did you need to go up on four lines

23  for Kosmas Koustas?  What was happening?

24     A.    They were for separate phone numbers as they

25  changed.

1      Q.    Why did you need to go up on separate phones?

2      A.    If phones changed, you needed to go to the

3  next phone.

4      Q.    Did he drop phones?

5      A.    He did.

6      Q.    So when he would drop a phone, what did you

7  have to do?

8      A.    You had to obtain the new phone number and

9  obtain a dirty phone call into that number.

10     Q.    Did it take quite a while?

11     A.    Yes, it did.

12     Q.    I want to direct your attention to

13  January 16th, 2014, and I want you to look at transcript

14  40J.  It's quite a ways into your transcript.  40J.

15          MS. OLLILA:  And, Cindy, please queue up

16  40A-2A, 40A-2A.

17     Q.    Now, Sergeant Norris, if you look at the

18  target telephone number, what is the target telephone

19  number during this call?

20     A.    Area code 508-745-9616.

21     Q.    Is this a number associated with Kosmas

22  Koustas?

23     A.    Yes.

24     Q.    This is a brand-new number; correct?

25     A.    It is a different number than previous, yes.

1       Q.   Before you went up on this phone, you received

2  additional authorization; correct?

3       A.   Yes.

4       Q.   And who is Kosmas Koustas contacting during

5  this telephone call?

6       A.   Charles Fowle.

7       Q.   And is this a new number for Charles Fowle?

8       A.   Yes, it is.

9       Q.   So both of them had received new phones within

10  a month; is that correct?

11       A.   Yes.

12           MS. OLLILA:  Go ahead and play, Cindy.

13           (Played recording.)

14       Q.   Charlie Fowle says:  Somebody wants that other

15  thing.  And then he says:  Yeah, the other thing that

16  starts with the same -- the same first letter.  What is

17  the first letter of marijuana?

18       A.   M.

19       Q.   What is the first letter of Molly?

20       A.   M.

21       Q.   What is the first letter of MDMA?

22       A.   M.

23       Q.   What do you understand Charles Fowle to be

24  asking Kosmas Koustas for during this call?

25       A.   MDMA.

1          MS. OLLILA:  Go ahead and play.

2          (Played recording.)

3     Q.   See what you can do to get some paper.  What

4 do you understand that to be a reference to?

5     A.   Money.

6          MS. OLLILA:  Keep playing, Cindy.

7          (Played recording.)

8          MS. OLLILA:  Pause.

9     Q.   Kosmas Koustas says:  I might see you tomorrow

10 night with -- and then he stopped; correct?  And then he

11 says:  You know what I mean?  It all depends.  I got to

12 make some phone calls.  What do you understand that to

13 mean?

14    A.   That he's going to be making some phone calls

15 in reference to this trip.

16         MS. OLLILA:  Go ahead.

17         (Played recording.)

18    Q.   What is "the normal thing"?

19    A.   It would be marijuana.

20         MS. OLLILA:  Go ahead.

21         (Played recording.)

22    Q.   Sergeant Norris, let me have you pull up the

23 next transcript, which is 40K, direct your attention to

24 40K.

25         MS. OLLILA:  And, Cindy, if you pull up

1    40A-2B, 40A-2B.

2        Q.    The transcript 40K, who are the participants

3    to the conversation?

4        A.    Kosmas Koustas and Charles Fowle.

5        Q.    What time does the conversation occur and what

6    is the date?

7        A.    The date is January 19th, 2014, and the time

8    is approximately 8:59:55 p.m.

9        Q.    Now, in the prior call referenced in 40A-2A,

10   Charles Fowle asked Kosmas Koustas what you surmised to

11   be for some MDMA; is that correct?

12       A.    Yes.

13           MS. OLLILA:  Go ahead and play this call,

14   Cindy.

15           (Played recording.)

16           MS. OLLILA:  Stop.

17       Q.    Koustas says:  So you changed your number?

18   And what did Fowle say?

19       A.    Yep.

20       Q.    So he got yet another new phone; is that

21   correct?

22       A.    Yes.

23           MS. OLLILA:  Go ahead and play.

24           (Played recording.)

25           MS. OLLILA:  Pause it.

1    Q.   So the telephone that Kosmas Koustas is

2   contacting Charlie Fowle over, how long had he had it

3   for before he starts saying he'd got to get yet another

4   one.  Had he even had it for a month?

5    A.   I don't believe it was more than a month, no.

6         MS. OLLILA:  Go ahead and play, Cindy.

7         (Played recording.)

8    Q.   Kosmas Koustas says that he's all F'd up and

9   he's still a little F'd up from that.  What did you

10  understand him to be referencing from that?

11   A.   MDMA.

12   Q.   What happens if you touch MDMA and it gets in

13  your body?

14   A.   You would feel the effects of the drug.

15        MS. OLLILA:  Go ahead and play.

16        (Played recording.)

17   Q.   Is MDMA highly potent?

18   A.   Yes.

19        MS. OLLILA:  Go ahead and play.

20        (Played recording.)

21   Q.   Like three grains of sand.  So would two

22  pounds of MDMA be an extraordinary amount?

23   A.   That would be a lot, yes.

24        MS. OLLILA:  Go ahead and play.

25        (Played recording.)

```
 1        Q.    Now, I want to direct your attention a couple

 2   months ahead on March 6, 2014.  If you look at

 3   transcript 41-O.

 4              MS. OLLILA:  Cindy, please queue up 41A-1A,

 5   41A-1A.

 6        Q.    Is Kosmas Koustas receiving a call on this

 7   transcript or making a call?

 8        A.    He's receiving a call.

 9        Q.    What time is the call occurring?

10        A.    3:55:52 p.m.

11              MS. OLLILA:  Go ahead and play it, Cindy.

12              (Played recording.)

13              MS. OLLILA:  Pause.

14        Q.    This individual who's identified in the

15   transcript as UM, Unknown Male No. 26, he says, I just

16   gout out of work, but I've got to go up north.  What's

17   up north?

18        A.    The border.

19              MS. OLLILA:  Go ahead and play.

20              (Played recording.)

21              MS. OLLILA:  Pause that.

22        Q.    Koustas says:  You're going up north?  And he

23   says:  I have to.  And then Koustas says what word?

24        A.    Plattsburgh.

25        Q.    Where is Plattsburgh?
```

1      A.    Upstate New York on the border.

2      Q.    On the border of what?

3      A.    Canada.

4            MS. OLLILA:  Go ahead.

5            (Played recording.)

6            MS. OLLILA:  Pause that and you can get out of

7      that, Cindy.

8      Q.    If you draw your attention to 41R, which

9      should be two transcripts from where you were.

10           MS. OLLILA:  Cindy, please queue up 41A-1C,

11     41A-1C.

12     Q.    This conversation occurred on March 15, 2014;

13     correct?

14     A.    Yes.

15     Q.    And the conversation occurred between who and

16     who?

17     A.    Kosmas Koustas and Christopher Ranfos.

18     Q.    What time did the conversation occur?

19     A.    1:53:19 p.m.

20           MS. OLLILA:  Go ahead and play.

21           (Played recording.)

22           MS. OLLILA:  Pause that.

23     Q.    At the time was Kosmas Koustas actually doing

24     some construction work for someone at this time?

25     A.    I believe they were doing some construction at

1    an apartment, yes.

2            MS. OLLILA:  Okay.  Go ahead.

3            (Played recording.)

4        Q.   Christopher Ranfos says:  I'm going to come by

5    and check out that heat?

6        A.   Yes.

7        Q.   What do you understand that to mean?

8        A.   I believe he was referencing marijuana.

9            MS. OLLILA:  Go ahead and play.

10           (Played recording.)

11       Q.   Do law enforcement at some point in time then

12   see Christopher Ranfos show up and meet with Kosmas

13   Koustas?

14           MR. SHEKETOFF:  Objection, your Honor, unless

15   it's personal knowledge.

16           THE COURT:  Foundation.

17       Q.   Do you have personal knowledge?

18       A.   I did receive knowledge of that, yes.

19       Q.   Were you there when that happened?

20       A.   No.

21       Q.   Okay.  Let me go now to March 30, 2014.  At

22   some point in time on March 30th, did law enforcement

23   develop information that Kosmas Koustas was going to

24   travel to Massachusetts?

25       A.   Yes.

1      Q.    Please pull up, Sergeant Norris, 41Y of your

2  transcripts.

3           MS. OLLILA:  And, Cindy, queue up 41A-1D,

4  41A-1D.

5      Q.    When Kosmas Koustas was on his way back from

6  Massachusetts, did you request a Massachusetts state

7  trooper to stop him?

8      A.    I believe we requested New Hampshire State

9  Police stop him.

10      Q.    I'm sorry, I said Massachusetts.  And did that

11  happen?

12      A.    Yes.

13      Q.    After the stop did Kosmas Koustas take off and

14  engage in a high-speed chase?

15      A.    Yes, he did.

16      Q.    Do you know how fast he was going on 93

17  heading north?

18      A.    I do not.

19           MS. OLLILA:  Cindy, why don't you go ahead and

20  play 41 -- correct.

21           (Played recording.)

22      Q.    Did law enforcement lose Kosmas Koustas?  Was

23  the high-speed chase stopped because it endangered the

24  public?

25      A.    Yes.

1    Q.   Did law enforcement lose Koustas?

2    A.   Yes.

3    Q.   Please turn to 41V.

4         MS. OLLILA:  And, Cindy, please queue up

5  41A-1E.

6    Q.   What is 41V, Sergeant Norris?

7    A.   Transcript of a phone call.

8    Q.   Between who and who?

9    A.   Kosmas Koustas and an unknown male.

10        MS. OLLILA:  Cindy, why don't you go ahead and

11  play 41A-1E.

12        (Played recording.)

13   Q.   Go to my house and inside my house in the

14  closet there's a shoebox.  And he's explaining

15  something; correct?

16   A.   Yes.

17   Q.   What are you doing right now -- not right now

18  today.  As of that date on March 30th, 2014, when you

19  are listening to this conversation, are you ordering

20  people to travel to Koustas's residence?

21   A.   Once we obtained this information, yes, we

22  directed law enforcement to respond to the residence.

23   Q.   And what was that residence?

24   A.   1465 Hooksett Road.

25   Q.   Why did you have law enforcement respond to

1    the residence?

2         A.    That was Kosmas Koustas -- that was his

3    residence, and based on the context of this phone call,

4    we sent law enforcement there to secure the residence.

5         Q.    Have you at this point in time planned to take

6    the wire down?

7         A.    No.

8         Q.    So Kosmas Koustas is in a high-speed chase

9    with a member of the New Hampshire State Police, and he

10   says it was a setup.  What is that going to do to your

11   wire now?

12        A.    I believe that that would probably be the end

13   of it, that no one would use the telephone after that

14   time.

15              MS. OLLILA:  Go ahead and keep playing, Cindy.

16              (Played recording.)

17        Q.    Says:  Next to my bed there's a thing of Mol.

18   What's Mol a reference to?

19        A.    Molly or MDMA.

20        Q.    Was there a search warrant executed at Kosmas

21   Koustas's residence?

22        A.    Yes.

23        Q.    Who applied for the search warrant?

24        A.    I did.

25        Q.    Did you draft an affidavit?

```
 1        A.    Yes.

 2        Q.    Was it signed?

 3        A.    It was.

 4        Q.    Was the search warrant authorized?

 5        A.    Yes.

 6        Q.    Was it executed?

 7        A.    It was.

 8        Q.    Was there Molly or MDMA seized at Kosmas

 9   Koustas's residence?

10        A.    Yes.

11        Q.    How much?

12        A.    I believe it was two pounds.

13        Q.    I'm going to have you put these gloves on.

14   Did you recall hearing Kosmas Koustas tell that unknown

15   man, go to my bedroom, there's a shoebox?

16        A.    Yes.

17        Q.    And did he tell that individual to get the

18   shoebox?

19        A.    Yes.

20        Q.    Did law enforcement beat him to the house?

21        A.    Yes.

22        Q.    Did law enforcement surround the house?

23        A.    Yes.

24        Q.    And was the house secured until a search

25   warrant was obtained?
```

1          A.    Yes, it was.

2               MS. OLLILA:  Can the witness please come down

3     from the witness stand, Judge.

4               THE COURT:  He may.

5          Q.    Sergeant Norris, I'm going to ask you to very

6     carefully try to take that shoebox out.

7               Now I will hold the shoebox, and why don't you

8     take out what is in Government's Exhibit 41KK-6.  Do you

9     see this exhibit?  Let me show you the exhibit sticker

10    first.  41KK-6.

11         A.    Yes.

12         Q.    What does this exhibit contain?

13         A.    Brown chunk of powder.

14         Q.    Was that sent to the New Hampshire State

15    Police forensic laboratory?

16         A.    Yes.

17         Q.    Did it test positive for the presence of 3,4

18    methylenedioxymethamphetamine?

19         A.    Yes, it did.

20         Q.    In the amount of two pounds?

21         A.    Yes, it did.

22         Q.    Can you please show it to the jury.  Is that a

23    lot of MDMA?

24         A.    Yes, it is.

25         Q.    In addition to seizing the MDMA, were there

```
 1   other items taken from Kosmas Koustas's residence at
 2   1465 Hooksett Road?
 3        A.   Yes.
 4             MS. OLLILA:  Your Honor, I didn't ask that the
 5   ID be stricken on 41KK-6.  I'd do that right now,
 6   please, Judge, and it be entered into full evidence.
 7             MR. SHEKETOFF:  I have no objection.
 8             THE COURT:  It's a full exhibit.
 9             (Government's Exhibit 41KK-6 admitted.)
10        Q.   Sergeant Norris, I'm showing you now what is
11   marked as 42JJ-2.  Do you recognize what this is?
12        A.   Yes.
13        Q.   What is it?
14        A.   Two containers of Inositol powder.
15        Q.   What is Inositol?
16        A.   It's a supplement I believe.
17        Q.   Could it be used to -- as an additive for
18   MDMA?
19        A.   They can use it as a cutting agent to make the
20   quantity more.
21        Q.   Why don't you explain that to the jury.  You
22   use it as a cutting agent to make the quantity more.
23   Where would you get Inositol?
24        A.   Health food stores such as GNC, things of that
25   nature, where you'd obtain dietary supplements.
```

1        Q.    This is absolutely legal; correct?

2        A.    Yes, it is.

3        Q.    What is the color of this Inositol?

4        A.    Should be white.

5        Q.    When drug dealers want to increase the volume

6   of their product to increase their profit, what do they

7   add to the product?

8        A.    They would add something like Inositol.

9        Q.    If I want to buy your product and you're

10  adding this, would it make me not want to buy your

11  product because you are adding something that is not a

12  controlled substance?

13       A.    It would depend on the amount.

14             MS. OLLILA:  Your Honor, I'd ask that the ID

15  be stricken on 42JJ-2 and it be entered into full

16  evidence.

17             MR. SHEKETOFF:  I have no objection.

18             THE COURT:  Full exhibit.

19             (Government's Exhibit 42JJ-2 admitted.)

20       Q.    Sergeant Norris, I'm showing you what has been

21  marked as 41JJ-1.  Do you recognize what this is?

22       A.    Yes.

23       Q.    What is it?

24       A.    A digital scale.

25       Q.    What is a digital scale used for?

 1          A.    To weigh items.

 2          Q.    What about in the drug trafficking business?

 3          A.    To weigh drugs.

 4          Q.    Would an individual be able to weigh MDMA on a

 5     scale?

 6          A.    Yes.

 7          Q.    By the way, that's two pounds of MDMA.  What

 8     is a user size of MDMA?

 9          A.    I would estimate it to be maybe a gram.

10                MS. OLLILA:  Your Honor, I'd ask that the ID

11     be stricken on 41JJ-1 and it be entered into full

12     evidence.

13                MR. SHEKETOFF:  No objection.

14                THE COURT:  Full exhibit.

15                (Government's Exhibit 41JJ-1 admitted.)

16          Q.    I'm now showing you what is marked as 42JJ-3.

17     Do you recognize what this is?

18          A.    Acetone.

19          Q.    Why did law enforcement seize acetone?

20          A.    Sometimes it may be used with cocaine.

21                MS. OLLILA:  Your Honor, I'd ask that the ID

22     be stricken on 42JJ-3 and it be entered into full

23     evidence.

24                MR. SHEKETOFF:  No objection.

25                THE COURT:  Full exhibit.

1           (Government's Exhibit 41JJ-3 admitted.)

2      Q.    You're holding what is marked as 42JJ-4.  Do

3 you recognize what this is?

4      A.    Yes.

5      Q.    What is it?

6      A.    A money counter.

7      Q.    Is it an electronic money counter?

8      A.    Yes.

9      Q.    Have you ever seen one of these?

10     A.    I have.

11     Q.    Do drug traffickers use these?

12     A.    They do.

13     Q.    For what?

14     A.    Count money.

15          MS. OLLILA:  Your Honor, I'd ask that the ID

16 be stricken on 42JJ-4 and it be entered into full

17 evidence.

18          MR. SHEKETOFF:  I have no objection.

19          THE COURT:  It's a full exhibit.

20          (Government's Exhibit 41JJ-4 admitted.)

21     Q.    Sergeant Norris, I'm showing you what is

22 marked as 41KK-1.  I will ask if you recognize what that

23 is.

24     A.    Yes.

25     Q.    What is it?

1      A.   Handgun.

2      Q.   Where was this handgun seized?

3      A.   Residence at 1465 Hooksett Road, Kosmas

4    Koustas's residence.

5           MS. OLLILA:  Your Honor, I'd ask that the ID

6    be stricken on 41KK-1 and it be entered into full

7    evidence.

8           MR. SHEKETOFF:  I have no objection.

9           THE COURT:  Full exhibit.

10           (Government's Exhibit 41KK-1 admitted.)

11      Q.   I'm going to show you what is marked as

12    41KK-2.  Do you recognize what that is?

13      A.   Yes.

14      Q.   What is it?

15      A.   Handgun.

16      Q.   Where was it seized?

17      A.   Residence of Kosmas Koustas.

18           MS. OLLILA:  Your Honor, I'd ask that the ID

19    be stricken on 41KK-2 and it be entered into full

20    evidence.

21           MR. SHEKETOFF:  I have no objection.

22           THE COURT:  Full exhibit.

23           (Government's Exhibit 41KK-2 admitted.)

24      Q.   Was there also ammunition seized at that

25    residence?

1        A.    Yes.

2        Q.    Were there also clips containing ammunition

3   seized at that residence?

4        A.    Yes.

5        Q.    Let me show you 41KK-7.  Do you recognize

6   that?

7        A.    Yes.

8        Q.    What is it?

9        A.    .25 automatic ammunition.

10       Q.    Where was that seized?

11       A.    At the residence of Kosmas Koustas.

12             MS. OLLILA:  Your Honor, I'd ask that the ID

13   be stricken on 41KK-7 and it be entered into full

14   evidence.

15             MR. SHEKETOFF:  No objection.

16             THE COURT:  Full exhibit.

17             (Government's Exhibit 41KK-7 admitted.)

18       Q.    41KK-5, do you recognize that?

19       A.    Yes.

20       Q.    What is it?

21       A.    .45 automatic ammunition.

22       Q.    Was that seized at Kosmas Koustas's residence?

23       A.    Yes.

24             MS. OLLILA:  Your Honor, I'd ask that the ID

25   be stricken on 41KK-5 and it be entered into full

 1   evidence.
 2           MR. SHEKETOFF:  I have no objection.
 3           THE COURT:  Full exhibit.
 4           (Government's Exhibit 41KK-5 admitted.)
 5       Q.    Sergeant Norris, 41KK-3.  What is 41KK-3?
 6       A.    It's a mix.  There's ammunition as well as
 7   three clips for them.
 8       Q.    Where were those items seized?
 9       A.    Residence of Kosmas Koustas.
10           MS. OLLILA:  Your Honor, I'd ask that the ID
11   be stricken on 41KK-3 and it be entered into full
12   evidence.
13           MR. SHEKETOFF:  No objection.
14           THE COURT:  Full exhibit.
15           (Government's Exhibit 41KK-3 admitted.)
16       Q.    And finally 41KK-4, do you recognize what that
17   is?
18       A.    Ammunition and two handgun clips.
19       Q.    Where was that seized?
20       A.    The residence of Kosmas Koustas.
21           MS. OLLILA:  Your Honor, I'd ask that the ID
22   be stricken on 41KK-4 and it be entered into full
23   evidence.
24           MR. SHEKETOFF:  I have no objection.
25           THE COURT:  Full exhibit.

1              (Government's Exhibit 41KK-4 admitted.)

2      Q.    Sergeant Norris, was there also a search

3  warrant executed for any vehicles at Kosmas Koustas's

4  residence?

5      A.    Yes.

6      Q.    Did law enforcement seize anything in that

7  vehicle?

8      A.    Yes.

9      Q.    What was the vehicle that was searched?

10     A.    A van.

11     Q.    What year was the van?

12     A.    The year I don't recall.

13     Q.    That was not the GTI, the Volkswagen GTI;

14  correct?

15     A.    No, this was a Chevy van.

16     Q.    What was seized in the Chevrolet van?

17     A.    Cellphones, marijuana.  That's all that comes

18  to mind.

19     Q.    Let mow show you what has been marked as

20  Government's Exhibit 41KK-8.  What is that?

21     A.    This is a bag of marijuana.

22     Q.    Where was it found?

23     A.    Chevrolet van.

24     Q.    Was it seized?

25     A.    It was.

1    Q.   Was it tested?

2    A.   I don't recall.

3         MS. OLLILA:  Your Honor, I'd ask that the ID

4    be stricken on 41KK-8 and it be entered into full

5    evidence.

6         MR. SHEKETOFF:  I have no objection.

7         THE COURT:  It's a full exhibit.

8         (Government's Exhibit 41KK-8 admitted.)

9         MS. OLLILA:  Your Honor, the parties have

10   stipulated that 41KK-8 was tested and tested positive

11   for the presence of marijuana.

12   Q.   Now, importantly, Sergeant Norris, when the

13   marijuana was seized, it was not in this bag; correct?

14   Was it in some other bag?

15   A.   Yes.

16   Q.   Now, let me show you what is 41KK-8, and I'd

17   ask that you hold that up for the jury.  Was that the

18   bag that contained the marijuana?

19   A.   Yes.

20        MS. OLLILA:  Why don't you go toward the end

21   so the jury can see it.

22        (Pause.)

23   Q.   Are there any letters contained on the upper

24   left portion of that bag?

25   A.   Yes.

1    Q.    What are those letters?

2    A.    NH.

3    Q.    And is there any other wording contained on

4    the top part of that bag?

5    A.    Yes.

6    Q.    What are the words?

7    A.    Grand Master.

8    Q.    Now, NH, had you seen NH in your investigation

9    before?

10   A.    Yes.

11   Q.    Is that consistent with the duffel bags that

12   contained the marijuana that were seized in 2008 and

13   2009?

14        MR. SHEKETOFF:  Objection, speculation.

15        THE COURT:  Sustained.

16   Q.    Grand Master, what is that?

17   A.    That would be a reference to the strain of

18   marijuana.

19   Q.    Sergeant Norris, in addition to the execution

20   of a search warrant at 1465 Hooksett Road, did law

21   enforcement execute a search at 140 Porter Street in

22   Manchester?

23   A.    140 South Porter, yes.

24   Q.    I'm sorry.  And you indicated that was the

25   residence of Kosmas Koustas's father?

1    A.    Yes.

2    Q.    I'm showing you what is 41L-2.  Do you

3 recognize what this is?

4    A.    Yes.

5    Q.    What is it?

6    A.    A black duffel bag.

7          MS. OLLILA:  Pull it out.  Open it up for the

8 jury.  If you could go ahead and show it to the jurors

9 at the end, too.

10   Q.    Where was that seized?

11   A.    140 South Porter Street, Manchester.

12         MS. OLLILA:  Your Honor, I'd ask that the ID

13 be stricken on 41L-2 and it be entered into full

14 evidence.

15         MR. SHEKETOFF:  I have no objection.

16         THE COURT:  Full exhibit.

17         (Government's Exhibit 41LL-2 admitted.)

18   Q.    And finally, Sergeant Norris, let me show you

19 what is marked as 41L-3.

20   A.    Yes.

21   Q.    Do you recognize what this is?

22   A.    Yes.

23         MS. OLLILA:  I'm going to take it out of the

24 bag and I want you to show it to the jury.  Sergeant

25 Norris, if you can show the jurors at the end.

1     Q.    Sergeant Norris, was that contained inside

2 that black duffel bag?

3     A.    Yes, it was.

4     Q.    It says "Diamond Kush" on one side "times 50."

5 What is Diamond Kush?

6     A.    A strain of marijuana.

7     Q.    What is "times 50" a reference to?

8     A.    We believed it to be 50 pounds.

9     Q.    What about the word "Boston," what's that a

10 reference to?

11     A.    Boston.

12           MS. OLLILA:  Your Honor, I'd ask that the ID

13 be stricken on 41L-3 and it be entered into full

14 evidence.

15           MR. SHEKETOFF:  I have no objection.

16           THE COURT:  Full exhibit.

17           (Government's Exhibit 41LL-3 admitted.)

18           MS. OLLILA:  Why don't you go ahead and take

19 the stand, please.

20           (Pause.)

21           MS. OLLILA:  Judge, Cindy is telling me that I

22 have referred to a couple of exhibits incorrectly.  I

23 was referring to them as 41L, but it's 41LL.  So those

24 exhibits that I have referred to as 41L there should be

25 two Ls, Judge.

1          And I've also been told that I mistakenly

2     referred to -- the acetone, Judge, I referred to as

3     42JJ-3 and I'm being told it's 41JJ-3.  And then there

4     was another one, the Royal money counter, I referred to

5     it as 42JJ-4 and it should be 41JJ-4.  Sorry about that.

6          I have no further questions for Sergeant

7     Norris.

8          THE COURT:  This is a good time to take a

9     brief morning break.  And, again, members of the jury,

10    we're going to take a brief morning recess.  You're

11    putting the transcripts in front of you as I see, and I

12    remind you those are not evidence in this case.  They

13    were to assist you in assessing and weighing the

14    evidence.  Your recollection and interpretation of what

15    is on those recordings is the evidence in the case.

16         Sergeant Norris has also testified about what

17    he thinks is on the audio recordings and what certain

18    words mean.  You are the factfinders in this case and

19    you will determine the meaning of every word in these

20    recordings, and you decide whether you agree with

21    Sergeant Norris's testimony on the meaning of words used

22    in these recordings.  You can accept or reject any part

23    of any witness's testimony.  You are the sole

24    factfinders.

25         Don't speak, again, about this case among

1    yourselves.  We will be back after the morning break.

2              (Jury left.)

3                        BEFORE THE COURT

4              THE COURT:  Quick question for counsel before

5    we go.  Some of the transcripts and text messages, are

6    those in a separate exhibit?

7              MS. OLLILA:  No, I did not offer them into

8    evidence, Judge.  I did not offer them.

9              THE COURT:  All right.  And just for

10   clarification, the bag that the pot was in, Sergeant

11   Norris identified it.  Did you actually strike it,

12   strike the ID?  Did you intend that the bag would

13   separately be admitted?

14             MS. OLLILA:  No.  The bag is part of the same

15   marijuana.  So when I struck the ID for the marijuana,

16   it was contained in the bag.

17             THE COURT:  All right.  We'll be back after

18   the morning break, sometime close to 11.

19             MS. OLLILA:  Thank you, Judge.

20             (Recess taken.)

21             THE COURT:  Attorney Sheketoff, go right

22   ahead.

23                      CROSS-EXAMINATION

24   BY MR. SHEKETOFF:

25        Q.   Good morning, Sergeant.

1      A.    Good morning, sir.

2      Q.    Now, I want to start with some just basic

3  baseline questions.  At some point you discovered that

4  Kosmas Koustas had a phone that was subscribed to his

5  own name; correct?

6      A.    Yes.

7      Q.    And at a later part in the investigation, in

8  March of 2014, you go up on that phone; correct?

9      A.    Yes.

10      Q.    So while you've played almost no conversations

11  from that phone, you were up on that phone for 30 days,

12  approximately, before Kosmas Koustas by fleeing from the

13  pursuing police officer sort of -- and saying over the

14  wire that he thinks he's being set up, he sort of blows

15  your wire; correct?

16      A.    It comes to an end shortly after that, yes.

17      Q.    Well, you concluded based on your training,

18  background, and experience that he's not going to be

19  talking on this phone anymore, so you decide to arrest

20  him basically?

21      A.    Arrest Kosmas Koustas?

22      Q.    Yeah.  Well, when do you arrest him?

23      A.    He was arrested that day by, I believe, Derry

24  Police Department.  For the charges from this case, I

25  believe he was arrested at a later date.

1    Q.   But he's at least arrested, alerted that he's

2  facing some charges on this day, March 30th; correct?

3    A.   Yes, sir.

4    Q.   And, in fact, there's a -- okay.  So you're up

5  on that phone that was registered to his name for about

6  a month, the month of March.  Correct?

7    A.   Yes.

8    Q.   And during that month you capture numerous

9  conversations between him and my client; correct?

10    A.   Yes.

11    Q.   Virtually one a day.  Sometimes two a day.

12    A.   I don't know how many per day, no, but we did

13  capture phone calls between the two of them.

14    Q.   Okay.  Once you realize that Kosmas Koustas

15  had this phone registered in his own name, you got the

16  Metro PCS records for that phone?  Are they Metro PCS or

17  that's my client?

18    A.   I believe Kosmas Koustas's phone was Metro

19  PCS, yes.

20    Q.   Okay.  And the prosecutor pointed out certain

21  entries on those records during your direct examination;

22  correct?

23    A.   Yes.

24    Q.   And the phone company keeps those records for

25  how long?  Years?  Decades?

1        A.    I'm not sure.  I believe it depends on the

2    phone carrier.

3        Q.    And you subpoenaed those records for what

4    period of time?

5        A.    Which records are we talking about, sir?

6        Q.    Kosmas Koustas -- let's call it his registered

7    phone, the phone that's under his name and doesn't

8    change throughout this investigation.  Correct?

9        A.    Yes.

10        Q.    I mean, on the last day of the wire,

11    March 30th of 2014, he's still using that phone

12    registered in his own name; correct?

13        A.    Yes, I believe he was.

14        Q.    And the records show that he had that phone

15    before the first wire went up on a different -- a burner

16    phone so to speak of Kosmas Koustas.

17        A.    Yes.

18        Q.    How many years did he have that phone

19    registered to himself?

20        A.    I would have to estimate.  I would estimate

21    over four years.

22        Q.    And isn't it fair to say that during that

23    entire period of time, that's 2011 to 2015, you could

24    pick any day of any week of any month of any year and

25    you would find a call between my client and Kosmas

1    Koustas.   In other words, they talked to each other

2    every day or virtually every day.

3         A.    They talked prior to the wire, yes.

4         Q.    No, I'm talking about virtually every day they

5    talked.  You had these records.  There's a pattern.

6    They talked 30 times a month, month after month after

7    month.  Correct?

8         A.    Again, I don't know how many times they talked

9    throughout the month.

10         Q.    Could you pick a day of any week of any month

11    of any year and find a day that they didn't talk to each

12    other based on those phone records?

13         A.    I'm not sure.

14         Q.    Do you remember one of the things you do in

15    your wiretap application for the very last wiretap --

16    which is this Kosmas Koustas registered phone, the very

17    last one you're going up on, is you explain to the judge

18    who you are asking to issue this wiretap warrant, that

19    there are hundreds and hundreds and hundreds of contacts

20    between my client and this phone?

21         A.    I may have, yes.

22         Q.    All right.  Now, how long did my client have

23    that phone number that, when you were up on the Koustas

24    phone, you actually got my client in a conversation with

25    Kosmas Koustas?

1        A.    How many times?

2        Q.    No.   How long did my client -- that phone was

3   registered to my client through his own name; correct?

4        A.    Yes.

5        Q.    And how many years did he have that number?

6        A.    I don't recall how long that phone was in

7   service for.

8        Q.    Well, how many years worth of records did you

9   get?

10       A.    I don't recall.

11       Q.    All right.   So you do have 30 days worth of

12  conversations approximately between my client and Kosmas

13  Koustas; correct?

14       A.    Yes.

15       Q.    Those conversations are in Greek; correct?

16       A.    Yes, there was Greek portions.   There might

17  have been English portions as well, but there was Greek.

18  I know that.

19       Q.    All right.   And one of the things you are

20  allowed to do in a wire room is to have a Greek

21  translator present so that she or he can fill out the

22  line sheets and tell you whether or not these

23  conversations are pertinent or not pertinent; correct?

24       A.    Yes.

25       Q.    And you had such a person; correct?

1      A.   We did obtain a translator for the Greek

2 language.

3      Q.   And Kosmas Koustas, do you know if his first

4 language is Greek?  In other words, was he born here or

5 was he born somewhere else?

6      A.   I do not know.

7      Q.   Did you ever ask the Greek translator if he

8 was the more fluent of the two in Greek between him and

9 my client?

10      A.   I don't recall.

11      Q.   Do you know if he talked to anybody else

12 during the course of this wire from beginning to end in

13 Greek other than my client?

14      A.   He may have.

15      Q.   But you are not sure?

16      A.   I can't say for certain.

17      Q.   And you've chosen, it's fair to say, not to

18 play a single recorded conversation that has my client's

19 voice on it; correct?

20      A.   I've chosen that?

21      Q.   Well, have you heard one?

22      A.   No.

23      Q.   Do you know if the government intends to play

24 one?

25      A.   I do not.

1      Q.    Now, you also had a pole camera up in front of

2  my client's bar or house of pizza, whatever you want to

3  call it, on Amory Street; correct?

4      A.    Yes, sir.

5      Q.    That pole camera went up when?

6      A.    I don't recall the date that it went up.

7      Q.    Is there a record somewhere that would tell

8  you when it went up?

9      A.    Not that I'm aware of, no.

10      Q.    So you guys -- by you guys I mean the New

11  Hampshire State Police put it up and no one recorded

12  down when it was that it went up for the first time?

13      A.    I don't believe it was recorded, no.

14      Q.    I think you told us on Friday that it was up

15  in March of 2013.

16      A.    I believe it was up probably right around that

17  time.  That sounds correct, but I'm not a hundred

18  percent certain.

19      Q.    And you say it was up for at least a year?

20      A.    I would say so, yes.

21      Q.    And it records constantly?

22      A.    Yes.

23      Q.    So you actually have 24 hours surveillance

24  from at least March of 2013 for at least a year until

25  March of 2014.

1       A.   Yes.   It was probably a little longer than

2   that, but, yes, that's correct.

3       Q.   And I believe you told us on Friday that the

4   camera doesn't work that well in the dark?

5       A.   No, I did not.

6       Q.   Okay.   So you capture images that occur once

7   the sun is set?

8       A.   Yes.

9       Q.   So if some, for instance, cooperating witness

10  were to tell you that I had a meeting with Alkis Nakos

11  right in front of the pizza store, would you look at the

12  pole camera to see if you captured any such meeting?

13      A.   Yes, we would review it.

14      Q.   During the course of your investigation, did

15  you ever review pole camera footage for the period of

16  December or January, December 2013 into January 2014,

17  looking to see if you found somebody by the name of

18  Sweeney captured on the pole camera footage?

19      A.   No, I did not.

20      Q.   You didn't look?

21      A.   That's correct.

22      Q.   Do you know if anyone has looked?

23      A.   To identify David Sweeney?

24      Q.   Yeah.

25      A.   No.

1      Q.   And you also had a GPS device placed at some

2  point in time on Kosmas Koustas' Volkswagen; correct?

3      A.   Yes, sir.

4      Q.   And as I understand it, and correct me if I'm

5  wrong, that went on sometime in October of 2013?

6      A.   No, sir.

7      Q.   When did it go on?

8      A.   I believe it was the beginning of November.

9      Q.   All right.  So these trips that we've talked

10  about to meet this person in Worcester -- and, by the

11  way, can we refer to that person as Mr. Seiger?  That's

12  who you believe it to be; correct?

13      A.   At the time that's who we believed it to be.

14      Q.   So whether it's him or somebody else, can we

15  refer to him as Seiger.  Did the GPS device -- it was up

16  and operating on December 5th, December 6th, and

17  December 7th of 2013?

18      A.   Yes, I believe it was.

19      Q.   And that gives you, it's fair to say, in live

20  time notice of where that vehicle is?

21      A.   Yes, sir.

22      Q.   At least on one of those days you told us he

23  used a van; correct?  Mr. Koustas.

24      A.   No, sir.

25      Q.   What did he use?  He used some other vehicle?

1          A.    Yes.

2          Q.    What vehicle was that?

3          A.    It was a small sedan.

4          Q.    So on one of the days he used a small sedan.

5    Which day was that in December of 2013?

6          A.    I believe he was using the sedan on

7    December 7th.

8          Q.    December 7th.  So you couldn't follow him in

9    realtime on December 7th; correct?

10         A.    You could not follow him because he was in

11   another vehicle; correct.

12         Q.    Right.  The GPS device might have been working

13   fine.  It was just not in the vehicle he was using;

14   correct?

15         A.    Yes, sir.

16         Q.    How about on December 6th?  Was the GPS

17   working on December 6th?  Was he driving around in the

18   Volkswagen?

19         A.    I don't recall.

20         Q.    December 6th is the day that the big meeting

21   gets cancelled, that he talks to Seiger at 4 or 5:00 in

22   the afternoon and says it's off.  I'm not coming down to

23   pick up the stuff, basically.  Correct?

24         A.    Yes.

25         Q.    So you mean you don't know where his car was

1   on December 5th?  You don't know if it was in Worcester

2   that morning or if it was in Manchester that morning?

3   You don't know when he left Manchester or if he ever

4   left Manchester on December 6th.  You have no knowledge

5   whatsoever of his positioning on December 6th?

6       A.   Yes.

7       Q.   That's true?

8       A.   That's correct.

9       Q.   And is that because you didn't bother to look

10  at the stuff or it's because he was using a different

11  car?

12      A.   That's because I don't remember right now,

13  sir.

14      Q.   Okay.  Is there something that could refresh

15  your memory as to where he was on December 6th?

16      A.   There may be.

17      Q.   And, by the way, you don't -- you can use

18  something besides a GPS device to figure out where

19  somebody is on December 6th or any other date; correct?

20  You just need the cell tower records from the phone

21  company; correct?

22      A.   You could obtain tower information post from

23  the phone company, yes.

24      Q.   Didn't you do that in this case?

25      A.   I don't recall.

1       Q.    I want to go to the first big day,

2   October 23rd of 2013.  Now, do you recall that there is

3   a telephone conversation that you played -- and by you,

4   I mean while you were on the stand that was played, the

5   jury got to listen to it, and you described what you

6   thought it meant.  And that was between a Mr. Blevens

7   and Kosmas Koustas.  Do you remember that call?

8       A.    I remember there was a phone call, yes.

9       Q.    At 6:32 p.m. from Mr. Blevens to Mr. Koustas,

10  and there's this big discussion about getting him some

11  Molly because he wants it?

12      A.    That sounds correct.

13      Q.    Do you remember there was a second call where

14  they talk about the same thing, the Molly, and Mr.

15  Koustas says to him, according to you, the MF boss is at

16  the Red Sox game.

17      A.    Yes, I remember that portion of the

18  conversation.

19      Q.    So we have call number one between Blevens and

20  Koustas.  Blevens is ordering Molly.  And then we have a

21  little while later call number two between Blevens and

22  Koustas, and Koustas says, not going to be able to

23  deliver.  My boss -- that's the way you heard it -- is

24  at the Red Sox game.  Correct?

25      A.    Yes.

1    Q.    Are you sure he says my boss and not the

2    mother F'er bounced?  In other words, left, bounced?

3    A.    No.

4    Q.    You hear boss?

5    A.    Boss; correct.

6    Q.    You don't hear bounced?

7    A.    No, sir, I hear boss.

8    Q.    Would "bounced" in that context be a word to

9    use -- and this is Kosmas Koustas speaking.  I can't get

10   it for you because the MF'er bounced.  You would know

11   what that meant; correct?

12   A.    Yes, if that was used, yes.

13   Q.    Yeah, he disappeared on me.  He left, he went

14   somewhere.  And you hear boss, not bounced.

15   A.    Yes, sir.

16   Q.    In the entire wiretap from beginning to end do

17   you hear Kosmas Koustas say the word "boss" on any other

18   occasion?

19   A.    Not that I recall.

20   Q.    In any event, do you have one iota of evidence

21   that my client was at a Red Sox game on October 23rd of

22   2013?

23   A.    I do not.

24   Q.    One little piece, one little nugget of any

25   kind, that he was at a Red Sox game on October 23rd of

1    2013?

2        A.   No, sir.

3        Q.   All right.  Now, you told us that there was a

4   phone call the next morning from the Metro PCS records,

5   the next morning, October 24th, between Kosmas Koustas

6   and my client -- it's on the records.  You're not up on

7   that wire for either of their phones subscribed to them,

8   so you don't know what's in it, but there's a

9   conversation; correct?

10       A.   I believe so.

11       Q.   And that's the conversation you were

12  suggesting was the conversation where Koustas learns

13  from my client about the availability of the Molly and

14  then later in the day calls Blevens and says I've got it

15  now.  Correct?

16       A.   Yes.

17       Q.   That's the inference you want people to draw;

18  correct?

19       A.   That's what I believed.

20       Q.   Yeah.  Even though every day of every week my

21  client is talking to Kosmas Koustas, not just the 24th,

22  the 23rd, the 22nd, the 20th, the 25th, November 2nd,

23  November 8th, December 3rd, that's what you focus on,

24  that phone call.  Correct?

25       A.   I answered the question, yes.

1    Q.    But are there phone calls as Kosmas Koustas is

2  driving back on October 23rd from his pickup with Seiger

3  between the two phone calls where he says, I will see if

4  I can get it for you, can't get it for you?  Are there

5  phone calls in between that on either his 603 number or

6  the number you're up on?

7    A.    I don't believe so, no.

8    Q.    You don't believe so?

9    A.    That's correct.

10    Q.    Don't you know that there were -- didn't you

11  repeat that in your affidavit for the very last wiretap?

12    A.    I'm sorry, I don't understand what the

13  question is.

14    Q.    Don't you, in fact, know that there were a

15  whole bunch of phone calls between the first phone call

16  with Blevens where he says I will see if I can get it

17  for you, Blevens says I want it, and the second phone

18  call with Blevens two hours later where Blevens says got

19  it, and Koustas says, nah, the guy bounced, or my boss

20  left.  He's at a Red Sox game.  Don't you know that

21  there are lots of phone calls between those?

22    A.    I do not.

23    Q.    Would it be a problem for your theory if there

24  were lots of phone calls between those?

25    A.    I don't believe so, no.

1    Q.   You don't believe so.  It wouldn't matter who

2  he called between the time he said I will look for it

3  and the time he said I can't find it.  It wouldn't

4  matter who he called; correct?

5    A.   It would if you had that information.

6    Q.   Well, didn't he call Brandon Lachance for four

7  minutes and eight seconds at 7:44 p.m. in between the

8  two phone calls to Blevens?

9    A.   I would have to review the phone records.  I'm

10  not sure.

11    Q.   You're really not sure?

12    A.   Again, I'm not sure, sir.

13         MR. SHEKETOFF:  Pray the Court's indulgence.

14         THE COURT:  Take your time.

15         (Pause.)

16         MR. SHEKETOFF:  May I approach, your Honor?

17         THE COURT:  You may.

18    Q.   My paper management is not as good as it

19  should be.  Does that refresh your memory?

20    A.   I haven't read it, sir.  Would you like me to?

21    Q.   Please.

22         (Pause.)

23    A.   Okay.

24    Q.   All right.  Between call number one with

25  Blevens, I will look for it for you, and two hours

1   later, call number two with Blevens, the guy is at the

2   Red Sox game.  Does he call Brandon Lachance?

3       A.   On October 23rd he does, yes.

4       Q.   Yeah.  Between those two phone calls, he calls

5   Brandon Lachance.  He's on his way back from picking up

6   with Seiger; correct?

7       A.   Yes.

8       Q.   And he calls Brandon Lachance.  That's a name

9   that you know from other investigations; correct?

10      A.   Yes, sir.

11      Q.   That's someone you believe had -- was involved

12  in the drug business.  Whether it's true or not, that's

13  someone you believed was involved in the drug business;

14  correct?

15      A.   Yes, sir.

16      Q.   And doesn't he also call his girlfriend

17  numerous times during those two phone calls?

18      A.   I don't recall, sir.

19      Q.   Was his girlfriend's name Jennifer Suk Day?

20      A.   Yes.

21      Q.   Do you remember that her number was

22  603-851-4001?

23      A.   I do not.

24      Q.   Isn't there also another phone call to another

25  603 number during that same period of time for

1   two minutes and 15 seconds, 703-9994, a 603 number.  Do

2   you know who that belongs to?

3        A.   No.

4        Q.   So at some point in time, you had all this

5   information because you have his phone record from the

6   phone subscribed to him and you have the wire up on the

7   phone that is his burner phone at the time, and you know

8   exactly, at least from those two phones -- this is

9   assuming he doesn't have a third phone.  You know

10  exactly from those two phones who he calls during this

11  period of time between the two Blevens phone calls.  You

12  had a chance to look at that before you got on the

13  witness stand today.  Correct?

14       A.   Yes.

15       Q.   And you are unaware of who it is that he

16  called between those two phone calls other than Brandon

17  Lachance?

18       A.   Yes.

19       Q.   And the reason you know he called Brandon

20  Lachance is because I showed it to you in your

21  affidavit; correct?

22       A.   Yes.

23       Q.   So at some point you did look at this stuff.

24       A.   Yes.

25       Q.   Weren't you at all curious about the

1  two-minute-and-15-second phone call that he made in

2  between these two Blevens phone calls?

3       A.   I don't know, sir.

4       Q.   So how was it that he learned that his boss,

5  my client, was at the Red Sox game?

6       A.   How did he -- I'm sorry, could you ask it

7  again.

8       Q.   Yeah.  How did Kosmas Koustas learn that his

9  boss, who you say is my client, was at the Red Sox game

10  between the first Blevens call and the second Blevens

11  call on October 23, 2013?

12       A.   I don't know, sir.

13       Q.   Do you think he learned it from Brandon

14  Lachance?

15       A.   I don't know.

16       Q.   Do you think Brandon Lachance told him, hey, I

17  don't got it right now.

18       A.   No, I don't believe that was the case.

19       Q.   You prefer the inference that the next morning

20  he found out because he got a call with my client.

21  That's the inference you prefer.

22       A.   Yes.

23       Q.   So December 5th he goes to see -- it's a

24  different phone now, but he goes to see Seiger in

25  Worcester.  It's the same voice that you're listening

1    to; correct?

2         A.   Yes.

3         Q.   And do you know what car he's driving?

4         A.   I don't.

5         Q.   Were you able to GPS him down there?

6         A.   I don't recall.

7         Q.   And there's some pickup of some sort and he

8    drives back to New Hampshire; correct?

9         A.   Yes.

10        Q.   And then you say there's a phone conversation

11   between my client and Kosmas Koustas that lasts

12   39 minutes on the morning of December 6th, and it's your

13   suggestion that that's where Kosmas Koustas learns that

14   there's going to be no pickup on December 6th, that

15   Seiger is not going to be able to deliver; correct?

16        A.   That's what I believed.

17        Q.   And that phone call is at what time in the

18   morning?

19        A.   I would have to review the record again to

20   give you a time.

21        Q.   Was it 10:41?  First there's an outgoing call

22   from Koustas to my client at 9:58, and then my client's

23   in a big hurry to get back to him, so he calls him back

24   at 10:41, and they're on the phone you said for

25   39 minutes or so.  Correct?

1        A.    I would have to review the phone record.

2              MR. SHEKETOFF:  May I approach, your Honor.

3              THE COURT:  You may.

4        Q.    The first paper is the marked stop.  The first

5   page is the October stop.

6        A.    I'm sorry, sir, I couldn't hear you.

7        Q.    So the first couple of pages is October, but

8   then it goes to December 5th.

9        A.    Okay.  December 5th.

10       Q.    So I'm suggesting at 10:41 a.m. there's an

11  incoming call that you talked about on direct

12  examination between the phone number registered to Mr.

13  Koustas and the phone number registered to my client

14  that lasts 39 minutes and one second; correct?

15       A.    Are you referring to the 5th, sir, or the 6th?

16       Q.    I'm sorry, the 6th.

17       A.    On the 6th there is a call at 10:41 a.m. that

18  lasted 39 minutes, yes.

19       Q.    And can you tell from that record if they're

20  on the phone together for that entire 39 minutes or he

21  puts my client on hold and picks up another call?

22       A.    I do not know.

23       Q.    Is there some sort of indication that there's

24  a call waiting thing there?

25       A.    There is special features that indicates

1   calling line ID presentation.  I'm not sure what that

2   means.

3        Q.   In any event, whether he's on the phone for

4   39 minutes or some portion of that, that's the call

5   you're referring to where my client must be telling

6   Kosmas Koustas that the deal is off and there's going to

7   be no pickup on December 6th.  Correct?

8        A.   Yes.

9        Q.   That's your suggestion; correct?

10        A.   Yes, it is.

11        Q.   Okay.  Because do you recall that the call to

12   Mr. Seiger or whatever his real name is where Kosmas

13   Koustas -- and it was played for the jury.  The two of

14   them talk, Kosmas Koustas and Seiger, and Seiger says,

15   no, I don't have it yet, and Koustas says it's off.

16   Right?

17        A.   Yes.

18        Q.   That's at 4:57, almost 5:00.  So there's this

19   call with my client at 11:00 in the morning, and then

20   there's Koustas telling Seiger it's off at 5:00.

21   There's six hours in between; correct?

22        A.   I would have to confirm the times, but, yes,

23   there was a call with Seiger.

24        Q.   All right.  Well, do you have that book in

25   front of you?

1       A.    No, it's on the desk, sir.

2             MR. SHEKETOFF:  May I approach, your Honor?

3             THE COURT:  Yes.

4       Q.    Okay.  So this was on December 6th.  There's a

5   call that was played for the jury between the person we

6   are calling Mr. Seiger and Kosmas Koustas --

7       A.    Yes.

8       Q.    -- where they cancelled their meeting for that

9   day.

10      A.    Yes.

11      Q.    Can you see from the transcript that it's

12  4:57?  That's when the call starts?

13      A.    What's the number, sir?

14      Q.    I do not know.  I don't have it pulled out.  I

15  can't find it.

16            THE COURT:  Mr. Sheketoff, I think your

17  associate may --

18      Q.    39U.  That's at 4:57 p.m.  Correct?

19      A.    Yes, sir.

20      Q.    So there's a phone call between Koustas and my

21  client at 10:41 a.m.  Let's call it 11:00 in the

22  morning.  And then there's a phone call between Koustas

23  and Seiger where he tells Seiger deal is off.  That's at

24  approximately 5:00 at night.  So six hours have passed.

25      A.    Approximately, yes, sir.

1      Q.    Where is Mr. Koustas during this period of

2    time?  Is he in Massachusetts, hanging out, waiting for

3    the deal to happen, or is he living up in Manchester,

4    New Hampshire?  I mean, where is he after he has this

5    phone conversation with my client at 11:00 in the

6    morning?  Where is he?

7      A.    I don't recall, sir.

8      Q.    You mean, you didn't ever look to see if he

9    was in Massachusetts during this whole period of time?

10   Your theory is that my client tells him it's off.  11:00

11   in the morning, it's off.  You're not curious to see

12   whether or not he drove to Massachusetts to get ready

13   for this thing or not?

14     A.    We may have checked, we may not have.  I don't

15   recall.

16     Q.    So as you sit here today, you can't tell me,

17   either from the GPS records or from the cell tower

18   records, whether Koustas was even in Manchester, New

19   Hampshire, or was already in Massachusetts after this

20   phone call with my client.  Correct?

21     A.    I did not, sir.

22     Q.    You don't know.

23     A.    That's correct, sir.

24     Q.    But it's possible to find this out; correct?

25     A.    Yes.

1      Q.   I mean, this data exists; correct?

2      A.   Yes.  We may have or may not have known at the

3   time.

4      Q.   All right.  Because it wouldn't make any sense

5   whatsoever for Mr. Koustas to leave Manchester and drive

6   to Massachusetts after 11:00 in the morning if my client

7   had just told him the deal's off, it's not happening;

8   correct?

9      A.   I don't know.

10      Q.   Well, would that make sense to you?  That he

11   would drive down to Massachusetts anyhow after my client

12   just told him the deal's off?

13      A.   He may.  He worked in Massachusetts.  I don't

14   know.

15      Q.   So if a meeting gets cancelled at 11:00 in the

16   morning, who waits till 5:00 at night to tell somebody

17   that the meeting has been cancelled?

18      A.   I do not know.

19      Q.   Now, are there text messages between Mr.

20   Seiger or whoever he is and Kosmas Koustas between 11:00

21   in the morning when my client, according to your theory,

22   tells him that the deal is off and 5:00 at night when

23   Seiger is informed by Mr. Koustas in a tape-recorded

24   conversation that we've all heard that the deal is off.

25   Are there text messages between Seiger and my client?

1      A.   We were not allowed to receive text message

2   content.   Whether or not text messages were exchanged, I

3   would have to review a record to let you know that.

4           MR. SHEKETOFF:  May I approach, your Honor?

5           THE COURT:  You may.

6           (Pause.)

7           THE WITNESS:  Okay, sir.

8      Q.   So were there text messages back and forth

9   between them?

10      A.   Yes.  It appears that there was approximately

11   five text messages, four were incoming, one outgoing.

12   First one appears to be at approximately 12:09 and the

13   last one appears to be 12:21.

14      Q.   All right.  So there's a flurry of activity

15   between Seiger and Koustas between a little after 12 and

16   almost 12:30; correct?

17      A.   Four incoming text messages it looks like and

18   one outgoing from Koustas's phone.

19      Q.   So Koustas, according to your theory, has just

20   learned that the deal is off.  He exchanges text

21   messages with Seiger later that morning or into the

22   early afternoon, and then he has to call him at 4:57 to

23   tell him the deal is off?  What sense does that make?

24      A.   I do not know what the content of the text

25   messages was.

1          Q.    Well, he was leaving Seiger on ice all day

2    just for the fun of it?

3          A.    I don't know.

4          Q.    Okay.  So I'm sure you wanted to know what was

5    in those text messages.  Correct?

6          A.    Yes.

7          Q.    Because if at 12 to 12:30 they're still

8    talking about the deal, your theory is out the window;

9    correct?

10         A.    It may be.

11         Q.    Even that won't put your theory out the

12   window, that phone call at 10:49 telling him that the

13   deal was off.

14         A.    Not knowing what the content of the messages

15   was, I can't say.

16         Q.    All right.  So you wanted to know what the

17   content was; correct?

18         A.    Yes.

19         Q.    And you made an affidavit to the court to get

20   historical text messages from this phone from the phone

21   company; correct?

22         A.    Historical text messages?

23         Q.    Yeah.  Okay.  Did you apply to a U.S. district

24   court judge to get the content of these messages?  In

25   other words, you've told us that you needed some sort of

```
1    dirty text in order to stay up on text messages.  You
2    didn't have a dirty text, so you had to stop after the
3    first 30 days of collecting text messages.  So you've
4    told us that.  Now my question is do you have another
5    method, not in realtime but after time has passed, to
6    ask a federal judge to issue an order to get historical
7    text messages.
8         A.   Yes, you can do that.
9         Q.   And you did it in this case; did you not?
10        A.   I don't recall.
11             MR. SHEKETOFF:  May I approach, your Honor?
12             THE COURT:  You may.
13             MS. OLLILA:  Judge, may we approach sidebar on
14   this issue.
15                       AT SIDEBAR
16             MS. OLLILA:  I'm not sure what counsel is
17   trying to claim.  I think he's trying to claim that the
18   United States got the content of the text messages for
19   this number for the person he's calling Seiger.  They
20   were not received, so I'm not sure what counsel's
21   referring to.  We got pen register information, but
22   that's not content.
23             MR. SHEKETOFF:  I'm referring to this, your
24   Honor, paragraph 116.  This is his affidavit to go up on
25   target telephone number five, which is the Koustas
```

 1   registered phone.

 2          (Pause.)

 3          THE COURT:  Okay.  You can look at the

 4   references content.

 5          (Pause.)

 6          THE COURT:  You can cross him with this.  Make

 7   sure my name -- I just don't want the jury to hear my

 8   name involved in anything.

 9          MS. OLLILA:  Right.

10          THE COURT:  Okay.  Go ahead.

11          MS. OLLILA:  Do you want to give him the

12   entire affidavit or just this page?

13          MR. SHEKETOFF:  This is the only relevant

14   paragraph, but if you want me to, I will give him the

15   entire affidavit.  The trouble is I pulled it apart.

16          THE COURT:  So if you have a clean copy of the

17   whole affidavit, maybe you could just point him to that.

18          MR. SHEKETOFF:  Sure.  Do you have a clean

19   copy?

20          MS. OLLILA:  Not with me.

21          MR. SHEKETOFF:  I don't.  That's my problem.

22          THE COURT:  I think you can just let him read

23   the paragraph.

24          MS. OLLILA:  Thank you, Judge.

25                      IN OPEN COURT

```
 1              THE COURT:  Go ahead, Attorney Sheketoff.
 2              MR. SHEKETOFF:  May I approach, your Honor.
 3              THE COURT:  Yes.
 4         Q.   I'm going to show you this portion of your
 5    affidavit, and if you want to look at any other portion,
 6    the government will help me pull it out from somewhere.
 7    But I'm directing your attention to paragraph 116.  If
 8    you want to see more, that's fine.
 9              (Pause.)
10         A.   Yes, sir.
11         Q.   So does that refresh your memory that on
12    December 9th of 2013, three days after December 6th, you
13    asked the U.S. District Court judge for permission to
14    get historical text messages.
15         A.   Yes.
16         Q.   And did you get them?
17         A.   We did.
18         Q.   So what do these text messages say?
19         A.   There's a text message here for December 5th.
20    Would you like me to read that one?
21         Q.   No.  I'm talking about the December 6th text
22    messages between Seiger and Koustas between 12 and 12:30
23    that day.
24         A.   I don't see any of those text messages here,
25    sir.
```

1      Q.   Okay.  So you don't recount them in your

2   affidavit.  This is the affidavit to go up on the

3   Koustas registered phone?

4      A.   Yes.

5      Q.   But I'm not talking about that.  You asked the

6   district court judge on December 9th of 2013 to let you

7   get historical data on the Koustas phone that -- his

8   burner phone that was getting text messages back and

9   forth from Seiger, and you just told us you did get some

10  text messages.  You were about to read one from December

11  5th.  I want to know what text messages you got on

12  December 6th.  What are those?  What do those say

13  between 12 and 12:30?

14     A.   I do not know.

15     Q.   Do they exist somewhere?

16     A.   I do not know.

17     Q.   Now, when you debrief somebody, like -- well,

18  in this case let's say Nicholas Champagne or Jonathan

19  Venturini.  Do you tape-record those debriefings?

20     A.   I did not.

21     Q.   Is there a reason you choose not to

22  tape-record those debriefings?

23     A.   No.

24     Q.   Then why aren't they tape-recorded?  Then

25  everyone would know exactly what was said.

1      A.   I don't know why we did not.

2      Q.   Well, was it a conscious choice or just an

3  accident?

4      A.   Neither.  I don't know why we did not.

5      Q.   What is your normal practice?

6      A.   To take notes and generate a report.

7      Q.   Now, let's take Jonathan Venturini.  I'm not

8  suggesting there's anything wrong with this.  Most

9  witnesses have a debriefing, correct, and then a trial

10 prep; correct?

11     A.   Yes.

12     Q.   In other words, right before you are going to

13 put him on trial, you go over with him, these are the

14 questions I'm going to ask you, this kind of stuff;

15 correct?

16     A.   Yes.

17     Q.   This is done with all kinds of witnesses, not

18 just cooperators, and this is what's expected that

19 lawyers will do; correct?  Prepare their witnesses for

20 their testimony?

21     A.   Again, yes.

22     Q.   So at these trial prep sessions, let's talk

23 about Venturini.  There was one for Venturini; correct?

24     A.   Yes.

25     Q.   And there was one for Champagne; correct?

1      A.   Yes.

2      Q.   Does anyone take notes?

3      A.   I don't know if anybody took notes at those.

4      Q.   And why not?

5      A.   I don't know.

6      Q.   Is there a policy never to debrief the same

7  person twice with someone actually taking notes or

8  tape-recording what they have to say?

9      A.   I'm not aware of any.

10     Q.   Did you as the lead agent in this case ever

11 debrief any one person twice?  Putting aside trial prep,

12 did you ever go back and have a second conversation with

13 any person?

14     A.   I don't believe that we did.

15     Q.   Is there a reason that neither Nicholas

16 Champagne or Jonathan Venturini were actually talked to

17 on two separate occasions to see if they could tell the

18 same story twice?

19     A.   Were they?

20     Q.   Yeah.

21     A.   No, not to my knowledge.

22     Q.   Now, in one of the tape-recordings we heard

23 yesterday, Blevens or Fowle, I can't even remember which

24 one now, talks about his house being broken into;

25 correct?

1          A.   Yes.

2          Q.   Do you remember which one it was?  Was it

3   Blevens or Fowle?

4          A.   Fowle, yes.

5          Q.   Was that ever reported to law enforcement?

6          A.   I don't know.  I don't believe so, but I'm not

7   certain.

8          Q.   But the burglary at my client's house was

9   reported to law enforcement; correct?

10          A.   Yes.

11          Q.   And, in fact, you know from collecting the

12   numerous documents that you collected in this case that

13   somebody actually got identified because they left blood

14   behind when they cut themselves on the glass when they

15   broke in.  There's a DNA match to a person; correct?

16          A.   I don't know.

17          Q.   You don't know.  Did you know that the builder

18   who was on the stand on Friday had been sued civilly by

19   my client?

20          A.   I found out just before trial, yes.

21          Q.   You mean he told you that just before trial?

22          A.   No.

23          Q.   Did you get the records for that?  In other

24   words, did you go to the courthouse and get the records

25   for that lawsuit?

1        A.   I did not.

2        Q.   Have you seen the records for that lawsuit?

3        A.   No.   That was the first time I had ever seen

4   Mr. Gibbons, the day he testified.

5        Q.   Do you remember the name of the FBI agent that

6   the prosecutor said to him, did so and so come to visit

7   you?

8        A.   Yes.

9        Q.   And he said I don't really recall the name of

10   the agent?

11       A.   Yes.

12       Q.   What was the name of that agent?

13       A.   Mark Alford.

14       Q.   Was Mark Alford's business card found in my

15   client's house when his house was searched in 2014?

16       A.   I don't recall.

17       Q.   Have you seen pictures of what the addition

18   looked like?

19       A.   I don't remember seeing any, no.

20       Q.   Were you ever in the house?

21       A.   No.

22       Q.   Do you know if the house was luxuriously

23   furnished or had almost nothing in it?

24       A.   I don't know.

25       Q.   Now, you gathered a whole bunch of my client's

1   financial records; correct?

2       A.   There was quite a bit of financial

3   documentation, yes.

4       Q.   Are you a forensic accountant?  Are you a

5   specialist in analysis of financial records?

6       A.   No.

7       Q.   Does the New Hampshire State Police to your

8   knowledge have a forensic accountant?

9       A.   I don't know.

10      Q.   Do you know if the U.S. Attorney's Office has

11  a forensic accountant or a financial expert?

12      A.   I do not.

13      Q.   Have you ever participated in a tax

14  prosecution?

15      A.   No.

16      Q.   My client had bank accounts in his name.

17  You've seen the records; correct?

18      A.   I believe I have.

19      Q.   And, by the way, there's a thing called a CTR;

20  correct?  A cash transaction report.

21      A.   Yes.

22      Q.   And if you deposit more than $10,000, you

23  withdraw more than $10,000, you pay somebody more than

24  $10,000, a cash transaction report is supposed to be

25  generated; correct?

1       A.   Yes.

2       Q.   With a bank it's very likely to be generated;

3  correct?

4       A.   With the what, I'm sorry?

5       Q.   The bank.

6       A.   The ones that generate that?

7       Q.   Well, the bank -- for instance, the accountant

8  that we saw on the witness stand, my client's

9  accountant, his understanding was that if you got

10 $10,001 and a fee, you didn't have to file a cash

11 transaction report.  Would he have to file a cash

12 transaction report if he got more than $10,000 as a fee?

13      A.   I believe so, but I'm not certain.

14      Q.   But certainly whether he filed it or didn't

15 file it, the bank always files it; correct?

16      A.   To my knowledge, yes.

17      Q.   And was my client structuring his funds so

18 that cash transaction reports were not generated?

19      A.   I don't know.

20      Q.   Didn't you see a lot of cash transaction

21 reports under his name?

22      A.   I believe I did, yes.

23      Q.   Okay.  Isn't it common knowledge out there, if

24 you want to hide your business from the IRS, you don't

25 deposit more than $10,000 at a time?  You don't withdraw

1   more than $10,000 at a time?  And you don't pay for a

2   Mercedes with more than $10,000 in cash?

3        A.   Yes.

4        Q.   You've seen his Mercedes records; correct?

5        A.   I can't recall them, no.

6        Q.   Well, do you know if they've been gathered?

7   Did you cause them to be gathered?

8        A.   I don't recall if the Mercedes records were

9   requested by me.

10        Q.   Do you know at the time that he -- do you know

11   if he's married?

12        A.   I do not.

13        Q.   Do you know if he has any children?

14        A.   Yes.

15        Q.   All right.  That child is basically a year

16   old?

17        A.   That sounds about right.

18        Q.   All right.  So for the vast majority of this

19   investigation, he was not married and had no kids;

20   correct?

21        A.   To my knowledge, yes.

22        Q.   How big is this house that he put the addition

23   on?  Is it a 5,600-square-foot house?  Is it a

24   2,500-square-foot house?  How big is it with the

25   addition on it?

1      A.   I'm not sure.  I'd estimate somewhere between

2  2,000 and 2,500.  That would be an estimate.

3      Q.   If you won $80,000 or so at a jackpot at

4  Foxwoods and you are a single male working at a pizza

5  place, you wouldn't spend it on a fancy car?

6      A.   Me?  No.

7      Q.   Okay.  And therefore if you do, you're a

8  criminal?

9      A.   No.

10      Q.   You know whether these cars were leased or

11  bought; correct?

12      A.   Yes.  There should be a record of that.

13      Q.   Yes, there's records; correct?

14      A.   There should be, yes.

15      Q.   You know how to access those records.  You

16  know exactly how much each one of these cars cost or

17  didn't cost; correct?

18      A.   Yes, I believe we have that information.

19      Q.   So when you were part of the debriefing with

20  Mr. Champagne, was he told in your presence that the

21  government would cut -- would make a motion to the Court

22  to reduce his supervised release to a year and a half?

23      A.   I don't recall that, no.

24      Q.   You're saying it didn't happen or you don't

25  recall it?

1      A.    I don't recall it.

2      Q.    And there's no tape-recording of that;

3  correct?

4      A.    Correct.

5      Q.    By the way, did you gather the records for the

6  purchase of that home that he put the addition on?

7      A.    We may or may not have.

8      Q.    Do you know if it was no money down or it was

9  a million dollars down?

10     A.    I don't.

11     Q.    You've seen the Foxwoods records?

12     A.    Yes, I've seen some of the Foxwoods records.

13     Q.    Have you talked to a representative of

14 Foxwoods to try and translate those records into

15 English?

16     A.    I don't believe I did, no.

17     Q.    He went to Foxwoods on an extremely regular

18 basis, did he not?

19     A.    I would say that's fair.

20     Q.    And he often brought with him thousands of

21 dollars to buy in; correct?

22     A.    I don't know.

23     Q.    Well, you've seen the records, haven't you?

24     A.    I have.

25     Q.    17,750, 10,500.

1          MS. OLLILA:  Objection, your Honor, if he's

2     referring to an exhibit that -- he can enter those

3     records into evidence, and I will stipulate to their

4     admission, counsel.  Do you want me to get those for

5     you?

6          THE COURT:  Overruled.  Go ahead and ask.

7     Q.    That doesn't refresh your memory in any way?

8     A.    I didn't hear what you said, sir.

9     Q.    Christopher Ranfos was stopped with my client;

10    correct?

11    A.    Yes.

12    Q.    You know that from your role in this

13    investigation; correct?

14    A.    Yes.

15    Q.    And we played one phone conversation for the

16    jury with Christopher Ranfos talking to Kosmas Koustas;

17    correct?

18    A.    Yes.

19    Q.    We just heard that today.  And you know that

20    Mr. Ranfos is an HVAC guy, don't you?

21    A.    Yes.

22    Q.    What does an HVAC guy do?  Does he do heating

23    and air conditioning and things like that?

24    A.    Yes.

25    Q.    And you know that Kosmas Koustas was actually

1    rehabbing an apartment; correct?

2         A.   We knew that they were doing work, yes.

3         Q.   And Ranfos calls him up and says:  I'm going

4    to come over to check out the heat.  And you say that

5    that's a reference to buying marijuana?

6         A.   Heat, yes, I testified that he -- I believed

7    it to be a reference to marijuana.

8         Q.   Is it within the realm of possibility that

9    it's a reference to checking out the heat?

10        A.   In this particular case, no, I didn't think it

11   was a reference to actual HVAC work.

12        Q.   Is there anywhere else on this wire or any

13   other wire in connection with this case that anyone

14   refers to marijuana as heat?

15        A.   Not that I'm aware of.

16             MS. OLLILA:  Are you all set?

17             MR. SHEKETOFF:  Yes.

18                     REDIRECT EXAMINATION

19   BY MS. OLLILA:

20        Q.   Christopher Ranfos was stopped -- strike that.

21   That same day Christopher Ranfos asked if he could come

22   and check out the heat, law enforcement saw him grab a

23   bag from Koumas Koustas's motor vehicle, didn't they?

24        A.   Yes.

25             MR. SHEKETOFF:  Well, objection to that, your

1   Honor.  Move to strike it unless there's personal

2   knowledge.

3           MS. OLLILA:  He opened the door, Judge.

4           MR. SHEKETOFF:  Hearsay.

5           MS. OLLILA:  Opened the door.

6           THE COURT:  I believe you did open the door.

7   Overruled.

8       Q.   And didn't Christopher Ranfos deal marijuana

9   that day to someone named John Horne?  Didn't he?

10          MR. SHEKETOFF:  Objection, same thing.

11          THE COURT:  Same basis?

12          MR. SHEKETOFF:  Personal knowledge.

13          THE COURT:  All right.  In your questions I

14  think you could ask him how he knows so the jury can

15  assess the weight.

16      Q.   Do you know if someone by the name of John

17  Horne was arrested that day?

18      A.   Yes.

19      Q.   Who was he arrested by?

20      A.   New Hampshire State Police.

21      Q.   What was found on him?

22      A.   Marijuana.

23      Q.   Before he was arrested, did he travel to

24  someone's residence?

25      A.   Yes.

1      Q.    Whose residence did he travel to?

2      A.    Christopher Ranfos.

3      Q.    Before he traveled to Christopher Ranfos's

4    residence, where did Christopher Ranfos go?

5          MR. SHEKETOFF:  Same objection, your Honor.  I

6    know you think I opened the door, but I think this whole

7    line of questioning is calling for stuff beyond his

8    personal knowledge.

9          THE COURT:  I think you could also limit it to

10   a limited set of facts with respect to heat.  But it's

11   overruled.  Go ahead.

12         MS. OLLILA:  Okay.  Sure.

13     Q.    So before Christopher Ranfos -- excuse me,

14   before John Horne got marijuana from Christopher Ranfos,

15   was that the same day that Christopher Ranfos contacted

16   Kosmas Koustas and said I want to come over and check

17   out the heat.

18     A.    Yes.

19     Q.    Now, let's talk a little bit about Brandon

20   Lachance because counsel seemed to suggest that it was

21   Brandon Lachance who was the MDMA source of supply;

22   correct?

23     A.    Yes.

24     Q.    But Brandon Lachance was a confidential

25   informant in this case, wasn't he?

1      A.   Yes.

2           MR. SHEKETOFF:  Objection.

3           MS. OLLILA:  He opened the door, Judge.

4           THE COURT:  Can you approach?

5                        AT SIDEBAR

6           THE COURT:  I just want to make sure that with

7    Brandon Lachance, essentially you're going to establish

8    the basis on which Sergeant Norris is uncomfortable

9    essentially not following up with the phone calls

10   between Brandon Lachance and Kosmas Koustas on the day

11   in the question.

12          MS. OLLILA:  Right.  Exactly.

13          THE COURT:  Okay.  So you're establishing that

14   a confidential informant therefore -- you're

15   establishing a foundation for his knowledge and

16   understanding.

17          MS. OLLILA:  Exactly.

18          THE COURT:  What's your objection?

19          MR. SHEKETOFF:  I have no idea where she's

20   going with this, but does this make him credible, that

21   he's a confidential informant?  And when does he become

22   a confidential informant?  In December of 2013?

23          MS. OLLILA:  I'm going to establish that.

24          THE COURT:  I think she can now establish his

25   understanding of Brandon Lachance, the fact that he's a

 1   confidential informant.  Perhaps you could move past

 2   that quickly, but I think you've opened the door to his

 3   knowledge and understanding of Brandon Lachance and why

 4   perhaps he would not lead to the inferences that you

 5   suggested in your cross.

 6            MR. SHEKETOFF:  Okay.

 7                      IN OPEN COURT

 8       Q.   Sergeant Norris, Brandon Lachance cooperated

 9   with law enforcement; correct?

10       A.   Yes.

11       Q.   And during the period of his cooperation, he

12   wore a body wire for law enforcement; correct?

13       A.   Yes.

14       Q.   And when he wore a body wire, did he meet with

15   Kosmas Koustas?

16       A.   Yes.

17       Q.   And when he met with Kosmas Koustas, did he

18   purchase marijuana from Kosmas Koustas?

19       A.   Yes.

20            MR. SHEKETOFF:  Objection.

21            THE COURT:  Overruled.  Go ahead.

22       Q.   Did he purchase marijuana from Kosmas Koustas?

23       A.   Yes.

24       Q.   Brandon Lachance, was he cooperating with law

25   enforcement before law enforcement seized two pounds of

1    MDMA at Kosmas Koustas's residence?

2         A.    Yes.

3         Q.    Now, defense counsel also seemed to suggest

4    that it was actually Kosmas Koustas who called the

5    Massachusetts courier on December 6th.  That wasn't so;

6    correct?  Wasn't it the Massachusetts courier who

7    finally called Kosmas Koustas?

8         A.    I'm sorry, I'd have to look at the records

9    again.

10             MS. OLLILA:  That's okay.  I have nothing

11   further, Judge.

12             THE COURT:  Anything further, Attorney

13   Sheketoff?

14                           RECROSS-EXAMINATION

15   BY MR. SHEKETOFF:

16        Q.    When did Brandon Lachance become a cooperating

17   individual?

18        A.    Sometime in January of 2014.

19        Q.    So when we were talking about October 23rd of

20   2013, he was not a cooperating individual?

21        A.    Correct.

22        Q.    He wasn't wearing a wire against anybody in

23   October of 2013; correct?

24        A.    Correct.

25        Q.    And he became a cooperating individual because

 1    he had been busted, for what?

 2         A.    Drug sales.

 3         Q.    What kind of drug sales?

 4         A.    Oxycodone.

 5         Q.    And he was presented with the choice of wiring

 6    up or going to jail on the oxycodone case; correct?

 7    This is in January of 2014.

 8         A.    Yes.

 9              MR. SHEKETOFF:  Thank you.

10              MS. OLLILA:  Nothing further.

11              THE COURT:  All right.  Sergeant Norris, you

12    may return to your seat.  It's close to a good time to

13    break for lunch, but it depends on your next witness.

14    If there's somebody we can get on and off we certainly

15    could do that.

16              MS. OLLILA:  I don't think the cross would be

17    short though, Judge.

18              THE COURT:  All right.  Why don't we take our

19    lunch break and then be back thereafter, probably just a

20    little more than 30 minutes to give the attorneys time

21    to grab something to eat.  We'll be back around 1:00.

22              MS. OLLILA:  Thank you, Judge.

23              (Luncheon recess at 12:25 p.m.)

24

25

C E R T I F I C A T E

        I, Diane M. Churas, do hereby certify that the
foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 4/14/16
_____
**DIANE M. CHURAS, LCR, CM**
LICENSED COURT REPORTER, NO. 16
STATE OF NEW HAMPSHIRE