Case 1:14-cr-00093-LM Document 199 Filed 07/13/16 Page 1 of 101

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                           *
UNITED STATES OF AMERICA                   *
                                           *   14-cr-93-01-LM
              v.                           *   August 25, 2015
                                           *   9:10 a.m.
ALKIS NAKOS                                *
                                           *
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

Day No. 6
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY
and a jury


Appearances:

For the Government:    Terry L. Ollila, AUSA
                       U.S. Attorney's Office
                       53 Pleasant Street
                       Concord, NH 03301


For the Defendant:     Robert L. Sheketoff, Esq.
                       Law Office of Robert L. Sheketoff
                       One McKinley Square
                       Boston, MA 02109


Court Reporter:        Diane M. Churas, LCR, CRR
                       Official Court Reporter (ret.)
                       Dianechuras@hotmail.com

1                         I N D E X

2

3

4   Closing by Ms. Ollila, page 6

5   Closing by Mr. Sheketoff, page 42

6   Judge's charge, page 66

7

8

9

10  EXHIBITS:                              ID.    Evid.

11
    Defendant's Exhibit 2                          4
12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | BEFORE THE COURT |
| 2 | THE COURT:  The government has rested. |
| 3 | Defense has technically not rested yet, haven't rested |
| 4 | its case.  So I just want to make sure Mr. Nakos |
| 5 | understands his right to testify if he desires and |
| 6 | understands his absolute right not to testify if you |
| 7 | desire.  I want to make sure that you understand that |
| 8 | that's your decision and yours alone, sir.  Do you |
| 9 | understand that? |
| 10 | MR. NAKOS:  Yes, I do, your Honor. |
| 11 | THE COURT:  All right.  Thank you.  Let's |
| 12 | bring the jury in, and before the defendant rests its |
| 13 | case formally, I'm going to instruct the jury on two |
| 14 | issues. |
| 15 | BEFORE THE JURY |
| 16 | THE CLERK:  The Court has before it for |
| 17 | consideration today jury trial day six in Criminal Case |
| 18 | 14-cr-93-01-LM, United States of America versus Alkis |
| 19 | Nakos. |
| 20 | THE COURT:  Good morning, members of the jury. |
| 21 | The government has rested its case.  I have an |
| 22 | instruction for you with respect to the government's |
| 23 | case. |
| 24 | I have disallowed two pieces of evidence. |
| 25 | First, you heard testimony about statements made by an |

1  individual identified as Kaylee Couture.  I have

2  disallowed that evidence.  In other words, I have

3  removed it from the case.

4       Second, you heard testimony that an individual

5  identified as Andre Watson committed a crime.  I have

6  also removed that from evidence.

7       This evidence is stricken from the case.  You

8  may not consider this evidence.  You must treat it as

9  though you never heard it.  To discuss the evidence or

10  consider it in any way during deliberations would be a

11  violation of my instructions and a violation of your

12  sworn duty as jurors.  Attorney Sheketoff.

13       MR. SHEKETOFF:  Thank you, your Honor.  The

14  defense offers Defendant 2, which is a letter from the

15  prosecutor to myself.

16       THE CLERK:  For the record, this is

17  Defendant's Exhibit 2.

18       THE COURT:  It's entered by agreement as a

19  full exhibit?

20       MR. SHEKETOFF:  Yes, your Honor.

21       MS. OLLILA:  That's correct, Judge.

22       (Defendant's Exhibit 2 admitted.)

23       THE COURT:  Could you just describe that to

24  the jury.

25       MR. SHEKETOFF:  Can I just read the part

1    that's not redacted.

2            THE COURT:  Certainly.

3            MR. SHEKETOFF:  Please note that with respect

4    to witness Nicholas Champagne, the United States intends

5    on filing a motion with the court pursuant to Rule 35

6    Fed Rule Crim Procedure to reduce the term of Defendant

7    Champagne's three-year period of supervised release to

8    one and one-half years.  This is dated August 4th, 2015,

9    and I believe there's a further agreement of the parties

10   that this information was also communicated to Mr.

11   Champagne's counsel.

12           MS. OLLILA:  That's correct, Judge.

13           THE COURT:  All right.  So you rest your case?

14           MR. SHEKETOFF:  And we rest, your Honor.

15           THE COURT:  All right.  Okay.  Government and

16   defense have rested their entire case then.  Is that

17   correct?

18           MS. OLLILA:  That's correct, Judge.

19           MR. SHEKETOFF:  And, your Honor, can I see you

20   at sidebar?

21           THE COURT:  Yes, you may.

22                          AT SIDEBAR

23           MR. SHEKETOFF:  I think because I put on a

24   case; namely, that one exhibit, I have to renew my

25   motion for judgment of acquittal, so I'm doing that now.

1      THE COURT:  Your motion is renewed, it's

2 preserved.  I deny it.

3      MR. SHEKETOFF:  Thank you, Judge.

4                IN OPEN COURT

5      THE COURT:  Members of the jury, we're now

6 going to hear closing arguments in this case.  You will

7 hear first from the government, Attorney Ollila.

8      MS. OLLILA:  Thank you, your Honor.

9      MS. OLLILA:  Good morning.

10      THE JURY:  Good morning.

11      MS. OLLILA:  Let me first take this

12 opportunity to thank you all so very much for your

13 service.  You have all undoubtedly sacrificed a lot to

14 be here.  Some of you are losing the opportunity to be

15 back at school starting a new year while others are

16 missing a lot of work that you really can't afford to

17 miss, and all of you are missing precious time away from

18 your families.  You have sat patiently and listened

19 intently for a week.  So on behalf of the United States,

20 on behalf of Lieutenant Encarnacao, on behalf of

21 Sergeant Norris, Dena Blanco, Diane Cullen, Chris True,

22 and even Cindy Budahn in the back of the courtroom, and,

23 in fact, on behalf of all law enforcement who testified

24 in this matter, we thank you so very much for your

25 service.

1          Ladies and gentlemen, the testimony did

2    establish that the defendant, Alkis Nakos, was the New

3    Hampshire chief of a huge marijuana drug trafficking

4    organization centered in Canada that was responsible for

5    smuggling thousands of pounds of marijuana, high-grade

6    marijuana, from Canada into the United States during the

7    period 2008 to 2014.

8          You also heard that defendant Alkis Nakos's

9    ability to receive the high-grade marijuana occurred

10   because he befriended Mihail Leventis, a high-ranking

11   member of the Canadian drug trafficking organization who

12   the defendant, Alkis Nakos, met while the two were

13   incarcerated together at the New Hampshire State Prison.

14         The testimony established that when the

15   defendant, Alkis Nakos, was released from prison, he

16   traveled to Canada, met with Mihail Leventis, and

17   arranged for the safe passage of marijuana into New

18   Hampshire.

19         The marijuana entered the country through

20   vehicle, on foot through the woods, and through

21   tractor-trailers that routinely transported over a

22   thousand pounds of marijuana on each occasion across the

23   border.

24         The marijuana itself, which you obviously now

25   know costs over $2,000 a pound, was initially delivered

1   in Home Depot style boxes, but as the organization grew,

2   the marijuana was packaged in 50-pound increments and

3   placed in black style hockey bags that contained the

4   label NH.

5          Dena, please pull up 1H at page one.

6          You know, ladies and gentlemen, that the case

7   against the defendant, Alkis Nakos, all started when a

8   border patrol agent seized a drug ledger at the end of

9   February 2008, February 21st, 2008.  The first page of

10  the ledger represented the distribution of 1,300 pounds,

11  and you can see to the right side of that page, it's 300

12  plus 300 plus 300 plus 400.  That means that during the

13  end of February 2008 and towards the beginning of

14  March 2008 the co-conspirators are scheduled to

15  distribute 1,300 pounds of marijuana.  And you can see

16  that NH, the defendant Alkis Nakos's cell of the

17  organization, is scheduled to receive 50 pounds.  And

18  also importantly you can see that there's a two-mil drop

19  schedule.  You know that the $2 million drop occurred

20  because it was intercepted by the Oklahoma State Police

21  Trooper Branson Perry.

22          Dena, please pull up 2F-14.

23          And you know that Trooper Perry contacted the

24  DEA in New Hampshire and Massachusetts because the

25  seizure signaled the existence of an enormous drug

1    trafficking organization.

2           You heard from Special Agent Jean Drouin that

3    a litany of law enforcement officers in over seven

4    states initiated Operation Brownshirt which ultimately

5    led to the arrest and prosecution of over 40

6    individuals.

7           During the investigation law enforcement

8    identified a New Hampshire car rental company located in

9    Derry, New Hampshire, named Buy Here Pay Here that had

10   been renting vehicles to numerous couriers who were

11   transporting the marijuana.  Because law enforcement

12   needed to track the couriers to be able to follow them,

13   they started placing GPS systems on the vehicles that

14   the couriers were using.

15          Please pull up 52-O, Dena.

16          By December of 2008 law enforcement placed a

17   GPS tracker on a vehicle that had been rented at Buy

18   Here Pay Here and then watched it travel to this very

19   warehouse in Waltham, Massachusetts.  While watching the

20   warehouse, law enforcement observed a tractor-trailer

21   with Quebec plates on it pull into the area and offload

22   what law enforcement knew was marijuana.

23          You may recall that law enforcement also saw

24   two vehicles meet with that tractor-trailer, and law

25   enforcement testified that the occupants of those two

1    vehicles had previously stopped at Home Depot and

2    obtained a number of boxes.

3              Please pull up 5H-2 and 5H-3 and do a split

4    screen, 5H-2 and 5H-3.

5              Law enforcement watched as the vehicles had

6    the Home Depot boxes packed back in their car, and law

7    enforcement knew that those boxes must have contained

8    marijuana.  But because only one of those vehicles had a

9    GPS tracker on it, law enforcement contacted a uniformed

10   Massachusetts State Police car and advised it to pull

11   over the vehicle that did not have the tracking device.

12   The vehicle was found to contain 200 pounds of

13   marijuana, all located in those Home Depot boxes.  That

14   marijuana was in the courtroom, ladies and gentlemen,

15   and it was introduced into evidence.

16             If you count as just $2,000 (sic), that small

17   amount of marijuana represented $400,000.

18             Because the tracking device had been placed on

19   one of the vehicles, law enforcement monitored it as it

20   returned to New Hampshire and ended up at 10 Delaware

21   Avenue, the stash house used by Nicholas Champagne.

22             Dena, please pull up 6A, which is a video, and

23   play that video.

24             By December of 2008 law enforcement obtained

25   video footage of Charles Fowle, the same Charles Fowle

1  you heard talking with Kosmas Koustas so often over the

2  wiretap, arrive at 10 Delaware Avenue, meet with

3  Nicholas Champagne, and obtain 50 pounds of marijuana in

4  that Home Depot box and deliver it to his customers.

5          Okay, Dena.  Thank you.

6          Although law enforcement intended to conduct

7  an interdiction of marijuana coming out of 10 Delaware

8  Avenue, before they had the opportunity to do so, there

9  was another seizure and this seizure occurred along the

10 Canadian border.  It was the 1,357 pounds of marijuana,

11 and it was seized from another tractor-trailer that was

12 located at the border.

13         Please pull up 52P-1.

14         You heard that the largest amount of the

15 marijuana in that 1,357-pound load was 200 pounds, which

16 represented another $400,000 worth of marijuana.  That

17 200 pounds was labeled NH because it was destined for

18 Alkis Nakos's organization in New Hampshire.

19         By February of 2009 law enforcement in New

20 Hampshire seized 58 pounds of marijuana that had been

21 distributed by Nicholas Champagne to David Couloumbe.

22         Dena, please pull up 9H-5.

23         The marijuana was contained in a dark hockey

24 style duffel bag with a brass-colored lock.  The bag

25 also contained a printed label on the exterior which

1    read NH, a clear reference to the Nakos organization.

2    Just like the NH written on 200 pounds of a 1,357-pound

3    load of marijuana.

4             Please pull up 12B-1 and 12B-5 and do a split

5    screen, Dena.

6             Because so many seizures were occurring,

7    ladies and gentlemen, and because it became clear that

8    the New Hampshire stash house had been heated up,

9    Nicholas Champagne left the house in early April 2009,

10   and his marijuana boss, defendant, Alkis Nakos, showed

11   up for the relocation.  And you can see him in the dark

12   shirt on the right with the bald shaved head.  It's not

13   at all how he looks now.

14            Within two days of leaving the stash house,

15   Nicholas Champagne delivered $194,000 to two female

16   Canadian couriers.

17            Please pull up 13D-4 and 13D-5 and do the

18   split screen.

19            The cash seized by law enforcement from

20   Nakos's New Hampshire cell meant that Nakos's cell

21   started to falter.  By May 2009 law enforcement seized

22   another 100 pounds representing $200,000 more of

23   marijuana.  It was taken from Nakos's organization in

24   New Hampshire.  Much like the 58 pounds, the 100-pound

25   seizure seized from Michael Gardner was contained in

1  black duffel style hockey bags with the label NH affixed

2  to the exterior of the bag.

3        Dena, please pull up 17H-4 and 17H-5 and do a

4  split screen.

5        By June 2009 law enforcement executed two

6  search warrants at stash houses located in Vermont at

7  the border of Canada.

8        Please pull up 18K-1 and 18K-2 and do a split

9  screen.

10       Do you remember the testimony of Special Agent

11  Jean Drouin?  He identified one of these stash houses as

12  a stash house located in the picture on the left, and he

13  identified that that waterway was right outside that

14  house, and if you look across the water, that land

15  across the way is Canada.

16       During that search of the two stash houses,

17  law enforcement recovered more marijuana, all of which

18  was contained in those exact same hockey dark duffel

19  bags, same exact style of bag seized from Michael

20  Gardner and David Coulombe.

21       You heard that Nicholas Champagne self-

22  surrendered to law enforcement in July 2009.  But

23  because Nicholas Champagne had been fending for himself

24  since the age of 12 by selling crack cocaine on the

25  streets, his moral compass at the time refused to allow

1    him to cooperate against the defendant, Alkis Nakos.

2    Nicholas Champagne took his sentence like a man and he

3    served every single day.

4         But Nick Champagne had a lot to live for when

5    he was released.  He spent five long years away from his

6    son.  Rather than continue the cycle of abandonment in

7    his life, one that his own drug-addicted mother showed

8    him at a terribly horrible young age, Nick decided that

9    his belief about a code of silence and the death before

10   dishonor tattoo on his arm were based upon a horrible

11   false premise.

12        Nick did what he had to do to be a father to

13   his son.  He showed up and testified.  He told you

14   exactly what happened.  Nicholas Champagne openly

15   admitted that he had distributed over 6,000 pounds of

16   marijuana that had entered into the United States

17   through Alkis Nakos's connection with Mihail Leventis.

18   Nicholas Champagne openly admitted to making a lot of

19   money, but Nicholas Champagne has absolutely nothing to

20   show for it now.  Nothing but heartache and the

21   unrelenting pain of knowing that he will never get one

22   of those days back with his son.  He simply refuses to

23   make that sacrifice again.  So no matter how humiliated

24   Nicholas Champagne was when he was asked if he could

25   read, there are not enough loud sighs in the world to

1   break his resilience because he knows he is never going

2   back, and he knows that telling the truth, telling

3   exactly what happened, is the only key to his freedom.

4           So accuse Nicholas Champagne, 55-year-old

5   father, with operating a drug trafficking organization

6   if you must.  There is nothing, absolutely nothing, that

7   will break Nicholas Champagne's will.  He will hold his

8   head down and wait until it's over because he was here

9   to tell you exactly what happened, and he did.  Nick

10  Champagne finally understands, much like a lot of you,

11  much like a lot of us understand, that the false premise

12  of loyalty to drug dealers absolutely pales in

13  comparison to the love a parent has for his child.

14          Nick Champagne openly owned up to his

15  involvement, but he had no ability, none whatsoever, to

16  get the marijuana into the United States from Canada.

17  He had absolutely no pull with Mihail Leventis, a Greek

18  speaker just like the defendant, Alkis Nakos.  If Nick

19  Champagne had any influence over Mihail Leventis, why in

20  the world would he be so beholden to the defendant,

21  Alkis Nakos.  And why in the world would Nick Champagne

22  give the defendant, Alkis Nakos, so much money if he had

23  the ability to go to Leventis directly himself.

24          That crucial role was held by only one person

25  in this case, ladies and gentlemen, and that was the

1    defendant, Alkis Nakos.  Only one person had the

2    connections and ability to ensure the free flow of

3    marijuana into New Hampshire.  It was the same person

4    who negotiated a deal that absolutely mandated that he

5    made money off the top of every single pound of

6    marijuana that entered New Hampshire through his

7    efforts.  You never heard once, not even once, that

8    Nicholas Champagne traveled to Canada to meet with

9    Leventis because Leventis would have never given

10   Nicholas Champagne the time of day.

11          But you did hear from the defendant's

12   ex-girlfriend, Allison Ouellette, who left in 2009, and

13   she openly said that she and her then boyfriend,

14   defendant, Alkis Nakos, went to Canada to meet with

15   Mike, Mihail Leventis, on at least four occasions.

16          If Alkis Nakos would have stopped the flow of

17   marijuana into New Hampshire, no one had the ability to

18   get it in through the Canadian drug trafficking

19   organization.  All of the marijuana roads into New

20   Hampshire led directly through Alkis Nakos and he knew

21   it.

22          He carefully fostered his relationship with

23   Mihail Leventis and even bragged about it to Paul

24   Poirier, the undercover law enforcement officer who was

25   inside Amory Street House of Pizza for over a year.

1    Alkis Nakos openly bragged to Sergeant Poirier how he

2    and his friends smuggled duffel bags of marijuana

3    through the woods at the Canadian border and that they

4    used Indian trails to get it across.  He even openly

5    bragged that he was making between 100 -- excuse me, 300

6    and $400 of profit off of every pound of marijuana that

7    entered into the United States.

8           Alkis Nakos told Sergeant Poirier that he had

9    been in Canada before and was stopped by law enforcement

10   because he was with someone who the Canadian authorities

11   were watching.  Alkis Nakos even told Sergeant Poirier

12   that the Canadian authorities took money from him when

13   they stopped him along with his friend.

14          You know that the defendant's bragging was

15   absolutely true.  A forensic examination of the

16   defendant's computer seized at his home in June of 2014

17   showed that he had sent an SMS message to a friend which

18   revealed that $15,000 had been taken from him in Canada,

19   and he said, as you will see yourself, quote, it was a

20   mess.

21          You also know that Alkis Nakos was obviously

22   referring to Mihail Leventis because Mihail Leventis is

23   absolutely someone in Canada who would be watched

24   closely by law enforcement.

25          So, ladies and gentlemen, what exactly was the

1   defense here?  Although at times it was confusing to

2   follow, it seemed to be that Nicholas Champagne and

3   Kosmas Koustas were the leaders of the New Hampshire

4   cell of the Canadian drug trafficking organization and

5   that the defendant, Alkis Nakos, was simply an unwitting

6   and loyal friend who had the uncanny ability to always

7   be in the wrong place at the wrong time.  But the

8   evidence made clear that that simply wasn't the case.

9            51J, please.  And please enlarge that, Dena.

10           Evidence like that found on the defendant's

11  own computer.  Why would anyone conduct a Google search

12  on how to erase text messages from their iPhone unless

13  they had something that they didn't want anyone,

14  especially law enforcement, to see.

15           Please pull up 51H at page one.

16           And why keep every single page, over 1,500

17  pages in total, of Operation Brownshirt discovery on

18  your computer for five years after supposedly reviewing

19  it as a legal scholar and favor for a friend whose own

20  criminal defense attorney was apparently incapable of

21  going to law school, practicing law for many years, and

22  understanding the documentation without the defendant's

23  assistance.

24           If you look at the discovery files themselves,

25  ladies and gentlemen, you will see that the defendant,

1    Alkis Nakos, is accessing the documentation two years

2    after Nicholas Champagne's arrest and incarceration.

3    You know that the defendant, Alkis Nakos, obtained

4    documentation on July 9, 2009, shortly after Nicholas

5    Champagne turned himself in because you can see the

6    creation date on that file.

7             But take a look on the line below the creation

8    date.  It says:  Access date, 11/3/2011.  And you heard

9    from Trooper Piche yesterday that that date represented

10   the time that that material had last been accessed.  Why

11   in the world would the defendant, Alkis Nakos, need to

12   review the discovery long after Nicholas Champagne had

13   been sent away to a Bureau of Prisons facility and was

14   now located in Pennsylvania?  He certainly would need to

15   review that information if he continued to operate as

16   the New Hampshire chief and as such would need to keep

17   that documentation on hand for review.

18            Please pull up 51K and enlarge that, Dena, as

19   much as you can.

20            And ask yourselves, ladies and gentlemen, why

21   defendant, Alkis Nakos, would still be reviewing DEA

22   press releases in December of 2013, some four years

23   after Nicholas Champagne had been arrested and

24   incarcerated.  He certainly would need to do so if he

25   continued to act as the New Hampshire chief of the cell

1    and wanted to monitor arrests made by law enforcement.

2              Another interesting aspect of the defense --

3    brought up by defense counsel seemed to consist of an

4    all-out attempt to legitimize all of the monies obtained

5    by defendant, Alkis Nakos, throughout the period of 2008

6    through 2014.

7              Attorney Sheketoff started down the road of

8    trying to get Sergeant Poirier to testify that indeed

9    food was served at Amory Street Pizza.  Remember how he

10   talked about Alkis Nakos carrying a bag of flour in?

11   But he quickly abandoned that effort when it became

12   painfully clear that for many years before the

13   defendant's arrest no one was getting food there.

14             Because he made no headway with the successful

15   pizza operation defense, Attorney Sheketoff quickly

16   turned to defendant Nakos's slot winnings at Foxwoods,

17   notwithstanding the fact that the defendant's

18   ex-girlfriend, Allison Ouellette, knew nothing about any

19   significant gambling winnings, and they were together

20   through the end of 2009.

21             So let's talk about the money, ladies and

22   gentlemen.

23             Exhibit 60B, please.  And please enlarge that,

24   Dena.

25             You know from Defendant Nakos's St. Mary's

1    Bank account that he had over $130,000 in the bank in

2    December 2009.  You also know from his taxes that you

3    saw from his very own accountant that he claimed to be a

4    pizza chef at Amory Street Pizza who made $30,000 in

5    2009.  You also know that the defendant didn't hit the

6    slots at Foxwoods until well into 2010.  So you need to

7    ask yourselves this, ladies and gentlemen, where did

8    that $130,000 come from?

9           Well, you certainly know that 2008 and 2009

10   were banner years for Alkis Nakos's New Hampshire cell

11   of the marijuana drug trafficking organization.

12          Do you remember when Special Agent Drouin

13   toward the end of his testimony was identifying amounts

14   of money that had been turned over to the Canadian drug

15   trafficking organization by Alkis Nakos's members of his

16   cell?

17          22C at page eight, Dena.  And enlarge that.

18          This ledger says:  Zinger, pick up paper from

19   NH, $350,000, and this was July 19th, 2008.

20          Please pull up 22D at page four.  And enlarge

21   that, Dena, at page four.

22          MS. BLANCO:  45.

23          MS. OLLILA:  I'm sorry, Dena.  45, I'm sorry.

24          Two weeks earlier on July 1st, 2008, $275,000

25   was obtained by the Canadians from the defendant's New

1    Hampshire cell.

2            22E at page ten.

3            And just one month later, on August 3rd, 2008,

4    another $200,000 was provided by Nakos's organization to

5    the Canadian drug trafficking organization.

6            If the defendant's New Hampshire cell is

7    paying out that much money and receiving load after load

8    after load of marijuana, sometimes receiving between 100

9    to 400 pounds of marijuana a month, just as testified to

10   by Nicholas Champagne, that means that the defendant,

11   Alkis Nakos, was making a lot of money off the top of

12   every pound of marijuana that was being distributed in

13   New Hampshire, and, ladies and gentlemen, that is

14   exactly why he had $130,000 in the bank in 2009.

15           Now, I'm sure that you also caught what

16   Attorney Sheketoff was trying to do with the money

17   aspect.  He seemed to handle it in two ways.  First, he

18   tried in vain to get Sergeant Paul Poirier, the

19   undercover inside Amory Street Pizza, to testify that

20   the poker machines at Amory Street Pizza, located in one

21   of the poorest areas of Manchester, were making huge

22   amounts of money.  He must have done this because he

23   wanted to be able to justify amounts of cash and

24   expenditures that you were going to see from the records

25   themselves.

1          But Attorney Sheketoff's attempt was clear to

2     Sergeant Poirier, and Sergeant Poirier testified that he

3     was advised by the defendant's own father that all three

4     of those one-dollar poker machines together made $500 a

5     week on the best week.

6          Exhibit 43P-4 and 43-5.  Please do a split

7     screen.

8          And this makes sense, doesn't it, ladies and

9     gentlemen?  Do you actually think that there would be a

10    flood of gamblers going to Amory Street Pizza to have a

11    pizza, sub, or a beer and play the one-dollar video

12    poker machine?  Of course not.  Sadly enough the

13    individuals who went there to lose their entire

14    paychecks were undoubtedly just squeaking by in life.

15    Unlike the defendant, Alkis Nakos, they didn't have a

16    lot of money to lose.  And if they did, they wouldn't be

17    at Amory Street Pizza.  They'd be sitting right next to

18    the defendant at Foxwoods.

19          So how else did Attorney Sheketoff try to

20    justify the money?  Well, because the video poker

21    machine attempt was failing, he turned to Defendant

22    Nakos's amazing skill as a gambler.  After all, not only

23    is the defendant a scholar whose legal prowess was

24    needed by Nicholas Champagne's attorney, he also was a

25    professional gambler.

1          But the funds don't add up, ladies and

2    gentlemen.  You already know that the defendant, Alkis

3    Nakos, had $130,000 in the bank long before he won any

4    money gambling.  But even if he tries to claim that his

5    lavish lifestyle was a result of his lottery winnings,

6    the figures don't add up.

7          Remember, first, that defendant, Alkis Nakos,

8    bragged to Sergeant Poirier about being a high roller at

9    Foxwoods.  He said that his bets were so high that he

10   was placed at the high-roller table, and that fellow

11   gamblers would be forced away from the table because

12   they couldn't keep up with his high-dollar bets.

13          Well, you know that when the defendant won at

14   Foxwoods, it was on the slot machines, not by playing

15   blackjack or poker.  So how was it then that an

16   individual making $30,000 a year at a pizza shop would

17   have the ability to be a high roller at Foxwoods long

18   before he even won any money there.  He had the ability,

19   ladies and gentlemen, because he was New Hampshire chief

20   of the marijuana trafficking organization and he had

21   plenty of money to burn.

22          How much money did he have to burn?  Well, you

23   know that during 2011 through 2013 alone he had four

24   different Mercedes Benz vehicles.  You actually heard

25   from Sergeant Poirier that the defendant, Alkis Nakos,

1   acquired two new Mercedes Benz vehicles within one week

2   of one another.  And he actually bragged that one of

3   them cost $65,000.  And you certainly know that the

4   defendant was also bragging to Sergeant Poirier about

5   how he was going to special order a $150,000 Mercedes

6   Benz and it would take over a year to receive.  The

7   amount for that special order Mercedes Benz would have

8   completely obliterated every cent of his winnings from

9   Foxwoods.

10          And yet you saw, ladies and gentlemen, that

11  seized at the defendant's residence were money bands

12  that represented an amount over $170,000 in cash.  And

13  you know that the defendant had at least $50,000 in home

14  renovations done because he sued the contractor, David

15  Gibbons, for the recovery of $100,000.  And you heard

16  that the defendant hired David Gibbons and only had one

17  condition for hiring him.  And that is that David

18  Gibbons ensure him, the defendant, Alkis Nakos, that

19  there be no paper trail.

20          In 2012 the defendant claimed that he lost

21  $30,000 in jewelry that had been taken from his

22  residence during a home burglary.  Among the evidence

23  taken were a $9,000 Rolex, a $9,900 necklace, a $7,000

24  gold medallion, and a $4,000 ring.

25          Please pull up 50A at page one, Dena.

1          And this is the defendant's 2013 tax filing.

2    You can see that he claimed during that year to make

3    $18,000 at Amory Street Pizza.

4          And you know that on March 17, 2014, New

5    Hampshire State Police Trooper Stefan Czyzowski stopped

6    Alkis Nakos in yet another brand-new Mercedes Benz.  You

7    know that Trooper Czyzowski took $9,000 from the

8    defendant, some of which included Canadian currency.

9    And you also know that the same trooper took $9,000 from

10   Christopher Ranfos who was a passenger in the

11   defendant's Mercedes Benz.

12          And, ladies and gentlemen, this is the very

13   same Christopher Ranfos two days earlier on March 15th,

14   2014, who met with Kosmas Koustas, obtained an amount of

15   marijuana, and then distributed it to John Horne.

16   Because law enforcement seized it.

17          This is the very same Christopher Ranfos that

18   Attorney Sheketoff tried to claim was going to see

19   Kosmas Koustas because he was an HVAC guy.  And you

20   heard the wire yourself.  Christopher Ranfos said I'm

21   going to come over and check out the heat.  Attorney

22   Sheketoff tried to convince you that that was a

23   reference to HVAC.  But you heard that law enforcement

24   that same day Christopher Ranfos went over there,

25   followed him, saw him deliver marijuana to John Horne,

1    and then stopped John Horne and seized marijuana.

2             At the time of the search of Defendant Nakos's

3    residence in June 2014, law enforcement recovered over

4    $12,000 in cash.  If Attorney Sheketoff wants to claim

5    that that cash was left over from Defendant Nakos's

6    Foxwood winnings, why would the defendant keep it in

7    small denominations.  You need to ask yourselves this,

8    ladies and gentlemen.  What would the defendant need

9    with 140 $20 bills?  And why would he feel the need to

10   hide that money in two separate shirts in his master

11   bedroom closet, two years after his winnings from

12   Foxwoods had ended.  This is particularly so because the

13   defendant had been burglarized in 2012, and he certainly

14   wouldn't want to leave that much currency in his home.

15            And you also saw that he had no problem

16   whatsoever keeping a lot of money in the bank.  So why

17   keep the money in the closet at all?

18            He kept it there, ladies and gentlemen,

19   because this was money that Kosmas Koustas had delivered

20   to him, and he simply hadn't had the time to bring it to

21   the bank and deposit it.  That's why it was there.

22            If you just add up the amount taken from

23   defendant, Alkis Nakos, when Trooper Czyzowski stopped

24   him on March 17th, $9,000, and the $12,000 that was

25   seized from the defendant at his house, that is two days

1    of money, two days.  If you add that up, that's $21,000.

2    That's more than the defendant claimed in total to be

3    making that year when he claimed $18,000.

4              And you know that the defendant must have had

5    Canadian currency in his wallet in 2014 because he was

6    always traveling to Canada to meet with Mihail Leventis

7    and foster his relationship so that his New Hampshire

8    cell of the drug trafficking organization could continue

9    to receive drugs for distribution in New Hampshire.

10             Defendant Nakos himself was moving the chess

11   pieces around the board just as he had done since 2008

12   and just as he continued to do until 2014.

13             So how exactly do you know that Defendant

14   Nakos's was Kosmas Koustas's boss, just as he had been

15   the boss of Nicholas Champagne.

16             Start from the very first night of the

17   wiretap, October 23rd, 2013, because the answer came

18   within the first several calls of the Title III

19   intercept.  During the call that Kosmas Koustas made to

20   Jeremy Blevens during the very first night, Kosmas

21   Koustas was on his way back from Worcester,

22   Massachusetts, where he had obtained a load of

23   marijuana.  During their conversation Jeremy Blevens

24   said to Koustas:  All right, can you get that girl?  A

25   clear reference to a request for MDMA, also known as

1    Molly, a girl's name.

2              You will hear that Koustas doesn't respond yes

3    because he has no ability to.  He needs to check with

4    his boss, Alkis Nakos.  Instead of saying yes right

5    away, Koustas replies:  Ah, I don't know.  I can make a

6    phone call.

7              Dena, please play 38A-2A.

8              (Played recording.)

9              When Attorney Sheketoff questioned Trooper

10   Norris about this conversation, he pointed out that

11   after his conversation, Kosmas Koustas called someone by

12   the name of Brandon Lachance.  The clear message that

13   he, Attorney Sheketoff, was trying to convey to you was

14   that it was Brandon Lachance who was the source of

15   supply for the MDMA.  That interesting strategy lingered

16   for a while until United States made it clear that

17   Brandon Lachance cooperated with law enforcement and

18   continued to do so long before the two pounds of MDMA

19   were seized from Kosmas Koustas's residence.  The only

20   person who Koustas was calling about the MDMA was his

21   actual boss, the defendant, Alkis Nakos.

22             Dena, can you go to minute marker six, and

23   pause it when you get to six.

24             (Pause.)

25             During the very same conversation on

1    October 23, 2013, Kosmas Koustas and Jeremy Blevins talk

2    about meeting because Jeremy Blevens wants to pay Kosmas

3    Koustas for a prior shipment of marijuana that he had

4    received.  During the conversation Jeremy Blevens tells

5    Kosmas Koustas that even if Koustas can't get the MDMA,

6    Blevens still wants to meet to turn over the monies that

7    he owed.  In response Kosmas Koustas says:  No, I got

8    you.  No, ah, it's not even mine.

9              Play it, Dena.

10             (Played recording.)

11             Thank you.

12             Koustas's comment, which he had no idea was

13   being recorded by law enforcement, shows that he is

14   referencing the fact that he has a boss, defendant,

15   Alkis Nakos.  Kosmas Koustas and Jeremy Blevens engage

16   in another conversation the very same night because

17   Kosmas Koustas told Jeremy Blevens that he would check

18   on the availability of the MDMA.

19             When Kosmas Koustas calls Jeremy Blevens back,

20   he says:  Ah, I was just about to call you, too, and

21   this mother-f'er boss, he's at the Red Sox game.

22             Please play 38A-2F.

23             (Played recording.)

24             Now, Dena, please pull up 51L and turn to page

25   seven.  And I want you to enlarge that.

1           Who is the boss, ladies and gentlemen, who

2     would be at a Red Sox game?  He's the same boss who went

3     to Celtics games, was at center ice for Montreal

4     Canadian games, and Patriots games.  The stored messages

5     on the defendant's computer show exactly who it was.

6     You are looking at page seven of those records.  And

7     this is a message that the defendant himself sent.

8     Crazy moments, we had lots.  St. Thomas, Superbowl,

9     Vegas, Cali, Greece, Rome, Pats games, Celtics, strip

10    clubs, Montreal, Foxwoods, Boston, too many fun times.

11          All of this, ladies and gentlemen, on $30,000

12    a year from a pizza shop that doesn't even sell pizza.

13          It is the defendant, Alkis Nakos, the very

14    same person who spent $650 at Gucci on Fifth Avenue in

15    New York during a five-minute period in 2010.  It's the

16    very same person that David Sweeney spoke with outside

17    of Amory Street Pizza in January 2014 when Alkis Nakos

18    told a fellow drug dealer, one he had done time with at

19    the New Hampshire State Prison, that Kosmas Koustas was

20    running his, Alkis Nakos's, product.  Alkis Nakos told

21    David Sweeney that he, Alkis Nakos, had exotics, a clear

22    reference to high-grade Canadian marijuana.  And he also

23    told David Sweeney that he had Molly, a clear reference

24    to MDMA.

25          Doesn't it all make sense, ladies and

1   gentlemen?  Defendant, Alkis Nakos, advertises the

2   availability of his product to fellow drug dealers that

3   he trusts and then sends his lieutenant in to carry out

4   his own work.

5        It's exactly what the defendant did with John

6   Venturini after Nicholas Champagne was arrested.  Do you

7   remember that John Venturini testified that after

8   Nicholas Champagne had been arrested, remember that John

9   Venturini was best friends with Nicholas Lawyer and

10  Nicholas Lawyer killed himself and John Venturini had a

11  motorcycle accident that same night?  You heard John

12  Venturini testify that after Nicholas Champagne, who had

13  been providing them with marijuana, had been arrested,

14  who showed up at his residence?  The defendant, Alkis

15  Nakos.  During the conversation Alkis Nakos asked John

16  Venturini how much marijuana he was receiving.

17       Shortly after that conversation, Kosmas

18  Koustas showed up and showed John Venturini an amount of

19  marijuana.  It's because the defendant, Alkis Nakos,

20  sent his new lieutenant, Kosmas Koustas, to show

21  Venturini the product.

22       Kosmas Koustas was consulting with the

23  defendant, Alkis Nakos, about the availability of the

24  MDMA on October 23rd, 2013.  It was the very same person

25  that Kosmas Koustas called four times on October 22nd,

1    2013, the day before he traveled to Massachusetts in

2    order to obtain that load of marijuana.

3            Please pull up 38RR at page 87.

4            You know that Kosmas Koustas picked up the

5    marijuana on October 23rd, 2013, because when he was

6    traveling back from Massachusetts, he called Charles

7    Fowle and told him that he'd be by with the marijuana.

8    After law enforcement saw Koustas arrive and quickly

9    depart from Charles Fowle's residence in Manchester,

10   Kosmas Koustas called Charles Fowle back and they

11   discussed the quality of the marijuana.

12           Please play 38A-2H.

13           (Played recording.)

14           Although you knew that Kosmas Koustas would

15   never, never engage in a drug-related conversation with

16   the defendant over the telephone, you would expect,

17   wouldn't you, that at some point in time after Kosmas

18   Koustas successfully delivered the marijuana to Charles

19   Fowle and Jeremy Blevens, that he would check in with

20   his boss.

21           So what did the phone records show the day

22   after that delivery on October 24th, 2013?

23           Please pull up 38RR at page 94.

24           The records show that Kosmas Koustas and the

25   defendant, Alkis Nakos, spoke several times on that

1    date.  Now, if this doesn't convince you, ladies and

2    gentlemen, that Alkis Nakos was the boss and Kosmas

3    Koustas his lieutenant, then focus on another day when

4    you know that Kosmas Koustas traveled to Massachusetts

5    in order to obtain a quantity of marijuana,

6    December 5th, 2013.  Would you expect that Defendant

7    Nakos's lieutenant, Kosmas Koustas, to touch base with

8    his boss the day before he traveled to Massachusetts on

9    December 5th?  And the day of December 5th?  Of course

10   you'd expect that.

11          Please pull up 39EE at page 99.

12          These records show that on December 4th, 2013,

13   the day before Koustas traveled to Massachusetts to pick

14   up the marijuana, he and Alkis Nakos spoke four times,

15   one conversation of which lasted for 17 minutes.  And

16   would you expect Kosmas Koustas to speak with his boss

17   on December 5th in order to still confirm that he needed

18   to go to Massachusetts to pick up the marijuana?  Of

19   course you would.

20          Turn to page 103, Dena.

21          Before Kosmas Koustas traveled to

22   Massachusetts, he and Alkis Nakos engage in a

23   conversation that lasts about eleven minutes.

24          The wiretap did show that Kosmas Koustas

25   arrived in Massachusetts at about 7:53 p.m. on

1    December 5th because he calls the courier once he

2    arrives and says:  Is that you over there?

3            You know that Koustas met with the courier at

4    8:00 because law enforcement followed him from his place

5    of employment to 4 Colebrook Road in Millbury,

6    Massachusetts, the location of one of the stash houses.

7    You also know that it takes over an hour to get back to

8    Manchester, New Hampshire from Massachusetts.

9            So would you expect Kosmas Koustas to be

10   checking in with his boss over his clean telephone as he

11   traveled back to New Hampshire?  Yep, you would.

12           Turn to page 106.

13           You can see that right before Kosmas Koustas

14   arrived back in New Hampshire at 9:37:31 he contacted

15   defendant, Alkis Nakos.  And you also heard that Kosmas

16   Koustas on that date went to 140 South Porter Street in

17   Manchester, New Hampshire, and that was the residence of

18   Kosmas Koustas's father.

19           Well, how do you know that 140 South Porter

20   Street ties into this conspiracy?  You absolutely know

21   that because when law enforcement executed a search

22   warrant at that residence, they seized this duffel bag,

23   the same style duffel bag that law enforcement had been

24   seizing all along.  Inside that duffel bag was this tag,

25   Diamond Kush times 50 on one side and Boston on the

1    other.

2           Kosmas Koustas -- much like Nicholas Champagne

3    used 10 Delaware Avenue, Kosmas Koustas was using 140

4    South Porter Street as a stash house.

5           Sergeant Norris testified that Kosmas Koustas

6    planned to travel back to Massachusetts on December 6th.

7    You will recall that.  But something happened on

8    December 6th and Kosmas Koustas's plans changed.  How

9    would Kosmas Koustas find out if his December 6th trip

10   to Massachusetts was cancelled?  He could find out if he

11   had contact with the one and only person who had direct

12   links to the Canadian upper echelon.

13          Turn to page 39EE at page 109.

14          You can see that during the morning of

15   December 6, 2013, Kosmas Koustas received an incoming

16   call, incoming call, from defendant, Alkis Nakos, and

17   you can see that they spoke for 39 minutes.  It had to

18   have been that Kosmas Koustas learned from defendant

19   Alkis Nakos, the only one who had direct contact with

20   the Canadians, that the marijuana load had either been

21   cancelled or postponed.

22          Wouldn't you obviously assume at this point in

23   time, ladies and gentlemen, that the Massachusetts

24   courier who Koustas had met with the day before on

25   December 5th would have learned that that marijuana

1  shipment was either cancelled or delayed?  Although you

2  think that the Massachusetts courier would know, he

3  actually didn't, and the wiretap showed that it was

4  actually Kosmas Koustas who informed him.

5          Play 38A-2Q.

6          (Played recording.)

7          Okay thank you.

8          The courier says to Koustas:  I was supposed

9  to have gotten that for you, but I haven't heard from

10  them yet.  Koustas says:  It's going to be no good, Roy,

11  and the courier says:  Did you hear it's going to be no

12  good?  And Koustas says:  Yeah, no go, maybe tomorrow or

13  the next day.

14          How would Kosmas Koustas be privy to such high

15  level information?  How could he receive it?  He

16  certainly could if he had a 39-minute conversation with

17  the defendant before contacting the -- before the

18  Massachusetts courier contacted him.

19          And you know that the defendant, Alkis Nakos,

20  would certainly tell his own lieutenant if the plans had

21  changed.

22          The wiretap also demonstrated that, although

23  marijuana was cancelled for delivery on December 6th, a

24  load actually came in on December 7th because law

25  enforcement followed Kosmas Koustas to Massachusetts and

1     then back to Manchester again.  As he had done on

2     December 5th, Kosmas Koustas traveled to 140 Porter

3     Street.  But where did he go after?  He went to 366 Arah

4     Street, the defendant's residence.

5             Contrary to Attorney Sheketoff's repeated

6     accusations, there should be no doubt that Nicholas

7     Champagne was not the chief of this New Hampshire cell.

8     He couldn't have been because law enforcement seized

9     marijuana in 2014 from Kosmas Koustas's residence that

10    had the very same NH markings on it as the marijuana had

11    in 2008 and 2009.

12            Please pull up 7E-12.

13            Do you remember yesterday when Sergeant Norris

14    held up the one pound of marijuana seized from Kosmas

15    Koustas's white van and I had him point out the markings

16    on the top and one of the markings was NH?

17            When law enforcement seized that pound of

18    marijuana, Nicholas Champagne was still in jail in

19    Pennsylvania.  So unless you want to believe that

20    Nicholas Champagne somehow miraculously had the ability

21    to run a drug trafficking organization from jail, you

22    must be left with a firm understanding that NH

23    represented Defendant Alkis Nakos's marijuana

24    trafficking organization.

25            Although Nicholas Champagne was an incredibly

1  proud man and although he refused to believe that anyone

2  was his boss, he, like everyone else in New Hampshire

3  receiving marijuana, was beholden to only one person,

4  the defendant, Alkis Nakos.

5       Nick Champagne was beholden to Alkis Nakos.

6  Kosmas Koustas was beholden.  Charles Fowle was

7  beholden.  Jeremy Blevens was beholden.  David Coulombe

8  was beholden.  Michael Gardner was beholden.  Corey

9  Buchan was beholden.  Christopher Ranfos was beholden.

10 And Andre Watson was beholden.  No one in New Hampshire

11 received marijuana or MDMA without Alkis Nakos first

12 organizing its entry and distribution into New

13 Hampshire.

14       He was a classic organizer, supervisor, and

15 manager of a continuing criminal enterprise that

16 conducted innumerable drug transactions in New

17 Hampshire.

18       And let me point out something that is very

19 important for you to remember, ladies and gentlemen.  As

20 soon as I'm finished and counsel's finished, Judge

21 McCafferty is going to instruct you on the law, and one

22 of the things that she is going to instruct you is that

23 you must be unanimous as a jury, that there were at

24 least three drug transactions that are attributable to

25 the defendant, and you must be unanimous with respect to

1    the three that you pick.

2              Although this evidence demonstrated without

3    any question that there were too many drug transactions

4    to count, you could certainly pick from among the

5    following list of just ten as the three.

6              The December 23rd, 2008, distribution of

7    marijuana at 10 Delaware Avenue by the courier who had

8    brought it there from the warehouse in Massachusetts.

9              The December 30th, 2008, distribution of

10   50 pounds to Charles Fowle by Nicholas Champagne at 10

11   Delaware Avenue.

12             The January 21st, 2009, seizure of 1,357

13   pounds of marijuana on the Canadian border, 200 pounds

14   of which were marked NH because they were intended for

15   distribution by defendant's organization in New

16   Hampshire.

17             The February 24th, 2009, 58-pound seizure from

18   David Coulombe after he received it from Nicholas

19   Champagne.

20             The May 27th, 2009, 100-pound seizure from

21   Michael Gardner.

22             The October 23rd, 2013, wiretap delivery of

23   marijuana to Charles Fowle by Kosmas Koustas.

24             The November 2013 wiretap MDMA distribution by

25   Kosmas Koustas to Jeremy Blevens.

1          The December 5th, 2013, wiretap receipt of

2    marijuana by Kosmas Koustas from the courier in

3    Massachusetts.

4          And, of course, the December 7th wiretap

5    receipt of marijuana by Kosmas Koustas from the courier

6    in Massachusetts.

7          And, finally, the March 30th, 2014, possession

8    with the intention of distributing the two pounds of

9    MDMA that was seized from Kosmas Koustas's residence,

10   along with the one pound of marijuana that was seized

11   from him.

12          None of these drug transactions, none of them,

13   would have occurred without Defendant Alkis Nakos's

14   being the center of the New Hampshire hub.  All

15   distribution roads started and ended with the defendant.

16   He was either the unluckiest person on the planet who

17   happened to always be in the vicinity of major drug

18   transactions or he is the boss who moves the chess

19   pieces around to suit his fancy.  It could only be one,

20   ladies and gentlemen.  Unfathomable bad luck or

21   unrelenting nefarious conduct.

22          Alkis Nakos was a major drug trafficker in New

23   Hampshire for a very long time and his reign comes to an

24   end today.  Thank you.

25          THE COURT:  Attorney Sheketoff.

1          MR. SHEKETOFF:  Thank you, your Honor.

2          MR. SHEKETOFF:  I didn't realize until that

3    closing argument that I was actually on trial here.

4          I'm going to talk about the law a little bit,

5    but the judge is supreme on the law.  Anything she says

6    about the law that I have said something different,

7    please disregard my comments.  And I'm obviously going

8    to mostly talk about the facts, but you are supreme on

9    the facts.  Your memory controls, not mine.  If I say

10   anything about the facts that differ from your memory, I

11   apologize.  You're supreme.

12         Now, my client is presumed to be innocent.

13   That presumption by itself is sufficient to acquit him.

14   He's to be treated as if he was sitting in the audience,

15   made to sit up here.

16         And of course in this case you learned

17   something at the very beginning when you were being

18   selected as jurors -- you made a pledge about this.  You

19   learned that he was in jail.  How does he know these

20   people?  It's not unfortunate bad luck.  He was in jail

21   with this crew.  He was in jail with them, for years.

22   He got out in 2005.  Leventis got out in 2006, and

23   Champagne got out in 2007.  He was in jail with them.

24         But you all said, and I'm sure you're going to

25   live up to it, that the evidence about that would be

limited in your mind to a specific thing, how he got to

know these people, and it wouldn't affect the

presumption of innocence.

　　　　　Perhaps the fact that he was in prison, and

you've learned about that as part of this case, is a

reason that they feel they can just conduct a smear

campaign, just smear him.

　　　　　He's presumed to be innocent.  And that

presumption by itself is sufficient to acquit him unless

and until, if ever, the government convinces you beyond

a reasonable doubt.  Now, that's a term that's pretty

well understood.  But it's a different scale than we use

even in the most important affairs of our daily lives, a

significantly different scale.  Am I going to get

married?  Am I going to move?  Am I going to change

jobs?

　　　　　We don't do that on surmise and conjecture.

We do it on what we call a preponderance of the

evidence.  We put the evidence in the scale and we weigh

it.  51 percent, I guess I'll change jobs.

　　　　　That's not the standard we use here.  We use

beyond a reasonable doubt.  A much more onerous standard

for the government to reach, much more onerous.  And in

most of our daily affairs, even important things, we

often get to change our mind.  You don't get to change

1    your mind.

2         Verdict means speak the truth.  When you come

3    in and speak the truth, the question you are asked to

4    speak the truth to, has the government convinced you

5    beyond a reasonable doubt.  If your answer is yes, you

6    don't get a chance tomorrow or the day after or whenever

7    you return with a verdict and say, geez, you know, maybe

8    I was too hasty.  No, this is not a decision that you

9    can change your mind about.

10        All right.  The prosecutor says he would

11   never, never, ever talk on a dirty phone.  He would

12   never talk drugs on that phone.  Okay.  And that's out

13   of one side of her mouth.  On the other side of her

14   mouth, he's warning him all the time on that same phone.

15   He's warning him.  The thing's not going to go down

16   today.  Which is it?  He never talked on that phone or

17   he does?

18        Now, you're going to have the Metro PCS

19   records of my client's phone.  You're going to have

20   them, and of Kosmas Koustas's phone.  You're going to

21   have these records.  And they go back for a long time.

22   You're going to see that there's a baseline.  I asked

23   Trooper Norris about this.  There's a baseline.  Pick

24   any day they're talking to each other.

25        Now, they did capture my client's voice on

1    this phone for 30 days in March of 2014, this clean

2    phone that they can only get up on if it's dirty.

3    That's the evidence they presented to you.  Oh, it took

4    them a while to get up on it, but it's dirty so they got

5    up on it.

6              They have -- and you can count them because

7    they're in the Metro's records.  They have at least 26

8    phone conversations between Kosmas Koustas and my client

9    that they recorded, and they played not a single one to

10   you, not a one.

11             I told you in my opening that this case would

12   be about the cooperators.  Turns out they called three

13   of them, Sweeney, Venturini, and Champagne.  That's what

14   the case is about.  All the rest of the case is smear or

15   nonsense.  $130,000 in 2009.  Trooper Norris, do you

16   have every single one of his bank records?  Yes, I do.

17   Do those bank records indicate where deposits come from,

18   if they're checks, if they're cash?  Yes.

19             But they don't introduce the bank records.  Do

20   you think if they could show that there's no explanation

21   for the $130,000, we wouldn't see the bank records?

22   Please, this case has been investigated since 2008.

23   That's a smear.

24             Oh, his girlfriend, his first girlfriend,

25   Allison Ouellette, she didn't see him gambling.  He's

1    trying to put this on gambling winnings.  Allison

2    Ouellette told you she left in November 2009.  She I

3    suggest to you was the most honest witness we had in

4    this case, and you know because you heard from Allison

5    Ouellette, you saw her cry at the idea that she would be

6    testifying against him.  This is his ex-girlfriend, not

7    his present girlfriend.  This is someone he hasn't been

8    with since November of 2009.  You know why he's

9    different.

10           And the Sweeneys of the world and the Nick

11   Champagnes of the world and Kosmas Koustases of the

12   world and the John Venturinis of the world.  You know.

13   You saw her.  You saw what she did for a living.  She

14   told you.  She vindicates his personality and his

15   lifestyle.  You think about that.  He was with this

16   woman for five years.  That's a smear.

17           Oh, he had four Mercedes Benz.  Trooper

18   Norris, do you have the Mercedes Benz records?  Yes.

19           Do you think if he spent an inordinate amount

20   of money on those Mercedes Benz, if he'd bought a

21   $60,000 Mercedes Benz as opposed to lease one, we

22   wouldn't have had the keeper of the records from

23   Mercedes Benz to tell us, wow, look at all this money.

24           Allison Ouellette left him in 2009.  His

25   accountant told you, 2011 he won over $108,000.  Oh,

 1    Allison Ouellette doesn't know anything about it.  Yeah.

 2    She's gone by then.  In 2012 he wins over $75,000.

 3    Okay.  Making it up?  His accountant's making it up?  He

 4    didn't have the Foxwoods records?  Trooper Norris, do

 5    you have the Foxwoods records?  Oh, yeah, got 'em.

 6    Keeper of the records here to show you the Foxwoods

 7    records to say he didn't make that money there?  Nope.

 8            Oh, he lives in a mansion, a 1,200-square-foot

 9    mansion according to Allison Ouellette that they got for

10    no money down.  We've got hundreds of pictures of

11    marijuana.  Do we have a picture of that house?  That's

12    a smear.

13            Trooper Norris, when did you learn about the

14    fact that he sued the builder?  Yesterday.

15            That's what a criminal does.  He tells the

16    builder let's make this cash.  I don't want any paper

17    trail.  And then I'm going to sue you, in a courthouse,

18    for the public to know about it.

19            Oh, and I have the FBI agent who visited used

20    car on my computer -- I mean, I do a Google search on my

21    computer about the FBI agent.  But Mr. Builder you never

22    mentioned to him?

23            He paid him in these money bands.  These money

24    bands have names on them and dates, many of them.  The

25    money comes out of the bank.  Are there cash transaction

1    report requirements?  Yes.  Did he generate cash

2    transaction reports that notify the world that he's

3    dealing in large sums of cash?  Yes.  Oh, that's a

4    typical drug dealer.  Put it in the bank and then take

5    it out in money bands.  There are records of these

6    things.  They didn't present them.  That's called a

7    smear.

8             Do you have a financial analyst?  Do you have

9    a forensic accountant that works for the New Hampshire

10   State Police or the U.S. Attorney's Office?  Trooper

11   Norris, I don't know.  I don't know.

12            You can contrast him with DEA Agent Jean

13   Drouin.  When I asked Jean Drouin a question, I get the

14   same kind of answer that the prosecutor gets.  The

15   truth.

16            The money is a smoke screen.  It's a -- he

17   bought a Gucci belt.  Wow.  He must be a drug dealer.

18   He bought a Gucci belt.

19            Oh, the poker machines at Amory Street House

20   of Pizza, they don't make any real money.  I mean, his

21   father told somebody, basically a stranger who used to

22   hang out there, you know, 50 times over the course of a

23   year and a half, we only make $500.  His father must

24   have been telling the truth.  I mean, when you're

25   talking to an undercover agent you always tell the

1  truth.

2          How about the other part of what the

3  undercover said?  That somebody else in there said those

4  machines used to generate 3 or $4,000 a week.

5          If you really want to attack him for money,

6  then do a real job at it.  Do something real.  Don't

7  throw mud at him.  That's called smearing someone.

8          Now, this case -- by the way, I want to talk

9  about that, the guy from the Alcohol -- the

10 investigator.  My client, according to him, told him

11 that he used to smuggle, him and his friends, Canadian

12 marijuana across the border, and in the same

13 conversation you may recall he said that was a long time

14 ago.  How do you know it was a long time ago?  Jean

15 Drouin told you why it was a long time ago.  Because he

16 told the Alcohol guy it cost him $800 a pound.

17         Now, in 2008 -- you just heard the prosecutor

18 repeat it -- the least you could get a pound of Canadian

19 marijuana for was $2,000.  That's if you were super

20 connected.  $2,000.  He's not getting an $800 pound in

21 2008.  Jean Drouin told you that's from yesteryear.

22         As I said in my opening, this case comes down

23 to those three cooperating witnesses.  It does.  Look at

24 all the other things my client does.  He gets stopped in

25 the car and he's got cash on him and his diaphragm is

1    making it impossible for him to breathe.

2            No, it's not.  He's totally cool and

3    collected.  He's on his way to Foxwoods with the cash,

4    the kind of cash he usually goes there with, and if he

5    didn't usually go there with that kind of cash, you

6    would have seen the Foxwoods records.

7            And there's nothing in the car, nothing.  When

8    they search his house they get these money bands in a

9    glass jar that's in plain view.  There's no drugs,

10   there's no ledgers, there's no scales, there's no burner

11   phones.  He keeps the same phone number for years and

12   it's registered to his name.  He has bank accounts in

13   his name.  The cars are in his name.  The mansion's in

14   his name.

15           So before I turn to these cooperators --

16   because I suggest to you they're the key to the case.

17   The prosecutor, you know, even called Mr. Champagne Nick

18   during her closing argument.  Nick, her pal.  If you

19   believe Nick, you know, my client's guilty.  That's what

20   it comes down to.  But you have to believe Nick.

21           Look at this investigation.  It went on

22   forever.  This is not some week that they had or two

23   weeks.  All these different agencies, all the tools that

24   you've learned about, the ability to get text messages

25   from the phone company that are historical, the ability

1    to get phone records, the ability to wire people up

2    without a court order, to put GPS devices on things, to

3    tap phones, to put up pole cameras.  He doesn't even

4    know -- Trooper Norris doesn't even know how long that

5    camera was up there.  It was up for over a year.  He

6    doesn't even know.  The ability to do these forensic

7    examinations, you know, where are the drug ledgers on

8    the computer?  Where's the paper ledgers?  Just enormous

9    tools that go through every piece of electronics you've

10   ever had.  And what do they come up with?

11           I will tell you what they come up with.  And

12   the prosecutor defended it again today.  The

13   October 23rd, 2013, Red Sox World Series game.  And Mr.

14   Koustas is not at the World Series.  And you listen to

15   that tape again.  You listen to it as many times as you

16   want.  You write down the word "bounced" and that's what

17   you'll hear.  You write down the word "boss," maybe

18   you'll hear that.  I suggest to you it's "bounced."

19           He's on his way to Massachusetts to pick up

20   the drugs, but he has -- the marijuana.  But he has this

21   important phone conversation.  They played it for you.

22   They played part of it or most of it again today.  Two

23   hours apart with this guy Blevens, the Molly guy.  6:30,

24   8:30 p.m.  6:30 p.m., hey, I want that G, I want that

25   girl, I want that Molly, I want that MDMA.  I will have

1  to call you back on it and I'll have to check.  I'll

2  have to make a phone call.

3          Two hours later he's obviously made the phone

4  call because he says the guy bounced.  He's at the Red

5  Sox game.  They laugh about being jealous, about maybe

6  we'll never see the Red Sox in the World Series again.

7  Who knows.

8          So there's got to be a call in there.  There's

9  got to be.  And if there was a call in there to my

10  client, you know what Trooper Norris would have said?

11  He would be giving my speech.  He would have said -- he

12  tells him he's going to make the call.  Boom, there it

13  is, the call to your client.  Boom, he tells Blevens he

14  can't do it.  The client's at the Red Sox game.

15          But it's not there.  So what does Trooper

16  Norris say?  I don't remember.  I don't remember.  This

17  is one of their two big events.  I don't remember if

18  there are any calls in there.  Have you got something to

19  show me?  So I show him.  And one of them is this guy

20  Lachance.  And there's another two-minute call in there.

21  And you will see these calls because they're on the

22  Metro records.

23          Well, I don't know who those people are.

24  Well, I don't know that one, but I know Lachance and he

25  cooperated with us, so it can't be him.

1          That's sort of like Mr. Sweeney.  You know,

2    you wouldn't be drug dealing and cooperating.  When did

3    he start cooperating, Mr. Lachance?  In January?  Well,

4    we're talking about October.  And whoever he called

5    during that two-hour gap -- and you will have every

6    single call.  And it's not my client.  Whoever he called

7    may not have been the actual supplier because what the

8    person he called is doing apparently is telling him that

9    the guy that can do it is at the Red Sox game.

10          That's one of their two big events.  The other

11   one is this December 6th cancellation.  This is -- my

12   client talks to him like he does virtually every day.

13   You will see these records.  You can't pick a day.  Or

14   if you are very lucky and you close your eyes, you'll

15   pick a day, you'll find one that my client doesn't talk

16   to him.

17          But my client talks to him around 11:00 in

18   the morning, and then at 5:00 or so Koustas tells the

19   courier, who I was calling Seiger, the guy from

20   Massachusetts, that it's off.  You heard her.  She just

21   played it again.  It's off.

22          So my client must have told him.  Even though

23   he would never, ever talk on a dirty phone or on that

24   phone, he must have been the one that did it.

25          All right.  Trooper Norris, are there text

1    messages back and forth between Seiger and Koustas

2    during this period of time, anytime between the 11:00

3    call and 5:00 call?  Are there text messages going back

4    and forth?  I don't think so.  Here they are.  Look at

5    them.  Oh, yes, there are some text messages.  But we

6    don't know what they say.  They could say anything.

7           Trooper Norris, did you make an application to

8    a federal district court judge to ask the phone company

9    to give you the historical text messages from that

10   phone?  Yep.  When I showed it to him, yep.  What do

11   they say?  I don't remember?  Is that legit?  Does that

12   have the ring of truth to you?  I don't remember?

13   Because they're texting back and forth to each other

14   about a meeting or something that's going to happen at

15   5:00 and they don't mention it, that it's off?

16          Well, because if they mentioned that it's off,

17   then it can't be my client's phone call that told them

18   that it's off.

19          So I don't remember what those text messages

20   say.  Hey, they could have been talking about anything.

21   Why would he bother to tell him it's off?

22          All right.  That's the investigation.  That's

23   why they turn to the trio that they turn to.  That's

24   why.  They have no choice.  They have no case.  Unless

25   you swallow -- even if you hold your nose.  Unless you

1    swallow those three people.

2            Let's start with -- and I want to suggest to

3    you, and this is the most -- you bring to the jury box

4    this incredible amount of common sense and worldly

5    wisdom.  You come from different walks of life.  You've

6    had different life experiences.  Together -- and this is

7    why we have juries of twelve.  Together you have this

8    enormous wealth of experience and understanding.  And

9    what you are actually doing in this case -- because

10   there's no wiretap conversation.  I mean, I don't

11   represent Koustas.  Koustas was caught within five

12   seconds of the wiretap going up.

13           You're going to have to make credibility

14   determinations in this case.  That's what it's about.

15           So let me talk -- there are these two things

16   that I want to ask you to think about besides the normal

17   things of, you know, does this person -- when they raise

18   their right hand and swear to tell the truth, is there

19   any chance that that means anything to them?  Is their

20   value system such that, oh, yeah, you know, that's where

21   I draw the line.  Yeah, I might shoot you.  I might rape

22   you.  I might sell drugs for a living, but if I'm made

23   to swear that I'm going to tell the truth, that's what

24   I'm going to do.

25           Besides that, you want to back these people up

1    to each other.  You know, when you get the fortunate

2    occurrence of somebody telling about the same event or

3    the same thing, you want to see how they stack up to

4    each other.

5          And then I suggest to you there's this other

6    important thing to think about, which is, you know, you

7    throw a pebble into the pond and it makes one circle and

8    then it makes another circle and then it makes another

9    circle.  Often people see the logic of their lie, when

10   they tell the lie, they see that first circle.  Some of

11   them even see the second circle, but the farther

12   circles, it just doesn't fit.  It doesn't make sense.

13   The lie is easy, but it doesn't make sense.

14         Let's start with Sweeney.  He's unbelievable I

15   suggest to you.  I mean, where do people like that come

16   from?  Oh, he had a tough upbringing.  Lots of people

17   had a tough upbringing.  He's 39 years old.  Some people

18   actually reform themselves.  It's not just that he sells

19   heroin.  He's still, you know, an honorable guy.  It's

20   not just that he committed rape.  It's not just that he

21   can look you in the eye and say, oh, yeah -- you know, I

22   moved states.  I was five days -- it was only five days.

23   I thought I had 30 days to register.  So, you know,

24   yeah.  That was an accident, failure to register as a

25   sex offender.

1              You know based on what other people have told
2    you that he can't possibly be telling the truth.  You
3    just can't.  That's because he picked the wrong place to
4    say he had this conversation with my client.  He didn't
5    know there was a pole camera up there in front of Amory
6    House of Pizza.  He just didn't know it.  Or he would
7    have picked somewhere else.  I guarantee it, I'd suggest
8    to you, that he would have picked somewhere else.

9              After he moved there in January, that pole
10   camera was still up.  It's near Christmastime he says,
11   which means January, but -- wouldn't be New Year's.
12   That pole camera is still up.  Where is it?  Where's the
13   picture?  I gave Trooper Norris the out.  I said does it
14   work at night?  Oh, no, it works at night.  Where is it?

15             He's someone that's so believable you wouldn't
16   want to corroborate the fact that he had this meeting
17   when you have a camera right on Amory Street House of
18   Pizza?

19             But there's something else that when you talk
20   about him and Mr. Champagne -- you know, I only put in
21   two exhibits in this case.  They are both about Mr.
22   Champagne.  There's an audiotape that went on for 14 or
23   so minutes where Champagne is talking to Koustas from
24   his jail and they get onto the topic of Mr. Sweeney.
25   This is in March of 2014.  And they talk about the fact

1    that Koustas -- I'm sorry, that Champagne beat Sweeney

2    up when they were in prison.  Champagne said he thought

3    it was 2001 or 2002.  Sweeney corroborated that for you,

4    in a manner of speaking.  Of course, according to

5    Sweeney, there wasn't even a fight.  They got separated

6    because they were in the weight room and so no one beat

7    up anyone, not even a punch was thrown.  But Champagne

8    said to him, in effect, you stinking rat.  You're a rat.

9         So my client, who's also in that jail, who is

10   obviously friends with Champagne, doesn't know that

11   Sweeney's a rat?  Sweeney is a rat.  He's the guy that

12   in 2001, he said, I got screwed because I didn't get the

13   benefit of my cooperation.  I got screwed because of

14   that felonious sexual assault charge.  He was a rat.

15   And this crew that grew up together, my client -- and

16   went to jail together as teenagers, my client and

17   Champagne and the rest of them all knew it.

18        So this is what my client does.  He sees him

19   for the first time since 2006, and Champagne has been in

20   jail since 2009, and he says to Mr. Sweeney, not just

21   can you sell Molly for me, can you sell marijuana for

22   me.  Let me fill you in on what's been going on just in

23   case you're interested.  I'm using Kosmas Koustas now.

24        Okay.  I mean, that guy's absolutely

25   ridiculous, and if I had a get-out-of-jail card for him,

1    he would have said anything I suggest to you that I

2    wanted him to say, and you should hear what he's saying

3    about you.

4            So then Mr. Venturini.  You know, he's the one

5    that had the accident and he was out of it for a year

6    after the accident, spent three months in the hospital.

7    Well, according to Champagne he spent one month in the

8    hospital and he didn't miss a beat.  Didn't miss a beat.

9    Still giving him the 20 to 40 pounds every other week or

10   so.  Right after the other guy died, Mr. Lawyer, just

11   kept giving him the 20 to 40 pounds a week.

12           Now, Venturini said he was lifelong friends

13   with Nick Champagne.  They really grew up together.  And

14   when -- right before Champagne self-surrendered -- and

15   the prosecutor insisted on that again.  He was on the

16   run for a month.  He told you that himself.  I asked him

17   did someone tip you off?  And he said no.  I said you're

18   under oath.  He said, well, I don't remember.

19           He told you that one of the people when he was

20   on the run he stayed with was my client, which is

21   exactly what you would do if you were his boss, right?

22   And he's on the run from being -- an arrest warrant is

23   out there for him.  They've just busted 40 people and

24   he's one of them.  You wouldn't want the police to find

25   him at your house.

1              But the main thing that Venturini says is

2     right after Nick gets arrested, Nick Champagne gets

3     arrested, my client shows up at his house, first time

4     ever.  They're not even friends.  They know each other,

5     but they're not even friends.  According to Nick

6     Champagne, this guy's getting 20 to 40 pounds of

7     marijuana from him every other week like clockwork.  And

8     my client, who's the boss of the whole operation, who

9     understands everything, who's pulling the strings and

10    moving the chess pieces, says to him, how much are you

11    getting?

12              If he was moving the chess pieces, he wouldn't

13    have to ask Mr. Venturini how much he was getting.  Is

14    that the easiest lie in the world to tell?  With my

15    five-year-old daughter, I'm filling up my pool, and the

16    guy who's going to get me out of my problem happens to

17    show up?  He's going to get me out of my problem because

18    I signed a cooperation agreement, the five-year on and

19    after -- he's the guy that loves guns.  They have

20    nothing to do with his business.  They're just for

21    target practice and stuff like that.  He's the traded.

22    My client is the traded.  All he's got to say is I had

23    this conversation with him.  The conversation makes no

24    sense in context.  None.

25              And he told you, too, that if he raised his

1    right hand and swore to tell the truth, he would.  He

2    hasn't been sentenced yet.  I wonder why that is.

3           Perhaps the government doesn't trust him to

4    stick with the story that he told, that he gets for the

5    cooperation agreement.  They want to hear how he does

6    before he gets sentenced.  He's got a range where he can

7    get in there.  He's already ahead of the game, but it's

8    based on his cooperation.

9           All right.  So let's get to the real person in

10   the case.  I don't know how long I've been boring you

11   for, but let's get to the real person in the case, Mr.

12   Champagne.  That's the case.  If he's believed, if you

13   believe him, you should convict my client.  You should.

14   If you weigh and balance what he has to say and it makes

15   you wonder whether you can believe him beyond a

16   reasonable doubt, you have to acquit my client.  He is

17   the man.  He's it.  He's their case.

18          And the second -- you know two things about

19   him that you wouldn't have known if you had just

20   listened to him testify.  One is that he does have a

21   deal to reduce his sentence -- his supervised release by

22   a year and a half and that his lawyer knew about it.

23   And if you believe that his lawyer knew that he had a

24   deal, but he kept it from him, that's your choice.

25          He insisted he had no deal, insisted.  He also

1  told you that there is no -- what do you call it.  No

2  honor in the drug business.  I suggest, take him at his

3  word on that topic.

4          The first thing I asked him about was what's

5  your connection to Leventis.  I mean, didn't you get his

6  contact information before he left jail about a year

7  before you did and about a year after my client did?

8  Didn't you get his contact information?  Absolutely not.

9  Never happened.

10          I show him his debriefing.  He goes, oh, yeah,

11  I might have said that.  Might have said that.  He said

12  it.  He was in that jail for an additional year.  He's

13  not Greek.  There's no evidence that Leventis is a Greek

14  speaker, not one shred of evidence that Leventis is a

15  Greek speaker.  So Greeks do crimes with Greeks?  They

16  would never do crimes with someone who wasn't Greek?  No

17  one named Leventis would work with someone named

18  Champagne?

19          According to Champagne that's who he dealt

20  with.  He had the meeting at my client's house of pizza.

21  And he got the phone from Sarti, an encrypted

22  BlackBerry, and then he dealt with Leventis himself on

23  the BlackBerry.  That's his story.  Person that she

24  wants you to believe.  That's his story.

25          And that my client had met with Leventis --

1    think about this for a second.  My client is out of jail

2    in 2005.  He's got a lousy pizza shop job.  And he's got

3    this great Canadian connection.  He can't wait until he

4    gets out of jail because then he's going to start making

5    real money.

6              In 2006 the guy gets out of jail.  But my

7    client decides to wait another year for Champagne to get

8    out of jail?  What is that about?  For instance,

9    Venturini, when he told you that he had the connection

10   to Champagne, that's why he got 50 percent with his best

11   buddy lawyer, of course Champagne doesn't remember that

12   at all.  He didn't even know they were partners, but

13   that's neither here nor there.

14             For the connect, Venturini said he got

15   50 percent.  But my client wants 25 percent.  When you

16   make a hundred dollars, give me $25.  When you make

17   $150, give me $25.  When you make 200 on a pound, give

18   me $25.  When you make 300 on a pound, give me $25.

19             Well, there's a genius businessman.  That

20   turns things upside down.  How many people here have

21   worked for a boss who makes less money than they do

22   consistently.  And the boss never asks you for a raise.

23   What sense does that make?  What sense does that story

24   make?  It makes no sense.

25             And maybe my math stinks, but I'm actually not

1    on trial here.  It's Champagne's math that's on trial.

2    He says in his debriefing that he moved 1,000 pounds.

3    1,000, not 6,000.  But he says he gave my client

4    $150,000.  So I'm the one that says to him, well, if my

5    client makes $25 a pound and you gave him $150,000, you

6    must have moved 6,000 pounds.  He said he moved 1,000

7    pounds.

8            You can listen to that phone call between him

9    and Champagne -- I mean, between him and Koustas and you

10   will know who Nick Champagne is.  He says himself, we

11   should have a double ring ceremony in hell.  That's

12   before he tells Koustas to let his daughter's bunny out

13   of the house so he doesn't have to take care of it and

14   tell her that the dog ate it.  That's a man just

15   consumed with desire to take care of his children.

16           He recruited Kosmas Koustas.  Allison

17   Ouellette told you that Kosmas Koustas and my client had

18   had a falling out and they were not really talking to

19   each other, even though they had all grown up together.

20   In 2009 they were not really talking to each other.  And

21   Champagne told you, I'm the one that recruited Kosmas

22   Koustas.  The prosecutor said, what did Mr. Nakos say

23   about that.  It wasn't his business.

24           I never suggested that the father of -- that

25   he wants to meet with his father privately so it's not

1    recorded on a phone.  I never suggested that his father

2    was running his drug business.  I made it very clear

3    what I suggested, that his father was taking care of his

4    money because the government took zero from him.

5    Koustas was taking care of his drug business.  He didn't

6    have to be actively involved.  Koustas was.  He told you

7    from the witness stand that Koustas was the guy he had

8    handpicked.  He was going to go to the side and let

9    Koustas run everything.  And he did.

10          Now, sometimes these cases are extremely easy

11   and extremely difficult at the exact same time, and I

12   want to suggest to you that if it was someone picked at

13   random from the courtroom, let's say this person, and

14   you had to decide whether Nick Champagne's description

15   and account of their interactions was correct, I suggest

16   you would never consider it.  Thank you.

17          MS. OLLILA:  Nothing further, Judge.

18          THE COURT:  All right.  We're going to take

19   the morning break and come back and I will give you my

20   instructions.  I'm going to give you the paper copy as

21   I'm also instructing you and reading them to you.  So

22   stretch a bit in there, perhaps some coffee before you

23   come back because I'm going to need you to pay close

24   attention.  All right?  So morning break and then we'll

25   be back.

1          (Recess taken.)

2          THE COURT:  Members of the jury, you have now

3    heard all of the evidence in this case and arguments by

4    the lawyers.  It is my duty at this point in the trial

5    to instruct you on the law that you must apply in

6    reaching your verdict.  It is your duty to follow and

7    apply the law as I give it to you, but you alone are the

8    judges of the facts.  Please do not consider any

9    statement that I have made in the course of trial or

10   make in these instructions as any indication that I have

11   any opinion about the facts of this case or what the

12   verdict should be.  You should not single out any one

13   instruction but should instead apply these instructions

14   as a whole to the evidence in this case.

15          You are the sole and exclusive judges of the

16   facts.  You must weigh the evidence that has been

17   presented impartially, without bias, without prejudice,

18   and without sympathy.  You must make a determination as

19   to what the facts are and what the truth is based upon

20   the evidence presented in this case.  You must decide

21   the case by applying the law as it is given to you in

22   these instructions and the facts as you find them to be

23   from the evidence.

24          You must apply the law regardless of any

25   opinion you may have as to what the law ought to be.  It

1    would be a violation of your sworn duty if you were to

2    base your verdict upon any view of the law other than

3    that reflected in these instructions, just as it would

4    be a violation of your sworn duty as judges of the facts

5    to base a verdict upon anything but the evidence

6    presented in this case.

7              The fact that the prosecution is brought in

8    the name of the United States of America entitles the

9    government to no greater consideration than that

10   accorded to any other party to a litigation.  By the

11   same token, it is entitled to no less consideration.

12   All parties, whether government or individuals, stand as

13   equals at the bar of justice.

14             The weight of the evidence is not necessarily

15   determined by the number of witnesses testifying on

16   either side.  You should consider all the facts and

17   circumstances in evidence to determine which of the

18   witnesses are worthy of belief.  In reviewing the

19   evidence, you should consider the quality of the

20   evidence and not the quantity.  It is not the number of

21   witnesses or the quantity of testimony that is

22   important, but the quality of the evidence that has been

23   produced that is important.  You must consider all of

24   the evidence no matter which side produced or elicited

25   it.

1          The evidence in this case consists of the

2  sworn testimony of the witnesses and all the exhibits

3  received in evidence and any facts which have been

4  admitted or stipulated.  When both parties agree as to

5  the existence of a fact, you must, unless otherwise

6  instructed, accept that fact as evidence and regard that

7  fact as proved.

8          You must entirely disregard any evidence to

9  which an objection was sustained by me and any evidence

10  ordered stricken by me during your deliberations.

11          Certain things are not evidence and cannot be

12  considered by you as evidence.

13          First, arguments and statements by the lawyers

14  are not evidence.  What they have said in their opening

15  statements, closing arguments, questions to the

16  witnesses and at other times is intended to help you

17  interpret the evidence, but it is not evidence.  If the

18  facts as you remember them differ from what the lawyers

19  have said about those facts, your memory controls.  If

20  the law as stated by the lawyers differs from the law as

21  stated by me, you must take the law from me.  You are

22  not to be concerned with the wisdom of any rule of law.

23          Second, objections raised by the lawyers are

24  not evidence.  Lawyers have a duty to object when they

25  believe a question is improper under the Rules of

1    Evidence.  I must rule on objections and I have not

2    intended to indicate in any way by my rulings what the

3    verdict should be in this case.  You should not be

4    influenced by the lawyers' objections or by my rulings

5    on those objections.

6         Third, anything you may have seen or heard

7    when the Court was not in session is not evidence.  You

8    are to decide the case solely on the evidence received

9    at trial.

10        There are two types of evidence which you may

11   properly use in deciding this case, direct and

12   circumstantial.

13        Direct evidence is the testimony given by a

14   witness about what that witness has seen, has heard, or

15   has observed or what that witness knows based on

16   personal knowledge.  Direct evidence also includes any

17   exhibits that have been marked.

18        Evidence may also be used to prove a fact by

19   inference, and this is referred to as circumstantial

20   evidence.  In other words, from examining direct

21   evidence, you may be able to draw certain inferences

22   which are reasonable and justified in light of your

23   daily experience.  Such inferences constitute

24   circumstantial evidence.  Circumstantial evidence may be

25   given the same weight by you as direct evidence.

1          During the course of the trial, I may have

2     instructed you that certain evidence was being admitted

3     for a limited purpose.  It is your duty to follow these

4     instructions during your deliberations.

5          The fact that an indictment is returned

6     against an individual is not evidence of that person's

7     guilt.  An indictment is merely a formal method of

8     accusing an individual of a crime in order to bring that

9     person to trial.  It is you, the jury, who will

10    determine whether an individual is guilty or not guilty

11    of the offense charged based on a consideration of all

12    the evidence presented and the law applicable to the

13    case.  Therefore, you must not consider the indictment

14    in this case as any evidence of the guilt of the

15    defendant, nor should you draw any inference from the

16    fact that an indictment has been returned against him.

17         The defendant, although accused, begins a

18    trial with a clean slate with no evidence against him.

19    The law permits nothing but legal evidence presented

20    before the jury to be considered in support of any

21    charge against a defendant.  The law presumes every

22    defendant to be innocent until proven guilty beyond a

23    reasonable doubt.  The burden of proving a defendant

24    guilty rests entirely on the government.  The defendant

25    does not have to prove his innocence.  The defendant

1    enters the courtroom and is presumed to be innocent

2    until the government convinces you beyond a reasonable

3    doubt that he is guilty of every essential element of

4    the offense charged.

5             The presumption of innocence alone is

6    sufficient to acquit a defendant unless the jury is

7    satisfied beyond a reasonable doubt that the defendant

8    is guilty after a careful and impartial consideration of

9    all of the evidence in the case.

10            The burden is always on the government to

11   prove guilt beyond a reasonable doubt.  This burden

12   never shifts to a defendant.  The law does not impose

13   upon a defendant in a criminal case the burden or duty

14   of calling any witnesses or producing any evidence.

15            If, after careful and impartial consideration

16   of all of the evidence in this case, you have a

17   reasonable doubt the defendant is guilty of the charges

18   set forth in the indictment, you must find the defendant

19   not guilty.

20            A jury must never find a defendant guilty

21   based on mere suspicion, conjecture, or guess.  Rather,

22   you must decide the case on the evidence that is before

23   you and on the reasonable inferences that can be drawn

24   from that evidence.

25            In determining what the facts are and what the

1   truth is, you must necessarily assess the credibility of

2   each witness and determine what weight you will give to

3   each witness's testimony.  By credibility I mean the

4   believability or the truthfulness of a witness.

5          You should carefully scrutinize all the

6   testimony given, the circumstances under which each

7   witness has testified, and every matter in evidence

8   which tends to show whether a witness is worthy of

9   belief or not worthy of belief.  For example:

10          Consider each witness's intelligence, motive,

11   state of mind, demeanor and manner while testifying.

12          Consider the witness's ability to observe or

13   to know the matters about which that witness has

14   testified and whether the witness impresses you as

15   having an accurate recollection of those matters.

16          Consider whether the witness had any reason

17   for telling the truth or not telling the truth, whether

18   the witness had an interest in the outcome of the case,

19   whether the witness had anything to gain or lose as a

20   result of his or her testimony, whether the witness had

21   any friendship, relationship, or animosity towards other

22   individuals involved in the case, whether the witness's

23   testimony was consistent or inconsistent with itself or

24   with the testimony of other witnesses.

25          Consider the extent, if any, to which the

testimony of each witness is either supported or

contradicted by other evidence in the case.

The testimony of a witness may be discredited

or, as we sometimes say, impeached by showing that the

witness previously made statements that are different

than or inconsistent with his or her testimony here in

court.

Inconsistent or contradictory statements which

are made by a witness outside of court may be considered

only to discredit or impeach the credibility of the

witness and not to establish the truth of these earlier

out-of-court statements.

You must decide what weight, if any, should be

given the testimony of a witness who has made prior

inconsistent or contradictory statements.  In making

this determination, you may consider whether the witness

purposely made a false statement or whether it was an

innocent mistake, whether the inconsistency concerns an

important fact, or whether it had to do with only a

small detail, whether the witness had an explanation for

the inconsistency, and whether that explanation appealed

to your common sense.

You should give the testimony of each witness,

both on direct and cross-examination, the weight you

think it deserves.  You are not required to believe the

1   testimony of any witness simply because that witness was

2   under oath.  You may believe or disbelieve all or part

3   of the testimony of any witness.  It is within your

4   province to determine what testimony is worthy of belief

5   and what testimony may not be worthy of belief.

6           You have heard testimony from government

7   witnesses who pled guilty to charges similar to those in

8   this case.  You are instructed that you are to draw no

9   conclusions or inferences of any kind about the guilt of

10  the defendant on trial from the fact that prosecution

11  witnesses or other individuals pled guilty to similar

12  charges.  The decisions by others to plead guilty were

13  personal decisions about their own guilt.  You may not

14  use these guilty pleas in any way as evidence against

15  the defendant on trial here.

16          Witnesses have testified in this case who have

17  been made promises by the government.  You should

18  consider whether the testimony of such a witness may

19  have been influenced by the government's promise and you

20  should consider the testimony of such a witness with

21  greater caution than that of an ordinary witness.

22          During the course of the trial, you've heard

23  several law enforcement agents testify.  You should

24  consider the testimony of a law enforcement agent the

25  same as the testimony of any other witness in the case.

1    In evaluating the credibility of a law enforcement

2    agent, you should use the same test which you applied to

3    the testimony of any other witness.  In no event should

4    you give the testimony of a law enforcement agent any

5    more credibility or any less credibility simply because

6    of that witness's position.

7            After assessing the credibility of each

8    witness, you will assign as much weight to his or her

9    testimony as you deem proper.  You may believe or

10   disbelieve all or part of the testimony of any witness.

11   You determine what testimony is worthy of belief and

12   what testimony may not be worthy of belief.  The

13   testimony of a single witness may be sufficient to prove

14   any fact, even if a greater number of witnesses may have

15   testified to the contrary, if after considering all the

16   other evidence you believe that single witness.

17           The fact that the defendant did not testify

18   must not be considered by you in any way or even

19   discussed in your deliberations.  He has an absolute

20   right not to take the witness stand, and you must not

21   draw any inferences from the fact that he exercised that

22   right.

23           You are not to give any consideration to

24   potential punishments or sentences in deciding this

25   case.  The punishment provided by law for the offense

charged in the indictment is a matter exclusively within the province of the Court and should never be considered by the jury in any way in arriving at an impartial verdict.  You must decide this case based on the evidence you have seen and heard and on the law as I give it to you and not on any punishment you believe the defendant might receive or could receive.

The indictment consists of two counts.  Count 1 charges the defendant with engaging in a continuing criminal enterprise involving violations of the Controlled Substances Act.  Count 2 charges the defendant with conspiring to distribute controlled substances, and to possess controlled substances with the intent to distribute them.

I will describe the charges against the defendant in more detail in a moment.  For reasons that need not concern you, I will describe Count 2 first and will then turn to Count 1.

A separate crime is charged in each count of the indictment.  Each offense and the evidence pertaining to it should be considered separately.

The defendant is not on trial for any act or conduct not alleged in the indictment.  You are not to be concerned with the guilt of any person or persons not on trial as a defendant in this case.

1          The defendant has pleaded not guilty to both

2   charges.  The defendant does not have to prove that he

3   is innocent.  The defendant has no burden of proof

4   whatsoever.  The government carries the burden of proof

5   throughout this trial and throughout your deliberations.

6   The government's burden is to prove beyond a reasonable

7   doubt each element of both charges.  You must presume

8   the defendant is innocent throughout your deliberations.

9   You may not find the defendant guilty unless all twelve

10  of you agree that the government has proven each element

11  of a charge beyond a reasonable doubt.

12          The indictment alleges that the crimes it

13  charges the defendant with occurred in or about certain

14  dates.  The government does not have to prove with

15  certainly the exact date of either alleged offense.  It

16  is sufficient if the government proves beyond a

17  reasonable doubt that the offense occurred on a date

18  reasonably near the date alleged.

19          As I have already told you, I will begin by

20  explaining the crime charged in Count 2.

21          In Count 2 the indictment charges that:

22          From at least in or about 2008, up to and

23  including June 2014, in the District of New Hampshire,

24  the District of Massachusetts, the District of New York,

25  the District of Vermont, and elsewhere, defendant, Alkis

1    Nakos, knowingly, intelligently, and unlawfully agreed

2    and conspired together, and with others known and

3    unknown to the grand jury, to distribute, and possess

4    with intent to distribute, in excess of a thousand

5    kilograms or more of a mixture or substance containing a

6    detectable amount of marijuana, a Schedule I controlled

7    substance, and 3,4 methylenedioxymethamphetamine, or

8    MDMA, a/k/a Ecstasy, a/k/a Molly, a Schedule I

9    controlled substance, in violation of Title 21, U.S.

10   Code, Sections 841(a)(1), 841(b)(1)(A)(vii), and 846.

11            In the rest of these instructions, unless I'm

12   directly quoting the indictment, I will refer to the

13   controlled substance called 3,4 methylenedioxy-

14   methamphetamine by its acronym, MDMA.

15            In order for you to find the defendant guilty

16   of the crime charged in Count 2, the government must

17   prove each of the following elements beyond a reasonable

18   doubt:

19            First, two or more persons entered into the

20   agreement described in the indictment to distribute or

21   possess with intent to distribute marijuana or MDMA, in

22   any amount;

23            Second, the defendant joined the conspiracy

24   with knowledge of the existence of the conspiracy and

25   its criminal objectives;

1            Third, the defendant knowingly, voluntarily,

2    and intelligently became a member of the conspiracy; and

3            Fourth, in joining the conspiracy, the

4    defendant intended to achieve the unlawful objectives of

5    the conspiracy.

6            I will now give you a bit more detail about

7    each of these elements.

8            First element.  A conspiracy is an agreement,

9    spoken or unspoken, between two or more people who join

10   together in an attempt to achieve an unlawful objective.

11   The essence of conspiracy is an agreement.  However, it

12   is not necessary that the conspirators enter into a

13   formal express agreement or plan for a conspiracy to

14   exist.  What the government must prove is that there was

15   a mutual understanding, either spoken or unspoken,

16   between two or more people to cooperate to accomplish an

17   unlawful act.

18           Each conspirator need not know all the details

19   of the conspiracy or even the names and identities of

20   all the other alleged conspirators.  It is sufficient if

21   the conspirators each agree to join in the conspiracy to

22   accomplish the unlawful objectives of the conspiracy.

23   Finally, the conspirators need not all join the

24   conspiracy so long as the overall plan and objectives of

25   the conspiracy persisted without fundamental alteration

1   notwithstanding any changes in membership.

2           Second element.  To be guilty of the offense

3   of conspiracy, the defendant must know of the existence

4   of the conspiracy when he becomes a member.  That is to

5   say, he must be aware of the existence of the conspiracy

6   and its unlawful objectives.  It is unnecessary that a

7   defendant know all of the details of the conspiracy or

8   the names of all of the other alleged conspirators so

9   long as the defendant joins the conspiracy with an

10  awareness of the existence of the conspiracy and its

11  unlawful objectives.

12          Third element.  A defendant must knowingly and

13  willfully join in the conspiracy to be guilty of

14  conspiracy.  To act willfully means to act voluntarily

15  and intelligently and with the specific intent to do

16  something the law forbids.  That is to say, with bad

17  purpose, either to disobey or disregard the law.

18  Willful action does not include action resulting from

19  ignorance, accident, or mistake.  The government must

20  prove two types of intent beyond a reasonable doubt

21  before the defendant can be said to have willfully

22  joined the conspiracy:  An intent to agree and an intent

23  that the underlying crime be committed.  Mere presence

24  at the scene of a crime is not alone enough, but you may

25  consider it among other factors.  Intent may be inferred

1    from the surrounding circumstances.

2          Proof that the defendant willfully joined in

3    the agreement must be based upon evidence of his own

4    words or actions.  You need not find that the defendant

5    agreed specifically to or knew about all the details of

6    the crime or that he participated in each act of the

7    agreement or played a major role, but the government

8    must prove beyond a reasonable doubt that the defendant

9    knew the essential features and general aims of the

10   venture.  Even if the defendant was not part of the

11   agreement at the very start, he can be found guilty of

12   conspiracy if the government proves that he willfully

13   joined the agreement later.  On the other hand, a person

14   who has no knowledge of a conspiracy, but simply happens

15   to act in a way that furthers some object or purpose of

16   the conspiracy, does not thereby become a conspirator.

17          Element four.  Count 2 alleges a conspiracy to

18   distribute and to possess with intent to distribute two

19   controlled substances, MDMA and marijuana.  It is

20   unlawful for a person knowingly or intentionally to

21   distribute or possess with intent to distribute a

22   controlled substance.  Although the indictment charges

23   conspiracy to distribute and possess with intent to

24   distribute, it is sufficient for the government to prove

25   that the defendant conspired either to distribute or

1   conspired to possess with intent to distribute.

2   Similarly, while the indictment charges that the

3   conspiracy involved marijuana and MDMA, it is sufficient

4   for the government to prove that the conspiracy involved

5   marijuana or MDMA.  The government need not prove both

6   alternatives.  In determining whether a conspiracy to

7   distribute or possess with intent to distribute

8   controlled substances existed and whether the defendant

9   joined the alleged conspiracy with an intention that

10  these offenses be committed, you will consider now my

11  instructions on the offenses of distribution and

12  possession with intent to distribute below.

13          A person distributes a controlled substance

14  when he intentionally transfers or delivers to another

15  person what he knows to be a controlled substance.  A

16  person possesses a controlled substance with intent to

17  distribute by possessing that substance with knowledge

18  of what it is and with an intent to distribute it.

19          Possession means the exercise of control or

20  authority over something at a given time.  There are

21  several types of possession, actual, constructive, sole,

22  and joint.  All four types of possession satisfy the

23  possession element of the offense of possession of a

24  controlled substance with intent to distribute.

25  Possession is actual when a person knowingly has direct

1    physical control over something.  Possession is

2    constructive when a person does not have direct physical

3    control over something, but can knowingly control it and

4    intends to control it, sometimes through another person.

5    Possession may be knowingly exercised by one person

6    exclusively, which is called sole possession, or

7    possession may be knowingly exercised jointly when it is

8    shared by two or more persons.

9              It is not necessary for the government to

10   prove that the conspirators succeeded in their alleged

11   conspiracy for the defendant to be guilty of conspiracy.

12             The mere presence of the defendant at the

13   scene of an alleged crime does not, standing alone, make

14   him a member of a conspiracy.  Mere association with one

15   or more members of the conspiracy does not make a

16   defendant a member.  One may know or be friendly with a

17   criminal without himself or herself being a criminal.

18   Mere similarity of conduct or the fact that the parties

19   may have assembled together and discussed common names

20   and interests does not by itself establish proof of the

21   existence of a conspiracy.

22             You have heard testimony that certain persons

23   alleged to be co-conspirators of the defendant have done

24   or said things during the life or existence of the

25   conspiracy in order to further or advance its goals.

1   Since these acts may have been performed and these

2   statements may have been made outside the presence of

3   the defendant, and even done or said without his

4   knowledge, you should examine these acts or statements

5   with particular care before you consider them to be

6   evidence against him.

7          You may consider the acts and statements of

8   co-conspirators in determining whether a conspiracy as

9   charged in the indictment existed.  However, only the

10  defendant's own acts and statements show whether the

11  defendant knowingly, voluntarily, and intentionally

12  joined the conspiracy.  Thus, in determining whether

13  this element of the conspiracy has been proved, you may

14  consider the acts and statements of co-conspirators only

15  to the extent that they help you understand the

16  defendant's own acts and statements.

17          Count 1.  In Count 1, the indictment charges

18  that:

19          From at least in or about 2008 up to and

20  including June 2014, in the District of New Hampshire

21  the District of Massachusetts, the District of New York,

22  the District of Vermont, and elsewhere, defendant, Alkis

23  Nakos, knowingly, intentionally, and unlawfully engaged

24  in a continuing series of violations of the Controlled

25  Substances Act, Title 21, U.S. Code, Section 801, et

seq., which were undertaken by defendant in concert with at least five other persons with respect to whom defendant occupied a position of organizer, supervisor, or manager, and from which defendant obtained substantial income and resources, in violation of Title 21, United States Code, Section 848(a).

In order for you to find the defendant guilty of the crime charged in Count 1, engaging in a continuing criminal enterprise, you must find that the government has proved all of the following elements beyond a reasonable doubt.

First, the defendant committed a felony violation of the federal narcotics laws;

Second, that violation was part of a series of at least three or more offenses committed by the defendant in violation of the federal narcotics laws, which make it a crime to distribute controlled substances or to possess controlled substances with the intent to distribute;

Third, the defendant committed the offenses in this series of violations in concert with five or more persons;

Fourth, the defendant acted as an organizer, supervisor, or manager of the five or more persons with whom he acted in concert; and

1          Fifth, that the defendant obtained substantial

2    income or resources from the series of offenses.

3          I will now explain each of the five elements

4    the government must prove before you may find the

5    defendant guilty of the continuing criminal enterprise

6    offense charged in Count 1.

7          First element.  The first element the

8    government must prove is that the defendant committed a

9    felony violation of the federal narcotics laws.  If you

10   find that the defendant is guilty of the conspiracy

11   charge in Count 2, then the government has also

12   established the first element of Count 1.

13         Element two.  The second element the

14   government must prove is that the violation that

15   establishes the first element was part of a series of

16   offenses that included three other violations of the

17   federal narcotics laws.  Violations that form a series

18   are violations that are connected together as

19   distinguished from violations that are isolated or

20   unconnected.  In order to find that this element of the

21   crime charged in Count 1 has been proven, you must

22   unanimously agree that the government has established at

23   least three other violations of the federal narcotics

24   laws.  Moreover, you must unanimously agree on which

25   three violations constitute the continuing series of

1   violations, and you must unanimously agree that at least

2   one of them occurred after July 23rd, 2009.

3          To establish the second element of Count 1,

4   the government must prove that the defendant engaged in

5   at least three acts of aiding and abetting the

6   distribution of a controlled substance or aiding and

7   abetting the possession of a controlled substance with

8   intent to distribute.  I will now describe the elements

9   of aiding and abetting and will then describe the

10  elements of the underlying crimes of distributing a

11  controlled substance and possessing a controlled

12  substance with intent to distribute.

13         To "aid and abet" means intentionally to help

14  someone else commit a crime.  To establish aiding and

15  abetting, the government must prove beyond a reasonable

16  doubt both of the following elements:  One, that someone

17  else committed an underlying crime, and, two, that the

18  defendant associated himself in some way with the crime

19  and participated in it as he would participate in

20  something he wished to bring about.  This means that the

21  government must prove that the defendant consciously

22  shared the other person's knowledge of the underlying

23  criminal act and intended to help him or her.  To be

24  guilty of aiding and abetting, the defendant need not

25  perform the underlying criminal act, be present when it

is performed, or be aware of the details of its
execution.  But a general suspicion that an unlawful act
may occur or that something criminal is happening is not
enough.  Mere presence at the scene of a crime and
knowledge that a crime is being committed are also not
sufficient to establish aiding and abetting.  Now I will
describe the elements of the underlying crimes.

Under the circumstances of this case a person
committed the offense of distributing a controlled
substance if:

First, he transferred marijuana or MDMA to
another person;

Second, he knew that what he transferred was
marijuana or MDMA; and

Third, he acted intentionally, that is, that
it was his conscious object to transfer the controlled
substance to another person.

Under the circumstances of this case, a person
committed the offense of possession of a controlled
substance with intent to distribute if:

First, he possessed marijuana or MDMA, either
actually or constructively;

Second, he did so with a specific intent to
distribute the marijuana or MDMA over which he had
actual or constructive possession; and

1          Third, he did so knowingly and intentionally.

2          To find that a person possessed a controlled

3    substance with intent to distribute, it is not necessary

4    for you to be convinced that he actually delivered

5    marijuana or MDMA to someone else or that he made any

6    money out of the transaction.  It is enough for the

7    government to prove, beyond a reasonable doubt, that he

8    had in his possession what he knew to be marijuana or

9    MDMA and that he intended to transfer it or some of it

10   to someone else.

11         A person's intent may be inferred from the

12   surrounding circumstances.  Intent to distribute may,

13   for example, be inferred from a quantity of drugs larger

14   than that needed for personal use.  In other words, if

15   you find that a person possessed a quantity of marijuana

16   or MDMA that was more than an amount that would be

17   needed for personal use, then you may infer that that

18   person intended to distribute marijuana or MDMA.  The

19   law does not require you to draw such an inference, but

20   you may draw it.

21         Element three.  The third element the

22   government must prove is that the defendant committed

23   the offenses in the underlying series of violations in

24   concert with five or more other persons.  The phrase "in

25   concert with five or more other persons" requires an

1    agreement by the defendant, whether direct or indirect,

2    with at least five other persons who were involved in

3    the continuing series of narcotics violations.  To prove

4    that the defendant acted in concert with five or more

5    other persons does not require proof that the five or

6    more other persons actually had contact with each other,

7    knew each other, or committed each violation together,

8    or operated together continuously at the same time.

9    Proof is not required that the organization,

10   supervision, or management of five or more persons

11   occurred at the same time.

12           In addition, you do not have to agree

13   unanimously on the identities of the five people with

14   whom the defendant acted in concert.  All twelve jurors

15   do not have to agree that the defendant acted in concert

16   with the same five people so long as each juror is

17   independently satisfied that the government has proven

18   beyond a reasonable doubt that the defendant acted in

19   concert with some collection of five or more other

20   persons and that the defendant and at least five or more

21   other persons were part of an agreement or a joint

22   action to commit the series of violations alleged by the

23   government.

24           Element four.  The fourth element the

25   government must prove is that the defendant acted as an

1    organizer, supervisor, or manager of the five other

2    persons with whom he acted in concert.

3            The terms "organizer," "supervisor," and

4    "manager" are to be given their usual and ordinary

5    meanings.  These words imply the exercise of power or

6    authority by a person who occupies some position of

7    management or supervision.  Such person need not be the

8    sole or only organizer, supervisor, or manager of the

9    activities or persons in question.

10           Element five.  The fifth element the

11   government must prove is that the defendant obtained

12   substantial income or resources from the series of

13   violations.  The phrase "obtain substantial income or

14   resources" is also to be given its usual and ordinary

15   meaning.  The statute requires proof that the income or

16   resources obtained by the defendant from the activity

17   must be significant and not trivial.  But it is not

18   limited to profit and includes gross income or gross

19   receipts.  The term "substantial income or resources"

20   may include money and other things of value.

21           When you retire to the jury room to

22   deliberate, you may take with you this charge and the

23   exhibits admitted into evidence.  You will also take

24   with you a form on which to record your verdict.

25           In addition, you will be able to view the

1   documentary exhibits in this case through an electronic

2   system called JERS.  J-E-R-S stands for Jury Evidence

3   Recording System.  In your deliberation room is a plasma

4   television.  You will be able to view the exhibits from

5   that plasma television screen.  It is operated by touch.

6   The courtroom deputy will show you a brief tutorial.

7          You should understand that you will also have

8   all the documentary exhibits in paper copy to examine as

9   well.  The JERS system is simply another way for you to

10  review the exhibits.  The advantage is that you can all

11  see an exhibit on the screen and discuss it while seeing

12  it displayed on the screen.

13         The principles of law set forth in these

14  instructions are intended to guide you in reaching a

15  fair and just result in this case, which is important to

16  all the parties.  You are to exercise your judgment and

17  common sense without prejudice and without sympathy, but

18  with honesty and understanding.  You should be

19  conscientious in your deliberations and seek to reach a

20  just result in this case because that is your highest

21  duty as judges of the facts and as officers of this

22  court.  Remember also that the question before you can

23  never be:  Will the government win or lose the case?

24  The government always wins when justice is done,

25  regardless of whether the verdict be guilty or not

1   guilty.

2          When you have considered and weighed all of

3   the evidence, you must make one of the following

4   findings with respect to the charge:

5          One, if you have a reasonable doubt as to

6   whether the government has proved any one or more of the

7   elements of the crime charged, it is your duty to find

8   the defendant not guilty.

9          Two, if you find that the government has

10  proved all of the elements of the crime charged beyond a

11  reasonable doubt, then you may find the defendant

12  guilty.

13         The punishment provided by law for the offense

14  charged in the indictment is a matter exclusively within

15  the province of the Court.  It should never be

16  considered by you in any way in arriving at an impartial

17  verdict.

18         You should conduct your deliberations by

19  considering the issues before you in the order described

20  in the verdict form you will take with you into the jury

21  room.  You must begin your deliberations by deciding

22  whether the government has proved beyond a reasonable

23  doubt each of the elements of the conspiracy offense

24  charged in Count 2.  If you have a reasonable doubt as

25  to whether the government has proven any one of those

 1   four elements, then you must find the defendant not

 2   guilty on Count 2 and conclude your deliberations.  That

 3   is because a verdict of not guilty on Count 2 precludes

 4   a guilty verdict on Count 1.  But if you find that the

 5   government has proven all four elements of its

 6   conspiracy charge, then you may find the defendant

 7   guilty of conspiracy.

 8           If you find the defendant guilty of

 9   conspiracy, and if you find that the conspiracy involved

10   marijuana, then you must go on to answer two questions

11   about the weight of the marijuana in this case.  First,

12   using the weight ranges provided on the verdict form,

13   you must determine beyond a reasonable doubt how much

14   marijuana the conspiracy involved.  Then you must

15   determine beyond a reasonable doubt how much marijuana

16   the defendant reasonably foresaw as being involved in

17   the conspiracy.

18           In addition, if you find the defendant guilty

19   of conspiracy, then you must also go on to decide

20   whether the government has proven beyond a reasonable

21   doubt each of the five elements of the continuing

22   criminal enterprise offense charged in Count 1.  If you

23   have a reasonable doubt as to whether the government has

24   proven any one of those five elements, then you must

25   find the defendant not guilty on that count and conclude

your deliberations.  But if you find that the government
has proven all five elements of its continuing
enterprise charge, then you may find the defendant
guilty of the crime charged in Count 1.

When you retire, you should elect one member
of the jury as your foreperson.  That individual will
act very much like a chairperson of a committee, seeing
to it that the deliberations are conducted in an orderly
fashion and that each juror has a full and fair
opportunity to express his or her views, positions, and
arguments.

The verdict must represent the considered
judgment of each juror.  In order to return a verdict,
it is necessary that each juror agree thereto.  Your
verdict must be unanimous.

It is your duty as jurors to consult with one
another and to deliberate with a view to reaching an
agreement, if you can do so without violence to
individual judgment.  Each of you must decide the case
for yourself, but do so only after an impartial
consideration of the evidence in the case with the other
jurors.  In the course of your deliberations, do not
hesitate to reexamine your own views and to change your
opinion if convinced it is erroneous, but do not
surrender your honest conviction as to the weight or

1    effect of the evidence solely based on the opinion of

2    the other jurors or merely for the purpose of returning

3    a verdict.  Remember at all times that you are not

4    partisans.  You are judges, judges of the facts.  Your

5    only interest is to seek the truth from the evidence in

6    the case.

7           If during your deliberations it becomes

8    necessary to communicate with me, please give a written

9    message to the court security officer who will bring it

10    to me.  I will then respond as promptly as possible,

11    either in writing or by meeting with you in the

12    courtroom.  I will always first show the attorneys your

13    question and my response before I answer your question.

14    This procedure for asking questions in written form also

15    applies to any questions you might have concerning the

16    JERS system, even if your question pertains to obtaining

17    technical assistance with the system.

18           The evidence of contraband, including guns,

19    ammunition, marijuana, and MDMA will be available for

20    your review if you request it.

21           Now, this is very important, you must never

22    disclose to anyone, including the Court, how the jury

23    stands, numerically or otherwise, on the matters you are

24    deciding until after you have reached a unanimous

25    verdict or have been discharged.  In other words, if the

1   jury is split, say, six to six on some issue, the

2   existence of that split or the number on one side or the

3   other must not be disclosed to anyone, including me.

4            If we recess during your deliberations, you

5   must follow all the instructions I have given you

6   concerning your conduct during the trial.  In

7   particular, do not discuss the case with anyone other

8   than your fellow jurors in the jury room when everyone

9   is present.

10           You were permitted to take notes during this

11  trial, and I want to remind you of the instructions I

12  gave you about your notes.  Do not use your notes as

13  authority to persuade other jurors.  Your notes should

14  be used only as aids to your own memory, and must not be

15  used as authority to persuade the other jurors of what

16  the evidence was during the trial.  In the end, each

17  juror must rely on his or her own recollection or

18  impression as to what the evidence was.

19           You are each going to have a paper copy of my

20  jury instructions to take with you into the jury room.

21  Attached to your individual copy of the jury

22  instructions is a copy of the verdict form.  The verdict

23  form is self-explanatory and contains all the questions

24  you need to answer as well as step-by-step instructions.

25  Read that verdict form carefully and follow the

1    instructions on it.  The verdict form is consistent with

2    the instructions I have just given to you.  Feel free to

3    consult the paper copy of the jury instructions as you

4    deliberate.  After you have reached your unanimous

5    verdict, your foreperson must complete, sign, and date

6    the official verdict form.  The official verdict form

7    will be given to you with an envelope and will be marked

8    with the word "original" at the top of the form.  After

9    you have reached a verdict, you are not required to talk

10   to anyone about the case unless I direct you to do so.

11          Let me once again tell you that nothing said

12   in these instructions is intended to suggest in any way

13   what your verdict should be.  The verdict is the

14   exclusive responsibility of the jury, not the judge.

15          When you have arrived at a verdict, notify the

16   court security officer and you will be brought back into

17   the courtroom where the foreperson will render the

18   verdict orally.

19          Does counsel need to approach for any reason.

20          MS. OLLILA:  No, your Honor.

21          MR. SHEKETOFF:  No, your Honor.

22          THE COURT:  Now, I've got to explain to you,

23   there are obviously 14 of you, but there are only 12

24   members of the deliberating jury, and so two of you will

25   be selected as alternate jurors.  I have a very fancy

1    way of doing this.  It's random.  I am going to pick --

2    I have the numbers 1 through 14 because there are 14 of

3    you in the jury box, and I'm going to pick out randomly

4    the numbers to select the alternates.

5         Now, remember, alternates, if you are so

6    named, you are still members of this jury.  You must

7    still follow all of my instructions, which means you may

8    not talk to anyone else at all about the case.  You

9    can't do research about it.  All the instructions that

10   I've given you throughout still pertain.

11        Now, if you are selected as an alternate, it's

12   your decision, you may remain here and we'll find a

13   place for you to remain or you may actually leave.  You

14   need to first, before you leave, give my courtroom

15   deputy your cellphone number or contact info so we can

16   contact you immediately, because if something, God

17   forbid, happens and we have to replace one of our

18   deliberating jury, then you will return and you will

19   come back to the jury.  The jury actually starts

20   deliberating fresh if an alternate is brought back.  You

21   start again, and I will give you instructions on that,

22   but you are still a member of the jury.  You are just

23   not one of the 12 deliberating.  Okay?

24        Now, if you are selected as an alternate, two

25   of you will be, you will then go into the deliberating

1    room to gather and retrieve your belongings and then the

2    jury of 12 will remain.  You do not begin deliberating,

3    discussing anything, until the two alternates have left

4    and the two alternates will then decide what you want to

5    do and tell my courtroom deputy, give my courtroom

6    deputy your contact info.

7                So now I will randomly select.  Juror No. 9.

8    Juror No. 12.

9                Okay.  So Juror No. 9 and Juror No. 12 are the

10   two alternates.

11               Now, if the court security officer could be

12   sworn.

13               THE CLERK:  Please raise your right hand.

14               (Court security officer duly sworn.)

15               THE COURT:  All right.  The jury may begin

16   deliberating after the two alternates have left.  Thank

17   you.

18               (Jury deliberations began at 12:25 p.m.)

19               (Jury adjourned deliberations at 3:40 p.m.)

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3          I, Diane M. Churas, do hereby certify that the

4   foregoing transcript is a true and accurate

5   transcription of the within proceedings, to the best of

6   my knowledge, skill, ability and belief.

7

8

9   Submitted: 4/14/16     _____

10                         **DIANE M. CHURAS, LCR, CM**
                           LICENSED COURT REPORTER, NO. 16
11                         STATE OF NEW HAMPSHIRE

12

13

14

15

16

17

18

19

20

21

22

23

24

25